# United States Court of Appeals

*for the*

# Third Circuit

Case No. 24-1593

ANDY KIM, in his personal capacity as a candidate for U.S. Senate; ANDY KIM FOR NEW JERSEY; SARAH SCHOENGOOD; SARAH FOR NEW JERSEY; CAROLYN RUSH; CAROLYN RUSH FOR CONGRESS,

– v. –

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM AN INTERLOCUTORY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, CASE NO. 3:24-CV-01098-ZNQ-TJB, DISTRICT JUDGE: HONORABLE ZAHID N. QURAISHI

**BRIEF ON BEHALF OF DEFENDANTS-APPELLANTS JOSEPH GIRALO, JOHN S. HOGAN, JOSEPH RIPA, RITA M. ROTHBERG, CELESTE M. RILEY, CHRISTOPHER J. DURKIN, JAMES M. HOGAN, MARY H. MELFI, PAULA SOLLAMI COVELLO, NANCY J. PINKIN, CHRISTINE GIORDANO HANLON, ANN GROSSI, DANIELLE IRELAND-IMHOF, STEVE PETER, JOANNE RAJOPPI, IN THEIR OFFICIAL CAPACITIES AS CLERKS OF ATLANTIC, BERGEN, CAMDEN, CAPE MAY, CUMBERLAND, ESSEX, GLOUCESTER, HUNTERDON, MERCER, MIDDLESEX, MONMOUTH, MORRIS, PASSAIC, SOMERSET AND UNION COUNTIES, NEW JERSEY IN SUPPORT OF EMERGENCY MOTION FOR A STAY PENDING APPEAL**

JASON C. SPIRO
ERIC H. JASO
SPIRO HARRISON & NELSON
*Attorneys for Defendant-Appellant*
  *Christine Giordano Hanlon, in her*
  *official capacity as Monmouth*
  *County Clerk*
200 Monmouth Street, Suite 310
Red Bank, New Jersey 07701
(732) 784-1470

ANGELO J. GENOVA
JENNIFER BOREK
DANIEL LEBERSFELD
GENOVA BURNS LLC
*Attorneys for Defendants-Appellants*
  *Christopher J. Durkin, in his official*
  *capacity as Essex County Clerk and*
  *Joanne Rajoppi, in her official*
  *capacity as Union County Clerk*
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (328773)

CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk; SCOTT M. COLABELLA, in his official capacity as Ocean County Clerk; PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk; MARY H. MELFI, in her capacity as Hunterdon County Clerk; STEVE PETER, in his official capacity as Somerset County Clerk; HOLLY MACKEY, in her official capacity as Warren County Clerk; NANCY J. PINKIN, in her official capacity as Middlesex County Clerk; JOSEPH J. GIRALO, in his official capacity as Atlantic County Clerk; JOHN S. HOGAN, in his official capacity as Bergen County Clerk; JOANNE SCHWARTZ, in her official capacity as Burlington County Clerk; JOSEPH RIPA, in his official capacity as Camden County Clerk; RITA ROTHBERG, in her official capacity as Cape May County Clerk; CELESTE M. RILEY, in her official capacity as Cumberland County Clerk; CHRISTOPHER J. DURKIN, in his official capacity as Essex County Clerk; JAMES N. HOGAN, in his official capacity as Gloucester County Clerk; E. JUNIOR MALDONADO, in his official capacity as Hudson County Clerk; ANN GROSSI, in her official capacity as Morris County Clerk; DANIELLE IRELAND-IMHOF, in her official capacity as Passaic County Clerk; JOANNE RAJOPPI, in her official capacity as Union County Clerk; LAURA ALI; CAMDEB COUNTY DEMOCRATIC COMMITTE; DALE CROSS, in his official capacity as Salem County Clerk; JEFF PARROTT, in his official capacity as Sussex County Clerk; NEW JERSEY SECRETARY OF STATE

JOSEPH GIRALO, JOHN S. HOGAN, JOANNE SCHWARTZ, JOEPH RIPA , RITA M. ROTHBERG, CELESTE M. RILEY, CHRISTOPHER J. DURKIN, JAMES M. HOGAN, E. JUNIOR MALDONADO, MARY H. MELFI, PAULA SOLLAMI COVELLO, NANCY J. PINKIN, CHRISTINE GIORDANO HANLON, ANN GROSSI, DANIELLE IRELAND-IMHOF, STEVE PETER, JOANNE RAJOPPI,

*Appellants.*

---

JOHN M. CARBONE
CARBONE & FAASSE
*Attorneys for Defendants-Appellants Mary H. Melfi, in her official capacity as Hunterdon County Clerk, Joseph J. Giralo in his official capacity as Atlantic County Clerk, Celeste M. Riley, in her official capacity as Cumberland County Clerk, James N. Hogan, in his official capacity as Gloucester County Clerk, Rita Rothberg, in her official capacity as Cape May County Clerk*
401 Goffle Road
PO Box 763
Ridgewood, New Jersey 07451
(201) 445-7100

LOUIS N. RAINONE
RAINONE COUGHLIN MINCHELLO
*Attorneys for Defendant-Appellant Paula Sollami Covello, in her official capacity as Mercer County Clerk*
555 U.S. Highway One South, Suite 440
Iselin, New Jersey 08830
(732) 709-4182

RICHARD K. WILLE, JR.
WILENTZ, GOLDMAN & SPITZER, P.A.
*Attorneys for Defendant-Appellant Steve Peter in his official capacity as Somerset County Clerk*
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
(732) 855-6056

KIRSTIN BOHN
CHASAN LAMPARELLO MALLON
& CAPPUZZO, PC
*Attorneys for Defendant-Appellant*
*Ann Grossi in her official capacity*
*as Morris County Clerk*
300 Harmon Meadow Boulevard
Secaucus, New Jersey 07094
(201) 348-6000

MICHAEL S. WILLIAMS
MIDDLESEX COUNTY OFFICE COUNTY
COUNSEL
*Attorneys for Defendant-Appellant*
*Nancy J. Pinkin in her official*
*capacity as Middlesex County*
*Clerk*
75 Bayard Street
New Brunswick, New Jersey 08901
(732) 745-3228

RAJIV D. PARIKH
KATHLEEN BARNETT EINHORN
PEM LAW LLP
*Attorneys for Defendant-Appellant*
*Danielle Ireland-Imhof in her*
*official capacity as Passaic County*
*Clerk*
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
(973) 577-5500

HOWARD LANE GOLDBERG
OFFICE OF CAMDEN COUNTY COUNSEL
*Attorneys for Defendant-Appellant*
*Joseph Ripa in his official capacity*
*as Camden County Clerk*
520 Market Street
Courthouse – 14th Floor
Camden, New Jersey 08102
(856) 225-5543

THOMAS A. ABBATE
DECOTIIS, FITZPATRICK, COLE
& GIBLIN, LLP
*Attorneys for Defendant-Appellant*
*John S. Hogan in his official*
*capacity as Bergen County Clerk*
61 South Paramus Road, Suite 250
Paramus, New Jersey 07652
(201) 928-1100

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ........................................................................1

STATEMENT OF THE CASE/PROCEDURAL POSTURE .................................3

JURISDICTION ..........................................................................5

STANDARD OF REVIEW .................................................................5

FACTUAL BACKGROUND ................................................................5

ARGUMENT.............................................................................12

    I.    THE PRELIMINARY INJUNCTION VIOLATES
        THE PURCELL PRINCIPLE ...........................................12

    II.   THE STATE INTERESTS OUTWEIGH THE HARM
        TO THE CANDIDATES ................................................17

CONCLUSION ..........................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ....................................................................17, 18

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ...........................................................................13

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ...........................................................................18

*Democratic Nat'l Comm. v. Wisc. State Legislature*,
  141 S. Ct. 28 (2020) ...........................................................................13

*Democratic-Republican Org. v. Guadagno*,
  900 F. Supp. 2d 447 (2012) ................................................................19

*Eu v. San Francisco County Democratic Cent. Committee*,
  489 U.S. 214 (1989) .....................................................................19, 20

*Frank v. Walker*,
  574 U.S. 929 (2014) ...........................................................................12

*Lara v. Comm'r Pa. State Police*,
  91 F.4th 122 (3d Cir. 2024) ................................................................. 5

*Mazo v. New Jersey Sec'y of State*,
  54 F.4th 124 (3d Cir. 2022) ...............................................................18

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ..................................................................*passim*

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) .......................................................................*passim*

*Quaremba v. Allan*,
  67 N.J. 1 (1975), affirming and modifying 128 N.J. Super 570
  (App. Div. 1974) ................................................................................19

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020) .................................................................12, 13

ii

*Revel AC, Inc. v. IDEA Boardwalk LLC*,
   802 F.3d 558 (3d Cir. 2015) .................................................................. 5

*Schrader v. DA of York Cnty.*,
   74 F.4th 120 (3d Cir. 2023) .................................................................. 5

*Thompson v. Dewine*,
   959 F.3d 804 (6th Cir. 2020) ........................................................... 13, 16

*Veasey v. Perry*,
   574 U.S. 951 (2014) ............................................................................ 12

*Voltaggio v. Caputo*,
   210 F. Supp. 337 (D.N.J. 1962) ......................................................... 19

**Statutes and Other Authorities:**

U.S. Const., amend. I ............................................................... 1, 14, 19, 20

U.S. Const., amend. XIV ...................................................................... 19

28 U.S.C. § 1292(a)(1) ......................................................................... 5

28 U.S.C. § 1331 .................................................................................. 5

Fed. R. App. P. 8 .................................................................................. 5

N.J.S.A. 19:23-26.1 ............................................................................ 18

N.J.S.A. 19:32-53 ................................................................................. 8

N.J.S.A. 19:49-2 ............................................................................ 18, 19

N.J.S.A. 19:63-9 .................................................................................. 6

## **INTRODUCTION**

Only one week before April 5, 2024, the statutory deadline for New Jersey's County Clerks (among the appellants here) to print ballots for the upcoming primary elections for federal and state offices, the District Court issued a blanket injunction sought by a leading (and now the presumptive) Democratic candidate for U.S. Senate, disrupting 70 years of State statutes and precedents governing ballot design. Based largely on one candidate's self-serving testimony and that of "experts" who had no experience in New Jersey elections, the District Court held that candidates who failed to win the endorsement of county political parties were either relegated to "ballot Siberia" or forced to associate by ballot placement with other endorsed candidates, both in violation of the First Amendment. Disregarding the testimony and averments of the County Clerks that an eleventh-hour change would wreak havoc and was logistically infeasible, as well as a certification of ES&S, the election software and equipment vendor for a number of the counties, that it could not guarantee the implementation of the changes sought by Plaintiffs to meet certain statutorily imposed deadlines, the Court concluded that New Jersey's interests in employing its longstanding ballot design for the imminent 2024 primary elections were "not especially compelling."

At a minimum, the District Court's injunction flies in the face of the Supreme Court's *Purcell* principle, which one Justice has aptly describes as a "bedrock tenet of election law":

> When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill v. Milligan*, 142 S. Ct. 879, 880-881 (2022) (Kavanaugh, *J*., concurring).   The District Court gave *Purcell* short shrift, concluding that "this case is not last-minute" because the election is on June 4, ignoring the fact that the 2024 primary election process is well underway, with ballot printing taking place on April 5 and mail-in balloting on April 20.

Further, the District Court granted this extraordinary relief after a nearly one-sided evidentiary hearing in which the Defendant Clerks (most of whom are appellants here) were unable to call rebuttal experts or procure the live testimony of critical fact witnesses.   In doing so, the Court largely ignored and inexplicably discounted the testimony and certifications of the County Clerks charged with administering New Jersey election laws on the issues that the Clerks know best – particularly as to the feasibility of radically changing statewide ballot design on the eve of the deadline for ballot printing without "chaos" ensuing.   The Court's assurances that its Order "can and should be enforced without disrupting the upcoming election" unfortunately ring hollow and defy both common sense and the extensive evidence in the record.   Indeed, the Court's follow-up Order -- "clarifying" that the injunction applies *only to Democratic*

*primary ballots* and not to Republican ballots (which the same machines will need to count on the same election day) baldly illustrates the predictable confusion wrought by this ill-considered, eleventh-hour edict.

## STATEMENT OF THE CASE/PROCEDURAL POSTURE

On February 26, 2024, Plaintiffs Andy Kim, Andy Kim for New Jersey, Sarah Schoengood, Sarah for New Jersey, Carolyn Rush, and Carolyn Rush for Congress (collectively "Plaintiffs") filed a Verified Complaint against numerous New Jersey County Clerks. (ECF Dkt. 1). The Verified Complaint challenges the constitutionality of New Jersey laws that dictate the design of the ballot in primary elections. *Id.* Also on February 26, 2024, Plaintiffs filed an application for a preliminary injunction enjoining Defendants from utilizing the legally authorized ballot design in the 2024 Democratic primary election. (ECF Dkt. 5).

On February 29, 2024, the District Court held a scheduling conference before Judge Zahid Quraishi after which the Court issued an Order requiring all opposition briefs to be filed by March 6, 2024. (ECF Dkt. 34). On March 4, 2024, the Camden County Democratic Committee filed a motion to intervene, which was subsequently granted. (ECF Dkt. 121). The District Court held a hearing on March 18, 2024 at which it heard the testimony of seven witnesses. (*See* ECF Dkt. 159). On March 26, 2024, the District Court held an emergency conference during which it discussed additional submissions by the parties related to First Lady Tammy Murphy's withdrawal

3

from the Senate race and Plaintiff Andy Kim's subsequent procurement of several county endorsements.  (*See* ECF Dkt.  185).

On March 29, 2024, Judge Zahid Quraishi issued his opinion (ECF Dkt. 194), granting the Plaintiffs' motion for a preliminary injunction. Judge Quraishi also issued an Order (ECF Dkt. 195) enjoining Defendants from preparing, disseminating, using, displaying, or counting any ballot that is (i) designed by columns or rows, rather than by office sought, (ii) positions candidates on the ballot automatically based upon a ballot draw among candidates for a different office, (iii) places candidates such that there is an incongruous separation from other candidates running for the same office, (iv) places candidates underneath another candidate running for the same office, where the rest of the candidates are listed horizontally, or to the side of another candidate running for the same office, where the rest of the candidates are listed vertically, and (v) bracketing candidates together on the ballot such that candidates for different offices are featured on the same column (or row) of the ballot.

Also on March 29, 2024, Defendants filed an emergency motion to stay and a notice of interlocutory appeal (ECF Dkt.  198, 200). The Morris County Republican Committee requested confirmation that the Order applies only to the Democratic primary and not the Republican primary (ECF Dkt. 196). The District Court subsequently clarified that the Order does not apply to the Republican primary.  (ECF

Dkt. 207). The District Court denied the emergency motion to stay on April 1, 2024. (ECF Dkt. 219).

## JURISDICTION

This Court has jurisdiction to review the grant of a preliminary injunction under § 1292(a)(1). *Schrader v. DA of York Cnty.*, 74 F.4th 120, 124 (3d Cir. 2023). The District Court had jurisdiction over this Constitutional challenge pursuant to 28 U.S.C. § 1331. *Id.* The Clerks complied with FRAP 8 by moving for an emergency stay before the District Court the same day the injunction was granted, which motion was denied.

## STANDARD OF REVIEW

In considering whether to grant a stay pending appeal, this Court will consider four factors:

> (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest.

*Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 565 (3d Cir. 2015).

This Court will review the District Court's findings of fact for clear error and its decision to grant the injunction *de novo. Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 128 n.5 (3d Cir. 2024). The Court will consider the Constitutional issues *de novo. Id.*

## FACTUAL BACKGROUND

Plaintiff Andy Kim announced his candidacy for U.S. Senate in September 2023. (Tr. 167: 10-11). Even before he announced his candidacy, he raised concerns about

ballot bracketing. (Tr. 211:18-21).[1] Yet, he waited until February 26, 2024 to file this lawsuit.    On January 21, 2024, Sarah Schoengood announced her candidacy for Representative of the 3rd Congressional District.    Because she filed two days after the Monmouth County Democratic Committee's deadline for filing an intent to seek endorsement at the Monmouth County Democratic Convention, Schoengood foreclosed herself from appearing on the county line. (Pl. Br. at 14).  [2] On February 12, 2023, Carolyn Rush announced her candidacy for Representative of the 2nd Congressional District, over one year before filing this action. Rush was also a candidate for the same seat in the 2022 Democratic Primary election and faced these same issues with the county line. (Complaint at ¶ 159).

The primary election, while ostensibly held on June 4, 2024, begins much earlier on April 20, 2024, when mail-in ballots are mailed according to a statutorily prescribed timeline. *See N.J.S.A.* 19:63-9. Monmouth County Clerk Christine Hanlon, who is responsible for the preparation of the ballots, submitted a certification and testified to the schedule that clerks are required to follow.  Ballot preparation begins even sooner than April 20: less than a month before, Republican and Democratic candidates must file petitions seeking their party's nomination on March 25, 2024. (Hanlon Cert. at ¶

---

[1] "Tr." refers to the Transcript from the March 18, 2024 hearing.
[2] "Pl. Br." refers to Plaintiffs' Brief in Support of their Motion for Preliminary Injunction filed on February 26, 2024. *See* ECF 5-1.

12)[3]. Within 48 hours after the March 25, 2024 petition filing deadline, candidates seeking to bracket with other candidates and use slogans to signify their association with one another must submit these requests. (*Id*. at ¶ 13). Statute, not political party organizations, controls the bracketing process. Any candidate can form a bracketed slate with the slogan of their choice by securing at least 100 signatures on a petition for a County Commissioner candidate. (*Id*. at ¶ 14).

Sixty-one days prior to election day, on April 4, 2024, the County Clerk must conduct the drawing to determine final ballot positions for primary election candidates. (*Id*. at ¶ 16). By April 4, most, if not all of the candidate information and the offices being contested must be entered into spreadsheets and elections management software's database. (*Id*. at ¶ 17). Primary election ballots must be prepared for printing 60 days before election day, or April 5, 2024. (Id. at ¶ 19). In order to meet federal and state deadlines for the mailing of mail-in ballots and to allow sufficient time for programming of the counties' elections management software, changes cannot be made to the ballot after April 5, 2024. (*Id*.). All mail-in ballots for the primary election must be mailed by April 20, 2024. (*Id*. at ¶ 28).

The preparation of the ballots requires a significant amount of work by the offices of the county clerks. In Monmouth County, for instance, the Clerk's office has only six

---

[3] "Hanlon Cert." refers to the Certification of Christine Giordano Hanlon dated March 6, 2024.  (ECF Dkt. # 61-2).

employees, and by early March, is already collecting information from the municipal clerks from the county's 53 municipalities. (*Id*. at ¶ 6,11). The Monmouth County Clerk must design, program, print, and mail 948 separately designed ballots for its 474 separate election districts, which contain more than 2,000 candidate names. (*Id*. at ¶¶ 10, 11). In preparing the ballots, the county clerks rely upon the elections management software that is programed to create the ballot; the County Superintendent in those counties that have one also rely upon this software to program the voting machines. (*Id*. at ¶ 21). The Superintendent has custody of the voting machines and is required to maintain them. *N.J.S.A*. 19:32-53. The Board of Elections is responsible for canvassing the mail-in ballots, and maintains optical scanners that must be programmed to conduct the canvassing. (Hanlon Cert. at ¶ 21). Clerk Hanlon testified that an office-block ballot has never been used in a primary election in Monmouth County, and that a column-and-row ballot has always been used in accordance with the statute, contrary to the claims of one of Plaintiffs' experts. (Tr. 350:21-25, 352:1-21).

Counties use various voting machines that have been approved by the State, including Dominion and Election Systems & Software ("ES&S") ExpressVote XL machines. Monmouth County, for instance, uses ES&S ExpressVote XL machines, which have been coded and certified by the Secretary of State in accordance with existing New Jersey law. (*Id*. at ¶ 24). In 2022 and 2023, as Benjamin R. Swartz, Principal State Certification Manager for ES&S, affirmed, the New Jersey Secretary of

State certified the ExpressVote XL machines and software. (ES&S Aff. March 4, 2024 at ¶ 6)[4]. The ExpressVote XL system used in New Jersey was certified and tested using the statutorily authorized ballot design style, not an office-block style. (*Id.* at ¶ 8). Swartz further affirmed that any deviations from the column-and-grid style previously used would have to be evaluated to determine feasibility, and that depending on the layout style requirements, any changes would require developing, testing, and certification of a new and/or updated version of software. (*Id.*). Notably, Swartz stated that, "Such deviations could not be made and implemented prior to New Jersey's 2024 primary elections." (*Id.*).

On March 18, 2024, ES&S's Benjamin Swartz submitted a supplemental affidavit. He advised that, "With any significant ballot design change, such as the one proposed in this lawsuit, we would have to conduct extensive internal accuracy testing." (ES&S Aff. March 18, 2024 at ¶ 8).[5] He estimated, based on his knowledge and experience, that testing would require two weeks. (*Id.* at ¶ 9). He advised that Ryan Macias, an expert hired by Plaintiff, was mistaken in stating "with certainty that the machines would not have to be re-certified by the New Jersey Division of Elections." (*Id.*). Notably, Swartz affirmed that, "In saying that the voting systems would not need

---

[4] "ES&S Aff. March 4, 2024" refers to the Affidavit of Benjamin R. Swartz dated March 4, 2024 and filed with the District Court on March 6, 2024.  (*See* ECF Dkt. 46).

[5] "ES&S Aff. March 18, 2024" refers to the Affidavit of Benjamin R. Swartz dated March 18, 2024.  (ECF Dkt. # 151).

to be retested or the voting system would not require recertification. Mr. Macias is ignoring the risk of tabulation errors any time a ballot layout is re-designed or deviated from what was demonstrated during the voting system certification or the established ballot layout practices currently done in New Jersey." (*Id*. at ¶ 13). He also added that if re-certification was required, that process would take an additional one to three months. (*Id*. at ¶ 17). Similarly, Union County Clerk Joanne Rajoppi submitted a statement stating that Union County's ES&S Account Manager said that changes may or may not require recertification, and that she could not be certain without knowing what the exact changes would be. (Rajoppi Declaration (ECF Dkt 166-1) at ¶ 6).

At the March 18, 2024 hearing, Ryan Macias, owner of RSM Election Solutions LLC, an expert called to testify by Plaintiffs, claimed that he could confidently say that the changes can be made in time for the election, but admitted on cross that none of his ten-plus years of experience occurred in New Jersey. (Tr. 144: 7-16). Dr. Andrew Appel, Professor of Computer Science at Princeton University, a self-described expert in the field of voting machines (Tr. 295:20-22) who also testified on behalf of Plaintiffs, claimed in his initial expert report that he had never seen ExpressVoteXL create an office-block ballot, but then suddenly submitted a supplemental report claiming that two New Jersey ExpressVote XL ballots each included one contest using an office-block style. At the March 18, 2024 hearing, however, he admitted on cross examination that he had never seen an ExpressVote XL ballot that had an office-block layout for every

contest. (Tr. 298:18-20). He also admitted he has not personally physically examined ES&S software, nor ever used it (Tr. 297:1-2; 298:21-23).

Clerk Hanlon testified as to the limitations that she has observed as County Clerk for nine years. She described the interaction between mail-in paper ballots and the machine ballots, noting that there is a limit in terms of what can be placed on mail-in ballots because it impacts the voting machines, and there are size constraints on the voting machine ballots. (Tr. 353:18-354:10). She also explained that there must be sufficient time to test the machine ballots. (Tr. 356:2-24). Importantly, the machine ballots must be ready by May 22, 2024 due to early voting, not June 4. (Tr. 356:25-357:7). Clerk Hanlon further testified that she had spoken to the printer used by Monmouth County, who conveyed that using an office-block ballot style for the primary was "uncharted territory." (Tr. 359:4-23). Clerk Hanlon also expressed concern that she needs to place up to ten races on each ballot, and it is unclear if there would be sufficient room on the ballot even if an office-block style could be accommodated. (Tr. 361:7-24). Notably, Clerk Hanlon referred to her conversation with ES&S about changing the ballot style, to which they responded, "No, that would be bad." (Tr. 361:25-362:24).

Additionally, Clerk Hanlon testified as to the guidance that county clerks would need if the preliminary injunction were granted. She noted that she didn't know how the statute would operate if bracketing were removed. (Tr. 363:4-364:9). And, if the machines could not be utilized, she would need some authority telling her what do to,

similar to the Executive Order in 2020. For example, if the election were to be conducted via paper ballots at the polling sites because the machines could not accommodate office-block ballots, a framework would be required to ensure that proper custody and control procedures were utilized. (Tr. 364:14-365:25). The March 29, 2024 Order does not provide such a framework.

Lastly, the District Court advised that the March 29, 2024 Order applies only to the Democratic Primary, not the Republican Primary. (ECF Dkt. 207). As a result, County Clerks must determine whether the voting software and machines can accommodate two different ballot styles concurrently.

## ARGUMENT

## I. THE PRELIMINARY INJUNCTION VIOLATES THE PURCELL PRINCIPLE

The Supreme Court's "*Purcell* Principle" holds that "[f]ederal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006), *Frank v. Walker*, 574 U.S. 929 (2014) and *Veasey v. Perry*, 574 U.S. 951 (2014)). "Court orders affecting elections, *especially conflicting orders*, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4-5 (emphasis added). The Purcell Principle "reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v.*

*Milligan,* 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring).  Accordingly, the Court discourages injunctions -- even those that "tinker[] with" a State's electoral processes "in the period close to an election" -- all the more so those which wholly upend them as here.  *Id.* at 881; *see also Republican Nat'l Comm.*, 140 S. Ct. at 1207; *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020); *Benisek v. Lamone*, 585 U.S. 155, 160-61 (2018).  As the Sixth Circuit observed in staying a District Court's "rewriting Ohio law with its injunction" *six months* before the 2020 election, "a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves.  This is exactly why we must heed the Supreme Court's warning that federal courts are not supposed to change state election rules as elections approach." *Thompson v. Dewine*, 959 F.3d 804, 812, 813 (6th Cir. 2020).  Yet the District Court gave short shrift to this "bedrock tenet," discussing it in a single paragraph, and distinguishing the *Purcell* line of cases (wrongly) on the ground that "this case is not last-minute."

In his *Merrill* concurrence, Justice Kavanaugh distilled the Purcell Principle into a four-part test to assess the validity of injunctive relief granted in the runup to an election. The plaintiff must have established "at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the

election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881. The Clerks respectfully submit that the Plaintiff Candidates in this case failed to establish any of these, much less all of them, and that the Purcell Principle commands that the Preliminary Injunction be stayed pending appeal.

*First*, regardless of what this Court might ultimately decide on the merits, they are far from "entirely clearcut" in the Candidates' favor, particularly considering these election laws have stood for over seventy years (and somehow still stand with respect to the Republican primary election). The District Court's Opinion demonstrates as much. The Court based its finding that "Plaintiffs have shown a severe burden on their First Amendment rights" on the testimony and reports of two experts (who have no experience with New Jersey elections) to conclude respectively that "candidates placed in an early position on a ballot receive a distinct advantage" and that "the county-line provides a substantial benefit . . . over and above candidates that are merely endorsed by a county [organization]." Op. at 31, 32. Yet these conclusions plainly were bootstrapped, though the District Court clothed them in the garb of credibility findings, perhaps to gird them for appellate review. The District Court acknowledged that one expert, Dr. Pasek, "assess[ed] four competing studies that called into question th[e] primacy effect" but "[f]or various reasons the Court finds are sound, he conclude[d] that those competing studies are less credible." Op. at 31. Similarly, the District Court noted that Plaintiffs' expert Dr. Rubin responded to cross-examination questioning "whether

14

she had adequately accounted for other potential causes of the [primacy] effect" by "emphasiz[ing] that her analysis was statistically descriptive, and that she saw a pattern of the county-line having a consistent positive effect on the race results." Op. at 32. These transparently subjective conclusions, however credible the District Court found them, are far from "entirely clearcut" in Plaintiffs' favor.

*Second*, the Candidates will not suffer irreparable harm absent this Injunction. Now that Candidate Kim's most prominent opponent has dropped out of the Senate race, he is the presumptive Democratic nominee and thus will not be penalized by bracketed ballots. The Candidates' purported remaining harm – that the brackets force their political association with other endorsed candidates – is a thin reed upon which to upend seventy years of election law and process.

*Third*, by (among other things) ignoring the imminent April 5 ballot-printing deadline and the soon-approaching April 20 start to mail-in balloting, the District Court erred in concluding that the Candidates did not unduly delay prosecuting their Constitutional challenge. Candidate Kim declared his run in September 2023 and had already retained counsel by year's end – the same counsel who since 2020 has represented other parties *before the same District Judge* challenging *the same bracketed ballots* as unconstitutional. The District Court's assurances that the Clerks have plenty of time to undo 70 years of ballot procedure is simply contrary to the bulk of the

evidence in this record, and ultimately defies common sense.  As the Sixth Circuit

observed in staying an injunction issued *six months* before a general election:

> Here, the November election itself may be months away but important,
> interim deadlines that affect Plaintiffs, other ballot initiative proponents,
> and the State are imminent. And moving or changing a deadline or
> procedure now will have inevitable, other consequences.

*Thompson*, 959 F.3d at 813.  The District Court either ignored or wrongly disregarded

those "imminent" "important, interim deadlines." *Id*.

*Fourth*, the Clerks presented ample evidence (which the District Court

improperly discounted or ignored) that changing the ballots – as the Court "clarified,"

*only the Democratic ballots* – will not be feasible (or even possible), and will certainly

result in "significant cost, confusion, [and] hardship."  *Merrill*, 142 S. Ct. at 881.

Among other things, the Clerks presented evidence that ES&S and Dominion, the two

companies providing voting machines and ballot-counting software to New Jersey

counties, cannot process the multi-column and/or multi-page office-block ballots that

the Injunction may require.  (*See* ECF Dkt. 46, 63-1, 151).

In sum, as the Supreme Court did in *Merrill*, "practical considerations sometimes

require courts to allow elections to proceed despite pending legal challenges."  *Id*. at

882.  As was the case there, this Court may ultimately affirm the District Court on the

constitutional merits, but the sweeping (and at the moment politically one-sided)

changes to New Jersey balloting can and should wait until the general election in

November or beyond.

## II.    THE STATE INTERESTS OUTWEIGH THE HARM TO THE CANDIDATES

The District Court gave the inexplicably short shrift to New Jersey's "interests in providing a manageable and understandable ballot, and ensuring an orderly election process[.]" Op. at 33.  Dismissing seventy years of unassailable elections, the Court pointed to *one* instance of apparent voter confusion in *one* county in *one* election, an incident in the 2020 Democratic primary in Mercer County where a purported one-third of voters were "disenfranchised . . . because they voted for more than one candidate for the same office due to the current ballot systems." *Id*.  That one incident, which occurred during a COVID lockdown election using paper/mail-in balloting, the Candidate's own expert acknowledged was an "anomaly." (Pasek Report, ECF 5-1 ("Pasek Rep."), Exh. B at ¶109).  Omitting that crucial context, the Court concluded that because of that single incident "the State's interests are not especially compelling." *Id*.

More importantly, the District Court's brushoff of the State's proffered interests flies in the face of well-established Supreme Court and Circuit precedent that affords heavy weight and deference to the State.  In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court recognized that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates."  *Id*. at 788. Rather, there must be "a substantial regulation of elections if they are to be fair and honest . . . some sort of order, rather than chaos."  *Id*. (citation omitted).  As the Court acknowledged, any state law

17

governing the election process has at least some effect on "the individual's right to vote and his right to associate with others for political ends," however, "the state's important regulatory interests are generally sufficient to justify *reasonable, nondiscriminatory restrictions*." *Anderson*, 460 U.S. at 788 (emphasis added). In considering the weight of these interests, the Court should be "'quite deferential,'" and must not require "'elaborate, empirical verification of the weightiness of the State's asserted justifications.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 153 (3d Cir. 2022) (citations omitted).

The U.S. Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick v. Takushi*, 504 U.S. 428, 438 (1992). The New Jersey statutes governing balloting are politically neutral and give County Clerks appropriate discretion to design ballots to facilitate voting and vote counting. *N.J.S.A.* 19:23-26.1 provides that "in the case of a primary election for the nomination of a candidate for the office of United States Senator . . . the names of all candidates for the office of United States Senator…shall be printed on the official primary ballot in the first column or horizontal row designated for the part of those candidates." *N.J.S.A.* 19:49-2 provides in relevant part, "in those counties where voting machines are used, the county clerk shall have the authority to determine the specifications for, and the final arrangement of, the official ballots." The statute also provides for candidates to associate with each other, "choose the same designation or

18

slogan" and petition to be "placed on the same line of the voting machine[.]" *Id*. This language, too, is neutral.

The federal courts considering these statutes have upheld them, rejecting identical arguments that candidates listed in the first column on the ballot receive additional votes solely because they are listed in the first column. *See Democratic-Republican Org. v. Guadagno*, 900 F. Supp. 2d at 459; *Voltaggio v. Caputo*, 210 F. Supp. 337, 339 (D.N.J. 1962). Similarly, the New Jersey Supreme Court long ago upheld the constitutionality of these statutes: "[T]here can be no doubt about the authority of the Legislature to adopt reasonable regulations for the conduct of primary and general elections. Such regulations, of course, may control the manner of preparation of the ballot, so long as they do not prevent a qualified elector from exercising his constitutional right to vote for any person he chooses." *Quaremba v. Allan*, 67 N.J. 1, 11 (1975), affirming and modifying 128 N.J. Super 570 (App. Div. 1974).

New Jersey has a legitimate interest in allowing candidates to exercise their freedom of political association by bracketing. *See Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 224 (1989) ("[I]t is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments.") (citation omitted). *Eu* makes clear that States are constitutionally prohibited from enacting election laws that infringe on political parties'

rights to associate. *Eu*, 489 U.S. at 222 ("A State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'").

In contrast, in finding their burden "severe," the District Court gave improper and factually unsupported weight to the Candidates' purported harms, including that such harms would be irreparable. As a Senate candidate, Candidate Kim's ballot position is randomly assigned, so Kim has an equal opportunity to obtain a first column ballot position. Further, he is now the presumptive Democratic nominee. Thus, bracketing has no impact on his chances of receiving first column ballot position and Kim has no equal protection argument relating to access to the first ballot column. Further, the Congressional candidates presented no reliable evidence showing that their appearing in the first versus second or third column of the ballot will significantly impact their election chances.

The Candidates also claimed to be burdened by the "weight of the line," or the placement of party-endorsed candidates in a single column. Plaintiffs' experts acknowledged, however, that any statistical evidence showing an advantage to the "weight of the line" could be attributed to an "endorsement effect" or other political or associational factors. *See, e.g.*, Pasek Rep. ¶ 135 ("[T]his disparate impact suggests that the benefits of county party endorsements likely hinge on features of the contest in which the endorsement takes place.").

Thus, while purporting to relieve constitutional burdens and irreparable harms to the Candidates, the Injunction visits severe burdens and irreparable harms on the Clerks and the State of New Jersey more broadly. Even if the change in the longstanding ballot format did not confuse voters and muck up voting machines (and it will, as the Clerks attested), the District Court's "clarification" that the Injunction applies *only to Democratic primary ballots* will ensure that these ills come to pass. The District Court erred both in fact and in law by deciding that the Candidates' interests outweighed the State's. The erroneous Injunction must be stayed.

## CONCLUSION

For all of the foregoing reasons, this Court should grant a stay of the District Court's order pending appeal.

**GENOVA BURNS LLC**

By: /s/*Angelo J. Genova*
   ANGELO J. GENOVA
   JENNIFER BOREK
   DANIEL LEBERSFELD
   494 Broad Street
   Newark, New Jersey 07102
   *Attorneys for Defendants Christopher J. Durkin, in his official capacity as Essex County Clerk and Joanne Rajoppi, in her official capacity as Union County Clerk*

**SPIRO HARRISON & NELSON**

By: /s/ *Jason C. Spiro*
    JASON C. SPIRO
    ERIC H. JASO
    200 Monmouth Street, Suite 310
    Red Bank, New Jersey 07701
    *Attorneys for Defendant Christine*
    *Giordano Hanlon, in her official*
    *capacity as Monmouth County Clerk*

**RAINONE COUGHLIN MINCHELLO**

By: /s/ *Louis N. Rainone*
    LOUIS N. RAINONE
    555 U.S. Highway One South, Suite 440
    Iselin, New Jersey 08830
    *Attorneys for Defendant Paula Sollami*
    *Covello, in her official capacity as*
    *Mercer County Clerk*

**CARBONE & FAASSE**

By: /s/*John M. Carbone*
    JOHN M. CARBONE
    401 Goffle Road
    PO Box 763
    Ridgewood, New Jersey 07451
    *Attorneys for Defendants Mary H. Melfi,*
    *in her official capacity as Hunterdon*
    *County Clerk, Joseph J. Giralo in his*
    *official capacity as Atlantic County*
    *Clerk, Celeste M. Riley, in her official*
    *capacity as Cumberland County Clerk,*
    *James N. Hogan, in his official capacity*
    *as Gloucester County Clerk, Rita*
    *Rothberg, in her official capacity as*
    *Cape May County Clerk*

**WILENTZ, GOLDMAN & SPITZER, P.A.**

By:/s/ *Richard K. Wille, Jr.*

    RICHARD K. WILLE, JR.
    90 Woodbridge Center Drive
    Suite 900
    Woodbridge, New Jersey 07095
    *Attorneys for Defendant Steve Peter in*
    *his official capacity as Somerset County*
    *Clerk*


**PEM LAW LLP**

By: /s/ *Rajiv D. Parikh*

    RAJIV D. PARIKH
    KATHLEEN BARNETT EINHORN
    1 Boland Drive, Suite 101
    West Orange, New Jersey 07052
    *Attorneys for Defendant Danielle*
    *Ireland-Imhof in her official capacity as*
    *Passaic County Clerk*


**CHASAN LAMPARELLO MALLON & CAPPUZZO, PC**

By:/s/ *Kirstin Bohn*

    KIRSTIN BOHN
    300 Harmon Meadow Boulevard
    Secaucus, New Jersey 07094
    *Attorneys for Defendant Ann Grossi in*
    *her official capacity as Morris County*
    *Clerk*

**OFFICE OF CAMDEN COUNTY COUNSEL**

By: /s/ *Howard Lane Goldberg*
 HOWARD LANE GOLDBERG
 520 Market Street
 Courthouse – 14th Floor
 Camden, New Jersey 08102
 *Attorneys for Defendant Joseph Ripa in his official capacity as Camden County Clerk*

**MIDDLESEX COUNTY OFFICE COUNTY COUNSEL**

By: /s/ *Michael S. Williams*
 MICHAEL S. WILLIAMS
 75 Bayard St.
 New Brunswick, NJ 08901
 *Attorneys for Defendant Nancy J. Pinkin in her official capacity as Middlesex County Clerk*

**DECOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**

By: /s/ *Thomas A. Abbate*
 THOMAS A. ABBATE
 61 South Paramus Road, Suite 250
 Paramus, New Jersey 07652
 *Attorneys for Defendant John S. Hogan in his official capacity as Bergen County Clerk*

## **CERTIFICATION OF ADMISSION TO BAR**

I, Angelo J. Genova, certify as follows:

      1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Angelo J. Genova
Angelo J. Genova, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Jason C. Spiro, certify as follows:

      1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Jason C. Spiro
Jason C. Spiro, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Louis N. Rainone, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By:  /s/ Louis N. Rainone
Louis N. Rainone, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, John M. Carbone, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By:  /s/ John M. Carbone
John M. Carbone, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Richard K. Wille, Jr., certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Richard K. Wille, Jr.
Richard K. Wille, Jr., Esq.


## **CERTIFICATION OF ADMISSION TO BAR**

I, Rajiv D. Parikh, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Rajiv D. Parikh
Rajiv D. Parikh, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Kirstin Bohn, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Kirstin Bohn
Kistin Bohn, Esq.


## **CERTIFICATION OF ADMISSION TO BAR**

I, Howard Lane Goldberg, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Howard Lane Goldberg
Howard Lane Goldberg, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Michael S. Williams, certify as follows:

      1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Michael S. Williams
Michael S. Williams, Esq.

## **CERTIFICATION OF ADMISSION TO BAR**

I, Thomas A. Abbate, certify as follows:

      1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2024

By: /s/ Thomas A. Abbate
Thomas A. Abbate, Esq.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(a). This brief contains 5,186 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2019 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: April 1, 2024

By: /s/ Angelo J. Genova
         Angelo J. Genova, Esq.

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that on this 1st day of April 2024, the foregoing Motion for a Stay

Pending Appeal has been filed through CM/ECF system and served on all parties

or their counsel of record through the CM/ECF system.

Dated: April 1, 2024

By: <u>/s/ Angelo J. Genova</u>
Angelo J. Genova, Esq.

**Exhibit A**

# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CHAMBERS OF
**ZAHID N. QURAISHI**
UNITED STATES DISTRICT JUDGE

**U.S. COURTHOUSE**
402 EAST STATE STREET, ROOM 4000
TRENTON, NJ 08608

April 1, 2024

## LETTER ORDER

Re:     **Andy Kim, *et al.* v. Christine Giordano Hanson, *et al.*
        Civil Action No. 24-1098-ZNQ-TJB**

Dear Counsel:

Before the Court are Emergency Motions to Stay this Court's Order (ECF No. 195) pending appeal to the Third Circuit.  (ECF Nos. 198, 204, 205, 217.)  Plaintiffs filed an opposition.  (ECF No. 214.)

"[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction." *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, Civ. No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  Preliminary injunctive relief is warranted where a party demonstrates: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  Accordingly, the same four factors that this Court previously analyzed in considering Plaintiffs' Motion for Preliminary Injunction are at issue here.

Where a party moves for a stay pending appeal of a decision concerning a preliminary injunction, and merely re-raises the same arguments the court already considered in issuing or denying the underlying preliminary injunction, the court will often re-incorporate its earlier reasoning to deny the stay pending appeal. *See, e.g.*, *Nat'l Shooting Sports Found. v. Platkin*, Civ. No. 22-6646, 2023 WL 2344635, at *1 (D.N.J. Mar. 3, 2023) (denying a defendant's motion for a stay as doing so would "arguably be tantamount to a reconsideration and reversal of the Court's [prior] decision."); *Robinson v. Murphy*, Civ. No. 20-5420, 2020 WL 13891018, at *2 (D.N.J. Oct. 28, 2020) (denying a motion to stay pending appeal and incorporating the same reasons set out in the court's prior opinions and order "as the facts before it remain largely the same at this juncture."); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, Civ. No. 00-5361, 2001 WL 493266, at *1 (D.N.J. Jan. 17, 2001) ("[Defendant] offers no new circumstances to support its application for a stay pending appeal. Therefore, granting [Defendant's] motion for stay would effectively be a reconsideration and reversal of the Court's [earlier] decision.").

For the same reasons expressed in its Opinion, which are fully incorporated herein, the Court concludes that Defendants have not demonstrated that a stay pending appeal is warranted.  Specifically,

Defendants do not raise any new facts or law suggesting their appeal is likely to succeed on the merits.[1] The Court declines to retread the same ground a second time.

For these reasons, Defendants' Emergency Motions to Stay (ECF Nos. 198, 204, 205, 217) are hereby DENIED.

**IT IS SO ORDERED.**

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

---

[1] Defendants raise purported "confusion" regarding the scope of the Court's Order, but the Court has already resolved that issue.  If anything, the record appears to have shifted further against Defendants' positions, insofar as Defendant Clerks for Burlington and Hudson County have filed letters indicating that they are withdrawing their appeals and will comply with the Court's Order.  (ECF Nos. 208, 209.)

**Exhibit B**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**ANDY KIM** *in his personal capacity as a candidate for U.S. Senate*, **et al.**,

Plaintiffs,

v.

**CHRISTINE GIORDANO HANLON, et al.**,

Defendants.

Civil Action No. 24-1098 (ZNQ) (TJB)

**ORDER**

---

**QURAISHI, District Judge**

**THIS MATTER**, having come before the Court on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 5) and Defendants' Motions in Limine (ECF Nos. 152–158), for the reasons set forth in the accompanying Opinion, and for good cause shown.

IT IS on this **29th** day of **March 2024**,

**ORDERED THAT:**

1.    Defendants' Motions in Limine (ECF Nos. 152–158) are hereby **DENIED**.

2.    Plaintiffs' Motion for Preliminary Injunction (ECF No. 5) is hereby **GRANTED**.

3.    Defendants and each of them; their officers, agents, servants, employees, and attorneys as follows (collectively, "Defendants"), with regard to the June 4, 2024 New Jersey Primary Election are enjoined as follows:

    (a)    Defendants are enjoined from preparing, disseminating, using, displaying, or counting any ballot, in any form, whether on paper or electronic, that:

        i.    Is designed by columns or rows, rather than by office sought;

        ii.    positions candidates on the ballot automatically based upon a ballot draw among candidates for a different office;

        iii.    places candidates such that there is an incongruous separation from other candidates running for the same

office;

iv. places candidates underneath another candidate running for the same office, where the rest of the candidates are listed horizontally, or to the side of another candidate running for the same office, where the rest of the candidates are listed vertically; and

v. bracketing candidates together on the ballot such that candidates for different offices are featured on the same column (or row) of the ballot;

(b) Defendants are enjoined from conducting draws for ballot positions that do not include a separate drawing for every office and candidate, and where every candidate running for the same office has an equal chance at the first ballot position; and

(c) Defendants are required to use a ballot for all voters, whether mail-in, at a polling site, or otherwise, that is organized by office sought (commonly known as a "office-block ballot,") rather than by column or row, and which implements for each office on the ballot, a randomized ballot order system (e.g. random draw) which affords each candidate for the same office an equal chance at obtaining the first ballot position.

4. The Court waives the requirement to post bond or security under Fed. R. Civ. P. 65(c).

5. The Court retains jurisdiction of this matter for the purpose of ensuring compliance.

Date: March 29, 2024

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

# Exhibit C

<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANDY KIM** *in his personal capacity as a candidate for U.S. Senate*, ***et al.***,<br><br>Plaintiffs,<br><br>v.<br><br>**CHRISTINE GIORDANO HANLON, *et al.***,<br><br>Defendants. | Civil Action No. 24-1098 (ZNQ) (TJB)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

    **THIS MATTER** comes before the Court upon a Motion for Preliminary Injunction (the "Motion", ECF No. 5) filed by Plaintiffs Andy Kim, Sarah Schoengood, Carolyn Rush, and their respective campaign committees (collectively, "Plaintiffs").  Plaintiffs filed a brief in support of their Motion.  ("Moving Br.", ECF No. 5-1.)  Defendant County Clerks Christine Giordano Hanlon, Scott M. Colabella, Paula Sollami Covello, Mary H. Melfi, Steve Peter, Holly Mackey, Nancy J. Pinkin, Joseph J. Giralo, John S. Hogan, Joanne Schwartz, Joseph Ripa, Rita Rothberg, Celeste M. Riley, Christopher J. Durkin, James N. Hogan, E. Junior Maldonado, Ann Grossi, Danielle Ireland-Imhof, and Joanne Rajoppi (collectively, "Defendants") filed oppositions to the Motion.  (ECF Nos. 16, 26, 44–46, 48–51, 53, 54, 57, 59–61, 63, 65, 69.)[1]  Plaintiffs filed a reply

---

[1] The Court granted a Motion to Intervene filed by the Camden County Democratic Committee ("CCDC") (ECF No. 121), and the CCDC attended the evidentiary hearing but did not file its own brief opposing Plaintiffs' Motion for Preliminary Injunction.

brief in further support of their Motion. ("Reply", ECF No. 95.)[2]  At the Court's request, the parties filed a letter identifying *all* the relevant submissions before the Court on the Motion for Preliminary Injunction. (ECF No. 193.)[3]

Pursuant to Federal Rule of Civil Procedure 65, the Court conducted an evidentiary hearing ("Hearing") on the record on March 18, 2024. (ECF No. 159; "Hearing Tr.")

The Court has carefully considered the parties' submissions as well as the evidence and arguments presented at the Hearing.  For the reasons set forth below, the Court will **GRANT** the Motion for Preliminary Injunction.

## I.  BACKGROUND AND PROCEDURAL HISTORY[4]

This matter arises out of the upcoming 2024 Democratic primary election (the "2024 Primary") for which Plaintiffs have declared their candidacies.  Plaintiff Andy Kim is running for U.S. Senate.  Plaintiff Sarah Schoengood is running for the U.S. House of Representatives for New Jersey's Third Congressional District.  Plaintiff Carolyn Rush is running for the U.S. House of Representatives for New Jersey's Second Congressional District.  Defendants are the County Clerks for nineteen of the twenty-one counties in New Jersey.[5]

On February 26, 2024, Plaintiffs filed a Verified Complaint raising concerns with a ballot design used for primary elections in nineteen of the twenty-one counties in New Jersey.  ("V.C.",

---

[2] The Court additionally received six amici submissions, (ECF Nos. 90 (certifications from candidate amici), 116–18, 128, 134, 136.)

[3] The Court has carefully reviewed each of these submissions.  It does note that the parties' joint list appears to have omitted the Response in Opposition by Joanne Schwartz at ECF No. 53.

[4] The Court recites the procedural history only as relevant to the instant Motion.  Notably, various issues concerning the underlying litigation that are not relevant here, such as discovery disputes, have been stayed pending the Court's resolution of Plaintiffs' Motion.

[5] The remaining two County Clerks are named as interested parties, together with Tahesha Way in her official capacity as Secretary of State for New Jersey and her related role as chief elections officer in the state.  The Attorney General for the State of New Jersey advised by letter dated March 17, 2024, that he was electing not to intervene in this matter. (ECF No. 149.)  His letter included additional discussion that this Court does not consider, given that it was essentially provided by a non-party that had not sought leave to brief the Court amicus curiae.

ECF No. 1.)  Plaintiffs' Motion for Preliminary Injunction was filed on the same day.  (ECF No. 5.)  In their Verified Complaint, Plaintiffs allege that the ballot design's "bracketing system" infringes upon their constitutional rights under the First Amendment[6]—specifically, the Right to Vote (Count I), Equal Protection (Count II), and Freedom of Association (Count III)—and that it violates the Elections Clause of the U.S. Constitution (Count IV).  (V.C. ¶¶ 168–227.)[7]

Defendants were properly served.  (ECF No. 8.)  Interested parties Tahesha Way, as Secretary of State for New Jersey, and County Clerks for the remaining two counties in New Jersey were furnished with copies of, *inter alia*, the Verified Complaint and Plaintiffs' Motion.  (*Id.*)  Plaintiffs also furnished the following non-parties with copies of the Verified Complaint and Motion: all declared candidates that at the time were running against Plaintiffs in the upcoming primary election, the Democratic and Republican State Committees, and all county party committees for whom email addresses could be found.  (*Id.*)

By way of background, the Verified Complaint alleges the following facts.

In nineteen of its twenty-one counties, New Jersey's primary election ballot system features, or "brackets," certain groups of candidates together in the same column[8] based on endorsements by political party leaders (the "Bracketing Structure"), rather than grouping candidates together based on the office for which they are running ("Office Block Structure").[9] (V.C. ¶¶ 3–6, 53–55, 62.)  New Jersey is the only state in the country that organizes its primary election ballots by the Bracketing Structure.  (*Id.* at 2 n.1; *id.* ¶¶ 1, 5.)  The Bracketing Structure is

---

[6] Plaintiffs correctly plead their First Amendment injuries via the Fourteenth Amendment.  For the sake of brevity only, the Court refers directly to the First Amendment.

[7] Plaintiffs' claims are brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983.

[8] The Verified Complaint refers to "column" as either the vertical or horizontal grouping together of the various bracketed candidates on New Jersey ballots.  (V.C. ¶ 3.)

[9] The two New Jersey counties that do not and have historically not used the Bracketing Structure for their ballots, Salem County and Sussex County, use the Office Block Structure instead.  (*Id.* ¶ 55.)

governed by New Jersey state law,[10] which allows candidates to request that they be bracketed, or grouped, with other party-endorsed candidates on the ballot. (*Id.* ¶¶ 6, 59–60.)

Once the deadline passes for submitting bracketing requests, whichever office position the County Clerk draws first becomes the "pivot point" of that county's ballot. (*Id.* ¶ 56.) The pivot point is the first column (or row, depending on the design) that appears on that county's primary ballot. (*Id.* ¶¶ 56, 65–66.)[11] This is known as the "preferential ballot draw." (*Id.* ¶ 7.) The other candidates endorsed by the county party and thus bracketed with the endorsed pivot point candidate(s) are then automatically placed on that same column (or row), with the same county party slogan. (*Id.* ¶¶ 6, 14, 62, 65.) This is referred to as the "county line." (*Id.* at 3.)

If a candidate chooses not to bracket with other candidates, or requests to do so but loses that spot to another candidate, that candidate is an "unbracketed candidate." (*Id.* ¶ 58.) Unbracketed candidates cannot receive the first ballot position (*i.e.*, the top left position), and are placed instead either farther to the right or farther to the bottom of the ballot, with no guarantee that they will be placed on the next available column after the bracketed candidates. (*Id.* ¶¶ 65–67.)[12] As a result, unbracketed candidates tend to occupy obscure parts of the ballot that appear less important and are harder to locate, and may be grouped in a column with other candidates with whom they did not want to be associated. (*Id.* ¶ 67.)

The Bracketing Structure is not imposed consistently throughout New Jersey, as the layout for a given county's ballot depends on that county's pivot point, and County Clerks have applied

---

[10] Defendants are elected officials vested with certain statutory duties and obligations including but not limited to designing, preparing, and printing all ballots, issuing mail-in ballots, and conducting a drawing for ballot positions for various elections held in various counties. (*Id.* ¶¶ 28–47.)

[11] According to the Verified Complaint, New Jersey law requires U.S. Senators (or Governors, if not Senators) to be drawn as the pivot point when those positions are up for election. (*Id.* ¶¶ 69–70.)

[12] Specifically, the Verified Complaint alleges that unbracketed candidates are: "(a) placed multiple columns away from the bracketed candidates, (b) stacked in the same column as another candidate for the exact same office, and/or (c) placed in the same column as candidates with whom they did not request to bracket and who requested a different ballot slogan." (*Id.* ¶ 67.)

internally inconsistent approaches to determining the pivot point candidate. (*Id.* ¶¶ 73, 75–76.) The Verified Complaint makes several allegations regarding the purported effects of the county line on elections in New Jersey, including positional bias, "arbitrary advantage[s]" that are given to candidates on the county line, and voter confusion. (*Id.* ¶¶ 77–78, 84–87.) Several expert reports were submitted with the Verified Complaint in connection with Plaintiffs' claims. (*Id.* ¶¶ 103–133; *id.* at Exs. B–E.)

The Verified Complaint also alleges the ways each Plaintiff has been or will be affected by the county line. Kim launched his campaign for the position of U.S. Senator in the 2024 Primary on September 23, 2023. (*Id.* ¶ 144.) Within one week after Tammy Murphy's campaign started for the same position, numerous counties in New Jersey endorsed her, including some of the largest Democratic counties in the state and totaling over half of New Jersey's registered Democratic voters. (*Id.* ¶ 145.) Although Kim at the time had received some endorsements himself, Murphy's position on the county line over Kim in certain counties disadvantaged Kim in the election and forced him to consider choosing to bracket with other candidates to avoid further disadvantages. (*Id.* ¶¶ 147–50.) Previously, Kim was elected three times—in 2018, 2020, and 2022—to represent New Jersey's Third Congressional District. (*Id.* ¶ 137.) Although Kim was unopposed in 2018 and 2020, he expressed frustration in 2018 with having to appear on the ballot in a column with Senator Bob Menendez. (*Id.* ¶¶ 139–40, 142.) After this suit was filed and the Hearing was conducted, Tammy Murphy announced her withdrawal from the Democratic Primary. Kim has been offered the county line in 17 counties. He accepted the line in 16, declining the county line in Camden because the CCDC is adverse to him in this suit.[13] He will therefore not appear on the county line in Camden.

---

[13] As of the parties' last communication dated March 27, 2024 on the status of endorsements, Cumberland County had not yet offered Mr. Kim its endorsement. (ECF No. 188.)

Schoengood declared her candidacy on January 21, 2024, for New Jersey's Third Congressional District, which is comprised of the counties of Monmouth, Burlington, and Mercer. (*Id.* ¶¶ 151–52.) She did so after the deadline had passed for her to seek endorsement in Monmouth County by its Democratic Committee, and thus will not be featured on the county line. (*Id.*) She will also not be featured on the county line in Burlington County, which had already by that time selected its endorsed candidate. (*Id.* ¶ 153.) Schoengood does not wish to consider bracketing with any senatorial candidate other than Kim, with whom her ideology aligns, and therefore it is "virtually certain" she will be excluded from preferential ballot draws in the Third Congressional District. (*Id.* ¶¶ 154, 157.) She is thus an unbracketed candidate. (*Id.* ¶ 155.)

Rush declared her candidacy for New Jersey's Second Congressional District, which is comprised of the counties of Atlantic, Cape May, Cumberland, and Salem, and portions of Gloucester and Ocean Counties, both in the 2024 Primary and in the 2022 primary election. (*Id.* ¶ 158.) In 2022, her opponent Tim Alexander was featured on the county line in Cumberland, Cape May, Atlantic, and Ocean Counties. (*Id.* ¶ 159.) In Gloucester County, Rush shared the county line with Alexander even though the vote was only for one person. (*Id.* ¶ 160.) She did not prevail in the election despite obtaining 38.8% of the total vote. (*Id.*) In the 2024 Primary, four counties had endorsed Alexander for the county line by the time the Verified Complaint was filed, putting her at a "substantial electoral disadvantage." (*Id.* ¶ 162.)

Voting for the 2024 Primary will occur on June 4, 2024. (*Id.* ¶ 164.) Plaintiffs filed the instant Motion for Preliminary Injunction seeking declaratory and injunctive relief, including an order enjoining Defendants from using the county line system in the 2024 Primary.

## II.    <u>JURISDICTION</u>

Based on the nature of the constitutional claims asserted, the Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. §§ 1331 and 1343.

## III.    <u>STANDING</u>

Defendants challenge Plaintiffs' standing to raise their claims.  The analysis is relatively straightforward.  Plaintiffs' First Amendment claims allege that the Bracketing System and ballot placement for primaries in New Jersey confer advantages to candidates who win a county line, bracket with other candidates, and/or are placed in an early position on the ballot.  There is at least one county where Kim will not have the county line:  Camden.  There is at least one county where Schoengood will not have the county line:  Monmouth, Burlington, and Mercer.  Finally, there is at least one county where Rush will not have the county line:  Ocean County.  Moreover, even in counties where Plaintiffs will be appearing on a county line and/or bracket, they allege an associational harm of being forced to associate with other candidates not of their choosing.  With respect to Plaintiffs' Elections Clause claims, Plaintiffs' allegations of an impermissible regulation of federal elections are sufficient to show an injury-in-fact given that the Bracketing Structure regulates federal elections, and the three plaintiffs allege injuries related to their candidacy in such elections.  Accordingly, the Court finds that Plaintiffs have alleged sufficient injuries-in-fact.

Moreover, Plaintiffs' injuries derive from the current and future enforcement of the Bracketing Structure.  Thus, Plaintiffs' injuries flow directly from Defendants' actions.  *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 77–78 (1978) (applying a "but for" test to the causation analysis).  It is likely that a declaratory judgment stating that the Bracketing Structure is unconstitutional and an injunction enjoining Defendants from enforcing it would prevent Plaintiffs' injuries.  *See Friends of the Earth*, *Inc. v. Laidlaw Env'tal Servs.*, 528 U.S. 167,

185–86 (2000) (reasoning that "for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress"); *New Jersey Civ. Just. Inst. v. Grewal*, Civ. No. 19-17518, 2021 WL 1138144, at *5 (D.N.J. Mar. 25, 2021) (same).

For these reasons, the Court concludes Plaintiffs have standing to raise each of their claims in this matter.

## IV.     <u>FAILURE TO JOIN CERTAIN PARTIES</u>

Defendants (other than Holly Mackey and E. Junior Maldonado) argue that this matter should be dismissed because certain parties were not named despite being required under Federal Rule of Civil Procedure 19.  (*See, e.g.*, ECF No. 63 at 39–41.)  The list of parties that Defendants view as indispensable is substantial: Plaintiffs' opponents in the primary; all other primary candidates; all county Democratic and Republican county committees; county boards of election and superintendents of election; and all local and statewide political organizations.  Defendants argue that these absent parties' constitutional rights "hang in the balance."  (ECF No. 50 at 5.)

Plaintiffs respond that the Court has already rejected similar arguments in *Conforti v. Hanlon*, Civ. No. 20-8267, 2022 WL 1744774 (D.N.J. May 31, 2022), and should do so again here.  In their view, Plaintiffs in this case have gone further than *Conforti* plaintiffs by naming as Interested Parties the other County Clerks (Salem and Sussex) and the Secretary of State; and serving the Verified Complaint and Motion on their opponents in the primary, the Democratic and Republican State Committees, and 39 of the 42 Democratic and Republican county party committees.  (Reply at 1–3; V.C. ¶¶ 48–52.)  None of these parties has sought to intervene other than the Camden County Democratic Committee.

A Rule 19 analysis is a two-step process. *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). Given that a failure to name a required party can be grounds for dismissal for lack of subject-matter jurisdiction, *see Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 117 (1968), a court must first determine whether a party is a "necessary" party that must be joined if "feasible" under Rule 19(a). *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993).[14] If the party is necessary, but joinder is not feasible because it would defeat subject-matter jurisdiction, then the Court must determine whether the party is "indispensable" under Rule 19(b). *Gen. Refractories Co*., 500 F.3d at 312*; accord Janney Montgomery Scott*, 11 F.3d. at 404. "A holding that joinder is compulsory under Rule 19(a) is a necessary predicate to the district court's discretionary determination under Rule 19(b)." *Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa.*, 385 F. App'x 135, 145 (3d Cir. 2010) (citation omitted). If the party is found to be indispensable under Rule 19(b), the action therefore cannot go forward. *See Janney Montgomery Scott*, 11 F.3d. at 404.

Rule 19(a)(1) provides that:

---

[14] The Third Circuit in *Janney Montgomery Scott* discussed the differences between the present and prior Rule 19 wording:

> The present version of Rule 19 does not use the word "necessary." It refers to parties who should be joined if *feasible*. The term *necessary* in referring to a Rule 19(a) analysis harks back to an earlier version of Rule 19. It survives in case law at the price of some confusion. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n. 12, 88 S. Ct. 733, 741 n. 12, 19 L. Ed. 2d 936 (1968) ("Where the new version [of the Rule] emphasizes the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable.'"); *see also Park v. Didden*, 695 F.2d 626, 627 (D.C. Cir. 1982) (acknowledging 1966 amendments to the Rule as attempt to circumvent "'a jurisprudence of labels'") (citation omitted).

*Id.* at 404 n.4. However, *Janney Montgomery Scott* favorably used the "necessary" language in its analysis. Therefore, the Court will employ the same language in its own analysis.

> *Required Party.* A person who is subject to service of process and
> whose joinder will not deprive the court of subject-matter
> jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief
> among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action
> and is so situated that disposing of the action in the person's absence
> may:
>
> > (i) as a practical matter impair or impede the person's ability to
> > protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of
> > incurring double, multiple, or otherwise inconsistent obligations
> > because of the interest.

Fed. R. Civ. P. 19(a)(1). "Any party whose absence results in any of the problems identified in

either subsection is a party whose joinder is compulsory if feasible." *Janney Montgomery Scott*,

11 F.3d at 405.

Here, the Court finds that joinder of the parties sought by Defendants is feasible because

the matter presents a federal question (such that joinder of the additional defendants would not risk

depriving the Court of subject matter jurisdiction) and because Plaintiffs have neither argued nor

shown that the absent parties would not be subject to formal[15] service of process. Accordingly,

the Court moves on to assessing the alternative prongs of Rule 19(a)(1)(A) and 19(a)(1)(B) to

determine whether joinder of the absent parties is "necessary."

"Subsection (a)(1)(A) is limited to considerations of whether the court can grant complete

relief to persons already named; the effect on unnamed parties is immaterial." *Culinary Serv. of*

*Delaware Valley*, 385 F. App'x at 145; *accord Field v. Volkswagenwerk AG*, 626 F.2d 293, 301

(3d Cir. 1980), *modified on other grounds* (quoting 3A James W. Moore et al., *Moore's Federal*

---

[15] The Court distinguishes formal service of process from any informal process by which Plaintiffs have served the
various absent parties identified in their Verified Complaint. (V.C. ¶¶ 48–52.)

*Practice* ¶¶ 19.07–1[2], at 19–128 (2d ed. 1979), and counseling that "mere theoretical considerations of disposing of the whole controversy should not be employed" to dismiss an action [on Rule 19(a)(1) grounds] 'where it appears unlikely that absent persons could be adversely affected'").

"Subsection (a)(1)(B), however, requires the court to take into consideration the effect the resolution of the dispute may have on absent parties." *Culinary Serv. of Delaware Valley*, 385 F. App'x at 145 (citation omitted). "Under the first prong of subsection (a)(1)(B), a party must show that some outcome of the federal case would preclude the absent parties with respect to an issue material to the absent parties' rights or duties." *Id*. (citation omitted). "[C]oncerns regarding privity and the possibility of preclusion are too speculative to require joinder. *Id*. (citation omitted). "The second prong of (a)(1)(B) focuses on the obligations of named parties, not absent parties." *Id*. (citations omitted). "Further, an unsubstantiated or speculative risk will not satisfy Rule 19(a) criteria—the possibility of exposure to multiple or inconsistent obligations must be real." *Id*. (citation omitted).

Subsection (a)(1)(A) does not apply to absent parties. Therefore, the Court will consider whether the absent parties must be joined under subsection (a)(1)(B). First, the Court finds that the absent County Boards of Elections and Superintendents of Elections are not necessary parties under subsection (a)(1)(B)(i). The Defendant County Clerks argue that ordering the County Clerks to change the ballot structure will not afford complete relief because "the putative new ballot structure Plaintiffs seek to have the Court impose would need to be configured to voting machines, which are outside of the control and purview of the County Clerks." (ECF No. 63 at 39–40.) Rather, the Defendant County Clerks contend, each County's Board of Elections or Superintendent of Elections has custody over voting machines. (*See id.*) (citing N.J. Stat. § 19:48-6)). Therefore,

the County Clerks argue that at least joinder of those absent parties is necessary to afford complete relief. (*See id.*)

The Court disagrees that custody over voting machines is relevant to the issue at hand. The issue here is ballot design, over which Defendant County Clerks do, in fact, have custody and control. (*See* V.C. ¶¶ 28–47.)

Furthermore, the Court finds the absent County Boards of Elections and Superintendents of Elections are not necessary parties under subsection (a)(1)(B)(ii). This subsection focuses on the effect on obligations of named parties, and there is no real risk that deciding the case without joining the absent parties would expose any of the named parties to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations . . . ." Fed. R. Civ. P. 19(a)(1)(B)(ii). For instance, a county clerk's duties regarding voting machines are clearly delineated in N.J. Stat. §19:48-6 and other provisions of New Jersey law (*see* V.C. ¶¶ 28–47), and any concerns on their behalf are purely speculative. The Court therefore finds that although it is feasible to join the County Boards of Elections and Superintendents of Elections, it is not necessary to join these absent parties in this action. For this reason, the Court need not decide whether the County Boards of Elections and Superintendents of Elections are indispensable parties under Rule 19(b).

The Court next considers whether the other absent parties Defendants mention—other primary candidates; all county Democratic and Republican county committees; Plaintiffs' opponents in the primary; and all local and statewide political organizations—are necessary parties under subsection (a)(1)(B). For the reasons stated below, the Court finds that these are not necessary parties.

Defendants argue that these are necessary parties under subsection (a)(1)(B)(i) because "the Bracketing System at least serves a legitimate interest of political candidates to associate with

one another and for political parties to endorse candidates . . . ."  (ECF No. 63 at 40.)  Defendants note that the Supreme Court held these constitutional interests to be compelling in *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989) and that upending the bracketing system would impair the interests of the absent parties.  (ECF No. 63 at 40.)

However, Defendants misplace their reliance on *Eu*.  That case concerned challenges to sections of the California Election Code that purported to, *inter alia*, ban primary endorsements by political parties and dictate the organization and composition of those parties.  *See Eu, 489 U.S.* at 216.  The U.S. Supreme Court in *Eu* opined:

> Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association.  It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments.  Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to "'identify the people who constitute the association,'" and to select a "standard bearer who best represents the party's ideologies and preferences."  Depriving a political party of the power to endorse suffocates this right.

*Id.* at 224 (citations omitted).

Defendants have not adequately explained how a change to the county line balloting system would burden the interests of the absent political committees, parties, and organizations.  Unlike in *Eu*, this is not a case of an outright ban on primary endorsements by political parties, nor is it a case of a state dictating the internal organization of a political party or political organization.  Absent the Bracketing Structure, political parties and political organizations would still maintain the freedom to endorse their preferred candidates.  Merely presenting the information in a different format, the Office Block Structure, will not detract from the political parties' and political organizations' freedom of speech and association.  In fact, Plaintiffs made clear in their Verified Complaint that they do not seek to inhibit political parties' ability to endorse candidates:

> Plaintiffs do not seek to disrupt the conduct of parties in their right to endorse the standard-bearer of their choice, or their right to contribute and pool resources to support that candidate in the primary or general election. Nor do Plaintiffs seek to disrupt the ability of parties to signify their endorsements or slogans on the ballot alongside the candidates of their choice.

(V.C. ¶ 17.) Clearly, the Defendants' stated interest does not rise to the level of the interests identified in *Eu*. Consequently, the Court finds that these parties are not necessary under subsection (a)(1)(B)(i). Nor are they necessary under subsection (a)(1)(B)(ii). Any concerns about the effect of the balloting system on the existing parties are purely speculative, as there is no real risk that deciding the case without joining these absent parties would adversely affect the obligations of the named parties. In fact, the allegations in the Verified Complaint (as well as Plaintiffs' supporting evidence discussed further, infra) suggest that maintaining the *current* Bracketing Structure adversely affects the named parties by creating "arbitrary advantage[s]" for candidates on the county line and leading to voter confusion. (V.C. ¶¶ 77–78, 84–87.) For the above reasons, the Court finds that the absent parties are not required to be joined under Rule 19(a). Therefore, the Court need not decide whether they are indispensable parties under Rule 19(b).[16]

---

[16] Even if Rule 19(b) did apply, the Court would find the absent parties were not indispensable parties. Under Rule 19(b), the Court would have to consider, in relevant part: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;" or "(2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures[.]" Fed. R. Civ. P. 19(b). Regarding (1), as discussed, Defendants have not adequately explained how failing to join the absent parties would prejudice the absent parties or the existing parties. Regarding (2), Defendants argue that there is no way to shape the relief Plaintiffs seek—requiring the County Clerks to use an "office-block ballot"—that would not require joining the absent county officials. (*See* ECF No. 63 at 41.) However, this argument is undermined by the fact that Salem County and Sussex County both use the Office Block Structure instead of the Bracketing Structure. (*See* V.C. ¶ 55.) Moreover, Plaintiffs' expert, Mr. Ryan Macias, testified at the Hearing that all of New Jersey's balloting machines are capable of laying out both paper and electronic ballots in the Office Block Structure instead of the Bracketing Structure. (*See* Hearing Tr. at 93:21–96:19.) Defendants' response, via their expert David Passante's testimony, that their county officials and printing staff are unprepared to implement a new balloting system, does not entirely rebut Macias's point and therefore does not constitute a compelling reason to join additional parties. (*See* Hearing Tr. 257:16–259:17.)

## V.     **THE MARCH 18, 2024 EVIDENTIARY HEARING**

### A.     **DEFENDANTS' MOTIONS IN LIMINE**

The Court first addresses seven motions in limine filed on the day of the Hearing by Defendants Durkin, Ireland-Imhof, and Rajoppi ("Moving Defendants").  The motions sought to prevent Plaintiffs' expert witnesses from testifying and to preclude the Court's consideration of their expert reports.  (ECF Nos. 152–158.)  Plaintiffs filed an omnibus brief opposing all seven motions.  ("MIL Opp'n Br.", ECF No. 177.)  This unusual posture warrants some explanation.

Defendants first indicated their intention to file "pre-hearing motions" of an unspecified type as part of a Joint Proposed Hearing Agenda filed by the parties three days before the Hearing:

> *Defendants' Position:*  Any pre-hearing motions shall be filed on or before March 15, 2024. Defendants believe that motions related to evidence are appropriate in advance of an evidentiary hearing and intend on filing same today.  Defendants have offered to Plaintiffs that responses to any such motions may be filed by March 17, 2024.

(ECF No. 140 at 5.)  Plaintiffs responded that they did not believe pre-hearing motions were appropriate given the nature of the Hearing.  (*Id.*)  On the basis of the information provided by the parties, the Court decided the issue by instructing counsel "to timely raise any objections during the hearing rather than file pre-hearing motions."  (ECF No. 141 at 5.)

At the start of the Hearing, however, Moving Defendants' intentions became clear when they raised their dispute as to the qualifications of Plaintiffs' experts.  (*See* Hearing Tr. 24:13–25:25.)  Given that the Hearing had already commenced and there was no jury involved, the Court exercised its discretion to permit the experts to testify as planned, and reserved its decision as to the merits of the motions in limine.  (*Id.* at 26:1–14.)  *See UGI Sunbury LLC v. A Permanent Easement for 1.775 Acres*, 949 F.3d 825, 833 (3d Cir. 2020).  Accordingly, the Court addresses

the motions by assessing, after the fact, the experts' testimony and reports. For the reasons set forth below, the Motions in Limine will be **DENIED**.

       1.      <u>MOTION No. 1: SEEKING TO EXCLUDE TESTIMONY OF ALL PLAINTIFFS' EXPERTS BASED ON FAILURE TO COMPLY WITH DISCOVERY REQUIREMENT</u>

Moving Defendants' First Motion in Limine is premised on discovery and cries unfair delay. They cite Federal Rule of Civil Procedure 26 for the principle that expert disclosures must be made "at least 90 days before the date set for trial or for the case to be ready for trial[.]" ("First MIL", ECF No. 152-2 at 5) (quoting Fed. R. Civ. P. 26(a)(2)(D)(i)). Moving Defendants argue that Plaintiffs contacted their experts more than two months before disclosing their opinions in this suit and Plaintiffs obtained one complete expert report nearly two months before filing suit. (*Id.* at 6.) According to Moving Defendants, Plaintiffs' decision to pursue an "eleventh-hour filing" with regard to the primary election deprived all Defendants of the opportunity to depose Plaintiffs' experts or prepare rebuttal reports. (*Id.*)

Plaintiffs broadly argue that all seven of Moving Defendants' motions in limine are merely attempts to "relitigate their claims of 'delay.'" (MIL Opp'n Br. at 1.) Plaintiffs also argue that Moving Defendants "confuse *admissibility* of an expert's testimony with the question of how much *weight* it should be given" when addressing the merits of Plaintiffs' Motion. (*Id.*) (emphasis in original). Finally, Plaintiffs contend that Moving Defendants misunderstand the concept of "relevance" under the Federal Rules of Evidence as well as "how time can be computed" in the context of an expedited hearing under the Federal Rules of Civil Procedure. (*Id.*) (emphasis in original). As it relates to the First Motion in Limine, Plaintiffs detail the timeline, content, and speed of the expert reports authored by Dr. Wang, Dr. Pasek, Dr. Rubin, and Dr. Appel. (*Id.* at 5–9.) Plaintiffs take the position that they brought this emergent application in a timely manner, with the proper evidence to support such application consistent with Article III standing requirements.

(*Id.*)  Plaintiffs deny the existence of any "grand scheme to line the whole case up in advance, press the pause button, and press play at the last second."  (*Id.*)

First, Moving Defendants provide no authority to support the notion that the disclosure requirements of Rule 26(a)(2)(D)(i) apply to a hearing on a motion for preliminary injunction. (*See generally* First MIL.)  Indeed, as accurately quoted by Moving Defendants' brief, the language of this part of the Rule contemplates a "trial" rather than a preliminary hearing.  (*Id.* at 5–6; *see also* MIL Opp'n Br. at 10.)  Setting aside the language of the Rule, Plaintiffs and the Court agree: reason dictates that it would defeat the purpose of a litigant seeking emergent relief if that litigant were required to wait 91 days for a hearing so that it could meet the strictures of Rule 26(a)(2)(D)(i).  (MIL Opp'n Br. at 10.)  Here, Plaintiffs provided their expert reports the very same day they filed suit.  Plaintiffs explain how the experts "worked concurrently and not sequentially" and the four expert reports "could not have come any earlier than they did."  (*Id.* at 8–9.)  Their disclosures could not reasonably be expected to have been provided to Moving Defendants any earlier.

Next, as Plaintiffs note, Moving Defendants' actual challenge is to when this suit was filed. That issue is properly addressed on the merits of Plaintiffs' emergent application rather than on a motion in limine.  As a final alternative, even if Plaintiffs' disclosures could be deemed a technical violation under Rule 26(a), the Court finds that Plaintiffs' technical failure was nevertheless "substantially justified" within the meaning of Rule 37(c)(1) based on the circumstances of this case.  For these reasons, the Court will **DENY** Moving Defendants' First Motion in Limine (ECF No. 152).

2.    MOTION Nos. 2–5: SEEKING TO EXCLUDE TESTIMONY OF RUBIN, APPEL, WANG, AND PASEK BASED ON THE FEDERAL RULES OF EVIDENCE

Four of the Motions in Limine—the Second through Fifth Motions in Limine—raise challenges to the experts' testimony and reports based on Federal Rule of Evidence 702 alone or in combination with Rule 402.  (ECF Nos. 153–156.)  The Court can dispose of these Motions quickly.  The Federal Rules of Evidence are "relaxed" in the context of a hearing on a motion for preliminary injunction.   (*See* Hearing Tr. 89:18–19) (Court reminding counsel of relaxed application of evidence rules); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that because preliminary injunctions have a "limited purpose," they are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"). For reasons unclear, the moving briefs supporting these motions in limine do not acknowledge, much less mention, that fact.  Plaintiffs however, repeatedly emphasize that Moving Defendants' arguments improperly challenge the admissibility of the expert testimony.[17]  (*See* MIL Opp'n Br. at 1, 12, 17.)  At best, Plaintiffs claim, Moving Defendants' challenges relate to the weight the Court should give the expert reports and testimony.  (*See id.* at 12, 17.)

Given the expedited schedule leading up to the Hearing driven by the emergent nature of the pending application, coupled with the relaxed standards generally utilized during a preliminary injunction hearing, the Court declines to exclude the expert testimony as inadmissible.  With respect to emergent applications, courts routinely permit expert testimony at preliminary injunction hearings before addressing any challenges to the expert testimony.  *See, e.g.*, *In re Ohio*

---

[17] For the avoidance of doubt, Plaintiffs firmly oppose Moving Defendants' admissibility challenges and Plaintiffs' position is that "each and every expert proffered by Plaintiffs qualifies as an expert under Rule 702."  (MIL Opp'n Br. at 4.)

*Execution Protocol Litig.*, Civ. No. 11-1016, 2018 WL 6382108, at *2 (S.D. Ohio Dec. 6, 2018) ("However in this case it is simply not possible to put the process on hold while the *Daubert* inquiry is separately conducted, given the imminence of the hearing . . . ."); *F.T.C. v. BF Labs Inc.*, Civ. No. 14-815, 2014 WL 7238080, at *2 n.3 (W.D. Mo. Dec. 12, 2014) (explaining that defendants moved to exclude expert testimony but the court took the motions "under advisement" and permitted the expert to testify at the hearing). Notably, at this stage of the proceedings, rather than evaluate the admissibility of the expert testimony, the more appropriate inquiry is to determine whether the expert reports and testimony "present the indicia of reliability common to expert testimony." *Parks v. City of Charlotte*, Civ. No. 17-670, 2018 WL 4643193, at *4 (W.D.N.C. Sept. 27, 2018).

Here, the Court finds that, for the limited purposes of resolving the pending preliminary injunction application, Plaintiffs' expert reports and their testimony contain the indicia of reliability sought under Rule 702 and *Daubert*. The reports and testimony seek to explain, *inter alia*, the "feasibility of using New Jersey's existing equipment and software to present office-block ballots to primary voters," the impact the county line had on candidates who were awarded it, and how ballot design affects voter behavior. (*See generally* MIL Opp'n Br.) Notably, the experts rely upon their professional and educational experience when providing the various quantitative and statistical analysis within their respective reports. Further, the Court finds that the various challenges raised in the Second through Fifth Motions in Limine attacking the reliability, relevance, and methodological flaws of the reports and testimony more properly go to the weight the Court affords the testimony and not the admissibility. *See BF Labs Inc.*, 2014 WL 7238080, at *2 n.3. For these reasons, the Court will **DENY** Moving Defendants' Second through Fifth Motions in Limine (ECF Nos. 153–156).

3.   MOTIONS Nos. 6–7: SEEKING TO EXCLUDE THE TESTIMONY OF PASEK AND MACIAS BASED ON THE FEDERAL RULES OF CIVIL PROCEDURE

The Sixth and Seventh Motions in Limine raise challenges to Dr. Pasek and Mr. Macias's testimony and reports based on Rule 26(a)(2)(D)(ii).[18]   ("Sixth MIL", ECF No. 157; "Seventh MIL", ECF No. 158.)   Moving Defendants rely on Rule 26(a)(2)(D)(ii) for the proposition that an expert's reply is prohibited unless it is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)."   (Sixth MIL at 1) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).   Here, Moving Defendants have not procured their own experts.   (*Id.*)   Accordingly, they argue that Dr. Pasek's Expert Reply, attached as Exhibit A to Plaintiffs' Reply ("Expert Reply", ECF No. 95 at 48–57), and Mr. Macias' expert report and testimony should be excluded because they do "not purport to rebut any expert report submitted by any of the Defendants[.]"   (Sixth MIL at 1.)

First, the Court finds that Moving Defendants' reliance on Rule 26(a)(2)(D)(ii) to exclude Dr. Pasek's Expert Reply and testimony is inapposite.   Rule 26(a)(2)(D)(ii) governs expert *rebuttal* reports, not expert *reply* reports.   *See Haskins v. First Am. Title Ins. Co.*, Civ. No. 10-5044, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013) (citing *Crowley v. Chait*, 332 F. Supp. 2d 530, 550–51 (D.N.J. 2004)); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 591 (N.D. Ill. 2015) ("Rule 26 does not address reply expert reports.")   Unlike Mr. Macias's report, which Plaintiffs characterized as a "rebuttal", (ECF No. 115), Dr. Pasek's Expert Reply was submitted as part of Plaintiffs' Reply Brief.   Therefore, the Expert Reply is a reply report, not a rebuttal report.

---

[18] Defendants also argue that Mr. Macias's report should be excluded because it was filed and served on March 13, 2024, a day after the Court's deadline for Plaintiffs to reply to Defendants' opposition of March 12, 2024.   (Seventh MIL at 1; ECF No. 34.)   Notably, Defendants do not argue that they suffered any impact or prejudice due to this one-day delay.   As such, the Court rejects Defendants' challenge to Mr. Macias's report on this basis.

Even so, Moving Defendants' challenge to the expert testimony is narrow because they do not challenge the contents of the testimony. Instead, Moving Defendants argue that Dr. Pasek and Mr. Macias do not respond to any expert testimony procured by Moving Defendants. (Sixth MIL at 1; Seventh MIL at 2.) Though Moving Defendants did not procure experts, Plaintiffs argue that the expert reports responded to Defense certifications that "contained a fair amount of 'technical discussion.'" (*Id.* at 22) (quoting Suppl. Certification of Ryan Macias, ECF No. 171 at ¶ 5). Plaintiffs emphasize Dr. Pasek and Mr. Macias were responding to briefs and certifications containing "arguments that were at least arguably in the realm of experts, not fact witnesses." (MIL Opp'n Br. at 20–21.) And as Plaintiffs reiterate, rules of procedure are relaxed in the context of preliminary injunction hearings. (MIL Opp'n Br. at 20, 22.) Moving Defendants recognize that the emergent nature of this application might have impacted their opportunity to procure experts. (Sixth MIL at 1.) Yet Moving Defendants fail to appreciate that Plaintiffs' experts are rebutting arguments raised by Moving Defendants in their various opposition briefs and certifications in the absence of, or even more accurately, in lieu of, expert testimony. Considering the circumstances of this case and the emergent nature of the application, the Court rejects Moving Defendants' hyper-technical challenge to the Expert Reply and testimony of Dr. Pasek and the expert report and testimony of Mr. Macias, especially in light of these experts' responses to evidence put forth by Defendants. For these reasons, the Court will **DENY** Moving Defendants' Sixth and Seventh Motions in Limine (ECF Nos. 157–158).

## B. HEARING CONDUCT AND TESTIMONY

On February 29, three days after the Verified Complaint and emergent application were filed, the Court conducted a case management teleconference with counsel for the parties. The Court set March 18 as the date for a one-day hearing and emphasized that it sought an *evidentiary* hearing rather than mere oral argument from counsel. The primary purpose of the hearing was to

provide Defendants with an opportunity to challenge Plaintiffs' proofs that were previously provided to the Court through documentary evidence as well as an opportunity for Defendants to introduce their own evidence. The Court instructed counsel to meet and confer and submit a proposed agenda for the one-day hearing by March 15 that included identification of witnesses and a proposed schedule. (ECF No. 34.) The parties timely submitted a proposed schedule— which although it presented some disputes, was largely agreed upon—but it identified an improbable number of witnesses for a one-day hearing: fifteen. (ECF No. 140.) The Court resolved the parties' disputes and, balancing the appropriate time allotted for the hearing against the unreasonable proposed scheduled submitted by the parties, the Court took what steps it could to manage the hearing in advance. The Court expressly noted that it "encourages the parties to streamline witness testimony as much as possible" to include limiting direct examination of certain expert witnesses at times to simply adopting the accompanying expert report; it limited opening arguments; it reserved on whether closing arguments could be presented and then ultimately denied this request; it instructed the parties to call each witness only once; it allowed for and permitted witnesses to be called out of order at Defendants' request; and it encouraged Plaintiffs to prepare any Plaintiff-candidates who were testifying to also serve as their own Rule 30(b)(6) designee-witnesses. (ECF No. 141.)

The marathon hearing that ensued lasted nearly 9 hours. It was not a model of efficiency by either side, a problem the Court noted to both sides during the proceedings. On several occasions throughout the hearing, the Court reminded the parties to manage their time wisely and make adjustments where needed to prioritize their presentations as it became obvious that the parties would not be able to fully comply with their proposed schedule in the allotted time. However, the Court, in an effort to ensure Defendants had sufficient time to respond to Plaintiffs'

proofs, extended the hearing beyond the expected time period. Ultimately, seven of the fifteen witnesses testified. The Court ultimately concluded the hearing because the courthouse was closing for the day and if the hearing continued further there would be insufficient security on staff to safely escort attendees from the building. Defendants final act was to request to nevertheless continue to present closing arguments which was denied. Overall, the Court provided Defendants with ample time to call and cross examine selected witnesses. It should be noted that neither party chose to call the plaintiff candidates to testify other than Andy Kim. Whether this was a tactical decision on the part of the parties or an error is unknown to the Court. What is known and wholly supported by the record is that Defendants could have called and examined all three plaintiff candidates as a priority during the hearing whether or not Plaintiffs elected to testify themselves in support of their motion for a preliminary injunction, especially in light of the Verified Complaint that was filed by them. Nevertheless, for reasons of their own choosing, Defendants only focused on Mr. Kim.

### 1.    Witness Testimony: Ryan Macias (Hearing Tr. 71–158)

Ryan Macias testified by video at the Hearing. Mr. Macias has worked for nearly 20 years in election infrastructure technology and security, as well as election administration and election policies. (Hearing Tr. 73:12–14). He was the acting director of voting systems and testing and certification program under the U.S. Election Assistance Commission, the agency designed by Congress to conduct testing and certification for voting systems in federal elections. (*Id*. 73:17–74:4.) He now owns a private consulting company that provides guidance to domestic and international election management bodies. (*Id*. 74:5–11). Having reviewed Mr. Macias' education and experience, the Court finds that he is qualified to testify as an expert on election technology. Mr. Macias described the voting systems in place in New Jersey and the election management software used design ballots. (*Id*. 75:14–118:14.) He testified that New Jersey's vote-by-mail and

in-person electronic voting systems have the ability to layout a ballot in an office-block style. (*Id*. 118:11–14.) He noted that the office-block ballot design was already used in the same or similar voting systems across the county. He further opined that the office-block style was actually less complicated and therefore less time consuming to lay out. On the whole, assessing Mr. Macias' demeanor, manner in which he testified, and the substance of his testimony together with other corroborative evidence, the Court found Mr. Macias's testimony credible and assigns it substantial weight.

2.    <u>Witness Testimony: Andy Kim  (Hearing Tr. 164–245)</u>

Congressman Andy Kim testified in person at the hearing. Mr. Kim held a variety of roles within the executive branch of the federal government until he was elected as U.S. Congressman for New Jersey's Third District in 2018. He was re-elected to the same office in 2020 and 2022. Mr. Kim testified as to the reasons he filed this suit:  his frustration with the current primary ballots and the effects they have on him individually and on his campaign. He also explained the timing as to when it was brought:  his attempts to approach the county clerks on the ballot issue without a response, then trying to balance assembling the evidence he needed to bring strong case against bringing suit in a timely manner. He testified as to the effect that the county line has on candidates and their campaigns. (*see, .e.g, Id*. 168:16–170:2.) Based upon Mr. Kim's demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found Mr. Kim's testimony to be credible and assigns it substantial weight.

3.    <u>Witness Testimony: David Passante (Hearing Tr. 250–280)</u>

David Passante testified in person at the hearing. He is co-owner of a printing service that does a lot of government work, and specializes in the printing of ballots. His company has been printing ballots in New Jersey since 1983. It has been printing New Jersey county ballots since 1994. It currently prints ballots for 11 counties in New Jersey. Ten of those use bracketing. Mr.

Passante opined that if the ballot layout for the primaries were to change—due to the deadlines his staffing, training required—the result within his company would be "chaos." (Hearing Tr. 257:12–14.) He expressed doubt that it could be done in time. On cross-examination, Plaintiffs challenged Mr. Passante on bias based on his company's relationship with the county clerks and its $6 million per year revenue earned from ballot printing. They also showed him office-block ballots prepared by his company that were prepared using the ES&S system. The Court concluded by questioning Mr. Passante whether, if requested by a county clerk, his company could find a way to print office-block ballots. Tellingly, Mr. Passante responded that his company would find a way. (Hearing Tr. 282:4–283:5.) Based upon his demeanor, manner in which he testified, and conflicting and contradictory testimony, the Court finds that Mr. Passante's testimony with respect to Defendants' professed inability to deliver office-block ballots for the 2024 Primary was of low credibility, and the Court assigns it minimal weight.

### 4. Witness Testimony: Andrew Wilson Appel (Hearing Tr. 284–302)

Dr. Appel testified in person at the hearing. Having reviewed Dr. Appel's education and experience, the Court finds that he is qualified to testify as an expert on election technology. Plaintiffs adopted his expert report for the purposes of his direct testimony (ECF No. 1-5). His report surveyed the voting machines used in New Jersey and their related election management software. He opined that the work required to prepare office-block ballots using the current systems "will not be significantly different from the work or effort needed to prepare row-and-column ballots." (ECF No. 1-5 at 5.) On cross examination, Defendants challenged the bases for Dr. Appel's opinion with respect to particular voting systems (including the ExpressVote) and election management software. On re-direct, Plaintiffs elicited testimony that emphasized Dr. Appel's overall assessment and a fundamental premise underlying his opinion: that voting machines from manufacturers come with software that accommodates many ballot designs and

that no software or hardware updates would be required to perform office-block voting.  The Court found Dr. Appel's testimony credible and assigns it substantial weight based upon his demeanor, manner in which he testified, and substance of his testimony which was corroborated by other evidence.

5. <u>Witness Testimony: Julia Sass Rubin  (Hearing Tr. 309–333)</u>

Dr. Rubin testified in person at the hearing.  Plaintiffs adopted her expert report for the purposes of her direct testimony.  The Court has reviewed Dr. Rubin's education and experience (Rubin Report at 2, and Appendix B thereto), and it satisfied that she is qualified to serve as an expert in the area of public policy.  The relevant substance of her testimony and her expert report and Defendants' cross-examination is discussed later in this Opinion.  Based upon Dr. Rubin's demeanor, manner in which she testified, and substance of her testimony which was corroborated by other evidence presented, the Court found her testimony credible and assigns it substantial weight.

6. <u>Witness Testimony: Christine Hanlon (Hearing Tr. 335–369)</u>

Christine Hanlon testified in person at the hearing.  She was elected Monmouth County Clerk in 2015 and has held the office since then.  She described the responsibilities of her office, as well as the magnitude of the effort assorted with voting in her county.  With respect to ballot changes, she expressed her concern that "there is a design process that would need to be undertaken to determine where things go, whether the equipment and software that we have could accommodate changes to the ballots that we have right now."  (Hearing Tr. 358: 5–10.)  Her office "would have to undertake an analysis of how these races would be laid out on a ballot" and new ballots "would take us some time to figure out where things would go."  (*Id*. 359:6–20.)  In sum, she related that based on communications with her ballot vendor and because her staff is untrained on office-block ballot format, she has "grave concern" about their ability to get this done "in the

26

very short time frame" left. (Hearing Tr. 362:17–363:6.) Although the Court does not express concern regarding Ms. Hanlon's demeanor, the Court found her testimony only moderately credible and assigns it medium weight for a number of reasons. First, for portions of her testimony she was doing little more than recounting what she had been told by third parties. Second, and more importantly, her assertions that she did not know how or if Monmouth County could administer office-block voting and her expressions of concern that they might not be able to, fell short of fully rebutting the direct testimony from Mr. Macias and Dr. Appel. Put another way, saying she was not sure it could be done does not necessarily fully respond to Plaintiffs' expert testimony that it can be done. Ms. Hanlon's testimony appeared to be based more on speculation than fact.

### 7. Witness Testimony: Noah Dion (Hearing Tr. 374–375)

Noah Dion testified in person at the hearing. He has been Andy Kim's campaign manager since October 13, 2023. Defendants called Mr. Dion to testify as to the timing of Mr. Kim's decision to bring this suit. Mr. Dion's testimony was compatible with Mr. Kim's testimony in this regard and corroborated a similar timeline. Defendants specifically questioned Mr. Dion on when the campaign communicated with litigation counsel and experts and when they were retained. The Court, upon assessing Mr. Dion's demeanor, manner in which he testified, and substance of his testimony together with corroborative evidence from others, finds his testimony credible and assigns it substantial weight.

## VI. **LEGAL STANDARD**

To determine whether a preliminary injunction should issue, a court must consider "(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest*." Amalgamated*

*Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty*, 39 F.4th 95, 102–103 (3d Cir. 2022) (quoting *Swartzwelder v. McNeilly*, 297 F.3d 228, 234. (3d Cir. 2002)).

The first two factors are "gateway factors" that the moving party must establish. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020). If they are established, the "court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* (internal quotation marks omitted).

"[W]hen the preliminary injunction is directed not merely at preserving the status quo but . . . at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) (citing *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976)). "[A] mandatory injunction is an 'extraordinary remedy to be employed only in the most unusual case.' " *Trinity Indus. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citing *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)). For a court to grant mandatory injunctive relief, "the moving party's 'right to relief must be indisputably clear.'" *Id.* (quoting *Communist Party of Indiana*, 409 U.S. at 1235).

## VII.    DISCUSSION

### A.    *PURCELL*

Unsurprisingly, Defendants are eager for the Court to view this suit as a last-minute election case, and exercise caution against upsetting the status quo as directed by the U.S. Supreme Court in *Purcell v. Gonzalez*, 549 U.S. 1 (2006). The problem with Defendants' position is that this case is not last-minute. It was filed 100 days before the primary election on June 4th, and well over a month before the April 5th deadline for preparing official primary election ballots for printing. On this basis alone, this case is readily distinguishable from the line of *Purcell* cases invoked by Defendants. *See, e.g., Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396 (E.D.

Pa. 2016) (suit filed mere 18 days before election). The Court is satisfied that it has made every effort to move quickly and efficiently through the briefing and hearing process while protecting the parties' rights to present their positions.[19] The Court is likewise satisfied that it has exhausted its own resources to render a comprehensive decision with substance that is also timely in relation to the 2024 Primary, one that can and should be enforced without disrupting the upcoming election.

## B.    LIKELIHOOD OF SUCCESS ON THE MERITS

### 1.    FIRST AMENDMENT

The parties largely agree that the *Anderson-Burdick* framework applies to Plaintiffs' First Amendment Claims. Indeed, because New Jersey's bracketing system regulates the voting ballots themselves as well as the "the mechanics of the electoral process," the Court finds that the Third Circuit requires the use of *Anderson-Burdick* in this instance. *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142–43 (3d Cir. 2022) ("*Mazo II*") *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (location/timing of regulation and nature/character of regulation decide applicability of *Anderson-Burdick*).

The parties disagree, however, as to the appropriate standard of review under *Anderson-Burdick*. Plaintiffs argue for strict scrutiny because they believe the burdens on their rights are severe. (Moving Br. at 22–32). Defendants argue for rational basis review because they believe the alleged burdens on Plaintiffs' rights are minimal. The Third Circuit has distilled how to determine the appropriate level of scrutiny under *Anderson-Burdick*:

> [t]he *Anderson-Burdick* test "requires the reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden. *Burdick*, 504 U.S. at

---

[19] Application of the *Purcell* principle is also not so automatic as Defendants hope. As recently as March 28, 2024, one Third Circuit judge observed that the *Purcell* concerns did not apply to challenges to mail-in ballot requirements in Pennsylvania. *See Pa. State Conference of NAACP Branches v. Sec. Commonwealth of Pa.*, App. No. 23-3166 at 9 n.5 (3d Cir. 2024) (Shwartz, C.J., dissenting).

434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564). If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564, the court may use *Anderson-Burdick's* sliding scale approach under which a State need only show that its "legitimate interests . . . are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440, 112 S.Ct. 2059.

*Mazo II*, 54 F.4th at 137.

Here, Plaintiffs present argument and evidence that New Jersey's system of bracketing and ballot placement violates their First Amendment rights.

> a)      Burdens on Associational Rights

All Plaintiffs assert that their right to associate (and not associate) with other candidates is burdened by the bracketing system no matter their circumstance with respect to the county line. Notably, they say that if they win the endorsement of a county and appear on the county line, they are forced to appear alongside (and thereby associate with) candidates for other offices with whom they don't wish to associate. Plaintiffs cite various reasons they often would prefer not to associate with other candidates on the county line or a created bracket: differences in policy, differences in personal views, line-mates who are supporting a competing candidate, and not even knowing the other line members. (V.C. ¶¶ 140 (Kim), 154 (Schoengood), 163 (Rush); Hearing Tr. 170:20–171:8 (Kim).) In Plaintiffs' view, if they do not pursue a position on the county line or other bracket, they suffer, whether it is viewed as ceding a significant advantage to their opponents or as being punished for asserting their own right to not associate.

> b)      Burdens of Ballot Placement & the "Weight of the Line"

For the reasons noted above, candidates who do not win a position on the county line and do not bracket are excluded from even the opportunity to be placed in or near the first position on

the ballot.[20] Plaintiffs proffered expert witnesses to show that this imposes real-world burdens on candidates' prospects. As to ballot positioning, Plaintiffs offer Dr. Pasek's expert report.[21] His report reviews and summarizes more than four dozen studies in the literature to support the conclusion that there is a pervasive primacy effect that favors candidates in elections that appear in an early position on a ballot. (Pasek Report ¶¶ 27, 38–43.) Dr. Pasek also assesses four competing studies that called into question that primacy effect. (*Id*. ¶¶ 44–47.) For various reasons the Court finds are sound, he concludes that those competing studies are less credible. (*Id*.) On the whole, the Court finds that Dr. Pasek's report is well-reasoned and suffices to establish, for this preliminary stage of this case, that candidates placed in an early position on a ballot receive a distinct advantage.[22]

As to the effect of the county line on voting ("the weight of the line") apart from its potential for leading to early ballot placement, Plaintiffs offer Dr. Pasek and Dr. Rubin. Dr. Pasek's report describes a voting experiment he designed and conducted involving 1,393 volunteer-voters in two Congressional districts in New Jersey. (Pasek Report ¶¶ 114–157.) He draws several conclusions from his experiment, including that his voters selected candidates endorsed by a county 11.6% more frequently when the endorsed candidates appeared together on a county line than if they appeared separately in office-block format. (*Id*. ¶ 156.) Pasek finds this

---

[20] Here, there is arguably some differences in Plaintiffs' respective circumstances. As already noted, Kim is running for U.S. Senate, which is expected to be considered a pivot office, such that he would not appear far from a first ballot position. He continues to maintain that, given a choice, he would prefer to simply run for office on his own merit without associating with other candidates by appearing on any county line. Schoengood and Rush, running for U.S. Congress, clearly remain subject to the ills of ballot placement and the weight of the line.

[21] Dr. Pasek's report was filed with the Verified Complaint as Exhibit B (ECF No. 1-2) and separately admitted into evidence at the Hearing as P-9. Neither of the parties called him to testify at the Hearing.

[22] On this issue, Plaintiffs also offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.

difference "statistically significant" and concludes that it has "less than a one-in-a-million probability of appearing by chance."[23]  (*Id*.)

Dr. Rubin was called to testify at the Hearing and, for the purposes of her direct testimony, Plaintiffs adopted her report.  (Hearing Tr. 312:8–11; Exhibit C to VC, ECF No. 1-3.)  Dr. Rubin focused her analyses on historical data.  Her findings include the observation that in 35 of the 37 primary contests that took place in New Jersey between 2012 and 2022, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line.  The difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12% points and a median of 11 percentage points."  (Rubin Report at 4.)  On cross-examination at the Hearing, Defendants challenged Dr. Rubin's choice of statistics and whether she had adequately accounted for other potential causes of the effects she observed.  (Hearing Tr. 312:14–332:15.)  In response, she emphasized that her analyses were intended to be statistically descriptive, and that she saw a pattern of the county-line having a consistent positive effect on the race results.  (Hearing Tr. 317:12–19.)  Having considered Dr. Pasek's report and Dr. Rubin's report and her testimony on the issue of ballot placement and the weight of the line, the Court finds that their opinions are well-reasoned and that they suffice to show, again, at this preliminary stage of this case, that the county-line provides a substantial benefit in terms of voting over and above candidates that are merely endorsed by a county. [24]

Based on the foregoing, the Court finds that Plaintiffs have shown a severe burden on their First Amendment rights.  Accordingly, the Court applies exacting scrutiny to decide whether the

---

[23] On this issue, Plaintiffs again offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.
[24] On this issue, Plaintiffs also offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.

laws establishing bracketing and ballot placement are "narrowly tailored and advance a compelling state interest."

          c)      State Interests

Defendants maintain that the current system in 19 counties of bracketing and ballot placement furthers important State interests because it: 1) preserves other candidates' rights and the political parties' rights to associate; 2) communicates those associations of candidates to voters; 3) provides a manageable and understandable ballot; and 4) prevents voter confusion.

As to the first two considerations, Plaintiffs in this case are quick to point out that they are not disputing political parties' rights to associate by choosing their standard bearers or disputing other candidates' rights to associate by choosing common slogans. Nor are Plaintiffs disputing a state's interest in communicating these associations to voters. As the Verified Complaint makes clear, Plaintiffs do not challenge any of these endorsement efforts *even on the ballots themselves*. Plaintiffs challenge is only to the practice of the county line/bracketing and ballot placement, with its attendant infringement on their right to not associate and its outsized effects on primary elections.

As to the last two considerations—state interests in providing a manageable and understandable ballot, and ensuring an orderly election process—Defendants' position is hampered by the fact, pointed out by Plaintiffs and Dr. Pasek, that history has demonstrated otherwise insofar as one-third of all Mercer County voters were disenfranchised in the 2020 Democratic Primary Election because they voted for more than one candidate for the same office due to the current ballot systems. (V.C. ¶ 117; Pasek Report ¶ 109.) Under the circumstances, the Court concludes that the State's interests are not especially compelling.

d)      Balancing the Burdens Against the Interests

Based on Plaintiffs' preliminary showing as to the burden imposed upon them, it is not clear at this stage how these burdens can be justified by the State's interests. This case is different from a previous one addressed by this Court where aggrieved candidates alleged purely legal burdens that could be measured at the motion to dismiss stage. *See Mazo v. Way*, 551 F. Supp. 3d 478, 508 n.12 (D.N.J. 2021) ("*Mazo I*"). This case is also different from another previous case addressed by this Court where aggrieved candidates needed only to allege sufficient factual burdens to survive a motion to dismiss and proceed to discovery. *See Conforti*, 2022 WL 1744774, at *17. Rather, in this case, Plaintiffs have come forward seeking emergent relief and support their application with a substantive factual record, including expert reports and credible expert and factual testimony. On the basis of that record, the Court finds that there is a sufficient likelihood that Plaintiffs will succeed on the merits of their First Amendment claims.

2.      ELECTIONS CLAUSE

The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. Const. art. I, § 4, cl. 1. When the regulation involves the time, place, and manner of primary elections, the only question is whether the state system is preempted by federal election law on the subject. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995). However, when the regulation does not regulate the "time, place, or manner," courts must consider whether the regulation on its face or as applied falls outside that grant of power to the state by, for example, "dictat[ing] electoral outcomes, favor[ing] or disfavor[ing] a class of candidates, or evad[ing] important constitutional restraints. *Cook v. Gralike*, 531 U.S. 510, 523 (2001). The Supreme Court has struck down such regulations when

34

they "attach[ ] a concrete consequence to noncompliance" rather than informing voters about some topic. *Id*. at 524. The timing may also add to the gravity of injury, especially when it occurs "at the most crucial stage in the election process – the instant before the vote is cast." *Id*. at 525 (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)).

Here, as set forth above, the State conferred its power to regulate the "manner" of federal elections to the county clerks, including the Defendant County Clerks, by requiring them to design and print ballots. N.J. Stat. Ann. 19:23-26.1, 19:42-2.  In Defendants' view, the Bracketing Structure is a permissible regulation on the "manner" of federal elections.  On the record already reviewed, Plaintiffs' evidence is sufficient to make their showing of a likelihood they will succeed in establishing that the Bracketing Structure and ballot placement is improperly influencing primary election outcomes by virtue of the layout on the primary ballots.  This would clearly exceed a State's right to regulate the "manner" of federal elections. *Cook*, 531 U.S. at 525 ("the instant before the vote is cast" is the "most crucial stage in the election process").

### C.     IRREPARABLE HARM

Next, the Court considers the extent to which Plaintiffs will suffer irreparable harm absent the requested relief.

"It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  At least one district court, later affirmed by the Third Circuit, noted that "[f]or the purposes of this [preliminary injunction], the Court assumes that Plaintiffs have satisfied the irreparable harm prong if they can demonstrate a constitutional injury." *Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447, 453 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012).  In other instances, however, the Third Circuit has provided that "the assertion of First Amendment rights does not automatically require

a finding of irreparable injury,'" *Hohe*, 868 F.2d at 72–73, and that Plaintiffs who show a likelihood of success on the merits for their First Amendment claim are not entitled to preliminary injunctive relief unless they can show a "'real or immediate'" danger to their rights "in the near future." *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997).

The Court could find that Plaintiffs have satisfied the irreparable harm prong because it concluded that Plaintiffs met their burden of showing success on the merits as to their constitutional challenges. However, the Court additionally finds that Plaintiffs have met their burden to show they are likely to suffer "real or immediate" irreparable harm "in the near future" should the Court not grant the Motion.

From the Verified Complaint through the testimony provided at the Hearing, Plaintiffs have made their position evident as to the associational harm they face with the current ballot design. In particular, Plaintiffs explain that their associational harm is twofold. If Plaintiffs "forfeit their right to not associate with certain other candidates," they will be harmed because they will be "punished for doing so by being excluded from the preferential ballot draw and risk getting relegated to obscure portions of the ballot in Ballot Siberia and/or put themselves at a substantial disadvantage from their opponents." (V.C. ¶ 201.) Alternatively, Plaintiffs are "forced" to associate with candidates "with whom they may not want to associate and whose policies they may disagree with." (*Id.* ¶ 202.)

Defendants' arguments that the changed political landscape has eliminated Kim's associational harm is specious at best. (ECF Nos. 190–91.) First, at the Hearing, Kim testified that he won the Monmouth County convention making him the endorsed candidate in that county. (Hearing Tr. 182:7–8.) Notably, Kim won and accepted the county line in Monmouth County *before* his main opponent withdrew from the primary. Kim will share the endorsed candidate line

with a congressman who chose *not* to endorse Kim and "is not supportive of [Kim's] campaign." (*Id.* 182:9–14.)   Kim faces a similar problem in Morris County too.   (*Id.* 182:18–22.)   Kim expressed that being on the same line with candidates that do not support him is "difficult" because it affects his campaign and voter engagement.   (*Id.* 182:21–24.)   Finally, Kim explained how being on the same candidate endorsed line with candidates that "are actively working against each other" is confusing to voters: "whole idea of association, you know, presents the idea that these are candidates that chose to associate with each other" yet Kim has not had formal conversations with nor does he "even know most of these candidates."   (*Id.* 183:5–14.)

Not only does Kim contend that the associational harm will be eliminated if this Court grants Plaintiffs relief, Kim underscored that he "just want[s] to run for the Senate seat."   (*Id.* 184:2–7.)   Kim does not want "to consider, you know, dozens if not hundreds of other candidates across multiple counties" but that he "unfortunately [has to] given the system here in New Jersey." (*Id.* 184:17–21.)   The Court reiterates that Kim's harms are not alleviated because his main opponent withdrew from the election.   Kim's harms, like Schoengood and Rush's, are real and immediate whether or not they are on the county line or not.

Second, though Defendants disproportionately focus on Kim, the Court emphasizes that Schoengood and Rush will also face irreparable harm.   Schoengood will not be on the county line in the three counties within her congressional district.   (V.C. ¶¶ 151–57; ECF No. 188 at 1.)   Nor will Schoengood be bracketed with any candidates, thus leaving her "vulnerable to be placed with ballot gaps in between her bracketed opponents or otherwise put out in Ballot Siberia, and/or could be either in a column by herself or stacked in a column with other candidates for the same or different offices with whom she does not want to associate."   (V.C. ¶ 156.)   As evidenced by Dr. Pasek's report, the impact on a candidate who fails to secure the county line or the first ballot

position is consequential. Dr. Pasek concluded that "[p]rimacy biases in New Jersey elections will always negatively impact candidates who do not bracket with a candidate for the pivot-point position, as these candidates are guaranteed to be placed in positions further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position." (Pasek Report ¶ 81.)

More specifically, Dr. Pasek found that "all candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates." (*Id.* ¶ 144.) Even just among bracketed candidates that are not in a column by themselves, "the earlier listed candidate received an 8.2% and 11.1% benefit over chance and 16.5% and 22.2% benefit over later-listed candidates" in the districts the study was conducted in. (Moving Br. at 9 n.9; Pasek Report ¶ 143.) Dr. Pasek's report, together with the other reports and testimony, highlights the negative impact resulting from a failure to secure the county line. However, the evidence as it relates to unbracketed candidates further explains the harm that a candidate faces when they choose to remain unbracketed in exchange for exercising their right to associate. As such, unbracketed candidates like Schoengood will be harmed.

Similarly, Rush will be off the county line in two of the counties within her congressional district. (ECF No. 188 at 1.) In these two counties, Rush will also remain unbracketed and will face the same harm that Schoengood faces. In three other counties within her congressional district, Rush will be on the county line. However, in two of these districts, Rush will be bracketed with her opponents in the same column, creating the perception that Rush is associated with these candidates although she is not. [25]

---

[25] There is an additional concern of overvoting that occurs when candidates are stacked together in the same column in "vote for one" counties. (V.C. ¶ 117.) For example, Mercer County is a vote for one county whereby multiple

Lastly, Defendants largely challenge that any harm Plaintiffs will suffer is the product of their own delay.[26]   Defendants claim that Plaintiffs "slow-walked" bringing this action and therefore "orchestrated" the existence of harm.  (Hearing Tr. 55:12–19.)  As previously discussed, the Court is not persuaded by Defendants' challenge for several reasons.

First, Defendants improperly frame undue delay as fatal to Plaintiffs' Motion.  However, delay is only one of the various *factors* a court considers when addressing a preliminary injunction.  *See Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 99 F. Supp. 3d 461, 504 (D.N.J. 2015) (noting that delay is an "important factor bearing on the need for a preliminary injunction, particularly irreparable harm"); *Cortés*, 218 F. Supp. 3d at 404 (considering plaintiffs' unreasonable delay as part of the court's analysis of the preliminary injunction and relief sought).  Therefore, the Court considers any delay as it relates to Plaintiffs irreparable harm.

Second, to the extent Defendants argue that Plaintiffs have unreasonably or unduly delayed, the Court disagrees.  Defendants characterize Plaintiffs' Motion as an "eleventh-hour application" and argue that Plaintiffs "have known about New Jersey's ballot structure for years" yet they "rested on their claims until the final weeks of preparation for the Primary Election."  (*Id.* at 19, 46.)  Defendants contend that that Kim's "clock on applying for injunctive relief" started in September of 2023 when he decided to run for Senate.  (ECF No. 191 at 2.)  However, Plaintiffs' written submissions and testimony at the Hearing clarified why Plaintiffs filed the emergent application when they did.

At the Hearing, Kim explained the timeline from when he decided to run in September of 2023 to when Plaintiffs filed this action in February of 2024.  Kim first explained that after

---

candidates are stacked in the same column but voters may only select one.  (*Id.*)  Dr. Pasek explained that in the 2020 Democratic Primary Election in Mercer County, a vote for one county, 32.4% of voters overvoted resulting in their votes being invalidated.  (Pasek Report ¶ 109.)
[26] Defendants Hanlon

speaking with his senior staff, "sometime in December [2023] was the first time that [Kim] had conversations with different attorneys." (Hearing Tr. 189:7–11.) Next, Kim described some of the considerations he faced about taking legal action. Kim explained that a key other consideration he faced was whether he was "able to demonstrate a — a real and non-speculative injury, a harm done to [Kim] personally." (*Id.* 189:12–18.) When asked when, it if at all, Kim faced a concrete injury, Kim stated the following: "So the concrete injury that happened in a real and non-speculative way was on February 10th [2024] with the – with the awarding of the actual formal, official county-line in Passaic County on February 10th. That was – that was adverse to me." (*Id.* 190:5–13.) Kim expressed concern that if he brought the action any sooner than February 10th, it "would be seen as – that [Kim had] not actually been injured at that point." (*Id.* 196:10–14.) Kim also feared that if he brought an action too soon, "there could be efforts to try to dismiss or push off" because he lacked an injury. (*Id.* 196:14–16.)

Kim also testified about his understanding of preliminary injunctions and how they "[require] a very high burden of evidence and proof to be able to demonstrate." (*Id.* 189:19–23.) Consequently, Kim became familiar with the types of evidence, research, and testimony that would be required to reach the burden and to make a "successful case." (*Id.* 189:24–190:4.) Kim subsequently testified about the various research and expert reports ultimately produced and why these materials were critical to his case. Ultimately, Kim emphasized that because of the high threshold he believed was required for a preliminary injunction, Kim needed "all of the necessary research and evidence that [he] felt was necessary to reach it." (*Id.* at 196:17–23.)

Having considered Kim's testimony, and Plaintiffs' written submissions, the Court rejects Defendants' position that Plaintiffs have unduly delayed bringing this action. Plaintiffs have explained that they filed suit as soon as they believed there was a concrete injury on February 10,

2024. And Plaintiffs filed the Verified Complaint and the present Motion about two weeks later on February 26, 2024. Plaintiffs even appreciated the consequences of filing this action prematurely.[27]

Also, Plaintiffs assert that the relief sought can be accomplished in time for the 2024 Primary. (V.C. ¶ 18.) Plaintiffs explain that the action was "filed 100 days prior to the Primary Election, almost two months before vote by mail ballots are to be sent out, about one and a half months before the ballot draw, and even almost a full month prior to the petition filing deadline." (Reply at 5.) In sum, despite Defendants' arguments to the contrary, the Court finds based on the entire record before it that Plaintiffs have timely filed this Motion.

### D.    BALANCE OF THE HARM

Given the Court's finding that Plaintiffs have successfully met the first two prongs, it must next consider the final two factors. The third factor requires the court to "balance the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). At this stage, a court should also consider "the possibility of harm to other interested persons from the grant or denial of the injunction." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (internal citation and quotation marks omitted). "[W]hen considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other." *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974).

---

[27] Testimony from Kim's campaign manager, Mr. Dion, further supported Kim's testimony about the timing of the action. Mr. Dion stated that as of late January 2024, "we had not made, in my summation, a final decision, because there needed to be other pieces brought together." (Hearing Tr. 380:23–381:7.)

Plaintiffs argue that, should the Court grant injunctive relief, any harm to Defendants would be minimal and would pale in comparison to the deprivation of Plaintiffs' constitutional rights. (Moving Br. at 51.)  Plaintiffs assert that office-block ballots would be easy for Defendants to implement, as it is already regularly used in two New Jersey counties.  (*Id.*)  Not only is the required infrastructure already in place according to Plaintiffs, (Moving Br. at 52), but the two voting systems that are predominantly used in New Jersey, ES&S[28] and Dominion, have already been employing the office-block ballots in various elections throughout the state, including in some of Defendants' counties,[29] with the same software and vendors that will be used in the 2024 Primary.  (Reply at 28–34 (detailing various elections that have occurred in New Jersey using Office Block Structure entirely or Office Block Structure plus other structures in a hybrid format).)  Plaintiffs provide the expert report and testimony of Dr. Andrew W. Appel, (Moving Br. at 51–52; V.C. ¶¶ 130–33; Appel Report at 2–6; Hearing Tr. 285:17–286:7), as well as the expert report and testimony of Ryan Macias to show that voting machines in New Jersey are capable of accommodating office-block ballots.  (ECF No. 115-1; Hearing Tr. 92:11–96:19.)  Furthermore, Plaintiffs provide the expert report of Edward P. Perez to show that changing a ballot's layout after the data has been entered takes just "a matter of hours," or one day at most.  (Reply at 29, 35–36, Ex. C ¶ 27.)  Plaintiffs emphasize that their requested relief would not eliminate counties' slogans, ability to endorse candidates, or right to associate by any constitutional means, and that the same election procedures must occur with or without a court order in preparation for the 2024 Primary. (Moving Br. at 52; Reply at 29.)

---

[28] In full, Election Systems & Software, LLC.

[29] Plaintiffs specify that some County Clerk Defendants have admitted to using office-block ballots, or incredibly deny knowledge of same.  (Reply at 30, 33–34.)

Defendants, on the other hand, argue that Plaintiffs' lack of urgency in bringing the lawsuit negates any purported harm to Plaintiffs.  (ECF No. 60 at 26.)  As for potential harm to others, some Defendants argue that a change in the ballot design cannot be effectuated in time for the 2024 Primary,[30] while other Defendants state that imposing the change in such a short timeframe would be a significant hardship to election workers and officials.  (ECF No. 16 at 5; ECF No. 26 at 2; ECF No. 44 at 9–10; ECF No. 51 at 40–41; ECF No. 61 at 49–53 (describing the 2024 Primary ballot as "particularly complex"); ECF No. 63 at 47.)  Defendants provide a certification from Benjamin R. Swartz, the Principal State Certification Manager for ES&S, (ECF No. 60 at 26 (citing Swartz Aff. (ECF No. 46)); ECF No. 61 at 54 (same)), witness testimony from County Clerk Hanlon, (Hearing Tr. 358:19–364:9), and a certification plus witness testimony from David Passante, owner of Royal Printing Services, to support their arguments concerning the timeline implications of Plaintiffs' request at this stage of the election cycle.  (ECF No. 53 at Ex. A; Hearing Tr. 257:12–263:5.)  Additionally, Defendants assert that the change sought by Plaintiffs would cause chaos and disruption, destroying the integrity or fairness of the election.  (ECF No. 26 at 1; ECF No. 50 at 25; ECF No. 51 at 41; ECF No. 59 at 17; ECF No. 60 at 24–26; ECF No. 61 at 55.) They argue that injunctive relief would not only cause voter confusion and distrust in the system (ECF Nos. 51 at 42, 65 at 15), but it would impose a burden on election officials to educate voters about the new design and potentially lead to disenfranchisement.  (ECF No. 48 at 1–2; ECF No. 51 at 42; ECF No. 53 at 15; ECF No. 59 at 17; ECF No. 61 at 50, 53; ECF No. 65 at 15.) Defendants insist that injunctive relief would infringe upon the broad discretion of the Defendants

---

[30] Plaintiffs counter that even if revisions are necessary to the ballot, they will take a matter of hours or one day at the most to effectuate, not weeks or months.  (Reply at 36.)

to design ballots in a manageable and understandable way, as well as the rights of various non-parties.[31]  (ECF No. 54 at 20–21.)

Given the extensive evidence in the record, and the relative weight the Court has assigned to each witness's testimony, the Court finds that the harm Plaintiffs would suffer absent an injunction well exceeds the harm that Defendants would suffer should the Court grant the injunction.  Plaintiffs have put forth credible evidence not only that their constitutional rights are violated by the present ballot design used in New Jersey, which is used in no other state in the country, *see supra* discussion of irreparable harm, but that Defendants would suffer minimal harm in implementing the ballot design requested by Plaintiffs.[32]  First, Defendants' argument that they simply cannot implement the Office Block Structure is readily belied by the fact that two counties in New Jersey, Salem and Sussex, already use office-block ballots for primary elections, and that some of the other counties have used the office-block ballots for other elections, including in a school board election, nonpartisan municipal election, school board race, fire commission race, and general elections.  (V.C. ¶ 55; Reply at 28–34; *see also* Appel Report at 2–6; Hearing Tr. 285:17–286:7; ECF No. 115-1; Hearing Tr. 92:11–96:19 ("[A]ll voting systems used in New Jersey have the ability to lay out ballots without the county-line style.").)  Even considering the reduced timeframe in which Defendants would have to change the ballot design before the 2024 Primary, the evidence indicates that it can be done.  (*See, e.g.*, Perez Decl. ¶¶ 21–23, 27.)  In fact,

---

[31] Specifically, Defendants argue that the following rights and interests will be infringed: the state legislature's interest in organizing ballots in such a way (ECF No. 54 at 20); the right of other candidates to associate (ECF No. 54 at 20–21; ECF No. 57 at 12–13; ECF No. 60 at 26); and the fundamental right of New Jersey's political parties to associate, which is particularly concerning because they are not named as parties in the lawsuit and thus their interests are not represented, (ECF No. 53 at 14–15; ECF No. 65 at 14).

[32] The Court notes that assertions by Defendants that they lack knowledge about what it would require to implement a change in the ballot design or about how it works are not responsive to Plaintiffs' argument that the ballot design can in fact be easily changed.

the undersigned asked that exact question to Defendants' witness Passante at the Hearing, during which the following exchange occurred:

> THE COURT: So erase me from the equation and erase this entire courtroom. One of the county clerks, they decide their preference is office ballot, and they come to you and your company and say, This is how we want it done. You tell them No, get another vendor?
>
> THE WITNESS: No.
>
> THE COURT: It would be chaos or you would find a way to do it?
>
> Do you see the difference between my question and the one that these guys have been asking?
>
> THE WITNESS: Yes.
>
> THE COURT: So what do you tell your client? What do you tell the county clerk when he or she says, We want this done. We made a decision that we prefer this ballot in this county for this election. Do you say yes or no?
>
> That's my first question.
>
> THE WITNESS: Yes.
>
> THE COURT: And you find a way to do it, correct?
>
> THE WITNESS: One hundred percent, yes.

(Hearing Tr. 282:12–283:5.)[33]

The Court finds that the effort that it would take Defendants to implement Office Block Structure in their respective ballots does not pose more harm than that suffered by Plaintiffs now because of the existing structure. *See supra* discussion of irreparable harm. Moreover, the timeline for implementing the change would not require the drawn-out process that Defendants would have

---

[33] ECF No. 191 points to a list of "unrefuted evidence in the record" that the suggested ballot changes cannot be implemented on time; this exchange with a witness called by the Defendants, along with testimony and reports from Plaintiffs' experts, squarely refute that contention.

the Court believe; rather, the evidence suggests that it would take not nearly as long. (*See, e.g.*, Reply at Ex. C ¶ 27.)[34]

In sum, the Court finds that Plaintiffs have shown that the harm to them absent an injunction exceeds the harm Defendants and other interested persons would suffer in the face of an injunction here. Accordingly, the Court finds that this factor also weighs in favor of granting Plaintiffs' Motion.

### E. PUBLIC INTEREST

Finally, the Court must weigh whether the public interest favors injunctive relief pending the outcome of this litigation. "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). The Third Circuit has recognized that "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997).

Plaintiffs argue that government compliance with the Constitution "should always be in the public interest, particularly where the fundamental right to vote is at stake." (Moving Br. at 52.) They provide the expert report of Dr. Pasek to show that the current Bracketing System can be outcome-determinative even when candidates win by double-digit margins. (*Id.* at 52; V.C. ¶ 127; Pasek Report ¶ 183.) Plaintiffs urge that injunctive relief is necessary to restore the power of the people to select nominees "without unnecessary government interference" and to instill confidence in election results. (Moving Br. at 53.)

---

[34] To the extent Defendants argue that the state legislature will be harmed if they cannot continue to organize their ballots using the Bracketing Structure under the current statutory framework, that argument fails because it is well-settled that there is no legitimate interest in the enforcement of an unconstitutional law. *Am. Civ. L. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).

Defendants argue that no fundamental rights are at stake, and Plaintiffs are acting in their own interest rather than for the public interest. (ECF No. 51 at 43, 46.) Defendants assert that, rather, the following public interests are at stake[35]: an interest in allowing states to regulate their own elections absent judicial intervention, especially when intervention would require last-minute ballot changes, (ECF No. 53 at 15–16; ECF No. 60 at 27–28); an interest in allowing candidates to signal to voters their chosen political associations, (ECF No. 50 at 24; ECF No. 60 at 27; ECF No. 61 at 58–59); and an interest in the "orderly administration of elections," (ECF No. 53 at 16–17 (citing Passante Cert., ECF No. 53 at Ex. A); ECF No. 61 at 56; ECF No. 65 at 16.) Defendants additionally argue that injunctive relief should not be granted on the "eve of an election," as it would confuse voters, cause them to feel distrust, disenfranchise them, (ECF No. 51 at 45–46, 53 at 16, 60 at 28, 61 at 58, 65 at 16.) Defendants point Plaintiffs instead towards "multiple political remedies" that they can use to address their concerns, as well as the state Legislature as another option for redress. (ECF No. 53 at 15–16, 65 at 15–16, 50 at 23 n.5) Lastly, Defendants argue that current election laws have already been deemed constitutional by New Jersey state courts (ECF No. 51 at 43–45.)

Here, the Court has already found a likelihood of success on the merits for Plaintiffs as well as a showing of irreparable harm, including the likelihood of constitutional violations. *See supra*. The Court finds that the concerns expressed here by Defendants are not the "legitimate, countervailing concerns" to be favored over the protection of Plaintiffs' constitutional rights in such a situation. *Council of Alt. Pol. Parties*, 121 F.3d at 883–84. Although mindful of Defendants' various concerns, the Court finds they do not weigh more heavily than the public

---

[35] Defendants argue that the public interests at stake here require fact discovery before any injunction should be granted. (ECF No. 60 at 28.)

interest in having candidates running in the 2024 Primary presented on the ballot in a fair and equal manner that is free from unnecessary government interference. (ECF No. 192 at 4.)

Accordingly, the Court concludes that public interest favors granting Plaintiffs' motion for a preliminary injunction. *Council of Alt. Pol. Parties*, 121 F.3d at 883–84; *Am. Tel. & Tel. Co.*, 42 F.3d at 1427 n.8.

### F.    SECURITY

Having concluded that a preliminary injunction order should issue, the Court turns to the final consideration under Rule 65: bond. Fed. R. Civ. P. 65(c). This is not a commercial case. Plaintiffs are claiming violations of their constitutional rights. Defendants have raised no more than speculative concerns that some counties may incur million-dollar costs *if* technical obstacles force them to switch to vote-by-mail for the 2024 Primary. The Court finds that imposing a bond on Plaintiffs based on this type of speculation would constitute an unnecessary hardship on Plaintiffs. On balance, the Court therefore finds it appropriate to waive the bond requirement of Rule 65. *See Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996); *Koons v. Platkin*, 673, F. Supp. 3d 515, 671 (D.N.J. 2023).

## VIII.  <u>CONCLUSION</u>

As a final note, the Court wishes to make clear that it recognizes the magnitude of its decision. The integrity of the democratic process for a primary election is at stake and the remedy Plaintiffs are seeking is extraordinary. Mandatory injunctive relief is reserved only for the most unusual cases. Plaintiffs' burden on this Motion is therefore particularly heavy. Nevertheless, the Court finds, based on this record, that Plaintiffs have met their burden and that this is the rare instance when mandatory relief is warranted.

For the reasons stated above, the Court will **GRANT** the Motion for Preliminary Injunction. Defendants' Motions in Limine will be **DENIED**. An appropriate Order will follow.

Date: March 29, 2024

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

# Exhibit D

1

```
 1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
 2   _____

 3   ANDY KIM, in his personal capacity
     as a candidate for U.S. Senate, ANDY
 4   KIM FOR NEW JERSEY, SARAH SCHOENGOOD,
     SARAH FOR NEW JERSEY, CAROLYN RUSH      CIVIL ACTION NUMBER
 5   and CAROLYN RUSH FOR CONGRESS,
        Plaintiffs,                          3:24-cv-01098-ZNQ-TJB
 6
        vs.                                  PRELIMINARY INJUNCTION
 7                                           HEARING
     CHRISTINE GIORDANO HANLON, in her
 8   Official capacity as Monmouth County
     Clerk, et al.,
 9     Defendants.

10        and

11   DALE A. CROSS, in his official
     Capacity as Salem County Clerk,
12   et al.,
        As Interested Parties.
13   _____
               Clarkson S. Fisher Building & U.S. Courthouse
14             402 E. State Street, Trenton, New Jersey 08608
               Monday, March 18, 2024
15             Commencing at 10:37 a.m.

16   B E F O R E :        THE HONORABLE ZAHID N. QURAISHI,
                          UNITED STATES DISTRICT JUDGE
17   A P P E A R A N C E S :

18   WEISSMAN & MINTZ
     BY: BRETT M. PUGACH, ESQUIRE
19       FLAVIO L. KOMUVES, ESQUIRE
     220 Davidson Ave, Suite 410
20   Somerset, New Jersey 08873
     For the Plaintiffs
21
22        Megan McKay-Soule, Federal Official Court Reporter
            Megan_McKay-Soule@njd.uscourts.gov
23                (856) 576-7094

24   Proceedings recorded by mechanical stenography; transcript
             produced by computer-aided transcription.
25
```

*United States District Court*
*District of New Jersey*

2

```
 1   A P P E A R A N C E S :   (Continued)

 2   BROMBERG LAW LLC
 3   BY: YAEL BROMBERG, ESQUIRE
     43 West 43rd Street, Suite 32
 4   New York, New York 10036-7424
     For the Plaintiffs

 5   SPIRO HARRISON & NELSON LLC
 6   BY: BRIAN M. NELSON, ESQUIRE
         JASON CHARLES SPIRO, ESQUIRE
         MARISSA K. DeANNA, ESQUIRE
 7   200 Monmouth Street, Suite 310
     Red Bank, New Jersey 07701
 8   For the Defendant Christine Giordano Hanlon

 9   WILENTZ, GOLDMAN & SPITZER
10   BY: RICHARD WILLE, II, ESQUIRE
         GORDON J. GOLUM, ESQUIRE
11   90 Woodbridge Center Drive, Suite 900
     Woodbridge, New Jersey 07095
12   For the Defendant Somerset County Clerk

13   GENOVA BURNS LLC
     BY: ANGELO J. GENOVA, ESQUIRE
14       RAJIV D. PARIKH, ESQUIRE
         HARRISON C. CLEWELL, ESQUIRE
15       JENNIFER BOREK, ESQUIRE
     494 Broad Street
16   Newark, New Jersey 07102
     For the Defendants Essex, Union and Passaic County Clerks

17   BROWN & CONNERY
18   BY: WILLIAM M. TAMBUSSI, ESQUIRE
     360 Haddon Avenue
19   Westmont, New Jersey 08108
     For the Defendant Camden County Democratic Committee

20   FLORIO KENNY RAVAL, L.L.P
     BY: EDWARD J. FLORIO, ESQUIRE
21   125 Chubb Avenue, Suite 310 - N
     Lyndhurst, New Jersey 07071
22   For the Defendant Hudson County Clerk

23   DeCOTIIS FITZPATRICK COLE & GIBLIN LLP
     BY: JAIME PLACEK, ESQUIRE
24   61 South Paramus Road, Suite 250
     Paramus, New Jersey 07652
25   For the Defendant Bergen County Clerk
```

*United States District Court*
*District of New Jersey*

3

```
 1   A P P E A R A N C E S :   (Continued)

 2   MALAMUT & ASSOCIATES LLC
 3   BY: MARK ROBERT NATALE, ESQUIRE
     457 Haddonfield Road, Suite 500
     Cherry Hill, New Jersey 08002
 4   For the Defendant Joanne Schwartz

 5   CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
 6   BY: KIRSTIN BOHN, ESQUIRE
     300 Lighting Way, Suite 200
 7   Secaucus, New Jersey 07094
     For the Defendant Ann Grossi, Morris County Clerk

 8   CAMDEN COUNTY NEW JERSEY
 9   HOWARD L. GOLDBERG, FIRST ASSISTANT COUNSEL
     520 Market Street
10   Camden, NJ 08102
     For the Defendant Camden County Clerk

11   MIDDLESEX COUNTY NEW JERSEY
12   BY: MICHAEL WILLIAMS, DEPUTY COUNTY COUNSEL
     County Administration Building 2nd Floor
13   75 Bayard Street
     New Brunswick, NJ 08901
14   For the Defendant County Clerk Nancy Pinkin

15   RAINONE COUGHLIN MINCHELLO
     BY: LOUIS N. RAINONE, ESQUIRE
16       DAVID L. MINCHELLO, ESQUIRE
         MATTHEW R. TAVERAS, ESQUIRE
17       CHRISTOPHER D. ZINGARO, ESQUIRE
     555 U.S. Highway One South
18   Suite 440
     Iselin, NJ 08830
19   For the Defendant County Clerk Paula Sollami Covello

20   BARRY, SAHRADNIK, KOTZAS & BENSON, P.C.
     BY: MATHEW B. THOMPSON, ESQUIRE
21   212 Hooper Avenue
     Toms River, NJ 08753
22   For the Defendant County Clerk Scott M. Colabella

23   BELL, SHIVAS & BELL
     BY: JOSEPH J. BELL, ESQUIRE
24   150 Mineral Springs Drive
     Rockaway, NJ 07866
25   For the Defendant County Clerk of Warren County
```

*United States District Court*
*District of New Jersey*

4

```
 1              I N D E X

 2        EXAMINATIONS                      PAGE

 3              RYAN MACIAS                   71
 4   DIRECT EXAMINATION BY MS. BROMBERG       72
     CROSS-EXAMINATION BY MR. NATALE         122
 5   CROSS-EXAMINATION BY MR. TAMBUSSI       152
     CROSS-EXAMINATION BY MR. NELSON         156
 6   DIRECT EXAMINATION BY MR. KOMUVES       158
              ANDY KIM
 7   DIRECT EXAMINATION BY MR. KOMUVES       165
     CROSS-EXAMINATION BY MR. TAMBUSSI       201
 8   CROSS EXAMINATION BY MR. SPIRO          210
     REDIRECT EXAMINATION BY MR. KOMUVES     243
 9   CROSS-EXAMINATION BY MR. FLORIO         245
              DAVID PASSANTE
10   DIRECT EXAMINATION BY MR. NATALE        250
     CROSS-EXAMINATION BY KOMUVES           263
11   CROSS-EXAMINATION BY MR. NATALE:        280
              ANDREW WILSON APPEL
12   DIRECT EXAMINATION BY MR. KOMUVES       285
     CROSS-EXAMINATION BY MS. DeANNA:        287
13   CROSS-EXAMINATION BY MR. PARIKH:        302
              JULIA SASS RUBIN
14   DIRECT EXAMINATION BY MR. NATALE        310
     CROSS-EXAMINATION BY MR. NATALE         311
15   CROSS-EXAMINATION BY MR. PARIKH         331
     REDIRECT EXAMINATION BY MR. PUGACH      333
16            CHRISTINE HANLON
     DIRECT EXAMINATION BY MR. SPIRO         335
17   CROSS-EXAMINATION BY MR. KOMUVES        369
              NOAH DION
18   DIRECT EXAMINATION BY MR. PARIKH        375

19              E X H I B I T S

20   Exhibit No.    Description             Page
21        Plaintiffs' Exhibit 1, 1 in evidence.    88
          Plaintiffs' Exhibit 2 in evidence.       91
22        Plaintiff's Defendant's Exhibit 3        99
     in evidence.
23        Plaintiff's Exhibit 4 in evidence.      103
          Plaintiffs' Exhibit 5 in evidence.      110
24        Plaintiffs' Exhibit 6 in evidence.      110
          Plaintiffs' Exhibit 7 in evidence.      112
25        Plaintiffs' Exhibit 8 in evidence.      165
          Plaintiffs' Exhibit 9 in evidence.      192
```

*United States District Court*
*District of New Jersey*

**5**

EXHIBITS

| | |
|---|---|
| Defendant's Exhibit 3 in evidence. | 242 |
| Plaintiffs' Exhibit 10 in evidence. | 289 |
| Defendants' Exhibit 4 received in evidence. | 343 |

---

**6**

1    (PROCEEDINGS held in open court before The Honorable
2  ZAHID N. QURAISHI, United States District Judge, on March 18,
3  2024, at 10:37 a.m.)
4        THE DEPUTY COURT CLERK:  All rise.
5        THE COURT:  All right, folks.  Please be seated.
6  Thank you.
7        Good morning.  We are on the record in Kim, et al.,
8  versus Hanlon, et al., docket number 24-1098, for a
9  preliminary injunction hearing.
10       Before I address some housekeeping issues with counsel,
11  let me just have appearances of counsel, beginning with the
12  plaintiff.
13       MS. BROMBERG:  Your Honor, Yael Bromberg on behalf of
14  the plaintiffs --
15       THE COURT:  You've got to stand.
16       MS. BROMBERG:  Sorry.
17       Yael Bromberg with Bromberg Law on behalf of the
18  plaintiffs.
19       THE COURT:  Good morning.
20       MS. BROMBERG:  Good morning.
21       MR. PUGACH:  Good morning, Your Honor.
22       Brad Pugach from Weissman & Mintz LLC, on behalf of the
23  plaintiffs.
24       THE COURT:  Good morning.
25       MR. KOMUVES:  Good morning, Your Honor.  May it

---

**7**

1  please the Court.
2        Flavio Komuves, K-O-M-U-V-E-S, of Weissman & Mintz, for
3  the plaintiffs.
4        THE COURT:  Good morning.
5        For the defense, I don't know how you're going to
6  organize this, but you all should have figured it out by now.
7        MR. GENOVA:  Well, we'll do our best.
8        Your Honor, good morning.
9        Angelo Genova, Genova Burns, Newark, New Jersey, on
10  behalf of the county clerks of Union County, Essex County,
11  Passaic County, Cumberland County, Salem County, Atlantic
12  County, Hunterdon County, Gloucester County.
13       I think I got them all on the list.
14       THE COURT:  All right.  Good morning, Mr. Genova.
15       MR. PARIKH:  Good morning, Your Honor.
16       Raj Parikh also of Genova Burns for those same parties.
17       THE COURT:  All right.  Good morning, Mr. Parikh.
18       MR. RAINONE:  Good morning, Your Honor.
19       Louis Rainone, Rainone Coughlin Minchello, on behalf of
20  the county clerk of Mercer County, Paula Sollami Covello.
21       THE COURT:  Good morning.
22       MR. TAMBUSSI:  Good morning, Your Honor.
23       William M. Tambussi for Camden County Democratic
24  Committee.
25       THE COURT:  Good morning.

---

**8**

1        MR. GOLDBERG:  Good morning, Your Honor.
2        Howard L. Goldberg, Assistant County Counsel for Camden
3  County on behalf of the Camden County Clerk.
4        THE COURT:  Good morning to you.
5        MR. NATALE:  Good morning, Your Honor.
6        Mark Natale from Malamut & Associates on behalf
7  Burlington County Clerk.
8        MR. FLORIO:  Good morning, Your Honor.
9        Edwin J. Florio, Florio Kenny Raval, on behalf of
10  Hudson County Clerk, E. Junior Maldonado.
11       THE COURT:  Good morning.
12       MR. WILLIAMS:  Good morning, Your Honor.
13       Michael Williams, Deputy County Counsel for Middlesex
14  County on behalf of Middlesex County, County Clerk Nancy
15  Pinkin.
16       THE COURT:  Good morning.
17       MR. GENOVA:  May it please the court.
18       Angelo Genova, also on behalf of the Burlington County
19  Clerk.
20       MR. THOMPSON:  Good morning, Your Honor.
21       Mathew Thompson from Barry Sahradnik Kotzas & Benson on
22  behalf of the County Clerk Scott M. Colabella.
23       MS. DEANNA:  Marissa Deanna on behalf of the Monmouth
24  County Clerk.  Good morning.
25       MR. SPIRO:  Jason Spiro from Spiro, Harrison & Nelson

1  on behalf of Monmouth County.

2  THE COURT: Good morning.

3  MR. NELSON: And Brian Nelson, Spiro, Harrison &

4  Nelson also on behalf of Monmouth County Clerk, Christine

5  Hanlon.

6  THE COURT: Good morning.

7  MR. MINCHELLO: Good morning, Your Honor.

8  David Minchello from the law firm of Rainone Coughlin &

9  Minchello on behalf of the Mercer County Clerk.

10  MS. BOREK: Jennifer Borek from Genova Burns on

11  behalf of the same counties as Mr. Genova.

12  MR. GOLUM: Gordon J. Golum and Richard Wille,

13  Wilentz, Goldman & Spitzer on behalf of the Somerset County

14  Clerk.

15  THE COURT: Folks, by the way, if you're outside,

16  just project a little bit for the court reporter so she can

17  make sure she gets your appearance on the record.

18  MR. BELL: Good morning, Your Honor.

19  Joseph J. Bell on behalf of the County Clerk of Warren

20  County.

21  THE COURT: Good morning.

22  MR. PLACEK: Good morning, Your Honor.

23  Jaime R. Placek, P-L-A-C-E-K, of DeCotiis Fitzpatrick

24  on behalf of the Bergen County Clerk John Hogan.

25  THE COURT: Good morning.

1  MR. TAVERAS: Matthew R. Taveras, Rainone Coughlin

2  Minchello, on behalf of Mercer County Clerk.

3  THE COURT: Good morning.

4  MS. BOHN: Good morning, Your Honor.

5  Kirstin Bohn, Chasan Lamparello Mallon & Cappuzo on

6  behalf of the Morris County Clerk.

7  MR. ZINGARO: Good morning, Your Honor.

8  Christopher Zingaro, Rainone Coughlin Minchello, also

9  for Mercer County Clerk.

10  THE COURT: Mr. Genova, is that everybody? Nope.

11  You got one.

12  MR. CLEWELL: Harrison Clewell, Genova Burns, on

13  behalf of the same defendants as Mr. Genova.

14  THE COURT: All right. Well, that hopefully is the

15  most difficult part of this morning, but we'll see.

16  Well, let me just say a few things, and then, if

17  there's any housekeeping issues either from the plaintiffs'

18  side or the defense side, I'm happy to hear from you before we

19  get started, but let me address a few issues right out of the

20  gate.

21  So first, let me say I appreciate the parties

22  continuing to meet and confer on how you intended to proceed

23  today as directed by the Court, but I want to be very clear

24  that you have today and today only.

25  This is not a situation where you are going to request

1  from me additional time or dates to present evidence to the

2  Court, so I want to make sure that you use your time wisely.

3  And I'm telling you now, for both sides, if you have to

4  make adjustments, I strongly suggest you make them, because

5  today is your day to present.

6  One issue on the bond: I think plaintiffs' counsel

7  actually mentioned it; they didn't think a bond was

8  appropriate here, and I don't remember reading anything from

9  the defense side even addressing the bond.

10  So can I presume from the defense side that no bond is

11  necessary because there's no monetary component here, or did I

12  miss it somewhere in the voluminous papers that have been

13  filed in the last three weeks?

14  MR. GENOVA: Your Honor, we actually think it's

15  premature. It would only be triggered by your entry of the

16  injunction, at which point --

17  THE COURT: Well, it's not premature, though. So I'm

18  not saying I'm going to grant the plaintiffs' relief that

19  they're requesting, but normally at a preliminary injunction

20  hearing -- and I'll get to this, by the way, folks, because

21  for some reason some of the lawyers think that what we're

22  doing here is unique to this case. It is not.

23  When a plaintiff files for emergent relief, this Court

24  acts, and this Court acts quickly. So folks that have

25  actually practiced in federal court know this. There's

1  nothing unusual about an expedited brief. There's nothing

2  unusual about demanding that folks have to get into court on

3  time.

4  Basically the plaintiffs are saying there's a fire, and

5  they would rather us not wait for the house to burn down

6  before we put it out.

7  So the bond issue is premature in that I haven't

8  granted the relief, but what you're telling me is that I have

9  to wait, and if I grant the preliminary injunction, then I got

10  to deal with supplemental papers from 19 lawyers to say what

11  the bond should be, if at all.

12  Is that the position? Because I disagree with that.

13  MR. GENOVA: Your Honor, I would say that we're

14  raising it now because we thought it was premature. I

15  understand the Court's view in the --

16  THE COURT: What do you think the bond should be?

17  Have you all talked about it?

18  MR. GENOVA: Well, Your Honor, I think it's going to

19  be a function of whatever costs may be necessitated by

20  whatever relief is ordered by the Court. So I don't know what

21  that is yet because we don't know what the Court's order is.

22  So that's why it's premature, and we don't mean to

23  burden the Court in any way. It just seems to me that that's

24  a component of relief should Your Honor order some kind of

25  change in the ballot design.

13

1    THE COURT:  Yeah, but, Mr. Genova, bonds have been
2  addressed in preliminary injunction hearings well in advance
3  of whether the Court decides to grant or deny the relief, so I
4  don't see what is so unique about this particular case.
5    But what I'm going to -- my understanding, though, is
6  that the defense -- I should not presume that you agree there
7  should be no bond.  The defense's position is a bond may be
8  appropriate or necessary, but you haven't determined yet what
9  the amount is because you're going to wait to decide whether I
10  grant the plaintiffs' relief.
11    Is that fair?
12    MR. GENOVA:  Well, that's fair, with one caveat.
13    THE COURT:  Go ahead.
14    MR. GENOVA:  Not knowing what that relief is, whether
15  you instruct anything with regard to that, we can't price it.
16    THE COURT:  How quickly can you turn around your
17  position on the bond if I grant the relief?
18    MR. GENOVA:  Your Honor, I'd have to ask my client.
19    THE COURT:  Well, it's going to happen quickly.  You
20  ask him.
21    MR. GENOVA:  I would say it would have to happen
22  quickly, and I would say that we would have to get our act
23  together and get some number and then take a formal position
24  with the Court.
25    THE COURT:  All right.  Fair enough.  So I'll take

14

1  this as your position, and I presume that's the collective
2  position of all the defendants.  Is that fair?
3    MR. GENOVA:  I think we can assume that what I say
4  today is the collective position until one of my colleagues
5  gets up and says otherwise.
6    THE COURT:  Fair enough.  I appreciate that,
7  Mr. Genova.  I've got another issue, though, but I'll let you
8  sit first.  I've got to make a comment.
9    So yesterday I received a letter, which I'm sure all
10  counsel is well aware of, from the attorney general of the
11  State of New Jersey dated March 17, 2024, where he simply
12  could have stated that he did not want to intervene in the
13  case, but he ended doing more than that.
14    He opined on the constitutional clause before this
15  Court.  And this is maybe more of question for the defense
16  counsel.
17    My concern is that I don't even know if I should
18  consider that letter at all.  The attorney general is not a
19  party to the case.  In fact, he actually failed to intervene
20  and stated he was not going to intervene in the case.
21    He has not moved to file an amicus brief, so he's
22  lobbying his opinion from the cheap seats without anything
23  behind it.  He's not here today, and he could have easily been
24  sitting at counsel table.
25    So I guess my question for the defense is -- you know,

15

1  the attorney general's filing of this letter on a Sunday, on
2  St. Patrick's Day, the day before this hearing was
3  scheduled -- when I scheduled this hearing on February 29th,
4  2024, with plenty of time for the attorney general's office to
5  decide whether they were going to intervene or not intervene,
6  and that could have been a one-sentence letter.
7    And so I have concerns about the prejudices to the
8  defense here if they believe that it's something that I should
9  not consider.
10    So my first question is:  Do I bother considering this
11  letter at all, or is it not proper before the Court because
12  he's trying to backdoor his opinion without getting into the
13  case?
14    MR. GENOVA:  Your Honor, I couldn't have said it
15  better.
16    Our position is that that letter has no place in this
17  courtroom.  The attorney general chose to drop a litigation
18  grenade in the middle of this proceeding.  Worse than that,
19  Your Honor has described this.  The attorney general's
20  represented in the case management conference in this matter.
21  The question of intervention was raised in this matter.  The
22  attorney general took a position that they wanted their 60
23  days under the statute to make that assessment.  I'll
24  represent to the Court that we had no notice of what the --
25    THE COURT:  But that was my next question.  Did they

16

1  call you before they filed that letter?
2    MR. GENOVA:  Your Honor, I read it in a -- on the
3  internet.  That's where I read it, and then I received their
4  letter.
5    THE COURT:  Let me ask you this:  I'm not going to
6  hold you to everything this morning because I know we want to
7  get to evidence.  But is the defense intending to respond in
8  writing to the letter by the attorney general's office?
9    MR. GENOVA:  Well, the defense has to assess the
10  impact of the letter on their clients, and those conversations
11  are underway.  I will say I can respond in this court
12  proceeding, beginning with the fact that I think, aside from
13  all of the points that Your Honor made, they are not a party;
14  they didn't intervene; they didn't even attempt to appear
15  amicus.  I believe they're judicially estopped from taking the
16  position they've taken here because they've taken an exact
17  opposite position in the *Conforti* case, and I can read to you
18  from the record and --
19    THE COURT:  I know the *Conforti* case because I had
20  it.
21    MR. GENOVA:  Right, Your Honor.  And in your
22  decision -- and in your decision, you restated the position of
23  the attorney general on the compelling state interest that
24  supports the position of the clerks in this case.
25    So for the life of me, I don't understand how, on the

1  eve of this proceeding, the attorney general does a reverse on

2  the merits of this case, having represented to this Court and

3  this judge a position totally different than what appears in

4  this letter.

5      I find it not only offensive from the defense point of

6  view; I find it offensive to this Court to introduce that

7  matter at this time and in the manner that it was.

8      THE COURT:  Here's what I'm going to do, then.  We're

9  going to table -- I'm going to give you all until Friday to

10  submit a response in writing with respect to the attorney

11  general's -- and the threshold issue will be, first, do I even

12  consider anything he had to say other than we do not intend to

13  intervene, period.  Because what he's done after that, which

14  was not necessary under the Rules of Civil Procedure, was

15  opine on the constitutional claims.

16      So that's going to be your first issue.

17      And then secondly, if you want to oppose --

18  alternatively, whether I consider it or not, that you disagree

19  with this position on the constitutionality of the ballot.

20      So -- and I presume, Plaintiff's Counsel, I don't know

21  if this is an issue on your end.  Are you going to be

22  responding to the attorney general's letter by this Friday as

23  well so I know what to expect?

24      MR. KOMUVES:  Your Honor, we certainly may, but just

25  by way of background, what -- first of all, we also did not

1  have any notice of the letter until yesterday afternoon.

2      THE COURT:  When it was filed or prior to the filing?

3      MR. KOMUVES:  No, when it was filed.  There was a

4  new --

5      THE COURT:  So we all got the notice the same way.

6      MR. KOMUVES:  Right, right.

7      So the -- this is the chief law enforcement weighing in

8  on the question of constitutionality of the statute in terms

9  of he took a position in *Conforti;* he effectively confessed

10  error there.  And I think it is very relevant, when you go

11  do -- when you go through the balancing of the government and

12  state interests, that you consider what the chief

13  law enforcement of the state -- chief law enforcement officer

14  of the state actually had to say --

15      THE COURT:  Well, I don't have -- if that's the

16  position of plaintiffs' counsel, and that's the position of

17  plaintiffs, you respond by Friday to say, "No, no, Judge.  You

18  may not like how this was done, but you should consider it,

19  and here's why."

20      So I presume you'll take, you know, an opposing

21  position from the defense.  But I want to hear it by this

22  Friday.  I don't want any longer than that.  I don't think it

23  will take much longer.

24      And by the way, no more than five pages.  I shouldn't

25  have to say it, but there it is.  You go to six pages, it's

1  going somewhere else but not in front of my eyes.

2      MR. GENOVA:  Five pages each, Your Honor?

3      THE COURT:  You all should start consolidating your

4  efforts a bit with the counties, but...

5      So that's all I have on the letter.  But, Mr. Genova,

6  do you have something more on that issue?  Because I'm not

7  done, and we need to get through my housekeeping.

8      MR. GENOVA:  No, Your Honor.  We'll address it in

9  writing.  I don't want to belabor.  I don't blame you.  We

10  have a lot to say about the letter, and I'll say one thing.

11  Your Honor, it's for this Court to make the --

12      THE COURT:  I got it.

13      MR. GENOVA:  So this Court --

14      THE COURT:  It's my call.  It's not Mr. Platkin's,

15  and he's well aware of that.

16      MR. GENOVA:  Okay.

17      THE COURT:  So regarding time today, let me just

18  briefly say that, because we have a lot of folks, we have a

19  lot to do today, and like I said, you get one day here, so use

20  it wisely.

21      Regarding the time.  Thirty-minute break for lunch.  It

22  will be between 12:00 and 12:30.  Counsel, if you guys are

23  presenting a witness and you think there is a good place to

24  stop, let me know.  I'm happy to accommodate that.  But if you

25  don't, I have to do a hard stop.  Everybody needs to at least

1  break.  I don't, but you all do.  My staff needs to break.  So

2  I want to give you 30 minutes to do whatever you need to do,

3  eat lunch, clear your head.

4      If you need a break in the morning or afternoon, I'm

5  not going to know unless you ask.  But if you want a personal

6  break, all you have to do is ask, and I'll accommodate.

7  Otherwise, I'm running through this.  So I'm not going

8  breaking, but, Counsel, don't be shy.  Ask me if you need a

9  break or someone from your party needs a break, and I'm happy

10  to give you five or ten minutes, whatever you ask for.

11      What else?

12      The expedited schedule.  I said this earlier, but I

13  want to be clear on the record about the expedited briefing

14  schedule for this hearing because there has been

15  correspondence about that.  There is nothing unusual about an

16  expedited briefing schedule when parties in this court have

17  requested emergent relief.  When this is done, the Court acts

18  quickly.

19      Not now, not just in this particular case, in all

20  cases.  So any change that the plaintiffs are requesting such

21  relief, there's an expedited briefing schedule.  Those who

22  regularly practice in this court know that.

23      So any implication that the schedule I ordered is

24  somehow unique to this case is simply without merit.  And I

25  said this before.  If somebody claimed there's a fire, this

21

1   Court doesn't wait for the house to burn down and then go put
2   it out because there's irreparable harm that's being claimed.
3   And you shouldn't read the tea leaves that, because we're
4   moving quickly, that the Court has somehow decided the issue
5   on the merits.
6         What you should understand, though, is, when somebody's
7   asking for emergent relief and has claimed irreparable harm,
8   we don't wait until that harm is done to decide the issue.
9         So there's nothing unique about this.  This is no
10  different than any other case.
11        Let me talk about today's schedule with that.
12        Plaintiffs, you have the burden.  You're the one
13  requesting this extraordinary relief, and you're well aware
14  that the burden is on you, and it's your intent to present
15  evidence, I presume, today, or additional evidence to what
16  you've already submitted to the Court.
17        I intend to only consider -- only consider what has
18  been submitted to the Court up to this point and anything
19  additional that may be presented later today with the
20  exception of that letter by the attorney general.  I want to
21  hear from the parties on Friday.  I have not decided yet
22  whether I'll consider that letter or opinion at all on the
23  constitutional claims.
24        So I'm going to -- that is one issue that is before the
25  Court that I do not yet have a finding that I'm going to

22

1   consider.  So I want to be clear about that.
2         I do want to advise counsel:  Focus on the legal
3   issues, the constitutional issues that are before the Court,
4   not the political concerns that may have some importance to
5   you outside these walls but have absolutely no relevance
6   inside them.  Those political concerns, however important they
7   may be to you, have absolutely no bearing on my consideration
8   or ultimate decision in this case.
9         Plaintiffs, you must have an order for your witnesses,
10  I presume, by now.  Yes?
11        MS. BROMBERG:  Yes.
12        THE COURT:  Who is testifying just this morning?
13  Give me the road map for this morning.
14        MS. BROMBERG:  We'll first have testifying Mr. Ryan
15  Macias, who is joining us on the screens from abroad.
16        THE COURT:  All right.
17        MS. BROMBERG:  And he's really the first up.  And
18  then we'll have Congressman Andy Kim testify.
19        THE COURT:  All right.  And if we get through more,
20  you'll let me know.  If we get a break in the afternoon,
21  you'll let know the afternoon lineup or if any changes are
22  made.
23        MS. BROMBERG:  Yes.
24        THE COURT:  What else?  You all want to do opening
25  remarks, I presume, right?  You wanted five or ten minutes to

23

1   give an opening statement before you present?
2         MS. BROMBERG:  We would like to, Your Honor.
3         And also just another housekeeping item.  As you know,
4   we started our session today at 10:30 a.m.  At 10:37 a.m., a
5   supplemental certification was filed --
6         THE COURT:  Should I find out right now who filed
7   something in my case while I'm sitting on the bench?  I mean,
8   I'm good, but I'm not that good.
9         What is it?
10        MR. NATALE:  Your Honor, it was a supplemental
11  certification from a witness from one of the election machine
12  companies that explains why he can't be present today.  And it
13  lays out some of the logistical items that would need to take
14  place if Your Honor enters an order.
15        I think it's highly relevant.  I understand that, if
16  Your Honor's order was that it's only everything up to the
17  start of this hearing and then anything presented at this
18  hearing, I would argue that that was presented at this
19  hearing.
20        THE COURT:  I think that's fair.
21        Is there some objection to the certification?
22        MS. BROMBERG:  I have not had an opportunity to put
23  my eyes on it yet, Your Honor.
24        THE COURT:  All right.  We'll take a look at it.  But
25  if there's an objection, you can let me know.

24

1         MS. BROMBERG:  Okay.
2         THE COURT:  But for now, I mean, unless there's some
3   substantive objection to it, the timing of it, I'm not going
4   to give counsel a hard time.
5         By the way, there's an overflow room.  So I just want
6   to be clear.  I'm looking back here.  So for those who are
7   interested, there is an overflow room where you can observe
8   this argument or this hearing in Courtroom 5W on the 5th
9   floor.  But I just want to make a note of it as I see folks
10  standing in the back.
11        Those are my housekeeping issues.  I'm sorry.
12        From the plaintiffs' side, what do we have on your end?
13        MR. KOMUVES:  Your Honor, the only question I have
14  is -- just trying to gauge the Court's preference here -- is
15  we asked the defense whether they would stipulate to the
16  expertise of any of the expert witnesses we are presenting.
17  They declined.  That's their right.
18        Is this something that Your Honor would entertain
19  considering on the papers, or do we want go through --
20        THE COURT:  There's really a dispute as to whether
21  they're going to be qualified as experts today?  Is that the
22  issue?
23        MR. GENOVA:  Well, we were prepared and are prepared
24  to submit some court briefs with respect to each expert or
25  alleged expert, and we've preserved our Daubert applications.

25

1    Your Honor directed that we deal with issues here
2  today.  We can provide the Court with briefs.  We defer to the
3  Court as to the protocol --
4    THE COURT:  Well, I guess let me just get to the
5  first question:  So the defense is not willing to stipulate
6  that anyone the plaintiffs are bringing to testify or
7  testifying by video is an expert?
8    You are not willing to stipulate to any of those
9  qualifications; you're going to dispute every single
10  qualification of each of the experts they bring?
11    MR. GENOVA:  I believe that's the case.  I believe
12  that's the case.
13    MR. NATALE:  Your Honor, if I may, one of the things
14  that plaintiffs' counsel has raised in this conversation was,
15  Oh, but look at their Ph. Ds; look at their academic
16  background.
17    We don't dispute that they are academic, but what you
18  will find -- and what we plan to establish on
19  cross-examination -- that their experience and knowledge about
20  design and the impact on elections is minimal, if existent.
21    So, while I'm sure there are plenty of areas and fields
22  and subjects of litigation where they would be experts, we
23  have a legitimate claim that they are not experts for this
24  case, and I believe that binding the defense's hands in
25  defending this issue would be extremely prejudicial.

26

1    THE COURT:  Well, I'm going to make it easy.  They're
2  going to testify today.
3    So, defense, you are not going to block their Tambussi
4  with an objection.  You are not going to make an objection.
5  If you wait until Friday to brief why they are not experts,
6  and you want to have a Daubert briefing done, then that's
7  fine.  We'll have it by the end of the week.
8    So I think that's fair.  If you really have an
9  objection there that you want to voice to the Court, then you
10  can do it, but they're going to testify today so that
11  testimony is before me.
12    And I can determine later whether I consider it, not
13  consider it, if they're an expert, not an expert, so I'll
14  reserve.  Fair enough?
15    What else?  Is there another housekeeping issue on the
16  plaintiff's side, or can I switch over to Mr. Parikh, who's
17  standing already?
18    MS. BROMBERG:  Your Honor, with regard --
19    THE COURT:  You got to stand up in this courtroom.
20    MS. BROMBERG:  I'm sorry.
21    Your Honor, with regard to the certification that was
22  belatedly filed after the start of our hearing today, I would
23  request leave at a minimum for us to be able to offer a
24  supplemental response to it, not that I want to paper us even
25  more.

27

1    THE COURT:  Look, do you have documents today that
2  you intend to submit, or is this all just witness testimony
3  that's being added --
4    MS. BROMBERG:  We will be presenting the expert
5  reports that have been --
6    THE COURT:  But those have already previously been --
7  I guess what I'm asking:  Is there anything additional or
8  something new, documentation wise, that you're presenting
9  today that was not previously submitted to the Court?
10    MS. BROMBERG:  There -- there may be a few.
11    THE COURT:  Right.  So how is this any different than
12  certification that defense counsel has?
13    MS. BROMBERG:  As --
14    THE COURT:  I mean, what's the difference if he filed
15  it or he brought it with him today and said, Your Honor, we're
16  moving to admit this certification?
17    MS. BROMBERG:  Your Honor, a certification that's
18  filed in response to a report offered by an expert needs
19  to be --
20    THE COURT:  Is it an expert report?  Is that
21  certification from an expert?
22    MR. NATALE:  No, it's from a fact witness,
23  Your Honor.  It's a fact witness from one of the voting
24  companies that runs the voting machines in New Jersey.  There
25  were allegations made in a supplemental certification filed

28

1  after initial briefing by defense counsel.
2    This election company is currently administering
3  elections in multiple states, all through the United States,
4  collaborated with them as quickly as possible.
5    But the certification to rebut that -- the
6  certification entered belatedly by defense could not be filed
7  until this morning.
8    THE COURT:  Why don't we do this, Ms. Bromberg.  You
9  guys review -- you don't have to do it now; review it over
10  lunch.  If there's an objection, you guys will note it on the
11  record this afternoon.
12    MS. BROMBERG:  Okay.
13    THE COURT:  All right?
14    MR. PARIKH:  Your Honor, thank you.
15    THE COURT:  Is there anything more from plaintiffs
16  because I don't want to go back and forth.  We're not a
17  ping-pong match.
18    Are you guys done?
19    MR. PUGACH:  Nothing further, Your Honor.
20    THE COURT:  All right.
21    MR. PARIKH:  Thank you, Judge.
22    Judge, on the in limine motions, on the Daubert motions
23  that Mr. Genova mentions, they've been e-filed with the court.
24  I'm happy to, if I may approach, hand a binder to the Court so
25  that Your Honor has it, or I can give it to Your Honor's staff

29

1  later. I can give a copy to plaintiffs.
2      If Your Honor wants to deal with those motions later --
3      THE COURT: This is regarding the expert testimony?
4      MR. GENOVA: It is, Your Honor.
5      THE COURT: I'm not going to deal with it today.
6      MR. GENOVA: I understand, Your Honor. We had
7  proposed to plaintiffs that we file those motions on Friday so
8  that we could try to expedite this proceeding by narrowing the
9  issues.
10      But there was seven in limine motions seeking to bar
11  each of these experts, some of them because there was late
12  filings. Clearly, based on Your Honor's ruling already, that
13  one will most likely be denied.
14      But there are, as Mr. Natale said, a whole host of
15  issues with those purported experts. We don't believe they
16  meet the test, the qualifications, and we've laid out those
17  reasons in the in limine motions.
18      THE COURT: So you don't have to brief anything by
19  Friday. You have it all done.
20      MR. PARIKH: It's done and already e-filed, or it
21  should be e-filed any moment, Your Honor.
22      THE COURT: All right. So why don't you submit it to
23  my courtroom deputy, and that way she has it.
24      MR. PARIKH: May I approach, Your Honor.
25      THE COURT: You may. Kim, thanks.

30

1      Hey, folks, a quick note: Anybody standing in the back
2  of the courtroom, the U.S. Marshals Service has informed me
3  that you're causing a fire hazard in my courtroom. So anyone
4  who is standing, not sitting, you have to go to 5W. It's not
5  an option.
6      So please just do me a favor and make your way to the
7  overflow room if you still want to observe the argument, but I
8  don't want the marshals having to come up here to clean this
9  up. Thank you.
10      All right. From defense, no other housekeeping issues,
11  folks?
12      MR. PARIKH: None, Your Honor.
13      THE COURT: All right. Let me just briefly state,
14  before we get to opening remarks, you all shouldn't need this
15  reminder, but I'm going to give it to you in an abundance of
16  caution.
17      Remember where you are today. All right. You're in
18  our district court. We expect a high level of
19  professionalism. You are free to zealously advocate on behalf
20  of your clients. We do not fall below that standard. I
21  promise you it will not go well if you do. That's the one
22  warning I give you all.
23      I know this is a very -- a highly charged issue. I
24  know there are a lot of folks here observing from the public,
25  but I give you that one caution. I won't give it to you a

31

1  second time.
2      Everybody understood?
3      With that, let's go with opening remarks. I'm sure --
4  I don't know who's giving it from the plaintiffs' side, but
5  who is giving the opening remarks?
6      MR. KOMUVES: I am.
7      THE COURT: All right. You may proceed when you're
8  ready.
9      MR. KOMUVES: Good morning, Your Honor.
10      THE COURT: Good morning.
11      MR. KOMUVES: Sam Komuves for the plaintiffs.
12      Your Honor, the design of the New Jersey's primary
13  ballots is an national outlier and a national embarrassment.
14  Since the early 1900s, our laws have said the way party
15  nominees are picked is by the voters in a primary election.
16      Unfortunately, that's simply not a reality today.
17  Today the Court will hear from three experts: Dr. Pasek,
18  Dr. Julia Sass Rubin, and Sam Wang.
19      They will give rigorous scientific evidence that
20  already confirms -- that confirms what political operators and
21  politicians and candidates already know in New Jersey, which
22  is that, because of the way our ballots are prepared -- and
23  they're prepared at taxpayer expense -- these races are not
24  presented to voters in an evenhanded way, in a constitutional
25  way.

32

1      They haven't been in a long time, and unless this Court
2  acts, they won't be presented that way in the 2024 election.
3      A competitor wants to run in our primary election.
4  They might not receive the county line, and if they don't
5  receive the county line, they may drop out and not compete at
6  all, or if they do compete, their campaigns may be very well
7  doomed from the start.
8      Why is that? The evidence that we're going to present
9  shows that the people that get the county line are
10  beneficiaries of double-digit advantages just by virtue of how
11  the ballot is designed, independent of other variables.
12      And that thumb on the scale, again, thumb put on the
13  scale by the Government, by the clerks, may not always be
14  outcome determinative, but in many cases it will be at these
15  kind of numbers, at these kinds of ratios.
16      And that violates both the elections clause and the
17  1st and 14th Amendments under the Anderson-Burdick test.
18      The burdens that -- on the candidates and on the voters
19  have to be weighed against the state interests.
20      Now, we talked a little bit about this before with --
21  what the attorney general thinks about the state interest,
22  what we argue about the state interests. But that's part of
23  the -- that's part of the balancing that has to go on, and
24  their view on the matter has been -- has been made very clear.
25      But we would suggest that, even without the attorney

33

1  general's letter, the totality of evidence that we have
2  presented and will present, it should be enough to convince
3  Your Honor that we have a likelihood of success on the merits
4  as that standard is defined in applicable law, again, on both
5  the elections clause and the 1st and 14th claims.
6      Further, Your Honor, the Court will hear from three
7  candidates for federal office:  Representative Andy Kim,
8  Ms. Sarah Schoengood, Ms. Carolyn Rush.
9      We're asking this federal court to make sure that their
10  elections for federal office are run fairly, and of course
11  there's also the materials from the amicus curiae and other
12  findings in the case.
13      These candidates will explain how they were personally
14  harmed by the county line, by that ballot system.  Once a
15  county line was awarded to an opponent, that constituted both
16  a necessary and sufficient injury to them under the
17  requirements of Article 3 for standing.
18      It's irreparable.  Why is that?  They get one chance to
19  run for Congress this year.  New Jersey has sore loser laws.
20  If they don't prevail on a primary, they can't turn around and
21  run as an independent.
22      They get one shot, and they're asking for one shot at a
23  fair ballot, and that's why these individuals are here today.
24      Further, Your Honor, our experts will explain that
25  New Jersey's election infrastructure can accommodate

34

1  alternatives to the county line that are -- to be presented in
2  the upcoming primary.
3      The opposition papers, the defendants are making a lot
4  of noise about this, but here's the reality of it.
5      THE COURT:  I don't want to cut you off, but I've got
6  a question because I want to make sure it's going to be
7  addressed today, right?
8      I understand the substantive claims.  Are you also
9  planning on addressing the timing issue?
10      MR. KOMUVES:  We are, Your Honor.
11      THE COURT:  All right.  Because the defense has
12  raised, well, to me at least, Judge, even if you were going to
13  grant the preliminary injunction, you can't do it because it's
14  too late.
15      So do the plaintiffs intend to address that issue on
16  timing of when a decision would have to be made that could
17  change the ballot system so that it could practically be moved
18  forward?
19      MR. KOMUVES:  So, yes, in two respects.  So
20  Mr. Macias and Dr. Appel will testify that, in essence, the --
21  if the Court were to order a ballot comparable to what's up on
22  the screen, that that would not require new equipment, would
23  not require new software, would not require new certification.
24  It is functional with the existing machinery.
25      And, moreover, it's being used.  It's being used today.

35

1  Office-block ballots of the kind seen in Figure 1, they're
2  being used with the equipment we have today already.
3      So the Court is going to have try and figure out what
4  their claims of infeasibility are.
5      So that's on the issue of timing.
6      And then, lastly, Congressman Kim will explain the
7  nature of the timing of when this suit was brought, why it was
8  brought this way.
9      And just to give a couple of highlights here:  He's an
10  Article 1 representative.  He knows that he can't come into an
11  Article 3 courtroom unless there's been actual injury by
12  virtue of the law standing.  And he also knows that
13  preliminary injunctions are a high bar, and you've got to come
14  in with real evidence.
15      You can't come in with speculative evidence.  You've
16  got to come in with historical and currently related evidence.
17  That's in the form of Dr. Pasek's report.
18      Put another way, you can't come in too early, because
19  then you don't have standing, and it's not right.  You can't
20  come in too late, because then, at that point, you get into
21  feasibility concerns.
22      So there has to be a sweet spot when the case can be
23  brought.  And this case was brought within that time under the
24  totality of the circumstances, including getting the rigorous
25  science that Your Honor is going to hear.

36

1      Now, at the end of the day, we are convinced that the
2  Court -- we're satisfied that the plaintiffs meet all the
3  requirements of a preliminary injunction.
4      I understand Your Honor wants to rule quickly on it and
5  all I would say --
6      THE COURT:  Well, I don't know if I want to move
7  quickly on it.  I mean, I think you're putting words in my
8  mouth.  I think the question is -- you've taken the position
9  that I have to move quickly on it.  Right?  And the defense
10  has taken the position that I have to move even quicker on it
11  than you're telling me I have to.
12      So -- and by the way, it's all moot if I deny the
13  relief.  But the question has to be posed now because if I
14  grant it, what's the time frame?
15      So for you-all, what's your position on the time?  What
16  am I going to hear today on Judge, if you're inclined to grant
17  this injunction, if you're inclined to change this ballot for
18  this election, when does that decision have to be made so that
19  this ballot can be changed in time, according to your
20  witnesses who are going to testify?
21      MR. KOMUVES:  Sure.  So what our witnesses will
22  testify is that -- you've seen in some of the affidavits they
23  explain all the steps that have to be done to prepare a ballot
24  file with the candidates and the races and all this sort of
25  stuff.  The testimony is going to be that has to be done

1  anyway, regardless of what the Court rules.
2      And the ballot that the definition file has to be
3  loaded into the voting machines by way of hard drives, it has
4  to be uploaded to a printer.  That's going to have to be done
5  anyway, regardless of what the Court rules.
6      The testimony is going to be that we're looking at a
7  day tops, a few hours, to change the layout of the ballots, of
8  the mail and paper ballots.  That is going to be the only
9  thing that's different.
10     And so I think with the deadlines we're looking at,
11 it's kind of two deadlines.  One is a bit of a softer
12 deadline; one is a harder deadline.  So I have April 4th.
13 April 4th is the day the printer proofs are supposed to be
14 prepared.
15     We have explained, in my certification, the state
16 courts have routinely, after that date, ordered new ballot
17 draws, have ordered redesigns of the ballot because it's not
18 truly a hard deadline.  It would be nice, it would be good, it
19 would be appropriate to have it done by the 4th, but the state
20 courts have relaxed that, including 21 years ago in a case
21 where some of the counsel before -- that are here today were
22 before the New Jersey Supreme Court that asked -- and
23 successfully asked the Supreme Court to replace a candidate
24 after mail-in ballots had gone out.
25     So there is flexibility --

1      THE COURT:  What's the hard date that you are
2  proposing?
3      MR. KOMUVES:  So I think the hard date that I
4  propose -- and it's not entirely a hard date -- but I would
5  argue that April 20th is the date when the ballots have to go
6  out to service members and Americans living abroad.  That's 45
7  days before the election.
8      It's not really April 4th.  The harder date is April
9  20th.  But even that has been waived in some instances by a
10 few days.
11     So that's 33 days from now.  And if the clerks need
12 time, they have 33 days.  That's -- that's our position, and
13 that's what our experts will testify to.
14     And so just in closing, Your Honor, we ask the Court to
15 grant the preliminary injunction against the use of the office
16 spot of the New Jersey line features.  And this is an
17 injunction that will bring New Jersey into line with the other
18 49 states in terms of how their ballots are presented.
19     And this is, just for your information, is a comparison
20 point of the New Jersey ballots versus the way other states do
21 it, 49 other states have seen fit to design their ballots.
22     And to put it another way, because of the elections
23 clause and because of the 1st and 14th Amendment clauses --
24 really the Constitution demands no less in a fair ballot for
25 voters and a fair ballot for candidates, and it's time for the

1      Court to intervene, we would suggest, and enjoin the
2  pernicious practices of the county line ballot.  And it can be
3  done, and it can be done in a way that the rest of the
4  country, and even two counties in New Jersey, are already
5  doing it.
6      And to some extent, as I said, it is even being done
7  today in New Jersey, and that's what we ask the Court to
8  grant.
9      If you have no other questions...
10     THE COURT:  No, no.  I don't want to interrupt too
11 much in opening remarks.  I've got questions for the defense,
12 too, so it will be fair.
13     But no, I don't have any questions.  I'll let you guys
14 present your evidence.
15     But let me hear from the defense.
16     MR. KOMUVES:  Thank you, Your Honor.
17     THE COURT:  Thank you.
18     At some point in our rotation, Mr. Genova, will you get
19 into the timing as well?
20     MR. GENOVA:  Absolutely.  I'll start with it now,
21 Your Honor, if you'd like.  I'll answer that question
22 directly.
23     THE COURT:  All right.  Let me hear it.  Are you
24 going to tell me it's too late?
25     MR. GENOVA:  I'm going to tell you that it can't be

1  done.  That's what I'm going to tell you.  It can't be done,
2  and it can't be done for 6,000 election districts.  And I'm
3  going to tell you, particularly in a presidential election
4  year, it can't be done.
5      THE COURT:  Okay.  Now, walk me through why it can't
6  be.  Or what am I going to hear today from evidence that it
7  can't be done?
8      MR. GENOVA:  You're going to hear from county clerks
9  that are going describe each and every step along the way in
10 terms of what is required to get a ballot together, the design
11 of a ballot, the printing of a ballot, the certification, the
12 changes to software, the effect it has on the training of
13 individuals, the cost associated with it.
14     You're going to get an education, Your Honor, today in
15 the machinery of elections in New Jersey.  And you're going to
16 get that from the people who are on the ground who do this,
17 and who do this every election, and many of them are sitting
18 in this courtroom.
19     But you will hear from Monmouth Clerk Hanlon, who will
20 describe to you and walk you through what it takes to put an
21 election today together.
22     And the complexities of that, I believe, through their
23 testimony and through the testimony of vendors charged with
24 providing the software and the like to construct the ballot
25 through their certifications -- they're going to reveal to you

41

1  that it is not feasible, it cannot be done.
2      THE COURT:  All right.  So it sounds like I'm going
3  to have conflicting testimony today, which is what I
4  anticipate, and I'm going to have to make determinations on --
5  and make factual findings.
6      MR. GENOVA:  Correct, Your Honor.
7      THE COURT:  All right.
8      MR. GENOVA:  Correct, Your Honor.
9      So may it please the Court, Your Honor, I'm here with a
10  bevy of barristers, as you can see, and we represent 19
11  clerks.  And I think it's important from the inception that
12  the Court understands who our clients are.  These are public
13  officials.  They're Constitutional officers.  They're not
14  partisans.  They are not corrupted in their processes.  They
15  are charged with the responsibility of administering the laws
16  of the State of New Jersey as they relate to elections.
17      As one of my colleagues continually says, they are
18  umpires; they are not players.
19      They are here in this litigation in their official
20  capacity, and they're here because they're charged with that
21  responsibility.
22      We do not represent candidates.  None of the lawyers
23  here, except for Mr. Tambussi, who represents a political
24  party committee, represent candidates.  We don't represent
25  party officials.  We don't represent politicians.  We don't

42

1  represent county chairs.
2      So any suggestions and arguments or otherwise that the
3  folks that we represent put -- I think I heard -- I heard it
4  said by my friend on the plaintiffs' side that the county
5  chairs either put their finger on the outcome -- is an
6  absolute mischaracter- --
7      THE COURT:  Why do they even care about the issue,
8  then?  I don't understand.
9      MR. GENOVA:  Why do I even care?
10      THE COURT:  Why do your clients care about the county
11  line if it's not a political issue?  Why don't they just say,
12  Look, we are all about abolishing it.  You just can't do it
13  now, Judge, because the timing won't work because we can't
14  administratively get this done.
15      MR. GENOVA:  Well, I --
16      THE COURT:  It sounds like you're trying to distance
17  them from the candidates or what that means for them.
18      MR. GENOVA:  I'll answer that, Your Honor.
19      THE COURT:  All right.
20      MR. GENOVA:  Okay.  So it starts with what the
21  statute says.  Okay?  They're charged with implementing what
22  the statute says.  And what gets lost many times is what the
23  statute says.
24      And I'm reading from the legislative history of
25  19:49-2, which you cite in *Conforti* and which says the

43

1  following.  This is the legislative statement.
2      The purposes -- and that statute, as you know,
3  Your Honor, provides for the bracketing and all of that.
4      The purpose of this act is to permit candidates filing
5  joint petitions and candidates who choose the same designation
6  or slogan to be placed on the same line on the voting machine.
7  Applies to a county of the first class only.
8      The clerks are charged with implementing the law, and
9  the law provides, through various sections, the use of a
10  slogan.  It provides for the right to bracket, an
11  associational right that is vested in the individuals who
12  choose to bracket.  It provides for how ballots are drawn, and
13  it delegates and defers to county clerks on how to design
14  those ballots.
15      So you asked the question why do they care?  They care
16  because, as the law presently states, they're dictated to
17  follow the law, and the law says folks can bracket, folks can
18  use slogans, and the legislative history, but the legislator
19  almost a hundred years ago, told us, I'll repeat, the purpose
20  of this act is to permit candidates to file joint petitions
21  and to -- and candidates who choose the same designation or
22  slogan to be placed on the same line on the voting machine.
23      THE COURT:  What about the collateral damage or
24  consequences that the plaintiffs are claiming are a result of
25  this process?

44

1      MR. GENOVA:  Well, there is collateral consequences,
2  and it may flow both ways, The collateral consequences to
3  those whose associational rights might be compromised by not
4  being able to bracket.  And to the extent that they make an
5  argument based on what I think is junk science, which will
6  prove that somehow there's a primacy effect or the like, and
7  we will attack those academic -- academic testimony, that
8  becomes the balancing that they're going to have to asses and
9  what those constitutional rights are.
10      And I'll remind the Court you did that quite well in
11  *Conforti.*  You did that quite well.  In *Conforti* you said:
12  Where plaintiffs -- where plaintiffs' claims assert a legal
13  burden rather than a factual burden, dismissal at this the
14  stage would be warranted because further proceedings,
15  discovery would not benefit the resolution of plaintiffs'
16  claims or change the nature, magnitude of the burden imposed.
17  When reviewing a case under the *Anderson* verdict, courts tend
18  to -- a standard, courts tend to establish a robust factual
19  record to characterize an alleged burden.
20      You said that.  And you also said, Your Honor -- and
21  you said that correctly because you denied our motion to
22  dismiss.
23      THE COURT:  Those cases survived.
24      MR. GENOVA:  Right.  The point I am making is this --
25      THE COURT:  I haven't addressed those issues

45

1  dispositively in either of those cases, though this is the
2  first time it's before me, at least in a preliminary
3  injunction phase.  Right?
4        There was no -- there was no emergent relief requested
5  in *Conforti*, correct?
6        MR. GENOVA:  No, Your Honor, which goes to the other
7  question that you asked about timing.
8        THE COURT:  Well, I don't know.  The cases have
9  different postures.  So, I mean, you'll get into timing today,
10  but those candidates were about to go into an election,
11  correct?
12        MR. GENOVA:  Those candidates.
13        THE COURT:  Had lost an election?
14        MR. GENOVA:  They had lost an election.
15        THE COURT:  It was after the fact.
16        MR. GENOVA:  Correct.
17        THE COURT:  So, I mean --
18        MR. GENOVA:  And another difference, Your Honor.
19  There was a general election, as I recall, right?  I think --
20  I think it was.  I'm not remembering it as I stand here right
21  now.
22        THE COURT:  Yeah, but the posture of the cases were
23  different, is all I'm saying, Mr. Genova.  That's all.
24        MR. GENOVA:  Right, and the plaintiffs were
25  different.  But, Your Honor, it was well within the minds of

United States District Court
District of New Jersey

46

1  my friends on the plaintiffs' side at the time.  They knew of
2  this issue.
3        They -- this complaint parrots almost identically that
4  complaint.  The only differences between that complaint and
5  this complaint are the parties.
6        The other point I wanted to make in addition to the
7  type of -- who is it we're representing is the public
8  officials, and as, you know, Your Honor, they're elected by
9  voters to serve in these administrative capacities.
10        They're the ones -- and you'll learn of this today.
11  They're the ones that have to face the everyday challenges
12  that go with administering elections, and you're going to hear
13  from them as to what challenges any relief would pose in the
14  context of this election.
15        And we rely heavily on *Purcell*, and Your Honor
16  correctly indicated that the burden resides on these folks to
17  establish that -- that relief in the context of this election
18  should occur.
19        Now, as I indicated, this complaint parrots *Conforti*,
20  and it was well within the mind -- Your Honor's very
21  familiar -- well within the mind of plaintiffs' counsel what
22  this case was about.
23        And it's going to be our contention that these folks
24  knew, as far back as November, of their intentions to bring
25  this application and waited four months to bring this

United States District Court
District of New Jersey

47

1  application on the eve of the election.
2        And under the *Purcell* standards that you'll hear about,
3  delay matters.  Delay is pertinent, and the disruption that
4  could be visited upon the election.
5        THE COURT:  Well, I permitted you to explore this
6  issue in this hearing.  I mean, I didn't disagree with the
7  defense on that particular issue.  I said it's relevant, but
8  we're going to get into it today.
9        MR. GENOVA:  Right.  That's correct, Your Honor.  I'm
10  happy to hear that we're going to get into it today, but I
11  want to go back to what you said in *Conforti* for a minute, and
12  I don't want to divert too much.
13        But the fact that the discovery -- that we're here
14  today addressing a preliminary injunction based on expert
15  testimony that we have not, in the context of a preliminary
16  injunction, had the opportunity to test, will only get to test
17  by cross-examination.
18        We've had no depositions of those folks.  The Court is
19  going to consider what purports to be support.  The whole
20  premise of this is that the constitutional burden is triggered
21  by a ballot design that we have academicians telling us -- who
22  haven't been deposed and haven't been cross-examined and who
23  haven't been tested and haven't even been --
24        THE COURT:  So you're saying that your clients -- all
25  of you were shocked by this issue, that, when that complaint

United States District Court
District of New Jersey

48

1  was filed, this is the first time you heard about county lines
2  and folks opposing this issue?
3        MR. GENOVA:  No, no, no, Your Honor.
4        THE COURT:  And now you -- I mean, I said this in
5  advance, but I'm going to say it again.  I'm not giving you
6  three months to get experts if you're really telling me, for
7  the first time, this is an issue of first impression for all
8  of you sitting there.  There's a lot of well-known counsel
9  sitting at table that know this is a hot issue that's been out
10  there before.
11        I'm not giving you three months to get experts so that
12  you can force the Court not to be able to decide a particular
13  issue by saying, Well, now it's too late, Judge, you know.
14        MR. GENOVA:  No, no --
15        THE COURT:  You have to decide this issue by here,
16  and if you don't give us experts, well, then you've timed
17  yourself out, and you can't grant the relief requested by the
18  plaintiffs.
19        So, I mean, I understand you haven't deposed anybody.
20  But you can cross-examine the experts here today, and you have
21  your opportunity to.
22        And, to the extent there were experts that you were
23  well aware of in the past or know of them who would oppose
24  their experts, I didn't prohibit you-all from having them
25  testify or even testifying by video conference.

United States District Court
District of New Jersey

49

1     If you didn't bring them, you didn't bring them.

2         MR. GENOVA:  Your Honor, you're going to continue in

3     this proceeding as you choose, and as you've just described,

4     it is perfectly appropriate in a preliminary injunction

5     hearing.

6         The point I'm attempting to make with Your Honor is

7     simply this:  You asked the question, Did we know?  Well,

8     everybody knew because there was the *Conforti* case that --

9     this issue was there, but had it ever been litigated?

10        In fact, when it's been litigated in this state,

11    there's been an opposite finding, and Your Honor has cited a

12    state court decision on the very issue that deferred to the

13    clerks if their decisions were rooted in reason and determined

14    that you weren't going to be following those, at least for

15    purposes of *Conforti*.

16        They knew.  It's their preliminary injunction

17    application.  They're the ones that manufactured the exigency

18    to bring us here at this hour shortly before the election.

19    They could have brought a preliminary injunction or any

20    injunction or interim relief under *Conforti* on the identical

21    issue, on the identical claims.  Yet we're sitting here while

22    they waited in the weeds to bring this application --

23        THE COURT:  And there were no discussions about the

24    issue?

25        MR. GENOVA:  No.

50

1         THE COURT:  You're saying they held it close to the

2     vest, and that's what's going to come out in today's hearing,

3     that these particular candidates wanted to address it, weren't

4     having any negotiations, weren't talking about it.

5         They just held this complaint close to the vest, and as

6     it got closer to the primary, they thought, Let's file the

7     lawsuit.

8         MR. GENOVA:  Your Honor, what the evidence is going

9     to show --

10        THE COURT:  I don't know yet.  That's why I'm asking

11    you, because this is opening remarks, by the way, just to be

12    clear.  None of what you're also saying is going to matter

13    because none of it is evidence.

14        But if you're going to point me to something, am I

15    going to hear witnesses who are actually going to say this?

16        MR. GENOVA:  You're going to hear witnesses that say

17    that it was in the contemplation -- and not just witnesses,

18    but emails and the like.

19        They're going to show you that it was in the

20    contemplation of the plaintiffs' counsel, in combination with

21    the evidence that they purport to be presenting, as far back

22    as November to do this.

23        You're going to see emails and evidence and speak to

24    people talking about how discovery was delayed in *Conforti*

25    without talking about the fact that this litigation was going

51

1     to be brought.

2         In fact, the discovery deadline that Your Honor imposed

3     for February 20th by consent, by this bevy of barristers that

4     are involved in that case, freely gave consent --

5         THE COURT:  I'm sorry.  You are talking about

6     *Conforti* now?

7         MR. GENOVA:  I'm talking about *Conforti* --

8         THE COURT:  There's the magistrate judge who is

9     governing the practices of this particular case.  No?

10        MR. GENOVA:  There is, Your Honor.  You're not -- I

11    will --

12        THE COURT:  Yeah.  I'm not -- you have to give me

13    what the point is.  I am misunderstanding.  I thought you're

14    saying I'm in the middle of discovery in *Conforti*, and that's

15    just not the case.  There's a separate judge handling it.

16        MR. GENOVA:  I'm saying we are -- we are in the

17    middle of *Conforti* discovery.  We consented to an extension of

18    that discovery.  We have taken no depositions in that case.

19    We have seen no experts.  We haven't seen these experts in

20    that case.

21        We have seen no experts.  We haven't cross-examined,

22    and plaintiffs' counsel asked for an extension of discovery in

23    that case, knowing that this litigation was going to be filed,

24    and you're going to get evidence of that.

25        So the point to all this, Your Honor, and which is

52

1     compelling under the *Purcell* standards, is this isn't just

2     delay for the sake of delay.  This is not a sweet spot as

3     Mr. Komuves talks about.

4         This was a design.  This was orchestrated.  This was

5     manipulated to get this before this Court on the eve of an

6     election to disrupt that election, by design or by

7     happenstance, but disrupt that election and put all these

8     public officials in the position where they have to scurry

9     around and hurry around to accomplish an objective.

10        Now, Your Honor said something earlier.  This is a

11    matter of debate, I'll concede that.  There's people all over

12    the state now talking about it.  They have done a very good

13    job on the narrative.

14        Nobody is blind to the fact that this has to be

15    discussed, but you ask an important question.  Where should it

16    be discussed?  Where should it be resolved?  Should it be

17    resolved in our legislature?  Should that be the place it gets

18    resolved?

19        If these clerks -- they're looking at a statute that

20    says what I said it says.  They're supposed to accommodate a

21    ballot with slogans.  They're supposed to accommodate a ballot

22    that respects the associational rights of individuals who

23    choose those slogans together.

24        They're reacting to the laws as they exist today, and

25    you don't legislate in a courtroom what might be accomplished

1 through the legislator.

2 Now, your job, as you know it, and you said it best, is

3 to look at those laws and decide whether or not --

4 THE COURT: They're constitutional or not. That is

5 within the purview of this Court.

6 MR. GENOVA: Exactly. It's well within the purview

7 of the Court and clearly not within the purview of the

8 attorney general, if I can resort back to that argument.

9 But that being said, I don't want to belabor my

10 opening, but I will answer your questions. But we're here.

11 They have the burden. They have the burden under the *Purcell*

12 to show you four things. Those four things are not the

13 equivalent of a preliminary injunction. It's a heavier

14 burden, and it's theirs.

15 They have to show that the underlying merits are

16 clear-cut on their -- in their favor. They have to show that

17 they have not unduly delayed bringing the complaint to the

18 Court.

19 They have to show that they would suffer irreparable

20 harm as a consequence of that -- of the statute as it exists,

21 and they have to show that the remedies in question that they

22 seek are at least feasible before the election without

23 significant cost, confusion, or hardship.

24 It's our contention that the evidence is going to

25 establish clearly that they won't be able to meet any one of

1 those.

2 Now, you yourself said -- you yourself said --

3 THE COURT: Here or in *Conforti* or in my backyard?

4 Because every time you quote me, I don't know where you're

5 quoting me from.

6 MR. GENOVA: Okay. I'll be clear, in *Conforti*.

7 THE COURT: All right. We're going back to a case

8 that's not before me at the moment.

9 MR. GENOVA: Correct.

10 THE COURT: All right.

11 MR. GOLDBERG: But the issues are the same.

12 And, Your Honor, you said it was close enough -- it was

13 a close call. You said it was a close call.

14 THE COURT: I did.

15 MR. GENOVA: It was close enough to warrant

16 discovery. You gave us discovery, those of us in that case.

17 It was close enough, but it wasn't dispositive to grant a

18 motion to dismiss. A close call doesn't warrant an

19 injunction.

20 THE COURT: Let me just be clear. And you're

21 saying -- and plaintiffs will present it -- there is nothing

22 different about the posture of that case than this one. There

23 is nothing different in the information. A year and a half

24 later, this is the identical case as *Conforti*.

25 MR. GENOVA: No, it's not the identical case. It's

1 factually different as it comes to the election. But the

2 legal theories advanced and the remedies sought in *Conforti*

3 and the nature of the claims that are being --

4 THE COURT: But the evidence is different, too, no?

5 MR. GENOVA: Correct, Your Honor. It is different.

6 THE COURT: Okay.

7 MR. GENOVA: But the legal principles are the same.

8 You said in *Conforti* as well that the decision was

9 going to be driven by the facts, and that's all that we're

10 looking for and whether or not those facts are advanced and

11 complete here.

12 Your Honor, you're going to see compelling evidence

13 that the plaintiffs unduly delay the action. I don't need to

14 belabor that. I think you know what we're saying here, but

15 they slow-walked it; they orchestrated it. They want to be

16 here today in this context, in this circumstance.

17 As a matter of irreparable harm, we're going to contend

18 that they're not suffering and will not suffer irreparable

19 harm. They created the delay. Any harm they created and --

20 and we contend that any harm they're complaining about is

21 speculative because that harm can only be visited upon them on

22 Election Day if, in fact, the ballot is --

23 THE COURT: I'm curious: What's the position of the

24 defense on when they should have filed a complaint in order to

25 avoid this argument by you-all now that says they unduly

1 delayed this on their own, if they're responsible for this

2 delay?

3 MR. GENOVA: Well, I suppose, you know, to the extent

4 that they are relying on a candidate as their lead plaintiff.

5 And their lead plaintiff, who chose to participate in the very

6 process that he is now complaining about through this

7 litigation, who went to those various conventions to support

8 the slogan, to utilize the same statute that's in dispute,

9 then they should have brought the lawsuit in November if they

10 were going to bring the lawsuit when that candidate chose to

11 run, and that's who they're representing as a candidate.

12 The ballot changes, you will hear -- and I'll on this

13 -- are not feasible. We contend that it can't happen and it

14 shouldn't happen. And it shouldn't happen in a way that is

15 going to disrupt this election. This is a presidential

16 election. It is a very hotly contested presidential election.

17 We talk about voter confusion. The confusion that would be

18 visited upon the voters --

19 THE COURT: Putting names together in the same office

20 is going to confuse the voters more than what the current

21 ballot looks like?

22 MR. GENOVA: Well, Your Honor, you'll have to rely on

23 my cross-examination --

24 THE COURT: I'm not asking you, because you're

25 telling me that, somehow, today, it's going to be more

57

1  confusing for voters to clean this up than leaving it as the
2  status quo. And I don't know what evidence is going to be
3  presented to show that, but I'm going to be curious.
4      MR. GENOVA: You're going to hear from a clerk, and
5  you're going to hear from a clerk just the fact that a voter
6  walks into a polling booth or gets a vote-by-mail ballot or
7  gets an overseas ballot that looks different -- what does it
8  mean. This has been the ballot structure in this state for a
9  hundred years. The courts of this state have said that --
10     THE COURT: Yeah, but, Mr. Genova, the argument that
11  this is how we've always done it so this is how it should be
12  is not necessarily the argument that's going to convince the
13  Court. I'll tell you that.
14     So a hundred years or 200 years of this ballot system
15  is not going to convince me.
16     MR. GENOVA: And I'm not arguing that. I'm not
17  arguing that, because it was done in the past, it should be
18  done -- I'm making the point that, because it was done in the
19  past, it introduces confusion for people that have to react to
20  something new. That's a different question of whether or not
21  you conclude that how it's been done in the past is
22  unconstitutional. I'm saying --
23     THE COURT: So just solely based on the change alone,
24  that's the confusion, potentially, to voters?
25     MR. GENOVA: Yeah. That's the first part of it. But

*United States District Court*
*District of New Jersey*

58

1  I'm going to defer to the clerk that's going to testify as to
2  what that change means and what that visits upon are the
3  various voting workers have to explain things and they get
4  questions and everything else with respect to sample ballots
5  and the like.
6      It's a process. You don't snip a finger, and you don't
7  say it's just moving a bunch of names on the ballot. It's not
8  just moving a bunch of names on the ballot.
9      And, please, Your Honor, I want to leave on this note.
10  *Purcell* is a compelling Supreme Court decision. Evaluating
11  this case under *Purcell* ends the story. We never get to the
12  injunction issue and should end the story and should allow you
13  to deprive them of the relief that they seek for this
14  election.
15     Their case survives; they don't have to get this
16  injunction. The parties and stakeholders in the matter can
17  address it in a different context if they choose,
18  legislatively or otherwise, just as it was done a hundred
19  years ago. And we get discovery, they get discovery, and the
20  case proceeds to determine whether or not they can actually
21  prove that these theories translate into what they claim as
22  harms.
23     You will hear that there are alternative theories. You
24  will hear that not all these theories have been accepted by
25  courts. You will hear that they've been criticized.

*United States District Court*
*District of New Jersey*

59

1      So with that, Your Honor, I welcome the opportunity
2  today with my colleagues to present to you, and I thank you
3  for indulging me.
4      THE COURT: Thank you. I appreciate it.
5      MR. TAMBUSSI: Your Honor, if I may.
6      THE COURT: Yes.
7      MR. TAMBUSSI: My interest is different.
8      THE COURT: We have more than one opening statement?
9  You guys didn't warn me.
10     MR. TAMBUSSI: My interest is different, which is why
11  I intervened.
12     THE COURT: Would you like to come to the podium?
13     MR. TAMBUSSI: I would like to, Judge, with your
14  permission.
15     THE COURT: You may.
16     MR. TAMBUSSI: Thank you.
17     THE COURT: But just so I'm clear, are you the only
18  one with a different interest that's going to speak so we can
19  get to evidence? Or is there anybody else that's going to be
20  popping up here?
21     MR. TAMBUSSI: I'm the only one here on behalf of the
22  political parties, Judge.
23     THE COURT: All right. That's fair. I am happy to
24  hear from you, Mr. Tambussi. And I know that you moved to
25  intervene, and I granted it, didn't I?

*United States District Court*
*District of New Jersey*

60

1      MR. TAMBUSSI: You did, Your Honor.
2      THE COURT: I just didn't let you on my phone call
3  until I granted it.
4      MR. TAMBUSSI: You did not, Your Honor.
5      THE COURT: But I thought that was the right call.
6      MR. TAMBUSSI: I respect Your Honor's call.
7      THE COURT: Good morning.
8      MR. TAMBUSSI: Good morning, Your Honor. I will be
9  brief, Judge.
10     But you recognized in *Confort* the political parties
11  have the right to associate. And that's a right guaranteed by
12  the United States Supreme Court and in the New Jersey Supreme
13  Court.
14     And that right to associate, the freedom of
15  association, means that the political party has the right to
16  identify those candidates to which it wishes to associate and
17  those to which it does not. And it also has the right to
18  identify them in such a way that they select -- they can be
19  bracketed with or associated with a standard bearer who best
20  represents the parties' ideologies and preferences.
21     If we look at how the ballot is structured now, you
22  can't just look at it between what the clerks do and what the
23  candidates -- the aggrieved candidate's position is. You have
24  to look at it also from the parties that got the endorsement
25  or the association.

*United States District Court*
*District of New Jersey*

61

1    And the way the law is structured and the way the law
2    is implemented, at least in Camden County, it affords everyone
3    the opportunity, the opportunity to get primacy of a ballot in
4    the first position or the first column or row. That's
5    permitted. That's a big part of the plaintiffs' argument
6    here.
7        Without primacy, we're harmed.
8        THE COURT: Why can't the county endorse and
9    associate with whatever candidates they want to support and
10   stay away from the ballot? Why can't they just go out there
11   and say, This is our candidate and we support this person and
12   this is where our committee is behind, and leave the ballot
13   where the names are next to the office that they're running
14   for so voters can just see the name? And if the committees
15   want to endorse or associate with whatever candidate, no one
16   is preventing that.
17       Why does it have to be they also control the ballot?
18       MR. TAMBUSSI: Because -- well, they don't control
19   the ballot. The statute permits the inclusion of slogans or
20   identifiers on the ballot. And as consequence -- as a
21   consequence, the parties have the right to identify those
22   people through those slogans or identifiers on the ballot
23   under the New Jersey --
24       THE COURT: How do you explain away this ballot
25   Siberia? All right. That the plaintiffs have already -- how

62

1    do you explain that and how that's somehow constitutional for
2    these voters when you've got somebody all the way down here,
3    15 columns later, and somehow that's going to be more
4    confusing when me deciding to grant this relief for the
5    plaintiffs to say, We're going to put all these names next to
6    the office where voters can actually see who they're voting
7    for and find the names that they're looking for to run?
8        How do you explain this?
9        MR. TAMBUSSI: Well, I explain it in the context of
10   this case in front of Your Honor right now as it applies to
11   the Senate race. That can't happen.
12       In Camden County, for example, they fill out four
13   Senate candidates. Those four Senate candidates will be in
14   row or column 1, 2, 3 and 4.
15       THE COURT: It can happen, but not in the Senate
16   race?
17       MR. TAMBUSSI: Not in the Senate race.
18       THE COURT: All right. So it basically -- how it
19   happens -- I have you here now at the podium --
20       MR. TAMBUSSI: Sure. Ask away.
21       THE COURT: -- so explain to me how that works
22   outside of the Senate race and how that makes sense for the
23   voters.
24       MR. TAMBUSSI: Well, I know that Camden County is
25   going to present a witness on how it's done in Camden County,

63

1    but what happens is, Judge, in a Senate race or a
2    gubernatorial race, there's a ballot draw for those positions,
3    and they have to be from the first position. So if there's
4    four candidates, they will take 1, 2, 3, and 4 because it's
5    columns in Camden County. Those candidates that are bracketed
6    with those Senate candidates would fall below or above.
7    Above, in this case, because there's a presidential candidate.
8        So if the bracketed candidates, Senate representative,
9    draws column 4, that's where the bracketed column would be.
10   So the primacy effect that is alleged here to be a big
11   difference wouldn't apply because the bracketed candidates
12   wouldn't be in column 1. They would be in column 4.
13       So there's an issue here that needs to be addressed,
14   which is do you have a guaranteed right to be in column 1, or
15   do you have a guaranteed opportunity to be in column 1? And
16   that's what's presented, and that's the balancing that gives
17   the political parties and balances the political parties'
18   rights to have endorsements and identification of standard
19   bearers.
20       Now, the voters are entitled to know about this. And,
21   in fact, that's the way the statutory construct is so that
22   each candidate that is permitted to be bracketed under the
23   statute would be identified by the same slogan or identifier.
24       The plaintiff here -- in this case, the primary
25   plaintiff, the Senate candidate plaintiff, elected to try to

64

1    get the endorsements in some counties. He received the
2    endorsements in some counties, and he will be permitted to
3    bracket in some counties. In others where he did not, he will
4    not. But he will still have the opportunity to have the
5    primary --
6        THE COURT: But I haven't decided the case yet. So
7    you're saying he has the opportunity. I mean, I actually
8    don't understand the legality of that argument. So if you
9    have a candidate who may benefit from some counties with the
10   county line and not others, somehow that has some bearing on
11   my consideration as to whether this is constitutional in the
12   first place? Because I'm not so sure that's even relevant for
13   my consideration. Why should I even care if a candidate is
14   benefitting or not benefitting from some counties or other
15   counties or no counties? I don't know if that's part of the
16   legal analysis here.
17       MR. TAMBUSSI: We're not saying that they're
18   benefitting. What we're saying is that each candidate has an
19   equal opportunity, an equal opportunity to be in a ballot
20   position.
21       You asked how the ballot would be constructed going
22   forward. There are certain limitations on county machines,
23   voting machines, and there's determinations based on how
24   certain offices are drawn. And that depends on the number of
25   candidates there.

65

1    But each have the same opportunity. And that's what
2  the law provides. And that's what the law guarantees. And
3  when you look at the opportunity, you have to look at it in
4  the context that political parties have rights also, and those
5  rights are constitutional. And they can't be just swept
6  aside. They have to be considered as part of this calculus.
7    So when you look at -- respectfully, Judge, or you hear
8  the evidence that's presented to you, you see box ballots that
9  are shown that have no identification of who the candidates
10  are with regard to a political party, which is permitted in
11  New Jersey, to identify candidates by political party and
12  factions of political parties.
13    That box -- that box ballot, excuse me, doesn't include
14  any reference, the one you saw.
15    If we were to put those references in those box
16  ballots, would we be required to have a draw for each box
17  ballot, or would it be the identified party -- identified
18  candidate that has an endorsement of a political party --
19  would that candidate always be in the top left position, or
20  will it be scattered across the ballot?
21    We are trying to make the voters -- give the voters the
22  opportunity to understand that which is guaranteed, which is
23  the right to associate. And by associating the political --
24  by association, I mean the right to give political
25  endorsements.

66

1    And that can't be ignored in the case of this -- I
2  don't know why people are putting things up on the screen.
3    THE COURT: Are you doing this? Because I don't know
4  if you want me to look at it or not, but I'm hurting my neck
5  over here.
6    MR. TAMBUSSI: I am not, Judge.
7    THE COURT: All right. I'll just focus on you. So I
8  understand the position you're taking on behalf -- but let me
9  ask you -- well, is there anything I'm missing, because I do
10  want to get to testimony.
11    Is there anything more I'm missing from your opening
12  remarks.
13    MR. TAMBUSSI: No. I think, Judge, what can't be
14  ignored is the fact that the statutory construct takes into
15  consideration the political rights to associate of the
16  candidates and the parties, and any decision here can't
17  obliterate --
18    THE COURT: The constitutional rights of the CCDC,
19  your client.
20    MR. TAMBUSSI: Right.
21    THE COURT: I read your papers more than once.
22    MR. TAMBUSSI: I appreciate it, Your Honor. Thank
23  you.
24    THE COURT: All of your papers. So I'm not biased
25  toward Mr. Tambussi. I've read all your papers more than

67

1  once, one too many times.
2    MR. TAMBUSSI: Thank you.
3    THE COURT: I appreciate it. Let's get with
4  plaintiffs' counsel, and who's up first?
5    MR. PUGACH: Your Honor, I just want to -- I think
6  Your Honor wanted witnesses to be sequestered, so I just
7  wanted to make sure there was an opportunity to do that.
8    THE COURT: I did. Are they still floating around
9  here? Because we have rooms available for both sides if
10  there's witnesses that are not parties, obviously.
11    MR. PUGACH: Yes, Your Honor.
12    THE COURT: Anyone that's not a party to the case.
13  All right. So you're going to take care of that now?
14    MR. PUGACH: Yes, Your Honor.
15    THE COURT: All right.
16    MS. BROMBERG: Your Honor, you had said that you want
17  to break for lunch in 15 minutes. If I put on a witness
18  now --
19    THE COURT: I can break at 12:30. It doesn't have to
20  be at 12:00. I'm driving somewhere in that realm. We go off
21  on time just on the opening remarks, but do you think you can
22  get a witness done by around 12:30?
23    You all know better how long you need with the
24  witnesses than I do.
25    MS. BROMBERG: We can -- I can start with him, and

68

1  then he can pick back up after lunch. He's remote anyway, so
2  there's no way he --
3    THE COURT: How long do you think you'll have with
4  him on direct?
5    MS. BROMBERG: On direct, I would say about an hour.
6    THE COURT: You want to try to get his direct done
7  and then break?
8    Well, I will tell you what: Why don't you just go, and
9  then I'll talk to counsel and say, How do you feel; do you
10  need a break for the lunch, or do we get done with direct?
11    And, Mr. Parikh, are you handling the cross,
12  Mr. Parikh?
13    MR. PARIKH: I think both Mr. Natale and I may both
14  be doing that, Your Honor.
15    THE COURT: All right. So is there any objection to
16  see if we can get his direct done and then break? And that
17  way we come back for cross? I mean, why don't we just see
18  how you all feel?
19    MR. PARIKH: Not at all, Your Honor. I have no
20  intent -- one hour is a lot of time considering that the
21  plaintiffs are trying to put on six or seven or eight
22  witnesses today. We may be here until tomorrow at the pace if
23  it's --
24    THE COURT: Well, we're not because I already told
25  you all that you guys submitted a proposal, and I'm going to

69

1  be very clear.  I asked you -- and actually I didn't ask you.
2  I ordered you to provide a proposal for today's hearing.
3      So if you all came to some meet and confer where,
4  practically speaking, you need two days to do what I told you
5  to do in one, you need to make adjustments today.
6      So I'm going to defer to the plaintiffs on making those
7  calls, and you must have worked out how long cross-examination
8  is going to be because it sounds like you agreed to 30 or
9  45 minutes per witness for cross-exam, but today's your day.
10     MR. PARIKH:  Well, Your Honor, we agreed to 30 to 45
11 per witness direct, and then cross obviously would be
12 dependent upon what the witnesses would talk about but, I
13 would assume, shouldn't take longer for most witnesses than
14 the direct would.
15     So, you know, that's all I wanted you to know.
16     THE COURT:  I'll let you guys proceed as you deem
17 appropriate for your case, but be mindful that we have a
18 hearing day, and you all needed to put that together in
19 advance.  But I'm happy to hear from you.
20     MS. BROMBERG:  Your Honor, I'm happy to try to shave
21 off some time, for example, on our next witness with regard to
22 his -- I mean, I might address it shortly, but with regard to
23 going through his education and experiences.
24     If there's going to be motions in limine to try to
25 remove him -- the designation of him from an expert -- as an

70

1  expert, then I have some reasonable concerns around that.
2      But that's an opportunity that I can, you know, cut
3  some time for us.
4      THE COURT:  I'm not going to ask you -- I'm not going
5  to tell you where to cut your time.  I'm not going to get
6  involved in that.  You cut your time -- if you want to cut
7  that particular area of a witness or some other area, but I'm
8  not going to direct you where to cut.
9      I'm not going to influence how you want to present your
10 case.  I'm just telling you, you all have today, and that's
11 it.
12     MS. BROMBERG:  I think that what I would ask, then,
13 Your Honor, is for consideration, if necessary, when the
14 motions in limine are filed, for us to also offer some
15 additional explanation with regard to his experience and
16 background.
17     THE COURT:  Any objection to that from the defense?
18     MR. PARIKH:  I'm sorry, Your Honor.
19     I have no objection to them providing additional
20 information.  I think the main issue, Your Honor, is, if it's
21 something new, that we have an opportunity to respond.  I know
22 Your Honor does not want to see, you know --
23     THE COURT:  No.  I mean, look, why do they have to go
24 through the whole CV today if you're objecting anyway on
25 whether they're an expert.  They can just provide the CV in

71

1  writing with their response on Friday, and I can address it.
2      Why are we spending 25 minutes for someone to give
3  their qualifications just for you to stand up and say, I
4  object to them being an expert in this particular area, and I
5  say reserved?
6      MR. PARIKH:  I absolutely agree with Your Honor.
7      THE COURT:  All right.
8      MR. PARIKH:  We're already before the Court.  At the
9  end of the day, I don't think -- frankly, I don't think we
10 need to be repetitive and go through any of it.  And
11 Your Honor will be able to put weight onto all these
12 witnesses.
13     I do think, and you'll see this in the papers, that --
14 that, if these folks are -- are viewed as experts or pseudo
15 experts by the Court for purposes of this hearing, that does
16 not mean that Your Honor has to rule that they're experts for
17 the entire case.
18     THE COURT:  -- correct.
19     So, Ms. Bromberg, does that work for you?  It sounds
20 like the defense is amenable to at least saying, Look, you
21 don't have to go through the entire CV; we'll have it.
22 They'll object to it.  We'll deal with it in writing, and that
23 should cut a lot of time at least on anyone that you're
24 deeming an expert.
25     MS. BROMBERG:  That works, Your Honor.

72

1      THE COURT:  All right.
2      So what do we have?  Who's up?  Are you all calling a
3  witness?
4      MS. BROMBERG:  We are.  We are.  Mr. Ryan Macias is
5  joining us remotely.
6      (Brief pause.)
7      MS. BROMBERG:  Hi, Ryan.  Can you hear us?
8      MR. MACIAS:  I can hear you, yes.  Can you hear me?
9      MS. BROMBERG:  Yes, we can.
10     THE COURT:  Can he hear us?
11     MS. BROMBERG:  Yes, he can hear us, Your Honor.
12 Ryan, are you hearing us clearly?
13     MR. MACIAS:  I am hearing you.  I just plugged in my
14 headset right now.
15     THE COURT:  The headset is not working well?
16     Can you avoid using the headset, sir?  Can you hear me
17 fine?
18     MR. MACIAS:  I can hear you fine.  Can you hear me
19 now?
20     THE COURT:  Yes.  Leave the headset off.  I am going to
21 have you sworn in, all right, by my courtroom deputy.
22     THE DEPUTY COURT CLERK:  Please raise your right
23 hand.
24 (RYAN MACIAS, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS
25 FOLLOWS:)

73

1   THE DEPUTY COURT CLERK:  Please state your name and
2   the spelling of your last name for the record.
3   THE WITNESS:  Ryan Macias, M-A-C-I-A-S.
4   MS. BROMBERG:  Ryan, if you can lean a little forward
5   also, I think that will be a little helpful.  Yeah.
6   (DIRECT EXAMINATION BY MS. BROMBERG:)
7   Q.   Ryan, welcome.  Thank you for joining us today in court.
8        We are going to skip a little bit over your background
9   in the interest of time.
10       But if you can tell us specifically what you specialize
11  in, in your particular field?
12  A.   Yes.  I've spent 18-plus years working in election
13  infrastructure technology and security as well as election
14  administration and election policies.
15  Q.   And what was the prior position that you held while being
16  at the United States Election Assistance Commission?
17  A.   Yes.  I was the acting director of the voting systems
18  testing and certification program, the United States Election
19  Assistance Commission.
20  Q.   And what do you --
21  A.   In --
22  Q.   Oh, I'm sorry.
23  A.   Sorry.  I'm hearing some -- I'm hearing some feedback or
24  background noise from what's coming through the telephone.  It
25  sounds like somebody's trying to talk to me.  No?  Okay.

*United States District Court*
*District of New Jersey*

74

1        So as I was stating, the EAC is the agency that was
2   designated by the U.S. Congress under the Help America
3   Vote Act to conduct testing and certification for voting
4   systems for the use in federal elections.
5   Q.   And, Ryan, what do you do now?
6   A.   I am the owner of RSM Election Solutions, which is a sole
7   proprietor, L.L.C., and I work on consulting and strategic
8   advising for election infrastructure technology and security
9   as well as election administration and election policies for
10  federal, state, and local elections officials as well as
11  internationally with election management bodies.
12  Q.   Mr. Macias, is this your first time serving as an expert
13  witness?
14  A.   No, it is not.
15  Q.   Thank you.
16       Okay.  Let's jump to it.  What kind of voting systems
17  are in use in New Jersey?
18       THE COURT:  Sorry.  I just -- what is the area that
19  you're qualifying him as an expert in?
20       MS. BROMBERG:  I'm sorry.  I am qualifying him as an
21  expert with regard to election technology.
22       THE COURT:  Okay.
23       MS. BROMBERG:  Specifically election security and
24  election administration.
25       THE COURT:  All right.  And there's an objection

*United States District Court*
*District of New Jersey*

75

1   there, correct?
2        MR. PARIKH:  Correct, Your Honor.
3        THE COURT:  All right.  I'm reserving, but the
4   defense has agreed that the plaintiff can supplement his
5   professional background and CV by Friday when we -- when we
6   deal with the Daubert issue.
7        Okay.  I just wanted to make sure, but that's the area.
8   All right.  I'm sorry.  Please continue.
9        MS. BROMBERG:  Yes.  Your Honor, with regard to an
10  expert in the field of voting systems, security, and election
11  technology.
12       THE COURT:  All right.  Thank you.
13  BY MS. BROMBERG:
14  Q.   Okay.  Mr. Macias, what kind of voting systems are in use
15  in New Jersey?
16  A.   Yes.  Based on the Secretary of State's website, there
17  are two main election technology providers or voting system
18  vendors, which are Election Systems & Software and Dominion
19  Voting Systems.  And, more specifically, the systems that are
20  certified are ES&S voting systems -- or ES&S version 6.3.0.0
21  and ES&S 6.2.0.0, as well as Dominion Voting Systems version
22  5.15.
23  Q.   And how are these two systems similar?
24  A.   So all voting systems are similar in their design and the
25  devices that are utilized.  So, specifically, we refer to a

*United States District Court*
*District of New Jersey*

76

1   voting system as an election management system, which is
2   basically the brains of the system that helps design and lay
3   out ballots, as well as brings in results from each of the
4   independent voting tabulators to aggregate those results and
5   ultimately display or report the final results.
6        Additionally, there are what we call voting tabulators.
7   Specifically for ES&S and Dominion in use in New Jersey, these
8   are scanners.  There's two different types of scanners:
9   precinct scanners and central scanners.  But ultimately what
10  this is, is a device that scans a piece of paper, interprets
11  results on that piece of paper, and then saves, in memory or
12  what we call tabloids, that interpretation.
13       Then there's a third device, which are typically
14  referred to as the accessible device, which is a
15  ballot-marking device, or a DRE, direct recording electronic
16  device.  What these are are computer systems where a voter
17  interacts with a computer or what we call an electronic ballot
18  interface.  So the ballot is on screen, typically a touch
19  screen, and that is how the voter ends up marking their
20  ballot.
21       The main difference between a ballot-marking device and
22  a DRE is that a DRE, when the voter completes their ballot,
23  they submit their selections into memory, and it also acts as
24  a tabulator, whereas, a ballot-marking device, when you submit
25  your vote selections, it prints out on a piece of paper that

*United States District Court*
*District of New Jersey*

1 is ultimately tabulated by one of the scanners that I had
2 referred to.
3 Q. Okay. Mr. Macias, we're going to try to get through the
4 direct within an hour, by 1 p.m. our time, so I'm sorry if I'm
5 going to try to speed us up a bit.
6 So you --
7 A. No problem.
8 Q. -- you spoke about how the election management system,
9 the EMS, or the brains, as you called it, is a computer
10 software that is used for laying out and designing ballots.
11 Can you please walk us through the process?
12 A. Yes. So...
13 MR. PARIKH: Objection. I still don't think it's
14 specific enough. I mean, you talked about four or five
15 different types of systems, talked about two different types
16 of voting machines. You know, if he wants to explain in his
17 answer which one he's talking about or whether there's a
18 general thing, I just think the record requires clarity.
19 THE COURT: All right. I think that's fair.
20 Ms. Bromberg, can you clarify it?
21 MS. BROMBERG: Yes.
22 BY MS. BROMBERG:
23 Q. Mr. Macias, you mentioned earlier that both voting
24 systems in place in New Jersey, the Dominion system and the
25 ES&S system, both rely on election management softwares.

United States District Court
District of New Jersey

1 Is that right, the EMS, the brains?
2 A. Correct.
3 MS. BROMBERG: Does that satisfy your objection?
4 MR. PARIKH: I'm sorry. I don't know if counsel is
5 addressing the Court or addressing --
6 THE COURT: Yes, I mean --
7 MS. BROMBERG: Okay.
8 THE COURT: -- I'm going to address the objection.
9 So I sustained Mr. Parikh's earlier objection. He
10 hasn't objected a second time, so let's --
11 MS. BROMBERG: Okay.
12 THE COURT: -- move on.
13 BY MS. BROMBERG:
14 Q. So, Mr. Macias, please walk us through the process with
15 regard to how to use the EMS for laying out and designing
16 ballots.
17 A. Yes. So, as I had previously mentioned, the election
18 management system is a set of technologies. It can be
19 multiple applications, or it can be one application with
20 multiple different functions and features.
21 But, ultimately, an election official or the
22 third-party provider, their contractor who may be laying out a
23 ballot for them, inputs data. And so this would be contests,
24 candidates, districts, precincts, all of the data that is
25 necessary for the development of a ballot.

United States District Court
District of New Jersey

1 After that data is input, it is overlaid onto a ballot
2 layout, or what we call ballot layout software, which is
3 ultimately what the presentation would look like both on paper
4 as well as in the electronic ballot interface.
5 Then that is generated into a set of files. One set of
6 files, typically what we call a ballot PDF, is just a PDF
7 version of the paper ballot that ends up getting printed, and
8 there's an electronic file that goes to each of the devices,
9 one of which includes the electronic ballot interface that a
10 voter would interact with.
11 Q. Mr. Macias, with regard to step 1, the data entry step,
12 what type of information is entered into the data --
13 MR. NATALE: Objection, Your Honor.
14 BY MS. BROMBERG:
15 Q. -- into the system?
16 MR. NATALE: Objection, Your Honor. I have the same
17 concerns --
18 THE COURT: I need you to stand up.
19 MR. NATALE: Sure, sorry. It's a little bit of tight
20 quarters back here.
21 THE COURT: All right.
22 MR. NATALE: I have come to the same concerns raised
23 by Mr. Parikh. What is unclear from testimony to me is
24 whether every voting machine has the same EMS, whether there's
25 different EMSs, whether the question should be tailored to him

United States District Court
District of New Jersey

1 giving information as to what voting machine he's talking
2 about.
3 THE COURT: All right. Let me look at the question.
4 I'll sustain the objection.
5 Can you clarify, Ms. Bromberg?
6 BY MS. BROMBERG:
7 Q. Mr. Macias, can you answer the question again? How are
8 the two systems, the two voting systems in place in
9 New Jersey, the ES&S system and the Dominion system, the same?
10 A. So each of the systems have multiple different
11 components. Each has an election management system, a
12 tabulator, more specifically, a set of scanners, and then an
13 accessible device, as we typically refer to it, which can be a
14 DRE or a BMV, ballot-marking device.
15 Q. Mr. Macias, to clarify, the two systems in place in
16 New Jersey each have an election management system?
17 A. That is correct.
18 Q. Okay. And, Mr. Macias, if there is a specificity that
19 you would like to offer with regard to the treatment of the
20 EMS or any other aspect of the voting system as to the
21 Dominion system or the ES&S system, will you offer us that
22 specificity?
23 A. Yes. So, in specificity, ES&S, their EMS, or election
24 management system, is entitled Electionware. And then
25 Dominion Voting Systems uses an EMS entitled the Democracy

United States District Court
District of New Jersey

81

1  Suite.

2      Election -- ES&S's Electionware is one piece of

3  software with multiple different -- with multiple functions

4  within, whereas Dominion Voting Systems', Democracy Suite is a

5  set of applications that perform similar functions to that of

6  the ES&S's Electionware.

7  Q.   Okay.  Does the process that you just previously

8  described with regard to step 1, the data entry, step 2 -- you

9  were starting to talk about the ballot design and layout --

10  does that step 1 and step 2 process apply to both voting

11  systems in New Jersey?

12  A.   Yes.

13  Q.   Okay.  So can you offer us, again -- because we got

14  disconnected a bit -- the data that's entered into the step 1

15  process?

16  A.   Yes.  So everything that would be necessary to conduct an

17  election.  So it is items such as the contest names -- so

18  governor, Senate, president -- candidate names, districts,

19  precincting data, and other data that would be necessary to

20  design and develop both a ballot -- as well as data that would

21  be necessary for carrying the final ballot generation files to

22  the voting systems.

23      So that is things like what types of voting systems

24  you're going to be utilizing, in some cases the device --

25  like, specific information about the device, like serial

82

1  numbers or what precincts they are going to be loaded with and

2  so on and so forth.

3  Q.   Let's go to step 2.  After you put in the data entry into

4  either EMS system, what is the step 2 process for the layout

5  and design?

6  A.   Yes.  So you can design a ballot layout from scratch.  So

7  I equate this to starting with a blank Word document.  And you

8  can design a ballot or lay out a ballot using a blank template

9  or a blank format in placing the data and information into the

10  necessary locations on the ballot display, or you can import

11  existing templates.

12      So I equate this to basically bringing in an existing

13  template in Word, or, like, a memo style, and then what you do

14  is you associate that data into the template.  So you

15  basically overlay the names of the candidates, the names of

16  the contests onto an existing template.

17      And these templates typically include elections that

18  the election official or their vendor has designed in the

19  past.  So it could be a previous gubernatorial primary, a

20  gubernatorial general, presidential primary, presidential

21  general, et cetera.

22  Q.   With regard to step 1, the data entry stage where you put

23  in the candidates, the number of office -- offices being

24  sought, the precinct information, does that have an impact on

25  step 2 in terms of sequence or timing?

83

1      In other words, if the Court grants the relief that

2  we're seeking with regard to the preliminary injunction, does

3  that make any change with regard to the need to engage with

4  step 1?

5      MR. PARIKH:  Compound.  Leading.  I don't even know

6  that I understand the whole question, Your Honor, so I

7  would --

8      THE COURT:  All right.  So there's an objection to

9  compound and leading.  I'll sustain it.

10      You can rephrase it.

11  BY MS. BROMBERG:

12  Q.   Mr. Macias, does step 1 need to take place regardless of

13  the layout that needs to be put in at step 2?

14      MR. NATALE:  Objection.  It's still leading, Your

15  Honor.

16      THE COURT:  I'll allow it.

17      THE WITNESS:  Yes.  Step 1 has to take place because

18  you are going to have different candidates, contests,

19  potentially different districts for every single election.

20  BY MS. BROMBERG:

21  Q.   Okay.  Mr. Macias, is it possible to adjust the

22  templates?

23  A.   Yes.  Just as you would with a template, it starts as a

24  format that you would end up modifying based on the given data

25  that was input.  So, for instance, in a gubernatorial primary

84

1  election, you may have a contest of governor that has five

2  candidates in the 2020 election or 2018 election.  Then when

3  you are reusing that template for a 2022 election, there may

4  only be three candidates.  So you would end up having to

5  remove two of the candidate areas.  And so these templates are

6  modified for every given election.

7  Q.   Does the EMS software have the ability to lay out a

8  ballot in portrait mode, vertically?

9      MR. PARIKH:  Objection, Your Honor.  Just on the word

10  "layout," I think that they've been using, you know, certain

11  phrases interchangeably, and I think that the meaning here in

12  this question --

13      THE COURT:  Overruled.

14      He can answer it if he understands the question.

15  BY MS. BROMBERG:

16  Q.   Do you know the question, Mr. Macias?

17  A.   Yes.

18  Q.   Does the EMS software have the ability to lay out a

19  ballot in portrait, vertically?

20  A.   Yes.

21  Q.   Does it have the ability to lay out a ballot in

22  landscape, horizontally?

23  A.   Yes.

24  Q.   Does this also apply to electronic ballots?

25  A.   So most voting devices have the ability to lay out

85

1  ballots in both portrait and landscape.  Some are unique in
2  that they can only do one or the other.
3  Q.   Okay.  Are the voting systems in use in New Jersey, the
4  ES&S, EVS 6200 and the 63 series, as you previously attested
5  -- and the Dominion Democracy Suite voting systems certified?
6        MR. NATALE:  Objection.
7        THE COURT:  I see your spacing is tight now.  I'm
8  exempting you from standing to address the Court because I'm
9  appreciating more how tight it is in that L shape of the table
10  over, but what have you got?
11        MR. NATALE:  I appreciate Your Honor's relief on
12  that.
13        THE COURT:  All right.  Well, what is the objection,
14  though?
15        MR. NATALE:  There are multiple types of
16  certification.  I think she needs to adopt.
17        THE COURT:  I agree.  Objection is sustained.  What
18  specific certification are you referring to in that question,
19  so it's clear?
20  BY MS. BROMBERG:
21  Q.   Mr. Macias, can you please describe the certification for
22  the ES&S EVS 6200 and 6300 series?
23  A.   Yes.  ES&S's EVS 6300 and 6200, respectively, are
24  certified by the United States Election Assistance Commission,
25  so federal certification, as well as certified by the

86

1  Secretary of State of New Jersey and approved for use in the
2  State of New Jersey.
3  Q.   And can you please describe the certification of the
4  Dominion Democracy Suite voting systems in New Jersey?
5  A.   The version utilized in New Jersey is certified by the
6  Secretary of State of New Jersey and approved for use in the
7  State of New Jersey elections.
8  Q.   Mr. Macias, did you have an opportunity to review the
9  certification offered in this matter written by Edward Perez,
10  which is entered on the docket as ECF 95?
11  A.   Yes.
12  Q.   Okay.  One moment, please.
13        (Brief pause.)
14        MS. BROMBERG:  Thank you.
15  BY MS. BROMBERG:
16  Q.   Mr. Macias, do you see it on my screen?
17  A.   Yes, I do.
18        MR. PARIKH:  Your Honor, this hasn't been marked.  I
19  don't know.  There was no request to publish it to the
20  witness.  I'm not really sure --
21        THE COURT:  What is the exhibit?
22        MR. DARROW:  -- what it's being offered for.
23        THE COURT:  What's the exhibit?
24        By the way, all those objections are sustained.
25        Ms. Bromberg, what are we doing here?  Is this marked

87

1  as an exhibit for plaintiffs?
2        MS. BROMBERG:  I would like to mark it as an exhibit,
3  Your Honor, as Plaintiffs' Exhibit 1.
4        THE COURT:  All right.  So this isn't something that
5  was previously admitted?
6        MS. BROMBERG:  It was also previously admitted to the
7  Court, entered on the docket as ECF 95.
8        THE COURT:  All right.
9        So you're marking it as P-1.
10        Is there any objection to this document?  It's part of
11  the docket?
12        MR. GENOVA:  Yeah, it's part of the docket,
13  Your Honor.  I -- there's no objection to her talking to the
14  witness about publishing it, but I'm really not so sure what
15  the scope is.
16        THE COURT:  All right.  Well, I don't know either
17  until I hear the question.  So if there's an objection, I'll
18  wait for it, but now, Ms. Bromberg...
19        All right.  So it's P-1.  Let me ask you this:  Have
20  the parties decided, if something's already been previously
21  submitted to the Court, you're not going readmit it for
22  purposes of the hearing, or are you double-tapping that?
23        How are you-all deciding to deal with that issue since
24  you've been meeting and conferring?
25        MR. PARIKH:  We have not met and conferred on the

88

1  evidence issues with respect to that, Your Honor.
2        THE COURT:  All right.  Well, then let me just
3  clarify it now.  If anything has been previously submitted to
4  the Court, why don't we -- why don't we say now that we agree
5  that it's deemed admitted so you don't have to resubmit the
6  same document that's already on the docket?  Notwithstanding
7  the attorney general's letter, which -- I know Mr. Genova is
8  going to say you've reserved on that.
9        MR. PARIKH:  I think the only concern with certain
10  documents like this one, Your Honor, is there's been no
11  opportunity to cross-examine, et cetera.  I believe Your Honor
12  can take the weight of that appropriately.
13        So I would have no objection, unless any other defense
14  counsel have an objection.
15        THE COURT:  Well, either way, I consider -- I
16  consider affidavits, certifications -- all those are fair game
17  at a preliminary injunction.
18        MR. PARIKH:  Yes, Your Honor.
19        THE COURT:  So I am going to consider all that, but
20  they're deemed admitted, but I think for purposes of here,
21  let's identify it with an exhibit number to say this is P-1.
22  There's now no objection from the defense to show it to the
23  witness, and we'll find out what you're going to ask.
24        I don't know what the scope of this direct exam is
25  going to be if there's an objection.

89

1   You may continue.
2        MS. BROMBERG:  Thank you.
3        (Plaintiffs' Exhibit 1 in evidence.)
4        MS. BROMBERG:  I'll identify as Exhibit Number P-1,
5   which was entered in the docket as ECF 95, the certification
6   offered by Edward P Perez.
7   BY MS. BROMBERG:
8   Q.   Mr. Macias, are you familiar with this document?
9   A.   Yes.
10  Q.   Okay.
11       And does Mr. Perez's explanation of step 1 as you
12  articulated and step 2 comport with the description you just
13  offered?
14  A.   Yes.
15  Q.   Okay.
16       MR. PARIKH:  Your Honor, I'll note the hearsay issue
17  there, and I understand --
18       THE COURT:  Acceptable.  The rules of evidence are
19  relaxed here.
20       MR. PARIKH:  I absolutely do, Your Honor.  I want
21  just to make it clear for the record that the --
22       THE COURT:  So you're going to object to every
23  hearsay objection?
24       MR. PARIKH:  I will not, Your Honor.
25       THE COURT:  The objection is noted.  Rules of

90

1   evidence are relaxed in a preliminary injunction hearing I.
2        I will allow that question, and the answer, I believe,
3   was captured, correct?
4        MS. BROMBERG:  Yes, sir.
5        THE COURT:  All right.
6   BY MS. BROMBERG:
7   Q.   Mr. Macias, are Mr. Perez's explanation and conclusions
8   commonly understood and standard within the voting machines
9   field?
10       MR. NATALE:  Objection.
11       THE WITNESS:  Yes.
12       THE COURT:  Hold on.  There's an objection.
13       MR. NATALE:  I was going to be honest; I was
14  confused --
15       THE COURT REPORTER:  Mr. Natale, can you speak into
16  the microphone, please.
17       MR. NATALE:  Sure.
18       THE COURT:  Sorry.  What is the objection?
19       MR. NATALE:  I would object.  We understand what
20  the -- what fields he is purported to be an expert in.  The
21  voting machines field is something that is undefined.  I'm not
22  sure what standard he's being asked about.
23       MS. BROMBERG:  Your Honor, I have a short period of
24  time to get the testimony of my witness, which is abbreviated
25  in the interest of lunch, and what we need to --

91

1        THE COURT:  Woah, woah, woah.  I didn't abbreviate
2   your testimony at all.
3        MS. BROMBERG:  No, no, that's not what I'm
4   suggesting.
5        THE COURT:  And I didn't do it for lunch.  If you're
6   cutting out -- but what is the response to the objection?
7        MS. BROMBERG:  The response to the objection is I
8   would like -- I'm happy to clarify that this is with regard to
9   the election technology field that Mr. Macias is here to speak
10  to as a proposed expert.
11       He's an expert in the field.  There's another
12  certification offered.  I would like him to reflect on that
13  certification specifically as a detailed --
14       THE COURT:  Okay.  I'll allow it.  You may continue.
15       MS. BROMBERG:  Thank you.
16  BY MS. BROMBERG:
17  Q.   Mr. Macias, I'd like to show you the declaration of
18  Flavio Komuves, which I'm marking as Plaintiffs' Exhibit 2,
19  which was previously on the docket at DE 951.
20       (Plaintiffs' Exhibit 2 in evidence.)
21       MS. BROMBERG:  One moment, please.
22       (Brief pause.)
23  BY MS. BROMBERG:
24  Q.   Are you familiar with this declaration, Mr. Macias?
25  A.   Yes.

92

1   Q.   Okay.  And do you recognize the exhibits which are
2   included, attached to this certification, Exhibits A through
3   F?
4   A.   Yes.
5   Q.   Okay.  How do you know that each of these ballots are
6   what they purport to be?
7   A.   So each of these sample ballots, I went to the specific
8   or the respective elections officials' website and looked up
9   the information and saw exact copies as of what is in these
10  exhibits.
11  Q.   Okay.  And, Mr. Macias, do each of these ballots include
12  at least one race presented to voters in an office-block
13  format?
14  A.   Can you scroll through each respectively?  The one on
15  screen right now does.
16  Q.   That's the bottom one.  That's Exhibit F?
17  A.   Exhibit F does.
18       MR. PARIKH:  Your Honor, I just object.  There's no
19  foundation laid for what an office-block format is.  If
20  Your Honor wants to take it under advisement, I'm trying to --
21  but I want to note the objection for the record.
22       THE COURT:  I'm sure it's going to come out today.
23       You may continue.
24  BY MS. BROMBERG:
25  Q.   So, Mr. Macias, does Exhibit E show at least one race

1  presented to the voters in an office-block format?

2  A.    Yes.

3  Q.    That's with respect to Camden County.

4        Mr. Macias, does Exhibit D, also Camden County, display

5  at least one race presented to the voters in an office-block

6  format?

7  A.    Yes.

8  Q.    Mr. Macias, does Exhibit C for the county of Hudson

9  include at least one race presented to the voters in an

10 office-block format?

11 A.    Yes.

12 Q.    Mr. Macias, does Exhibit B for Ocean County -- I'm

13 sorry -- for Monmouth County display at least one race

14 presented to the voters in an office-block format?

15 A.    Yes.

16 Q.    Last one, Mr. Macias, does Exhibit A for the county of

17 Morris include at least one race presented to the voters in an

18 office-block format?

19 A.    Yes.

20 Q.    Thank you, Mr. Macias.

21       Mr. Macias, you testified earlier with regard to step 2

22 that step 2 offers the process for layout and design.

23       Can you offer specificity with regard to your

24 description of layout for both systems?

25 A.    Can you repeat the question, please.

1  Q.    Mr. Macias, in step 2 of the EMS process, the layout and

2  design system, does that layout option offer a technological

3  grid-based format?

4  A.    Both ES&S and Dominion have the ability to lay out a

5  ballot in a grid-based format, yes.

6  Q.    And is another form of layout set out in step 2 an

7  office-block format?

8  A.    I do not believe that the EMS's called them office-block

9  layout, but a traditional office-block layout is what we could

10 consider a bubble-based or generally referred to as a

11 bubble-based ballot.

12       And that is what we would also call an office-block

13 layout, and, yes, both systems have the ability to lay out a

14 ballot in that format.

15 Q.    And is there a system that -- is there a machine that --

16 you know what?  Let me pause that question.  I'll move

17 forward.

18       Mr. Macias, can you tell us with a reasonable degree of

19 scientific certainty that all vote-by-mail ballots in the

20 State of New Jersey can offer an office-block presentation

21 style to the voters?

22       MR. PARIKH:  Objection.  Same objection as earlier

23 with respect to the in limine motions, conclusory nature,

24 et cetera, with a scientific basis.

25       THE COURT:  All right.  I'll reserve on it, though

1  I'm overruling.  She's going to be able to get an answer to

2  her question.

3        So you can answer the question, Mr. Macias.

4        THE WITNESS:  Thank you.

5        Yes.  All paper -- excuse me -- both voting systems can

6  lay out all paper ballots in a traditional office-block style.

7  BY MS. BROMBERG:

8  Q.    Mr. Macias, can you tell us with a reasonable degree of

9  scientific certainty that all electronic ballot interfaces in

10 New Jersey can offer an office-block presentation style?

11       THE COURT:  Noted.

12       MR. PARIKH:  Yes.  Thank you, Your Honor.

13       Your Honor, I just noted --

14       THE COURT:  I know.  Let's do that.  Because I want

15 Ms. Bromberg to get through her witness, and you guys are

16 starting to push my buttons.

17       MR. PARIKH:  Note the running objection on that

18 particular issue.

19       THE COURT:  All right.

20       THE WITNESS:  I did not hear.  Was that sustained, or

21 can I answer?

22       THE COURT:  You can answer the question, Mr. Macias.

23       THE WITNESS:  Thank you, Your Honor.

24       Yes.  Each voting system has the ability to lay out an

25 electronic ballot interface in a traditional office-block

1  style.  However, there is one voting device in New Jersey,

2  specifically, the ES&S ExpressVote XL.  That requires a

3  grid-based ballot layout.

4  BY MS. BROMBERG:

5  Q.    And can that ES&S ExpressVote XL voting machine, which

6  presents -- which uses a grid template -- can it present with

7  an office-block presentation style?

8  A.    Yes.  As a matter of fact, what is on-screen right now

9  from Ann F. Grossi, County Clerk, appears to be the electronic

10 ballot interface for ExpressVote XL and presents to the voter

11 an office-block-like ballot layout with all candidates listed

12 in a single column.

13 Q.    Mr. Macias, can you tell us, with a reasonable degree of

14 scientific certainty, that all voting systems and all voting

15 devices in New Jersey can provide voters with a ballot that

16 does not use the county-line-style ballot format?

17 A.    Yes.  Both voting systems -- or all voting systems used

18 in New Jersey have the ability to lay out ballots without the

19 county-line style.

20       MR. PARIKH:  Your Honor, I apologize because I do

21 know that Your Honor wants to get through this.  I will note a

22 running objection also to the characterization of anything

23 that's a county-line style ballot.  It's bracketing.  That's

24 what's referenced in the statutes.  I know that the plaintiffs

25 have used that term colloquially throughout their briefing and

1  whatnot, but I do think it's a mischaracterization of exactly
2  what's going on here.
3      And I just note the running objection to that
4  throughout the proceedings because I'm sure it will come up
5  many times.
6      THE COURT:  All right.  Your objection is noted, and
7  that's fair.
8      And look, by the way, to be clear, we'll talk about
9  lunch, about your response to the motions in limine and when
10  they're due.  So just remind me when we take the break, let's
11  address that before I let you guys off to lunch.
12      All right.  Go ahead, Ms. Bromberg.
13      MS. BROMBERG:  Thank you.
14  BY MS. BROMBERG:
15  Q.    Mr. Macias, how can a grid-based voting template, like
16  that used by the ExpressVote XL, be generated to look similar
17  to an office-block style?
18  A.    Yes.  So grid-based ballots generally, or typically --
19  basically, whenever they are used outside of the state of New
20  Jersey -- so the other four states, Louisiana, New York,
21  Delaware, and Pennsylvania -- present a voter with a ballot
22  that has all candidates listed in a single column to appear to
23  the voter similar to that of an office-block layout.
24      So presenting all candidates under a single contest or
25  alongside, as we are seeing on-screen right now, a single

1  complicated.
2      THE COURT:  Sorry.
3      If you're going to object, speak up.
4      Who is objecting, and what is it?  I can't hear you.
5      MR. NATALE:  I would object again to the
6  characterization of --
7      THE COURT:  Overruled.
8      MR. PARIKH:  There's also a lack of foundation,
9  Your Honor, but -
10      THE COURT:  All right.  Overruled.
11      Go ahead, Ms. Bromberg.
12  BY MS. BROMBERG:
13  Q.    Mr. Macias, is it your conclusion that the county-line
14  style formats are a simplified or a more complicated format
15  than the other ballot formats?
16  A.    Yeah, the county-line is a more complicated format.  If
17  you just look at it from a mathematical perspective, a
18  traditional office-block style ballot would be a single
19  column.  And so if there are four candidates, it would have
20  four cells, one column for each of the four candidates.
21  Whereas, the county-line style ballot requires a multitude of
22  columns for which the candidates can be laid out.
23      And so, again, as an example, it may take four columns
24  by the four candidates, or the four rows, equivalent to 16
25  different cells in which a candidate can be placed.  That is

1  contest as opposed to across multiple different columns.
2  Q.    Are the Dominion and ES&S voting systems used in
3  New Jersey the same that are used across the country?
4  A.    The -- the ES&S 6300 and 6200 respectively are used
5  throughout the country.  They're certified in a majority of
6  the states and are utilized in a majority of the states across
7  the country.
8      The Dominion Voting Systems 5.15 specifically, I
9  believe, is unique to New Jersey.  However, the Dominion
10  Voting Systems 5 series -- so that we would call 5.X, so the
11  5.5, 5.17, 5.0, et cetera -- are used in a majority of the
12  states across the country.
13  Q.    Okay.  Do those other states use a county-line style
14  ballot format?
15  A.    No, that is unique to New Jersey.
16  Q.    Does the provision of the traditional office-block style
17  require recertification or retesting of the New Jersey ES&S or
18  Dominion Voting Systems?
19  A.    It does not because it is already a part of the current
20  certified system.
21  Q.    Is it your conclusion that county-line style formats are
22  a simplified or a more complicated format than the other
23  ballot formats?
24      MR. NATALE:  Objection.
25      THE WITNESS:  Using a county-line is more

1  much more complicated than four cells in which an office-block
2  style would be laid out.
3  Q.    How does the use of a county-line style format impact the
4  time needed to program the voting systems?
5  A.    Well, the answer would be similar in the fact that it is
6  more complicated.  You have to create additional rows --
7  excuse me, additional columns for the candidates that are part
8  of that given election.
9      And so the more columns you have to create, the more
10  time that it takes, number one.
11      And number two is it requires more time for the
12  election official to conduct the proofing or basically to
13  determine and ensure the accuracy to make sure that the
14  candidate is in the right cell.
15      And then lastly is it takes more time for the election
16  official to conduct what we call logic and accuracy testing
17  which is required prior to every election.  Because you then
18  have to be able to test every single cell to ensure that the
19  cell is operating correctly.
20  Q.    Mr. Macias, I'm going to refer us to your report, which
21  I'm marking into evidence as Plaintiffs' Exhibit 3, which is
22  in the record as ECF 115-1.
23      (Plaintiff's Exhibit 3 in evidence.)
24  BY MS. BROMBERG:
25  Q.    Are you looking at your report, Mr. Macias?

101

1   A.   I see it on the screen, yes.

2   Q.   Okay. Referring to Figure 1 in your report, which is on

3 page 16, can this be designed using a grid-based ballot

4 system -- I'm sorry. Let me rephrase.

5    Can this be designed, Figure 1, using a grid-based

6 ballot?

7   A.   Yes. A grid-based template would be laid out in 1, 2, 3,

8 4, 5, 6, 7, 8, 9 -- this would be what we would call a two

9 column by nine row. So a two-by-nine grid-based ballot.

10   Q.   Okay. Can this be done on all New Jersey's voting

11 systems?

12   A.   Yes.

13   Q.   Is this an office-block-like ballot?

14   A.   Yes, it is using a grid-based template to present like an

15 office-block ballot layout.

16   Q.   Is this the layout and format in use in other states?

17   A.   Where a grid-based ballot is used, yes.

18   Q.   What other states are those, Mr. Macias? Just a few.

19   A.   So grid-based generally are in Louisiana, some

20 jurisdictions in Pennsylvania, some jurisdictions in New York,

21 and the state of Delaware.

22   Q.   Do those states use the ES&S voting systems?

23   A.   Pennsylvania, New Jersey -- or excuse me, New York, and

24 Delaware do use ES&S voting systems.

25   Q.   Okay. Ryan, I'm -- Mr. Macias, I'm moving us to

102

1 Figure 2, which is page 17 of your report.

2   A.   Uh-huh.

3   Q.   Can this be designed using a grid-based template?

4   A.   Yes, similar to Figure 1. The difference here is that it

5 would be a one-by -- it would be a one-by-six layout on a

6 grid-based ballot for the left-hand column, and then,

7 subsequently, you would create a one-by-four grid for the

8 right-hand column.

9   Q.   Is this layout and format in use in other New Jersey

10 counties?

11   A.   Yes.

12   Q.   What counties is that? Can you give us one example,

13 Mr. Macias?

14   A.   I would need to refer back to the ballots to name

15 specifically the counties that use this layout. I do not

16 recall off of the top of my head.

17   Q.   Let me direct us to one.

18    So just by way of example, Exhibit D, previously

19 entered into the record as Plaintiffs' Exhibit 2, Exhibit D,

20 the Camden County ballot for Cherry Hill.

21    Does that look like the Figure 2 we just took a look

22 at?

23   A.   In part, yes, it does. Insofar as that there is the

24 left-hand column with one grid-based layout and then a second

25 column on the right-hand side with a second grid-based layout,

103

1 yes, that is similar.

2   Q.   Okay. Is this an example of a New Jersey county using

3 the office-block presentation from Figure 2?

4   A.   Yes.

5   Q.   How do you know that this is an office-block

6 presentation? How do you know that that's possible here?

7   A.   So this is a sample ballot from Camden County, which

8 actually, if you scroll up a little bit -- well -- so it

9 refers there, across the top, that this is the official

10 election sample ballot for the Tuesday, November 7th, 2023,

11 election. And it is a sample ballot, is an exact copy as

12 highlighted for that election for ballots on Election Day.

13    So this reflects that this ballot was used in an

14 election in 2023 in Camden County.

15   Q.   Okay. Was this a ballot for voting machines or for paper

16 ballots?

17   A.   This is a paper ballot.

18   Q.   Okay. Mr. Macias, I'm putting up another image, which is

19 in your report, but it is included in Plaintiffs' Exhibit 2 as

20 Exhibit B of ECF 95-1.

21    Is this an example of a New Jersey county using an

22 office-block presentation that you're referring to?

23   A.   Yes.

24   Q.   Is this an office-block display set up with a grid-based

25 layout?

104

1   A.   Yes.

2   Q.   Okay. Thank you, Mr. Macias.

3    Did you review the affidavit submitted by the defense

4 by Benjamin Swartz, which is on the record as DE 46, the

5 principal state certification manager of ES&S?

6   A.   Yes, I did.

7   Q.   Okay. And you were -- oh, okay.

8    Do you recall paragraph eight therein? I can put it on

9 the screen as well.

10   A.   Yes. Please put that on the screen. I do not recall

11 which paragraph off the top of my head.

12   Q.   Do you see it now?

13      MR. PARIKH: Your Honor, I just ask that counsel mark

14 this exhibit so the record's clear.

15      THE COURT: Agreed.

16      MS. BROMBERG: I can -- I'll mark this as Plaintiffs'

17 Exhibit 4, please. It is the Benjamin Swartz affidavit in the

18 record as DE 46, the principal state certification manager for

19 ES&S.

20      (Plaintiff's Exhibit 4 in evidence.)

21      THE COURT: Thank you.

22 BY MS. BROMBERG:

23   Q.   Mr. Macias, in paragraph eight, what does Mr. Swartz mean

24 when he refers to a -- what is Mr. Swartz telling us in

25 paragraph eight?

1  **A.**   So it is assumed that the first sentence is saying that
2  the two systems, the two ES&S systems -- EVS 6200 and EVS
3  6300, specifically the ExpressVote XL used in New Jersey --
4  were tested and certified using the New Jersey traditional
5  ballot-style layout, which includes a grid-based ballot using
6  a county-line style.
7     That is what I assume he is referring to as a
8  traditional ballot layout style.  Again, I will call that a
9  New Jersey traditional ballot layout style and not a
10  traditional ballot layout style.
11    Second, it says, depending on ballot layout style
12  format, changes may need to be tested and certified to include
13  new or updated versions of the software.
14    And then the last thing is that any modifications or
15  changes and -- any modifications or changes that would require
16  updated software and therefore, a retest and recertification
17  cannot be implemented prior to the 2024 primary election.
18  **Q.**   Do you agree with Mr. Swartz's description of traditional
19  to describe the ballot layout style?
20    MR. PARIKH:  Your Honor, just relevancy.  I mean, the
21  certification says what it says.  What his opinion is of
22  what's traditional --
23    THE COURT:  Well, he's opposing your expert, right?
24  You have this individual.  She's got somebody else, and she's
25  asking whether you agree with or not.  No?  I'm going to allow

1  it.
2     MR. PARIKH:  It's -- okay.  That's fine.  Withdrawn.
3     THE WITNESS:  No, I would not consider New Jersey's
4  style of grid-based ballot using a county-line a traditional
5  ballot layout style, as it is unique to New Jersey and used in
6  New Jersey alone.
7     A traditional ballot layout style would be an
8  office-block style as it is used in an overwhelming majority
9  of the states.
10    Secondarily, if you use a grid-based ballot layout, the
11  traditional grid-based ballot layout would be not using the
12  county-line style as is used in the other four states:
13  Louisiana, Delaware, New York, and Pennsylvania.
14  BY MS. BROMBERG:
15  **Q.**   Would you agree with the assertion here that any
16  deviations from that style would need to be evaluated to
17  determine feasibility?
18    And, Mr. Macias, if you can please offer some
19  description of what that style here, how you're assuming it to
20  be applied.
21  **A.**   So from that style, again, I infer that Mr. Swartz is
22  talking about the New Jersey grid-based, county-line style,
23  and any deviations from that would need to be evaluated to
24  determine feasibility.
25    I do not believe that it would need to be evaluated to

1  be determined feasibility for the EVS 6300 or the EVS 6200 as
2  we know, in fact, that other styles are used across the
3  country --
4  **Q.**   And what about --
5  **A.**   -- using that -- using on that device.
6  **Q.**   And what about for the Dominion systems?
7  **A.**   For the Dominion system, I also know that the system can
8  use different layouts than what is used in New Jersey.
9  **Q.**   Okay.  And, Mr. Macias, the next sentence where he
10  describes:  Depending on the ballot layout style requirements,
11  any changes would require development, testing, and
12  certification of a new and or updated version of software.
13    What is your -- is this applicable to New Jersey's
14  voting machines for the purposes of offering an office-block
15  display presentation?
16    MR. PARIKH:  Your Honor, I believe this witness has
17  testified multiple times now that the EVS 6200 and the
18  EVS 6300 are capable, but the ExpressVote is not.
19    And when we talk in generalities about election
20  machines, it really will, I think, make things confusing with
21  respect to a question like this.
22    So I would ask that counsel --
23    THE COURT:  What's the objection?  To the form of the
24  question?
25    MR. PARIKH:  Too general, Your Honor.  It's undercut

1  by foundational evidence.
2     THE COURT:  You can handle it on cross.  Are you
3  cross-examining this witness?
4     MR. PARIKH:  I don't know, Your Honor.
5     THE COURT:  Well, somebody in the team of 19 is going
6  to cross-examine, so...
7     Ms. Bromberg, ask the question, get an answer, and one
8  of you can cross-examine if you want to seek clarification on
9  that particular issue, but I'm overruling the objection.
10 BY MS. BROMBERG:
11 **Q.**   Mr. Macias, with regard to Swartz's statement here, is it
12 your conclusion that this is an accurate statement that,
13 depending on the ballot layout style requirements in
14 New Jersey, any changes would require development, testing,
15 and certification of a new and/or updated version of software
16 with respect to New Jersey's current voting systems?
17 **A.**   Well, the question is open ended in that it says
18 depending on ballot layout style requirements.  There may be
19 ballot style requirements that would require testing --
20 development testing and new software and, therefore, new
21 retesting or recertification.
22    However, as it applies to the styles that we are
23 talking about here, so a grid-based ballot layout that appears
24 like an office-block style or, more specifically, a single
25 column of candidates with the contests either above or

1 alongside, no, I do not agree that it would require
2 development testing and certification or upgraded software, as
3 those styles are used on these systems and devices across the
4 country.
5     Q.   And, Mr. Macias, do you agree with Mr. Swartz's statement
6 that such deviations could not be made and implemented prior
7 to New Jersey's 2024 primary elections?
8     A.   Again, for clarification, if --
9          THE COURT:  Can you put him back on the screen so I
10 can see him?  Thank you.
11 BY MS. BROMBERG:
12     Q.   You can continue.
13          THE WITNESS:  Well, Your Honor, I didn't hear --
14          THE COURT:  I just want to be able to see you.  I can
15 see you now.
16          Now you can answer the question.
17          THE WITNESS:  Oh, okay.
18          For clarification, if such deviations means a
19 grid-based ballot layout with a single column and the contest
20 listed above or alongside, I disagree with the statement.
21          THE COURT:  Ms. Bromberg?
22          MS. BROMBERG:  Yes.
23 BY MS. BROMBERG:
24     Q.   Mr. Macias, does the remedial action that plaintiffs seek
25 use the same ballot layout formats as what is already in place

1 in New Jersey?
2     A.   Yes.
3     Q.   And for the clerks listening to your testimony today,
4 Mr. Macias, how would you advise them to adjust the same
5 ballot layout to permit for the remedial action that
6 plaintiffs seek?
7     A.   So as we have seen on some of the ballot -- sample
8 ballots that have been placed on screen during this testimony,
9 many of the clerks are already doing what the plaintiffs are
10 requesting, which is using a grid-based ballot layout with
11 candidates listed in a single column and either the contest
12 listed above or alongside.
13          Therefore, if they're importing ballot layouts, they
14 should begin by importing one of the layouts that they have
15 already currently used.  However, if their jurisdiction has
16 not ever used a single-column ballot layout, then they could
17 import the county-line-style grid-based ballot layout, remove
18 the excess columns -- so if there's five columns, delete four
19 columns -- and add the same number of rows.
20          So if you deleted four columns whereby the candidates
21 were listed in the four columns, then you would -- instead you
22 would delete those four columns and instead add four rows and
23 include the names of the candidates in that layout.
24          And so it is as simple as using the ballot layout
25 software to remove X number of columns and add that same X

1 number to the number of rows and still lay out the exact same
2 candidates, just in a different cell.
3     Q.   Okay.
4          MS. BROMBERG:  Your Honor, I'm going to try to go for
5 ten more minutes.
6          THE COURT:  All right.  Let's push.  Let's do it.
7 BY MS. BROMBERG:
8     Q.   Mr. Macias, are you familiar with the certification of
9 Warren County Clerk, Holly Mackey, which was entered into
10 evidence as ECF 57-1 and will be marked as Plaintiffs'
11 Exhibit 5?
12     A.   I am aware that I believe Ms. Mackey submitted two
13 different certifications, a certification and a supplemental.
14     Q.   That's correct.  She offered an original certification
15 which is Plaintiffs' Exhibit 5, and the supplemental which
16 we'll mark into evidence as Plaintiffs' Exhibit 6, which is on
17 ECF 139.
18          (Plaintiffs' Exhibit 5 in evidence.)
19          (Plaintiffs' Exhibit 6 in evidence.)
20 BY MS. BROMBERG:
21     Q.   Mr. Macias, with regard to Plaintiffs' Exhibit 5, her
22 original certification, what did she originally attest to?
23     A.   So I believe there was lower -- I'm not sure which
24 paragraph it was, but one of the things that she attested to
25 is that her current system can handle -- her current ES&S,

1 specifically, can handle the multiple different ballot
2 layouts.
3          Specifically, as shown on the screen right now,
4 paragraph 7 says, the ES&S system can handle any style of
5 ballot that I need it to.
6     Q.   All right.
7     A.   She also attests that ballots in previous years included
8 a bubble ballot design, which by its very nature is an
9 office-block style.
10     Q.   And what did she clarify in her supplemental
11 certification, which is Plaintiffs' Exhibit -- sorry -- 6?
12     A.   For clarification, we affirmed that the ES&S system can
13 create a bubble-style ballot in -- on a paper ballot as
14 opposed to the electronic ballot interface.
15     Q.   Do you agree that the ExpressVote XL cannot do the bubble
16 ballot but can do the grid ballot?
17     A.   Yes.
18     Q.   Do you agree that the ExpressVote can do both
19 bubble-based and grid-based, office-block presentations?
20     A.   Yes.
21     Q.   Which system is Clerk Mackey referring to here?
22     A.   Based on her certification documents and the
23 supplemental -- excuse me.  Based on the supplemental, which
24 is up on-screen right now, I cannot tell.  It just says,
25 express machines, if I recall.

113

1 I believe it's -- right there on paragraph 2, ES&S
2 express machines. This could be either the ExpressVote, which
3 is one type of device, or ExpressVote XL, which is a different
4 type of device.
5 However, in additional research and, I believe, in her
6 original certificate, it does specify the ExpressVote XL.
7 Q. Okay. Mr. Macias, let's turn to one final piece of item
8 (sic) that was entered into the record, which is -- we're
9 going to mark as Plaintiffs' Exhibit 7. It's the
10 certification offered by David Passante on the record as ECF
11 65-1.
12 (Plaintiffs' Exhibit 7 in evidence.)
13 BY MS. BROMBERG:
14 Q. Did you have an opportunity to review this certification?
15 A. Yes.
16 Q. Do you recall that Mr. Passante states that he services
17 11 counties for the purposes of administering -- for the
18 purpose of servicing New Jersey elections?
19 A. Yes.
20 Q. Okay. What does Mr. Passante claim that he does?
21 A. So it says that he provides printing services. However,
22 the description later on in his cert is difficult to ascertain
23 exactly what he is -- what his company provides.
24 As the description for preprinting -- where is it? --
25 here in paragraphs 7 and 8 where he's talking about the design

*United States District Court*
*District of New Jersey*

114

1 features, the shells, which, again, I -- he is talking about
2 ballot layouts as well as other descriptions in here -- is not
3 what we would typically, in the elections world, describe as
4 printing or printing services.
5 Rather, it would be ballot printing or election
6 definition configuration services as opposed to printing
7 services.
8 Q. What do you make of Mr. Passante's explanation that his
9 company performs for 11 counties tasks that use a shell ballot
10 for each of his clients? What is he talking about?
11 MR. PARIKH: Judge, I don't know the relevancy of
12 this. I mean, it's a certification for the Court. She's
13 asking what the witness would make of this person's paragraph
14 and his description of a shell ballot.
15 I don't know what the relevancy of that is to any issue
16 before the Court, and this --
17 THE COURT: So the objection is on relevance?
18 MR. PARIKH: It is, Your Honor.
19 THE COURT: All right. So let me ask you this,
20 Ms. Bromberg. I understand you're asking -- whose affidavit
21 am I looking at again? Remind me.
22 MS. BROMBERG: We're looking at the affidavit of
23 Mr. Passante, who's the co-owner of Royal Printing Services.
24 THE COURT: You're asking whether he agrees with his
25 position in the affidavit?

*United States District Court*
*District of New Jersey*

115

1 MS. BROMBERG: Well, Mr. Passante uses a term here of
2 "shell ballots" with respect to the printing services that he
3 offers these counties, and I'm -- Mr. Passante is also on the
4 witness list for later today.
5 So I'm trying to ascertain what is meant here by "shell
6 ballots" based on Mr. Macias' expertise in the field.
7 THE COURT: I mean, are you calling this witness?
8 MR. PARIKH: We are, Your Honor.
9 THE COURT: So why don't you just ask the witness
10 whose affidavit this is or certification this is? Shouldn't
11 he be able to answer what he means by shell ballot?
12 MS. BROMBERG: I will be sure to ask --
13 THE COURT: I'll sustain the objection, then, if this
14 witness -- this witness is definitely coming?
15 MR. PARIKH: Yes, Your Honor.
16 THE COURT: All right. Then you can ask the witness
17 who actually wrote shell ballot. Why ask another party what
18 the author meant by it?
19 So I'll sustain the objection.
20 BY MS. BROMBERG:
21 Q. Mr. Macias, Mr. Passante describes that it takes him
22 three to four weeks in order to complete the ballot design
23 process with the ten clerks that he represents.
24 Is this any different in time from what he can provide
25 using a grid-based ballot to look like an office-block

*United States District Court*
*District of New Jersey*

116

1 presentation?
2 THE COURT: This one I'm going to allow, but I'll let
3 you put your objection on.
4 MR. PARIKH: Same objection, Your Honor. This
5 witness is going to task force --
6 THE COURT: This is a different question than having
7 her interpret what your witness meant by "shell ballots."
8 So objection is noted. It's overruled.
9 Repeat the question, or have him answer it.
10 THE WITNESS: Yes. So it would take a similar time
11 to be able to lay out a ballot in an office-block style or a
12 grid-based ballot style. Particularly, if you were starting
13 from scratch.
14 In regards to whether or not you are reusing a ballot
15 layout or template, it may take a little bit different timing
16 in that you would have to make some modifications and
17 adjustments as I have described earlier in regards to deleting
18 specific columns and adding the applicable number of rows.
19 However, this is very minimal and is typically done in any
20 given election anyhow.
21 As I previously testified, every template that is
22 reused is going to have a different number of contests, a
23 different number of candidates in it. And so anybody who is
24 performing the ballot programming is automatically going to
25 have to make some adjustments. And I would say that these

*United States District Court*
*District of New Jersey*

1  types of adjustments are equivalent to any other adjustments
2  that would be made in a ballot layout.
3  BY MS. BROMBERG:
4  **Q.**   Do you have a concern, Mr. Macias, at this stage before
5  the primary election with regard to the ability to meet the
6  statutory deadlines to satisfy an office-block presentation
7  layout in New Jersey's primary ballots?
8  **A.**   Insofar as if -- this is going to be a company-by-company
9  if we're talking about third parties doing it on their
10  resources.
11      Now, in regards to Mr. Passante and his 11 counties,
12  the process would be very similar.  So if he does not take on
13  additional business, does not take on additional counties and
14  so on and so forth, he should be able to continue to do the
15  ballot programming for the same number of jurisdictions in the
16  same amount of time.
17      And, equivalently, a single jurisdiction who programs
18  their own ballots, so an election official or a county clerk
19  who does this on their own, they should also be able to do the
20  grid-based ballot layout without a county-line-style in the
21  same amount of time that they would do a grid-based ballot
22  with the county-line format, or similar to in time.
23  **Q.**   Mr. Macias, is it your conclusion that New Jersey's
24  primary ballot -- ballots for the upcoming primary can
25  support --

1      MR. PARIKH:  Leading, Your Honor.  Objection.
2      THE COURT:  It's leading.  I think it's obvious what
3  his position is, so I'm going to allow it because I don't
4  think it's going to be a shock, what he is going to say to
5  answer this question.
6      So maybe it would be different if we don't know.  I
7  don't think he is going to be influenced by the leading format
8  of the question.  So I'm going to overrule it.
9      You can ask him.
10  BY MS. BROMBERG:
11  **Q.**   Is it your conclusion, Mr. Macias, that New Jersey's
12  primary ballots for the 2024 primary can support an
13  office-block presentation style for all races in New Jersey?
14  **A.**   Yes.
15      MS. BROMBERG:  Your Honor, I'd like to, obviously,
16  have Mr. Macias moved in as an expert into the matter, and I
17  understand that will have to wait until --
18      THE COURT:  Yeah, I'll reserve on that because --
19  and, Mr. Parikh, my understanding is the motions in limine
20  that you referenced are being filed today.  Correct?  I'm
21  seeing them on the docket as I'm --
22      MR. PARIKH:  Yeah, they're already on the docket.
23      THE COURT:  Okay.  So there are no additional
24  motions; they're all being filed today regarding these
25  experts?

1      MR. PARIKH:  There -- I hesitate -- I believe the
2  answer to that is yes, Your Honor.  I don't know if there's
3  testimony that comes out today from one of these --
4      THE COURT:  That might result in some additional
5  motions.  Anything additional has to come in by Friday.  But
6  these motions in limine regarding the experts, when do you-all
7  intend to respond to those motions?
8      MS. BROMBERG:  How many are there?
9      MR. PARIKH:  There are seven, Your Honor.  Each is
10  just a few pages long as are -- as is the case with in limine
11  motions.
12      MS. BROMBERG:  When would Your Honor like for us to
13  respond?
14      THE COURT:  Can you get them by Monday?
15      MS. BROMBERG:  Okay, Your Honor.
16      THE COURT:  All right.  So 3/25 is the deadline to
17  oppose those motions in limine.  And let's not do 11:59 p.m.
18  I'm not the Third Circuit, so I'm not ordering some rule on
19  timing, but I want them in, let's say, no later than 1 p.m. on
20  Monday.
21      So...
22      MS. BROMBERG:  Your Honor, one last housekeeping
23  piece.
24      THE COURT:  But let me ask you this.  Are you done
25  with direct exam with Mr. Macias?

1      MS. BROMBERG:  I would just like to make sure that
2  Plaintiffs' Exhibits 1 through 7 are moved into evidence.
3      THE COURT:  So admitted.
4      There's no objection to any of these exhibits, correct?
5      MR. PARIKH:  These are all the ones that were filed
6  on the docket.
7      THE COURT:  They're all on the ECF docket, correct?
8  All right.  So those are in.
9      MS. BROMBERG:  And as well as -- his report is in
10  here.  Plaintiffs' Exhibit -- yeah, that's all.
11      THE COURT:  Those are all in.  All right.
12  So that was your last housekeeping matter?
13      MS. BROMBERG:  Yes.
14      THE COURT:  You want to take a break, then, and then
15  begin cross-examination after a 30-minute break for lunch?
16      MR. NATALE:  I'll leave it to your discretion, Your
17  Honor.
18      THE COURT:  I mean, there's too many folks here.  I
19  think some folks are going to have to take a break.
20      MR. NATALE:  That sounds good, Your Honor.
21      THE COURT:  Is somebody in the gallery motioning to
22  me?  Because that's odd.
23      All right.  Why don't we do this.  We'll take a
24  30-minute lunch break.  I'll see you guys back in 30.
25      Your witness is on cross-examination.  Do not speak

121

1    with him about it, because he's on cross.
2         MR. PARIKH:  Your Honor, can we approach with
3    plaintiffs' counsel just for one second?
4         THE COURT:  Come on up.
5         (Luncheon recess was taken from 1:09 p.m. until 1:44
6    p.m.)
7         THE DEPUTY COURT CLERK:  All rise.
8         THE COURT:  Mr. Macias, let me just briefly, before
9    we get to the cross-examination, Mr. Macias, let me just make
10   sure I speak to the gallery.
11        These are folks that are not in the well and they are
12   not doing anything up here as lawyers.  Your phones are off.
13   If the CSOs come over to you and you are causing distractions
14   with your telephones, I'm going to have you removed from the
15   courtroom.  Okay?
16        So I say that to you folks in the gallery.  If you need
17   to use your phone, you're free to step in and out.  This isn't
18   like a Broadway musical where once you're in, I lock the doors
19   on you.  Feel free to go out, use your phone, and come back
20   in.  But don't bother the court security officers, and don't
21   distract the lawyers, because it was distracting this morning
22   -- not for me because I don't hear very well.  So I can't hear
23   the phones back there, but the lawyers can.  All right?  And
24   they've got a job to do, and it's an important one.  So just
25   be mindful of that, and that's for you folks in the gallery.

*United States District Court*
*District of New Jersey*

122

1         Now, absent that, do we have any other housekeeping
2    issues that we need to address?
3         MR. PARIKH:  I believe the parties have come to an
4    understanding, Judge.  There's an agreement that --
5         THE COURT:  Let's hear it.
6         MR. PARIKH:  With respect to the proposed expert
7    witnesses, plaintiffs will just be relying upon their expert
8    reports.  We'll be able to cross; they'll able to redirect in
9    order to try to expedite things.
10        THE COURT:  All right.  And I think that makes sense,
11   but, again, that's something that you guys have agreed to,
12   correct?
13        MR. KOMUVES:  Yes, it's the reports and the CVs.
14        THE COURT:  Which are already part of the record, and
15   I will consider them.
16        So you're really just going to defer cross-examination
17   right out of the gate and then redirect, if needed.
18        MR. KOMUVES:  I think we would ask the question if
19   the witness would -- if called to the stand, testify to the
20   contents of this report and the accuracy of the CV.  They say
21   yes, they cross.
22        THE COURT:  All right.  Makes sense to me.
23        MR. KOMUVES:  And the redirect.
24        THE COURT:  All right.  I appreciate that, folks.  It
25   does make sense, and I appreciate you all meeting and

*United States District Court*
*District of New Jersey*

123

1    conferring during the break.
2         What else?  Anything additional?
3         MR. PARIKH:  I don't believe so, Your Honor.
4         THE COURT:  All right.  So who is conducting the
5    cross-examination?
6         MR. NATALE:  I'm going to start, Your Honor.
7         THE COURT:  All right.  And, Mr. Macias, I just want
8    to remind you that you're still under oath from earlier today.
9    Okay?
10        MS. BROMBERG:  Your Honor, I don't think he can hear
11   us just yet.
12        THE COURT:  Oh, sorry.  Liz?
13        THE WITNESS:  Can you hear me now?
14        THE COURT:  I can.  Can you hear me, that you're
15   still under oath from earlier today?
16        THE WITNESS:  I understood that, yes.
17        THE COURT:  You may proceed.
18        MR. NATALE:  Okay.
19   (CROSS-EXAMINATION BY MR. NATALE:)
20   Q.   Good afternoon, Mr. Macias.  I am going to have a few
21   questions for you today, but first, just logistically, I want
22   to make sure that you can hear me okay.
23   A.   I can hear you, yes.
24   Q.   Excellent.
25   A.   I will let know if there's any issues.

*United States District Court*
*District of New Jersey*

124

1    Q.   I appreciate that, thank you.
2         Now, just two questions that I would ask any witness.
3         First, we just got done a break.  Did you speak to
4    anyone during your break?
5    A.   Only thing I spoke about was the fact that I couldn't
6    hear you and was asking whether or not you guys could hear me;
7    and then I was also asked to come back into the room.
8    Q.   Okay.  And the second is, do you have any documents that
9    are printed out or on your computer screen that have not been
10   identified to the Court that you've been referring to
11   throughout this morning?
12   A.   I do not have any documents whatsoever on my computer
13   and/or on my desk.
14   Q.   Okay.  Excellent.  Thank you.
15        I'm going to talk a little bit about your background.
16   We're not going to go all into your qualifications, but
17   there's a couple of things I need to know to understand your
18   answers.
19        First, you currently own RSM Election Solutions,
20   L.L.C., correct?
21   A.   Yes.
22   Q.   Okay.  And is it fair to characterize that as a
23   consulting company?
24   A.   Yes.
25   Q.   Okay.  Do you currently have any clients, public or

*United States District Court*
*District of New Jersey*

125

1   private, within the state of New Jersey other than plaintiffs'
2   law firm?
3   A.    No.
4   Q.    So just to clarify, you don't represent any voting
5   machine technology company in the state of New Jersey; is that
6   correct?
7   A.    That is correct.
8   Q.    Okay.  And you don't perform any consulting services for
9   any county clerk or other government agency within the state
10  of New Jersey; is that correct?
11  A.    I am not -- I have not been hired by any elections
12  officials in the state of New Jersey, either the Secretary of
13  State or any of the local elections officials.
14        However, in one of my roles, I work alongside or with
15  the Department of Homeland Security as one of their subject
16  matter expert consultants.  And in that role working for them,
17  I work with all 50 secretaries of -- or excuse me -- all 50
18  chief elections officials and all 80 under jurisdictions
19  across the country.  But I have not been hired by or work on
20  behalf of anyone in the state of New Jersey.
21  Q.    Okay.  And is that role with the Department of Homeland
22  Security, is that through RSM Election Solutions?
23  A.    No, it is not.
24  Q.    Okay.  And does that role relate to either ballot design
25  or preparing for the upcoming election?

126

1   A.    That role does not.
2   Q.    Okay.  Along with owning RSM Election Solutions, are you
3   also currently an employee of the Lafayette Group?
4   A.    That is correct.
5   Q.    Okay.  And is the Lafayette Group also a consulting
6   company?
7   A.    It is.
8   Q.    Okay.  And does the Lafayette Group have any clients,
9   public or private, in the state of New Jersey?
10  A.    Not to my knowledge.
11  Q.    Okay.  And have you performed any work for the
12  Lafayette Group in the state of New Jersey outside of that
13  role with the Department of Homeland Security that you just
14  specified?
15  A.    No.
16  Q.    Okay.  When was the last time prior to this case that you
17  worked directly with a stakeholder in the state of New Jersey?
18  A.    Directly with?  I believe it would have been -- I worked
19  with the New Jersey -- it's called the NJ Kick.  It's the
20  fusion center on a product -- one of the DHS products called
21  The Last Mile.
22        I believe in January of this year would have been the
23  last time I worked with anybody in the state of New Jersey.
24  Q.    Is that product currently in use in New Jersey elections?
25  A.    It is a -- they're printed materials, so they're guidance

127

1   documents, and they were developed for the 2024 election.  So
2   I will assume that they are in use somewhere in the state
3   currently.
4   Q.    And what is the subject of these written materials?
5   A.    Election security.  So one product is called the
6   snapshot, which basically is just that.  It's an overview of
7   election security policies and processes that New Jersey
8   implements to secure election infrastructure.
9         The second one is called emergency response guide,
10  which identifies partners in the election infrastructure
11  community such as emergency management, the NJ Kick, and
12  others that support elections officials.
13        And it basically gives an all-hazards approach, so it
14  identifies specific types of threats or risks like violence or
15  fire or a cybersecurity incident.
16        It identifies steps that should be taken if one of
17  those incidents were to occur as well as identifies the phone
18  numbers of external stakeholders that can help in support, if
19  one of those incidents were to occur.
20  Q.    Okay.  And would you consider election security the bulk
21  of your consulting practice?
22  A.    Election technology and security, yes.
23  Q.    Okay.  Have you ever consulted with an election
24  technology company that was undergoing the New Jersey state
25  certification process?

128

1   A.    No.
2   Q.    Have you ever consulted with a county government who was
3   having election technology undergoing the New Jersey state
4   certification process?
5   A.    No.
6   Q.    So do you have any experience working with the state of
7   New Jersey on the certification or recertification process of
8   election technology within the state?
9   A.    Not under my RSM Election Solutions role, but when I was
10  at the United States Election Assistance Commission, I did
11  work with the state of New Jersey in the Secretary of State's
12  office in regards to state certification.
13  Q.    Did you work with the state of New Jersey as it relates
14  to federal certification or as it relates to their own state
15  certification?
16  A.    Generally around best practices and guidance for
17  certification as well as -- one of the things we did at the
18  United States Election Assistance Commission was break down
19  who used federal certification, who did not use federal
20  certification, and if you did not use federal certification,
21  what your state certification process was.
22        So we worked with all of the states and territories in
23  regards to that.
24  Q.    So did you help administer state certification for the
25  state of New Jersey in that role?

129

1    A.    Administer, no.

2    Q.    So when you make an opinion that these changes would not

3    require recertification by the state of New Jersey, are you

4    making that opinion without any experience representing the

5    voting technology company in the recertification process?

6          MS. BROMBERG:  Objection.

7          THE COURT:  Sorry.  What is the objection?  You guys

8    can remain seated for this afternoon.

9          So go ahead.

10         MS. BROMBERG:  Just for clarification of the

11   question, please.

12         MR. NATALE:  Okay.

13         THE COURT:  Well, I'm going to overrule that

14   objection.  The witness seemed to have understood it.  If he

15   doesn't understand it, then we'll deal with it.

16         So, Mr. Macias, did you hear the question?

17         THE WITNESS:  I did hear the question, yes.

18         THE COURT:  Can you respond to it?  Can you answer

19   it?

20         THE WITNESS:  Yes.  As it -- yes, I can.

21         THE COURT:  Then do so.

22         THE WITNESS:  Yes.

23         As it relates to working on behalf of a voting systems

24   vendor who was going through certification in the state, no,

25   and as I have answered, I have not -- I do not have any

United States District Court
District of New Jersey

130

1    experience.

2    BY MR. NATALE:

3    Q.    And when you answer a question as to whether or not these

4    machines would have to be recertified, do you do so without

5    any experience of consulting the state of New Jersey through

6    any individual state recertification process?

7    A.    Can you repeat that question?

8    Q.    Sure.  I'll withdraw the question.

9          Have you ever advised the state of New Jersey on a

10   recertification application by an election technology company?

11   A.    No.

12   Q.    Okay.  So when you give your opinion on whether or not

13   the state recertification statute would be implicated by these

14   changes, are you doing so just by reading the statute?

15   A.    That and my expertise and understanding of what is

16   required for a new certification, which generally across the

17   country as well as for federal certification would require

18   software changes.

19   Q.    But that experience does not relate to any specific

20   New Jersey state recertification process; is that correct?

21   A.    That is correct.

22   Q.    As part of your current experience, do you consult with

23   any of either Dominion or ES&S about any of their internal

24   quality control protocols?

25   A.    Not as it pertains to my current role.

United States District Court
District of New Jersey

131

1    Q.    Okay.  And in a past role, did you consult with either

2    Dominion or ES&S as it pertains to any of their internal

3    quality control protocols?

4    A.    I have never been retained to consult with them.

5    However, under the U.S. Election Assistance Commission's

6    testing and certification program, there are requirements that

7    each of the voting system vendors must have quality control in

8    place.

9          They must submit documentation in regards to their

10   quality control and more generally what we call their quality

11   management system.

12         And so I worked directly with each of the voting

13   systems vendors on quality control, on quality management, and

14   also the EAC requires continuous monitoring for compliance

15   with those quality controls and quality management, so I have

16   conducted audits and inspections to ensure that those

17   processes and policies are being adhered to.

18   Q.    Okay.  And that all occurred when you were at the EAC,

19   correct?

20   A.    California had similar laws or similar requirements, I

21   should say, for its testing and certification program, so I

22   have gone through it with both California and EAC.

23   Q.    Okay.  I'm trying my best to truncate your experience.

24   So I want to be clear that I was asking the last time you went

25   through that was with the EAC, correct?

United States District Court
District of New Jersey

132

1    A.    Correct.

2    Q.    Okay.  And you stopped working for the EAC in 2019,

3    correct?

4    A.    Correct.

5    Q.    And while you were at the EAC, you were focused on the

6    federal standards for quality control, correct?

7    A.    So what -- what -- federal standards require that the

8    vendors have quality control and quality management systems in

9    place, but each of the respective vendors has to submit its

10   documentation.

11         So it is the quality control that they conduct as a

12   company holistically, and so my experience is with each of the

13   respective company's quality control and quality management

14   systems.

15   Q.    Now, is it possible that the ES&S or Dominion internal

16   quality control protocols have changed since you left ES&S in

17   2019?

18   A.    It is responsible that they have changed since I left the

19   EAC in 2019.  However, in some of the roles that I play

20   working directly with state certification authorities, I do

21   get to see some of that documentation.

22         And many of the quality control processes in place,

23   while being enhanced, are similar to what they were at the EAC

24   when I was conducting audits on them.

25   Q.    Okay.  Is it your opinion that changes of this caliber

United States District Court
District of New Jersey

133

1  would require an internal quality control protocol by the
2  voting technologies company?
3         MS. BROMBERG:  Objection.
4         MR. NATALE:  I'll withdraw the question.  I know what
5  I did wrong.
6         THE COURT:  Sustained.  That's the easiest one I'm
7  going to have for the afternoon.
8         Go ahead.
9  BY MR. NATALE:
10 Q.    Would it be your opinion that the changes as requested by
11 the plaintiffs in this lawsuit would require an internal
12 quality control protocol to be in place by the election
13 technology companies to ensure the accuracy of their ballots?
14 A.    Protocols?  The protocols are already in place.
15 Q.    Would they have to go through those quality control
16 protocols if they were to design the ballots under the Court's
17 direction for this action?
18 A.    The company may choose to do so.  However, because there
19 is no software changes, there is no configuration changes,
20 these are -- the requested change or modifications to ballot
21 layout is something that each of the companies does on an
22 ongoing basis utilizing the current and existing systems and
23 software.  No.
24        These are ballot programming changes that happen prior
25 to every single election, and vendors do not typically go

134

1  through quality control checks prior to every single election
2  when any kind of data and layout changes occur.
3         Rather, that is something that is placed on the county
4  elections officials to test and proof.  We call this ballot
5  proofing and logic and accuracy testing.  That is conducted
6  prior to every single election regardless of the changes in
7  layout.
8  Q.    Okay.  So I want to focus on something you said at the
9  beginning of your answer.  You said that they could go through
10 this protocol if they choose to.  Am I understanding your
11 words correctly?
12 A.    That is correct.
13 Q.    Okay.  So is it your position that these election
14 technology companies who are charged with the accuracy of our
15 elections should make these ballot changes and then hand them
16 to the county clerks and say good luck?
17 A.    They are not charged with the accuracy of the elections.
18 The elections officials are.
19 Q.    Okay.  So it's your position, then, that the election
20 technology companies have no responsibility or control over
21 the accuracy of our elections; is that what you're telling the
22 Court today?
23 A.    That is not correct.
24 Q.    Okay.  Well, can you clarify what you just said?
25 A.    Yes.  The election official is charged with the accuracy

135

1  of a given election.  They do ballot proofing and testing for
2  what we call logic.  So is the ballot definition programmed
3  correctly prior to every election?
4         We also go through accuracy tests to ensure that the
5  systems are accurate.  The voting systems vendors who do the
6  ballot programming on behalf of the election officials, so if
7  they're consulted, they also conduct similar proofing and
8  checks on the ballot programming as they go through it.
9         But that is -- that is a databases, not a voting
10 systems software, change.  As it relates to voting systems
11 software changes, which would not be required in this
12 situation, then, yes.  They should go through -- they do --
13 they should and do go through multiple layers of quality
14 control, accuracy checking and so on and so forth.
15 Q.    So if a representative from one of the vendors
16 responsible for New Jersey's election technology states that
17 the changes requested in this lawsuit would trigger their
18 internal quality control protocols, you would disagree with
19 that?
20 A.    I do not believe it would be required based on their
21 quality control processes.
22 Q.    Okay.  Do you think that it would have no value to go
23 through that process?
24 A.    No, I disagree with that.  There is always value in going
25 through testing, proofing, accuracy checks, and so on and so

136

1  forth.
2         But in this case that is -- that would be conducted by
3  whoever is doing the ballot programming, whether that is the
4  vendor or another third-party provider, and it would be
5  conducted by the election official, and that is the normal
6  case -- course of business in every election.
7  Q.    So you started that -- by saying that you felt there
8  would always be value.
9         Do you believe that there is also always value in
10 having a layered approach to quality control where both the
11 vendor and the government official make sure that these
12 machines are working properly?
13 A.    So as previously answered, yes.  If -- whoever the vendor
14 is, if there is a vendor who is doing the ballot programming,
15 i.e., entering the ballot -- the election definition data
16 and/or laying out the ballots on their behalf, then they
17 should go through normal proofing throughout the process.
18        Similarly, if you are doing the ballot printing on
19 behalf of an election official, you should be testing your
20 quality control through the printing process.
21        And then, ultimately, an election official at the end
22 is going to do that proofing and logic and accuracy testing to
23 make sure that everything is correct.  And that is part of the
24 normal course of business.
25 Q.    Okay.  Staying on the topic of ES&S and Dominion, you

137

1  testified about their EMS software and how they each have
2  different EMS software.
3      Is that software proprietary?
4  A.  Yes.
5  Q.  In your roles currently, do you have access to use of
6  that software?
7  A.  When -- yes. In my role as it pertains to testing and
8  certifying on behalf of an election authority when either of
9  the vendors, or any vendor, for that matter, applies for
10  certification to one of my clients, then I generally will have
11  access to the software to be able to conduct the necessary
12  testing.
13  Q.  Okay. And have you had access to the software since you
14  prepared your first certification in this case?
15  A.  No.
16  Q.  Okay. And when you were preparing that certification,
17  did you have access to the proprietary software for either
18  ES&S or Dominion?
19  A.  No.
20  Q.  Okay. So when you were detailing how this proprietary
21  software that you don't have access to could function, were
22  you actually performing those tasks on the software, or were
23  you going off of your memory?
24  A.  Going off of my expertise.
25  Q.  Okay. Now, I notice that you switched the word "memory"

138

1  to "expertise," so I have to ask an important follow-up
2  question.
3      Have you ever gone on to the proprietary software for
4  the devices that you discuss in your certification and tried
5  to design a ballot?
6  A.  Yes. For EMS 6300 specifically and EMS 6200, I have had
7  to do ballot design and layout for testing and certification
8  for my clients.
9  Q.  Okay. And who --
10  A.  As it pertains to Dominion 5.15 specifically, no. But
11  for Dominion Democracy Suite generally, yes.
12  Q.  Okay. Have you ever done it for the ExpressVote XL?
13  A.  So you don't lay out a ballot in the ExpressVote XL; you
14  lay it out in the election management software, and then you
15  generate a file for the ExpressVote XL.
16      I have done -- I have laid out a ballot in the
17  Electionware software and generated the files for the
18  ExpressVote XL and tested the XL, yes.
19  Q.  Okay. And when was the last time you did that?
20  A.  6300 would have been in 2023. I don't recall the month.
21  6200 would have been 2022, I believe.
22  Q.  Have you ever done that in the state of New Jersey?
23  A.  No.
24  Q.  Have you ever overseen any of the accuracy testing after
25  you designed a layout?

139

1  A.  I have both overseen and conducted the testing after
2  laying out the ballots, yes.
3  Q.  Have you ever overseen or done the testing internally
4  that is required by either ES&S or Dominion?
5  A.  No, I have never worked for either of them to do their
6  internal testing.
7  Q.  Okay. Have you ever done any testing for any New Jersey
8  clerk's office?
9  A.  No.
10  Q.  Okay. You've talked a lot about the duties and
11  responsibilities of the New Jersey clerk and their staff to
12  ensure an accurate election. I just want to clarify, though:
13  Have you ever assisted with, consulted with, trained, or
14  otherwise worked with any New Jersey County Clerk or any of
15  their staff as it relates to proofing and accuracy testing?
16  A.  I have not worked directly with them. However, I helped
17  write the guidance document for proofing as well as for logic
18  and accuracy testing. So one of my clients who has worked
19  directly with New Jersey county and state elections
20  official --
21  Q.  Okay.
22  A.  -- on proofing and logic and accuracy.
23  Q.  Do you have any knowledge about the staffing levels at a
24  New Jersey County Clerk's office?
25  A.  Similarly, yes. On any given elections office, no.

140

1  Q.  Okay. Do you have any knowledge as to the training and
2  job responsibilities of each member of the New Jersey County
3  Clerk staff?
4  A.  No, not for each member.
5  Q.  Do you have any direct knowledge of whether the staff at
6  the New Jersey County Clerk's office are appropriately trained
7  to make the changes to the voting machines that you describe
8  in your certification?
9  A.  That's going to be dependent upon the county itself. So
10  some of the certifications actually speak to the fact that
11  they do the ballot design and layout, or what we generally
12  call "ballot programming."
13      That staff would have the ability to do this for the
14  jurisdictions, such as the 11 jurisdictions that were
15  mentioned in Mr. Passante's certification. Those local
16  elections offices outsource that to a vendor or a third-party
17  contractor to do that work. And so it is likely that the
18  staff internally would not have the expertise or knowledge to
19  make those changes.
20  Q.  Okay. I'm going to repeat virtually the same question
21  because I want to emphasize that I asked about your direct
22  knowledge and not knowledge that you may have learned through
23  filings of this case.
24      Do you have any knowledge of the training and skills
25  that the staff of the New Jersey County Clerks has to make the

141

1  changes that you propose in your certification?

2  　　　MS. BROMBERG:  Objection with regard to lack of

3  clarity and the description of changes specifically.

4  　　　THE COURT:  Well, the changes, he qualified those

5  that you proposed in your certification.  So I'm going to

6  overrule the objection.

7  　　　Mr. Macias, can you answer that question?

8  　　　Do you want me to repeat it?

9  　　　Do you have any knowledge of the training and skills

10 that the staff of the New Jersey County Clerks have to make

11 the changes that you propose in your certification?

12 　　　That's the question.

13 　　　Did I do good job with that, Counsel?

14 　　　MR. NATALE:  Better than I did, Your Honor.

15 　　　THE WITNESS:  Any given staff member, no.

16 BY MR. NATALE:

17 Q.  I'm -- you broke up.

18 　　　MR. NATALE:  So I didn't quite hear his answer.

19 　　　THE WITNESS:  Yeah, no problem.  I said any given

20 staff member, no.

21 BY MR. NATALE:

22 Q.  Okay.  Do you have any direct knowledge of any training,

23 experience, and expertise of staff members of the county

24 clerk's office in New Jersey as it comes to ballot proofing

25 and accuracy testing?

*United States District Court*
*District of New Jersey*

142

1  A.  I know that they have been trained.  I know some of the

2  jurisdictions -- though it will, again, be dependent upon

3  which jurisdiction we are referring to, but I know that some

4  of the jurisdictions have been trained on a ballot-proofing

5  guide as well as a logic and accuracy guide for which I helped

6  develop and write.

7  　　　And from that perspective, yes, I know what they have

8  been trained on -- again, for those specific jurisdictions

9  that were trained on that guide.

10 Q.  Well, I want to specify something.

11 　　　You know what was in the guide because you helped

12 author it, correct?

13 A.  Correct.

14 Q.  Did you attend any of these trainings on the guide that

15 you helped author?

16 A.  I did not.

17 Q.  Do you have any idea when these trainings occurred?

18 A.  The guide was published in -- well, the proofing guide

19 was published for 2022.  The logic and accuracy guide, I

20 believe, was in the summer of 2023, and then the proofing

21 guide was updated in 2023, and the trainings have taken place

22 since that time frame.

23 Q.  Okay.  But do you have any direct knowledge of when these

24 trainings took place in various New Jersey County Clerks

25 offices?

*United States District Court*
*District of New Jersey*

143

1  A.  Not to a specific date, but I know that they have been

2  provided at county associations meetings as well as directly

3  to elections officials in the state of New Jersey.

4  Q.  Okay.  And do you have any idea how quickly any of the

5  individual county clerks' offices can go through their

6  proofing and accuracy testing protocols?

7  A.  Any given elections office, no.  However, I know that it

8  has to be conducted by a certain time frame before every

9  single election.

10 Q.  Okay.  But you don't know when that necessarily starts in

11 order to get done in that time frame, correct?

12 A.  Not by any given elections office, but generally, yes.

13 Q.  Is it safe to say that you don't know the inner workings

14 of any given county clerk in New Jersey?

15 　　　MS. BROMBERG:  Objection.

16 　　　THE COURT:  Basis?

17 　　　MS. BROMBERG:  This is a generalized question.  I

18 think his testimony already established his ability to have

19 been engaged in training --

20 　　　THE COURT:  What do you mean by "inner workings"?  I

21 mean, you've asked this question in different ways.

22 　　　I'll sustain the objection, but can you clarify.

23 You've asked this question, but this is different wording.

24 　　　MR. NATALE:  Okay, understood.

25 　　　THE COURT:  All right.  Objection sustained.

*United States District Court*
*District of New Jersey*

144

1  BY MR. NATALE:

2  Q.  To summarize this line of questioning, would you say that

3  you do not have any direct knowledge of the training,

4  expertise, skills, or efficiency of any, to use your words,

5  particular county clerk in the state of New Jersey?

6  A.  That is correct.

7  Q.  Okay.  But yet you believe you can say confidently that

8  they can get your changes done in time for the election?

9  A.  From my ten-plus years working in this space and

10 understanding what logic and accuracy testing is,

11 understanding what proofing is, understanding the voting

12 systems that we are talking about and their capabilities, yes,

13 I do believe that I can speak to that.

14 Q.  Okay.  Despite the fact that none of that experience

15 occurred in the state of New Jersey, correct?

16 A.  That is correct.

17 Q.  Okay.  I want to talk to you -- you spent some time in

18 your certification talking about how grid-layout ballots can

19 be adjusted to mimic the block-ballot system.

20 　　　Do you recall that?

21 A.  Yes.

22 Q.  Okay.  When you have a grid-layout ballot, is there a

23 limit to the number of grids that can appear on the page of a

24 ballot?

25 A.  Yes.

*United States District Court*
*District of New Jersey*

1  Q.   Okay.  And do you recall whether or not the ballots that
2  you use in your certification were unopposed elections or
3  opposed elections?
4  A.   I believe there was both, but I am not certain.
5  Q.   Okay.  Is it possible that, depending on the number of
6  races, that a ballot could run out of the number of grids
7  permitted on one page?
8  A.   On one page, yes.
9  Q.   Okay.  And then that would have to go to a multipage
10  ballot, correct?
11  A.   That is correct.
12  Q.   Okay.  And for counties that never have done it this way,
13  is it fair to say they may have never produced a multipage
14  ballot?
15  A.   For counties that have not done it, that is a fair
16  statement because they've never done it.
17  Q.   Okay.  And do you think that producing a multipage ballot
18  for the first time would cause any sort of delays or
19  complications in making sure that ballot is accurate?
20  A.   The number of contests is the same so the proofing would
21  be the same.  It would increase the amount of logic and
22  accuracy testing but not as it pertains to an electronic
23  ballot interface, only if it goes to a multipage on paper
24  because you would need to test more paper.
25  Q.   And do you think that having a multipage ballot for the

1  first time would cause additional time needed for each
2  county clerk to design their numerous ballots they have to
3  design?
4  A.   It may.
5  Q.   Okay.  Do you think that having multipage ballots for the
6  first time in some counties might extend the amount of time
7  that is needed to accurately print those ballots?
8  A.   To print?  Yes.  Because you would have -- you would have
9  more pages or more documents, what we call sheets, to be
10  printed.
11  Q.   Okay.  While we're on the subject of printing, you
12  offered an opinion on Mr. Passante's certification, correct?
13  A.   Yes.
14  Q.   Okay.  I want to clarify something.  Have you ever owned
15  or worked for a printing company?
16  A.   Owned or worked for?  No.
17  Q.   Okay.  Are any of your clients in your consulting
18  business printing companies?
19  A.   No.
20  Q.   Do you have any idea how many employees Mr. Passante has?
21  A.   No.
22  Q.   Do you have any idea about the internal protocols he has
23  for quality control?
24  A.   Not for his company, no.
25  Q.   Okay.  Do you have any idea what internal protocols he

1  has in order to ensure the accuracy of his printing?
2       MS. BROMBERG:  Objection, Your Honor.
3       THE WITNESS:  I don't.
4       THE COURT:  Sorry.  Wait.
5       MS. BROMBERG:  Lack of clarity with regard to
6  ascribing Mr. Passante as a printing company.
7       THE COURT:  You're saying Mr. Passante does not have
8  a printing company?
9       MS. BROMBERG:  Mr. Passante claims in his
10  certification that he operates as a printing company, but
11  Mr. Macias has offered that he also does ballot design
12  services.
13       THE COURT:  All right.  So are you asking specific
14  about his printing services?
15       MR. NATALE:  I was asking if Mr. Macias has any
16  knowledge at all as to what protocols a printing company would
17  take place to make sure that printing is accurate.
18       THE COURT:  I think that's fair questioning, so I'll
19  overrule the objection.
20       THE WITNESS:  Yes.  I believe that was a different
21  question, and as to what a printing company would do, yes, I
22  do.
23       In the state of California, we actually certify -- or
24  we certified, I should say, when I was there, ballot printing
25  companies as well as ballot printing technologies.

1       The process was very similar to what I had testified I
2  did at the EAC where we actually went to ballot printing
3  facilities.  We tested their quality control.  We tested their
4  quality management systems.  We watched their proofing.  We --
5  you know, we assessed all of their technologies, all of their
6  processes, and so on and so forth.
7       So, yes, I do have extensive knowledge on protocols
8  conducted by a ballot printing company.
9  BY MR. NATALE:
10  Q.   Okay.  And I think you're right because I think, when I
11  reworded the question, I worded it a little bit differently.
12       So I believe the original question was:  Do you have
13  any direct knowledge of what those protocols are within
14  Mr. Passante's printing company?
15  A.   No.
16  Q.   Okay.  Do you have any knowledge of what protocols he has
17  in place for his coordination with his county clerk clients
18  regarding ballot design?
19  A.   No.
20  Q.   Okay.  So when he certifies that it would take three to
21  four weeks, you certified you don't think it should take that
22  long, correct?
23  A.   I don't believe that that was my statement.  What I
24  stated was that he attested that it was three to four weeks,
25  and what I was unaware of was whether that was three to four

149

1  additional weeks -- whether that was the same three to four

2  weeks that it would normally take to lay out a ballot.

3       And so the other thing that I had stated was that

4  generally these changes would not take a significant amount of

5  time beyond what it normally takes to lay out a ballot or go

6  through the normal ballot programming process.

7  Q.   Okay.  Do you recall the part of the certification where

8  he testified that he has already done a significant portion of

9  legwork for this election?

10  A.   I do not believe that that is how it was stated.  I

11  believe that the way that his certification was written was he

12  was talking about a normal process and interactions that he

13  would normally have with elections officials regarding the

14  services that he provides but not as to whether or not that

15  has already been -- taken place for this election or any given

16  election.

17  Q.   Okay.  And if he testifies that that would be to start

18  over and he would need three to four weeks after this Court's

19  order, do you have any knowledge about Mr. Passante's company

20  to know whether or not he is telling the truth?

21       MS. BROMBERG:  Objection.  Speculative.

22       THE COURT:  Well, he's asking if he has any

23  knowledge.

24       MS. BROMBERG:  Your Honor, he's asking if he has any

25  knowledge about Mr. Passante's company specifically but not

150

1  with regard to the process itself, the ballot design, and

2  printing process itself.

3       THE COURT:  Repeat the question, Counsel, so I can --

4       MR. NATALE:  Yeah, she summarized my question well.

5  I'm asking that -- whether or not he knows how long it would

6  take Mr. Passante's company specifically because he has 11

7  county clerk clients.

8       If counsel is saying that that testimony is speculative

9  because he doesn't have any knowledge of Mr. Passante's

10  company, I would agree, which is why he shouldn't opine on it.

11       But I'm asking the question what knowledge does he

12  have.

13       THE COURT:  I think that's a fair question.  Is there

14  an objection to that question of Mr. Macias?

15       MS. BROMBERG:  I think -- well, we can address it on

16  redirect.

17       THE COURT:  All right.  I'm going to let you ask it,

18  counsel.

19       MR. NATALE:  Sure.

20  BY MR. NATALE:

21  Q.   If Mr. Passante -- I'll rephrase it for you.

22       If Mr. Passante testifies that, once this Court comes

23  down with his order, he would need an additional three to four

24  weeks to go through his internal processes and protocol to be

25  ready with a ballot design, do you have any specific knowledge

151

1  as to Mr. Passante's company and how it runs to make you think

2  he is being incorrect?

3  A.   I do not have knowledge of his company to assert that it

4  would not take him that long.

5  Q.   Okay.  And you have no reason to dispute that he is the

6  printing vendor for 11 different county clerks, correct?

7  A.   Based on the cert -- the certification, I cannot tell

8  whether or not he performs printing for those jurisdictions.

9  The process that was described is more closely aligned to

10  ballot programming, but some -- but some print service

11  companies do both.

12       So it is very -- it is very plausible that he does both

13  ballot programming and ballot printing services.

14  Q.   Okay.  But the fact that he is the vendor for half of the

15  county clerks or nearly half of the county clerks, you don't

16  have any personal knowledge to dispute that fact, correct?

17  A.   The fact that he is a vendor for those counties, I have

18  nothing to dispute it.

19  Q.   Okay.  So if he later testifies that he would need this

20  amount of time, and that would impact half of our county

21  clerks, you don't have any direct knowledge to dispute that,

22  correct?

23  A.   Again, based on his company, no.  However, in terms of

24  the process generally, I still dispute the fact that it

25  would take -- that he would have to restart the process and

152

1  take an additional three to four weeks to make the minor

2  modification that is necessary to change the ballot layout.

3  Q.   So that's why I think we have a little bit of a

4  disconnect, Mr. Macias.

5       How can you say that if you don't know what resources,

6  what templates, what documents Mr. Passante currently has in

7  his possession?

8  A.   I am solely saying, from the use of the technology and

9  the understanding of what a ballot design-and-layout software

10  and/or application is and does and the fact that anybody who

11  has ever programmed a ballot has to make modifications and

12  changes prior to every single election, that is what my

13  assertion -- that's where -- you know, where I come from in

14  making that assertion.

15  Q.   If a single vendor performs these services for half of

16  our county governments, do you think it is valuable

17  information to know how that vendor performs his services?

18  A.   Again, I've worked with multiple different vendors across

19  the country, and I understand that, number 1, in every

20  election somewhere in the country, any major vendor is used to

21  making edits and changes, both due to Court orders, due to the

22  deaths of candidates, due to additional changes and

23  modifications that must be conducted.

24       This is part of the everyday process that they go

25  through in creating ballot design and ballot layout.  Changes

153

1  in modifications happen prior to every election, and this is
2  just a normal course of business.
3      And so, again, from a general perspective, anyone who
4  has ever conducted these services is used to making
5  modifications and changes, particularly in short time frames.
6  Q.  Okay.  Do you think that, after 30 years of experience,
7  Mr. Passante should change how his company does his business
8  to suit the way you believe it should be done and that that
9  should be done before the June election?
10     MS. BROMBERG:  Objection, Your Honor.
11     THE COURT:  Sustained.
12     MR. NATALE:  Withdrawn.  I defer the rest of my time
13 to defense counsel.
14     THE COURT:  All right.  There's a lot of defense
15 counsel.
16     Mr. Tambussi?
17     MR. TAMBUSSI:  Thank you.
18 (CROSS-EXAMINATION BY MR. TAMBUSSI:)
19 Q.  Mr. Macias, I just want to get some clarification.
20     For the office-block ballot using the grid base
21 template, is it your position that each candidate lists --
22 listed for each particular office, starting with president,
23 would start at the top of the ballot and work its way down
24 column 1?
25 A.  That is one method.  As we have seen on some of the

154

1  sample ballots that were shown, there can be multiple --
2  multiple grids.  And so, you know, it would go down the column
3  on the left-hand side.  Then you would go into another grid in
4  another column and so on and so forth.
5      But, yes, for a given contest, it would be a contest on
6  the top or alongside with the list of the candidates down.
7  And if you run out of space or what we call ballot real
8  estate, typically that would then roll over to the next
9  column.
10 Q.  Real estate.  That would move a person from the bottom of
11 the column over to the next column; is that what you're
12 saying?
13 A.  Correct.
14 Q.  Okay.  And depending on how many candidates there are,
15 that depends on how much ballot real estate you need to use,
16 correct?
17 A.  That is correct.
18 Q.  Okay.  In determination of where a candidate falls within
19 that ballot real estate for a particular office, for example,
20 if there are four Senate candidates, how would there be
21 determined who falls in what position or what order?
22 A.  So that is based on state law.  It is typically done by
23 some sort of alphabet.  In some cases that is a traditional
24 alphabet.
25     In some cases, that is what we call a random alphabet,

155

1  where basically you pick the order based on the first letter
2  of the last name and you randomly select, so it wouldn't be A
3  through Z but it may be, for instance, Z, M, A, C, Y, G.  That
4  becomes your new alphabet.
5      In some cases it is based on party.  So some states
6  use -- whatever the party of the governor is, that would be
7  the first candidate.  That would obviously be for a general
8  election only.  But every state has a law as to how they would
9  order the candidates.
10 Q.  Are you --
11     THE COURT:  Mr. Macias, did you say most states?
12 What was the last part of your response?
13     THE WITNESS:  Yeah.  I believe I first said all
14 states, and I would say most states have a form specified in
15 law of what that alphabet or random alpha or ordering system
16 would be.
17 BY MR. TAMBUSSI:
18 Q.  You've heard of random draws in determining ballot order?
19 A.  Yes.
20 Q.  Okay.  And in the ballot that you're proposing on your
21 grid layout, all using column 1, is there a way to identify
22 candidates by political party?
23 A.  Yes.
24     MR. TAMBUSSI:  That's all I have, Judge.
25     THE COURT:  All right.  Is there any -- are we done

156

1  with the defense cross?
2      MR. NELSON:  Your Honor?
3      THE COURT:  Have you guys -- is this what we're doing
4  now?  We're going to have every defense attorney cross-examine
5  each witness?  Because I thought you just told me on break
6  that you guys met and conferred and figured out how to
7  streamline this.
8      Because this doesn't seem very streamlined to me.
9      MR. TAMBUSSI:  Judge, I'm speaking on behalf of the
10 political parties, which my interest is different.
11     THE COURT:  All right.  So what is this now?
12     MR. NELSON:  Just three quick questions.
13     THE COURT:  On behalf of who?
14     MR. NELSON:  On behalf of Monmouth County Clerk,
15 Christine Hanlon.
16     THE COURT:  And you couldn't coordinate with
17 Mr. Natale to get three questions asked during his
18 cross-examination?
19     MR. NELSON:  We have been coordinating.
20     THE COURT:  All right.  Bang them out.  But I've got
21 to tell you:  This is not how this afternoon is going to be.
22 We are not leaving here at 9:00 o'clock p.m. because each one
23 of you wants to have one sound bite.
24     So get it done, but next time coordinate with your
25 counsel because he could have asked those questions.  They're

157

1 probably redundant anyway.

2          MR. NELSON: Yes, sir.

3          THE COURT REPORTER: Can you identify yourself,

4 please.

5          MR. NELSON: Yes. Brian Nelson, Spiro, Harrison &

6 Nelson, on behalf of Monmouth County Clerk, Christine Hanlon.

7 (CROSS-EXAMINATION BY MR. NELSON:)

8 Q.    Are you familiar with the various offices commissioned

9 with the administering of elections in each county in

10 New Jersey?

11 A.    I couldn't name each of them for each county. However, I

12 do know that many of the counties have three election

13 officials per county. Some have two elections officials or

14 elections administrators that have different roles and

15 responsibility within some of the jurisdictions, yes.

16 Q.    Are you aware of the role in which the counties that have

17 a superintendent of elections plays -- the role that the

18 superintendent of election plays in those counties which have

19 a superintendent?

20          MS. BROMBERG: Objection. Relevance.

21          THE COURT: Overruled. I'll allow it.

22          You got three questions? Is that how many? And you

23 can't -- I mean, this is going to be more to with the

24 objections --

25          MR. NELSON: Your honor, I am not repeating a single

158

1 question.

2          THE COURT: No, I know. But how many questions do

3 you have?

4          MR. NELSON: I've had three, but this could lead

5 into, because of his answers --

6          THE COURT: I'll overrule it.

7          MR. NELSON: -- important.

8          THE COURT: All right. I've got it. I overruled the

9 objection. Let's go.

10          MR. NELSON: Okay.

11 BY MR. NELSON:

12 Q.    So the question I asked, to just repeat it, are you aware

13 of the role which the superintendent of elections plays in the

14 counties that have a superintendent?

15 A.    I don't know the role of any specific office and what

16 role they play in any given county, no.

17 Q.    Are you aware of the role that the boards of elections

18 play in each county?

19 A.    Same answer.

20 Q.    Do you know which of these election offices have custody

21 of the machines in these counties?

22 A.    No.

23 Q.    Do you know which of these offices conduct the ballot

24 proofing and testing in each of these counties?

25 A.    Based on the documentation that I have seen, the sample

159

1 ballots that I have seen, the certs that I have seen, it is my

2 understanding that the county clerk does. But if that differs

3 county by county, no, I could not.

4          MR. NELSON: That's all I have, Your Honor.

5          THE COURT: All right. Thank you, Counsel.

6          Anything further from the defense? But I presume the

7 answer is no.

8          Redirect. Is there any redirect on this?

9 (DIRECT EXAMINATION BY MR. KOMUVES:)

10 Q.    Hi, Mr. Passante. This is Flavio Komuves, one of the

11 plaintiffs -- sorry.

12          Mr. Macias, this is Flavio Komuves, one of the

13 plaintiffs' attorneys. I just want to ask you a few redirect

14 questions.

15          Your testimony earlier today was about two different

16 systems, two different election management systems of ES&S,

17 correct?

18 A.    Yes.

19 Q.    And one election management system of Dominion, correct?

20 A.    Yes.

21 Q.    And with respect to those systems, you gave us testimony

22 about the ease with which ballot layout could be changed in

23 each of those two systems, yes?

24 A.    Sir, which two systems?

25 Q.    Sorry. The ES&S system and the Dominion system.

160

1 A.    Yes. I talked about the process for ballot programming

2 but more specifically ballot layout.

3 Q.    Okay. And with respect to ballot layout, fundamentally

4 there is -- let me withdraw that.

5          With respect to creating the ballot definition files,

6 that requires a certain amount of work to put candidates in

7 offices, correct?

8 A.    Yes.

9 Q.    Would that amount of work change whatever this Court

10 enters by way of an order requiring redesign or enjoining

11 certain ballot uses?

12 A.    In the redesign it -- you know, as previously testified,

13 yes, it is likely that it would take additional time, but that

14 would not -- it should not be substantially different from the

15 time that it would take to redesign any ballot for any given

16 election.

17 Q.    Okay. So there might be some additional time associated

18 with the redesign of the ballot layout, correct?

19 A.    Correct.

20 Q.    How much additional time are we talking about?

21 A.    Again, it's going to depend on every single election, how

22 many candidates you have, how many contests you have. But in

23 just the normal course of business, in every single election,

24 you are going to have to redesign a ballot. Even if you are

25 starting with a template, the template is not going to be

161

1  exactly the same as the previous election. And so this is
2  just a normal course of business in every single election when
3  defining an election definition.
4  **Q.**  Okay. And going back to the steps before the layout,
5  which is the creation of the ballot definition file, the
6  entering of the candidates, things like that, is it your --
7  would there be any change in the amount of time required to
8  take that step of the process based on whatever the Court may
9  order?
10  **A.**  For data input, no. The number of candidates and
11  contests are finite, and that will be the same regardless of
12  ballot layout. That is a separate process. And so that is
13  dependent upon the number of contests in an election and
14  number of candidates in an election.
15  **Q.**  But those are two things that this Court will not decide,
16  right, the number of contests, the number of candidates?
17  **A.**  I don't believe that is part of this case, while courts
18  decide that prior to almost -- to many elections for reasons
19  that I had described earlier.
20  **Q.**  Okay. And post layout, when the ballot definition files
21  and the layout has to be transferred into the voting machines,
22  would that take any more or less time than what it would take
23  today, regardless of what this Court orders?
24  **A.**  To load the programming onto each of the voting devices
25  would take the same amount of time regardless of ballot

*United States District Court*
*District of New Jersey*

162

1  layout.
2  **Q.**  So no change whatsoever, correct?
3  **A.**  Correct.
4  **Q.**  All right. Now, your testimony also was that, in your
5  expert opinion, you don't -- no software changes would be
6  required to implement the relief that the plaintiffs are
7  seeking in this case, correct?
8  **A.**  Correct.
9  **Q.**  All right. And if there is no change in software, to
10  your understanding, does the United States election
11  official -- the United States Election Assistance Commission
12  require recertification under the VVSG?
13  MR. PARIKH: Your honor, I just think we're getting
14  very repetitive here. This has already been testified about
15  twice. The answer has come up five times.
16  Just general objection on --
17  THE COURT: All right. I'll overrule on this
18  question, but how many questions do you have left, Counsel, on
19  this redirect?
20  MR. KOMUVES: Not too many, Your Honor.
21  THE COURT: All right. Well, I'll let this question
22  go, but if that objection comes up again from Mr. Parikh, I
23  may sustain it.
24  MR. KOMUVES: Understood.
25  THE COURT: All right.

*United States District Court*
*District of New Jersey*

163

1  Do you want to answer that question, Mr. Macias? Do
2  you have the question, or do you remember what it is?
3  THE WITNESS: Yeah. The question was would these
4  changes require additional certification by the Election
5  Assistance Commission, and the answer to that is no, there
6  would not be a recertification or retest without a software
7  change.
8  BY MR. KOMUVES:
9  **Q.**  All right. And with the familiarity level that you do
10  have regarding New Jersey state certification, if a new
11  software -- if new software is not required for a particular
12  system, would certificate -- would recertification be required
13  in New Jersey?
14  **A.**  Required, no.
15  **Q.**  Okay. Is it necessary -- in formulating these opinions
16  about the various election management systems you described,
17  is it necessary for you to have worked with any election
18  official in New Jersey for you to have come to those
19  conclusions?
20  **A.**  No. These are capabilities of a system. And so I'm
21  speaking on the capability and the process for laying out and
22  finding about.
23  THE COURT: Now I'm going back to Mr. Parikh's
24  objection. I may go back in time here, but this has already
25  been said on his direct and through cross.

*United States District Court*
*District of New Jersey*

164

1  What's new here in this redirect that we're --
2  MR. KOMUVES: What's --
3  THE COURT: We're all going to have transcripts. I
4  don't need -- it's not like we have to memorize what his
5  testimony is, but there's nothing he's saying on redirect he
6  hasn't already testified to either on direct or through his
7  cross-examination.
8  MR. KOMUVES: Your Honor, I think the issue here is
9  that on cross, there were efforts to ask whether he had --
10  whether he had worked with New Jersey companies or not. I'm
11  trying to establish that whether or not he worked with
12  New Jersey companies is not relevant to or affecting his
13  opinion.
14  THE COURT: Right. And I thought he made that clear
15  on cross-examination. Obviously, defense counsel disagrees
16  and the defendants disagree with that -- that opinion, but --
17  I'll let you have a few more questions, but I thought that was
18  pretty clear, that he didn't believe he had to work with
19  New Jersey or work with folks in New Jersey. They are going
20  to make a noise out of that, but it didn't sound like
21  Mr. Macias was concerned about it.
22  BY MR. KOMUVES:
23  **Q.**  And is it necessary for you to know individual clerks'
24  office duties to make those conclusions?
25  **A.**  No.

*United States District Court*
*District of New Jersey*

1   Q.   Is it necessary for you to understand the number of
2   employees or the protocols of printing companies for you to
3   make those conclusions?
4   A.   No.
5   Q.   Okay.
6        MR. KOMUVES:  Nothing further.
7        THE COURT:  All right.  Thank you.
8        Mr. Macias, thank you for your time.  You're excused
9   from this matter.
10       THE WITNESS:  Thank you.
11       THE COURT:  Where we going next, Plaintiffs?  Next
12  witness?
13       MR. KOMUVES:  Congressman Andy Kim.
14       THE COURT:  Mr. Kim, come up to the witness box.  I'm
15  going to have you sworn in by my courtroom deputy.
16  (ANDY KIM, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS
17  FOLLOWS:)
18       THE DEPUTY COURT CLERK:  Please state your name and
19  the spelling of your last name for the record.
20       THE WITNESS:  My full name is Andrew Kim, last name
21  K-I-M.
22       THE COURT:  Mr. Kim, you can be seated.
23       Counsel, when you are ready to proceed with direct
24  examination, feel free.
25       MR. KOMUVES:  Thank you.

*United States District Court*
*District of New Jersey*

1   (DIRECT EXAMINATION BY MR. KOMUVES:)
2   Q.   Good afternoon, Congressman.
3        Can you tell the Court what your current occupation is?
4   A.   I am currently the U.S. representative of the
5   3rd Congressional District of New Jersey.
6   Q.   When were you first elected?
7   A.   I was elected in November of 2018 and sworn in
8   January 3rd, 2019.
9   Q.   So you've served how many -- this is your third term in
10  Congress?
11  A.   Third term.  That's right.
12  Q.   Okay.  Before being elected to Congress, what was the
13  nature of your work?
14  A.   Before being elected into Congress, I had worked in a
15  variety of jobs in the executive branch of the federal
16  government, primarily in foreign policy.
17  Q.   All right.  You're among the plaintiffs who filed a
18  verified complaint in this matter?
19  A.   That's correct.
20  Q.   You've previously seen the verified complaint itself,
21  which is docket entry DE 1, and we'll mark it as Plaintiff 9.
22       MS. BROMBERG:  Eight.
23       MR. KOMUVES:  Plaintiff 8.
24       (Plaintiffs' Exhibit P-8 in evidence.)
25  BY MR. KOMUVES:

*United States District Court*
*District of New Jersey*

1   Q.   And the statements you've made in that complaint, you
2   reviewed them before signing it, correct?
3   A.   That is correct.
4   Q.   And all those statements were made, correct?
5   A.   That's right.
6   Q.   All right.
7        Now, I want to turn to your candidacy now for the
8   U.S. Senate seat for New Jersey.  When did you declare your
9   candidacy?
10  A.   I declared my candidacy end of September, September 23rd,
11  2023.
12  Q.   Okay.  And were you the first candidate in the race?
13  A.   That's correct.  I was.
14  Q.   All right.  Prior to December 23rd, had you given any
15  public statements on the issue of New Jersey's ballot design,
16  laws, and practices?
17  A.   I did.  I gave an interview just a little bit before
18  December 23rd in which I was asked directly about my position
19  on the county-line, and I said publicly that I opposed it.
20  Q.   Okay.  And when you gave that interview, you were not a
21  declared candidate at that time?
22  A.   That's correct.  I was not.
23  Q.   You were not planning to become a declared candidate?
24  A.   Not for the United States Senate, no.
25  Q.   And what did prompt your candidacy for U.S. Senate?

*United States District Court*
*District of New Jersey*

1   A.   What prompted my candidacy was the indictment that came
2   out on our current senator, Senator Menendez, the day before,
3   so on September 22nd.
4   Q.   Did you know that indictment was forthcoming?
5   A.   I had no idea when the date would be or that indictment
6   would come.
7   Q.   So when you made your public statements about the
8   county and the line, you had no idea of the indictment and no
9   idea you were going to be a candidate, correct?
10  A.   That's correct.
11  Q.   Okay.  Now, you said before you ran -- you've run three
12  times for Congress, and now you're running for U.S. Senate.
13  Could you give the Court a sense of how the New Jersey primary
14  ballot design laws affect you?
15  A.   How the design of the ballots affects me?
16  Q.   Yes.  We are using colloquially -- I understand defense
17  is objecting -- but we are talking about the way the primary
18  ballot is laid out in New Jersey, which is shorthand -- I'll
19  call it the county-line ballot.
20  A.   Yeah.  Look, you know, it's something that's very
21  fundamental to every consideration.  I remember, when I first
22  was considering running for the United States Congress,
23  literally the first question I was asked by anybody was
24  whether or not I could -- if I thought I could achieve the
25  county-line.  It was seen as very much determinative of

*United States District Court*
*District of New Jersey*

169

1  whether or not I would be successful or not.
2       So from the very outset it was something that was made
3  very clear to me was very important for my candidacy and the
4  candidacy of anyone running for office in New Jersey.
5  Q.   How, if at all, did being awarded a line effect your
6  fundraising potential?
7  A.   Well, look, for instance, my very first race, I was
8  trying to take on an incumbent Republican congressman.  I was
9  not supported by National Democratic Party institutions like
10 the Democratic Congressional Campaign Committee or others
11 until I was able to demonstrate an ability to be able to
12 achieve the county lines within my congressional district.
13      So it was seen as very much determinative on viability
14 and, as a result, was something that had a very significant
15 impact on whether or not I would be seen as viable amongst
16 Democratic party institutions, donors, et cetera.
17      So it was very impactful.
18 Q.   So I'm understanding you, getting the county-line would
19 be evidence of your viability as a candidate?
20 A.   It was the main consideration of viability in the eyes of
21 many, if not all, people in the political space, correct.
22 Q.   And your viability as a candidate, in turn, does that
23 affect your fundraising potential?
24 A.   It is incredibly important.  If you are not able to
25 demonstrate viability, it becomes very difficult to be able to

170

1  convince people or organizations to be able to financially
2  back your campaign.
3  Q.   Did you observe similar effects of receiving the line in
4  your subsequent two races for Congress?
5  A.   It was with certain -- with my second and third races, at
6  that point, I was an incumbent congressman, so viability had
7  been established in that type of way.
8       But certainly, you know, the continuation of being on
9  the county-line is -- was seen as important for my ability to
10 be able to -- to be able to win and to be able to have the
11 kind of margins needed.
12 Q.   Okay.  And in regard to that -- just let me be clear:  In
13 all three races for Congress, you've received a county-line in
14 all the counties in your district, correct?
15 A.   That's correct.
16 Q.   Okay.  So in the county-line, your name appears
17 associated with other candidates, right?
18 A.   That's right.  Up and down with -- of different offices,
19 correct.
20 Q.   Did you -- did you see any downsides to that arrangement
21 on the ballot?
22 A.   I did.  I mean, in -- in -- you know, you're being
23 associated with candidates and -- in every county, every
24 municipality and in multiple counties.
25      So, for instance, I just simply did not know everybody

171

1  that I was now being associated with.  I did not know their
2  policy backgrounds.  I was not aware of their personal
3  background.  I had concerns of whether or not there would be
4  some type of new information or some scandal that one of the
5  candidates might have and how that would affect me being --
6  now that I'm being forced to associate with them.
7       So that was -- that was a real concern of mine and
8  something that I worried about a lot.
9  Q.   As you sit here today, do you have any regrets about
10 pursuing the county-line in those first three races?
11 A.   Well, as I mentioned, you know, it was something that was
12 made very clear to me was necessary for me to be able to be
13 successful.
14      And so despite my personal concerns about how this
15 went, I felt like I had no choice but to participate in this
16 system if I wanted to be successful in my elections.
17 Q.   If someone else was awarded the county-line, one of your
18 opponents, how would that have affected you?
19 A.   It would have been quite devastating most likely,
20 especially my first race.  You know, it is something where, if
21 you are -- if I do not accept the county-line and if I were to
22 -- to avoid that, that advantage would then go to a
23 competitor, and that would be something that would
24 significantly adversely affect my candidacy.
25 Q.   So if I'm understanding you, part of the reason you

172

1  accept the county-line is so that the advantages that come
2  from the county-line don't go to an opponent.  Is that fair?
3  A.   That's correct.  It's not just about what it is that I
4  can achieve, but if I do not participate in this system, then
5  that advantage will go to a competitor of mine and likely make
6  my candidacy significantly weaker.
7  Q.   You talked a little bit earlier about these advantages
8  being perceptions of viability and perceptions of fundraising.
9       What about the electoral results themselves?  What
10 affect does the county-line have on electoral results?
11 A.   Well, there would be, I would say, two ways to think
12 about this.  Certainly in terms of actually being on the
13 ballot, you know, the advantage that we see -- and I know
14 other experts will speak to this -- is significant in terms of
15 just the competitiveness.
16      Especially when I was in the House of
17 Representatives -- running for the House of Representatives,
18 which does not have the -- the primacy argument -- it does
19 have the primacy argument and concerns.  You know, there is --
20 if I did not take the line, the prospects were being put out
21 in what is called ballot Siberia, which was very real.
22      So that could have a very pronounced impact, but the
23 secondary effect that I've seen and witnessed is, if someone
24 doesn't get the county-line, oftentimes that candidate ends up
25 dropping out.  Oftentimes, it becomes this determinative

1 effect where the choice is limited for the voters to start
2 with because it is seen as impossible to be a win without the
3 county-line.
4      So, I mean, I can imagine -- I can recall any number of
5 situations in which I have seen candidates not get the
6 county-line and drop out because they just do not feel like it
7 is at all possible for them.
8      So the advantage is not just about what we see in
9 November or June on the ballot, but a lot of it is about
10 preventing candidates to start with and preventing that choice
11 to start with on the ballot.
12 Q.   So you're saying the county-line system results in fewer
13 candidates and fewer voters?
14 A.   Correct.  That's absolutely correct.
15 Q.   Okay.  And based on your experience as a legislator, as
16 someone who's worked for the State Department on democracy
17 issues, what is your opinion about the effect of having less
18 candidates?
19 A.   Well, look, the whole point of democracy is to give the
20 people a choice and to be able to have the decision made by the
21 people.  But if you are limiting that or if there are elements
22 that are limiting or repressing that choice, I find that to be
23 adverse to the pursuit of the democracy that I believe in, of
24 fairness and equality.
25 Q.   And that's based on your judgment as a candidate and as a

1 legislator?
2 A.   Yes, and just as an American.
3 Q.   Great.  Okay.
4      I want to switch gears for a moment to the Senate race.
5 So you touched on this a little bit earlier.  You declared, I
6 think, on September 23rd, which was a day after the incumbent
7 Senator got into some legal trouble.
8 A.   Uh-huh.
9 Q.   That's what prompted you to run?
10 A.   Correct.
11 Q.   After you declared as a Senate candidate, what steps did
12 you take to organize and run your campaign?
13 A.   Well, immediately had to set up a full operation at that
14 time.  I was running -- you know, I was running for the House
15 of Representatives.  I had only two campaign staff at the
16 time, so certainly needed to hire senior staff, be able to
17 build out an operation that could then run in 21 counties.
18      So it was a major operation that I immediately had to
19 shift into, knowing full well that I did not have a full
20 campaign cycle ahead of me, given that this was a later
21 decision.
22      So it was something I had to immediately turn to.
23 Q.   And did you also take steps to ramp up fundraising?
24 A.   Correct.  Yes.  I had to immediately start to increase
25 our operations when it comes to fundraising.

1 Q.   Did you take steps to ramp up communication efforts with
2 voters?
3 A.   Yes.  Certainly did engagements, thinking about different
4 events that we can do across the state.
5 Q.   What about social media?
6 A.   Yes.
7 Q.   Okay.  And when you had -- obviously, I understand, as a
8 congressman, you're pretty busy down in D.C., but when you
9 weren't busy down in D.C., what did you -- what did you do
10 back in New Jersey to further your candidacy?
11 A.   I would often travel around to many of the different
12 counties, hold different meet and greet events, build
13 engagement with voters, fundraisers and other types of efforts
14 to be able to reach out to people.
15 Q.   Did you pursue endorsements from any persons or entities?
16 A.   I did have conversations with different organizations,
17 whether that be, you know, unions or advocacy organizations,
18 as well as elective leaders and political leaders across the
19 state.
20      A lot of that was about just introducing myself to a
21 lot of people that I haven't met before.  So at that stage,
22 the primary effort was about informing them about my
23 candidacy, hearing from them about feedback.
24 Q.   Okay.  And so you've described all this hiring,
25 fundraising, social media, talking with voters, meeting with

1 NGOs, things like that.  If at the time that -- shortly after
2 you declared, if you knew that New Jersey's ballot design laws
3 and the county-line ballot were not going to be in effect,
4 would you have done anything differently than -- given the
5 status quo that they are in effect?
6 A.   Well, I think -- if the county-line system was not in
7 effect, I still would be reaching out to voters.  I'd still be
8 engaged in the fundraising and different operations at that
9 point.  I think maybe there would have been, you know, maybe
10 some different reactions from some of my conversations about
11 my viability in terms of a candidacy for Senate.  And so I
12 think that might have changed some of the dynamics.
13 Q.   But overall, would you say your --
14 A.   In terms of -- in terms of just, you know, the
15 operations, I would still be hiring on the staff, still be
16 engaged with voters, still be out there doing those types of
17 outreach.
18 Q.   Okay.  And so this is now your fourth time running for
19 federal office.  Based on that experience, is seeking
20 endorsements a useful or a necessary part of a campaign?
21 A.   It is a useful part of the campaign in terms of being
22 able to show the coalition that one can build.  But with --
23 and I would just say, you know, the endorsements in that kind
24 of capacity in terms of different organizations, elected
25 leaders, that's one aspect of it.  But it is fundamentally

177

1  different from sort of an endorsement situation when it comes
2  to county chairs or other entities that, you know, participate
3  in this system about awarding county lines.  So that's a
4  different set.
5  Q.    So it is true you made efforts to get county party
6  endorsements in all counties, correct?
7  A.    For the Senate race?
8  Q.    Yes.
9  A.    Yes.  I've been participating in the county convention
10  efforts in the counties that do have conventions, which is
11  only about half of them.  So, you know, the other half of
12  counties in New Jersey that do not have that kind of system,
13  you know, I did not have a county convention effort to be able
14  to engage in that.
15        Those counties account for roughly about 50 percent of
16  all registered Democratic voters in the state.
17  Q.    And in your experience, do any electoral benefits come
18  from winning a county party endorsement?
19  A.    Yes.  Yes.  I mean, if you're able to win a county
20  endorsement -- we've certainly seen the research, and this was
21  a lot of what we tried to present here today and before this
22  Court, about the advantages that come with that endorsement.
23  Q.    And in pursuing these endorsements, you did win some and
24  you didn't win some.  Is that fair?
25  A.    That's correct.

*United States District Court*
*District of New Jersey*

178

1  Q.    All right.  Does your campaign keep records of the
2  counties where you won or lost endorsements?
3  A.    Yes, we do.
4  Q.    Measured as a share of Democratic voters, what do those
5  records tell you about which senatorial candidate has won the
6  county endorsements in the county with the majority of
7  Democratic voters?
8  A.    Yes.  So I've won now nine county conventions.  That
9  accounts for about 33 percent, about a third of all registered
10  Democratic voters in New Jersey.  Whereas, my main competitor,
11  the First Lady Jamie Murphy, she has county lines.  We've --
12  it's not all sorted out, but it will be over 60 percent of all
13  Democratic voters reside in the counties that she either has
14  or is expected to be able to have the county-line in.
15  Q.    So on a net basis, because of the number and size of the
16  counties that she won as compared to the number and size of
17  the counties you won, is that a net benefit for her?
18  A.    That's a significant net benefit for her.  That's
19  correct.
20  Q.    Okay.
21        Congressman, one thing I didn't ask before was about
22  the steps you had taken as polls and polsters.  So in the
23  course of running for Congress and in the course of your
24  Senate race, have you relied on polls and pollsters in the
25  ordinary course?

*United States District Court*
*District of New Jersey*

179

1  A.    Yes.  That's a very regular and form part of campaigning.
2  Q.    Of all campaigns?
3  A.    Of all campaigns, yes.
4  Q.    Have there been any senatorial -- any polls taken about
5  your senatorial race and how you faired against Ms. Murphy,
6  Ms. Campos, and Mr. Hand?
7  A.    There have been a number of different polls that have
8  come out and have been public in this race, yes.
9  Q.    And just summarize, if you would, what have those polls
10  shown?
11  A.    Every single poll showed me with a very significant
12  double-digit lead over my competitors.
13  Q.    So I'm assuming, in your media coverage, you must be
14  characterized now as the favorite or leading candidate, right?
15  A.    No.  In fact, for -- in many, if not most or all,
16  publications, I'm often referred to as an underdog despite my
17  significant advantage in polling.
18  Q.    And based on your experience as a four-time federal
19  candidate, why is it that they're treating you as underdog?
20  A.    It is predominantly because of the county-line situation.
21  When it comes to fundraising, she has -- the first lady has a
22  slight advantage over me, but I've kept up with the
23  fundraising on that front.
24        The primary reason by far that I'm being referred to as
25  an underdog is because of the number of county endorsements

*United States District Court*
*District of New Jersey*

180

1  that the first lady has compared to me.
2  Q.    Okay.
3        And just to focus on your request to this Court, could
4  you define for the Court and Judge Quraishi what is it that
5  you want this Court to do vis-à-vis New Jersey primary
6  ballots?
7  A.    Look, I just ask for us to have a fair ballot here.  I'm
8  not asking for any advantage to me.  I'm not asking to hold on
9  to the advantages that I have in the counties that I have been
10  successful in.
11        All I'm asking for is for New Jersey to be in line with
12  49 other states in terms of pursuing an office-block-style
13  ballot that would allow us to have a fair system here and give
14  me an opportunity to be able to pursue this -- this chance to
15  run for Senate.  This is -- I'm getting -- this will likely be
16  the only time that I'll be able to step up and run for Senate
17  in this kind of way.  I want to be able to serve the state and
18  this country, and given this -- this situation right now, I
19  hope that this chance that I have to serve will be -- will be
20  allowed for the voters to be able to do it in a fair way.
21  Q.    So in this one chance that you have to run for Senate,
22  you want to make sure the voters are presented with evenhanded
23  and fair ballots, right?
24  A.    That's correct.  I mean, the winner of the Senate seat
25  could very well be there for potentially a long time to come.

*United States District Court*
*District of New Jersey*

181

1  This is a significant situation for me, but it's also a
2  significant situation for the state of New Jersey in terms of
3  who will represent them in the United States Senate when
4  there's so many difficult issues facing our nation right now.
5  Q.   And just so I'm clear, you want the Court to enjoin --
6  well, we know there's two counties that don't use county-line
7  ballots; they use office block.  But you're asking the Court
8  to enjoin this statewide, correct?
9  A.   That's correct.  And the fact that, as you mentioned, the
10  two counties in New Jersey already use an office-block system
11  show that, you know, that it's something that we are able to
12  do here, and I'd ask for the other 19 counties to follow suit.
13  Q.   And so that would mean you personally would be giving up
14  the county lines in the counties you've won.
15  A.   That's correct.
16  Q.   You would be able to do that?
17  A.   Yes.
18  Q.   Great.
19       So if on the other hand the Court does not enjoin the
20  office block -- the -- sorry.  If the Court does not enjoin
21  the county-line ballot, will there be a similar situation
22  where you're named with other candidates in a column?
23  A.   That's right.  In some of the counties that I have been
24  awarded the line, I will be associated with other candidates
25  in those counties.

182

1  Q.   And focusing on this year's election, are there any
2  problems about being associated with those other candidates?
3  A.   Yes, yes.  In some of the counties that I'm -- where I've
4  been awarded the line, there are candidates on that -- there
5  are candidates that have also won the line in those counties
6  that are actively working against my campaign.
7       So, for instance, in Monmouth County, I won the county
8  convention there.  That was my very first win.
9       The congressman there, Congressman Frank Pallone, is
10  actively supporting a competitor of mine, has been campaigning
11  on her behalf.  So that makes it very challenging for me.
12  That makes it very difficult for me to be on an endorsed
13  candidate line with -- with somebody who is not supportive of
14  my campaign.
15  Q.   So you're going to be listed on the same line and
16  visually associated with someone that wants your Senate
17  opponent to win?
18  A.   That's correct.  And that's, you know, also the case in
19  Morris County, a county that I just won the congressional
20  candidate there, somebody that has endorsed a competitor of
21  mine.  So it just makes things very difficult for me to be
22  able to campaign.
23       Think about how to build a field program, how to do
24  voter engagement.  And certainly it's very confusing to a lot
25  of voters that I've talked to when the -- the county-line is

183

1  not all supporting each other but instead that there are
2  elements within those county lines that are actively working
3  against each other.
4  Q.   Do you have any concerns that this would confuse voters?
5  A.   Well, it's very confusing to voters.  I mean, the whole
6  idea of association, you know, presents the idea that these
7  are candidates that chose to associate with each other.  But
8  essentially what has happened is that I did not actually have
9  formal conversations with all of these other candidates.  As I
10  mentioned, I don't even know most of these candidates in, you
11  know, these different counties across the state that are
12  awarded these lines.  I am -- I am basically being awarded
13  this and then forced to associate with one another through the
14  county organizations.
15  Q.   So just -- I'm sorry.
16  A.   Yeah.  So that's the challenge there.  I don't know the
17  policy positions of many of these candidates, and because I'm
18  running for Senate, I'm now in many more counties than I was
19  before as a House candidate.  So it's more pronounced, more
20  difficult for me to understand, and it's more concerning in
21  terms of, you know, whether or not there are candidates there
22  that I might disagree with policy-wise, might have elements of
23  a background that I would be and find concerning.  And because
24  I'm associated with them, I'm often referred to as a running
25  mate for some of these candidates.  I'm taking on that type of

184

1  potential concern and harm to my campaign.
2  Q.   And these concerns about confusion and -- and the
3  oddities of being shared with the candidates that you just
4  went over, they would be eliminated if this Court enjoined the
5  use of county-line ballots, correct?
6  A.   That's correct.  I mean, look.  What I'll just say is,
7  like, I just want to run for the Senate seat.  This is what I
8  was stepping up to do because there's so much at stake right
9  now.  And like -- you know, if I think about -- about, yes,
10  freedom to associate in this country, that also should mean
11  that I have the freedom to not associate with others if I
12  choose not to.  And, you know, here's a situation where, for
13  my own electoral prospects, I am forced to have to associate
14  with people that I do not know, many of them I do not know,
15  some of them who are actively working against me, and I just
16  find that to be, you know, deeply challenging.
17       I don't want to have to do this.  I'd rather just run
18  for my Senate race and not have to consider, you know, dozens
19  if not hundreds of other candidates across multiple counties.
20  But, unfortunately, I have to given the system here in
21  New Jersey.
22  Q.   Okay.  And so with all these concerns that come from the
23  county-line, can you share with the Court your thoughts why
24  don't you just give it up?  Why not --
25  A.   Look, it's similar to what I said earlier, which is that

185

1  it would just -- if I do not accept these lines, if I do not
2  participate in those conventions, then a competitor of mine
3  would be able to then be on the line and be afforded very
4  significant advantages in the election.
5      So, again, even if it was something that I personally
6  did not like, I felt it necessary to participate, even if it
7  was to prevent a competitor of mine from gaining that type of
8  advantage in all of those different counties which would have
9  very much had an adverse effect on my capacity to be able to
10 win this campaign.
11 Q.  Appreciate that.
12     Okay.  I want to just go over, briefly, a little bit,
13 some of the time sequence again.
14 A.  Yeah.
15 Q.  I don't want to necessarily repeat myself here.  You
16 declared candidacy on September 23rd at a point after you come
17 out publicly against the practices known as the "county-line."
18     Now, when you declared for Senate, did you know with
19 any level of certainty whether those laws would benefit you or
20 harm you?
21 A.  I did not know for certain at that time, no.
22 Q.  Okay.  But at some point, other candidates entered in the
23 race for Senate?
24 A.  That's correct.
25 Q.  Okay.  And at some point, these other candidates received

186

1  the endorsement of county political chairs, right?
2  A.  That's right.
3  Q.  When was that?
4  A.  It was, I believe, some time in mid November.  The
5  first lady, Tammy Murphy, jumped into the race officially and
6  then, within just a matter of a few days, had about eight or
7  nine county chairs endorse her campaign.
8  Q.  Just so I'm clear, there's a difference between receiving
9  the endorsement of the political party chair and actually
10 receiving the line, correct?
11 A.  That's correct.
12 Q.  All right.  And what is that difference?
13 A.  Well, you know, at that time the county chairs, some of
14 those that made the endorsements, you know -- they did so in
15 their own personal capacity, but there was no officially
16 awarding of a county-line at that point.
17 Q.  So would you say that, as of the moment that these county
18 chairs had endorsed your opponent, that that was a moment
19 where you felt you were experiencing an injury as a candidate
20 in your electoral chances?
21 A.  Well, I think that there was -- it certainly got my
22 attention, you know, just the speed with which these, you
23 know, endorsements came out.
24     And so, you know, I certainly felt that this could --
25 it could very well hurt my electoral chances, but at that

187

1  point the -- the county-line form -- the formality of it
2  wasn't there yet.
3  Q.  So --
4      MR. PARIKH:  Your Honor, just to be very kind of
5  deferential here with --
6      THE COURT:  Is this going to be a leading objection?
7      MR. PARIKH:  It is a leading objection.
8      THE COURT:  Sustained, but you have to object.
9      MR. PARIKH:  I understand, Your Honor.  And I'm
10 trying to kind of --
11     THE COURT:  I got it.  It's sustained.  Counsel,
12 don't lead the witness.  Is there another objection?
13     MR. PARIKH:  There will be hearsay objections as
14 well.  Some of this testimony is about what other people are
15 saying.
16     THE COURT:  Object, and I'll rule on it.
17     MR. PARIKH:  Thank you.
18     THE COURT:  All right.  Counsel, go ahead and
19 proceed, but for now you have an objection on -- don't lead
20 the witness, which I sustained, and a potential objection on
21 hearsay, which may or may not be revisited, so...
22     MR. KOMUVES:  Understood, Your Honor.  I'll be more
23 attentive to that.
24 BY MR. KOMUVES:
25 Q.  All right.  So all right.  So we've talked a little bit

188

1  about the effects of -- the county chair endorsements.
2      All right.  Now, I want to go through -- through your
3  process in initiating this litigation.
4      MR. KOMUVES:  Your Honor, you've ruled obviously the
5  timing is a factor that the Court will be considering.  But
6  just -- I want to be clear:  I am not asking the witness --
7  and I'm asking the witness not to disclose the substance of
8  any communications with counsel in this next line of
9  questioning.
10     This is solely going to be about timing.
11     THE COURT:  I think that's fine, but I don't think
12 anyone's looking to go into any kind of attorney-client
13 privilege with Mr. Kim or any lawyers, but you can't lead them
14 on a timeline.
15     MR. KOMUVES:  Of course.
16     THE COURT:  All right.
17     MR. KOMUVES:  Of course.
18     THE COURT:  You may proceed.
19 BY MR. KOMUVES:
20 Q.  Congressman, did there come a point in time when you
21 began efforts to seek counsel?
22 A.  At the end of November, I wanted to see what options I
23 had available to me, so I, at the end of November, asked some
24 of my senior staff to start to reach out to attorneys to have
25 conversations about what might be available.

189

1  Q.   And when you say some of your senior staff, how many
2  people are we talking about?
3  A.   It was primarily my campaign manager and then my chief of
4  staff.
5  Q.   Chief of staff, who's at the time volunteering?
6  A.   Volunteering, yeah.  That's right.
7  Q.   Okay.  And there ultimately came a point at which you
8  engaged counsel?
9  A.   That's right.  My -- my senior staff had initial
10 conversations, and then sometime in December was the first
11 time that I had conversations with different attorneys.
12 Q.   All right.  Did there come a point at which you made some
13 strategic decisions about expert testimony in this matter?
14 A.   Yes.  I mean, I was told that -- that there were sort of
15 two main considerations that we have to think through whether
16 or not this would be successful -- is, one, to be able to
17 demonstrate a -- real and non-speculative injury, a harm
18 done to me specifically.
19      And then the second one being that the -- it was made
20 very clear do me that there's a very high threshold that is
21 necessary to be able to seek a preliminary injunction.  And
22 that is something that requires a very high burden of evidence
23 and proof to be able to demonstrate.
24      So it became very clear to me just the kind of in-depth
25 research and expert -- expert testimony and other types of

United States District Court
District of New Jersey

190

1  evidence that are necessary to be able to achieve that.
2      So we did have conversations in terms of what kind of
3  research we would want to have to try to make a successful
4  case.
5  Q.   All right.  Now, let's just break those down into two
6  things.  The first thing you talked about was concrete injury
7  to you.
8      When, if it at all, did that happen?
9  A.   So the concrete injury that happened in a real and
10 non-speculative way was on February 10th with the -- with the
11 awarding of the actual formal, official county-line in
12 Passaic County on February 10th.  That was -- that was adverse
13 to me.
14 Q.   On February 10th?
15 A.   Correct.
16 Q.   Okay.
17      Now, did you -- you said about the threshold for
18 preliminary injunction.  What kind of research did you think
19 would be important in light of those standards?
20 A.   Yeah.  I think -- again, I think it was important to be
21 able to kind of look at it both in terms of past incidents and
22 be able to use the research and expertise to be able to
23 identify from past experiences in -- in -- in large cases what
24 kind of harm might have been done, what we think the advantage
25 was.

United States District Court
District of New Jersey

191

1      But I also just -- again, given that we needed to
2  demonstrate it for this particular election cycle for my case,
3  specific to me, I felt it was important as well to be able to
4  have some research about this specific election cycle and see
5  if we can show corroboration between analysis of past races as
6  well as what is happening right now in this particular
7  election cycle.
8      So that was the type of thinking of what kind of
9  information is necessary to reach the very high threshold and
10 high burden for a preliminary injunction.
11 Q.   So there's historical research, and there's current
12 research?
13 A.   Correct.
14 Q.   Right.  Do you recall -- you said earlier you recall
15 signing the verified complaint.  Do you recall what was
16 attached to the verified complaint?  I'm speaking specifically
17 about expert reports.
18 A.   A number of different expert reports.
19 Q.   And did one of those expert reports focus on the current
20 election?
21 A.   We had a couple different ones.  One was about past
22 research, and then we did have a survey that was done specific
23 to this campaign and this election cycle that was attached to
24 it.
25 Q.   Okay.  Do you recall in -- when that survey was

United States District Court
District of New Jersey

192

1  completed?
2  A.   That survey itself was completed on February 14th.
3  Q.   Okay.
4      When you authorized this research to begin, did you
5  know how it was going to turn out?
6  A.   The survey of this current cycle?  No, I did not.  This
7  was going to be -- this was done on its own in an independent
8  way, looking at sending out -- literally sending out, you
9  know -- you know, ballots -- sample ballots to voters across
10 New Jersey with my name on it, with competitors' names on it.
11      Sometimes I'm on the line.  Sometimes I'm not.  It was
12 done in a way to try to understand what kind of impact the
13 line would have.
14      I did not know what the actual outcome would be when we
15 received it back on February 14th.
16 Q.   Okay.  And just to be clear, so there was a -- there was
17 a survey component to it and a report component to it.  Is
18 that -- is that --
19 A.   That's right.
20 Q.   -- right?
21      And the report itself -- not necessarily the survey
22 component but the report itself component, when -- is that --
23 A.   The survey itself was completed on February 14th, and
24 then they would need to take that data to be able to analyze
25 it after that to be able to provide that kind of context of

United States District Court
District of New Jersey

193

1 the analysis, and that happens shortly -- that happened after
2 February the 14th.
3          MR. KOMUVES:  Excuse me one minute.
4          (Brief pause.)
5          MR. KOMUVES:  Your Honor, may I approach the witness?
6          THE COURT:  You may.  What do you have?  What are you
7 approaching him with?
8          MR. KOMUVES:  I'm providing him with Exhibit B, as in
9 Bravo, the verified complaint.
10          THE COURT:  Okay.  All right.  You guys have a copy
11 of that, so...
12          MR. PARIKH:  Can I just ask that Mr. Komuves mark
13 that as a PX number for the purposes of the record, please?
14          THE COURT:  Sure.
15          MR. PUGACH:  Your Honor, I have the order.  That
16 would be P-9.
17          THE COURT:  P-9?
18          MR. PUGACH:  Yes, Your Honor.
19          (Plaintiff's Exhibit P-9 in evidence.)
20          MR. KOMUVES:  And this is the docket entry BA -
21 DE1-2.
22 BY MR. KOMUVES:
23 Q.   If you could take a look at that.  Do you recognize that?
24 A.   Yes.  I see this, yeah.
25 Q.   And what is it?

194

1 A.   It's the expert report of Dr. Josh Pasek.
2 Q.   So that's Dr. Pasek's final report?
3 A.   It looks like it.
4 Q.   What date is it?
5 A.   February 14th.
6 Q.   Thank you.
7          The contents of Dr. Pasek --
8          THE COURT:  Counsel, hold on one second.
9          Just so you know, we are going to take a break for my
10 court reporter around 3:30.  All right.  So I just wanted to
11 let you know.
12          Go ahead, Counsel.
13          MR. KOMUVES:  Sure.  Good chance we'll be done by
14 then.
15 BY MR. KOMUVES:
16 Q.   Just with regard to the report that you just identified,
17 the survey part of that, that would have been completed
18 before --
19 A.   Prior to that, correct.
20 Q.   Okay.  Thank you.
21          All right.  And -- so did you deem it important to see
22 the results of Dr. Pasek's survey -- well, let me ask you:
23 Did Dr. Pasek's survey influence your result to proceed with
24 this litigation?
25 A.   Yeah, I mean, look -- as I mentioned, I very much wanted

195

1 to make sure this was reaching that high threshold of
2 necessary for trying to be successful in this kind of legal
3 matter.
4          And I didn't feel like I could -- I could -- I could
5 achieve that necessarily just off of research about past
6 elections, because every election has its own dynamics.
7          So I thought it was very important to be able to have
8 this researched.  As mentioned before, I did not know what the
9 outcome actually would be when we received the report back.
10          And, look, I wanted to see that to be able to help
11 inform my decision on how to move forward, and I think that
12 that was really important for me to take on board and
13 consider.
14 Q.   Just so I'm clear, Dr. Pasek's February 14th report, that
15 had a big influence on your decision based to --
16 A.   That's right.  The research, as it -- as it was
17 presented, as we saw, showed to me a very strong sense of --
18 of influence that the line had on this particular race.  Had
19 the results been different, had it not been so pronounced,
20 that would have -- that would have maybe caused me to
21 reevaluate whether or not I proceed and what kind of actions
22 that I would take.
23          So it was very important.  I wanted -- I wanted to be
24 respectful to the Court, make sure that, if we do this kind of
25 action, that we felt like we had the kind of evidence and

196

1 information necessary to be able to present a strong argument.
2 Q.   Congressman, there's been testimony or at least there's
3 been argument that you could have brought this case sooner,
4 maybe a month or so before you brought it.
5          What's your response to that?
6 A.   Look, I have -- as I told you, I wanted to -- I wanted to
7 run for the Senate seat.  I see the challenges that we face
8 here, and when it came to this legal matter, I knew I had one
9 shot at this, to be able to engage.
10          And I had concerns, if I were to do this prior to
11 February 10th, which was the awarding of the first county-line
12 adverse to me, you know -- I was worried that that would be
13 seen as -- that I have not actually been injured at that
14 point.  There was not an actual real and non-speculative
15 injury and harm done to me and concern that there could be
16 efforts to try to dismiss or push off because of that.
17          And then the other aspect of it was about the data,
18 about the research.  You know, it's very -- it was made very
19 clear to me just the high threshold that is needed.  And if I
20 were to submit prior to having all of the necessary research
21 and evidence that I felt was necessary to reach it, I -- I
22 worried about whether or not we could actually be successful
23 there.
24 Q.   Congressman, I think that's all I have.  Thank you for
25 your time.

1    MR. KOMUVES:  I turn it over to defense counsel.

2    THE COURT:  All right.  Thank you, Counsel.

3    Who on the defense is conducting the cross-examination?

4    MR. SPIRO:  I am, Your Honor.

5    THE COURT:  Do you mind if we do the ten-minute break

6    now?  I want to make sure my staff has a break.  And I

7    apologize, but why don't we just -- Mr. Kim, you can come off

8    the witness stand as well, if you want, go back to counsel's

9    table.

10   We're going to take a ten-minute break, and then we'll

11   get back at it.

12   MR. TAMBUSSI:  I have some questions, too.

13   THE COURT:  I'm sorry?

14   MR. TAMBUSSI:  I have some questions also.

15   THE COURT:  Right, I know.  But I want to take that

16   ten-minute break.

17   I know, Mr. Tambussi.  It's a separate issue.

18   (A short recess occurred.)

19   THE DEPUTY COURT CLERK:  Please remain seated.

20   THE COURT:  Counsel, you want to get your folks if

21   we're missing anybody.  Let's get started.

22   We are back on record.  Counsel, you ready for

23   cross-exam?

24   MR. PARIKH:  Judge, I have a significant concern I

25   have to raise.  Plaintiffs have violated the sequestration

1    order.  They've had Professor Appel in the courtroom.

2    THE COURT:  Why don't you come back on a sidebar.

3    MR. PARIKH:  Very well, Your Honor.

4    THE COURT:  Kim, hit the white noise.

5    (Sidebar begins at 3:35 p.m.)

6    THE COURT:  All right.  I'm sorry.  So what's the

7    issue?

8    MR. PARIKH:  There's a sequestration order saying

9    that witnesses be out of the courtroom.

10   THE COURT:  All nonparty witnesses.

11   MR. PARIKH:  Correct.  Professor Appel, one of the

12   plaintiffs' experts, has been sitting, I guess, in the

13   gallery, at least all through Mr. Kim's testimony and perhaps

14   even Mr. Macias' cross-examination.

15   THE COURT:  Counsel?

16   MR. PUGACH:  I can speak to --

17   THE COURT:  Come closer.

18   MR. PUGACH:  I can speak to -- I spoke to Mr. Appel.

19   He didn't realize.  He had come in late.  He was coming

20   from --

21   THE COURT:  What do you mean he didn't realize?  It's

22   your responsibility to sequester the witnesses.

23   MR. PUGACH:  Well, I understand, but he wasn't here.

24   He had come from elsewhere and then came into the -- he must

25   have asked where the courtroom was, came here, and it's my

1    understanding he wasn't, like -- he came here and -- I could

2    ask him what time.

3    THE COURT:  I mean, again, though, it's your

4    responsibility to tell the witnesses that they can't be in the

5    room and listen to others' testimony.

6    I mean, I don't know why you guys are looking at me

7    like a deer in headlights.  Whose issue do you think this is?

8    Mine?

9    MR. PARIKH:  I noticed his appearance, Your Honor.

10   THE COURT:  Well, I want to hear first when he got

11   into the courtroom and what he may have actually listened to.

12   I don't have any of those facts yet.  But it sounds like he

13   did come in here and violate the sequestration order.  He's

14   not a party to the case.  You guys were informed of that.

15   I mean, am I mistaken?

16   MR. PUGACH:  No, you're not, Your Honor.

17   MR. KOMUVES:  You did inform us, Your Honor.  We were

18   not aware of his arrival.

19   THE COURT:  I'm not saying it's intentional, but it's

20   still a violation of sequestration.

21   So I need to know what harm, if any, was done.  I'm not

22   willing to strike anything just yet.  I don't even know when

23   he walked in or what he heard.

24   Was he here during another expert's testimony?  That

25   would be more concerning to me.

1    MR. PUGACH:  He may have been, Your Honor.  We have

2    to get some clarification on that, but he may have been.  I

3    don't know how long he was here.

4    THE COURT:  Anybody else coming in late?  Because to

5    me it's irrelevant whether they're coming in the afternoon or

6    not.  They should be aware that they can't be just coming into

7    the courtroom.

8    So do you have other witnesses that are coming in this

9    afternoon?  What steps have you taken to prevent another

10   witness from walking in here?

11   MR. KOMUVES:  So all the nonparty witnesses were here

12   this morning.  They left after the closing statements.

13   THE COURT:  Right, except for this one witness.

14   MR. KOMUVES:  Appel, who was -- he was testifying at

15   a legislative hearing --

16   THE COURT:  I don't care where he was.  Is he the

17   only witness, or is there anybody else coming in this

18   afternoon?

19   MR. KOMUVES:  He's the only one.

20   THE COURT:  All right.  So what's the story?  When

21   did he walk in here?

22   MS. BROMBERG:  He's actually missing.  He's

23   downstairs, and somebody else went downstairs to find out what

24   time he walked in.  I know that he came late.

25   THE COURT:  Okay.  Why don't we do this.  Why don't

201

1  we address this after Mr. Kim is done.  This has nothing to do
2  with the witness in the box.  But I am going to reserve on
3  this issue.  I don't know yet what, if anything, I'm going to
4  do about it.  But you-all make sure that that doesn't happen
5  again, including with him, but we're going to have to talk
6  about it.
7         So one of you is going to have to gather some
8  information from the potential witness as to when he came in
9  and what he may have heard, and then I'll hear from defense
10  counsel.
11         But for now, let's table it.  We'll deal with
12  cross-exam with Mr. Kim, and then maybe we take a break and
13  just -- I guess maybe after this -- when was he expected to
14  testify?
15         MR. KOMUVES:  So we told him to come at 3 --
16         MR. PUGACH:  So he was going to come for 3:00, but I
17  don't know if he was driving from Pennsylvania.
18         THE COURT:  All right.  So let's figure that out.  I
19  don't want Mr. Kim sitting here for no reason.  Let's go.
20         (Sidebar was concluded at 3:41 p.m.)
21         (Open court.)
22         THE COURT:  All right.  Let's proceed with
23  cross-examination.  And, Counsel, just make sure you put your
24  name in the record, too, just for my court reporter, just so
25  she knows, like, who is speaking when, folks.

United States District Court
District of New Jersey

202

1         Mr. Tambussi, are you going?
2         MR. TAMBUSSI:  I'm starting.
3         THE COURT:  Okay.  I didn't know if you were
4  starting.  Make sure she knows which lawyer is speaking when.
5         MR. TAMBUSSI:  I will, Your Honor.
6         THE COURT:  Thank you.
7  (CROSS-EXAMINATION BY MR. TAMBUSSI:)
8  Q.  Congressman Kim, my name is Bill Tambussi.  I'm from the
9  Brown & Connery law firm, and I represent the Camden County
10  Democratic Committee.
11         You said a couple of things in your direct examination
12  with regard to association:  association with political
13  parties, association with different groups.
14         You agree that the political parties themselves have a
15  constitutional right to associate with whom they choose,
16  correct?
17         MR. KOMUVES:  Objection.  Calls for legal conclusion.
18         THE COURT:  Sustained.
19  BY MR. TAMBUSSI:
20  Q.  You agree, do you not, that political parties have a
21  right to associate with whom they choose?
22         MR. KOMUVES:  Same objection.
23         THE COURT:  I'll sustain it.
24  BY MR. TAMBUSSI:
25  Q.  Mr. Kim, you raised the issue of a concern with the

United States District Court
District of New Jersey

203

1  associations because there may be -- you may be forced to
2  associate with people who have backgrounds that you don't
3  like.  Correct?
4  A.  Or that I don't know.
5  Q.  Or that you don't know.
6  A.  Yeah.
7  Q.  You also raised the issue of association with people in a
8  political party who may be actively working against you,
9  correct?
10  A.  Other candidates in other offices that are -- you know,
11  that do not support my candidacy.
12  Q.  Nonetheless, you continue to seek the endorsement of
13  political parties, correct?
14  A.  I continue to -- I continue to seek out these conventions
15  because I do not want my competitors to be able to gain that
16  type of advantage, correct.
17  Q.  And you also sought the endorsement of the political
18  committees in each and every county in the state of New
19  Jersey, right?
20  A.  In each and every -- I mean, in terms of the ones that
21  have conventions, correct, yeah.
22  Q.  You sought the endorsement for those that don't have
23  conventions, correct?
24  A.  I don't -- no.  Not necessarily, no.
25  Q.  Well, did you not seek the endorsement of a county chair

United States District Court
District of New Jersey

204

1  on a committee that doesn't -- or a committee that doesn't
2  have a convention?
3  A.  I mean, the number of those -- the number of those county
4  chairs, I mean, some of them already had endorsed my
5  competitor prior to me even having a conversation with them.
6  Q.  But nonetheless, you sought their endorsement anyway,
7  correct?
8  A.  I mean, not every single one.
9  Q.  How about the one in Camden?  Did you seek the one in
10  Camden's endorsement, even though you knew that he had
11  endorsed Tammy Murphy?
12  A.  Did I seek -- I'm sorry.  Say that again?
13  Q.  Sure.
14         Did you seek the endorsement of the chair of the Camden
15  County Democratic Committee even though you knew that that
16  chairman had endorsed Tammy Murphy?
17  A.  I haven't had a conversation with the Chairman of the
18  Camden County Democratic Association.
19  Q.  How about you or your representatives?  Did you not seek
20  the endorsement of the Camden County chair even though you
21  knew that that chair endorsed Tammy Murphy?
22  A.  I do not recall.
23  Q.  You do not recall?
24  A.  I -- so I don't know what you're referring to.  Yeah, I
25  mean, the only -- I think the only engagement that I can

United States District Court
District of New Jersey

205

1    recall was that there was a meeting just a couple days ago
2    that was going to talk about the Senate race, and I had asked
3    whether or not I would be permitted to attend that meeting.
4    Q.   Did you contact -- did you send that contact to the
5    Camden County Democratic committee seeking their endorsement?
6    A.   I -- we contacted to be able to attend the meeting.
7    Q.   Now, you said that -- in this case that you reviewed a
8    report from a Dr. Pasek, correct?
9    A.   Correct.
10   Q.   Did you review the report before it was actually
11   submitted as part of the record in this case?
12   A.   No.  Before it was -- I mean, I -- I saw it in its final
13   form.  I did not see it in any draft form, if that's what
14   you're asking.
15   Q.   Well, once it was in its final form, you read it,
16   correct?
17   A.   That's correct.
18   Q.   And you read it before you submitted it to the Court as
19   part of this case, correct?
20   A.   Correct.
21   Q.   Because it helped inform your decision as to whether or
22   not you were going to go forward with this case.  Wasn't that
23   your testimony?
24   A.   That's correct.
25   Q.   And you would expect that Dr. Pasek would have truthful

206

1    statements, accurate statements in this report, correct?
2    A.   That's correct.
3    Q.   Right.  And, in fact, you said you researched this
4    specific election before you filed this lawsuit, correct?
5    A.   That's correct.
6    Q.   And you knew, did you not, in the review of that -- this
7    specific election involving the Senate race, that you would be
8    selected and have the opportunity to have the first ballot
9    position through -- through a draw by county clerk, correct?
10   A.   In different counties, correct.
11   Q.   Including Camden County, correct?
12   A.   Correct.
13   Q.   So your opportunity was to have the first ballot position
14   in Camden County, correct?
15   A.   There's a possibility.
16   Q.   All right.  Now, Dr. Pasek in his report says, "When
17   counties in New Jersey organize primary ballots based on
18   bracketing, candidates who bracket with a candidate vying for
19   pivot position, pivot point position are the only ones who can
20   end up on the leftmost top or top row column of the ballot."
21       That's not accurate, is it, in the case of a Senate
22   race?
23   A.   Can you say it one more time?
24   Q.   Sure.  I'll read it again.
25       When counties in New Jersey -- this is Dr. Pasek,

207

1    page 17, paragraph 50:  When counties in New Jersey organize
2    primary ballots based on bracketing, candidates who bracket
3    with a candidate vying for the pivot point position are the
4    only ones who can end up on the leftmost column or top row of
5    the ballot.
6        That's not accurate in the Senate here, is it?
7    A.   I guess technically I would be a pivot point candidate,
8    so that is still correct.
9    Q.   Well, isn't the draw for the Senate candidate statutory?
10   A.   Yes.
11   Q.   And you know and you knew, at the time you filed this
12   lawsuit, you would have a chance -- you would have the
13   opportunity and the same opportunity as any candidate running
14   for Senate to have the primacy position, the first position,
15   correct?
16   A.   That's correct.
17   Q.   Now, your lawsuit's about ballot structure, correct?
18   A.   Yes.
19   Q.   So why did you file the lawsuit based on the fact that
20   the line in Passaic was awarded to someone else?
21   A.   Well, I filed that because that was the first instance of
22   real harm.
23   Q.   The first instance of you losing an endorsement?
24   A.   Correct.  Of having an adverse county-line, correct.
25   Q.   That didn't have anything to do with ballot position,

208

1    correct?
2    A.   No.
3    Q.   And you said that you wanted to be fair to the Court
4    before you filed the lawsuit, right?  Do you recall saying
5    that?
6    A.   Uh-huh.
7    Q.   Yes?
8    A.   Yes.
9    Q.   Say yes or no.
10       And if that were the case, why is it that you only sued
11   the county clerks and not any of your opponents, not any of
12   the county political parties, any interested party on the
13   ballot?
14       Why didn't you include them in this lawsuit so that
15   they could be heard here in this Court as to your allegations?
16       MR. KOMUVES:  Objection.  Seeks a legal conclusion.
17       THE COURT:  Sustained.
18   BY MR. TAMBUSSI:
19   Q.   Congressman, if you had a choice, would you rather run
20   opposed or unopposed?
21   A.   If I had my choice?  Well, that's not my choice to be
22   had.
23   Q.   My question is, if you had the choice, would you rather
24   run opposed or unopposed?
25   A.   And I still don't fully understand the question.  I mean,

209

1  look, I -- whenever I seek office I would like to win. And
2  so, you know, I've -- I guess I would say that, if I was
3  running unopposed, it would be a greater guarantee that I can
4  win.
5  Q.    All right.  Now, you understand that, if you're endorsed
6  by a chair or a political committee, that does not guarantee
7  that you'll win the votes -- all the votes in that particular
8  county, correct?
9  A.    That's correct.
10  Q.    And when you talked about, in particular, I think you
11  raised Senator -- or Congressman Pallone with regard to people
12  who are actively campaigning against you and the like.
13       So you have problems where you're bracketed with other
14  candidates, correct?
15  A.    That's right, the association there, yes.
16  Q.    And yet you still decided to freely associate with those
17  people, correct?
18  A.    Well, I'm being required to associate with those
19  candidates because of the county organization endorsements.
20  Q.    Didn't you sign in every county in which you got the
21  county endorsement a consent -- a consent that's filed with
22  the clerk, a consent to bracket with all the other candidates?
23  A.    That is part of the process, I -- yeah.  That comes
24  later.
25  Q.    Yes or no, did you sign a consent to bracket in each of

United States District Court
District of New Jersey

210

1  the counties where you have an endorsement?
2  A.    I have not yet.
3  Q.    You have not.  In what counties have you not signed a
4  consent to bracket?
5  A.    I have to check.  Those -- the deadline for that is not
6  yet here.
7  Q.    In the counties where you received the endorsement, is it
8  your testimony that you haven't signed a consent to bracket in
9  a number of those counties?
10  A.    Well, what I was saying -- that the deadline to sign
11  those is not yet here, so I do not think that I've -- I recall
12  signing those yet.
13  Q.    Do you have any specific recollection of signing any
14  consents to bracket?
15  A.    I have in past elections.
16  Q.    How about in this election?
17  A.    I don't -- I don't recall having signed it yet.
18  Q.    In how many counties have you received endorsements?
19  A.    I have received endorsements in nine counties -- nine
20  conventions that I've been successful in.
21  Q.    And how many counties have you not received the
22  endorsement in?
23  A.    Well, we have 21 counties, so...
24  Q.    Well, some haven't decided yet, right?
25  A.    Correct.  Some haven't decided just yet, so I think the

United States District Court
District of New Jersey

211

1  number is probably at around seven or eight of the counties I
2  have not been successful in, but I don't know the exact number
3  right off the top of my head.
4  Q.    And you understand that your decision to seek the
5  endorsement is something that you do freely, correct?
6  A.    Yes.
7       MR. TAMBUSSI:  That's all I have, Judge.
8       THE COURT:  All right.  Thank you.
9       There may be others.  You can use the podium.  Make
10  sure you identify yourself so that we have a clear record of
11  it in the transcript.
12       MR. SPIRO:  So my name is Jason Spiro, appearing for
13  the Monmouth County Clerk.
14  (CROSS-EXAMINATION BY MR. SPIRO:)
15  Q.    Congressman Kim, you testified before that you announced
16  your candidacy for the Senate in September; is that right?
17  A.    That's right.
18  Q.    You made the point that, before you announced your
19  candidacy, you had publicly raised concerns about ballot
20  bracketing; is that right?
21  A.    That's correct.
22  Q.    When you announced your candidacy on September 23rd, did
23  you continue to have those concerns?
24  A.    I still do.
25  Q.    So those concerns never went away?  They -- they

United States District Court
District of New Jersey

212

1  continued throughout the duration of your campaign; is that
2  right?
3  A.    That's correct.
4  Q.    And in September, you also made some statements to the
5  press where you said that you would work within New Jersey's
6  election system and seek county endorsements.
7       Do you recall that?
8  A.    Yes.
9  Q.    Not really a statement of urgency for pursuing claims for
10  constitutional rights, is it?
11  A.    Well, look, one can seek reforms to assist them while
12  still having to work within it.
13  Q.    But was there any urgency at that time that you would
14  pursue those constitutional rights?
15  A.    At that time there were no other candidates in the race.
16  Q.    You were pursuing Senator Menendez's seat at that time;
17  is that right?
18  A.    Correct.
19  Q.    So in a race where there were -- you were unsure whether
20  there were candidates, you didn't feel the need to pursue the
21  experts -- the four to seven experts that you have in this
22  case and prepare for the eventuality that there might be a
23  candidate who opposed you.
24       Is that your testimony?
25  A.    Well, look, as I mentioned in my testimony, right from

United States District Court
District of New Jersey

213

1  the outset, I have to start up a campaign.  I didn't even have
2  a campaign manager, you know.  I didn't have staff.  I had
3  never run statewide before, and I still have a day job.
4        So, you know, there's a lot that we were trying to work
5  on at that time.  So my main priority early on was about
6  getting the campaign up and running.
7  Q.   You made a strategic choice to focus your resources and
8  your -- and your activities on pursuing your campaign, not
9  these claims; is that right?
10 A.   Well, that is -- yes.  You need to have a campaign if you
11 want to run for office, yes.
12 Q.   You formally -- you testified you formally entered the
13 race in November; is that right?
14 A.   No.  I formally enter the race on September 23rd.
15 Q.   You -- you were an official candidate as of -- as of
16 November; is that right?
17 A.   I was an official candidate as of September 23rd.
18 Q.   Okay.  You filed the paperwork to become a candidate for
19 U.S. Senate in November; is that right?
20 A.   On September 23rd.
21 Q.   Okay.  Sorry.  Go ahead.
22 A.   Yeah.
23 Q.   I'll move on.
24       When you were, as of September, an official candidate,
25 you knew that the ballot would be a bracket ballot at that

215

1  the county-line.
2  A.   From a number of the counties.
3  Q.   You were seeking the advantages of the ballot bracket; is
4  that right?
5  A.   Well, I was actually seeking to prevent a competitor from
6  gaining those advantages.
7  Q.   During that time, did you do anything to -- in October to
8  pursue your rights to constitutional claims?
9  A.   Well, at that time, as I said, there were no other
10 competitors in the race.  There was no formal injury or harm
11 due upon me at that point.  So no, I did not -- I did not
12 pursue at that time.
13 Q.   In November, did you do anything to pursue your claims?
14 A.   Well, I've mentioned at the end of November I reached out
15 to -- I had my senior staff reach out to attorneys to assess
16 what potential options there are for me to take, should I
17 choose to move forward.
18 Q.   Was there -- was there a formal candidate in the race at
19 that time?
20 A.   There was.
21 Q.   Who is that candidate?
22 A.   That was Tammy Murphy.
23 Q.   Okay.  So at that time you felt like there was a
24 potential constitutional harm because you were going to be
25 appearing on a ballot that you believed to be

214

1  time; is that right?
2  A.   That was my expectation in 19 counties.
3  Q.   And your claim in this case is that the ballot bracket is
4  itself unconstitutional; is that right?
5  A.   Yes.
6  Q.   And this isn't just a case against the Passaic County
7  Clerk, right?
8  A.   No.  This is a -- by nature what you see.  I mean, look,
9  there are 19 counties that use this system.
10 Q.   You're pursuing a claim against the constitutionality of
11 the bracket used in all those 19 counties, right?
12 A.   Correct.
13 Q.   And which you knew, that they would -- it would be used
14 in all those counties when you entered the race, right?
15 A.   Yes.
16 Q.   And you chose to campaign in all 19 counties, for county
17 endorsements and for the county-line; is that right?
18 A.   I was campaigning in all 21 counties, yes.
19 Q.   You were campaigning for the county-line.  That was your
20 testimony, right?
21 A.   I was -- yes.  I was pursuing -- I was campaigning in all
22 counties.  As mentioned earlier, I did not formally seek
23 endorsement in every single county for county lines, but I was
24 moving in that direction.
25 Q.   And you did seek endorsements from the county parties for

216

1  unconstitutional; is that right?
2  A.   That she had jumped into the race and received the
3  endorsements of a number of county chairs, yes.
4  Q.   So you knew that you were going to be in a race against
5  another candidate at that time that you believed would be
6  subject to an unconstitutional ballot; is that right?
7  A.   That was a concern.
8  Q.   And did you act with urgency at that time?
9  A.   Well, I reached on out to -- yes.  We reached on out to
10 attorneys to be able to understand what -- what options were
11 available for us to pursue.
12 Q.   When did you first formally engage with an attorney to
13 pursue these claims?
14 A.   What do you mean -- like, in terms of meeting with
15 attorneys?
16 Q.   Did you sign an engagement letter with any law firms?
17 A.   Yes.  I eventually did.
18 Q.   When did you do that?
19 A.   Beginning of January.
20 Q.   You waited a month and a half to sign an engagement
21 letter from when you first had concerns?
22 A.   I first met with an attorney myself sometime early
23 December after my staff initially reached out.  So I have
24 never filed a lawsuit before, never taken this action before.
25 So I wanted to make sure that I was doing my due diligence in

217

1    terms of understanding what that process would entail, what
2    kind of research was necessary to be able to reach the kind of
3    high threshold burden that I mentioned earlier about what this
4    Court would need to see to potentially be successful.
5        So that's what we were pursuing at that time.
6    Q.    You wanted to meet your own high threshold burden
7    before --
8    A.    It's not my own high threshold.
9    Q.    If I could just finish the question.
10   A.    Okay. Go ahead.
11   Q.    I'll rephrase based on what I heard.
12       You wanted to meet a threshold burden that came from
13   where?
14   A.    That came from an understanding of, as I talked to
15   attorneys -- about what we thought we needed to -- to be able
16   to prove or show in order to be successful, given just the
17   high bar that a preliminary injunction requires.
18   Q.    And what diligence did you do personally between November
19   and January 3rd to help meet your burden?
20   A.    So to help meet the burden?
21   Q.    Yeah.
22   A.    Well, that was when I engaged with attorneys, talked to
23   them about what research and what type of expert information
24   and submissions would be necessary, and to see if whether or
25   not we'd be able to find experts that could be able to provide

218

1    that type of information.
2    Q.    Now, you've previously -- you testified before you ran
3    three times for office before this; is that right?
4    A.    Yeah. That's right.
5    Q.    You appeared on the ballot for the December 2020 primary
6    election; is that right?
7    A.    The -- I'm sorry. What?
8        MR. KOMUVES: Primary's aren't held in December.
9        THE COURT: Is there an objection? Because you've
10   got to object, state your basis, and then I'll resolve it.
11       MR. KOMUVES: Objection. I don't think primary
12   elections are held in December any year.
13       MR. SPIRO: Did I say December?
14       THE COURT: You said, you appeared on the ballot for
15   the December 2020 primary election; is that right?
16       MR. SPIRO: I'm sorry. 2020 primary election. I'll
17   ask the question again.
18   BY MR. SPIRO:
19   Q.    You appeared on the ballot for the 2020 Democratic
20   primary election; is that right?
21   A.    2020, yes.
22   Q.    And are you familiar with the *Conforti v. Hanlon* case?
23   A.    I am.
24   Q.    Same counsel that's representing you in this case are
25   counsel in that case, right?

219

1    A.    Yes.
2    Q.    And in that case, are there -- do you know if there's
3    still a challenge to the 2020 Democratic primary election
4    ballot?
5    A.    There is.
6    Q.    Do you believe that your constitutional rights were
7    violated in connection with the ballot for the 2020 Democratic
8    primary?
9        MR. KOMUVES: Objection. Calls for a legal
10   conclusion.
11       MR. SPIRO: It's the same question as to why he's
12   bringing this case.
13       I don't think it's a legal conclusion.
14       THE COURT: I'm sorry. I was looking at the
15   question. My little screen here repeats what you all say back
16   to me.
17       Sorry. What was the nature of the objection, Counsel?
18       MR. KOMUVES: It calls for a legal conclusion.
19       THE COURT: Well, it's basically asking him, do you
20   believe that that case has a similar constitutional claim than
21   the one that you're bringing in this case because he said he
22   was aware of it.
23       So I'm going to allow the question.
24       MR. KOMUVES: If that's the question, then I have no
25   objection.

220

1        THE COURT: Phrase it the way I just asked it. You
2    see what I just did there.
3        (Laughter.)
4        MR. SPIRO: I may not get it exactly.
5        THE COURT: All right. Paraphrase it, but I think we
6    can move on if you change some of those words.
7    BY MR. SPIRO:
8    Q.    Well, there may be two questions there.
9        So the first -- do you believe that there's a similar
10   claim in the *Conforti* case to the claim that you're making in
11   this case?
12   A.    About -- yeah. I mean, I think that they're similar in
13   nature.
14   Q.    Do you believe that you have a legal claim that you had a
15   basis to pursue in connection with the 2020 Democratic --
16   A.    You're asking about my Democratic primary in 2020?
17   Q.    Yes.
18   A.    I believe I ran unopposed.
19   Q.    Do you believe in -- do you believe that other candidates
20   had constitutional claims in connection --
21       THE COURT: Sustained.
22       MR. KOMUVES: Thank you, Your Honor.
23       (Laughter.)
24   BY MR. SPIRO:
25   Q.    And you also ran for the House of Representatives in

221

1  2022; is that right?

2  A.    Correct.

3  Q.    Now, you didn't file a constitutional challenge seeking

4  to change the ballot before you ran in that election; is that

5  right?

6  A.    That's correct.  I did not.

7  Q.    At the time of that primary election, *Conforti* was also

8  still pending before this Court; is that right?

9  A.    I believe so.  I don't remember the exact timeline.

10  Q.    Do you have a constitutional claim in connection with the

11  ballot in the 2022 primary election?

12  A.    Do I think I had a constitutional claim?

13  Q.    Yes.

14  A.    Well, look, if --

15        MR. KOMUVES:  Objection.  Speculative.  Calls for

16  legal conclusion.

17        THE COURT:  I was going to say asked and answered.

18        Didn't you just ask those questions and he said he ran

19  unopposed?  That was 2020.

20        MR. SPIRO:  This is 2022.

21        THE COURT:  Oh, we're going through every one.  Okay.

22        MR. SPIRO:  Well --

23        THE COURT:  Ask the question again.  I'm sorry.

24  Phrase it the way you did, and then I'll --

25  BY MR. SPIRO:

*United States District Court*
*District of New Jersey*

222

1  Q.    Do you believe you have a basis to bring a claim in

2  connection with the 2022 primary election?

3        THE COURT:  I'll allow it.

4        So objection overruled, if that's the question.

5        Mr. Kim, you can answer.

6        THE WITNESS:  My understanding of meeting a claim is

7  that there was injury done upon me, a real non-speculative

8  injury, which I did not sustain in 2022 like I did in 2024.

9  BY MR. SPIRO:

10  Q.    And what's your reason for thinking that you didn't

11  sustain in 2022?

12  A.    Well, for instance, the reason why I brought up the

13  timing of this case is, you know, as I mentioned on February

14  10th, the Passaic county-line adverse to me, right -- that's

15  the injury we're referring to this time around -- I did not

16  have an injury of that nature in 2022.  I did not have an

17  adverse county-line against me in 2022, so I did not have an

18  injury that I could point to to be able to bring a lawsuit

19  about.

20  Q.    Before -- before you ran, did you believe that -- did you

21  know that you would have the county-line in all -- all of your

22  districts?

23  A.    Sorry, in 2022?

24  Q.    Yes.

25  A.    I -- I had -- I was a sitting incumbent, a two-term

*United States District Court*
*District of New Jersey*

223

1  member of Congress, so I think there was an understanding that

2  I would be very competitive for the county lines there.

3        But, no, I had -- no one informed me that I would

4  definitely have the county lines leading up to that election,

5  though.

6  Q.    Are you aware, before filing suit in this case, of your

7  counsel doing anything to reach out to the defendants to

8  discuss the potential claims that you have in this case?

9  A.    Sorry.  If you can say that one more time?  If -- can you

10  say that one more time, just repeat the question?

11  Q.    Are you aware of your counsel reaching out to defendants

12  at any time before you filed this suit to discuss your

13  constitutional claims in this case?

14  A.    The defendants here in the court?

15  Q.    Yes.

16  A.    Not that I'm aware of it.

17  Q.    Did you ever reach out to defendants to raise your

18  constitutional claims in this case before you filed suit?

19  A.    Well, I have certainly been speaking about this publicly

20  raising my concerns, and so I think my position is very well

21  known right now, even prior to when this lawsuit was filed.

22  Q.    Did you ever publically raise constitutional concerns?

23  A.    I don't really -- I'm not really sure exactly what

24  threshold that is.

25        As I said, I've raised publicly concerns about this

*United States District Court*
*District of New Jersey*

224

1  system that we have, and I've deemed it -- I've said it

2  publicly that it's unfair.  So I'm not sure if that meets the

3  threshold of what you're asking for.

4  Q.    Did you ever -- did you ever refer to bracket balloting

5  as unconstitutional publicly?

6  A.    I may have.  I'm not positive of the exact wording that

7  I've used.

8  Q.    Do you ever recall using that wording?

9  A.    Of unconstitutional?

10  Q.    Yes.

11  A.    Usually I say the words of unfair, you know, things of

12  that nature.  Those are usually the types of words I more

13  associate with it.

14  Q.    Did you ever do anything to put defendant on counsel

15  (sic) that you were planning to bring this case prior to

16  filing suit?

17  A.    You mean did I ever let them know that I might be filing

18  suit?  Is that what you're asking?

19  Q.    Yes.

20  A.    No, I did not.

21  Q.    Now, in February of 2024, you did write a letter to the

22  county clerks; is that right?

23  A.    I did.  I did write a letter to county clerks and county

24  chairs; that's correct.

25  Q.    And let's start with the county clerks' letter.  What was

*United States District Court*
*District of New Jersey*

225

1  the purpose of writing that letter to the county clerks?
2  A.   The purpose of the letter was to just raise our request
3  that we conduct using office-block ballots.
4  Q.   Why did you wait five months to send that letter until
5  after you entered the race?
6  A.   In terms of the timing of that letter? I think, at that
7  point, that's when -- I think that was just before the
8  convention season was beginning. So I thought it would be
9  something that would help the conversation. And that's when
10  people were talking about the ballots, and we were having
11  these conventions, so I thought that could be something that
12  would help raise that issue and try to see if there's a way
13  that we could try to get office-block ballots in the 19
14  counties that do not have them.
15  Q.   Why didn't you send that letter in September, though, or
16  October?
17  A.   Again, September and October, there were no other
18  declared candidates in the race.
19  Q.   You could have started the conversation in September or
20  October?
21  A.   Yes, I could have, but I also, as I said, was building up
22  the campaign, hiring staff. There were a lot of different
23  components to a campaign getting started up.
24  Q.   And in December you hired experts for this case; is that
25  right?

*United States District Court*
*District of New Jersey*

226

1  A.   I talked with counsel about -- about what kind of experts
2  we could bring on board and start those conversations.
3  Q.   And experts had started to do work for your counsel in
4  December; is that right?
5  A.   I do not know when they started.
6  Q.   You know they started by January, right?
7  A.   I certainly know that I -- I brought on board counsel in
8  January, yes.
9  Q.   When did you first see the survey results from Dr. Pasek?
10  A.   Probably -- I don't remember the -- the exact day, but I
11  imagine it was probably on February 14th or after.
12  Q.   Did you think it would be helpful at any time to let
13  defendants know that you had expert consultants who had
14  provided analysis that you believe was relevant to the ballots
15  in this election?
16  A.   Yes, which is why we submitted them when we filed suit.
17  Q.   If you wanted to start the conversation before that,
18  would it have been helpful to bring that to their attention
19  before you filed suit?
20  A.   Well, look, as I said, you know, we -- we tried to have
21  opportunities for those conversations per the letter and other
22  things. No conversations were had. No -- no response was
23  ever given to us from those letters or any of the other
24  outreach.
25  Q.   I'd like to introduce the February 8th letter that you

*United States District Court*
*District of New Jersey*

227

1  sent to the county clerks, which has been submitted as part of
2  the briefing in this case.
3        THE COURT: Are you going to mark it as D something?
4        MR. SPIRO: It might be D-1. I don't know if we've
5  had an --
6        THE COURT: Have you guys had an exhibit yet?
7        MR. PARIKH: No, Your Honor.
8        THE COURT: You have not?
9        MR. PARIKH: We have not.
10        THE COURT: All right. There we go. D-1.
11        (Defendant's Exhibit 1 in evidence.)
12        MR. KOMUVES: Could I get the associated docket
13  number with that?
14        THE COURT: Yeah. What's the ECF number?
15        MR. SPIRO: It might have appeared as just a link in
16  the footnote in one of the briefs. I'm not sure if it -- if
17  it -- if there's an actual exhibit that was presented.
18  Marissa, do you know?
19        MS. DeANNA: No.
20        THE COURT: This is a link to a brief from one of the
21  defense counsel?
22        MR. SPIRO: I would say it's appeared in two briefs.
23  It's also in the reply brief.
24        THE COURT: All right. Can you at least give him
25  where you have it, where's the link?

*United States District Court*
*District of New Jersey*

228

1        MR. SPIRO: Page 30 of the reply brief, from memory,
2  is where they address it. We do have copies.
3        THE COURT: All right. Let's get a copy over to
4  plaintiffs' counsel.
5        MR. SPIRO: This is an argument that they raised, not
6  us, just for reference.
7        THE COURT: Is this in your papers from the
8  plaintiffs? Is this in your brief?
9        MS. BROMBERG: I don't know what he's referring to.
10        THE COURT: All right. Never mind. Let's continue.
11  They got a copy.
12        MR. SPIRO: It's in my brief.
13        THE COURT: They got a copy. It's in your brief
14  anyway, but let's go.
15        MR. SPIRO: We're just waiting for it to go on the
16  screen. I can bring up a copy, too.
17        THE COURT: You have to ask to approach.
18        MR. SPIRO: May I approach?
19        THE COURT: Now you may.
20        I don't want people going up and back to the
21  witnesses without them knowing you are coming.
22        All right. So the witness has it. You guys have it.
23  If you can get it up on the screen, great. If not, why don't
24  you ask Mr. Kim whatever question you want to ask him.
25        MR. SPIRO: Can I bring a copy for you as well?

*United States District Court*
*District of New Jersey*

1    THE COURT:  Sure.

2    BY MR. SPIRO:

3    Q.    Mr. Kim, I think you testified before that, when you sent

4    this letter, you wanted to start a conversation with -- with

5    the county clerks; is that right?

6    A.    Well, yes.  It's me and two other candidates for Senate.

7    We thought that this would be potentially an opportunity to --

8    to get a response.

9    Q.    So you respectfully requested that the clerks utilize an

10   office-block design ballot for mail and in-person balloting

11   for all competitive elections.

12        Am I reading that right?

13   A.    Yes.

14   Q.    Again, not really suggesting urgency in seeking for the

15   clerks to ask, are you?

16   A.    I mean, when you have 75 percent of the Senate candidates

17   that are running send a letter, you know, I think that that

18   shows that, you know, this is something that we thought it was

19   important.

20   Q.    You didn't mention violation of constitutional rights in

21   this letter, did you?

22   A.    I do not see that in there.

23   Q.    Did you mention the prospect of filing a lawsuit?

24   A.    No.

25   Q.    And what you did ask them was to use office-block-design

United States District Court
District of New Jersey

1    ballots.  And is it your understanding that the clerks could

2    do that under the law as it exists today?

3    A.    Well, we do have two clerks -- yeah, two counties that

4    already use office-block ballots.

5    Q.    So do you have a view that those two clerks are operating

6    under the law as it exists today?

7    A.    Well --

8         MR. KOMUVES:  Objection.  Calls for legal conclusion.

9         THE COURT:  Sustained.

10   BY MR. SPIRO:

11   Q.    You are aware, are you not, that the clerks have taken

12   the position, including in *Conforti*, that they're required to

13   follow the election laws and permit balloting?

14        Are you aware of that?

15   A.    I've -- I've heard that.

16   Q.    So you were asking for them to follow a new

17   interpretation of the law that was inconsistent with the

18   interpretation for 80 years?

19        MR. KOMUVES:  Objection.  Calls for a legal

20   conclusion.

21        THE COURT:  That's a different question.  I'm going

22   to -- overruled.  That's not what he asked him there.

23        Go ahead.  You can answer it, Mr. Kim.

24        THE WITNESS:  Can you say it one more time?

25   BY MR. SPIRO:

United States District Court
District of New Jersey

1    Q.    You were asking the clerks to change their interpretation

2    of the New Jersey election laws; is that right?

3    A.    I think what we're doing here is requesting -- yeah,

4    we're requesting that they utilize an office-block-design

5    ballot.  That's right.

6    Q.    If they responded and started that conversation, were you

7    intending to continue with this lawsuit?

8    A.    Well, it depended on how that conversation went.

9    Q.    You also mentioned that you sent a letter to the party --

10   was it the party chair that you mentioned?

11   A.    The county chairs, correct.

12   Q.    What was the purpose of that letter?

13   A.    Just to again let them know of our desire that, you know,

14   three of the four candidates -- we had a desire for utilizing

15   an office-block ballot.

16   Q.    Have you reached out to the -- to this group before this?

17   A.    To these other candidates?

18        MR. KOMUVES:  Objection.  This group, are we talking

19   about clerks?

20        THE COURT:  All right.  Sustained.  Just clarify who

21   you're referring to when you ask him about a group.

22   BY MR. SPIRO:

23   Q.    Did you reach out to the county party chairs?

24   A.    Oh, the county chairs.

25        MR. KOMUVES:  Your Honor, I've got to object on the

United States District Court
District of New Jersey

1    basis of relevance here.  I mean, this is --

2         THE COURT:  Overruled.  And repeat the question, and

3    let him get it out.  All right?

4         Go ahead.

5    BY MR. SPIRO:

6    Q.    Had you -- had you reached out to the county party chairs

7    before sending the February letter that you referred to

8    before?

9    A.    I had talked with a number of them about my concerns, but

10   I haven't talked -- I haven't sent out a letter en masse to

11   all of them.

12   Q.    This is your first formal approach to the county party

13   chairs; is that right?

14   A.    First formal approach with the other candidates, correct.

15        MR. SPIRO:  What is the technology?  Are we still --

16   I'd like to introduce this February 8th letter to the county

17   party chairs as well.

18        THE COURT:  Where is this found?

19        MR. SPIRO:  This is found in the same place as the

20   other.

21        THE COURT:  All right.  So, plaintiffs' counsel, you

22   guys have this link to this letter?

23        MS. BROMBERG:  We are not aware of it.

24        MR. PUGACH:  I don't believe that -- that we referred

25   to that one.  If counsel tells me I'm wrong and shows me, then

United States District Court
District of New Jersey

233

1  that --
2       THE COURT:  Yeah.  Why don't you tell us where it's
3  coming from as opposed to like a mystery?
4       MR. SPIRO:  I might -- I might be wrong about where
5  it is, but I will say it was raised for the first time in
6  testimony by Mr. Kim.
7       So I'm just bringing up a document that he introduced
8  in the first instance.
9       THE COURT:  All right.  Does plaintiffs' counsel have
10 a copy of it?
11      MR. SPIRO:  We'll bring the copies --
12      THE COURT:  Let's do that.  Do you have another copy
13 for me?
14      MR. PARIKH:  Judge, while we're doing that, I think
15 there's something wrong with the overall system.
16      THE COURT:  All right.  We can take a break if we
17 need to.  If you want to approach Mr. Kim to provide him that
18 document?
19      MR. SPIRO:  Yes.
20      THE COURT:  You may.
21      MR. SPIRO:  I don't -- I don't expect to have too
22 many more exhibits.
23      THE COURT:  All right.  What about me?  Let's
24 continue.
25 BY MR. SPIRO:

234

1  **Q.**  Mr. Kim, when you sent this letter, you were also seeking
2  to gain support for changing the bracket ballot for the 2024
3  Democratic primary; is that right?
4  **A.**  I wanted to try to increase support for an office-block
5  ballot, correct.
6  **Q.**  And again -- and you can take a second to review the
7  letter.  You're asking these Democratic party chairs to reach
8  out to the county clerks for that purpose?
9  **A.**  Encourage them to do so, correct.
10 **Q.**  And you also asked them to reach out to legislators; is
11 that right?
12 **A.**  That's right.
13 **Q.**  And the county clerks, as you knew at this time, would
14 have to change their interpretation of New Jersey state
15 election law in order to respond to a request like this; is
16 that right?
17 **A.**  Yeah.
18 **Q.**  But the legislature actually could have done something if
19 people reached out to the legislators; is that right?
20 **A.**  You said that the legislators could have -- yes.
21 **Q.**  Have you reached out to any legislators, state
22 legislators to see about amending the statute, the New Jersey
23 election laws, that you're seeking to challenge in this case?
24      THE COURT:  Hold on.
25      MR. KOMUVES:  I object.  This is getting a little

235

1  afield.  We were asking about --
2       THE COURT:  Sidebar.
3       (Sidebar begins at 4:22 p.m.)
4       THE COURT:  Your objection is on what, on relevance?
5       MR. KOMUVES:  Yes.
6       THE COURT:  The time frame, isn't this all going to
7  time frame?  What's the relevance of this line of questioning?
8       MR. SPIRO:  That's what it's going to.  There's a
9  number of things he could have done if he felt there's
10 urgency --
11      THE COURT:  I'm not saying I necessarily agree with
12 it or not.  But I think, as far as what their position is and
13 what they're examining Mr. Kim on, it's relevant to the
14 inquiry because they're questioning about him when he knew
15 certain things and when he could have filed a lawsuit.  All
16 these questions go to that.
17      So I'm not going to actually agree with either of you
18 on where you're going with it, but it's relevant to the
19 inquiry, and that's the line of questioning.  I mean, I
20 presume we're almost done here.
21      MR. SPIRO:  Yeah.
22      THE COURT:  So what other objections?
23      MR. PARIKH:  With --
24      MR. GENOVA:  Whether or not --
25      THE COURT:  Hey, guys, when you're in the gallery and

236

1  I'm in sidebar, keep quiet or leave the courtroom or I'm going
2  to instruct the CSOs to tell you to get out of here.  Do we
3  understand each other?  Thank you.
4       MR. GENOVA:  My point, Your Honor, was whether or not
5  a party is dilatory in addition to the time.  So the course of
6  conduct --
7       THE COURT:  It's relevant to that inquiry, so I'm
8  going to allow it.
9       I don't think you have that many more questions left, I
10 presume no, but relevance is a pretty broad standard, guys.  I
11 mean, if you really want to have the objection, we have 19
12 people standing here now, but I'm going to allow the inquiry,
13 and we're almost done.
14      All right.  Let's go back.
15      (Sidebar was concluded at 4:24 p.m.)
16      (Open court.)
17      THE COURT:  Mr. Spiro, I'm going to allow the
18 question.  So if you want to repeat it, feel free.
19 BY MR. SPIRO:
20 **Q.**  So the question was, did you take any steps to reach out
21 to state legislators about the laws -- the bracketing laws
22 under Title 19?
23 **A.**  So at that point only two legislators that I'm aware of
24 in the New Jersey Assembly or Senate were supportive of
25 changes to the ballot line.  So it was something that was

237

1  talked about very -- to a great extent, but there was -- you
2  know, there were only two legislators in New Jersey that were
3  supportive of any types of changes.
4  Q.  So not an approach that you pursued at all, it sounds
5  like.
6  A.  It was not an approach that would have been successful.
7  Q.  Just to clarify your testimony on constitutional harm --
8  or, actually, let me strike that.
9       Clarify your testimony on the injury that you're
10  alleging.  What is the injury that you're alleging in this
11  case?
12  A.  Well, the injury that I'm alleging here is that --
13  that -- that I am not being given fair opportunity to be able
14  to appear on the ballot in a way that can -- where I can be
15  successful in terms of -- of -- in all the different counties
16  that are out there.  That there's significant -- there's
17  significant advantage giving to a competitor of mine in a far
18  larger part of New Jersey.  That's something that doesn't give
19  me a fair shot to be able to pursue this election.
20  Q.  And that's an injury caused by the design of the ballot;
21  is that right?
22  A.  That's right.
23  Q.  And you also talked before about forced association; is
24  that right?
25  A.  I talked about the challenges, yeah, that come with

238

1  association.  Yes.
2  Q.  And when did you start to feel those challenges with
3  forced association in connection with the 2024 primary
4  election?
5  A.  With the forced association?
6  Q.  Yeah.
7  A.  So yes.  I had concerns about that leading up to -- I
8  mean, you know, I guess I'd say I had these kind of concerns
9  starting with when I approached counsel.
10  Q.  And the concerns were that you were in a situation where
11  you felt like you needed to campaign for endorsements and
12  associate with candidates whose views you may or may not
13  share; is that right?
14  A.  That's part of it, yeah.  As mentioned, you know, my
15  focus on September 23rd was to run for the Senate race, you
16  know.  And if I had my way, you know, I could just focus on
17  that race.  But our system is such that, again, if I do that,
18  I will give significant advantage to a competitor if I don't
19  participate in the convention.
20       So I was being forced to participate in this system in
21  that kind of way.
22  Q.  And part of the reason you reached out to -- to counsel
23  in November was because you were feeling those pressures of
24  association that you've raised in this case; is that right?
25  A.  That's part of it.

239

1  THE COURT:  Do you have much more left, Counsel?
2  MR. SPIRO:  No, Your Honor.
3  THE COURT:  All right.
4  MR. SPIRO:  The last line of a few questions.
5  THE COURT:  All right.
6  BY MR. SPIRO:
7  Q.  I think you testified before that, in this case, there is
8  no primacy effect as it relates to you; is that correct?
9  A.  As it relates to the Senate race.
10  Q.  And there's no concern of ballot Siberia; is that right?
11  A.  Regarding the Senate race.
12  Q.  The only concern that you're raising is -- relates to the
13  bracketing on the ballot; is that right?
14  A.  Yeah, it's a very significant concern.
15  Q.  And just because a candidate receives the county-line
16  doesn't mean that the candidate's opponents -- they can
17  bracket too; is that right?
18  A.  So -- yes, yes, yes, correct.  They could bracket, too.
19  Q.  And if you have two candidates that have, you know, full
20  brackets appearing on columns next to each other, do you feel
21  like there's any constitutional harm in that circumstance?
22  A.  Well, I think you're glossing over the significant effort
23  that is put in to have to create full brackets in 19 counties.
24  I mean, like, the amount of time that I would have to spend to
25  reach out to candidates in every single municipality, every

240

1  single county, I mean, it would be a full-time job and then
2  some just to be able to do that.
3       So it's not like -- there's not just, like, a standing
4  bracket of people I can just join up with.  And even still,
5  again, I have to vet, figure out policy position.  So I want
6  to make sure that you're not just glossing over and making it
7  seem like that's a super easy thing to do, nor is it
8  necessarily something that I would want to do.
9  Q.  So I'm not testifying or glossing.  I think I asked a
10  much more simple question.
11  A.  Well, you were saying about comparing -- if I had the
12  ability to create a bracket.  Well, then I would have to
13  create -- find someone who is also running for the president
14  of the United States.  You know, Joe Biden is at the top of
15  the county-line for the main county endorsements, right?  He
16  is the sitting president of the United States.
17       Do you think that I can create a separate county
18  bracket that is going to have someone at the top of that that
19  is going to have the kind of name recognition and
20  understanding from the voters as Joe Biden?  Like, there's
21  just no comparison there.
22       So, yes, I could create a line, and I could find
23  someone to run for president of the United States, but it's
24  not the sitting president of the United States.
25  Q.  But in the circumstance I described on the ballot, where

241

1 you have two candidates or both have brackets associated with
2 them and columns next to each other, is there any
3 constitutional harm there?
4 A.   Sorry.  Constitutional harm in --
5      THE COURT:  That's where you want to stand up.
6      MR. KOMUVES:  Objection.
7      THE COURT:  Sustained.
8      (Laughter.)
9      THE COURT:  He's not the lawyer.  You've got to stop
10 asking him those questions.  And if that's all you have, let's
11 move this on because we have a lot of witnesses.  You have one
12 day, folks.  I'm telling you, when I said today's the day, I
13 don't think you understood that I meant it.  So you will be
14 here until we're done.
15      MR. SPIRO:  Your Honor, this is going very directly
16 to --
17      THE COURT:  All right.  Well, I've already sustained
18 that objection, so go directly to the next question.  But you
19 said you have a few left, and I'll allow you, as long as
20 they're not objectionable, but then we're proceeding.  We're
21 going to move on.
22 BY MR. SPIRO:
23 Q.   So when you launched the county-line in Passaic, is it
24 your testimony that you determined that you had no opportunity
25 to put together a bracket that could be competitive in

United States District Court
District of New Jersey

242

1 Passaic County?
2 A.   No.  What I was saying is that -- that the county had --
3 had given the endorsement to a competitor of mine.  So that's
4 what was -- that sparked it.
5 Q.   But you could have bracketed in Passaic County and
6 appeared next to that same candidate in the first column with
7 the full bracket; is that not true?
8 A.   Theoretically, I could put together and find a candidate
9 to run for president of the United States, yes.
10 Q.   But you feel at that point you had suffered a concrete
11 harm.  Is that your testimony, that was different than the
12 harm that you experienced in November?  Is that your
13 testimony?
14      MS. BROMBERG:  Your Honor, this is -- objection.
15 This is speculative.  It's also a compounded question.
16      THE COURT:  Hold on.  Let me just look at it.
17      MS. BROMBERG:  Whether or not he can --
18      THE COURT:  Wait.  Just let me read it.
19 No, I'll allow it.
20      Mr. Kim, here's the question.  "But you feel at that
21 point you had suffered a concrete harm.  Is that your
22 testimony, that was different than the harm that you
23 experienced in November?  Is that your testimony?"
24      That's the question.  You can answer it.
25      THE WITNESS:  Yeah.  So, look, yes.  I do think that

United States District Court
District of New Jersey

243

1 the official awarding of a county-line -- that is where
2 the threshold was for a real and nonspeculative injury and
3 harm.
4 BY MR. SPIRO:
5 Q.   Even though at that point you could still bracket with a
6 full slate of candidates?
7      THE COURT:  This has all been asked and answered now.
8 So is there anything more?  There's no jury.  They're
9 confusing you, I think.  So you've got your plan for the jury
10 box, but it's just me.
11      MR. SPIRO:  I wasn't even looking at them and
12 smiling.
13      THE COURT:  All right.
14      Really?  We're going to do redirect?
15      MR. KOMUVES:  Just a couple.
16      MR. PARIKH:  You know, before redirect, I just want
17 to talk to counsel for one second so we can avoid some
18 questions of Mr. Kim.
19      THE COURT:  Sure.
20      (Brief pause.)
21      MR. PARIKH:  Your Honor, counsel has stipulated to
22 the Defendant's Exhibit 2, which is a compiled document that
23 is 69 pages long that is representative of the privilege logs
24 that plaintiffs' counsel produced.
25      MR. PUGACH:  Your Honor, I think we're on Defense 3,

United States District Court
District of New Jersey

244

1 I think.
2      MR. PARIKH:  I'm sorry.  Defense Exhibit 3.
3      THE COURT:  All right.  Defense Exhibit 3 is
4 basically a privilege log.
5      MR. PARIKH:  Correct, Your Honor.  If I may hand that
6 to Your Honor's clerk.
7      THE COURT:  Thank you.  Yes, you may.
8      (Defendant's Exhibit 3 in evidence.)
9      THE COURT:  We're back on redirect?
10      MR. KOMUVES:  Yes.
11      THE COURT:  All right.  Counsel, when you're ready to
12 proceed, go ahead.
13 (REDIRECT EXAMINATION BY MR. KOMUVES:)
14 Q.   Congressman, real quick, one of the issues that's raised
15 in this complaint is primacy, correct?
16 A.   Right.
17 Q.   And which plaintiffs in the complaint does primacy
18 affect?
19 A.   The primacy would affect the candidates for the House of
20 Representatives.
21 Q.   Okay.  And you've -- you've heard of the concept of the
22 weight of the line?
23 A.   The weight of the line?
24 Q.   Yes.
25 A.   Yes.

United States District Court
District of New Jersey

245

| 1 | Q. Can you just -- well, let me ask you this: Which |
| 2 | candidates -- which of the plaintiffs does the weight of the |
| 3 | line issues affect? |
| 4 | A. The weight of the -- the weight of the line, you know, |
| 5 | that would affect those that are not in the brackets, so the |
| 6 | candidates that do not bracket. |
| 7 | Q. So potentially all three candidates, all three |
| 8 | plaintiffs? |
| 9 | A. Correct. |
| 10 | Q. All right. And the associational rights claim, does that |
| 11 | also affect all three plaintiffs? |
| 12 | A. Correct. That does. |
| 13 | Q. Okay. Just going back to your point about bracketing, |
| 14 | just so I understand, this is clear, you're saying -- or in |
| 15 | answer to their question, if you wanted to bracket in another |
| 16 | county, who would you have to identify? You mentioned |
| 17 | president, but who else would you have to identify? |
| 18 | A. I mean, you would have to identify so many different |
| 19 | races. I mean, it's president, and there's Senate. Then |
| 20 | there's House of Representatives. Then there's, you know, |
| 21 | county commissioners and sheriffs. Every single municipality |
| 22 | that has its own people running for municipal, you know, |
| 23 | township council or this and that. |
| 24 | Just the sheer volume of people if I were to try to |
| 25 | build a full bracket, I mean, it would be -- I can't imagine |

United States District Court
District of New Jersey

246

| 1 | that it's even possible, especially for a statewide race, you |
| 2 | know, 19 counties. |
| 3 | Q. So the record is clear, you're saying you'd have to |
| 4 | identify candidates for every municipal office in every -- |
| 5 | partisan municipal office in every municipality of that county |
| 6 | in order to build a comparable bracket? |
| 7 | A. Yeah, and then I'd have to do that in every single |
| 8 | county. |
| 9 | MR. KOMUVES: Nothing further. |
| 10 | THE COURT: Thank you, counsel. |
| 11 | MR. FLORIO: Can I ask one question, please? |
| 12 | Literally one question. |
| 13 | THE COURT: All right. Put your name on the record, |
| 14 | and who you represent, so we don't get confused in the |
| 15 | transcript. Nobody else is going to get a onsie? This is it? |
| 16 | MR. FLORIO: Edward J. Florio, counsel for the Hudson |
| 17 | County clerk, Junior Maldonado. |
| 18 | (CROSS-EXAMINATION BY MR. FLORIO:) |
| 19 | Q. Congressman, isn't it true that there are candidates for |
| 20 | offices all over New Jersey reaching out to you to bracket |
| 21 | with you? Isn't that true? |
| 22 | A. There have been a few candidates that have reached out to |
| 23 | me. |
| 24 | THE COURT: All right. That's all? |
| 25 | Mr. Kim, you're excused. Thank you for your time. |

United States District Court
District of New Jersey

247

| 1 | THE WITNESS: Thank you, sir. |
| 2 | THE COURT: You can go back to counsel table. |
| 3 | THE WITNESS: Yeah. |
| 4 | THE COURT: Folks, who's next? Let's go. Guys? |
| 5 | MR. NATALE: Your Honor, we agreed to skip and have |
| 6 | the witness Dave Passante -- |
| 7 | THE COURT: However you guys want to do it, but let's |
| 8 | keep it moving. I mean, these folks should be ready, and you |
| 9 | should be bringing in witnesses, so... |
| 10 | MR. PARIKH: I will note for the record, Judge, I |
| 11 | provided counsel with a copy of Defendant's Exhibit 3. |
| 12 | THE COURT: All right. Do we still have to address |
| 13 | that witness issue with one of the plaintiffs' experts at some |
| 14 | point? |
| 15 | MR. PARIKH: We do, Your Honor. |
| 16 | THE COURT: All right. We'll deal with that when |
| 17 | that witness is ready to testify, but my understanding is all |
| 18 | the plaintiffs' experts for now are simply going to say on |
| 19 | direct that they stand by their report. |
| 20 | And we're going to go into cross-examination as opposed |
| 21 | to a redundant direct examination, which is basically |
| 22 | regurgitating the report that's already been submitted to the |
| 23 | Court. |
| 24 | Is that accurate? |
| 25 | MR. PARIKH: That's correct, Your Honor. |

United States District Court
District of New Jersey

248

| 1 | THE COURT: Okay. So that will streamline it a bit. |
| 2 | Do you have something? |
| 3 | MR. PUGACH: That is 99.9 percent accurate, |
| 4 | Your Honor. |
| 5 | THE COURT: What is the .1 that I missed? |
| 6 | MR. PUGACH: The .1 is if there is a slight error in |
| 7 | something, we wanted to make sure that it didn't deceive the |
| 8 | Court -- that was discovered afterwards -- so we would ask one |
| 9 | question to clarify. |
| 10 | THE COURT: Well, I appreciate that, and that, of |
| 11 | course, you'll have the liberty to do. |
| 12 | All right. Are we still waiting on the witness? |
| 13 | (Brief pause.) |
| 14 | THE COURT: When is the issue with sequestration |
| 15 | coming up? When do I have to deal with that? Not for a |
| 16 | while? |
| 17 | MR. PUGACH: Not for a while. |
| 18 | THE COURT: Have you at least done your due diligence |
| 19 | on when the witness arrived and what the witness listened to? |
| 20 | MS. BROMBERG: Yes. So my understanding, Your Honor, |
| 21 | is that he listened to the -- this is the witness about voting |
| 22 | machines in New Jersey. He's, like, the main New Jersey |
| 23 | voting machines guy. He attended the last ten minutes of Mr. |
| 24 | Macias on Zoom where Macias talked about step 1 and step 2. |
| 25 | It was the end of the -- I believe it was the redirect, |

United States District Court
District of New Jersey

249

1  and then we went -- then I think we went on break, but he was
2  here for Representative Kim's testimony.
3          THE COURT:  All right.  What is your position?
4          MR. PARIKH:  Our position is that it's a blatant
5  violation of the sequestration order, and his testimony should
6  be stricken.
7          THE COURT:  Why?  So let me ask you this:  Why can't
8  you just raise it on cross-examination?  Did he have access to
9  the report?  The report's marked confidential, right?
10         MR. PARIKH:  The reports are not confidential.
11         THE COURT:  Mr. Macias didn't say anything that's
12  really a shock to anybody, right?  He's got an expert report
13  that he's regurgitating on direct and cross-examination.
14         So what's the real prejudice to you that he sat here
15  for ten minutes that you can't address on cross-examination?
16         MR. PARIKH:  So I think the prejudice, Your Honor,
17  ultimately is that we now have a witness, unlike any of the
18  witnesses on our side, who has an understanding of what the
19  role of questioning is, how the lawyers are approaching the
20  case, what the strategy is.
21         THE COURT:  This was in the last ten minutes of
22  Mr. Macias?
23         MR. PARIKH:  Yeah, and Mr. Kim.
24         THE COURT:  Look, I'll take that into consideration,
25  but I'm not going to strike the witness in its entirety.  He's

United States District Court
District of New Jersey

250

1  got a report that's already been submitted, so I'm not so sure
2  how much extra the plaintiffs are getting by this, other than
3  I directed them to bring witnesses to testify for purposes of
4  this hearing because I didn't know if there would be
5  conflicting testimony and I'd have to make credibility
6  decisions.
7          So what I'm going to say is just nip this in the bud
8  now so we're not spending time on it.  This witness is going
9  to testify.  You are absolutely able to explore everything
10  that he did in violation of the sequestration order, whether
11  that was intentional or negligent.
12         You can talk about what he may have overheard with
13  Mr. Macias, and I will take all that into consideration, but
14  I'm not striking the witness in his entirety when he's already
15  produced an expert report to all of you and the Court in
16  advance of him walking into the courtroom, you know,
17  potentially by accident earlier this afternoon.
18         So that's my ruling there.
19         Do we have the witness now?  What am I waiting for?
20  Mr. Passante?
21         Come on down.
22         MR. PARIKH:  Thank you, Your Honor.
23         THE COURT:  If you don't mind, as you come up to the
24  witness box, my courtroom deputy is just going to swear you
25  in, and then we'll proceed from there.

United States District Court
District of New Jersey

251

1  (DAVID PASSANTE, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS
2  FOLLOWS:)
3          THE DEPUTY COURT CLERK:  Please state your name and
4  the spelling of your last name for the record.
5          THE WITNESS:  David Passante, P-A-S-S-A-N-T-E.
6          THE COURT:  Thank you.  Mr. Passante, you can have a
7  seat.
8          And, Counsel, whenever you're ready.
9          MR. NATALE:  Thank you.
10 (DIRECT EXAMINATION BY MR. NATALE:)
11 Q.    Mr. Passante, good afternoon.
12         MR. KOMUVES:  Sorry.  Your Honor, Congressman Kim has
13  another function to go to, so he'd like the Court's permission
14  to leave.
15         THE COURT:  He's no longer a witness.  He's a party
16  to the case, but he doesn't have to be here, so if he needs to
17  be excused, that's fine by me.
18         Any objections from the defense?
19         MR. PARIKH:  No objection.
20         THE COURT:  All right.
21         MR. KOMUVES:  Thank you, Your Honor.
22         THE COURT:  So Mr. Kim is free to go.
23         Let's start the direct examination here.
24 BY MR. NATALE:
25 Q.    Mr. Passante, I know you just mentioned your name for the

United States District Court
District of New Jersey

252

1  court reporter, but could you introduce yourself again?
2  A.    David Passante, Royal Printing Service.
3  Q.    Okay.  And, Mr. Passante, what do you do for a living?
4  A.    I own Royal Printing Service with my brother, Kevin.
5  Q.    Can you tell us a little bit about your job duties and
6  responsibilities as owner of Royal Printing Services?
7  A.    We -- are a commercial printing company.  We do a lot of
8  government work, municipal work.  One of the things that we
9  specialize in is printing of ballots.
10         We've been printing ballots since 1984, started with
11  municipal ballots, and then in 1994, we started printing
12  county ballots.  Presently we print for 11 counties in the
13  state of New Jersey.
14 Q.    And how long have you worked for Royal Printing Service?
15 A.    Since 1988 full time, but my father had me there when I
16  was about 14 years old.
17 Q.    You say your father had you there.  Is it a family
18  business?
19 A.    Yes, sir, grandfather, father, myself, and my brother.
20 Q.    And where is it located?
21 A.    We're in West New York, New Jersey.
22 Q.    How many employees do you have?
23 A.    We have 60 employees.
24 Q.    And is part of that workforce union?
25 A.    Yes.  The entire print shop is union.  One of the things

United States District Court
District of New Jersey

253

1  that my dad was always proud of was that every person who
2  worked for us was supplied benefits and had a union job.
3  Q.   Excellent.  So you mentioned that you've been printing
4  county ballots since 1994; is that correct?
5  A.   Yes, sir.
6  Q.   Okay.  And currently how many different counties do you
7  print county ballots for?
8  A.   11.
9  Q.   Okay.  And of those 11 how many use the bracketing
10  ballot?
11  A.   One.  Oh, the bracketed ballot.  Excuse me.
12        (Off the record.)
13        THE WITNESS:  Out of the 11 counties, ten used the
14  bracketing.
15  BY MR. NATALE:
16  Q.   Okay.
17        Now, can you explain your process for prepping ballots
18  for an election in a normal year irrespective of this lawsuit?
19  A.   So usually what we do is we prepare with each county
20  clerk based on how they want to lay out their ballot.
21        One thing I found over the years is that every county
22  clerk does things a little bit differently.  So we'll go, and
23  we'll meet with the clerks.
24        We'll go over with them the possible candidates that
25  are going to be on the ballot and the different ways that they

*United States District Court*
*District of New Jersey*

254

1  could lay out their ballot, what the options are as far as who
2  brackets together, who can possibly be in a draw, who would go
3  in one column, so forth and so on.
4  Q.   And for this election year have you already held those
5  meetings?
6  A.   Not as of yet.
7  Q.   Okay.  And for this election year, what's the next
8  deadline that you're looking for?
9  A.   The first deadline we work off is the date of the ballot
10  drawing, which is April 4th, so we try to set up the meetings
11  with the clerks that week because we -- we don't want to -- we
12  want to wait until we can be as close as possible, that all of
13  the candidates are confirmed.
14        You know, a lot of times there's unofficial, and so we
15  really don't want to discuss things that aren't official.
16        So, you know, the closer we get to the ballot drawing
17  is when we try to have these meetings.
18  Q.   And after that April 4th deadline, what's the next big
19  deadline on your calendar?
20  A.   That would be April 20th, which is the day that
21  vote-by-mail ballots are supposed to be commenced mailing.
22  Q.   Now, do you assist in the design of the ballots as well?
23  A.   Yes, we do.
24  Q.   Okay.  And is that something that you've done since 1994?
25  A.   Yes.  All of the design work for the ballots is done in

*United States District Court*
*District of New Jersey*

255

1  our print shop by our staff.
2  Q.   Okay.  So when you have these meetings with the county
3  clerks that you said would happen around the April 4th date,
4  are you starting from scratch in designing the ballots?
5  A.   Yes and no.  I mean, each year presents new challenges,
6  new candidates.  But because of familiarity and having worked
7  with the different clerks and knowing how they like their
8  ballots laid out, it's a quicker process because we -- we
9  understand what each clerk favors, and so we can sit down and
10  basically say, okay, in Hudson County, I know they like a
11  landscape ballot and so we're going to, you know, discuss how
12  that's going to go.  And say if maybe they do a portrait style
13  ballot -- and so we discuss that with the clerk.
14  Q.   And you prepared a certification for this case, correct?
15  A.   Yes, I did.
16  Q.   Now, in your certification you used the word "shell
17  ballot."
18  A.   Correct.
19  Q.   Can you describe what you mean by that?
20  A.   So a shell is what we call a template or a master for the
21  ballot.  What we try to do when we lay out a ballot is we
22  start with -- for anybody that's familiar with what a pyramid
23  is, we start with the basic candidates that are running.  And
24  this year it's a congressional situation because the Senate
25  candidates who are running are running statewide.

*United States District Court*
*District of New Jersey*

256

1  So each county has different congressional candidates,
2  so we try to lay out the ballot based on starting there.  So
3  in Bergen County, for instance, they have three congressional
4  districts, and so we'll lay out three masters of the ballot,
5  and we'll start -- that will be our first initial, you know,
6  template, master, shell, whatever word we want to use for
7  that.
8  Q.   And based on these 30 years that you've been doing this
9  for county governments, at this point do you have shells for
10  each one of your clients?
11  A.   We have a style that we know that they like, so yes.
12  Q.   Okay.
13        And if nothing changes about the design of the ballot,
14  are you confident that you're going to be able to hit the
15  applicable state deadlines?
16  A.   Yes.  We have to every year.  We make sure that we do.
17  Q.   Now, you mentioned that you have 60 employees, correct?
18  A.   Yes, sir.
19  Q.   Okay.  And you represent these county governments, but
20  these are not your only clients, correct?
21  A.   Correct.
22  Q.   How -- what percentage of operations do you think it
23  would take in order to meet the deadlines if nothing changes
24  about the ballot?
25  A.   40, 50 percent.

*United States District Court*
*District of New Jersey*

257

1  Q.    Now, the other 50 to 60 percent of operations, are they
2  just doing nothing until April 20th?
3  A.    No.  Absolutely not.  We have commercial clients that we
4  work with, too.
5  Q.    Okay.  So is your business currently at or near a hundred
6  percent capacity?
7  A.    Presently right now, today, March 18th?
8  Q.    Yes.
9  A.    No.
10  Q.    Will it be once the ballot draw is done?
11  A.    Yes.
12  Q.    Okay.  What would happen to that schedule that you just
13  laid out if the ballot design changes?
14  A.    Chaos.
15  Q.    Okay.  Can you elaborate a little bit on what you mean?
16  A.    It's -- you know, we're -- it would really turn our world
17  upside down.  Okay?  Because it's putting us into a situation
18  of unfamiliarity on the printing side, on the clerk side, with
19  the voting machine companies, just all across the board.
20        As I said to you previously, you know, we're familiar
21  with what our clerks like and how they want things done
22  presently.  So if said happens, what we would do is we would
23  have to go back, again, and meet with the clerks and find out
24  how they wanted their new ballot done.  Do you want it done in
25  a portrait style?  Do you want it done in a landscape style?

*United States District Court*
*District of New Jersey*

258

1  Do you want your candidates one above the other?  Do you want
2  them side by side?  You know, different types of things.
3        Then what we would do is, from that, we would go back
4  and meet with our staff, come up with a layout, a shell, a
5  master, and then the next thing we would do is we would send
6  it to either Dominion or ES&S, who are the two voting machine
7  companies, because we wouldn't want to print something that
8  we're not familiar with unless they can confirm to us that,
9  yes, this layout is going to work.
10  Q.    When you talk about masters, shells, templates -- we've
11  used a few words here -- are they specific to the type of
12  election year that it is?
13  A.    Yes.
14  Q.    Okay.  So this year you'll be using masters and templates
15  for presidential election years, correct?
16  A.    Correct.
17  Q.    Okay.
18        And do you currently have any masters, templates, or
19  shells for presidential election years for the ten counties
20  that use the bracketing system that are unbracketed?
21  A.    Yes.  For the current system that we work with, yes.
22  Q.    No.  I'm asking:  Do you have any masters or shells for
23  an unbracketed system?
24  A.    No.  No, we don't.
25  Q.    So if this change comes, then will the process that

*United States District Court*
*District of New Jersey*

259

1  you've described with the county clerks take just as long or
2  longer?
3  A.    I feel it will take longer.
4  Q.    Okay.  And do you think that the process of proofing and
5  ensuring accuracy of the ballots from your perspective will
6  also take longer?
7  A.    Yes.
8  Q.    Okay.  And have you estimated how long you believe it
9  would take for you to undergo this process if the Court orders
10  the change in the ballot design?
11  A.    I believe it's three to four weeks.
12  Q.    Okay.  And that's three to four weeks from the moment you
13  know that the new design is coming, correct?
14  A.    Correct.
15  Q.    Okay.  And you mentioned that the print deadline for
16  paper ballots is April 20th, correct?
17  A.    Yes.  We have to commence mailing on April 20th.
18  Q.    Okay.  Can you walk through with me what will happen in
19  those three to four weeks if the Court orders a change in
20  ballot design?
21  A.    So, as I said, the first thing would be immediate
22  meetings with the different county clerks.
23        Secondly would then be layout and design with our
24  staff.
25        Third would be back to the clerks to make sure that

*United States District Court*
*District of New Jersey*

260

1  they approved of, you know, what the layout would be.
2        Fourth, then, would be to immediately try to send them
3  to the two voting machine companies, Dominion and ES&S.  At
4  that point, we would have to wait for -- those two companies
5  to tell us yes, you know, everything is good to go.  Once we
6  got the approval on the layout, then we would finish
7  finalizing the layouts.
8        About a year and a half ago, New Jersey changed --
9  excuse me -- the vote-by-mail process where all vote-by-mail
10  ballots and machine ballots now have to be tallied by
11  district, down to the district level.  For a company like ours
12  who works with the 11 counties, we need to produce roughly in
13  the area of about 3,200 ballots.
14        So what would need to be done then is those 3,200
15  ballots would have to be designed.  Then they get approved by
16  the clerks.  Then we print them.  Then they go to the mail
17  house.
18        From the mail house it's a very arduous task as well.
19  They have multiple items that have to be inserted into the
20  envelopes for mailing, and then the other thing is, because
21  the ballots have to be counted by district, they have to
22  hand-match each ballot with each district before they mail
23  them.
24        So it's a considerable amount of work.  People don't
25  realize how much is involved.

*United States District Court*
*District of New Jersey*

261

1  Q.    Now, you mentioned, within that three- to four-week

2  process, that at some point you're going to send the ballots

3  to the voting machine companies; is that correct?

4  A.    A hundred percent.

5  Q.    Now, do you do that in a normal election year?

6  A.    We do, but there's a little bit of a difference.

7  Q.    Okay.  What's the difference?

8  A.    So because we're familiar with what we do now, we're very

9  confident that what we do now is prepared properly.

10        So, yes, we send them to the voting machine companies,

11  but we pretty much move ahead with them because we know -- we

12  have a lot of confidence in our own ability that everything is

13  set up properly and we're not going to have a problem.

14        In a situation where we would have something

15  drastically new that we never dealt with before, I know I

16  wouldn't and I'm sure my brother wouldn't feel comfortable

17  sending anything to print before the voting machine companies

18  gave us their approval that, you know, yes, this is going to

19  work.

20  Q.    Is part of the reason you typically feel comfortable with

21  the voting machine companies is because they already approved

22  masters and shells that you use?

23  A.    Yes.

24  Q.    Okay.  That three- to four-week estimate, is that

25  contingent on a certain turnaround time by the voting machine

United States District Court
District of New Jersey

262

1  companies?

2  A.    Assuming they're going to get back to us in an

3  expeditious manner.

4  Q.    So if the voting machine companies were going to say that

5  they would need two weeks or so to test the machines and the

6  ballots, that would also slow you down, correct?

7  A.    Yes, that's --

8        MR. KOMUVES:  Objection.  That's hypothetical.

9  There's no foundation for what the voting machine companies

10  might or might not take.

11        MR. NATALE:  Your Honor, I'm asking about variables

12  in his time line.

13        THE COURT:  Sorry, what's the question again?

14        MR. NATALE:  It was, if the voting machine companies

15  needed two weeks to test his ballots as opposed to turning

16  them around quickly, would it slow him down as well, what

17  he --

18        THE COURT:  I guess it would slow him down by the two

19  weeks.  Whatever you say in your hypothetical.  No?  I mean,

20  that's kind of a --

21        MR. NATALE:  Yeah.

22        THE COURT:  I'll overrule.  He can ask it.  But, I

23  mean, I don't know how much --

24        MR. NATALE:  Actually, Your Honor, I'll attempt to

25  move on.

United States District Court
District of New Jersey

263

1  BY MR. NATALE:

2  Q.    Would any amount of time that the voting machine

3  companies delay in approving the new ballots -- would that

4  also delay you?

5  A.    Yes.

6  Q.    Okay.  Now, we've talked about an April 20th deadline.  I

7  want to seek some clarity on that.

8        That April 20th deadline, is that for you to start

9  printing?

10  A.    No.  That's to commence mailing.

11  Q.    Okay.  And is that a legal requirement?

12  A.    Yes, it is state statute.

13  Q.    There's been some discussion in this case about a former

14  election case that you might recall when Frank Lautenberg was

15  running and his name had to be replaced on a ballot.

16        Do you recall that case?

17  A.    I do.

18  Q.    Were you guys printing county ballots at that time?

19  A.    Yes.

20  Q.    Is -- from your perspective, as a printing owner who is

21  responsible for printing these ballots, is it comparable to

22  swapping one name to what would happen if this case is

23  granted?

24  A.    No.  A different situation.

25  Q.    Okay.

United States District Court
District of New Jersey

264

1        Mr. Passante, last question.  Since I brought you here

2  today, I want to make something clear.  Does it matter to you

3  what the ballots look like?

4  A.    No.

5  Q.    Are you only here to testify what it would take you to do

6  your job properly?

7  A.    That's correct.

8        THE COURT:  Is that the end of the line of

9  questioning?

10        MR. NATALE:  Yeah.

11        THE COURT:  All right.  You might want to let me

12  know.  I thought you just like gave up.

13        MR. NATALE:  No, no further question, Your Honor.

14        THE COURT:  You walked away.  I'm like, I'd love to

15  do that, too, but I'm still sitting here.

16        MR. NATALE:  No further questions.

17        THE COURT:  All right.  Do you have additional -- do

18  we have cross?  Are we done with the defense here, folks?

19        MR. KOMUVES:  We have cross.

20        THE COURT:  Cross-examination.

21  (CROSS-EXAMINATION BY KOMUVES:)

22  Q.    Mr. Passante, good afternoon.

23  A.    How are you?

24  Q.    How many -- so how many counties, again, is that you

25  have contracts with?

United States District Court
District of New Jersey

265

1    **A.**    11.

2    **Q.**    Okay. And what kind of revenue does your company earn

3    from these 11 contracts?

4         MR. NATALE: Objection.

5         THE COURT: What's the basis -- overruled. You say

6    he's just here, and he's got no bias and no dog in this fight?

7    He asks one question about how much money he makes, and

8    then -- doing this for these 9 or 11 counties, and he can't

9    ask it?

10        Go ahead.

11   BY MR. KOMUVES:

12   **Q.**    How much revenue does your company earn from these

13   11 contracts?

14   **A.**    Honestly, I couldn't give you an exact answer, but --

15   **Q.**    I'll take an estimate.

16   **A.**    6 million.

17   **Q.**    Per year?

18   **A.**    Yes.

19   **Q.**    Okay. And as a family businessman, you recognize it's

20   important to keep your clients happy, right?

21   **A.**    Absolutely.

22   **Q.**    In fact, you told us before that what your clients like,

23   I think was your verbiage, in terms of ballot design is

24   important, correct?

25   **A.**    Correct.

266

1    **Q.**    Right. And you understand that these clients of yours --

2    they oppose the relief the plaintiffs seek in this lawsuit.

3    They don't -- they oppose the -- a mandate of office-block

4    ballots, correct?

5         MR. PARIKH: Objection. Lacks foundation.

6    BY MR. KOMUVES:

7    **Q.**    Do you understand what your client's position is in this

8    lawsuit regarding plaintiffs' requests?

9    **A.**    Meaning whether they're for or against it?

10   **Q.**    Yes.

11   **A.**    I haven't talked to my clients about whether they're for

12   or against it, to be honest with you.

13   **Q.**    So you personally don't know the legal positions or

14   arguments they've made, whether they're for or against this,

15   right?

16   **A.**    I'm aware that most of the clerks are against it, but I

17   have not spoken to them personally to say, Ms. Rajapi, are you

18   against it.

19   **Q.**    Okay. And so -- so okay. So you're aware the clerks

20   generally are -- are -- are against this.

21        All right. Let me ask you something. You told us

22   before that ten county -- I think you said ten counties use

23   the bracketing ballot.

24   **A.**    Correct.

25   **Q.**    Right. Now, that's in regard to primary elections only,

267

1    correct?

2    **A.**    No, primary and general.

3    **Q.**    Oh, you said you -- you said you print for Atlantic

4    County, right?

5    **A.**    Yes.

6    **Q.**    Did you print for Atlantic County in 2023?

7    **A.**    Yes.

8         MR. KOMUVES: Request to approach, Your Honor.

9         THE COURT: You may. What is it, though? What are

10   you approaching --

11        MR. KOMUVES: I'm sorry. This is the Andrew Appel

12   report, D-95, the number?

13        MR. PUGACH: P-10.

14        THE COURT: All right.

15   BY MR. KOMUVES:

16   **Q.**    So this is, Mr. Passante, a ballot you printed on behalf

17   of the Atlantic County.

18   **A.**    Just let me put my glasses on.

19        THE COURT: Give him a minute.

20        (Brief pause.)

21   BY MR. KOMUVES:

22   **Q.**    Do you recognize that?

23   **A.**    Yes.

24        THE COURT: Counsel, back up. You can cross-examine

25   him from the table.

268

1         MR. KOMUVES: Certainly.

2    BY MR. KOMUVES:

3    **Q.**    So you recognize that Atlantic County ballot?

4    **A.**    Yes, I do.

5    **Q.**    And it does, in fact, have office-block components to

6    that, doesn't it?

7    **A.**    It has bracketed columns, sir, Democrats/Republicans.

8    **Q.**    What about the school board race?

9    **A.**    School board race is a totally different election.

10   **Q.**    The ballot that's before you, are you telling me that the

11   school board election that's on that ballot was not run

12   November 7, 2023?

13   **A.**    I didn't say that. I say it's a totally different

14   election. Okay. So --

15        THE COURT: Mr. Passante, wait for the question.

16   Answer the question that he's asking, all right? I get it,

17   but --

18        THE WITNESS: Okay.

19        THE COURT: Listen to the question, respond to it,

20   and also keep that mic away because I think you're going to

21   blow Megan's eardrum out.

22        So I promise you, counsel can hear you from where

23   you're sitting. The mics will pick you up. They're

24   sensitive. Go ahead.

25        THE WITNESS: Got it.

1    THE COURT:  Go ahead.
2  BY MR. KOMUVES:
3    Q.    So I know you say it's a totally separate election, but
it's held on the same day, correct?
5    A.    Correct.
6    Q.    Same jurisdiction, same voters?
7    A.    Correct.
8    Q.    Same in all respects?
9    A.    Correct.
10    Q.    And it is presented on here as an office -- in the
11  office-block format, is it not?
12    A.    Yes, it is.
13    Q.    Okay.  Turn to Exhibit C, please, of that document.
14    A.    Uh-huh.
15    Q.    Exhibit C of this document -- let me ask you:  Did you
16  print this out?
17    A.    Yes, we did.
18    Q.    Is there an office-block ballot -- office-block race on
19  that ballot?
20    A.    Are you -- are you referring to the school board?
21    Q.    I am.
22    A.    Yes.
23    Q.    Okay.
24    MR. KOMUVES:  May I approach, Your Honor?
25    THE COURT:  You may.

1    MR. KOMUVES:  This is document 94-1.  This was filed
2  and submitted through the testimony of Mr. Macias.
3  BY MR. KOMUVES:
4    Q.    He told us before that you print for Cumberland County,
5  correct?
6    A.    Yes, we do.
7    Q.    Would you look at the last page of that product?
8    MR. PARIKH:  Your Honor, can I ask, if counsel
9  doesn't have copies for all of us, that maybe they pull it up
10  on the screen, if they have it available.
11    THE COURT:  They're working on it.
12    MR. PARIKH:  Thank you.
13    THE COURT:  Also, Counsel, if you have a microphone
14  near you, make sure you have it somewhere near you while
15  you're conducting the cross, all right?
16    MR. KOMUVES:  Yes, sir.
17    THE COURT:  Just so that way folks can hear.
18  BY MR. KOMUVES:
19    Q.    So sorry.  Mr. Passante, this is a ballot you printed for
20  Cumberland County?
21    A.    Yes, sir.
22    Q.    And you see a school board race on there presented in
23  office-block format, correct?
24    A.    Yes, I do.
25    Q.    Okay.  Turn to page 3 of that packet, please.

1    A.    Which page?
2    Q.    Page 3.
3    A.    Page 3.  Yes.
4    Q.    You print for Hudson County, correct?
5    A.    Yes, we do.
6    Q.    Is that ballot on page 3 something your company printed?
7    A.    Yes, it is.
8    Q.    And there's office ballots within that ballot, are there
9  not?
10    A.    School board, yes.
11    Q.    Okay.
12    MR. KOMUVES:  Approach one more time, Your Honor.
13    THE COURT:  You may.
14    MR. KOMUVES:  These are reprints of Exhibits G and H
15  to my certification.  We will attempt --
16    THE COURT:  What are they going to be called now?
17    MR. PUGACH:  I think it's all P-2.
18    THE COURT:  It's all P-2?
19    MR. PUGACH:  It's all P-2.
20    THE COURT:  All right.  Just so counsel is all aware.
21  BY MR. KOMUVES:
22    Q.    Yes.  So this is a slightly different format than exactly
23  what's in there.
24    But, Mr. Passante, you print ballots for -- for Mercer
25  County, correct?

1    A.    Years.
2    Q.    You printed those ballots?
3    A.    Yes.
4    Q.    Okay.  Now the November ballot, that includes a
5  combination of a grid for the partisan races, and it also
6  includes office block -- office blocks for multiple municipal
7  races, correct?
8    A.    Uh-huh.
9    Q.    And the last ballot, the runoff --
10    A.    Yes.
11    Q.    -- that, in fact, is a ballot that the only thing on it
12  is an office-block race, correct?
13    A.    Correct.
14    Q.    Okay.  So when you said that you don't print office-block
15  ballots for all -- for ten of your eleven clients, you do, in
16  fact, as it turns out, print them for some, correct?
17    A.    School board ballots.
18    Q.    You print school board ballots --
19    A.    Yes.
20    Q.    -- in office-block format?
21    A.    It's -- it's -- it's a different ballot.
22    Q.    I agree with you.  That's a different ballot.  That's for
23  an election, but it is office-block format, is it not?
24    A.    Correct.
25    Q.    All right.  Do you do any of those ballots for main

273

1  municipal elections in your customer counties?
2  A.    No, we do not.
3  Q.    Okay.  All right.  And I think your testimony -- correct
4  me if I'm wrong here, but you said you haven't had your annual
5  meetings with the clerks to prepare for the primary elections
6  yet?
7  A.    No, not yet.
8  Q.    In fact, that wouldn't happen until at least March 25th,
9  right?
10  A.    Usually -- usually the week of the drawing.
11  Q.    Week of the drawing.  Okay.  Before the drawing or after
12  the drawing?
13  A.    The week of the drawing, before the drawing.
14  Q.    Okay.
15        MS. BROMBERG:  The first week of April.
16        MR. KOMUVES:  The first week of April.
17  BY MR. KOMUVES:
18  Q.    All right.  And regardless of what this Court orders, you
19  would still have those meetings with the clerks, correct?
20  A.    Yes.
21  Q.    All right.  And regardless of what happens with this
22  Court, you would still be preparing, you said -- I mean,
23  there's number and numbers in your certification.
24        But regardless of what this Court does, the number of
25  different ballots that your company prepares, designs, and

*United States District Court*
*District of New Jersey*

274

1  prints, that wouldn't change, correct?
2  A.    No.
3  Q.    Okay.  And the number of ballots that's ultimately
4  printed for mail voters, those are circumstances beyond your
5  control, correct?
6        I'm sorry.  Let me withdraw that.
7        The number of mail ballots that your company sends out
8  depend on the number of mail ballots that are requested by
9  voters, right?
10  A.    Correct.
11  Q.    Not by anything this Court might or might not order?
12  A.    No.
13  Q.    Okay.  Now, when you were talking before about your
14  template or master or shell ballots, you said this -- you
15  described these as, I think, a style that your company knows
16  they, meaning the clerks, like.
17        So you're telling us, if I'm understanding, that
18  there's a lot of variability between counties?
19  A.    Yes.
20  Q.    There's not really a uniform ballot?
21  A.    No.
22  Q.    Are there uniform rules for how to design ballots?
23  A.    Could you repeat that?
24  Q.    Are there uniform rules on how to design ballots?
25  A.    Yes.  There's certain laws that we follow, yes,

*United States District Court*
*District of New Jersey*

275

1  absolutely.  You know, bracketing, et cetera.
2  Q.    Right.  But notwithstanding that, there's still a lot of
3  variability.
4  A.    Correct.
5  Q.    Okay.  And, in fact, if that variability didn't exist,
6  that would make your company's job a lot easier, right?
7  A.    Meaning if there was just one standard statewide ballot?
8  Q.    Well, one standard set of rules for -- for ballots, I
9  guess.
10  A.    Well, I mean, the rules are the same.  It's the personal
11  preferences of the clerks of what they feel is clear for their
12  voters.
13  Q.    Okay.  And then, regardless of what this Court orders,
14  once you have meetings with the clerks, your staff has done
15  the layout and design, you said you've got to send these out
16  to the voting machine companies.
17        You have to answer verbally.
18  A.    Correct.  Yes.
19  Q.    Is that a choice of your companies, or is that an
20  instruction of the clerks, or is that -- well, let me ask --
21  let me withdraw that.
22        Why do you do that?  Why do you send them out to the
23  voting machine companies?
24  A.    Because the voting machine companies in recent years are
25  new machines.  Okay.  And what happens is each machine has --

*United States District Court*
*District of New Jersey*

276

1  they have a set of grids, okay, that need to be followed.  And
2  what we do with the layout is we make sure that it works
3  within the parameters of what the voting machine company has
4  so that their counting tabulators are able to count the
5  machines.
6        So we always send PDFs to the voting machine companies
7  of all the ballots, and then what we do is they have us print
8  what they call test decks which they then run to program their
9  machine.
10        But being that this would be a new system for us, we
11  absolutely would want to go to the voting machine companies
12  and have them confirm that, yes, the way we're laying out this
13  ballot is something that is able to be tabulated and is going
14  to work within the parameters of their machine.
15  Q.    There's been -- well, sorry.
16        When your staff is designing these ballots, what
17  software exactly are you using?
18  A.    So we use our own Mac-based programs.  The program is
19  called InDesign.  Okay.  And then what happens -- but also
20  with one of the voting machine companies, ES&S, they have
21  their own software that we use their software to design the
22  ballots as well.
23        So it depends which voting machine company we're
24  working with.
25  Q.    So ES&S machines are using ES&S software.

*United States District Court*
*District of New Jersey*

277

1   A.   Correct.

2   Q.   And then what's the other one, Dominion?

3   A.   Dominion, correct.

4   Q.   And that's where you're using this Mac-based program.

5   A.   That's right.

6   Q.   Okay.  And there has been some testimony that the ES&S

7   software can accommodate a variety of ballot design styles.

8        Do you think that's incorrect?

9   A.   I would say to you that the ES&S system is more difficult

10  design-wise than the Dominion system is.

11  Q.   Okay.  So it's more difficult in every election every

12  year, right?

13  A.   The software is not as user friendly as the InDesign that

14  we use for Dominion.

15  Q.   Okay.  But after you get past this user-friendliness

16  issues, would it be fair to say that the ES&S software can

17  design office-block ballots?

18        MR. NATALE:  Objection to the form of the question.

19        THE COURT:  Who said that?  You have to stand.  She

20  has to know who's speaking.

21        Do you want to rephrase, Counsel?

22        Do we have a lot left here?

23        MR. KOMUVES:  No.

24        THE COURT:  All right.  Because I have a question for

25  Mr. Passante, but I'll wait until the end.

United States District Court
District of New Jersey

278

1        All right.  Now I'll keep you in suspense as to what

2   that question is.

3        MR. KOMUVES:  Yeah.  So I apologize; could I have the

4   question read?

5        THE COURT:  "Okay.  But after you get past this user

6   friendliness issues, would it be fair to say that the ES&S

7   software can design office-block ballots?"

8   BY MR. KOMUVES:

9   Q.   You've testified that the ES&S software you don't find

10  particularly user friendly.

11        Notwithstanding that, can the ES&S software design

12  office-block ballots?

13  A.   I don't know.

14  Q.   I've shown you a number of ballots before that have

15  office-block races.

16        Why did you just tell me you don't know?

17        MR. PARIKH:  Objection, Your Honor.

18        Never mind.  Withdrawn.

19        THE COURT:  I didn't have to do anything there.

20        THE WITNESS:  Mercer County is a Dominion company.

21  BY MR. KOMUVES:

22  Q.   I'm trying to understand.  I thought I had shown to your

23  satisfaction that there are certain ballots that your company

24  prints --

25  A.   Yes.

United States District Court
District of New Jersey

279

1   Q.   -- general election ballots that include office-block

2   races.  They're not all office block, I understand that.

3   A.   Right.

4   Q.   There's a combination.

5        But I am trying to understand why you're telling me

6   that you're not printing office block when I've just shown you

7   those ballots?

8        MR. PARIKH:  Objection.  Mischaracterizes his

9   testimony.

10        THE COURT:  All right.  Overruled.  I want to hear

11  the answer.  And if it's mischaracterized, then the witness

12  will correct it.

13        THE WITNESS:  So the -- the -- we're not -- as I said

14  to you, they're all new machines, okay.  And we're not 100

15  percent sure what the capabilities of these machines are or

16  what they're not without running them past Dominion, okay.  I

17  mean, past ES&S.

18        So if you want me to say to you, yes, 100 percent sure

19  that I'm sure, I'm not going to say that to you because I

20  would want to run it past Dominion -- I mean, ES&S first and

21  make sure that they tell me, yes, that it works.

22  BY MR. KOMUVES:

23  Q.   All right.  Those ballots that I showed you, at least the

24  ES&S ones, did ES&S raise any objections to the work that your

25  company and your staff of union workers did in designing them?

United States District Court
District of New Jersey

280

1        MR. NATALE:  Objection.  I don't think the record is

2   clear which one of those ballots are ES&S, if any.

3   BY MR. KOMUVES:

4   Q.   Do you know, Mr. Passante, which of those ballots are

5   ES&S?

6        THE COURT:  Rephrase.

7        THE WITNESS:  Give me a minute.  I'll look at them

8   again.

9        THE COURT:  Do you have a lot left, Counsel,

10  because --

11        MR. KOMUVES:  No.

12        THE COURT:  All right.

13        Is there any redirect?

14        MR. NATALE:  Your Honor, I know you've heard this

15  before, but I have three questions.

16        THE COURT:  Okay.  I'm going to count those.

17        THE WITNESS:  So the only one would be Hudson County.

18  BY MR. KOMUVES:

19  Q.   The only one would be Hudson County Clerk?

20  A.   Hudson County Clerk, correct.

21  Q.   What I'm asking, though, is, when you submitted those

22  ballots to ES&S for their review --

23  A.   Uh-huh.

24  Q.   -- did they raise any concerns or objections?

25  A.   No.

United States District Court
District of New Jersey

281

1  Q.  Did ES&S ever raise concerns or objections with any of
2  the ballots that I've shown you up there?
3  A.  No, there's only the Hudson County one, and I just said
4  no.
5  Q.  That's the only ES&S one?
6  A.  Correct.
7  Q.  Okay.  Did Dominion raise any concerns with the ballots
8  that I've put before you?
9  A.  No.
10  Q.  All right.
11      MR. KOMUVES:  I have nothing further, Your Honor.
12      THE COURT:  Three questions?
13      MR. NATALE:  Three questions, Your Honor.
14      THE COURT:  And nobody else has any questions?
15      All right.  Go ahead.
16  (CROSS-EXAMINATION BY MR. NATALE:)
17  Q.  Mr. Passante, do you get paid any less based on the
18  design of the ballot?
19  A.  No.
20  Q.  Okay.  Is a 2023 legislative race master any use to you
21  in this election?
22  A.  No.
23  Q.  Is a school board portion of a prior ballot any use to
24  you in this election?
25  A.  In the primary election?

282

1  Q.  Yes.
2  A.  No.
3      MR. NATALE:  No further questions.
4      THE COURT:  All right.
5      Mr. Passante, I want to dismiss you, but I have a
6  question for you.
7      All right.  So the attorneys have all been couching
8  this in -- I'll paraphrase -- if I order a change in the
9  ballot, to an office ballot, what would happen?  I think your
10  words were "chaos."  Correct?
11      THE WITNESS:  Yes.
12      THE COURT:  So erase me from the equation and erase
13  this entire courtroom.  One of the county clerks, they decide
14  their preference is office ballot, and they come to you and
15  your company and say, This is how we want it done.  You tell
16  them No, get another vendor?
17      THE WITNESS:  No.
18      THE COURT:  It would be chaos or would you find a way
19  to do it?
20      Do you see the difference between my question and the
21  one that these guys have been asking?
22      THE WITNESS:  Yes.
23      THE COURT:  So what do you tell your client?  What do
24  you tell the county clerk when he or she says, We want this
25  done.  We made a decision that we prefer this ballot in this

283

1  county for this election.  Do you say yes or no?
2      That's my first question.
3      THE WITNESS:  Yes.
4      THE COURT:  And you find a way to do it, correct?
5      THE WITNESS:  One hundred percent, yes.
6      THE COURT:  Now I'm good.  You're permanently
7  excused.  Thank you for your time.
8      MR. PARIKH:  Your Honor, may I redirect on that?
9      THE COURT:  No.  Next witness.
10      MR. PARIKH:  Note my objection to not being able to
11  redirect on the question.
12      THE COURT:  I'll note it.  Objection noted.
13      MR. KOMUVES:  Andrew Appel.
14      THE COURT:  You're excused, Mr. Passante.
15      THE WITNESS:  Thank you, Judge.
16  (Witness is excused.)
17      THE COURT:  Do you know who the next witness is?
18      MR. KOMUVES:  Andrew Appel.
19      THE COURT:  All right.  In about ten minutes, I want
20  to give a break to court staff and whoever else needs one.  So
21  do you want to take that break now while we're waiting for
22  this witness so that we can keep moving, or do you want to do
23  a little bit of direct exam?
24      How long is this going to be?
25      MR. KOMUVES:  So this is one of the experts where I'm

284

1  just going to ask them to attest to their --
2      THE COURT:  All right.  Let's do that.
3      MR. KOMUVES:  This is also the witness with the
4  sequestration issue.
5      THE COURT:  I've already addressed that issue.  So
6  why don't you just do your brief direct, and then we're
7  probably going to take a break, folks, for at least my staff,
8  and maybe you-all need one too, and then you can
9  cross-examine.
10      (Brief pause.)
11      MR. PARIKH:  Judge, while we're waiting for this
12  witness, can I make a record?
13      THE COURT:  Sure.  Well, do you want to do it now or
14  after the witness?
15      MR. PARIKH:  I can do it now.
16      THE COURT:  Because I didn't allow you a re-redirect?
17      MR. PARIKH:  That's correct, Your Honor.
18      THE COURT:  All right.
19      MR. PARIKH:  Which -- which I -- which I understand,
20  Your Honor.  But I think the key component in terms of
21  redirect on that, Your Honor, is not about whether he would do
22  it or not but about when the clerk in your hypothetical would
23  have asked him.
24      And that to me was the relevant question, now that the
25  witness is not here, and that is the reason --

285

1          THE COURT:  I think the context was clear.

2          MR. PARIKH:  -- to redirect.

3          THE COURT:  I think the context was clear.  If I

4    order it, it's chaos.  If the county clerk asks him to do it,

5    he'll find a way to get it done.

6          I think the context was clear in the question.  That's

7    the answer from the witness.  Whether you guys like that

8    answer or not is up to you.

9          MR. NATALE:  Can I highlight one difference between

10   my question and yours?

11         Your question, I felt, was clearly phrased for one

12   county clerk, whereas I asked if the Court ordered it that it

13   doesn't call for any one.  I do think that's a big difference.

14         THE COURT:  Your objections are all noted.

15         MR. PARIKH:  Thank you, Judge.

16         THE COURT:  You're welcome.

17         Is the witness ready or on the way?

18         MR. KOMUVES:  On his way, apparently.

19         (Brief pause.)

20   (ANDREW WILSON APPEL, HAVING BEEN DULY SWORN/AFFIRMED,

21   TESTIFIED AS FOLLOWS:)

22         THE DEPUTY COURT CLERK:  Please state your name and

23   the spelling of your last name for the record.

24         THE WITNESS:  Andrew Wilson Appel, A-P-P-E-L.

25   (DIRECT EXAMINATION BY MR. KOMUVES:)

*United States District Court*
*District of New Jersey*

286

1    Q.    Good afternoon, Dr. Appel.  As a result of the

2    stipulations of counsel, I'm just going to have a couple of

3    questions for you rather than eliciting a full direct

4    examination from you.

5          So sorry if this is a little bit of a surprise.

6          First of all, you furnished us with a copy of your

7    curriculum vitae dated March 17th, 2024, or at least furnished

8    a link to us, correct?

9    A.    Correct.

10         MR. KOMUVES:  May I approach, Your Honor?

11         THE COURT:  You may.

12   BY MR. KOMUVES:

13   Q.    Is that it?

14   A.    Yes, this is my CV.

15   Q.    And that is complete and accurate, correct?

16   A.    Yes.

17   Q.    All right.  Second, Dr. Appel, you prepared a report

18   January 24, 2024, entitled Capability of New Jersey Voting

19   Equipment to Handle Office-Block Ballots.

20         Do you recall that?

21   A.    Yes.

22   Q.    Is everything in that report true and correct?

23   A.    Yes, except for one or two issues about which county uses

24   exactly which voting machine, which I corrected in my

25   supplemental report.

*United States District Court*
*District of New Jersey*

287

1    Q.    Which is about what I'm going to get to.

2          And you then submitted a report to us March 24 entitled

3    Supplemental Expert Report, correct?

4    A.    That's correct.

5    Q.    Is everything in that report true and correct?

6    A.    Yes.

7    Q.    Okay.

8          MR. KOMUVES:  That concludes my direct questioning.

9          THE COURT:  I appreciate that.

10         Listen.  We're going to take a break.  I want to take a

11   break for my staff, so why don't we just hold off on cross for

12   ten minutes.  Everyone take a break.  We'll get back on the

13   record and continue.

14         Thank you.  Remain seated.

15         (A short recess occurred.)

16         THE DEPUTY COURT CLERK:  Everyone remain seated.

17         THE COURT:  All right.  Folks, when you're ready,

18   let's commence with cross-examination when you guys are ready

19   to go.

20         MS. DeANNA:  Good evening, Your Honor.

21         THE COURT:  Good evening.

22         MS. DeANNA:  My name is Marissa DeAnna.  I'm from

23   Spiro Harrison & Nelson, representing the Monmouth County

24   Clerk.

25         THE COURT:  That's right.  Whenever you are ready to

*United States District Court*
*District of New Jersey*

288

1    proceed, feel free.

2          MS. DeANNA:  Thank you.

3    (CROSS-EXAMINATION BY MS. DeANNA:)

4    Q.    Good evening, Dr. Appel.  I understand you were in the

5    courtroom earlier today.

6    A.    Yes.

7    Q.    And you heard some testimony from Mr. Ryan Macias?

8    A.    I think I may have heard the last 15 or 20 minutes of his

9    testimony.

10   Q.    You believe it was 15 to 20 minutes?

11   A.    I came into the courtroom at about 2:30 after driving

12   from Harrisburg.

13   Q.    Okay.  And do you recall what was being discussed during

14   those 15 to 20 minutes?

15   A.    I think he was talking about order of operations in

16   programming voting machines with candidates and the layout.

17   Q.    And you also heard some of Mr. Kim's direct testimony; is

18   that accurate?

19   A.    Yes.

20   Q.    And were you aware that there was a sequestration order

21   in this matter?

22   A.    No.

23   Q.    Okay.  And when did you first discuss this matter with

24   plaintiffs' attorneys?

25   A.    The matter of sequestration or the --

*United States District Court*
*District of New Jersey*

289

1    Q.    Sorry.  This matter generally, this case.

2    A.    In December, Mr. Komuves asked me if I could write a

3    report about the capabilities of voting machines used in

4    New Jersey.

5    Q.    And did you ever speak to any of the plaintiffs?

6    A.    No.

7    Q.    Okay.  And did you ever speak to any of the plaintiffs'

8    campaign managers?

9    A.    I was not aware of who the plaintiffs were until after my

10   expert report was submitted and the case was filed.

11   Q.    Okay.  You filed two reports -- that's correct? -- an

12   initial report and a supplemental report?

13   A.    That's right.

14   Q.    And in your initial report, you had mentioned that you

15   were discussing elections where there are several separate

16   contests with several candidates; is that right?

17   A.    I can't recall exactly, but in referring to office-block

18   ballots, it's often the case there are several separate

19   contests.

20   Q.    And were you aware that in the -- the case at hand was a

21   case about a primary election?

22   A.    I don't recall.  As I said, I -- when I wrote the initial

23   report filed January 24th, I was not aware of who the

24   plaintiff might be or that there was even a case.

25   Q.    Okay.

290

1         MS. DeANNA:  Your Honor, if I may approach with

2    ECF -- Exhibit ECF 5, the initial report?

3         THE COURT:  You may.

4         MR. PUGACH:  Your Honor, is this -- I'm sorry.  If

5    this is the Appel cert, I'm not sure if it's marked yet.

6         MS. DeANNA:  Oh, I'm sorry?  Was it not marked yet

7    when we did the draft?

8         MR. PUGACH:  That's my bad.  I don't think I marked

9    it.

10        THE COURT:  All right.  So what are we going to call

11   it?

12        MR. PUGACH:  P-11 it would be, then.

13        THE COURT:  So P-11.

14        (Plaintiff's Exhibit 10 in evidence.)

15        MR. PUGACH:  Apologies, Your Honor, my mistake.  It's

16   P-10.

17        THE COURT:  P-10 is the report.

18        MR. PUGACH:  P-10.

19        THE COURT:  So it's already in, P-10.

20        MR. KOMUVES:  There's two reports, January 24 and

21   then --

22        THE COURT:  Which one is this one?

23        MS. DeANNA:  This is the January 24th.

24        THE COURT:  So what's that number, folks?

25        MR. KOMUVES:  P-10.

291

1         MR. PARIKH:  Your Honor, that's -- P-10 was marked by

2    Mr. Komuves, and he introduced it to this witness --

3         THE COURT:  All right.  Let's go.  P-10.

4         MS. DeANNA:  Okay.

5         THE COURT:  You guys are running out of time.  I'm

6    telling you.

7    BY MS. DeANNA:

8    Q.    Do you see the paragraph that's headed office-block

9    versus row-and-column ballot?

10   A.    Yes.

11   Q.    And your first sentence is "For an election in which

12   there are several separate contests, such as governor,

13   senator, legislator, mayor, et cetera, each with several

14   candidates, all to be displayed on the same sheet of paper or

15   voting machine screen, there are different ways that the

16   ballot can be laid out."

17   A.    Yes.

18   Q.    And so would it fair to say that you were opining about

19   contests in which -- I'm sorry.

20        Let me rephrase:  Would it be fair to say that you were

21   opining about races in which there are several contests with

22   several candidates?

23   A.    In this paragraph, yes.

24   Q.    Okay.  And in your initial report you opined that sources

25   suggest that ExpressVote XL machines can accommodate an

292

1    office-block ballot; is that correct?

2    A.    Yes.

3    Q.    As part of your engagement in this case, you didn't

4    physically examine an ExpressVote XL voting machine that's

5    used in New Jersey?

6    A.    No, not as part of my work in this case.

7    Q.    And you didn't speak to anyone at ES&S about the

8    ExpressVote XL voting machine in relation to this matter?

9    A.    No.

10   Q.    You didn't speak to any superintendent of elections that

11   has experience with the ExpressVote XL voting machines?

12   A.    No.

13   Q.    And you admit in your initial report that no state

14   currently uses the ExpressVote XL voting machine with an

15   office-block ballot; is that accurate?

16   A.    I believe that's what I said in my initial report.

17   Q.    In your initial report, you made the claim that ES&S's

18   brochure suggests that the ExpressVote XL can support an

19   office-block ballot; is that accurate?

20   A.    That's accurate.

21   Q.    But the ES&S brochure does not say that it can support an

22   office-block ballot; is that correct?

23   A.    That's correct.

24   Q.    And you stated also in your report that the ES&S brochure

25   suggests that the ExpressVote XL machine can support an

293

1  office-block ballot because it says that the ExpressVote XL
2  machine supports many layout options, including grid style for
3  party voting and rows or columns.
4      Wouldn't grid style for party voting or rows or columns
5  correspond more with the bracket ballot style than
6  office-block style?
7  A.  I think it's possible to do grid styles so that they're
8  not bracket style, but, in general, the grid style is the one
9  that I understand supports in this case the notion of the
10  county-line, and the office-block does not.
11  Q.  Okay.  And you also state in your initial report that,
12  because the state of Washington approved the ExpressVote XL
13  and also uses office-block ballots, that this suggests that
14  ExpressVote XL can accommodate an office-block ballot; is that
15  accurate?
16  A.  I believe that's accurate, yes.
17  Q.  You're not aware, though, of ExpressVote XL ever being
18  used in Washington for an office-block ballot; is that
19  accurate?
20  A.  That's accurate.
21  Q.  And then you also filed a supplemental report in this
22  matter; is that correct?
23  A.  Yes.
24  Q.  And that was March 12th of 2024?
25  A.  Yes.

294

1  Q.  And then suddenly in that report, you say that
2  ExpressVote XL was used in Atlantic County for an office-block
3  ballot; is that true?
4  A.  In Atlantic County, it's a mixed ballot.  Part of it is a
5  grid style with rows and columns, and part of it is a separate
6  contest that's more in the nature of an office-block.
7  Q.  And the one that was in the nature -- I'm going to use
8  your words -- in the nature of an office-block, that was a
9  school board election; was it not?
10  A.  I believe it was, yes.
11  Q.  And it was one contest, correct?
12  A.  It was one contest.
13  Q.  It was not multiple contests?
14  A.  In an office-block ballot, you would not put multiple
15  contests into the same block.  The whole point of an
16  office-block ballot is that each office is contested in a
17  separate block.  That's called an office-block, and you have
18  multiple office blocks on the ballot.
19      So it would be essentially impossible to have an
20  office-block that's a single block with more than one contest
21  in it.
22  Q.  Well, let me ask a little bit of a different question.
23      There was only one contest on that ballot that you
24  claim was an office-block style, correct?
25  A.  That's correct.

295

1  Q.  And that was the school board election?
2  A.  Right.  In addition to the other block that was a grid
3  style.
4  Q.  I'm sorry.  I just didn't hear.
5  A.  There were two blocks on that ballot.  One was a grid
6  style, which had multiple offices in the rows and columns
7  format, and the other was a school board, which was a single
8  office block.
9  Q.  Okay.  And, again, in your initial report, you said you
10  had never heard of an office -- I'm sorry -- ExpressVote XL
11  machine doing an office-block ballot; is that correct?
12  A.  I was unaware at that time of that evidence, that
13  ExpressVote XL can support multiple blocks, some of which are
14  office blocks, some of which are rows and columns in the grid
15  style.
16      And then in between the time of filing my initial
17  report and filing my supplemental report, I came across this
18  single ballot that indicates this capability of the
19  ExpressVote XL.
20  Q.  And would you consider yourself to have expertise in the
21  area of voting machines?
22  A.  Yes.
23  Q.  But you did not know that ExpressVote XL supposedly could
24  be used to do an office-block ballot?
25  A.  I didn't have hard evidence of it at that time; that's

296

1  right.
2      MS. BROMBERG:  Objection, Your Honor, with respect to
3  the definition of "office-block ballot" on the ExpressVote XL.
4      Are we talking about the office-block layout of a grid
5  template, or are we talking about specifically just an
6  office-block ballot?
7      THE COURT:  I mean, he already answered the question.
8  If you're going to object, you have to object before he
9  speaks, right?  So I would reserve that objection for the next
10  time she might ask that question, but for now, it's already in
11  evidence.
12      You're not going to revisit.
13      Counsel, you may proceed.
14      Do we have a lot left here?
15      MS. DeANNA:  There's not too much.
16      THE COURT:  All right.
17      MS. DeANNA:  It's not terrible.
18      THE COURT:  That's good.
19  BY MS. DeANNA:
20  Q.  And you also claim in your initial report that, to the
21  extent that ES&S voting equipment supports office-block
22  ballots, the corresponding election management system already
23  supplied by the vendor to New Jersey counties will also
24  support office-block ballots.  Is that correct?
25  A.  Correct.

297

1   **Q.**   You didn't physically examine the ES&S software, did you?

2   **A.**   No. But I know that ES&S submits software for

3 certification to states such as New Jersey after submitting it

4 to the Election Assistance Commission for a certification.

5 And although New Jersey does not necessarily require EAC

6 certification before deciding to certify election equipment

7 for use in New Jersey, the fact that ES&S has submitted this

8 to a national agency, the EAC, and that many states rely on

9 this certification for the election management software that

10 is used in many states -- this software would be unacceptable

11 for use in most states if it could not support an

12 office-block.

13   **Q.**   So, again, in your initial report you were not aware of

14 anywhere that used ExpressVote XL to do an office-block

15 ballot; is that true?

16     MS. BROMBERG: Objection, Your Honor. Again, this is

17 a question with regard to how we are defining an office-block

18 ballot. Are we defining the layout, an

19 office-block-like-layout ballot design, or are we talking

20 about an off-of-the-grid template, or are we talking about a

21 pure office-block template?

22     THE COURT: All right. Doctor, when you're

23 questioned and counsel refers to an "office-block ballot,"

24 what does that mean to you?

25     THE WITNESS: An office-block ballot is one where

298

1 each office, each contest, is in a separate block with the

2 candidates ordered in that block -- and perhaps in a different

3 block, the candidates who are not -- for example, the primary

4 election, the candidates could be ordered not necessarily in

5 the same party order that -- each contest lists the candidates

6 for that contest only.

7     And on a separate portion of the ballot, whether it's a

8 paper ballot or on the screen, there is another set of

9 candidates for that office. And on a separate part of the

10 ballot, there's another block with the candidates for that

11 office. And then there's no row across or column down that

12 links all the different candidates for different offices. You

13 know, just by the layout of the ballot, it's clear that you're

14 making a different choice in each different office.

15     That's what I mean by an office-block ballot. That's

16 the most common kind of ballot used in the United States.

17 BY MS. DeANNA:

18   **Q.**   And in New Jersey, have you ever seen an ExpressVote XL

19 ballot that had an office-block layout for every contest?

20   **A.**   No, not for every contest, just for some contests.

21   **Q.**   Okay. And you've never personally used the ES&S

22 software, have you?

23   **A.**   No.

24   **Q.**   And you didn't speak to anyone at ES&S about the software

25 that is used in New Jersey, did you?

299

1   **A.**   No, I did not.

2   **Q.**   And if an office-block layout for all contests was

3 possible with ES&S software, you can't opine as to how many

4 pages that ballot might be, correct?

5   **A.**   When you fit the layout -- you have to fit the candidate

6 on -- in the layout on the screen of the machine. And so you

7 fit, in any state, as many candidates and -- as many contests

8 as fit on one page, you fit on one page. And if there's more

9 than fit on one page (sic), then you go to the second page.

10     In general, New Jersey does not have that many offices

11 contested in any given election. So it's usually possible to

12 fit on one page.

13   **Q.**   You've never seen that with an ExpressVote XL machine in

14 New Jersey, correct?

15   **A.**   I have not.

16   **Q.**   Or in any other state, correct?

17   **A.**   ExpressVote XL in that way, no.

18   **Q.**   Okay. And you also opine as to the Sequoia AVC Advantage

19 equipment's capabilities; is that accurate?

20   **A.**   Yes.

21   **Q.**   In your initial report, you opine that you know of no

22 reason why Sequoia AVC Advantage could not support an

23 office-block ballot layout. Accurate?

24   **A.**   Right.

25   **Q.**   And then your supplemental report, you point to a Bass

300

1 River Township ballot; is that correct?

2   **A.**   If I recall correctly, it may have been.

3   **Q.**   And, again, this was one contest that had the

4 office-block layout; is that correct?

5   **A.**   The point of that contest was that the choices you make

6 in voting don't have to be all in the same column, that

7 there's a grid of multiple rows and columns. In this case,

8 the grid does not have significance of attaching candidates to

9 each other, so it's really just a rectangle in which there's,

10 you know, two-by-four or whatever the number is of possible

11 candidates to vote for, and the voter's allowed to vote for

12 any two, if I recall correctly, of those candidates regardless

13 of what row they're in and what column they're in.

14     So in that case, it behaves more like an office-block

15 that happens to be laid out in two columns than, like, a

16 county-line or grid ballot layout.

17   **Q.**   And it was not multiple contests that that was used for,

18 correct?

19   **A.**   That's correct. But it indicates that the voting machine

20 is not restricted in its programming to insist that all the

21 candidates for a single office be lined up in a particular

22 way, that there's flexibility in programming that machine to

23 more layouts than have been traditionally used in New Jersey.

24   **Q.**   Well, I mean, did you ever physically examine a Sequoia

25 AVC Advantage machine for the purpose of determining which

301

1   ballot formats it can support?

2   A.   Not for that purpose.

3   Q.   And in relation to your -- providing your opinion in this

4   matter, you did not speak to anyone at Sequoia; is that

5   accurate?

6   A.   Sequoia is out of business.

7   Q.   Okay.  So the answer to that would be no.

8   A.   That would be no.

9   Q.   Okay.

10        And you also opine as to Dominion's capability; is that

11  correct?

12  A.   Yes.

13  Q.   And you state that Dominion accommodates the office-block

14  ballot in other states; is that accurate?

15  A.   Yes.

16  Q.   And you did not physically examine a Dominion machine

17  used in New Jersey.  Accurate?

18  A.   No.

19  Q.   And you did not physically examine the Dominion software

20  that is used in New Jersey.  Accurate?

21  A.   That's correct.

22  Q.   And did you not speak to anyone from Dominion who

23  provides services to New Jersey counties; is that correct?

24  A.   Not in connection with this case.

25  Q.   Okay.  And you did not opine as to whether Dominion would

United States District Court
District of New Jersey

302

1   need a certain amount of time to be able to prepare its

2   software in New Jersey if there was a change in the ballot

3   design, correct?

4   A.   Dominion wouldn't need to make any change to the software

5   as defined as the election program that runs in the voting

6   machine --

7   Q.   Did you -- sorry?

8   A.   -- which is a different question from Dominion as a

9   provider of election services.

10  Q.   Well, did you opine as to whether -- whether Dominion

11  would need a certain amount of time to prepare its software?

12  A.   What I opine is that the same software that runs in the

13  machine can accommodate office-block layouts without any

14  change at all.

15  Q.   Okay.  And you state in your supplemental report that

16  voting machines come from manufacturers programmed with

17  software that accommodates many ballot designs.  Correct?

18  A.   That's correct.

19  Q.   And you state that no software update or hardware update

20  would be required for any of the machines.  Is that accurate?

21  A.   That's accurate.

22  Q.   But when you wrote your initial report, you didn't even

23  know that ExpressVote supposedly could be used to do an

24  office-block ballot in New Jersey, right?

25  A.   I hadn't seen the sample ballots at that time that

United States District Court
District of New Jersey

303

1   indicate the capability of the ExpressVote to flexibly program

2   multiple blocks, some of which are office-blocks and some of

3   which are grids.

4   Q.   So the answer to my question would be no, then, right?

5   A.   At the time I wrote my first report, that's correct.

6        MS. DeANNA:  I have no further questions, Your Honor.

7        THE COURT:  All right.  Thank you.

8        Any -- oh.

9        MR. PARIKH:  Sorry, Judge.  I just have a couple of

10  questions of Mr. Appel on a different topic.

11       THE COURT:  Okay.

12  (CROSS-EXAMINATION BY MR. PARIKH:)

13  Q.   Mr. Appel, how are you?

14  A.   Fine.

15  Q.   I know it's been a long day.

16       MR. PARIKH:  Your Honor, may I approach?

17       THE COURT:  You may.

18  BY MR. PARIKH:

19  Q.   I'm going to show -- Mr. Appel, I'm going to show you

20  what has been marked in evidence as Defendant's Exhibit

21  Number 3.

22       I need you to take a look at that.  It's a privilege

23  log.

24       If you can turn to page number 7, Mr. Appel.  They are

25  double-sided pages.  Try to save some paper.

United States District Court
District of New Jersey

304

1        Are you there?

2   A.   Yes.

3   Q.   All right.

4        You see at the top it says:  Plaintiffs' privilege log,

5   Andrew Appel, expert, right?

6   A.   Yes.

7   Q.   And do you recognize what this listing is?

8   A.   I can guess what it is.

9   Q.   Give us your best guess?

10  A.   It seems to be a record of communications between me and

11  Mr. Komuves in December.

12  Q.   Right.  So is December 18th, 2023, the first time that

13  Mr. Komuves reached out to you respect to this case?

14  A.   That sounds about right, yes.

15  Q.   That was via email?

16  A.   That I don't recall, whether it was by email or by phone.

17       THE COURT:  Is there an objection?  Is there an

18  objection?  Otherwise don't interrupt, Counsel.  Let him

19  continue.

20       MS. BROMBERG:  There is an objection.  I'll let it

21  go, Your Honor.

22       THE COURT:  Withdrawn.  Continue.

23       MR. PARIKH:  Thank you.

24  BY MR. PARIKH:

25  Q.   Mr. Appel, if you can now turn to page 14.  This is a

United States District Court
District of New Jersey

305

1  different listing of emails.

2      Do you see that under your name?

3  **A.**  Yes.

4  **Q.**  Okay.  It shows that a retainer agreement for signature

5  was sent to you January 23rd; is that right?

6  **A.**  Yes.

7  **Q.**  Is that accurate, that a retainer agreement was sent to

8  you on January 23rd?

9  **A.**  Yes, I think so.

10  **Q.**  Did you start preparing your report in December 2023?

11  **A.**  Yes.  Yes, I did.

12  **Q.**  Why wasn't a retainer agreement sent to you in January?

13  **A.**  I don't always insist on a retainer agreement for my

14  services, you know, if I have confidence that the attorney

15  that's asking for my services is not some sort of fly-by-night

16  lawyer who is going to disappear without paying me.

17  **Q.**  And when you were engaged to do this work in December,

18  were you given a timeline upon which you were going to try to

19  complete a report?

20  **A.**  Yes.  I think Mr. Komuves said that he would like to have

21  it as soon as possible by the end of the month.

22  **Q.**  By the end of December?

23  **A.**  But that's just my vague recollection.

24  **Q.**  Okay.  Thank you.

25      MR. PARIKH:  No further questions, Your Honor.  May I

United States District Court
District of New Jersey

306

1  approach to get that exhibit back?

2      THE COURT:  You may.

3      Do we have any redirect, or are we moving on to the

4  next witness?

5      MR. PUGACH:  Next witness.

6      THE COURT:  All right.  Doctor, you're excused.

7  Thank you.

8      THE WITNESS:  Thank you.

9      THE COURT:  How many witnesses do we have left, by

10  the way?

11      MR. PUGACH:  Five.

12      THE COURT:  I'm telling you now that, at 7:09, I'm

13  not breaking my fast on the bench.  So when I turn into a

14  pumpkin, we're done.  So you have to manage these witnesses

15  over the next hour, however you want to proceed.

16      I think we can get through them if your direct is one

17  question, and then you're deferring to cross.

18      MR. PUGACH:  Your Honor --

19      THE COURT:  But I'm letting you know I'm half machine

20  and half human.  I have to at some point drink water and eat,

21  so...

22      MR. PUGACH:  Understood, Your Honor.  For three of

23  the witnesses, it's -- other than the one question, it's

24  cross, and for the other two witnesses it's very short.

25      THE COURT:  Okay.  Then I think we should make it.

United States District Court
District of New Jersey

307

1      MR. PARIKH:  Those are only plaintiffs.

2      THE COURT:  How many do you have?

3      MR. PARIKH:  Three or four.

4      THE COURT:  All right.  There's no other stipulations

5  or anything -- where did you guys intend this proposal would

6  get you, that we would just go until midnight?

7      MR. PARIKH:  No, Judge.

8      THE COURT:  Right.  So I mean, look:  I'm telling

9  you, when we get to a little bit over an hour from now, it's

10  done.  Whatever I have, I have.

11      So you guys work it out.  Maybe you streamline how many

12  of these plaintiffs' witnesses you have left, and who's

13  testifying for the defense?

14      MR. PARIKH:  So we have Ms. Hanlon, who is the

15  Monmouth County Clerk --

16      THE COURT:  Right.

17      MR. PARIKH:  -- who is a party to this case.

18      THE COURT:  Right.

19      MR. PARIKH:  We have Noah Dion, Mr. Kim's campaign

20  manager.  That should be 20 minutes at most.  And then --

21      THE COURT:  What do you need the campaign manager for

22  when you have the candidate?

23      MR. PARIKH:  Because the campaign manager has

24  knowledge and information that the candidate would not have

25  had, Your Honor.

United States District Court
District of New Jersey

308

1      THE COURT:  Would not have had or you asked him and

2  he didn't know?

3      MR. PARIKH:  No.  He would not have had it because he

4  was not part of those communications directly.

5      THE COURT:  All right.

6      MR. KOMUVES:  Your Honor, this issue relates to the

7  issue of timeline --

8      THE COURT:  Okay.  Let's go on timeline.

9      MR. KOMUVES:  -- when the privilege log and the

10  questioning --

11      THE COURT:  How long does it take to get a witness

12  into sequestration into the courtroom?  Are they being

13  notified in advance that they're on deck?

14      MR. PUGACH:  Someone just went to get --

15      THE COURT:  Yeah, I know, but it shouldn't be done

16  like that, right?  This is the most like -- it's got to be

17  much more seamless than this, right?

18      You know who the next witness is, and you know who the

19  witness is after that, so someone needs to let that witness

20  know, Hey, you're on deck, you know; you can be outside

21  waiting wherever they need to be.

22      And then, when this witness is done, they're walking

23  in.  That's how this needs to be done.

24      And this is why you guys are at 6 o'clock and still

25  fumbling around trying to get the witnesses done.  So figure

United States District Court
District of New Jersey

309

1  it out.  Start moving, because around 7:10 I adjourn.  Okay.

2       By the way, how many of these experts are redundant?

3  Are any of them ones that you can rely upon the reports only?

4  Because if --

5       MR. PARIKH:  That's what we tried to do, Your Honor.

6       THE COURT:  Right.  It's for you also, then.  You

7  guys should be mindful on the defense side that I'm stopping a

8  little after 7, so you may want to say, We don't need to

9  cross-examine this witness, because we want to make sure that

10  we direct this witness.

11       What I'm not going to do is be here until midnight.  So

12  if you guys want to brainstorm that, that's fine.

13       MR. PARIKH:  I'm happy to brainstorm, Your Honor, and

14  I completely understand your concerns, but it is highly

15  prejudicial to defendants that the plaintiffs here, who had

16  multiple months to prepare this case -- we had two weeks

17  and --

18       THE COURT:  I've already heard this argument, so...

19       MR. PARIKH:  They have literally wasted the whole

20  day.  The first examination took multiple hours.

21       THE COURT:  Cross-examination seemed half wasteful

22  too, but I let you guys go through that and didn't cut you

23  guys off.

24       MR. PARIKH:  I understand, Your Honor, and we're --

25       THE COURT:  You had more than one -- you had three

United States District Court
District of New Jersey

310

1  different -- four different lawyers cross-examining the same

2  witness.

3       MR. PARIKH:  All of these lawyers here, Your Honor,

4  represent different parties.

5       THE COURT:  I understand.

6       MR. PARIKH:  They have different interests.  They're

7  all constitutional officers that have different obligations.

8  They have different ballots.  They have different machines.

9       And so we streamlined it pretty well, I would think,

10  considering that there's 19 parties plus two interested

11  parties in terms of the county clerk.

12       THE COURT:  Meanwhile, it's five minutes, and I'm

13  still waiting for the witness.

14       MR. PARIKH:  I understand, Your Honor.  We're ready.

15  You can take one of the plaintiffs and put them on the stand

16  right now.  Let's go.

17  (JULIA SASS RUBIN, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED

18  AS FOLLOWS:)

19       THE DEPUTY COURT CLERK:  Please state your name and

20  the spelling of your last name for the record.

21       THE WITNESS:  Julia Sass Rubin, R-U-B-I-N.

22       THE COURT:  You may be seated.  Thank you, sir.

23       MR. PUGACH:  Your Honor, I'd like to approach the

24  witness with what is going to be marked as P-11.  It's the --

25       THE COURT:  You may approach.

United States District Court
District of New Jersey

311

1       THE WITNESS:  Is this for me?

2       THE COURT:  I don't know.  I didn't put that there.

3  Kim, is the water for the witness, or is that left over from

4  another witness?

5       THE WITNESS:  Thank you very much.  Thank you.

6  (DIRECT EXAMINATION BY MR. PUGACH:)

7  Q.  Good evening, Dr. Rubin.

8  A.  Hi.

9  Q.  I just showed you a document that's marked as P-11.

10      Are you familiar with that document?

11  A.  I am.

12  Q.  And is that your expert report that you submitted in

13  connection with this case?

14  A.  It is.

15  Q.  And at the time that you submitted it, did you believe

16  that everything was true and accurate in that report?

17  A.  Yes.

18  Q.  And did you have time to look at it in preparation for

19  testimony today?

20  A.  I did.

21  Q.  And is there anything that you discovered may or may not

22  be accurate in your original report?

23  A.  So I found one small mistake that doesn't change anything

24  in my findings, but in my analysis of candidates who were

25  endorsed in one county and an opponent was endorsed in a

United States District Court
District of New Jersey

312

1  different county in the same district, I thought that the

2  largest margin in the candidates' performance was 79.

3  It's actually 83.  So that doesn't change --

4  Q.  Is that a stronger effect?

5  A.  Yeah.  It's a stronger effect, and it doesn't change the

6  38 percent average between the 45 candidates.

7  Q.  Thank you, Dr. Rubin.

8       So because the court proceedings are being streamlined,

9  we're actually -- that report is going to be considered your

10  direct testimony, so I want you to understand that, and I'm

11  going turn you over as a witness to counsel.

12  A.  Oh, okay.

13  (CROSS EXAMINATION BY MR. NATALE:)

14  Q.  Good evening, Doctor.

15  A.  Good evening, sir.

16  Q.  Just so make sure I get it right, do you prefer Dr. Rubin

17  or Dr. Sass Rubin?

18  A.  Dr. Rubin.

19  Q.  Okay.

20  A.  Thank you.

21  Q.  Thank you.

22       We are going to try to do this as quickly as possible.

23  I know you've been here a long time today, as everybody else

24  has.

25       We're not going to get too much into your background,

United States District Court
District of New Jersey

313

1  but there's just a couple key questions.
2      First, is it true that you got your Ph.D. in 2002?
3  **A.**   Yes.
4  **Q.**   Okay.  And is it true that your -- the focus of your
5  Ph.D. was the origins of behavior of community development
6  venture capital funds?
7  **A.**   It was.
8  **Q.**   Okay.  And is it a fair characterization to say that the
9  first several years of your career was focused in that topic
10  and related topics?
11  **A.**   Yes.
12  **Q.**   Okay.  And is it fair to say that --
13      MR. PUGACH:  Objection.
14      I don't want to interrupt counsel, but I just thought
15  we had stipulated that, as to the qualifications, that was
16  going to be done on papers.
17      THE COURT:  He can ask a few questions, but I
18  thought -- there's a motion in limine, right, regarding all
19  the experts?
20      MR. NATALE:  Yes.
21      THE COURT:  So why only with this one witness are we
22  going through this background like this?
23      MR. NATALE:  I asked similar to the last witness --
24  similarly just to understand the basis of some of their
25  opinions, not at all to --

*United States District Court*
*District of New Jersey*

314

1      THE COURT:  I'll allow it.  Let's not go through the
2  whole thing.
3      MR. NATALE:  Not at all, Your Honor.
4  BY MR. NATALE:
5  **Q.**   And in your long academic career, and I have a very long
6  CV that shows that, is it accurate to say that you published
7  two academic articles on the subject of ballot design and
8  their impact on elections?
9  **A.**   So not exactly.  I've published two articles on the
10  impact of ballots specifically, and academic journals.  I've
11  also published two policy briefs, and I've published another
12  four academic journal articles about the related New Jersey
13  politics that discuss the impact of the county-line or the
14  political structures around it and another nonacademic article
15  related to that.  And also just a -- dozens of academic and
16  nonacademic presentations on this topic.
17  **Q.**   Okay.  Is this the first case where you've served as an
18  expert witness?
19  **A.**   It is for a court, yes.
20  **Q.**   Okay.  And are you being paid to be here today?
21  **A.**   I am, yes.
22  **Q.**   Okay.  Are you being compensated at a rate of $400 an
23  hour?
24  **A.**   I actually have -- I believe so.  I haven't filed
25  anything for pay yet.

*United States District Court*
*District of New Jersey*

315

1  **Q.**   Okay.  Understood.
2      Is this the first case that you served as an expert
3  witness?
4      THE COURT:  She just answered that.
5      MR. NATALE:  I apologize.
6      THE WITNESS:  Yes.  I have been an expert witness to
7  the U.S. Senate and to other -- to state Senates but never in
8  a court case before.
9  BY MR. NATALE:
10  **Q.**   Have you ever been compensated for any of your
11  election-related research prior to this case?
12  **A.**   No.
13  **Q.**   Okay.
14      I want to dive into your report.  And I'm going to skip
15  ahead because we have limited time.  And on page 11, we get to
16  a page where you take a look at 45 candidates between 2002 and
17  2022 for the House and Senate where they appear on a line in
18  one county but not on a line in another; is that correct?
19  **A.**   Yes.
20  **Q.**   And is it fair to say that you aggregate the results of
21  this, and you also report a median and a mean of how much you
22  proposed the county-line impacted these races?
23  **A.**   Yes.  I come up with an average and a median, correct.
24  **Q.**   Now, is the reason you come up with an average and a
25  median is because you're hoping to eliminate variables that

*United States District Court*
*District of New Jersey*

316

1  might exist in individual races?
2  **A.**   No, no.  It's just a descriptive statistic that people
3  understand.  I mean, I also provide a range of 13 to -- at
4  this point I said 79, but it's actually 83.  So it's just a
5  way of giving people a sense of the data.
6      I also provide a visual to show where they all align
7  and details about how each race broke out.  I'm just trying to
8  provide as much information as possible.
9  **Q.**   Okay.  So you don't believe that this approach that you
10  use isolates the impact of the county-line.
11  **A.**   I'm not sure I understand what you're asking.
12  **Q.**   When we look at the median and means that you came up
13  with, can we be certain that the only thing behind those
14  results is the alleged impact of the county-line?
15  **A.**   No.  It would include other variables that come with the
16  endorsement, which is why I did the follow-up analysis.
17  **Q.**   Okay.  And is it true that there are several variables
18  that might impact the candidate's performance in a race?
19  **A.**   Sure.
20  **Q.**   And is it true that some of those variables might
21  naturally follow the county-line?
22  **A.**   Yes.  That's why I did the subsequent analysis.
23  **Q.**   And would you agree that how well-known a candidate is in
24  a community would impact their performance in the election?
25  **A.**   Potentially, although I didn't find that to be true with

*United States District Court*
*District of New Jersey*

317

1  Senator Lautenberg's race.
2  Q.   And would you believe that whether or not an individual
3  served in a different elected office in that county might
4  impact how they perform when they're running for federal
5  office in that same county?
6  A.   Potentially.  But, again, that didn't seem to necessarily
7  hold.
8  Q.   Okay.
9  A.   But, yes, of course it's possible.  If you don't test for
10  that, you don't know.
11  Q.   Okay.  And did you test for that?
12  A.   No.  Because this is a natural experiment.  So I was
13  looking at how these individuals did in the context of the
14  same race across 45 instances.  So if you had that situation
15  and particular race, you wouldn't see such a consistent
16  pattern.  You'd just see it in that race or in a couple
17  others.  But you're seeing the same pattern of being on the
18  county-line having this substantial positive effect on their
19  results across all 45 races.
20  Q.   So what you would need to find to attribute it to another
21  variable is another consistent pattern throughout the race,
22  correct?
23  A.   Potentially.
24  Q.   Okay.  So I would love to talk about all 45 races;
25  unfortunately, we don't have the time for that.  So I'm going

*United States District Court*
*District of New Jersey*

318

1  to focus on the one that you talk about specifically in your
2  report.
3      Do you recall speaking about the 2020 Republican
4  primary in the 3rd Congressional District?
5  A.   Can you point me to the page?
6  Q.   Yeah.  That should be on that same page 11.
7  A.   Oh, Gibbs and Richter.
8  Q.   Yes.
9  A.   Yes.
10  Q.   Okay.  And there you found that Kate Gibbs had the
11  county-line in Burlington and David Richter had the
12  county-line in Ocean, correct?
13  A.   Right.
14  Q.   And you found that Kate Gibbs outperformed in Burlington
15  as opposed to Ocean, correct?
16  A.   Yes.
17  Q.   Okay.  Now, when you took a look at the data, did you
18  know that Kate Gibbs was a former Burlington County
19  freeholder?
20  A.   I wouldn't be surprised in an instance like that, but,
21  again, that's one example.  The reason I use it is it's a very
22  simple example.  So you have two candidates in two counties,
23  so it's a demonstration of the process I'm using.  It's not
24  meant to be reflective of the 45 races.
25  Q.   And I appreciate that explanation, but right now, I'm

*United States District Court*
*District of New Jersey*

319

1  trying to get to the bottom of what exactly was your thought
2  process when you went into this.  So when I ask a direct
3  question like "Did you know that," to the best of your
4  ability, if you could answer yes or no.
5  A.   I did not know that she held that office, no.
6  Q.   And did you know that she served in that office
7  immediately prior to running in the Republican primary for
8  CD-3?
9  A.   No, sir.  I did not.
10  Q.   Do you think that the fact that she was a Burlington
11  County freeholder also impacted her performance in Burlington
12  County?
13  A.   It very well may have, which is why I did 45 contests.
14  Q.   Okay.  And so, when you're looking at just this contest,
15  which you've highlighted in your report, did you do any
16  statistical analysis that can separate the benefit of her
17  being a freeholder and the alleged benefit of the line?
18  A.   I did not.
19  Q.   Okay.
20      If we go now to the next race that you talk about,
21  which will be directly after that, you talk about a race that
22  you mentioned, which was Frank Lautenberg and Rob Andrews in
23  the 2008 Senate Democratic primary.
24      Do you see that?
25  A.   Yes.

*United States District Court*
*District of New Jersey*

320

1  Q.   Okay.
2      Do you recall or did you know at the time you wrote
3  this report that, at the time of this primary, Rob Andrews was
4  a sitting congressman?
5  A.   Yes.
6  Q.   Okay.  And do you know what district he served in at the
7  time?
8  A.   Yes.  He was, I believe, in the 2nd District.
9  Q.   Okay.  And do you know what geographic area that covered?
10  A.   Yes.  Southern Jersey.
11  Q.   Okay.  And if I told you that his district had Camden
12  County in it, would you have any reason to disbelieve that?
13  A.   No.
14  Q.   If I told you that his district also had Gloucester
15  County in it, do you have any reason to disbelieve that?
16  A.   No.
17  Q.   If I told you that his district had parts of Burlington
18  County, would you have any reason to disbelieve that?
19  A.   No.
20  Q.   Okay.  And if you look at the table, is it clear that Rob
21  Andrews performed better in the southern counties than he did
22  in the northern counties, correct?
23  A.   Right.  That's where he was also in the county-line.
24  Q.   Okay.  So did you do any statistical analysis to
25  determine whether or not Rob Andrews' performance in the

*United States District Court*
*District of New Jersey*

321

1    southern county -- how much of it could be attributed to his
2    long-term incumbent -- incumbency in Congress versus how much
3    could be attributed to the county-line?
4    A.    I did not.
5    Q.    Okay.  And you would agree that that's the same pattern
6    that's at play in the Gibbs/Richter race, correct?
7    A.    I would, but that's why there's 45 races.
8    Q.    Understood.
9          I'm going to go to the next race, then, that you talk
10   about.
11         And we can talk about the 2012 Democratic primary for
12   the 9th Congressional District.  Okay.  And here you have Bill
13   Pascrell running and having the endorsement of Passaic County.
14         Do you recall that?
15   A.    Yes.
16   Q.    Do you recall that this was a district that was
17   redistricted together?
18   A.    Yes.
19   Q.    Okay.  And do you recall that, prior to the redistricting
20   together, Bill Pascrell represented a larger portion of
21   Passaic than his opponent?
22   A.    Yes.
23   Q.    Okay.  And were you aware at the time you did the report
24   that, prior to being a member of Congress, Bill Pascrell was a
25   state legislator that covered Passaic?

322

1    A.    I'm not sure if I knew that, no.
2    Q.    Okay.  Were you aware at the time that you did this
3    report that Bill Pascrell was also the mayor of Paterson,
4    New Jersey, which was the largest city in Passaic?
5    A.    Yes, I did know that.
6    Q.    Okay.  And based off the analysis that you did, are you
7    able to differentiate what -- how much his past history in
8    Passaic County helped him versus how much the county-line
9    alleged help him?
10   A.    No, I did not do that analysis.
11   Q.    Okay.  And would you agree that this is the same pattern
12   that you find in the Lautenberg/Andrews race and in the
13   Gibbs/Richter race?
14   A.    So it's four races -- or three races out of 45.
15   Q.    Understood.  And like I said, I'd be happy to go through
16   all 45.  I could go through more here, but I will rest for the
17   Court and save for my briefs that there are numerous other
18   races that include the same consistent pattern.
19   A.    If I may, I think the other thing that's important is the
20   analysis looking at endorsed candidates who are on the
21   county-line versus endorsed candidates, which is why -- as I
22   mentioned before, that's why I added that analysis, which
23   really encapsulates what you're trying to get at.
24   Q.    Okay.  So let's talk about that, then.
25   A.    Yeah.

323

1    Q.    So you ran a study in your report that said that the
2    endorsements in county-line counties matter more than
3    endorsements in non-county-line counties, correct?
4    A.    I meant -- yes.  What I'm saying is that, if you are
5    endorsed on the county-line, you outperform in 35 out of 37
6    instances.
7    Q.    Okay.  Do you feel that, other than the county-line, all
8    county endorsements are equal?
9    A.    I don't know if I can really speak to that.  I haven't
10   looked at that.
11   Q.    Okay.  So you haven't looked at that.
12         So -- oh, would you agree that there are two counties
13   that don't offer the county-line in New Jersey?
14   A.    Correct.
15   Q.    Okay.  And would you --
16   A.    At this time.
17   Q.    Okay.
18         And would you agree that they are Salem County and
19   Sussex County?
20   A.    Yes.
21   Q.    Okay.  Prior to writing this report, did you do any
22   research into the publicly filed campaign finance reports of
23   the Salem County political parties and the Sussex County
24   political parties?
25   A.    I did not, but they're not the only counties that don't

324

1    have a county-line in this analysis.
2    Q.    Okay.  What other counties?
3    A.    So Warren did not have a county-line prior to 2018, and
4    in the 2020 election, Hunterdon, Passaic, and Warren did not
5    use a county-line ballot.
6    Q.    Did you do anything to take a look at the campaign --
7    publicly filed campaign finance reports of any political
8    parties in any county?
9    A.    No, I did not.
10   Q.    Okay.  Would it surprise you that the counties that don't
11   use the county-line are also among the weakest fundraisers of
12   the county parties in the state?
13   A.    Does that include Passaic?
14   Q.    Well, Passaic, I believe, was one election where they
15   didn't have a county-line.
16   A.    Right, but the results are consistent.
17         Does that include Warren?
18   Q.    Correct, yes.
19   A.    And does that include Hunterdon?
20   Q.    Yes.  Would that surprise you?
21   A.    I don't know.  I mean, I haven't looked at this data, so
22   I really can't speak to it.
23   Q.    And would it surprise you that many of the county-line
24   counties have full-time staff and offices and the counties
25   that don't use the county-line do not?

325

1  A.    Again, I haven't looked at that.

2  Q.    Would you agree that if a county party endorses you and

3  they have more money and they have staff and they have

4  resources, that it's more beneficial than a county party that

5  endorses you with none of that?

6  A.    Potentially.

7         MR. PUGACH:  Objection.  Calling for speculation.

8         MR. NATALE:  Asking about what she believes would be

9  impactful in the race that she's in on.

10        THE COURT:  I will allow it.

11 BY MR. NATALE:

12 Q.    Did you do any research to find whether or not those

13 issues like you described are consistent themes in the data

14 that you had?

15 A.    I did not look at the individual races per race.  I just

16 looked at the aggregate data.

17 Q.    But you testified earlier today that a consistent theme

18 in the data, other than the county-line, could show an impact

19 that wasn't the county-line, correct?

20 A.    Well, there's many alternative explanations, except the

21 statistical analysis that someone performed suggests that

22 that's not the case, but I didn't do that.

23        This is descriptive statistics only in the aggregate.

24 Q.    Yeah, so I'm asking specifically about what you --

25 A.    Right.

326

1  Q.    So I want to repeat the question because my question was

2  confirming some of your earlier testimony.

3  A.    Uh-huh.

4  Q.    And your earlier testimony was that a consistent variable

5  throughout these studies could prove to have an impact other

6  than just the county-line, correct?

7  A.    Anything is possible, yes.

8  Q.    But it would have to be consistent, correct?

9  A.    Yes.

10 Q.    Okay.  But you did nothing to find out if any of the

11 variables that we discussed today were consistent among the

12 data that you --

13 A.    No.

14 Q.    Okay.

15 A.    Because it's a natural experiment, so there was no reason

16 to do that.

17 Q.    So you didn't think it was necessary to find out if there

18 was another variable that was impacting the races other than

19 the --

20 A.    I wasn't -- I wasn't doing inferential statistics.  I was

21 doing simple descriptive statistics based on a natural

22 demarcation between these candidates.

23 Q.    And I just want to clarify:  You find that your report is

24 descriptive as opposed to --

25 A.    It's descriptive statistics, yes, as opposed to

327

1  inferential.

2  Q.    Okay.  I understand that my questions might be

3  frustrating, and I also --

4  A.    No, no, I'm just trying --

5  Q.    I'm going to ask this for the court reporter's sake, who

6  has been here for a long day.  If you can let me finish, I

7  will do my best to let you finish as well.

8  A.    I'm sorry.

9  Q.    No problem.

10        So my question, though, was you would characterize your

11 work as descriptive, correct?

12 A.    Descriptive statistics, not descriptive work.

13 Q.    Okay.

14 A.    There's a difference in statistics between statistics

15 that are inferential and statistics that are descriptive.  So

16 I'm just trying to be clear.

17        It doesn't mean that my work is descriptive, like I'm

18 just talking about how someone dressed.  It's still

19 statistically important.

20 Q.    There was one other category of races that you talked

21 about that I just want to address on the record real quick.

22        You take a look at state legislative incumbents in your

23 report --

24 A.    Yes.

25 Q.    -- do you recall that?

328

1  A.    Yes.

2  Q.    And despite the -- one of the subsets that you look at is

3  that there were 19 incumbents who got either no county-line

4  support or only partial county-line support?

5  A.    Yes.

6  Q.    And you were -- you illustrate -- you described in

7  descriptive statistics that only 9 out of the 19 incumbents

8  won reelection, correct?

9  A.    Yes.

10 Q.    Okay.  So did you look at all into the publicly filed

11 campaign finances reports of the ten losing incumbents in

12 those races?

13 A.    I did not.

14 Q.    Okay.  So would it surprise you that a consistent

15 variable in those ten races are that they all had less money

16 via their own accounts or joint campaign accounts than their

17 opponents in those races?

18 A.    It's possible.  I mean, I didn't look at that.

19 Q.    And you would agree that spending money could impact

20 performance in an election, correct?

21 A.    It could, yes.

22 Q.    And are you aware that the state legislative races also

23 have joint campaign committees that service the candidates all

24 over the state?

25 A.    Yes.

329

1    Q.    Are you aware that you wouldn't get the support of those
2    organizations if you didn't have a county-line?
3    A.    Yes.
4    Q.    Okay.  So is it possible too that the influence of those
5    organizations spending money, giving resources, giving
6    infrastructure would also be a consistent variable among these
7    results?
8    A.    It's possible, yes.
9    Q.    But you didn't look for any of that, right?
10   A.    No.
11   Q.    Okay.  Now, you mentioned that you only had two academic
12   articles, and I want to preface academic because you're
13   clearly a prolific writer, but you had two law review articles
14   that you were responsible for as it relates to ballot design,
15   correct?
16   A.    Yes.
17   Q.    And is it true that you did one of those with multiple
18   authors?
19   A.    Yes.
20   Q.    And then you did one on your own, correct?
21   A.    Yes.
22   Q.    Okay.  Is the one that you did on your own similar to
23   your expert report in this case?
24   A.    It is similar in parts.
25   Q.    Okay.  If I told you that, upon my review, it's hard to

United States District Court
District of New Jersey

330

1    tell the difference in the first 60 pages of your law review
2    article and your expert report, does that sound --
3    A.    60?
4    Q.    60.
5    A.    The article is not that long.
6    Q.    So I'm sorry.
7         If I told you that the first, I want to say, nine
8    figures in the law review article were the same as the one in
9    your expert report, does that sound wrong to you?
10   A.    That does sound wrong.
11   Q.    Okay.
12   A.    There was -- there was certainly overlap between the two
13   reports, but there's also a lot of new information.
14   Q.    How much overlap would you just say there was?
15   A.    The setup of the county-line, you know, how -- explaining
16   what it is, the analysis of the 45 races is consistent between
17   the two reports.
18   Q.    Okay.  Oh, I'm sorry to interrupt.
19        THE COURT:  Let her finish.
20        THE WITNESS:  And then there's -- there's additional
21   data on the legislative races, and then there's a whole new
22   analysis looking at candidates who were endorsed or endorsed
23   and on the county-line.
24   BY MR. NATALE:
25   Q.    But is it fair to say that a lot of the data that you use

United States District Court
District of New Jersey

331

1    in your expert report you derived from that law review
2    article?
3    A.    As referred to just now, the -- actually I -- I collected
4    the data again on the state legislative races, so it was
5    not -- it was consistent data, but I had been relying on data
6    from a report that Francisco Diez for the CWA -- did for the
7    CWA for 2003 through 2019.
8         And then I had added my data, and I noted that in the
9    article, so I re-collected all that data and re-analyzed it
10   for this, and then all the analysis of the endorsement is new.
11   Q.    Here's my direct question before we're done:  When you
12   were retained on this case, were you retained contingent on a
13   particular outcome of your report?
14   A.    Absolutely not.
15   Q.    Okay.  That being said, did you expect to have a
16   different outcome in your report than you did in your law
17   review article?
18   A.    I didn't know what I would find in terms of the
19   endorsement analysis, because I hadn't done it before, but I
20   knew that I certainly, you know, had the same expected results
21   for the 45 races.
22   Q.    Okay.
23   A.    But in terms of the additional analysis, I didn't know
24   what I would find.
25   Q.    And when it comes to those 45 races, you didn't do any

United States District Court
District of New Jersey

332

1    additional research into incumbency, home county, any of those
2    effects --
3    A.    No.
4         MR. PUGACH:  Objection.  Asked and answered.
5         MR. NATALE:  -- from -- can I finish?
6         THE COURT:  I'll let him finish the question.
7    BY MR. NATALE:
8    Q.    -- from the time that you did your law review article
9    until the time you did your expert report; is that correct?
10   A.    Yeah.  There really wasn't --
11   Q.    Is that because you didn't want to come up with a
12   different answer that you didn't --
13   A.    I didn't have time, sir.  This really ate up my entire
14   winter break, and also I have a day job.
15   Q.    Understood.  Thank you.  Thank you for your time today.
16        MR. PARIKH:  Judge, I tried to resolve my questions
17   via stip, but they haven't agreed, so...
18   (CROSS-EXAMINATION BY MR. PARIKH:)
19   Q.    Hi, Ms. Sass Rubin.  How are you?
20        MR. PUGACH:  What was --
21        MR. PARIKH:  She changed the language.  It doesn't
22   work.
23        THE COURT:  Just ask her the questions.  I don't have
24   time for it.  Let's move.
25   BY MR. PARIKH:

United States District Court
District of New Jersey

333

1  Q.  Ms. Sass Rubin, you just mentioned you were engaged prior
2  to -- for this matter by counsel in mid-December 2023; is that
3  correct?
4  A.  I did not mention that at all, no.
5  Q.  You said you were working on this through your December
6  break; is that right?
7  A.  I was working on it over winter break, correct.
8  Q.  So when were you contacted by plaintiffs' counsel
9  regarding this matter in December?
10  A.  In December sometime -- I think it was like the 15th,
11  16th, 18th, something like that, the first time.
12  Q.  And did counsel advise that they wanted you to do your
13  report and analysis for a litigation?
14  A.  Actually, initially they just said it was a possibility,
15  and they wanted to know if I would be willing to do it.  There
16  wasn't actually a commitment right away.
17  Q.  There was not a commitment for what, ma'am?
18  A.  There was no contract, and there was no commitment to
19  actually move forward.  It was just like was I available and
20  would I be willing to do this.
21  Q.  And have you been engaged as an expert on this subject
22  matter in any other matter, in any other case?
23  A.  Not on this subject matter, no.  I've never testified in
24  a court case before.
25  Q.  And I understood the testimony part, but have you been

United States District Court
District of New Jersey

334

1  engaged by counsel for the *Forte* case or any of the other
2  ballot cases --
3  A.  I have not.
4     MR. NATALE:  Thank you, Judge.
5     THE COURT:  Is there anything further from the
6  defense?
7     MR. PARIKH:  No, Your Honor.
8     THE COURT:  For the plaintiff?
9     MR. PUGACH:  Extremely brief, Your Honor.
10  (REDIRECT EXAMINATION BY MR. PUGACH:)
11  Q.  You mentioned before it was a 45 contest when the
12  candidate -- well, when the candidate was on the line versus
13  when their opponent was on the line was in the range of 13 to
14  83?
15  A.  Yes.
16  Q.  In terms of 83 percent; is that correct?
17  A.  Yes.
18  Q.  Are those both positive numbers?
19  A.  Yes.  There were no instances in which the candidate did
20  worse on the county-line than when their opponent was on the
21  county-line.
22     MR. PUGACH:  No further questions.
23     THE COURT:  All right.  Thank you, Doctor.  You're
24  excused.  Thank you for your time.
25     THE WITNESS:  Thank you.

United States District Court
District of New Jersey

335

1     MR. PARIKH:  We'd like to call Ms. Hanlon out of
2  turn.  I mean, we spent the whole entire day here with the
3  plaintiffs' witnesses going slowly, et cetera.
4     THE COURT:  Well, you're all going slowly.  So it's a
5  plague on both your houses.
6     But is there any objection from plaintiffs' counsel to
7  have Ms. Hanlon testify out of order?
8     MR. PUGACH:  I mean, the witness is here, other
9  than --
10     THE COURT:  I just want to know if there's an
11  objection.  I'm going to be very quick about it.  It's
12  overruled.  But do you want to object to it or not?
13     MR. PUGACH:  No objection.
14     THE COURT:  All right.  So let's go.  Ms. Hanlon will
15  testify, and we'll go out of order, and you can sequester your
16  witness and have them sit outside.
17     MR. PARIKH:  Thank you, Your Honor.
18     THE COURT:  You're welcome.  Let's keep things
19  moving.
20     I don't mind going out of order, but let's keep things
21  moving.  But I think it's a fair request.
22     In spite of my better judgment, it's very possible
23  we'll have to go past the 7:10 time that I mentioned, but
24  let's try to keep things moving.
25     I am going to have my courtroom deputy swear you in,

United States District Court
District of New Jersey

336

1  but then you can come into the box or whatever is most
2  comfortable for you.  Okay.
3  (CHRISTINE HANLON, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED
4  AS FOLLOWS:)
5     THE DEPUTY COURT CLERK:  Please state your name and
6  the spelling of your last name for the record.
7     THE WITNESS:  Christine Hanlon.  H-A-N-L-O-N.
8     THE COURT:  Good morning -- or good afternoon.  I
9  think we're in the evening now, so -- we're not evening now.
10     THE WITNESS:  Your Honor, do you mind if I keep my
11  water with me?
12     THE COURT:  You can keep it with you at all times.
13  And once you're comfortable, they will begin direct
14  examination.
15     THE WITNESS:  Thank you.
16  (DIRECT EXAMINATION BY MR. SPIRO:)
17  Q.  Ms. Hanlon, what is your current position with Monmouth
18  County?
19  A.  I'm the county clerk.
20  Q.  How long have you held that position?
21  A.  Since 2015.
22  Q.  And how did you become the Monmouth County clerk?
23  A.  I ran for office and was fortunately elected.
24  Q.  And please describe your responsibilities as Monmouth
25  County clerk.

United States District Court
District of New Jersey

1   A.    In Monmouth County, I am the keeper of the records and,
2   first and foremost, the keeper of the property records
3   relating to every transaction in the county basically relating
4   to property.
5        I oversee the Monmouth County archives.  I oversee the
6   County Office of Records Management.  I have two passport
7   offices, and also I am the clerk of elections for the county
8   of Monmouth.
9   Q.    And what is your function as the clerk of elections?
10  A.    So the clerk of elections is responsible for a few
11  distinct duties relating to the election process.  There are
12  two other offices that also have a hand in the election
13  process.
14       The county clerk is responsible for preparation of
15  ballots for most elections within the county, accepting
16  candidate petitions for certain offices, accepting and
17  reviewing mail-in ballot applications, and also issuing
18  mail-in ballots.
19  Q.    What are the other two offices that you mentioned that
20  have responsibility for elections in Monmouth County?
21  A.    There is the superintendent of elections office, which is
22  responsible -- actually, the superintendent in Monmouth County
23  is also the commissioner of registration.  And that entity
24  handles the voter registration file, the machine voting
25  machines, and the poll books.

*United States District Court*
*District of New Jersey*

1        And then there is the board of elections.  I think you
2   asked me about that one, too.  The board of elections is a
3   separate and distinct office as well, and that entity is
4   responsible for counting of all of the mail-in ballots or
5   other paper ballots, responsible for poll workers, polling
6   locations, training of poll workers, redistricting of election
7   districts, and hopefully I didn't forget anything else.  But
8   if it comes to mind, I'll let you know.
9   Q.    And what authority, if any, do you have over the
10  responsibilities of those other two offices?
11  A.    None.
12  Q.    Approximately how many registered voters are there in
13  Monmouth County?
14  A.    We have over 490,000 registered voters.
15  Q.    And how are voting locations geographically divided in
16  Monmouth County?
17  A.    So everywhere in New Jersey, actually -- it's not just
18  Monmouth County -- the county is divided into election
19  districts.  And these election districts are geographic areas
20  within each municipality where it's basically a geographic
21  area where voters are -- it -- they must go vote in a certain
22  location within that geographic location, and in Monmouth
23  County, we have 474 of these election districts.
24  Q.    And those 474 election districts are spread across how
25  many municipalities?

*United States District Court*
*District of New Jersey*

1   A.    53.
2   Q.    And what are the ways that voters can cast votes in
3   New Jersey?
4   A.    New Jersey has several ways of voting currently.  The law
5   has changed recently to allow for different types of voting,
6   but basically voters can go to the -- in that geographic
7   polling location in that district to cast their vote on
8   Election Day.  In 2021, with the implementation of early
9   voting -- we have an early voting period where voters can go
10  to any one of up to ten, I think, voting locations within the
11  county, and they have to be able to obtain the ballot for
12  their specific election districts, whichever polling location
13  they go to.
14       Voters can also cast their vote on a mail-in ballot,
15  and we also have other types.  We have emergency and
16  provisional ballots depending upon the circumstance.
17  Q.    And you mentioned early voting and legislation that was
18  passed to implement that.  Did that require any changes for
19  Monmouth County after the early voting legislation?
20  A.    Yes.  With the implementation of early voting,
21  Monmouth County, I believe many of the counties -- it kind of
22  ushered in a massive change to the election process because
23  the current apparatus that the county had, with respect to
24  machine ballots, had -- didn't work really anymore.
25       So with early voting, the county, and Monmouth County

*United States District Court*
*District of New Jersey*

1   specifically, had to invest in voting machines for the polling
2   locations that would accommodate any voter who walked into
3   that location because, prior to that, we did not have the
4   capability to do that.
5        And, in addition to that, the state mandated that the
6   whole election process go from paper poll books to electronic
7   poll books.  So this was a massive change for Monmouth County,
8   a huge financial investment.
9        But, because of this decision, Monmouth County decided
10  to replace its entire fleet of voting machines, not just
11  purchase machines that could accommodate that early voting
12  locations.  So that was a purchase of, I think, about a
13  thousand new voting machines.
14       But also it impacted the mail-in ballot equipment that
15  we had.  So our board of elections purchased new mail-in
16  ballot scanners, and then my office -- because I handle the
17  preparation of the ballots and tabulation of results, my
18  office had to go to a whole new system that was basically
19  mandated once the other two offices purchased new equipment.
20       So my office has to license a software program to be
21  able to accommodate the new voting machines and the new
22  scanners for mail-in ballots.
23  Q.    And what county office was responsible for implementing
24  these changes, except for what you described in your office,
25  the changes to the machines and the polling books?

*United States District Court*
*District of New Jersey*

341

**A.**    So I can't change voting machines, so that would have
been the superintendent of elections office who determined
which voting machines that they were going to -- to purchase,
along with the county commissioners, because it was a huge
financial investment. So they had to purchase this equipment.

And then the board of elections made the determination
to change their scanners that they had from the Dominion
system to ES&S scanners. And on the machine side of things,
the superintendent went from Dominion machines to the ES&S
ExpressVote XL machines.

**Q.**    And what were some of your considerations as the county
clerk when you were implementing these changes and purchasing
these new machines?

**A.**    So it was very important to me that the system be totally
integrated because we have to report results in a very short
period of time. I didn't want the superintendent to have one
system and the board of elections to have another system and
then I would have to be working with both systems and both
software.

It was also important to me, because of the -- the way
we lay out our ballots, that the machines be able to
accommodate the layout of the ballots that we've had for many
years. I did not make the decision but expressed my concerns
to both of those offices because we have requirements about reporting and,

342

you know, getting the election results done in a timely
fashion.

**Q.**    And after the machines were purchased, did it require
more work to integrate the machines the way you just
described?

**A.**    Well, we have done a lot of training to be able to use
these machines. It involved training of not only our vendor,
who handles or assists with the preparation of our ballots,
but also my staff, the superintendent of elections staff, the
board of elections staff, all of that training that we had to
do to accommodate this, in addition to training the 2,000 poll
workers that the board of elections had to train, and the
municipal clerks of the 53 municipalities, who are the senior
election official in every one of these municipalities, so
that everybody was able to utilize this new system.

**Q.**    Was there any customization of the system to meet those
reporting requirements?

**A.**    Well, first and foremost, it needed to be able to
accommodate the ballot format that we normally use.

In addition to that, there was some customization and
software updates relating to Monmouth County because we have a
system where we -- it's called regional results -- where every
one of our municipal clerks has a laptop throughout the county
where they are able to transmit the results to my office in
Freehold so that we can collect the results in a timely

343

fashion. That was something that ES&S had to sort of
customize for Monmouth County. We may be the only county that
does that.

**Q.**    And what was the cost to Monmouth County of making these
changes, machines and everything you've just described?

**A.**    Over twelve and a half million dollars and counting
because of the licensing and everything, and it changes every
year.

**Q.**    And then is there a timeline that officials follow for
this 2024 primary election?

**A.**    Yes. There is a statutory timeline both for New Jersey
and for the federal -- federal law because of people who are
overseas or members of the military. Those are statutory
requirements.

**Q.**    And can you walk us through some of the key dates that
are statutorily required for the primary election?

**A.**    Yes. So the first date -- well, March 25th, all of the
candidates statutorily will be filing their petitions, and
that is sort of the last date that the municipal clerks and
the different government entities have to share information as
to what offices will be on the ballot.

Subsequent to that, we have -- 48 hours later, the
individuals who are going to be on the ballot can make
requests for bracketing.

By April 4th is the date that we conduct the ballot

344

draw to determine where people go on the ballot.

And then April 5th, we have to have our ballots ready
for printing.

And then April 20th is the date that we must send out
mail-in ballots pursuant to state and federal law to mail-in
ballot voters and overseas and military voters.

MR. SPIRO:   Your Honor, I'd like to introduce an
exhibit which has not been previously introduced but was
disclosed to Plaintiffs. It would be Defendants' Exhibit 4.

THE COURT:   And what is it, just so I know what it
is?

MR. SPIRO:   It's a 2024 primary election timeline.

THE COURT:   Okay.

(Defendants' Exhibit 4 received in evidence.)

THE COURT:   Is that part of any previous submission,
Counsel?

MR. SPIRO:   It's not.

THE COURT:   Are you moving to admit that?

MR. SPIRO:   We'd like -- we are moving to admit that.

THE COURT:   Is there any objection to the document?

MR. PUGACH:   No objection.

THE COURT:   All right. So admitted.

MR. SPIRO:   Can I pass this up?

THE COURT:   You may.

THE WITNESS:   Is that for me?

1    THE COURT:  I have three.  You have zero.

2    MR. PARIKH:  Judge, if I may approach to take one of

3  those back from you?

4    THE COURT:  I was going to give it to my law clerk.

5    MR. PARIKH:  I'd be happy to get a copy to your law

6  clerk.

7    THE COURT:  No, that's all right.  Everybody's got

8  one.

9  BY MR. SPIRO:

10  Q.   Can you please tell us what this document is?

11  A.   This is the state timeline for the primary election, and

12  it basically is just a recitation of the key dates that are

13  pulled out of New Jersey law so that, you know, the clerks,

14  election officials, voters, everybody has these at their

15  fingertips if they need them.

16  Q.   Is this something that can be publicly found?

17  A.   Yes.  It's on my website, Monmouthcountyvotes.com, and

18  it's on probably most of the clerk websites and the

19  division-of-elections website.

20  Q.   I believe the last date that you mentioned -- this may be

21  a helpful reference -- was April 5th as the deadline for

22  prepping official primary ballots.

23       Are there any key deadlines that you'd like to

24  highlight for the Court?

25  A.   There's a lot of deadlines on here.

1  Q.   I made it more confusing.  I apologize.

2  A.   That's okay.  I think I mentioned April 4th, April 5th,

3  April 20th.  We can keep going if you'd like, or if there's

4  something that, you know, you want to refresh my recollection

5  with, I --

6  Q.   You mentioned -- you testified before about early voting.

7  Is that -- is that a deadline that's coming up?

8  A.   Yes, yes, in May.  It begins on May 29th and runs through

9  June 2nd for the primary election and then, of course,

10  Election Day, June 4th.

11  Q.   You mentioned state election dates, but you also

12  mentioned federal deadlines.  Are there any federal deadlines

13  that we should be aware of?

14  A.   Yes, the federal deadline relating to the mailing of

15  ballots to military and overseas voters.  We then have to

16  report to the Department of Justice that we complied with that

17  deadline.

18  Q.   Did you say that deadline?  I missed it.

19  A.   That was the 20th also of April.

20  Q.   And for this year's primary election, what are the

21  offices that will be on the ballot in Monmouth County?

22  A.   In Monmouth County, we will have the president and the

23  statewide delegates, the congressional delegates as well.  We

24  will have United States Senate.  We will have three

25  congressional elections.

1    We will have a county commissioner election and up to

2  five, potentially, municipal elections in each of the

3  municipalities.  We just don't know what those are yet.

4    And we have county committee elections in each of the

5  474 election districts times two because of the -- everything

6  will be times two for the Republicans and Democrats, and those

7  ballots are prepared separately.

8  Q.   And what's the county committee position you just

9  mentioned?

10  A.   In all of the election districts within the state of New

11  Jersey, there are members of -- representatives to the

12  Republican and the Democratic parties, and it's two

13  individuals per election district.

14    So in Monmouth County, we have 474 election districts

15  times two individuals and -- Republicans and Democrats, and

16  these people are the official representatives to the parties,

17  to the political parties from their districts.

18    And this year Monmouth County, we have the county

19  committee election.

20  Q.   And that adds up to approximately how many ballots that

21  you have to -- unique ballots you have to prepare for the

22  election?

23  A.   It's about -- I think it's about 958.  I'm a little tired

24  right now, but 958 and up to potentially 2,000 candidates that

25  have to be placed on the ballot.

1  Q.   And then, other than the ballot deadlines that we've just

2  been discussing, what are other types of statutory

3  requirements that exist for preparation of the ballots?

4  A.   So Title 19 is our guideline with respect to just about

5  everything we do for elections, unless there's case law that

6  modifies that in some way.

7    But there are various statutes that guide the

8  preparation of the ballot, whether it's the general election

9  ballot or the primary ballot.

10  Q.   What are the types of things that are dictated relating

11  to the design and formatting of the ballot?

12  A.   Well, the statute that pertains to the primary election

13  ballot speaks to columns and rows.  So in terms of the ballot

14  layout, the statute requires columns and rows.

15    In addition to that, there's different language that

16  needs to be included on the ballot -- office titles, you know,

17  other information that needs to appear on the ballot,

18  instructions, things like that.

19    And also New Jersey law provides a framework by which

20  the candidates appear within those columns and rows.

21  Q.   And then you mentioned that a framework is part of that

22  kind of associational rules that you follow for the ballot

23  format?

24  A.   Well, yes.  There's -- there's basically a statute

25  relating to the ballot draw and an order of candidates, and

1    there are statutes relating to bracketing and separately
2    grouping.
3    Q.    Can you please explain what you mean by bracketing?
4    A.    So bracketing -- the bracketing statute provides that
5    various candidates can opt to appear in the same column or row
6    of the ballot.
7          So the statute that guides this speaks specifically to
8    the ability of the county candidate, a candidate that can file
9    a joint -- jointly countywide petition, which is a county --
10   generally speaking, a county commissioner candidate.
11         And it provides that that -- those candidates -- the
12   campaign manager of those candidates can allow individuals to
13   appear on the ballot in the same column or row as those
14   individuals.
15   Q.    You mentioned a drawing.  Can you explain how the drawing
16   would work in connection with the 2024 primary election?
17   A.    So the 2024 primary election is the U.S. Senate.  There
18   is a U.S. Senate election on the ballot.  So there are various
19   statutes that have to be harmonized in relationship to the
20   U.S. Senate race being on the ballot.
21         There's a statute that dictates how the ballot draw
22   takes place.  It has to take place on April 4th.  I believe
23   it's 3:00 p.m., and it has to be open to the public and based
24   on the statutory guidelines and case law as well.
25         In a U.S. Senate election, the candidates for

United States District Court
District of New Jersey

1    U.S. Senate would be placed in a box.  Their names would be on
2    cards, be placed in a box, you know.  It's not done like the
3    alphabetical way that we heard this morning.
4          The candidate names for U.S. Senate are placed in a
5    box.  The box is shaken, and names are randomly drawn from the
6    box.  And the first candidate drawn gets column 1, and the
7    second candidate drawn gets column 2, and so on and so forth.
8          If any one of those Senate candidates are bracketed
9    with other candidates, the bracket would follow the order that
10   the Senate candidates were drawn, and then, after that, we
11   would draw any other candidates who hadn't been drawn already.
12   Q.    Are you aware of Monmouth County ever using a
13   block-and-row ballot for any presidential primary election?
14   A.    I'm not sure what that means.
15         MR. KOMUVES:  I'm not sure --
16         THE COURT:  Sustained.
17   BY MR. SPIRO:
18   Q.    Are you aware of Monmouth County -- sorry.
19         THE COURT:  Go ahead.
20   BY MR. SPIRO:
21   Q.    Are you aware of Monmouth County using an office-block
22   ballot for any presidential primary election?
23   A.    No primary election.  No.  We are not -- we have not done
24   that.  We have always, to my experience, used columns or rows
25   because that's what it says in the statute.

United States District Court
District of New Jersey

1    Q.    And that's for -- is that for any election that the
2    Monmouth County's conducted that you've overseen?
3    A.    We use the column or row grid pattern, and we do it the
4    same way in the general election as we do in the primary
5    election.  It's in this column-and-row format.
6    Q.    And did you hear the testimony of plaintiffs' expert,
7    Mr. Macias, where he referred to the Long Branch ballot from
8    May of 2022?
9    A.    Yes.
10         MR. SPIRO:  I'd like to introduce that.
11         (Brief pause.)
12         MS. BROMBERG:  P-2.
13         MR. SPIRO:  Okay.
14         MS. BROMBERG:  I think it's 2.  The report is 3.
15         MR. SPIRO:  Your Honor, may I approach the witness?
16         THE COURT:  You may.
17         MR. PARIKH:  Your Honor, just for clarity, it's PX --
18   it's Plaintiffs' Exhibit 3.
19         THE COURT:  P-3.
20         MR. PARIKH:  Correct.
21         MR. SPIRO:  So this has already been introduced into
22   evidence, Your Honor.
23   BY MR. SPIRO:
24   Q.    Ms. Hanlon, did you hear plaintiffs' expert testify that
25   this is an office-block ballot?

United States District Court
District of New Jersey

1    A.    I -- I heard his testimony.  I don't recall if he said it
2    looks like an office-block ballot or if it is an office-block
3    ballot.
4    Q.    We'll start with the first.
5          Is this an office-block ballot?
6    A.    In my opinion, it is not.
7    Q.    And why is that?
8    A.    Well, these candidates are bracketed, and you have their
9    competitors -- first of all, they're in columns and rows, and
10   their competitors, who are potential write-ins, are in the
11   next column over.
12         So I don't see this as what I have heard to be an
13   office-block ballot.
14   Q.    Is this type of ballot comparable to a primary election
15   ballot?
16   A.    Well, this is a very different election because it is a
17   nonpartisan municipal election.  It's not a primary election
18   where you have certain statutes and specific statutes that
19   you're dealing with, and this has very few candidates on the
20   ballot.
21         So I wouldn't compare one with the other.
22   Q.    You testified before about the ballot draw.  What happens
23   after the ballot draw?
24   A.    So after the ballot draw, we have -- at that point we
25   have to be ready for the next day to be having the ballots

United States District Court
District of New Jersey

353

1  ready to print. We are -- we have, over the course of that
2  week prior to the ballot draw, been sending our ballot printer
3  information on candidates, on offices.
4      And that information is being placed into the ballots
5  format that we have designed over the past several years.
6      In addition to that, my team has been entering the --
7  up to 2,000 names into Excel spreadsheets along with lots of
8  other information that goes into that, you know, addresses,
9  email addresses.
10     And we are gathering up all this information and
11 getting it to the ballot printer over the course of that time
12 period after all of the petitions are filed.
13     Once we do the ballot draw, we're at that point of
14 finalizing information and where things go on the ballot as it
15 relates to the mail-in ballot.
16     So I just want to be specific about which type of
17 ballot we're talking about.
18 Q.  Can you describe for the Court the interaction between
19 the mail-in ballot and machine ballots?
20 A.  So we -- we first work to ensure that we have the mail-in
21 ballot ready to go because of the statutory deadlines.
22 Everything we do with respect to the mail-in ballot is part of
23 this integrated Electionware software system.  That is also
24 the foundation for the machines.
25     There are decisions that we make with respect to the

United States District Court
District of New Jersey

355

1  going to work.
2      In addition to that, we print out a set to get to our
3  board of elections so that they can review these because I
4  don't count the ballots.  The board of elections is
5  responsible for counting the ballots.
6      And then they are taking that set and ensuring that
7  everything is programmed properly because it's over 50,000
8  ballots that could potentially be coming back, maybe more than
9  that, this year.  I'm not quite sure.  So that all of that is
10 tested.
11     And then we are prepping our envelopes.  My team is
12 still processing mail-in ballot applications.  And once all of
13 the testing take place, then we go to printing these ballots
14 and inserting them into the envelopes so that they will be
15 ready to get out the door, begin the process, on April 20th.
16 Q.  And then, apart from the mail-in ballots, when are the
17 machine ballots prepared?
18 A.  So as soon as we get the test to ES&S, we are already in
19 the process of preparing the machine ballot.  The format for
20 our machine primary ballot is already designed.  What we're
21 then doing is entering information into the system so that the
22 names and the offices can appear where they're supposed to be
23 on the machine ballot.
24     So it's just an ongoing process.  As soon as we're
25 ready to go with the mail-in ballots, we're working on the

United States District Court
District of New Jersey

354

1  mail-in ballot that impact what happens on the machine.  Right
2  now, we are programmed for the ballot styles that we currently
3  have.
4      We are limited in terms of what can be contained on our
5  mail-in ballot and the size of the mail-in ballot because that
6  impacts the voting machine as well because there are sizes and
7  constraints on the voting machine.
8      And the size of the paper trail that is on the voting
9  machine is impacted by the size of the mail-in ballot because
10 things are interconnected.
11 Q.  And what else does your office need to do before the
12 ballots are actually mailed out on April 20th?
13 A.  So there's a long process of proofing, proofreading the
14 ballots that are going to be mailed out to the voters.  We
15 have a back-and-forth with our ballot printer over several
16 days as to all of those 2,000 names, the office where things
17 are going, the correct office titles.  That takes my team
18 several days of back-and-forth in terms of the proofreading
19 process.
20     When we have the final sign-off on the mail-in ballot
21 that, you know, there are no other mistakes, everything is in
22 the right place, my printer prints a test deck that goes to
23 ES&S, which is our, you know, election system.  And ES&S takes
24 the 958 ballots, and they test every single one of those races
25 on the system that we have to ensure that these are -- they're

United States District Court
District of New Jersey

356

1  machine ballots.
2  Q.  And is there testing for the machine ballots?
3  A.  Yes.  There's testing that's done by ES&S, and there's
4  testing that's done by the superintendent of elections.  There
5  was a reference to logic and accuracy testing.  That's not
6  what the county clerks do.  From my end, I don't do that.  The
7  superintendent of elections do that.
8      But once all the data has been entered into the
9  Electionware system, encoded properly with the codes that ES&S
10 has given to my team so that everything appears where it's
11 supposed to be and the graphic design has been done for the
12 machine, then the system is sent to ES&S for them to test and
13 ensure that everything is in the right place and it's working
14 properly.
15     Then we start the downloading process of all that
16 information onto the thousand flash drives, about a thousand
17 flash drives, so that the flash drives contain all that data.
18 And then it is given to our superintendent of elections office
19 so that they can upload that data to the voting machines that
20 the superintendent has custody and control over.
21     And then they do their -- their logic and accuracy
22 testing that they do, and then ultimately those machines get
23 sent out into the early voting locations and, after that, the
24 Election Day polling locations.
25 Q.  And when do the machines need to be ready by?

United States District Court
District of New Jersey

357

1  **A.**    Typically we try to have the machines ready on or about
2  May 22nd because there's testing that needs to be done, and
3  they need to be -- you know, it takes time to get the machines
4  out to the polling locations before May 29th, I believe, is
5  the date of early voting.  And there needs to be time for the
6  public to inspect the numbers.  There's statutory requirements
7  about that.
8  **Q.**    Are there other ballots that your office is preparing
9  during this time?
10  **A.**    Yes.  In the meantime, we're also preparing provisional
11  ballots that need to be scanned and emergency ballots.  We
12  have to have provisional and emergency for each of the 948 --
13  -58 contest -- you know, the different ballot styles that we
14  have.
15  **Q.**    Is there a time when a sample ballot needs to be
16  prepared?
17  **A.**    Yes.  The sample ballot is also being prepared -- thank
18  you for refreshing my recollection with that.  We have to send
19  out a sample ballot to the voters.  I believe it's three days
20  prior to the early voting period.
21        So a sample ballot also needs to be prepared, and
22  there's statutory requirements on what goes on that as well.
23  **Q.**    So now that you've addressed, I think, kind of a lot of
24  the moving components, how would changes to the ballot design
25  impact the ES&S election system?

359

1  the board of elections because they -- their scanners are
2  programmed for the ballots that we have today, the format that
3  that we have today.
4  **Q.**    And how would the change to the ballot impact your
5  vendors, like your printer?
6  **A.**    So my ballot printer -- we would have to undertake an
7  analysis of how these races would be laid out on a ballot,
8  whether it would be one page, two pages, three pages, in order
9  to get all of these different offices onto the ballot.  And
10  that, in turn, impacts what goes on in the machine because of
11  this voter card, you know, this card that goes into the voting
12  machine that ultimately ends up being the paper trail.
13  Because if they are not compatible, it leads to problems at
14  the polls.
15        With respect to changing the format on the primary
16  ballot, that would take us some time to figure out where
17  things would go, a completely new layout, how it would fit,
18  and then a determination as to whether the scanners that the
19  board of elections has can be reprogrammed to accommodate the
20  new ballot design.
21        Separate and apart from that, with respect to changing
22  the design on the voting machine, my vendor, my ballot
23  printer, said that is unchartered territory.
24        MR. KOMUVES:  Objection.
25        THE WITNESS:  They did not know what to do.

358

1  **A.**    So I've been working to talk to my vendor, talk to my
2  people about the changes that would need to take place, and
3  there was a lot of testimony this morning about, you know,
4  reentering the data no matter what.
5        The issue, though, is what happens prior to that.  And
6  for our primary election ballot, if I would have to change it,
7  there is a design process that would need to be undertaken to
8  determine where things go, whether the equipment and software
9  that we have could accommodate changes to the ballots that we
10  have right now.
11        And my apologies.  It's late.  I lost track of your
12  question.  I feel like I was going in another direction, so if
13  you could remind me of the question.
14  **Q.**    No, I think you covered it.
15        THE COURT:  It's late.
16        MR. SPIRO:  It's late.  And in the interest of
17  brevity, I think you covered it well.
18  BY MR. SPIRO:
19  **Q.**    And in the same vein, how would changes to the ballot
20  impact other election offices in Monmouth County?
21  **A.**    Well, because we are three different election offices,
22  any changes that are made affect the superintendent of
23  elections office, who is in charge of the machines:  it would
24  affect the training of poll workers relating to the machines,
25  the training of our municipal clerks; and it would also impact

360

1        MR. KOMUVES:  She's talking about what her ballot
2  printer told her.
3        THE COURT:  Sustained.  I mean, sustained.
4        It's okay.  It's not your fault.  It's a legal issue,
5  but sustained.
6        MR. SPIRO:  We had said before that hearsay in
7  preliminary injunctions and -- it has formed her impression,
8  which I think would be an exception to hearsay.
9        THE COURT:  Let me hear the whole answer.  What's the
10  question again?
11  BY MR. SPIRO:
12  **Q.**    I think it --
13  **A.**    You were asking about the changes, and I said that my
14  ballot printer, who designs the ballot for my voting machine,
15  said that would be uncharted territory, that he would need
16  training to do that.
17        THE COURT:  I'll allow that answer only because I've
18  relaxed hearsay earlier against the defense.  I don't see why
19  I wouldn't do it against the plaintiffs' counsel also.
20        So, no, your answer is appropriate and will be
21  considered by the Court.
22        MR. SPIRO:  Thank you, Your Honor.
23  BY MR. SPIRO:
24  **Q.**    You heard testimony before about how an office-block
25  ballot -- strike that, please.

361

1  You heard testimony before about how a grid ballot
2  could be made to look like an office-block ballot, right?  And
3  part of that testimony was that perhaps there could be
4  different blocks on the ballot itself.
5  Do you recall that?
6  A.  Yes.
7  Q.  And have you given consideration for the 2024 primary
8  election about how many blocks would need to appear on the
9  ballot, if it could even be done, in order to accomplish the
10  number of offices that need to be shown to voters?
11  A.  Just give me a moment.
12  Depending upon the municipal races, it could be up to
13  ten depending upon what is going on with the municipal races.
14  I think I counted that right.
15  Q.  Do you have any concerns about attempting to put ten --
16  up to ten blocks on a ballot?
17  A.  Yes.  I don't know whether that can fit on the ballots
18  that we have today.  As there was testimony earlier, there is
19  a limit -- by the plaintiff's expert, there's a limited number
20  of grids on this system, and you would have to factor in how
21  many of these office blocks you could fit on the ballot and in
22  what order and how would that appear.
23  You know, there's a consideration as to what that would
24  look like.
25  Q.  If there -- if the Court were to rule that office-block

362

1  balloting is a constitutional requirement, what are some of
2  the concerns that you might have with attempting to administer
3  an election in that circumstance?
4  A.  Well, to a large degree, I have to rely on our election
5  system company that has filed affidavits in this case about
6  the inability to do certain things by the primary election.
7  It's their equipment.  It's their software.  It's proprietary
8  software that I cannot make changes to.
9  So understanding what they are saying -- and I had a
10  conversation with them myself, and I'm going to ask the judge
11  before I say what -- what --
12  THE COURT:  Go ahead.  You can get it out.
13  THE WITNESS:  Well, when I asked my representative
14  from ES&S, he said -- I said, Could you do this right now?
15  And he said, No, that would be bad.  That was my -- that was
16  my representative even before these affidavits came into play.
17  And in addition to that, when I'm relying on my ballot
18  vendor, who is the one who is helping me create what that
19  machine looks like and what the ballots look like and my --
20  I'm sorry -- my printing vendor -- that that is uncharted
21  territory, and my staff is not capable of making these changes
22  because my staff has been trained on a certain type of format.
23  My staff knows certain codes to plug in play into the format
24  that we have right now.
25  So I have to rely on the information I have to say that

363

1  this would be of grave concern to be able to get this done in
2  the very short time frame that we have.
3  BY MR. SPIRO:
4  Q.  Do you have any concerns about how the statute would
5  operate if the bracketing were removed as a component from the
6  statute?
7  A.  Yes, I do.  Because I think that -- as county clerks, a
8  great deal of what we do is we have to follow the statute.  So
9  there are things that we wouldn't know what to do.  We would
10  need some kind of framework to work within so that we could
11  determine what we do next.
12  And just like, for example, if my -- if
13  Monmouth County's voting machines were unable to be used, I
14  would need some authority somewhere to say to me, here's what
15  you do.  It has to be Court order, has to be executive order,
16  it has to be a statute saying, in the event that you cannot
17  use those, here's what you do.  So like in 2020 when we were
18  having the COVID-19 crisis and we couldn't -- you know, the
19  state decided that we were going to go a different process, it
20  was an executive order that said, County clerks, you're just
21  sending out all mail-in ballots, but that wasn't something
22  that we could decide to do.
23  So having the framework of what we do is very
24  important.
25  In addition to that, conducting the ballot draw.  You

364

1  know, we would need some kind of guidance as to how to do
2  that.  If I have to draw every race separately, I could be
3  doing 1,300 of those ballot draws.  And if I have to do that
4  from 3:30 p.m., the day before the ballots have to go to
5  print, and it has to be open to the public, you know, I need
6  some framework to say, okay, here's what you have to do.  This
7  is how you accomplish that.
8  There are statutes that guide what we do, and there's a
9  framework that we work within.
10  THE COURT:  How many questions do you have left?
11  MR. SPIRO:  Five or less.
12  THE COURT:  All right.  Let's get to it.
13  BY MR. SPIRO:
14  Q.  If you were -- if the ballot was declared
15  unconstitutional, and it wasn't feasible to do machine ballots
16  in the time frame provided by statute, have you given
17  consideration to the possibility of shifting to paper ballots?
18  A.  So it depends on what kind of paper ballots.  So there
19  would need to be some kind of directive, you know, from my
20  either the Court or an executive order or something like that
21  or law change that says we're going all mail-in ballots.
22  And that's assuming that ES&S can reprogram our
23  scanners to accommodate all mail-in ballots, but I just can't
24  make a decision to do that.  If we don't have that, I think
25  that we would have to do paper and potentially hand-counting

1  paper.

2  Q.   How would that work with early voting?

3  A.   For early voting, we would need to have enough paper

4  ballots to accommodate the 950- -- I forgot, how many it

5  was -- 958 -- sorry, I'm getting tired: I think that was the

6  number -- ballot styles because we have Republicans and

7  Democrats, primary.

8       We have the county committee elections, so we have to

9  have all those ballot styles in each of the polling locations,

10  which in Monmouth County is ten, and then we would have to

11  have enough of those to accommodate whoever walked in the

12  door.

13      So I have nothing to compare that to because we haven't

14  had a presidential primary election with early voting.  I only

15  know that, during early voting for our general election, you

16  know, the number varies.  Our max, I think, was about 33,000

17  voters that came in to vote early.

18      But even if we did that, even if I had paper there,

19  there's a framework that I would need.  What happens with that

20  paper once the voter is voting on that paper if I'm not using

21  the machines.

22      What is the custody and control?  What are the

23  envelopes?  What are the -- what are the things that I'm using

24  to ensure that the ballots are protected and secure and able

25  to be ultimately counted for the election?

1  Q.   I know you described a number of different variables that

2  we don't know, but have you given thought to what the

3  estimated cost would be to implement a ballot change at this

4  point in your process?

5  A.   No.  I'm sorry.  I have not.

6       MR. SPIRO:  I have no further questions.

7       THE COURT:  Thank you.

8       Is there any cross?

9       MR. KOMUVES:  Yes, Your Honor.

10      THE COURT:  How long is it?  Because I want to see --

11  before we get to cross from the defense side, who's the next

12  witness, the 30(b)(6) witness?

13      I want to squeeze one more in, and then we're likely

14  done.

15      So who do you want to speak with since pretty much

16  these witnesses were compelled for the benefit of the defense,

17  not the plaintiff?

18      So if you have a choice of one more witness, who would

19  that be?

20      MR. PARIKH:  I think --

21      MR. GOLDBERG:  Well, I would indicate that -- this is

22  Howard Goldberg, Camden County.

23      The testimony just given is essentially the same as

24  that Deputy Clerk John Schmidt would give, so we would

25  stipulate to that.  We don't need to call them.

1       THE COURT:  What would be -- so then what would you

2  want next, Kim's 30(b)(6)?

3       MR. PARIKH:  No.  Well, they designated Mr. Kim as

4  30(b)(6).  I think his campaign manager would be the next one.

5  I'd want to confer with everybody, but I think that would be

6  the --

7       THE COURT:  Is he here?

8       MR. PARIKH:  He should be here sequestered somewhere.

9       THE COURT:  All right.  So then why don't we do that:

10  Let's do the cross.  Hopefully, we can get through that, have

11  that witness, but then we have to adjourn for the day.

12      CSOs have to leave.  Building has to close down.  So be

13  prepared to have the campaign manager on deck.  Whenever one

14  of you is not doing something, go out there and make sure that

15  things are set up while Ms. Hanlon is on the witness stand.

16      MR. PUGACH:  Your Honor, that's just been arranged,

17  Your Honor.

18      THE COURT:  Okay.  Great.  So let's start with the

19  cross, then.  Let's continue.

20      MR. PUGACH:  Your Honor, we also wanted to just make

21  sure that our expert reports are already in evidence.

22      THE COURT:  All the experts are in, so, to the extent

23  another expert is not testifying on direct, you have the

24  report in.

25      The reason why I compelled their testimony was to

1  really give some advantage to the defense to have the ability

2  to at least cross examine some of these witnesses.

3       So I have given that opportunity, but let's have that

4  witness on deck, and let's get the cross-examination started

5  right this second.

6       MR. GENOVA:  On the issue of -- you and I talked

7  about this --

8       MR. PARIKH:  Please.

9       MR. GENOVA:  On the issue of the experts, Your Honor,

10  we haven't had any discovery with them.  We understand here --

11      THE COURT:  The building is closing.  So you're

12  wasting time now with the witness that's on cross-examination.

13  So this is all a waste of time.

14      MR. GENOVA:  I'm just asking whether a letter with

15  respect in lieu --

16      THE COURT:  Let's talk about that after we get the

17  witnesses done.  Right?  I mean, it doesn't need to be done

18  this second.  I can hold you guys a little longer, but we have

19  other folks here that we need to get --

20      MR. PARIKH:  What I was going to say, Your Honor, is

21  that they have put in six or seven expert reports to

22  contradict everything that Ms. Hanlon said.

23      So do they even need the opportunity to cross her right

24  now?  Can that hold, and they can rely upon these reports that

25  Your Honor has already accepted, and we can get to the actual

369

1  fact witnesses to get to the issues of undue delay,
2  irreparable harm, and other issues that have not been
3  testified to?
4      THE COURT:  How long is the cross-examination for
5  Ms. Hanlon?
6      MR. KOMUVES:  Your Honor, it's not going to be
7  insubstantial.  I mean, her testimony was pretty long.
8      THE COURT:  Yeah, but I agree with Mr. Parikh, Right?
9  You've had the benefit of all your expert reports in, right?
10  I provided and compelled these witnesses, so the defense has
11  some opportunity to respond.
12      So how much more can I do?  This cannot be a
13  situation -- I hate to tell you this, but I feel like I'm
14  giving a lesson to a bunch of teenagers.
15      You can't have the court for as long as you want.  That
16  is not what today was about.  You guys actually provided a
17  joint proposed hearing agenda that was complete nonsense.
18      If I looked at what you actually wrote in there and
19  said, We will get all this done today, that was not true, and
20  that comes from both sides.
21      So now I have to put my foot down and say, Where do you
22  want to end this?
23      I'm going to defer to the defense because you've had
24  the benefit of filing the verified complaint.  You had the
25  benefit of the expert reports being provided to the Court.

370

1  The defense has had limited time to respond.
2      And although I didn't have to compel these witness, I
3  did, and I did that to equal the playing field.
4      So if you want to ask a few questions of Ms. Hanlon,
5  I'll allow you that, but that's all you're getting.
6      Then we're going to get the campaign manager on.  We're
7  going to do that testimony, and then we are adjourning.
8      So decide what few questions you want to ask
9  Ms. Hanlon, but you're not getting to take up the rest of the
10  day with this witness and prejudice the defense from getting
11  that one last witness where they're going to try to address
12  some of the issues with respect to the preliminary injunction
13  request.
14      So let's get to it
15  (CROSS-EXAMINATION BY MR. KOMUVES:)
16  Q.  Ms. Hanlon, on the primary election.  You were the
17  county clerk in 2015 and 2020?
18  A.  Yeah.
19  Q.  Were you -- was your name listed on the county-line in
20  those two elections?
21  A.  I don't usually use that term.
22  Q.  Do you know what it means?
23  A.  I know what you're thinking it means.
24  Q.  Okay.  Based on what I think it means, were you on the
25  county-line --

371

1  A.    Was I in the column that was endorsed by the
2  Monmouth County Republican organization?
3  Q.    Yes.
4  A.    Yes.
5  Q.    And featured together in block on -- on the ballot?
6  A.    We were in a column.
7  Q.    In a column.  Okay.
8        And your term is up next year, right?
9  A.    Yes.
10  Q.    And when you run for reelection you're hoping to get the
11  benefit of the line again, aren't you?
12      MR. GENOVA:  Your Honor, objection.  She's already
13  testified she ran for office.  This is -- I mean, it's
14  cumulative.  It's unnecessary.
15      THE COURT:  I'm going to give you about five more
16  questions.  You can use them on these; I don't mind.  But you
17  are not going to get to the crux of what you are trying to get
18  to, because I just told you I was going to limit your cross.
19      MR. KOMUVES:  Judge, at this point --
20  BY MR. KOMUVES:
21  Q.    Do you have your certification there?
22  A.    No.
23      MR. KOMUVES:  May I approach?
24      THE COURT:  You may.
25  BY MR. KOMUVES:

372

1  Q.    This is the certification.  It bears document number ECF
2  61-2.
3        Ms. Hanlon, in that certification, paragraph 26, you
4  wrote you are not personally aware of the ES&S Express Vote XL
5  machines or accompanying elections management software being
6  used with an office-block balloting format in any county in
7  the state.
8        Do you stand by that statement today?
9  A.    Yes, but with a qualification.
10  Q.    Please share that.
11  A.    I stand by that statement because I am not aware of the
12  ExpressXL in the bubble format that you have been talking
13  about and people have been talking about today.
14  Q.    All right.  We --
15  A.    The columns and rows are the format of the Express XL.
16  If somewhere it can be made to look like something, that's a
17  different question.
18      THE COURT:  Ms. Hanlon, is that your certification?
19      THE WITNESS:  So I'm not aware --
20      THE COURT:  Is that your certification --
21      THE WITNESS:  Yes.  Yes.
22      THE COURT:  Do you stand by your certification --
23      THE WITNESS:  I do.
24      THE COURT:  -- or not?
25      THE WITNESS:  I do.

373

1        THE COURT:  Okay.

2        THE WITNESS:  Okay.

3        THE COURT:  There it is.  So you stand by every

4   paragraph in your certification?

5        THE WITNESS:  Yes.

6        THE COURT:  Counsel, what's the next question?

7   BY MR. KOMUVES:

8   Q.    Are you familiar with the -- you've seen the Long Branch

9   ballot from May of 2022, right?  Just -- I want to understand.

10   Your contention is that's not office-block?

11   A.    Right.

12   Q.    Right.  But your -- your systems could design mail for

13   election ballots looking like that today, could they not?

14   A.    This is a contested election with columns and rows.

15   Depending upon the number of columns and rows -- that would be

16   a determining factor.

17   Q.    Could you design an election ballot today that has the

18   candidates in a column with the name and the office term and

19   other information directly to its left, the way the

20   Long Branch ballot --

21   A.    For the -- for the primary -- I'm sorry.  For the machine

22   ballot?

23   Q.    Well, let's start with that, yeah.

24   A.    I can't say that right now, because I'm basing my

25   knowledge on what I stated earlier, what my printing vendor is

United States District Court

District of New Jersey

374

1   saying, what ES&S is saying, what my staff is saying.

2   Q.    Just to be clear, your printer has not ruled out the

3   possibility of having a ballot that looks like this in the

4   primary election, correct?

5   A.    I'm sorry.  I don't know what you're saying.  This or

6   what?

7   Q.    Has your printer ruled out the possibility of having a

8   ballot that looks like the Long Branch 2022 municipal for the

9   primary election?

10   A.    One does not equal the other.

11   Q.    The 2022 election has been -- the 2022 Long Branch ballot

12   has been referred to as an office-block ballot.

13   A.    Not by me.

14   Q.    I understand that.

15        My question is a ballot that looks like this, can

16   that -- that can be designed for machine ballots today by your

17   software?

18   A.    Not.

19        MR. PARIKH:  Objection.  It's argument.  It's been

20   asked and answered now four times.

21        THE COURT:  Let me just hear the answer because it's

22   going to take longer to deal with your objections.

23        So overruled.

24        THE WITNESS:  My answer is the same as it was before.

25   ES&S said no.  Their statement says, Not for the primary

United States District Court

District of New Jersey

375

1   election.  My print vendor said, Uncharted territory and my

2   staff cannot do that.  Because you have so many races, you

3   can't just look at one.

4        THE COURT:  Thank you, Ms. Hanlon.  You're excused.

5        Counsel, get the next.  You've got about 20 minutes

6   before we have to shut down the building.

7        (Brief pause.)

8        THE COURT:  Counsel, you've got 15 minutes with the

9   witness.  Anything else will be supplemented in writing.  The

10   building's closing.  You guys are getting dismissed.  And the

11   fact that nobody's listening, this is where we're at.  So

12   you've got 15 minutes with the witness.  You want to

13   supplement something in writing, both parties can use a few

14   pages to do that.  We're done.

15   (NOAH DION, HAVING BEEN DULY SWORN/AFFIRMED, TESTIFIED AS

16   FOLLOWS:)

17        THE DEPUTY COURT CLERK:  Please state your name and

18   the spelling of your last name for the record.

19        THE WITNESS:  Noah Dion, D-I-O-N.

20        MR. PARIKH:  Judge, may I approach?

21        THE COURT:  You may.  You have 15 minutes.

22        MR. PARIKH:  I understand, Judge.

23   (DIRECT EXAMINATION BY MR. PARIKH:)

24   Q.    I am going to give you what has been marked as

25   Defendants' Exhibit 3.  Hold on to that for a minute.

United States District Court

District of New Jersey

376

1        Can you just tell the judge what your role is and what

2   your job is right now?

3   A.    I am the campaign manager for Andy Kim for New Jersey.

4   Q.    And when did you get hired for that job?

5   A.    I started on October 13th.

6   Q.    And at some point in late November, you reached out to

7   counsel with respect to wanting to have a conversation

8   regarding the county-line; is that right?

9   A.    Yes.

10   Q.    Okay.  And before you had the conversations with counsel,

11   what was the conversations amongst the campaign with respect

12   to the county-line?

13   A.    You know, I was not familiar with New Jersey, so I was

14   learning and hearing about other cases going forward and

15   was -- knew there was a case to take on the county-line.

16        And the discussion was, you know -- as we were getting

17   into things, the congressman had come out against it, and we

18   were getting into a competitive primary situation, and the

19   line looked to loom large, and we were talking about, you

20   know, how do we support this suit and how do we get involved.

21   Q.    And why did you reach out -- well, let me ask this first:

22   Did you reach out to any lawyer -- other lawyers before you

23   reached out to the lawyers that are here today?

24   A.    No.

25   Q.    And why did you reach out to these lawyers?

United States District Court

District of New Jersey

1  A.    I remember finding the On The Line website, and they were
2  listed as counsel.
3  Q.    So they seemed to have the most information and knowledge
4  regarding the issue, correct?
5  A.    Correct.
6  Q.    Okay.  And so you had a Zoom meeting with them on or
7  about November 30th; is that right?
8  A.    That sounds correct.
9  Q.    Okay.  Why don't you take a look at that packet I gave
10  you.  It's double-sided, but why don't we look at page -- why
11  don't we start with page 1, actually, right on the front.
12       So at the very bottom it says November 30th, 2023,
13  meeting recap, right?
14  A.    Yep.
15  Q.    Was Congressman Kim on that call?
16  A.    I don't believe so.
17  Q.    Okay.  So now it looks like -- do you recall the next
18  time you spoke with counsel?
19  A.    I do not.
20  Q.    All right.  Why don't we turn to page 16, please.  Right
21  above your name on that page.
22       Do you see your name on that page?
23  A.    Yes.
24  Q.    It says, Invitation, New Jersey county-line conversation,
25  Friday, December 8th, 2023, Noon to 1:00 p.m. Eastern time,

1  correct?
2  A.    That's correct.
3  Q.    All right.  And so was there a call on December 8th
4  regarding the county-line?
5  A.    Yes.
6  Q.    And right above that, it looks like there was another
7  weekly call the next Friday; is that right?
8  A.    I wouldn't categorize it as a weekly call, but yes, there
9  was a call on the 15th.
10  Q.    And on that December 15th call, Congressman Kim was on
11  there as well, correct?
12  A.    I believe -- actually, I don't remember.
13  Q.    So these emails that you're looking at -- actually, I
14  think, from Congressman Kim.  You can go to page 15, the prior
15  page.  You can see that his name is up there.
16       Does that help refresh your memory as to whether he was
17  on those calls?
18  A.    Yeah.  It would seem that he was on those calls.
19  Q.    Okay.  Now, it was on December 15th that the campaign
20  agreed -- or decided to proceed with pursuing this case,
21  correct?
22  A.    I don't remember the date.
23  Q.    Well, right above that, if you look -- if you continue to
24  look.  I'm sorry.  I'm getting a different page now.  This is
25  the way this was produced.

1  Do you recall talking or hearing about experts being
2  hired for the case?
3  A.    I don't recall hearing that experts were hired.  I recall
4  a conversation about experts, about what type of experts we
5  would need.
6  Q.    So why don't we turn to page 21, please.  We're going to
7  go backwards, okay.
8       At the bottom of that page, if we start moving up,
9  it looks like it goes oldest date at the bottom to most recent
10  date near the top.
11       And it shows a series of emails between you and counsel
12  regarding meetings, et cetera.  Correct?
13  A.    Yes.
14  Q.    Okay.  Now, already in evidence is the fact that multiple
15  experts were hired around December 18th, so would that --
16       MS. BROMBERG:  Objection, Your Honor.
17       MR. KOMUVES:  Misstates testimony.
18       THE COURT:  Sorry.  Repeat it.
19       MR. PARIKH:  I said, Your Honor, that already in
20  evidence is testimony that experts were hired on or around
21  December 18th.
22       MR. KOMUVES:  Misstates the record.
23       MR. PARIKH:  Okay.  I'll rephrase.
24       THE COURT:  Yeah, I'm not so sure that was the
25  testimony either.  I don't have a transcript in front of me,

1  but I'm not sure they said they hired anyone on December '18.
2       MR. PARIKH:  They are correct, Your Honor.
3       THE COURT:  All right.
4  BY MR. PARIKH:
5  Q.    After your meeting on December 15th, it appears that
6  counsel contacted a series of experts on or around December
7  18th.
8       Does that timeline seem to make sense to you?
9  A.    Yes.
10  Q.    Now, if we continue to move up, and we go to page 20,
11  which brings us through New Year's, it looks like on
12  January 3rd you received some emails about quick update
13  regarding experts.
14       Do you see that?
15  A.    Is this to me or from me?
16  Q.    This would be -- this would be to you from one of the
17  counsel that are here at the table to my right.
18  A.    Okay.  So these are the -- my emails -- the emails that
19  were -- okay -- that were addressed to me.  Okay.
20  Q.    Well, some are to you; some are from you.  But yes, all
21  involve you in this list.
22  A.    Got it.  Re:  Quick update, experts, yes.
23  Q.    Okay.  And so it made sense to you that -- you understood
24  that experts had been engaged and were working on reports as
25  of January 23rd, 2024?

381

**A.** I knew that we were -- that counsel was talking to
experts. I don't think we -- that's -- that's what I would
say.

**Q.** All right. And you understood at that time that this was
heading towards litigation, correct?

**A.** We had not made, in my summation, a final decision,
because there needed to be other pieces brought together. So
I think that we knew we were getting serious. We signed a
letter of retainer.

**Q.** So let's go up a little bit more. It looks like on June
3rd, Mr. Komuves sent an invitation to you. It says, video
conference regarding litigation status for Friday, January
5th, 2024.

Does that refresh your memory as to what -- that there
was a discussion about litigation status in January of 2024?

**A.** Okay. Yeah. I mean, we were talking about it.

**Q.** As of June 5th, 2024, there was an understanding that
Andy Kim for New Jersey was going to pursue litigation related
to the county-line, correct?

**A.** No.

MR. KOMUVES: Misstates the testimony. Objection.

THE COURT: He's answering the question. Let the
witness answer it.

THE WITNESS: No. There was a discussion about
what -- what -- whether there would be litigation, and I don't

382

think anything was finalized until a later date.

BY MR. PARIKH:

**Q.** Now, there's also a December 1st federal election
commission deadline, correct?

**A.** Oh, for filing -- for --

**Q.** Finance?

**A.** Well, you didn't have to file that day. That is the last
day to raise funds.

**Q.** Right. And so the filing that happens after that day,
you have to report everything up through December 31st,
correct?

**A.** Correct.

**Q.** And was anything related to this litigation incurred or
paid for in advance of December 31st?

**A.** No.

**Q.** So none of it appeared on the reports, correct?

**A.** No. The report actually has not been -- that report was
filed, but no.

**Q.** Okay. Was that done strategically, to hide the fact that
this litigation makes it possible?

**A.** No. I believe we were going back and forth over the
break. I think it was just the date that made sense. That
was my understanding of it, but...

**Q.** Understood.

And so earlier today, Congressman testified about the

383

fact that, you know, the issue here was that it's about the
ballot design.

Is that your understanding of the reason that the
campaign is here in court -- is to change the ballot design?

**A.** Yes.

**Q.** Okay. And it has less to do with what endorsements the
Congressman has or has not received from either county
political party organizations or others, correct?

**A.** Correct.

**Q.** You understood, being somebody that wasn't from
New Jersey, that -- when you came here, you understood that
the ballot design in New Jersey was unique; is that right?

**A.** I learned it very quickly.

**Q.** And that was back in September, October once you got on
board?

**A.** Yes.

**Q.** So wasn't the house on fire, so to speak, back in
November once a -- a competitor entered the campaign and you
understood that the ballot design could have an issue on the
campaign?

**A.** We understood that it was going to be formidable, that
people were lining up in a way that did not appear to be
balanced in any way with the first lady and -- I think we were
looking ahead to what we could do to make sure that we -- we
put all of our best efforts into -- into securing those lines.

384

I mean, we've obviously won nine now, and that was a
purposeful effort on our part to make sure that we competed in
places where we could.

But, yeah, it seems unfair. It seemed wrong that we
were being essentially shut out of the process without even
being given an opportunity.

**Q.** And that was even with the call to counsel in November,
the calls -- the weekly calls in December, correct?

**A.** To talk about what our options were, yeah.

**Q.** And so the campaign understood, and you as the campaign
manager understood, in January of 2024, that, in order to
effectuate the change to the ballot design that you wanted, a
lawsuit would have to be filed, correct?

**A.** I -- yes.

**Q.** Moving to something a little bit different, a lot of
experts have testified about the effect --

THE COURT: You only have a few minutes left. Use
last three minutes wisely.

MR. PARIKH: Understood. Appreciate it.

BY MR. PARIKH:

**Q.** The effect of the ballot is pretty significant. How long
have you been in campaigns?

**A.** My first was in 2010.

**Q.** So for 14 years, correct?

**A.** Uh-huh.

385

1  Q.  All over the country?

2  A.  Yep.

3  Q.  You understand, right, as a campaign leader now and as

4  somebody that's worked a campaign that campaigns are not just

5  about ballot design, correct?

6  A.  They're about a lot of factors.

7  Q.  Correct.  It's about how much money you can raise?

8  A.  Uh-huh.

9  Q.  Whether you're an incumbent, correct?

10 A.  Uh-huh.

11 Q.  You have to say yes or no for the court reporter.

12 A.  Yes.  Sorry.

13 Q.  Also for how many volunteers you can get, correct?

14 A.  Yes.

15 Q.  What the enthusiasm is for your candidate, whether

16 they're an incumbent, those are all factors that go into how

17 successful a candidate can be at an election, correct?

18 A.  They are the factors, yes.

19 Q.  And there are a multitude of other factors as well,

20 correct?

21 A.  Yes.  Although, I will point out that in no other state

22 have I worked where the ballot was designed in this way.

23 Q.  Understood.  And I'm not saying that the ballot

24 positioning -- in other states that you've worked in, it's

25 really good in a block design ballot to be the first candidate

386

1  at the top, correct?

2  A.  It is -- I don't know.

3  Q.  Okay.

4  A.  Yeah.

5  Q.  All right.

6      MR. PARIKH:  I'll try to make it very brief,

7  Your Honor.

8  BY MR. PARIKH:

9  Q.  Last couple questions.

10     You understood that the primary election process

11 essentially kicked off in January, right?

12 A.  I think it -- yeah.  I mean, like the -- well, the first

13 convention was in early February.

14 Q.  Petitions were out.  You were getting petition signatures

15 in January?

16 A.  Yeah.

17 Q.  Raising money for the election?

18 A.  Sure.

19 Q.  Building an operation, building volunteers.  The

20 election -- we're in the middle of the election right now,

21 correct?

22 A.  Correct.

23 Q.  Okay.

24     MR. PARIKH:  Judge, I have no further questions.

25     THE COURT:  I appreciate that.

387

1      Plaintiffs' counsel, you have one or two questions.  Do

2  you need them?  Are we able to excuse this witness?

3      MR. PUGACH:  We don't have any questions, Your Honor.

4      THE COURT:  Sir, you are excused.  Thank you for your

5  time.

6      THE WITNESS:  Thank you.

7      (Witness excused.)

8      THE COURT:  Folks, you've got Friday deadlines.  You

9  have Monday deadlines to the extent there are some unresolved

10 issues.  I've already given defense the ability to file a

11 letter on the docket.

12     Do not file 19 letters.  You guys should coordinate,

13 consolidate.  I want to get everybody out of here.  I

14 appreciate your time and your hard work today.  This matter is

15 adjourned.

16     MR. PARIKH:  Your Honor, before we leave, I would

17 like to enter or propose to the Court a summation presentation

18 that we're going to provide to the Court that walks through

19 the pathways of facts that are entered into evidence here

20 today as to why it is that this application is barred by

21 *Purcell* and why it is that it is impossible without

22 significant threat to the voters of the state of New Jersey to

23 enter the relief that the plaintiffs are seeking on the

24 timeline that they themselves delayed.

25     THE COURT:  Is that closing summation?

388

1      MR. PARIKH:  I can give you the slides and I'm happy

2  to give them to counsel, and Your Honor can consider them or

3  not as you deem.

4      THE COURT:  Any objection?

5      MR. KOMUVES:  Yes, Your Honor.

6      THE COURT:  It's not evidence.  Do you have one?

7      MR. KOMUVES:  We do not.

8      MR. PARIKH:  I can --

9      THE COURT:  Wasn't part of your proposal of closing

10 remarks that I reserved depending on whether we had time?

11     MR. KOMUVES:  Yes.

12     THE COURT:  So were you going to present some kind of

13 closing remarks?

14     MR. KOMUVES:  It didn't seem based on Your Honor's

15 rulings that that was going to be happening.

16     MS. BROMBERG:  We are prepared to.

17     THE COURT:  I reserved.  I'm not going take closing

18 remarks from one side and not the other.

19     MR. PARIKH:  If Your Honor indulges us for ten

20 minutes, I'm happy to keep mine to five minutes --

21     THE COURT:  No, I can't do that.  We have security

22 officers that have to shut down the building.  We have to make

23 sure that people safely get out of the federal courthouse.

24     So if it was just up to me, I would stay, but it's not

25 up to me.  There are security issues.

389

1        I reserved and I also told the parties that I was not
2   having closing remarks if we didn't have time.  We don't have
3   time, so I reject that proposal.  We are adjourned.
4        Everyone be well.  I appreciate the hard work of
5   counsel today.
6            THE DEPUTY COURT CLERK:  All rise.
7            (Court concludes at 7:45 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*United States District Court*
*District of New Jersey*

390

1   <u>FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE</u>.
2        - - - - - - - - - - - - - - - - - - - -
3
4        I certify that the foregoing is a correct transcript from
5   the record of proceedings in the above-entitled matter.
6
7
8        I
9
10
11   <u>/S/ Megan McKay-Soule, RDR, CRR</u>   <u>March 20, 2024</u>   Court
12   Reporter                      Date
13
14
15
16
17
18
19
20
21
22
23
24
25

*United States District Court*
*District of New Jersey*

# $

**$400** [1] - 314:22

# '

**'18** [1] - 380:1

# /

**/S** [1] - 390:11

# 0

**07071** [1] - 2:21
**07094** [1] - 3:6
**07095** [1] - 2:11
**07102** [1] - 2:15
**07652** [1] - 2:24
**07701** [1] - 2:7
**07866** [1] - 3:24
**08002** [1] - 3:3
**08102** [1] - 3:9
**08108** [1] - 2:18
**08608** [1] - 1:14
**08753** [1] - 3:21
**08830** [1] - 3:18
**08873** [1] - 1:20
**08901** [1] - 3:13

# 1

**1** [36] - 4:20, 35:1, 35:10, 62:14, 63:4, 63:12, 63:14, 63:15, 77:4, 79:11, 81:8, 81:10, 81:14, 82:22, 83:4, 83:12, 83:17, 87:3, 89:3, 89:11, 101:2, 101:5, 101:7, 102:4, 119:19, 120:2, 152:19, 153:24, 155:21, 166:21, 227:11, 248:5, 248:6, 248:24, 350:6, 377:11
**1,300** [1] - 364:3
**10** [2] - 5:4, 290:14
**100** [2] - 279:14, 279:18
**10036-7424** [1] - 2:3
**103** [1] - 4:22
**10:30** [1] - 23:4
**10:37** [3] - 1:15, 6:3, 23:4
**10th** [5] - 190:10, 190:12, 190:14, 196:11, 222:14
**11** [17] - 113:17, 114:9,

117:11, 140:14, 150:6, 151:6, 252:12, 253:8, 253:9, 253:13, 260:12, 265:1, 265:3, 265:8, 265:13, 315:15, 318:6
**110** [2] - 4:23, 4:23
**112** [1] - 4:24
**115-1** [1] - 100:22
**11:59** [1] - 119:17
**122** [1] - 4:4
**125** [1] - 2:21
**12:00** [2] - 19:22, 67:20
**12:30** [1] - 19:22, 67:19, 67:22
**12th** [1] - 293:24
**13** [2] - 316:3, 334:13
**139** [1] - 111:17
**13th** [1] - 376:5
**14** [3] - 252:16, 304:25, 384:24
**14th** [10] - 32:17, 33:5, 38:23, 192:2, 192:15, 192:23, 193:2, 194:5, 195:14, 226:11
**15** [9] - 62:3, 67:17, 288:8, 288:10, 288:14, 375:8, 375:12, 375:21, 378:14
**150** [1] - 3:23
**152** [1] - 4:5
**156** [1] - 4:5
**158** [1] - 4:6
**15th** [5] - 333:10, 378:9, 378:10, 378:19, 380:5
**16** [3] - 99:24, 101:3, 377:20
**164** [1] - 4:6
**165** [2] - 4:7, 4:24
**16th** [1] - 333:11
**17** [3] - 14:11, 102:1, 207:1
**17th** [1] - 286:7
**18** [2] - 1:14, 6:2
**18-plus** [1] - 73:12
**18th** [6] - 257:7, 304:12, 333:11, 379:15, 379:21, 380:7
**19** [18] - 12:10, 41:10, 108:5, 181:12, 214:2, 214:9, 214:11, 214:16, 225:13, 236:11,

236:22, 239:23, 246:2, 310:10, 328:3, 328:7, 348:4, 387:12
**1900s** [1] - 31:14
**192** [1] - 4:25
**1984** [1] - 252:10
**1988** [1] - 252:15
**1994** [3] - 252:11, 253:4, 254:24
**19:49-2** [1] - 42:25
**1:00** [1] - 377:25
**1:09** [1] - 121:5
**1:44** [1] - 121:5
**1st** [4] - 32:17, 33:5, 38:23, 382:3

# 2

**2** [27] - 4:21, 62:14, 63:4, 81:8, 81:10, 82:3, 82:4, 82:25, 83:13, 89:12, 91:18, 91:20, 93:21, 93:22, 94:1, 94:6, 101:7, 102:1, 102:19, 102:21, 103:3, 103:19, 113:1, 243:22, 248:24, 350:7, 351:14
**2,000** [4] - 342:11, 347:24, 353:7, 354:16
**20** [7] - 288:8, 288:10, 288:14, 307:20, 375:5, 380:10, 390:11
**200** [3] - 2:7, 3:6, 57:14
**2002** [2] - 313:2, 315:16
**2003** [1] - 331:7
**2008** [1] - 319:23
**201** [1] - 4:7
**2010** [1] - 384:23
**2012** [1] - 321:11
**2015** [2] - 336:21, 370:17
**2018** [3] - 84:2, 166:7, 324:3
**2019** [5] - 132:2, 132:17, 132:19, 166:8, 331:7
**2020** [15] - 84:2, 218:5, 218:15, 218:16, 218:19, 218:21, 219:3, 219:7, 220:15, 220:16, 221:19, 318:3, 324:4, 363:17,

370:17
**2021** [1] - 339:8
**2022** [18] - 84:3, 138:21, 142:19, 221:1, 221:11, 221:20, 222:2, 222:8, 222:11, 222:16, 222:17, 222:23, 315:17, 351:8, 373:9, 374:8, 374:11
**2023** [14] - 103:10, 103:14, 138:20, 142:20, 142:21, 167:11, 267:6, 268:12, 281:20, 304:12, 305:10, 333:2, 377:12, 377:25
**2024** [27] - 1:14, 6:3, 14:11, 15:4, 32:2, 105:17, 109:7, 118:12, 127:1, 222:8, 224:21, 234:2, 238:3, 286:7, 286:18, 293:24, 343:10, 344:12, 349:16, 349:17, 361:7, 380:25, 381:13, 381:15, 381:17, 384:11, 390:11
**20th** [14] - 38:5, 38:9, 51:3, 254:20, 257:2, 259:16, 259:17, 263:6, 263:8, 344:4, 346:3, 346:19, 354:12, 355:15
**21** [5] - 37:20, 174:17, 210:23, 214:18, 379:6
**210** [1] - 4:8
**212** [1] - 3:20
**220** [1] - 1:19
**22nd** [2] - 168:3, 357:2
**23rd** [13] - 167:10, 167:14, 167:18, 174:6, 185:16, 211:22, 213:14, 213:17, 213:20, 238:15, 305:5, 305:8, 380:25
**24** [3] - 286:18, 287:2, 290:20
**24-1098** [1] - 6:8
**242** [1] - 5:4
**243** [1] - 4:8
**245** [1] - 4:9
**24th** [2] - 289:23, 290:23

**25** [1] - 71:2
**250** [3] - 2:24, 4:9, 4:10
**25th** [2] - 273:8, 343:17
**26** [1] - 372:3
**263** [1] - 4:10
**280** [1] - 4:11
**284** [1] - 4:11
**285** [1] - 4:12
**287** [1] - 4:12
**289** [1] - 5:4
**29th** [3] - 15:3, 346:8, 357:4
**2:30** [1] - 288:11
**2nd** [3] - 3:12, 320:8, 346:9

# 3

**3** [23] - 4:21, 5:4, 33:17, 35:11, 62:14, 63:4, 100:21, 100:23, 101:7, 201:15, 243:25, 244:2, 244:3, 244:8, 247:11, 270:25, 271:2, 271:3, 271:6, 303:21, 351:14, 351:18, 375:25
**3,200** [2] - 260:13, 260:14
**3/25** [1] - 119:16
**30** [7] - 20:2, 69:8, 69:10, 120:24, 153:6, 228:1, 256:8
**30(b)(6** [2] - 366:12, 367:2
**30(b)(6)** [1] - 367:4
**30-minute** [2] - 120:15, 120:24
**300** [1] - 3:6
**302** [1] - 4:13
**309** [1] - 4:13
**30th** [2] - 377:7, 377:12
**310** [3] - 2:7, 2:21, 4:14
**311** [1] - 4:14
**31st** [2] - 382:10, 382:14
**32** [1] - 2:3
**33** [3] - 38:11, 38:12, 178:9
**33,000** [1] - 365:16
**331** [1] - 4:15
**333** [1] - 4:15
**335** [2] - 4:16, 4:16
**343** [1] - 5:5
**35** [1] - 323:5

**360** [1] - 2:18
**369** [1] - 4:17
**37** [1] - 323:5
**374** [1] - 4:17
**375** [1] - 4:18
**38** [1] - 312:6
**3:00** [2] - 201:16,
349:23
**3:24-cv-01098-ZNQ-
TJB** [1] - 1:5
**3:30** [2] - 194:10,
364:4
**3:35** [1] - 198:5
**3:41** [1] - 201:20
**3rd** [6] - 166:5, 166:8,
217:19, 318:4,
380:12, 381:11

**4**

**4** [11] - 4:22, 5:5,
62:14, 63:4, 63:9,
63:12, 101:8,
104:17, 104:20,
344:9, 344:14
**40** [1] - 256:25
**402** [1] - 1:14
**410** [1] - 1:19
**43** [1] - 2:3
**43rd** [1] - 2:3
**440** [1] - 3:17
**45** [17] - 38:6, 69:9,
69:10, 312:6,
315:16, 317:14,
317:19, 317:24,
318:24, 319:13,
321:7, 322:14,
322:16, 330:16,
331:21, 331:25,
334:11
**457** [1] - 3:3
**46** [2] - 104:4, 104:18
**474** [4] - 338:23,
338:24, 347:5,
347:14
**48** [1] - 343:22
**49** [3] - 38:18, 38:21,
180:12
**490,000** [1] - 338:14
**494** [1] - 2:15
**4:22** [1] - 235:3
**4:24** [1] - 236:15
**4th** [11] - 37:12, 37:13,
37:19, 38:8, 254:10,
254:18, 255:3,
343:25, 346:2,
346:10, 349:22

**5**

**5** [8] - 4:23, 98:10,
101:8, 111:11,
111:15, 111:18,
111:21, 290:2
**5.0** [1] - 98:11
**5.15** [3] - 75:22, 98:8,
138:10
**5.17** [1] - 98:11
**5.5** [1] - 98:11
**5.X** [1] - 98:10
**50** [6] - 125:17,
177:15, 207:1,
256:25, 257:1
**50,000** [1] - 355:7
**500** [1] - 3:3
**520** [1] - 3:9
**53** [2] - 339:1, 342:13
**555** [1] - 3:17
**57-1** [1] - 111:10
**576-7094** [1] - 1:22
**58** [1] - 357:13
**5th** [6] - 24:8, 344:2,
345:21, 346:2,
381:13, 381:17
**5W** [2] - 24:8, 30:4

**6**

**6** [7] - 4:23, 101:8,
111:16, 111:19,
112:11, 265:16,
308:24
**6,000** [1] - 40:2
**6.2.0.0** [1] - 75:21
**6.3.0.0** [1] - 75:20
**60** [8] - 15:22, 178:12,
252:23, 256:17,
257:1, 330:1, 330:3,
330:4
**61** [1] - 2:24
**61-2** [1] - 372:2
**6200** [9] - 85:4, 85:22,
85:23, 98:4, 105:2,
107:1, 107:17,
138:6, 138:21
**63** [1] - 85:4
**6300** [8] - 85:22,
85:23, 98:4, 105:3,
107:1, 107:18,
138:6, 138:20
**65-1** [1] - 113:17
**69** [1] - 243:23

**7**

**7** [10] - 4:24, 101:8,
112:4, 113:9,
113:12, 113:25,

120:2, 268:12,
303:24, 309:8
**71** [1] - 4:3
**72** [1] - 4:4
**75** [2] - 3:12, 229:16
**79** [2] - 312:2, 316:4
**7:09** [1] - 306:12
**7:10** [2] - 309:1,
335:23
**7:45** [1] - 389:7
**7th** [1] - 103:10

**8**

**8** [4] - 4:24, 101:8,
113:25, 166:23
**80** [2] - 125:18, 230:18
**83** [4] - 312:3, 316:4,
334:14, 334:16
**856** [1] - 1:22
**88** [1] - 4:20
**8th** [4] - 226:25,
232:16, 377:25,
378:3

**9**

**9** [5] - 4:25, 101:8,
166:21, 265:8, 328:7
**90** [1] - 2:10
**900** [1] - 2:10
**91** [1] - 4:21
**94-1** [1] - 270:1
**948** [1] - 357:12
**95** [3] - 86:10, 87:7,
89:5
**95-1** [1] - 103:20
**950** [1] - 365:4
**951** [1] - 91:19
**958** [4] - 347:23,
347:24, 354:24,
365:5
**99** [1] - 4:21
**99.9** [1] - 248:3
**9:00** [1] - 156:22
**9th** [1] - 321:12

**A**

**A-P-P-E-L** [1] - 285:24
**a.m** [4] - 1:15, 6:3,
23:4
**abbreviate** [1] - 91:1
**abbreviated** [1] -
90:24
**ability** [19] - 84:7,
84:18, 84:21, 84:25,
94:4, 94:13, 95:24,
96:18, 117:5,
140:13, 143:18,

169:11, 170:9,
240:12, 261:12,
319:4, 349:8, 368:1,
387:10
**able** [82] - 26:23, 44:4,
48:12, 53:25, 71:11,
95:1, 100:18,
109:14, 115:11,
116:11, 117:14,
117:19, 122:8,
137:11, 169:11,
169:24, 169:25,
170:1, 170:10,
171:12, 173:20,
174:16, 175:14,
176:22, 177:13,
177:19, 178:14,
180:14, 180:16,
180:17, 180:20,
181:11, 181:16,
182:22, 185:3,
185:9, 189:16,
189:21, 189:23,
190:1, 190:21,
190:22, 191:3,
192:24, 192:25,
195:7, 195:10,
196:1, 196:9,
203:15, 205:6,
216:10, 217:2,
217:15, 217:25,
237:19, 240:2,
250:9, 256:14,
276:4, 276:13,
283:10, 302:1,
322:7, 339:11,
340:21, 341:21,
342:6, 342:15,
342:18, 342:24,
363:1, 365:24, 387:2
**abolishing** [1] - 42:12
**above-entitled** [1] -
390:5
**abroad** [2] - 22:15,
38:6
**absent** [1] - 122:1
**absolute** [1] - 42:6
**absolutely** [12] - 22:5,
22:7, 39:20, 71:6,
89:20, 173:14,
250:9, 257:3,
265:21, 275:1,
276:11, 331:14
**abundance** [1] - 30:15
**academic** [11] - 25:15,
25:17, 44:7, 314:5,
314:7, 314:10,
314:12, 314:15,
329:11, 329:12

**academicians** [1] -
47:21
**accept** [3] - 171:21,
172:1, 185:1
**acceptable** [1] - 89:18
**accepted** [2] - 58:24,
368:25
**accepting** [2] -
337:15, 337:16
**access** [6] - 137:5,
137:11, 137:13,
137:17, 137:21,
249:8
**accessible** [2] - 76:14,
80:13
**accident** [1] - 250:17
**accommodate** [20] -
19:24, 20:6, 33:25,
52:20, 52:21, 277:7,
291:25, 293:14,
302:13, 340:2,
340:11, 340:21,
341:22, 342:11,
342:19, 358:9,
359:19, 364:23,
365:4, 365:11
**accommodates** [2] -
301:13, 302:17
**accompanying** [1] -
372:5
**accomplish** [3] - 52:9,
361:9, 364:7
**accomplished** [1] -
52:25
**according** [1] - 36:19
**account** [1] - 177:15
**accounts** [3] - 178:9,
328:16
**accuracy** [27] -
100:13, 100:16,
122:20, 133:13,
134:5, 134:14,
134:17, 134:21,
134:25, 135:4,
135:14, 135:25,
136:22, 138:24,
139:15, 139:18,
139:22, 141:25,
142:5, 142:19,
143:6, 144:10,
145:22, 147:1,
259:5, 356:5, 356:21
**accurate** [31] - 108:12,
135:5, 139:12,
145:19, 147:17,
206:1, 206:21,
207:6, 247:24,
248:3, 286:15,
288:18, 292:15,
292:19, 292:20,

293:15, 293:16,
293:19, 293:20,
299:19, 299:23,
301:5, 301:14,
301:17, 301:20,
302:20, 302:21,
305:7, 311:16,
311:22, 314:6
**accurately** [1] - 146:7
**achieve** [5] - 168:24,
169:12, 172:4,
190:1, 195:5
**act** [4] - 13:22, 43:4,
43:20, 216:8
**Act** [1] - 74:3
**acting** [1] - 73:17
**ACTION** [1] - 1:4
**action** [6] - 55:13,
109:24, 110:5,
133:17, 195:25,
216:24
**actions** [1] - 195:21
**actively** [6] - 182:6,
182:10, 183:2,
184:15, 203:8,
209:12
**activities** [1] - 213:8
**acts** [5] - 11:24, 20:17,
32:2, 76:23
**actual** [6] - 35:11,
190:11, 192:14,
196:14, 227:17,
368:25
**add** [3] - 110:19,
110:22, 110:25
**added** [3] - 27:3,
322:22, 331:8
**adding** [1] - 116:18
**addition** [11] - 46:6,
236:5, 295:2, 340:5,
342:11, 342:20,
348:15, 353:6,
355:2, 362:17,
363:25
**additional** [28] - 11:1,
21:15, 21:19, 27:7,
70:15, 70:19, 100:6,
100:7, 113:5,
117:13, 118:23,
119:4, 119:5, 123:2,
146:1, 149:1,
150:23, 152:1,
152:22, 160:13,
160:17, 160:20,
163:4, 264:17,
330:20, 331:23,
332:1
**additionally** [1] - 76:6
**address** [19] - 6:10,
10:19, 19:8, 34:15,

50:3, 58:17, 69:22,
71:1, 78:8, 85:8,
97:11, 122:2,
150:15, 201:1,
228:2, 247:12,
249:15, 327:21,
370:11
**addressed** [7] - 13:2,
34:7, 44:25, 63:13,
284:5, 357:23,
380:19
**addresses** [2] - 353:8,
353:9
**addressing** [5] - 11:9,
34:9, 47:14, 78:5
**adds** [1] - 347:20
**adhered** [1] - 131:17
**adjourn** [2] - 309:1,
367:11
**adjourned** [2] -
387:15, 389:3
**adjourning** [1] - 370:7
**adjust** [2] - 83:21,
110:4
**adjusted** [1] - 144:19
**adjustments** [6] -
11:4, 69:5, 116:17,
116:25, 117:1
**administer** [3] -
128:24, 129:1, 362:2
**administering** [5] -
28:2, 41:15, 46:12,
113:17, 157:9
**administration** [3] -
73:14, 74:9, 74:24
**Administration** [1] -
3:12
**administrative** [1] -
46:9
**administratively** [1] -
42:14
**administrators** [1] -
157:14
**admit** [4] - 27:16,
292:13, 344:18,
344:19
**admitted** [6] - 87:5,
87:6, 88:5, 88:20,
120:3, 344:22
**advance** [6] - 13:2,
48:5, 69:19, 250:16,
308:13, 382:14
**advanced** [2] - 55:2,
55:10
**Advantage** [3] -
299:18, 299:22,
300:25
**advantage** [13] -
171:22, 172:5,
172:13, 173:8,

179:17, 179:22,
180:8, 185:8,
190:24, 203:16,
237:17, 238:18,
368:1
**advantages** [8] -
32:10, 172:1, 172:7,
177:22, 180:9,
185:4, 215:3, 215:6
**adverse** [7] - 173:23,
185:9, 190:12,
196:12, 207:24,
222:14, 222:17
**adversely** [1] - 171:24
**advise** [3] - 22:2,
110:4, 333:12
**advised** [1] - 130:9
**advisement** [1] -
92:20
**advising** [1] - 74:8
**advocacy** [1] - 175:17
**advocate** [1] - 30:19
**affect** [12] - 168:14,
169:23, 171:5,
171:24, 172:10,
244:18, 244:19,
245:3, 245:5,
245:11, 358:22,
358:24
**affected** [1] - 171:18
**affecting** [1] - 164:12
**affects** [1] - 168:15
**affidavit** [6] - 104:3,
104:17, 114:20,
114:22, 114:25,
115:10
**affidavits** [4] - 36:22,
88:16, 362:5, 362:16
**affirmed** [1] - 112:12
**afforded** [1] - 185:3
**affords** [1] - 61:2
**afield** [1] - 235:1
**afternoon** [18] - 18:1,
20:4, 22:20, 22:21,
28:11, 123:20,
129:8, 133:7,
156:21, 166:2,
200:5, 200:9,
200:18, 250:17,
251:11, 264:22,
286:1, 336:8
**afterwards** [1] - 248:8
**agency** [3] - 74:1,
125:9, 297:8
**agenda** [1] - 369:17
**aggregate** [4] - 76:4,
315:20, 325:16,
325:23
**aggrieved** [1] - 60:23
**ago** [5] - 37:20, 43:19,

58:19, 205:1, 260:8
**agree** [25] - 13:6, 71:6,
85:17, 88:4, 105:18,
105:25, 106:15,
109:1, 109:5,
112:15, 112:18,
150:10, 202:14,
202:20, 235:11,
235:17, 272:22,
316:23, 321:5,
322:11, 323:12,
323:18, 325:2,
328:19, 369:8
**agreed** [8] - 69:8,
69:10, 75:4, 104:15,
122:11, 247:5,
332:17, 378:20
**agreement** [5] - 122:4,
305:4, 305:7,
305:12, 305:13
**agrees** [1] - 114:24
**ahead** [22] - 13:13,
97:12, 99:11, 129:9,
133:8, 174:20,
187:18, 194:12,
213:21, 217:10,
230:23, 232:4,
244:12, 261:11,
265:10, 268:24,
269:1, 281:15,
315:15, 350:19,
362:12, 383:24
**aided** [1] - 1:24
**al** [4] - 1:8, 1:12, 6:7,
6:8
**align** [1] - 316:6
**aligned** [1] - 151:9
**all-hazards** [1] -
127:13
**allegations** [2] -
27:25, 208:15
**alleged** [6] - 24:25,
44:19, 63:10,
316:14, 319:17,
322:9
**alleging** [3] - 237:10,
237:12
**allow** [23] - 58:12,
83:16, 90:2, 91:14,
105:25, 116:2,
118:3, 157:21,
180:13, 219:23,
222:3, 236:8,
236:12, 236:17,
241:19, 242:19,
284:16, 314:1,
325:10, 339:5,
349:12, 360:17,
370:5
**allowed** [2] - 180:20,

300:11
**almost** [5] - 43:19,
46:3, 161:18,
235:20, 236:13
**alone** [2] - 57:23,
106:6
**alongside** [6] - 97:25,
109:1, 109:20,
110:12, 125:14,
154:6
**alpha** [1] - 155:15
**alphabet** [5] - 154:23,
154:24, 154:25,
155:4, 155:15
**alphabetical** [1] -
350:3
**alternative** [2] - 58:23,
325:20
**alternatively** [1] -
17:18
**alternatives** [1] - 34:1
**amenable** [1] - 71:20
**amending** [1] - 234:22
**Amendment** [1] -
38:23
**Amendments** [1] -
32:17
**America** [1] - 74:2
**American** [1] - 174:2
**Americans** [1] - 38:6
**amicus** [3] - 14:21,
16:15, 33:11
**amount** [16] - 13:9,
117:16, 117:21,
145:21, 146:6,
149:4, 151:20,
160:6, 160:9, 161:7,
161:25, 239:24,
260:24, 263:2,
302:1, 302:11
**analysis** [22] - 64:16,
191:5, 193:1,
226:14, 311:24,
316:16, 316:22,
319:16, 320:24,
322:6, 322:10,
322:20, 322:22,
324:1, 325:21,
330:16, 330:22,
331:10, 331:19,
331:23, 333:13,
359:7
**analyze** [1] - 192:24
**analyzed** [1] - 331:9
**Anderson** [2] - 32:17,
44:17
**Anderson-Burdick** [1]
- 32:17
**ANDREW** [2] - 4:11,
285:20

*United States District Court*
*District of New Jersey*

**Andrew** [6] - 165:20, 267:11, 283:13, 283:18, 285:24, 304:5
**Andrews** [3] - 319:22, 320:3, 320:21
**Andrews'** [1] - 320:25
**Andy** [5] - 22:18, 33:7, 165:13, 376:3, 381:18
**ANDY** [4] - 1:3, 1:3, 4:6, 165:16
**Angelo** [2] - 7:9, 8:18
**ANGELO** [1] - 2:13
**Ann** [2] - 3:7, 96:9
**announced** [3] - 211:15, 211:18, 211:22
**annual** [1] - 273:4
**answer** [48] - 39:21, 42:18, 53:10, 77:17, 80:7, 84:14, 90:2, 95:1, 95:3, 95:21, 95:22, 100:5, 108:7, 109:16, 115:11, 116:9, 118:5, 119:2, 129:18, 130:3, 134:9, 141:7, 141:18, 158:19, 159:7, 162:15, 163:1, 163:5, 222:5, 230:23, 242:24, 245:15, 265:14, 268:16, 275:17, 279:11, 285:7, 285:8, 301:7, 303:4, 319:4, 332:12, 360:9, 360:17, 360:20, 374:21, 374:24, 381:23
**answered** [8] - 129:25, 136:13, 221:17, 243:7, 296:7, 315:4, 332:4, 374:20
**answering** [1] - 381:22
**answers** [2] - 124:18, 158:5
**anticipate** [1] - 41:4
**anyhow** [1] - 116:20
**anyway** [7] - 37:1, 37:5, 68:1, 70:24, 157:1, 204:6, 228:14
**apart** [2] - 355:16, 359:21
**apologies** [2] - 290:15, 358:11
**apologize** [5] - 96:20, 197:7, 278:3, 315:5,

346:1
**apparatus** [1] - 339:23
**appear** [13] - 16:14, 97:22, 144:23, 237:14, 315:17, 348:17, 348:20, 349:5, 349:13, 355:22, 361:8, 361:22, 383:22
**appearance** [2] - 9:17, 199:9
**appearances** [1] - 6:11
**appeared** [7] - 218:5, 218:14, 218:19, 227:15, 227:22, 242:6, 382:16
**appearing** [3] - 211:12, 215:25, 239:20
**APPEL** [2] - 4:11, 285:20
**Appel** [19] - 34:20, 198:1, 198:11, 198:18, 200:14, 267:11, 283:13, 283:18, 285:24, 286:1, 286:17, 288:4, 290:5, 303:10, 303:13, 303:19, 303:24, 304:5, 304:25
**applicable** [4] - 33:4, 107:13, 116:18, 256:15
**application** [8] - 46:25, 47:1, 49:17, 49:22, 78:19, 130:10, 152:10, 387:20
**applications** [5] - 24:25, 78:19, 81:5, 337:17, 355:12
**applied** [1] - 106:20
**applies** [4] - 43:7, 62:10, 108:22, 137:9
**apply** [3] - 63:11, 81:10, 84:24
**appreciate** [17] - 10:21, 14:6, 59:4, 66:22, 67:3, 85:11, 122:24, 122:25, 124:1, 185:11, 248:10, 287:9, 318:25, 384:19, 386:25, 387:14, 389:4
**appreciating** [1] - 85:9
**approach** [27] - 28:24, 29:24, 121:2,

127:13, 136:10, 193:5, 228:17, 228:18, 232:12, 232:14, 233:17, 237:4, 237:6, 267:8, 269:24, 271:12, 286:10, 290:1, 303:16, 306:1, 310:23, 310:25, 316:9, 345:2, 351:15, 371:23, 375:20
**approached** [1] - 238:9
**approaching** [3] - 193:7, 249:19, 267:10
**appropriate** [6] - 11:8, 13:8, 37:19, 49:4, 69:17, 360:20
**appropriately** [2] - 88:12, 140:6
**approval** [2] - 260:6, 261:18
**approved** [6] - 86:1, 86:6, 260:1, 260:15, 261:21, 293:12
**approving** [1] - 263:3
**April** [27] - 37:12, 37:13, 38:5, 38:8, 254:10, 254:18, 254:20, 255:3, 257:2, 259:16, 259:17, 263:6, 263:8, 273:15, 273:16, 343:25, 344:2, 344:4, 345:21, 346:2, 346:3, 346:19, 349:22, 354:12, 355:15
**archives** [1] - 337:5
**arduous** [1] - 260:18
**area** [9] - 70:7, 71:4, 74:18, 75:7, 260:13, 295:21, 320:9, 338:21
**areas** [3] - 25:21, 84:5, 338:19
**argue** [3] - 23:18, 32:22, 38:5
**arguing** [2] - 57:16, 57:17
**argument** [16] - 24:8, 30:7, 44:5, 53:8, 55:25, 57:10, 57:12, 61:5, 64:8, 172:18, 172:19, 196:1, 196:3, 228:5, 309:18, 374:19

**arguments** [2] - 42:2, 266:14
**arranged** [1] - 367:16
**arrangement** [1] - 170:20
**arrival** [1] - 199:18
**arrived** [1] - 248:19
**Article** [3] - 33:17, 35:10, 35:11
**article** [8] - 314:14, 330:2, 330:5, 330:8, 331:2, 331:9, 331:17, 332:8
**articles** [5] - 314:7, 314:9, 314:12, 329:12, 329:13
**articulated** [1] - 89:12
**AS** [7] - 72:24, 165:16, 251:1, 285:21, 310:18, 336:4, 375:15
**ascertain** [2] - 113:22, 115:5
**ascribing** [1] - 147:6
**aside** [2] - 16:12, 65:6
**aspect** [3] - 80:20, 176:25, 196:17
**Assembly** [1] - 236:24
**assert** [2] - 44:12, 151:3
**assertion** [3] - 106:15, 152:13, 152:14
**asses** [1] - 44:8
**assess** [2] - 16:9, 215:15
**assessed** [1] - 148:5
**assessment** [1] - 15:23
**assist** [2] - 212:11, 254:22
**Assistance** [9] - 73:16, 73:19, 85:24, 128:10, 128:18, 131:5, 162:11, 163:5, 297:4
**ASSISTANT** [1] - 3:8
**Assistant** [1] - 8:2
**assisted** [1] - 139:13
**assists** [1] - 342:8
**associate** [21] - 60:11, 60:14, 60:16, 61:9, 61:15, 65:23, 66:15, 82:14, 171:6, 183:7, 183:13, 184:10, 184:11, 184:13, 202:15, 202:21, 203:2, 209:16, 209:18, 224:13, 238:12
**associated** [12] -

40:13, 60:19, 160:17, 170:17, 170:23, 171:1, 181:24, 182:2, 182:16, 183:24, 227:12, 241:1
**ASSOCIATES** [1] - 3:2
**Associates** [1] - 8:6
**associating** [1] - 65:23
**Association** [1] - 204:18
**association** [14] - 60:15, 60:25, 65:24, 183:6, 202:12, 202:13, 203:7, 209:15, 237:23, 238:1, 238:3, 238:5, 238:24
**associational** [5] - 43:11, 44:3, 52:22, 245:10, 348:22
**associations** [2] - 143:2, 203:1
**assume** [4] - 14:3, 69:13, 105:7, 127:2
**assumed** [1] - 105:1
**assuming** [4] - 106:19, 179:13, 262:2, 364:22
**ate** [1] - 332:13
**Atlantic** [7] - 7:11, 267:3, 267:6, 267:17, 268:3, 294:2, 294:4
**attached** [3] - 92:2, 191:16, 191:23
**attaching** [1] - 300:8
**attack** [1] - 44:7
**attempt** [3] - 16:14, 262:24, 271:15
**attempting** [3] - 49:6, 361:15, 362:2
**attend** [3] - 142:14, 205:3, 205:6
**attended** [1] - 248:23
**attention** [2] - 186:22, 226:18
**attentive** [1] - 187:23
**attest** [2] - 111:22, 284:1
**attested** [3] - 85:4, 111:24, 148:24
**attests** [1] - 112:7
**attorney** [22] - 14:10, 14:18, 15:1, 15:4, 15:17, 15:19, 15:22, 16:8, 16:23, 17:1, 17:10, 17:22, 21:20, 32:21, 32:25, 53:8,

88:7, 156:4, 188:12, 216:12, 216:22, 305:14

**attorney-client** [1] - 188:12

**attorneys** [10] - 159:13, 188:24, 189:11, 215:15, 216:10, 216:15, 217:15, 217:22, 282:7, 288:24

**attribute** [1] - 317:20

**attributed** [2] - 321:1, 321:3

**audits** [2] - 131:16, 132:24

**author** [3] - 115:18, 142:12, 142:15

**authorities** [1] - 132:20

**authority** [3] - 137:8, 338:9, 363:14

**authorized** [1] - 192:4

**authors** [1] - 329:18

**automatically** [1] - 116:24

**available** [6] - 67:9, 188:23, 188:25, 216:11, 270:10, 333:19

**AVC** [3] - 299:18, 299:22, 300:25

**Ave** [1] - 1:19

**Avenue** [3] - 2:18, 2:21, 3:20

**average** [3] - 312:6, 315:23, 315:24

**avoid** [4] - 55:25, 72:16, 171:22, 243:17

**awarded** [8] - 33:15, 169:5, 171:17, 181:24, 182:4, 183:12, 207:20

**awarding** [5] - 177:3, 186:16, 190:11, 196:11, 243:1

**aware** [39] - 14:10, 19:15, 21:13, 48:23, 111:12, 157:16, 158:12, 158:17, 171:2, 199:18, 200:6, 219:22, 223:6, 223:11, 223:16, 230:11, 230:14, 232:23, 236:23, 266:16, 266:19, 271:20, 288:20, 289:9, 289:20, 289:23,

293:17, 297:13, 321:23, 322:2, 328:22, 329:1, 346:13, 350:12, 350:18, 350:21, 372:4, 372:11, 372:19

**B**

**BA** [1] - 193:20

**back-and-forth** [2] - 354:15, 354:18

**backdoor** [1] - 15:12

**background** [11] - 17:25, 25:16, 70:16, 73:8, 73:24, 75:5, 124:15, 171:3, 183:23, 312:25, 313:22

**backgrounds** [2] - 171:2, 203:2

**backwards** [1] - 379:7

**backyard** [1] - 54:3

**bad** [2] - 290:8, 362:15

**balanced** [1] - 383:23

**balances** [1] - 63:17

**balancing** [4] - 18:11, 32:23, 44:8, 63:16

**ballot** [484] - 12:25, 17:19, 32:11, 33:14, 33:23, 34:17, 34:21, 36:17, 36:19, 36:23, 37:2, 37:16, 37:17, 38:24, 38:25, 39:2, 40:10, 40:11, 40:24, 47:21, 52:21, 55:22, 56:12, 56:21, 57:6, 57:7, 57:8, 57:14, 58:7, 58:8, 60:21, 61:3, 61:10, 61:12, 61:17, 61:19, 61:20, 61:22, 61:24, 63:2, 64:19, 64:21, 65:13, 65:17, 65:20, 76:15, 76:17, 76:18, 76:20, 76:21, 76:22, 76:24, 78:23, 78:25, 79:1, 79:2, 79:4, 79:6, 79:7, 79:9, 80:14, 81:9, 81:20, 81:21, 82:6, 82:8, 82:10, 84:8, 84:19, 84:21, 94:5, 94:11, 94:14, 95:9, 95:25, 96:3, 96:10, 96:11, 96:15, 96:16, 96:23, 97:21, 98:14, 98:23, 99:15, 99:18, 99:21, 101:3, 101:6, 101:9,

101:13, 101:15, 101:17, 102:6, 102:20, 103:7, 103:10, 103:11, 103:13, 103:15, 103:17, 105:5, 105:8, 105:9, 105:10, 105:11, 105:19, 106:4, 106:5, 106:7, 106:10, 106:11, 107:10, 108:13, 108:18, 108:19, 108:23, 109:19, 109:25, 110:5, 110:7, 110:10, 110:13, 110:16, 110:17, 110:24, 112:1, 112:5, 112:8, 112:13, 112:14, 112:16, 114:2, 114:5, 114:9, 114:14, 115:11, 115:17, 115:22, 115:25, 116:11, 116:12, 116:14, 116:24, 117:2, 117:15, 117:20, 117:21, 117:24, 125:24, 133:20, 133:24, 134:4, 134:15, 135:1, 135:2, 135:6, 135:8, 136:3, 136:14, 136:15, 136:18, 138:5, 138:7, 138:13, 138:16, 140:11, 140:12, 141:24, 142:4, 144:19, 144:22, 144:24, 145:6, 145:10, 145:14, 145:17, 145:19, 145:23, 145:25, 147:11, 147:24, 147:25, 148:2, 148:8, 148:18, 149:2, 149:5, 149:6, 150:1, 150:25, 151:10, 151:13, 152:2, 152:9, 152:11, 152:25, 153:20, 153:23, 154:7, 154:15, 154:19, 155:18, 155:20, 158:23, 159:22, 160:1, 160:2, 160:3, 160:5, 160:11, 160:15, 160:18, 160:24, 161:5, 161:12,

161:20, 161:25, 167:15, 168:14, 168:18, 168:19, 170:21, 172:13, 172:21, 173:9, 173:11, 176:2, 176:3, 180:7, 180:13, 181:21, 206:8, 206:13, 206:20, 207:5, 207:17, 207:25, 208:13, 211:19, 213:25, 214:3, 215:3, 215:25, 216:6, 218:5, 218:14, 218:19, 219:4, 219:7, 221:4, 221:11, 229:10, 231:5, 231:15, 234:2, 234:5, 236:25, 237:14, 237:20, 239:10, 239:13, 240:25, 253:10, 253:11, 253:20, 253:25, 254:1, 254:9, 254:16, 255:11, 255:13, 255:17, 255:21, 256:2, 256:4, 256:13, 256:24, 257:10, 257:13, 257:24, 259:10, 259:20, 260:22, 263:15, 265:23, 266:23, 267:16, 268:3, 268:10, 268:11, 269:18, 269:19, 270:19, 271:6, 271:8, 272:4, 272:9, 272:11, 272:21, 272:22, 274:20, 275:7, 276:13, 277:7, 281:18, 281:23, 282:9, 282:14, 282:25, 291:9, 291:16, 292:1, 292:15, 292:19, 292:22, 293:1, 293:5, 293:14, 293:18, 294:3, 294:4, 294:14, 294:16, 294:18, 294:23, 295:5, 295:11, 295:18, 295:24, 296:3, 296:6, 297:15, 297:18, 297:19, 297:23, 297:25, 298:7, 298:8, 298:10,

298:13, 298:15, 298:16, 298:19, 299:4, 299:23, 300:1, 300:16, 301:1, 301:14, 302:2, 302:17, 302:24, 314:7, 324:5, 329:14, 334:2, 337:17, 339:11, 339:14, 340:14, 340:16, 342:19, 343:21, 343:23, 343:25, 344:1, 344:6, 346:21, 347:25, 348:1, 348:8, 348:9, 348:11, 348:13, 348:16, 348:17, 348:22, 348:25, 349:6, 349:13, 349:18, 349:20, 349:21, 350:13, 350:22, 351:7, 351:25, 352:2, 352:3, 352:5, 352:13, 352:14, 352:15, 352:20, 352:22, 352:23, 352:24, 353:2, 353:11, 353:13, 353:14, 353:15, 353:17, 353:19, 353:21, 353:22, 354:1, 354:2, 354:5, 354:9, 354:15, 354:20, 355:12, 355:19, 355:20, 355:23, 357:13, 357:15, 357:17, 357:19, 357:21, 357:24, 358:6, 358:19, 359:4, 359:6, 359:7, 359:9, 359:16, 359:20, 359:22, 360:1, 360:14, 360:25, 361:1, 361:2, 361:4, 361:9, 361:16, 361:21, 362:17, 363:25, 364:3, 364:14, 365:6, 365:9, 366:3, 371:5, 373:9, 373:17, 373:20, 373:22, 374:3, 374:8, 374:11, 374:12, 374:15, 383:2, 383:4, 383:12, 383:19, 384:12, 384:21, 385:5, 385:22, 385:23,

385:25
**ballot-marking** [4] -
76:15, 76:21, 76:24,
80:14
**ballot-proofing** [1] -
142:4
**ballot-style** [1] - 105:5
**balloting** [5] - 224:4,
229:10, 230:13,
362:1, 372:6
**ballots** [182] - 31:13,
31:22, 35:1, 37:7,
37:8, 37:24, 38:5,
38:18, 38:20, 38:21,
43:12, 43:14, 58:4,
65:8, 65:16, 76:3,
77:10, 78:16, 84:24,
85:1, 92:5, 92:7,
92:11, 94:19, 95:6,
96:18, 97:18,
102:14, 103:12,
103:16, 110:8,
112:7, 115:2, 115:6,
116:7, 117:7,
117:18, 117:24,
118:12, 133:13,
133:16, 136:16,
139:2, 144:18,
145:1, 146:2, 146:5,
146:7, 154:1, 159:1,
168:15, 180:6,
180:23, 181:7,
184:5, 192:9,
206:17, 207:2,
225:3, 225:10,
225:13, 226:14,
230:1, 230:4, 252:9,
252:10, 252:11,
252:12, 253:4,
253:7, 253:17,
254:21, 254:22,
254:25, 255:4,
255:8, 259:5,
259:16, 260:10,
260:13, 260:15,
260:21, 261:2,
262:6, 262:15,
263:3, 263:18,
263:21, 264:3,
266:4, 271:8,
271:24, 272:2,
272:15, 272:17,
272:18, 272:25,
273:25, 274:3,
274:7, 274:8,
274:14, 274:22,
274:24, 275:8,
276:7, 276:16,
276:22, 277:17,
278:7, 278:12,

278:14, 278:23,
279:1, 279:7,
279:23, 280:2,
280:4, 280:22,
281:2, 281:7,
289:18, 293:13,
296:22, 296:24,
302:25, 310:8,
314:10, 337:15,
337:18, 338:4,
338:5, 339:16,
339:24, 340:17,
340:22, 341:21,
341:22, 342:8,
344:2, 344:5,
345:22, 346:15,
347:7, 347:20,
347:21, 348:3,
352:25, 353:4,
353:19, 354:12,
354:14, 354:24,
355:4, 355:5, 355:8,
355:13, 355:16,
355:17, 355:25,
356:1, 356:2, 357:8,
357:11, 358:9,
359:2, 361:17,
362:19, 363:21,
364:4, 364:15,
364:17, 364:18,
364:21, 364:23,
365:4, 365:24,
373:13, 374:16
**Ballots** [1] - 286:19
**bang** [1] - 156:20
**Bank** [1] - 2:7
**bar** [3] - 29:10, 35:13,
217:17
**barred** [1] - 387:20
**barristers** [2] - 41:10,
51:3
**BARRY** [1] - 3:19
**Barry** [1] - 8:21
**base** [1] - 153:20
**based** [22] - 29:12,
44:5, 47:14, 57:23,
64:23, 75:16, 83:24,
94:3, 94:5, 94:10,
94:11, 96:3, 97:15,
97:18, 101:3, 101:5,
101:7, 101:9,
101:14, 101:17,
101:19, 102:3,
102:6, 102:24,
102:25, 103:24,
105:5, 106:4,
106:10, 106:11,
106:22, 108:23,
109:19, 110:10,
110:17, 112:19,

112:22, 112:23,
115:6, 115:25,
116:12, 117:20,
117:21, 135:20,
151:7, 151:23,
154:22, 155:1,
155:5, 158:25,
161:8, 173:15,
173:25, 176:19,
179:18, 195:15,
206:17, 207:2,
207:19, 217:11,
253:20, 256:2,
256:8, 276:18,
277:4, 281:17,
322:6, 326:21,
349:23, 370:24,
388:14
**basic** [1] - 255:23
**basing** [1] - 373:24
**basis** [10] - 94:24,
133:22, 143:16,
178:15, 218:10,
220:15, 222:1,
232:1, 265:5, 313:24
**Bass** [1] - 299:25
**Bayard** [1] - 3:12
**bearer** [1] - 60:19
**bearers** [1] - 63:19
**bearing** [2] - 22:7,
64:10
**bears** [1] - 372:1
**became** [1] - 189:24
**become** [3] - 167:23,
213:18, 336:22
**becomes** [4] - 44:8,
155:4, 169:25,
172:25
**BEEN** [7] - 72:24,
165:16, 251:1,
285:20, 310:17,
336:3, 375:15
**began** [1] - 188:21
**begin** [5] - 110:14,
120:15, 192:4,
336:13, 355:15
**beginning** [5] - 6:11,
16:12, 134:9,
216:19, 225:8
**begins** [3] - 198:5,
235:3, 346:8
**behalf** [37] - 6:13,
6:17, 6:22, 7:10,
7:19, 8:3, 8:6, 8:9,
8:14, 8:18, 8:22,
8:23, 9:1, 9:4, 9:9,
9:11, 9:13, 9:19,
9:24, 10:2, 10:6,
10:13, 30:19, 59:21,
66:8, 125:20,

129:23, 135:6,
136:16, 136:19,
137:8, 156:9,
156:13, 156:14,
157:6, 182:11,
267:16
**behaves** [1] - 300:14
**behavior** [1] - 313:5
**behind** [3] - 14:23,
61:12, 316:13
**belabor** [3] - 19:9,
53:9, 55:14
**belatedly** [2] - 26:22,
28:6
**believes** [1] - 325:8
**Bell** [1] - 9:19
**BELL** [3] - 3:22, 3:23,
9:18
**below** [2] - 30:20, 63:6
**bench** [2] - 23:7,
306:13
**beneficial** [1] - 325:4
**beneficiaries** [1] -
32:10
**benefit** [12] - 44:15,
64:9, 178:17,
178:18, 185:19,
319:16, 319:17,
366:16, 369:9,
369:24, 369:25,
371:11
**benefits** [2] - 177:17,
253:2
**benefitting** [3] - 64:14,
64:18
**Benjamin** [2] - 104:4,
104:17
**Benson** [1] - 8:21
**BENSON** [1] - 3:19
**Bergen** [3] - 2:25,
9:24, 256:3
**best** [9] - 7:7, 53:2,
60:19, 128:16,
131:23, 304:9,
319:3, 327:7, 383:25
**better** [5] - 15:15,
67:23, 141:14,
320:21, 335:22
**between** [20] - 19:22,
46:4, 60:22, 76:21,
186:8, 191:5,
217:18, 274:18,
282:20, 285:9,
295:16, 304:10,
312:6, 315:16,
326:22, 327:14,
330:12, 330:16,
353:18, 379:11
**bevy** [2] - 41:10, 51:3
**beyond** [2] - 149:5,

274:4
**bias** [1] - 265:6
**biased** [1] - 66:24
**Biden** [2] - 240:14,
240:20
**big** [5] - 61:5, 63:10,
195:15, 254:18,
285:13
**Bill** [5] - 202:8,
321:12, 321:20,
321:24, 322:3
**binder** [1] - 28:24
**binding** [1] - 25:24
**bit** [29] - 9:16, 19:4,
32:20, 37:11, 73:8,
77:5, 79:19, 81:14,
103:8, 116:15,
124:15, 148:11,
152:3, 167:17,
172:7, 174:5,
185:12, 187:25,
248:1, 252:5,
253:22, 257:15,
261:6, 283:23,
286:5, 294:22,
307:9, 381:10,
384:15
**bite** [1] - 156:23
**blame** [1] - 19:9
**blank** [3] - 82:7, 82:8,
82:9
**blatant** [1] - 249:4
**blind** [1] - 52:14
**Block** [1] - 286:19
**block** [138] - 26:3,
35:1, 92:12, 92:19,
93:1, 93:5, 93:10,
93:14, 93:18, 94:7,
94:8, 94:9, 94:12,
94:20, 95:6, 95:10,
95:25, 96:7, 96:11,
97:17, 97:23, 98:16,
99:18, 100:1,
101:13, 101:15,
103:3, 103:5,
103:22, 103:24,
106:8, 107:14,
108:24, 112:9,
112:19, 115:25,
116:11, 117:6,
118:13, 144:19,
153:20, 180:12,
181:7, 181:10,
181:20, 225:3,
225:13, 229:10,
229:25, 230:4,
231:4, 231:15,
234:4, 266:3, 268:5,
269:11, 269:18,
270:23, 272:6,

272:12, 272:14,
272:20, 272:23,
277:17, 278:7,
278:12, 278:15,
279:1, 279:2, 279:6,
289:17, 291:8,
292:1, 292:15,
292:19, 292:22,
293:1, 293:6,
293:10, 293:13,
293:14, 293:18,
294:2, 294:6, 294:8,
294:14, 294:15,
294:16, 294:17,
294:20, 294:24,
295:2, 295:8,
295:11, 295:24,
296:3, 296:4, 296:6,
296:21, 296:24,
297:12, 297:14,
297:17, 297:19,
297:21, 297:23,
297:25, 298:1,
298:2, 298:3,
298:10, 298:15,
298:19, 299:2,
299:23, 300:4,
300:14, 301:13,
302:13, 302:24,
350:13, 350:21,
351:25, 352:2,
352:5, 352:13,
360:24, 361:2,
361:25, 371:5,
372:6, 373:10,
374:12, 385:25
**block-and-row** [1] -
350:13
**block-ballot** [1] -
144:19
**blocks** [11] - 272:6,
294:18, 295:5,
295:13, 295:14,
303:2, 361:4, 361:8,
361:16, 361:21
**blow** [1] - 268:21
**BMV** [1] - 80:14
**board** [28] - 195:12,
226:2, 226:7,
257:19, 268:8,
268:9, 268:11,
269:20, 270:22,
271:10, 272:17,
272:18, 281:23,
294:9, 295:1, 295:7,
338:1, 338:2,
340:15, 341:6,
341:17, 342:10,
342:12, 355:3,
355:4, 359:1,

359:19, 383:15
**boards** [1] - 158:17
**bodies** [1] - 74:11
**Bohn** [1] - 10:5
**BOHN** [2] - 3:5, 10:4
**bond** [10] - 11:6, 11:7,
11:9, 11:10, 12:7,
12:11, 12:16, 13:7,
13:17
**bonds** [1] - 13:1
**books** [4] - 337:25,
340:6, 340:7, 340:25
**booth** [1] - 57:6
**BOREK** [2] - 2:14,
9:10
**Borek** [1] - 9:10
**bother** [2] - 15:10,
121:20
**bottom** [6] - 92:16,
154:10, 319:1,
377:12, 379:8, 379:9
**box** [15] - 65:8, 65:13,
65:15, 65:16,
165:14, 201:2,
243:10, 250:24,
336:1, 350:1, 350:2,
350:5, 350:6
**bracket** [34] - 43:10,
43:12, 43:17, 44:4,
64:3, 206:18, 207:2,
209:22, 209:25,
210:4, 210:8,
210:14, 213:25,
214:3, 214:11,
215:3, 224:4, 234:2,
239:17, 239:18,
240:4, 240:12,
240:18, 241:25,
242:7, 243:5, 245:6,
245:15, 245:25,
246:6, 246:20,
293:5, 293:8, 350:9
**bracketed** [12] - 60:19,
63:5, 63:8, 63:9,
63:11, 63:22,
209:13, 242:5,
253:11, 268:7,
350:8, 352:8
**bracketing** [19] - 43:3,
96:23, 206:18,
207:2, 211:20,
236:21, 239:13,
245:13, 253:9,
253:14, 258:20,
266:23, 275:1,
343:24, 349:1,
349:3, 349:4, 363:5
**brackets** [5] - 239:20,
239:23, 241:1,
245:5, 254:2

**Brad** [1] - 6:22
**brains** [3] - 76:2, 77:9,
78:1
**brainstorm** [2] -
309:12, 309:13
**branch** [1] - 166:15
**Branch** [5] - 351:7,
373:8, 373:20,
374:8, 374:11
**Bravo** [1] - 193:9
**break** [42] - 19:21,
20:1, 20:4, 20:6,
20:9, 22:20, 67:17,
67:19, 68:7, 68:10,
68:16, 97:10,
120:14, 120:15,
120:19, 120:24,
123:1, 124:3, 124:4,
128:18, 156:5,
190:5, 194:9, 197:5,
197:6, 197:10,
197:16, 201:12,
233:16, 249:1,
283:20, 283:21,
284:7, 287:10,
287:11, 287:12,
332:14, 333:6,
333:7, 382:22
**breaking** [2] - 20:8,
306:13
**BRETT** [1] - 1:18
**brevity** [1] - 358:17
**BRIAN** [1] - 2:5
**Brian** [2] - 9:3, 157:5
**Brief** [11] - 72:6,
86:13, 91:22, 193:4,
243:20, 248:13,
267:20, 284:10,
285:19, 351:11,
375:7
**brief** [14] - 12:1, 14:21,
26:5, 29:18, 60:9,
227:20, 227:23,
228:1, 228:8,
228:12, 228:13,
284:6, 334:9, 386:6
**briefing** [7] - 20:13,
20:16, 20:21, 26:6,
28:1, 96:25, 227:2
**briefly** [4] - 19:18,
30:13, 121:8, 185:12
**briefs** [6] - 24:24,
25:2, 227:16,
227:22, 314:11,
322:17
**bring** [18] - 25:10,
38:17, 46:24, 46:25,
49:1, 49:18, 49:22,
56:10, 222:1,
222:18, 224:15,

226:2, 226:18,
228:16, 228:25,
233:11, 250:3
**bringing** [7] - 25:6,
53:17, 82:12,
219:12, 219:21,
233:7, 247:9
**brings** [2] - 76:3,
380:11
**broad** [1] - 236:10
**Broad** [1] - 2:15
**Broadway** [1] - 121:18
**brochure** [3] - 292:18,
292:21, 292:24
**broke** [2] - 141:17,
316:7
**Bromberg** [14] - 6:13,
6:17, 28:8, 71:19,
77:20, 80:5, 86:25,
95:15, 97:12, 99:11,
108:7, 109:21,
114:20
**BROMBERG** [126] -
2:2, 2:2, 4:4, 6:13,
6:16, 6:20, 22:11,
22:14, 22:17, 22:23,
23:2, 23:22, 24:1,
26:18, 26:20, 27:4,
27:10, 27:13, 27:17,
28:12, 67:16, 67:25,
68:5, 69:20, 70:12,
71:25, 72:4, 72:7,
72:9, 72:11, 73:4,
73:6, 74:20, 74:23,
75:9, 75:13, 77:21,
77:22, 78:3, 78:7,
78:11, 78:13, 79:14,
80:6, 83:11, 83:20,
84:15, 85:20, 86:14,
86:15, 87:2, 87:6,
89:2, 89:4, 89:7,
90:4, 90:6, 90:23,
91:3, 91:7, 91:15,
91:16, 91:21, 91:23,
92:24, 95:7, 96:4,
97:13, 97:14, 99:12,
100:24, 104:16,
104:22, 106:14,
108:10, 109:11,
109:22, 109:23,
111:4, 111:7,
111:20, 113:13,
114:22, 115:1,
115:12, 115:20,
117:3, 118:10,
118:15, 119:8,
119:12, 119:15,
119:22, 120:1,
120:9, 120:13,
123:10, 129:6,

129:10, 133:3,
141:2, 143:15,
143:17, 147:2,
147:5, 147:9,
149:21, 149:24,
150:15, 153:10,
157:20, 166:22,
200:22, 228:9,
232:23, 242:14,
242:17, 248:20,
273:15, 296:2,
297:16, 304:20,
351:12, 351:14,
379:16, 388:16
**Bromberg..** [1] - 87:18
**brother** [3] - 252:4,
252:19, 261:16
**brought** [14] - 27:15,
35:7, 35:8, 35:23,
49:19, 51:1, 56:9,
196:3, 196:4,
222:12, 226:7,
264:1, 381:7
**Brown** [1] - 202:9
**BROWN** [1] - 2:17
**Brunswick** [1] - 3:13
**bubble** [7] - 94:10,
94:11, 112:8,
112:13, 112:15,
112:19, 372:12
**bubble-based** [3] -
94:10, 94:11, 112:19
**bubble-style** [1] -
112:13
**bud** [1] - 250:7
**build** [6] - 174:17,
175:12, 176:22,
182:23, 245:25,
246:6
**building** [7] - 225:21,
367:12, 368:11,
375:6, 386:19,
388:22
**Building** [2] - 1:13,
3:12
**building's** [1] - 375:10
**bulk** [1] - 127:20
**bunch** [3] - 58:7, 58:8,
369:14
**burden** [19] - 12:23,
21:12, 21:14, 44:13,
44:16, 44:19, 46:16,
47:20, 53:11, 53:14,
189:22, 191:10,
217:3, 217:6,
217:12, 217:19,
217:20
**burdens** [1] - 32:18
**Burdick** [1] - 32:17
**Burlington** [8] - 8:7,

**United States District Court**
**District of New Jersey**

8:18, 318:11,
318:14, 318:18,
319:10, 319:11,
320:17
**burn** [2] - 12:5, 21:1
**Burns** [4] - 7:9, 7:16,
9:10, 10:12
**BURNS** [1] - 2:12
**business** [11] -
117:13, 136:6,
136:24, 146:18,
153:2, 153:7,
160:23, 161:2,
252:18, 257:5, 301:6
**businessman** [1] -
265:19
**busy** [2] - 175:8, 175:9
**but..** [2] - 19:4, 382:23
**buttons** [1] - 95:16
**BY** [170] - 1:18, 2:2,
2:5, 2:9, 2:13, 2:17,
2:20, 2:23, 3:2, 3:5,
3:11, 3:15, 3:23, 4:4,
4:4, 4:5, 4:5, 4:6,
4:7, 4:7, 4:8, 4:8,
4:9, 4:10, 4:10, 4:11,
4:12, 4:12, 4:13,
4:14, 4:14, 4:15,
4:15, 4:16, 4:17,
4:18, 73:6, 75:13,
77:22, 78:13, 79:14,
80:6, 83:11, 83:20,
84:15, 85:20, 86:15,
89:7, 90:6, 91:16,
91:23, 92:24, 95:7,
96:4, 97:14, 99:12,
100:24, 104:22,
106:14, 108:10,
109:11, 109:23,
111:7, 111:20,
113:13, 115:20,
117:3, 118:10,
123:19, 130:2,
133:9, 141:16,
141:21, 144:1,
148:9, 150:20,
153:18, 155:17,
157:7, 158:11,
159:9, 163:8,
164:22, 166:1,
166:25, 187:24,
188:19, 193:22,
194:15, 202:7,
202:19, 202:24,
208:18, 211:14,
218:18, 220:7,
220:24, 221:25,
222:9, 229:2,
230:10, 230:25,
231:22, 232:5,

233:25, 236:19,
239:6, 241:22,
243:4, 244:13,
246:18, 251:10,
251:24, 253:15,
263:1, 264:21,
265:11, 266:6,
267:15, 267:21,
268:2, 269:2, 270:3,
270:18, 271:21,
273:17, 278:8,
278:21, 279:22,
280:3, 280:18,
281:16, 285:25,
286:12, 288:3,
291:7, 296:19,
298:17, 303:12,
303:18, 304:24,
311:6, 312:13,
314:4, 315:9,
325:11, 330:24,
332:7, 332:18,
332:25, 334:10,
336:16, 345:9,
350:17, 350:20,
351:23, 358:18,
360:11, 360:23,
363:3, 364:13,
370:15, 371:20,
371:25, 373:7,
375:23, 380:4,
382:2, 384:20, 386:8

# C

**calculus** [1] - 65:6
**calendar** [1] - 254:19
**caliber** [1] - 132:25
**California** [3] -
131:20, 131:22,
147:23
**CAMDEN** [1] - 3:8
**Camden** [26] - 2:19,
3:9, 3:10, 7:23, 8:2,
8:3, 61:2, 62:12,
62:24, 62:25, 63:5,
93:3, 93:4, 102:20,
103:7, 103:14,
202:9, 204:9,
204:14, 204:18,
204:20, 205:5,
206:11, 206:14,
320:11, 366:22
**Camden's** [1] - 204:10
**Campaign** [1] - 169:10
**campaign** [49] - 170:2,
174:12, 174:15,
174:20, 176:20,
176:21, 178:1,
182:6, 182:14,

182:22, 184:1,
185:10, 186:7,
189:3, 191:23,
212:1, 213:1, 213:2,
213:6, 213:8,
213:10, 214:16,
225:22, 225:23,
238:11, 289:8,
307:19, 307:21,
307:23, 323:22,
324:6, 324:7,
328:11, 328:16,
328:23, 349:12,
367:4, 367:13,
370:6, 376:3,
376:11, 378:19,
383:4, 383:18,
383:20, 384:10,
385:3, 385:4
**campaigning** [6] -
179:1, 182:10,
209:12, 214:18,
214:19, 214:21
**campaigns** [5] - 32:6,
179:2, 179:3,
384:22, 385:4
**Campos** [1] - 179:6
**candidacy** [17] -
167:7, 167:9,
167:10, 167:25,
168:1, 169:3, 169:4,
171:24, 172:6,
175:10, 175:23,
176:11, 185:16,
203:11, 211:16,
211:19, 211:22
**candidate** [71] - 1:3,
37:23, 56:4, 56:10,
56:11, 61:11, 61:15,
63:7, 63:22, 63:25,
64:9, 64:13, 64:18,
65:18, 65:19, 81:18,
84:5, 99:25, 100:14,
153:21, 154:18,
155:7, 167:12,
167:21, 167:23,
168:9, 169:19,
169:22, 172:24,
173:25, 174:11,
178:5, 179:14,
179:19, 182:13,
182:20, 183:19,
186:19, 206:18,
207:3, 207:7, 207:9,
207:13, 212:23,
213:15, 213:17,
213:18, 213:24,
215:18, 215:21,
216:5, 239:15,
242:6, 242:8, 299:5,

307:22, 307:24,
316:23, 334:12,
334:19, 337:16,
349:8, 349:10,
350:4, 350:6, 350:7,
385:15, 385:17,
385:25
**candidate's** [3] -
60:23, 239:16,
316:18
**candidates** [159] -
31:21, 32:18, 33:7,
33:13, 36:24, 38:25,
41:22, 41:24, 42:17,
43:4, 43:5, 43:20,
43:21, 45:10, 45:12,
50:3, 60:16, 60:23,
61:9, 62:13, 63:4,
63:5, 63:6, 63:8,
63:11, 64:25, 65:9,
65:11, 66:16, 78:24,
82:15, 82:23, 83:18,
84:2, 84:4, 96:11,
97:22, 97:24, 99:19,
99:20, 99:22, 99:24,
100:7, 108:25,
110:11, 110:20,
110:23, 111:2,
116:23, 152:22,
154:6, 154:14,
154:20, 155:9,
155:22, 160:6,
160:22, 161:6,
161:10, 161:14,
161:16, 170:17,
170:23, 171:5,
173:5, 173:10,
173:13, 173:18,
181:22, 181:24,
182:2, 182:4, 182:5,
183:7, 183:9,
183:10, 183:17,
183:21, 183:25,
184:3, 184:19,
185:22, 185:25,
203:10, 206:18,
207:2, 209:14,
209:19, 209:22,
212:15, 212:20,
220:19, 225:18,
229:6, 229:16,
231:14, 231:17,
232:14, 238:12,
239:19, 239:25,
241:1, 243:6,
244:19, 245:2,
245:6, 245:7, 246:4,
246:19, 246:22,
253:24, 254:13,
255:6, 255:23,
255:25, 256:1,

258:1, 288:16,
289:16, 291:14,
291:22, 298:2,
298:3, 298:4, 298:5,
298:9, 298:10,
298:12, 299:7,
300:8, 300:11,
300:12, 300:21,
311:24, 312:6,
315:16, 318:22,
322:20, 322:21,
326:22, 328:23,
330:22, 343:18,
347:24, 348:20,
348:25, 349:5,
349:11, 349:12,
349:25, 350:8,
350:9, 350:10,
350:11, 352:8,
352:19, 353:3,
373:18
**candidates'** [1] -
312:2
**cannot** [9] - 41:1,
105:17, 112:15,
112:24, 151:7,
362:8, 363:16,
369:12, 375:2
**capabilities** [5] -
144:12, 163:20,
279:15, 289:3,
299:19
**Capability** [1] - 286:18
**capability** [5] - 163:21,
295:18, 301:10,
303:1, 340:4
**capable** [2] - 107:18,
362:21
**capacities** [1] - 46:9
**capacity** [8] - 1:3, 1:8,
1:11, 41:20, 176:24,
185:9, 186:15, 257:6
**capital** [1] - 313:6
**Cappuzo** [1] - 10:5
**CAPPUZZO** [1] - 3:5
**captured** [1] - 90:3
**card** [2] - 359:11
**cards** [1] - 350:2
**care** [8] - 42:7, 42:9,
42:10, 43:15, 64:13,
67:13, 200:16
**career** [2] - 313:9,
314:5
**CAROLYN** [2] - 1:4,
1:5
**Carolyn** [1] - 33:8
**carrying** [1] - 81:21
**case** [131] - 11:22,
13:4, 14:13, 14:19,
14:20, 15:13, 15:20,

16:17, 16:19, 16:24,
17:2, 20:19, 20:24,
21:10, 22:8, 23:7,
25:11, 25:12, 25:24,
33:12, 35:22, 35:23,
37:20, 44:17, 46:22,
49:8, 51:4, 51:9,
51:15, 51:18, 51:20,
51:23, 54:7, 54:16,
54:22, 54:24, 54:25,
58:11, 58:15, 58:20,
62:10, 63:7, 63:24,
64:6, 66:1, 67:12,
69:17, 70:10, 71:17,
119:10, 126:16,
136:2, 136:6,
137:14, 140:23,
161:17, 162:7,
182:18, 190:4,
191:2, 196:3,
199:14, 205:7,
205:11, 205:19,
205:22, 206:21,
208:10, 212:22,
214:3, 214:6,
218:22, 218:24,
218:25, 219:2,
219:12, 219:20,
219:21, 220:10,
220:11, 222:13,
223:6, 223:8,
223:13, 223:18,
224:15, 225:24,
227:2, 234:23,
237:11, 238:24,
239:7, 249:20,
251:16, 255:14,
263:13, 263:14,
263:16, 263:22,
289:1, 289:10,
289:18, 289:20,
289:21, 289:24,
292:3, 292:6, 293:9,
300:7, 300:14,
301:24, 304:13,
307:17, 309:16,
311:13, 314:17,
315:2, 315:8,
315:11, 325:22,
329:23, 331:12,
333:22, 333:24,
334:1, 348:5,
349:24, 362:5,
376:15, 378:20,
379:2
**cases** [13] - 20:20,
32:14, 44:23, 45:1,
45:8, 45:22, 81:24,
154:23, 154:25,
155:5, 190:23,
334:2, 376:14

**cast** [3] - 339:2, 339:7,
339:14
**categorize** [1] - 378:8
**category** [1] - 327:20
**caused** [2] - 195:20,
237:20
**causing** [2] - 30:3,
121:13
**caution** [2] - 30:16,
30:25
**caveat** [1] - 13:12
**CCDC** [1] - 66:18
**CD-3** [1] - 319:8
**cell** [4] - 100:14,
100:18, 100:19,
111:2
**cells** [3] - 99:20,
99:25, 100:1
**center** [1] - 126:20
**Center** [1] - 2:10
**central** [1] - 76:9
**cert** [3] - 113:22,
151:7, 290:5
**certain** [23] - 64:22,
64:24, 84:10, 88:9,
143:8, 145:4, 160:6,
160:11, 170:5,
185:21, 235:15,
261:25, 274:25,
278:23, 302:1,
302:11, 316:13,
337:16, 338:21,
352:18, 362:6,
362:22, 362:23
**certainly** [14] - 17:24,
170:8, 172:12,
174:16, 175:3,
177:20, 182:24,
186:21, 186:24,
223:19, 226:7,
268:1, 330:12,
331:20
**certainty** [4] - 94:19,
95:9, 96:14, 185:19
**CERTIFICATE** [1] -
390:1
**certificate** [2] - 113:6,
163:12
**certification** [94] -
23:5, 23:11, 23:21,
26:21, 27:12, 27:16,
27:17, 27:21, 27:25,
28:5, 28:6, 34:23,
37:15, 40:11, 73:18,
74:3, 85:16, 85:18,
85:21, 85:25, 86:3,
86:9, 89:5, 91:12,
91:13, 92:2, 104:5,
104:18, 105:21,
107:12, 108:15,

109:2, 111:8,
111:13, 111:14,
111:22, 112:11,
112:22, 113:10,
113:14, 114:12,
115:10, 127:25,
128:4, 128:7,
128:12, 128:14,
128:15, 128:17,
128:19, 128:20,
128:21, 128:24,
129:24, 130:16,
130:17, 131:6,
131:21, 132:20,
137:10, 137:14,
137:16, 138:4,
138:7, 140:8,
140:15, 141:1,
141:5, 141:11,
144:18, 145:2,
146:12, 147:10,
149:7, 149:11,
151:7, 163:4,
163:10, 255:14,
255:16, 271:15,
273:23, 297:3,
297:4, 297:6, 297:9,
371:21, 372:1,
372:3, 372:18,
372:20, 372:22,
373:4
**certifications** [4] -
40:25, 88:16,
111:13, 140:10
**certified** [11] - 75:20,
85:5, 85:24, 85:25,
86:5, 98:5, 98:20,
105:4, 105:12,
147:24, 148:21
**certifies** [1] - 148:20
**certify** [3] - 147:23,
297:6, 390:4
**certifying** [1] - 137:8
**certs** [1] - 159:1
**cetera** [9] - 82:21,
88:11, 94:24, 98:11,
169:16, 275:1,
291:13, 335:3,
379:12
**chair** [8] - 186:9,
188:1, 203:25,
204:14, 204:20,
204:21, 209:6,
231:10
**chairman** [1] - 204:16
**Chairman** [1] - 204:17
**chairs** [17] - 42:1,
42:5, 177:2, 186:1,
186:7, 186:13,
186:18, 204:4,

216:3, 224:24,
231:11, 231:23,
231:24, 232:6,
232:13, 232:17,
234:7
**challenge** [4] -
183:16, 219:3,
221:3, 234:23
**challenges** [6] -
46:11, 46:13, 196:7,
237:25, 238:2, 255:5
**challenging** [2] -
182:11, 184:16
**chance** [6] - 33:18,
180:14, 180:19,
180:21, 194:13,
207:12
**chances** [2] - 186:20,
186:25
**change** [43] - 12:25,
20:20, 34:17, 36:17,
37:7, 44:16, 57:23,
58:2, 83:3, 133:20,
135:10, 152:2,
153:7, 160:9, 161:7,
162:2, 162:9, 163:7,
220:6, 221:4, 231:1,
234:14, 258:25,
259:10, 259:19,
274:1, 282:8, 302:2,
302:4, 302:14,
311:23, 312:3,
312:5, 339:22,
340:7, 341:1, 341:7,
358:6, 359:4,
364:21, 366:3,
383:4, 384:12
**changed** [8] - 36:19,
132:16, 132:18,
159:22, 176:12,
260:8, 332:21, 339:5
**changes** [55] - 22:21,
40:12, 56:12,
105:12, 105:15,
107:11, 108:14,
129:2, 130:14,
130:18, 132:25,
133:10, 133:19,
133:24, 134:2,
134:6, 134:15,
135:11, 135:17,
140:7, 140:19,
141:1, 141:3, 141:4,
141:11, 144:8,
149:4, 152:12,
152:21, 152:22,
152:25, 153:5,
162:5, 163:4,
236:25, 237:3,
256:13, 256:23,

257:13, 339:18,
340:24, 340:25,
341:12, 343:5,
343:7, 357:24,
358:2, 358:9,
358:19, 358:22,
360:13, 362:8,
362:21
**changing** [3] - 234:2,
359:15, 359:21
**chaos** [4] - 257:14,
282:10, 282:18,
285:4
**characterization** [3] -
96:22, 99:6, 313:8
**characterize** [3] -
44:19, 124:22,
327:10
**characterized** [1] -
179:14
**charge** [1] - 358:23
**charged** [9] - 30:23,
40:23, 41:15, 41:20,
42:21, 43:8, 134:14,
134:17, 134:25
**CHARLES** [1] - 2:6
**CHASAN** [1] - 3:5
**Chasan** [1] - 10:5
**cheap** [1] - 14:22
**check** [1] - 210:5
**checking** [1] - 135:14
**checks** [3] - 134:1,
135:8, 135:25
**Cherry** [2] - 3:3,
102:20
**chief** [6] - 18:7, 18:12,
18:13, 125:18,
189:3, 189:5
**choice** [13] - 171:15,
173:1, 173:10,
173:20, 173:22,
208:19, 208:21,
208:23, 213:7,
275:19, 298:14,
366:18
**choices** [1] - 300:5
**choose** [12] - 43:5,
43:12, 43:21, 49:3,
52:23, 58:17,
133:18, 134:10,
184:12, 202:15,
202:21, 215:17
**chose** [5] - 15:17,
56:5, 56:10, 183:7,
214:16
**CHRISTINE** [3] - 1:7,
4:16, 336:3
**Christine** [5] - 2:8,
9:4, 156:15, 157:6,
336:7

**CHRISTOPHER** [1] - 3:16
**Christopher** [1] - 10:8
**Chubb** [1] - 2:21
**Circuit** [1] - 119:18
**circumstance** [5] - 55:16, 239:21, 240:25, 339:16, 362:3
**circumstances** [2] - 35:24, 274:4
**cite** [1] - 42:25
**cited** [1] - 49:11
**city** [1] - 322:4
**CIVIL** [1] - 1:4
**Civil** [1] - 17:14
**claim** [17] - 25:23, 58:21, 113:20, 214:3, 214:10, 219:20, 220:10, 220:14, 221:10, 221:12, 222:1, 222:6, 245:10, 292:17, 294:24, 296:20
**claimed** [3] - 20:25, 21:2, 21:7
**claiming** [1] - 43:24
**claims** [19] - 17:15, 21:23, 33:5, 34:8, 35:4, 44:12, 44:16, 49:21, 55:3, 147:9, 212:9, 213:9, 215:8, 215:13, 216:13, 220:20, 223:8, 223:13, 223:18
**clarification** [7] - 108:8, 109:8, 109:18, 112:12, 129:10, 153:19, 200:2
**clarify** [16] - 77:20, 80:5, 80:15, 88:3, 91:8, 112:10, 125:4, 134:24, 139:12, 143:22, 146:14, 231:20, 237:7, 237:9, 248:9, 326:23
**clarity** [5] - 77:18, 141:3, 147:5, 263:7, 351:17
**Clarkson** [1] - 1:13
**class** [1] - 43:7
**clause** [4] - 14:14, 32:16, 33:5, 38:23
**clauses** [1] - 38:23
**clean** [2] - 30:8, 57:1
**clear** [43] - 10:23, 20:3, 20:13, 22:1, 24:6, 32:24, 50:12,

53:16, 54:6, 54:20, 59:17, 69:1, 85:19, 89:21, 97:8, 104:14, 131:24, 164:14, 164:18, 169:3, 170:12, 171:12, 181:5, 186:8, 188:6, 189:20, 189:24, 192:16, 195:14, 196:19, 211:10, 245:14, 246:3, 264:2, 275:11, 280:2, 285:1, 285:3, 285:6, 298:13, 320:20, 327:16, 374:2
**clear-cut** [1] - 53:16
**clearly** [6] - 29:12, 53:7, 53:25, 72:12, 285:11, 329:13
**CLERK** [13] - 6:4, 72:22, 73:1, 121:7, 165:18, 197:19, 251:3, 285:22, 287:16, 310:19, 336:5, 375:17, 389:6
**Clerk** [41] - 1:8, 1:11, 2:11, 2:22, 2:25, 3:7, 3:10, 3:13, 3:18, 3:21, 3:24, 8:3, 8:7, 8:10, 8:14, 8:19, 8:22, 8:24, 9:4, 9:9, 9:14, 9:19, 9:24, 10:2, 10:6, 10:9, 40:19, 96:9, 111:9, 112:21, 139:14, 140:3, 156:14, 157:6, 211:13, 214:7, 280:19, 280:20, 287:24, 307:15, 366:24
**clerk** [39] - 7:20, 57:4, 57:5, 58:1, 117:18, 125:9, 139:11, 143:14, 144:5, 146:2, 148:17, 150:7, 159:2, 206:9, 209:22, 244:6, 246:17, 253:20, 253:22, 255:9, 255:13, 257:18, 282:24, 284:22, 285:4, 285:12, 310:11, 336:19, 336:22, 336:25, 337:7, 337:9, 337:10, 337:14, 341:12, 345:4, 345:6, 345:18, 370:17

**clerk's** [2] - 139:8, 141:24
**Clerk's** [2] - 139:24, 140:6
**Clerks** [4] - 2:16, 140:25, 141:10, 142:24
**clerks** [62] - 7:10, 16:24, 32:13, 38:11, 40:8, 41:11, 43:8, 43:13, 49:13, 52:19, 60:22, 110:3, 110:9, 115:23, 134:16, 151:6, 151:15, 151:21, 208:11, 224:22, 224:23, 225:1, 227:1, 229:5, 229:9, 229:15, 230:1, 230:3, 230:5, 230:11, 231:1, 231:19, 234:8, 234:13, 253:23, 254:11, 255:3, 255:7, 257:21, 257:23, 259:1, 259:22, 259:25, 260:16, 266:16, 266:19, 273:5, 273:19, 274:16, 275:11, 275:14, 275:20, 282:13, 342:13, 342:23, 343:19, 345:13, 356:6, 358:25, 363:7, 363:20
**clerks'** [3] - 143:5, 164:23, 224:25
**Clewell** [1] - 10:12
**CLEWELL** [2] - 2:14, 10:12
**client** [4] - 13:18, 66:19, 188:12, 282:23
**client's** [1] - 266:7
**clients** [22] - 16:10, 30:20, 41:12, 42:10, 47:24, 114:10, 124:25, 126:8, 137:10, 138:8, 139:18, 146:17, 148:17, 150:7, 256:10, 256:20, 257:3, 265:20, 265:22, 266:1, 266:11, 272:15
**close** [10] - 50:1, 50:5, 54:12, 54:13, 54:15, 54:17, 54:18, 254:12, 367:12
**closely** [1] - 151:9

**closer** [3] - 50:6, 198:17, 254:16
**closing** [9] - 38:14, 200:12, 368:11, 375:10, 387:25, 388:9, 388:13, 388:17, 389:2
**co** [1] - 114:23
**co-owner** [1] - 114:23
**coalition** [1] - 176:22
**codes** [2] - 356:9, 362:23
**Colabella** [2] - 3:21, 8:22
**COLE** [1] - 2:23
**collaborated** [1] - 28:4
**collateral** [3] - 43:23, 44:1, 44:2
**colleagues** [3] - 14:4, 41:17, 59:2
**collect** [1] - 342:25
**collected** [2] - 331:3, 331:9
**collective** [2] - 14:1, 14:4
**colloquially** [2] - 96:25, 168:16
**column** [48] - 61:4, 62:14, 63:9, 63:12, 63:14, 63:15, 96:12, 97:22, 99:19, 99:20, 101:9, 102:6, 102:8, 102:24, 102:25, 108:25, 109:19, 110:11, 110:16, 153:24, 154:2, 154:4, 154:9, 154:11, 155:21, 181:22, 206:20, 207:4, 242:6, 254:3, 291:9, 298:11, 300:6, 300:13, 349:5, 349:13, 350:6, 350:7, 351:3, 351:5, 352:11, 371:1, 371:6, 371:7, 373:18
**column-and-row** [1] - 351:5
**columns** [33] - 62:3, 63:5, 98:1, 99:22, 99:23, 100:7, 100:9, 110:18, 110:19, 110:20, 110:21, 110:22, 110:25, 116:18, 239:20, 241:2, 268:7, 293:3, 293:4, 294:5, 295:6, 295:14, 300:7, 300:15, 348:13,

348:14, 348:20, 350:24, 352:9, 372:15, 373:14, 373:15
**combination** [3] - 50:20, 272:5, 279:4
**comfortable** [4] - 261:16, 261:20, 336:2, 336:13
**coming** [14] - 73:24, 115:14, 198:19, 200:4, 200:5, 200:6, 200:8, 200:17, 228:21, 233:3, 248:15, 259:13, 346:7, 355:8
**commence** [3] - 259:17, 263:10, 287:18
**commenced** [1] - 254:21
**Commencing** [1] - 1:15
**comment** [1] - 14:8
**commercial** [2] - 252:7, 257:3
**Commission** [8] - 73:16, 73:19, 85:24, 128:10, 128:18, 162:11, 163:5, 297:4
**commission** [1] - 382:4
**Commission's** [1] - 131:5
**commissioned** [1] - 157:8
**commissioner** [3] - 337:23, 347:1, 349:10
**commissioners** [2] - 245:21, 341:4
**commitment** [3] - 333:16, 333:17, 333:18
**committee** [10] - 41:24, 61:12, 204:1, 205:5, 209:6, 347:4, 347:8, 347:19, 365:8
**Committee** [5] - 2:19, 7:24, 169:10, 202:10, 204:15
**committees** [3] - 61:14, 203:18, 328:23
**common** [1] - 298:16
**commonly** [1] - 90:8
**communication** [1] - 175:1
**communications** [3] - 188:8, 304:10, 308:4

community [3] - 127:11, 313:5, 316:24
companies [32] - 23:12, 27:24, 133:13, 133:21, 134:14, 134:20, 146:18, 147:25, 151:11, 164:10, 164:12, 165:2, 257:19, 258:7, 260:3, 260:4, 261:3, 261:10, 261:17, 261:21, 262:1, 262:4, 262:9, 262:14, 263:3, 275:16, 275:19, 275:23, 275:24, 276:6, 276:11, 276:20
company [46] - 28:2, 113:23, 114:9, 117:8, 124:23, 125:5, 126:6, 127:24, 129:5, 130:10, 132:12, 133:2, 133:18, 146:15, 146:24, 147:6, 147:8, 147:10, 147:16, 147:21, 148:8, 148:14, 149:19, 149:25, 150:6, 150:10, 151:1, 151:3, 151:23, 153:7, 252:7, 260:11, 265:2, 265:12, 271:6, 273:25, 274:7, 274:15, 276:3, 276:23, 278:20, 278:23, 279:25, 282:15, 362:5
company's [2] - 132:13, 275:6
company-by-company [1] - 117:8
comparable [4] - 34:21, 246:6, 263:21, 352:14
compare [2] - 352:21, 365:13
compared [2] - 178:16, 180:1
comparing [1] - 240:11
comparison [2] - 38:19, 240:21
compatible [2] - 341:25, 359:13

compel [1] - 370:2
compelled [3] - 366:16, 367:25, 369:10
compelling [4] - 16:23, 52:1, 55:12, 58:10
compensated [2] - 314:22, 315:10
compete [2] - 32:5, 32:6
competed [1] - 384:2
competitive [4] - 223:2, 229:11, 241:25, 376:18
competitiveness [1] - 172:15
competitor [14] - 32:3, 171:23, 172:5, 178:10, 182:10, 182:20, 185:2, 185:7, 204:5, 215:5, 237:17, 238:18, 242:3, 383:18
competitors [5] - 179:12, 203:15, 215:10, 352:9, 352:10
competitors' [1] - 192:10
compiled [1] - 243:22
complaining [2] - 55:20, 56:6
complaint [18] - 46:3, 46:4, 46:5, 46:19, 47:25, 50:5, 53:17, 55:24, 166:18, 166:20, 167:1, 191:15, 191:16, 193:9, 244:15, 244:17, 369:24
complete [5] - 55:11, 115:22, 286:15, 305:19, 369:17
completed [4] - 192:1, 192:2, 192:23, 194:17
completely [2] - 309:14, 359:17
completes [1] - 76:22
complexities [1] - 40:22
compliance [1] - 131:14
complicated [6] - 98:22, 99:1, 99:14, 99:16, 100:1, 100:6
complications [1] - 145:19
complied [1] - 346:16

component [8] - 11:11, 12:24, 192:17, 192:22, 284:20, 363:5
components [4] - 80:11, 225:23, 268:5, 357:24
comport [1] - 89:12
compound [2] - 83:5, 83:9
compounded [1] - 242:15
compromised [1] - 44:3
computer [6] - 1:24, 76:16, 76:17, 77:9, 124:9, 124:12
computer-aided [1] - 1:24
concede [1] - 52:11
concept [1] - 244:21
concern [13] - 14:17, 88:9, 117:4, 171:7, 184:1, 196:15, 197:24, 202:25, 216:7, 239:10, 239:12, 239:14, 363:1
concerned [1] - 164:21
concerning [3] - 183:20, 183:23, 199:25
concerns [33] - 15:7, 22:4, 22:6, 35:21, 70:1, 79:17, 79:22, 171:3, 171:14, 172:19, 183:4, 184:2, 184:22, 196:10, 211:19, 211:23, 211:25, 216:21, 223:20, 223:22, 223:25, 232:9, 238:7, 238:8, 238:10, 280:24, 281:1, 281:7, 309:14, 341:23, 361:15, 362:2, 363:4
conclude [1] - 57:21
concluded [2] - 201:20, 236:15
concludes [2] - 287:8, 389:7
conclusion [13] - 98:21, 99:13, 108:12, 117:23, 118:11, 202:17, 208:16, 219:10, 219:13, 219:18, 221:16, 230:8,

230:20
conclusions [4] - 90:7, 163:19, 164:24, 165:3
conclusory [1] - 94:23
concrete [4] - 190:6, 190:9, 242:10, 242:21
conduct [11] - 74:3, 81:16, 100:12, 100:16, 132:11, 135:7, 137:11, 158:23, 225:3, 236:6, 343:25
conducted [10] - 131:16, 134:5, 136:2, 136:5, 139:1, 143:8, 148:8, 152:23, 153:4, 351:2
conducting [5] - 123:4, 132:24, 197:3, 270:15, 363:25
confer [3] - 10:22, 69:3, 367:5
conference [3] - 15:20, 48:25, 381:12
conferred [2] - 87:25, 156:6
conferring [2] - 87:24, 123:1
confessed [1] - 18:9
confidence [2] - 261:12, 305:14
confident [2] - 256:14, 261:9
confidential [2] - 249:9, 249:10
confidently [1] - 144:7
configuration [2] - 114:6, 133:19
confirm [2] - 258:8, 276:12
confirmed [1] - 254:13
confirming [1] - 326:2
confirms [1] - 31:20
conflicting [2] - 41:3, 250:5
Conforti [27] - 16:17, 16:19, 18:9, 42:25, 44:11, 45:5, 46:19, 47:11, 49:8, 49:15, 49:20, 50:24, 51:6, 51:7, 51:14, 51:17, 54:3, 54:6, 54:24, 55:2, 55:8, 60:10, 218:22, 220:10, 221:7, 230:12
confuse [2] - 56:20, 183:4

confused [2] - 90:14, 246:14
confusing [7] - 57:1, 62:4, 107:20, 182:24, 183:5, 243:9, 346:1
confusion [6] - 53:23, 56:17, 57:19, 57:24, 184:2
Congress [13] - 33:19, 74:2, 166:10, 166:12, 166:14, 168:12, 168:22, 170:4, 170:13, 178:23, 223:1, 321:2, 321:24
CONGRESS [1] - 1:5
Congressional [4] - 166:5, 169:10, 318:4, 321:12
congressional [7] - 169:12, 182:19, 255:24, 256:1, 256:3, 346:23, 346:25
Congressman [14] - 22:18, 35:6, 166:2, 182:9, 202:8, 209:11, 211:15, 246:19, 251:12, 377:15, 378:10, 378:14, 382:25, 383:7
congressman [13] - 165:13, 169:8, 170:6, 175:8, 178:21, 182:9, 188:20, 196:2, 196:24, 208:19, 244:14, 320:4, 376:17
connection [9] - 219:7, 220:15, 220:20, 221:10, 222:2, 238:3, 301:24, 311:13, 349:16
Connery [1] - 202:9
CONNERY [1] - 2:17
consent [8] - 51:3, 51:4, 209:21, 209:22, 209:25, 210:4, 210:8
consented [1] - 51:17
consents [1] - 210:14
consequence [3] - 53:20, 61:20, 61:21
consequences [3] - 43:24, 44:1, 44:2
consider [24] - 14:18,

15:9, 17:12, 17:18, 18:12, 18:18, 21:17, 21:22, 22:1, 26:12, 26:13, 47:19, 88:15, 88:16, 88:19, 94:10, 106:3, 122:15, 127:20, 184:18, 195:13, 295:20, 388:2
**considerable** [1] - 260:24
**consideration** [12] - 22:7, 64:11, 64:13, 66:15, 70:13, 168:21, 169:20, 249:24, 250:13, 361:7, 361:23, 364:17
**considerations** [2] - 189:15, 341:11
**considered** [3] - 65:6, 312:9, 360:21
**considering** [6] - 15:10, 24:19, 68:20, 168:22, 188:5, 310:10
**consistent** [13] - 317:15, 317:21, 322:18, 324:16, 325:13, 325:17, 326:4, 326:8, 326:11, 328:14, 329:6, 330:16, 331:5
**consolidate** [1] - 387:13
**consolidating** [1] - 19:3
**constituted** [1] - 33:15
**Constitution** [1] - 38:24
**Constitutional** [1] - 41:13
**constitutional** [33] - 14:14, 17:15, 21:23, 22:3, 31:24, 44:9, 47:20, 53:4, 62:1, 64:11, 65:5, 66:18, 202:15, 212:10, 212:14, 215:8, 215:24, 219:6, 219:20, 220:20, 221:3, 221:10, 221:12, 223:13, 223:18, 223:22, 229:20, 237:7, 239:21, 241:3, 241:4, 310:7, 362:1
**constitutionality** [3] - 17:19, 18:8, 214:10
**constraints** [1] - 354:7

**construct** [3] - 40:24, 63:21, 66:14
**constructed** [1] - 64:21
**consult** [3] - 130:22, 131:1, 131:4
**consultants** [2] - 125:16, 226:13
**consulted** [4] - 127:23, 128:2, 135:7, 139:13
**consulting** [7] - 74:7, 124:23, 125:8, 126:5, 127:21, 130:5, 146:17
**contact** [1] - 205:4
**contacted** [3] - 205:6, 333:8, 380:6
**contain** [1] - 356:17
**contained** [1] - 354:4
**contemplation** [2] - 50:17, 50:20
**contend** [3] - 55:17, 55:20, 56:13
**contention** [3] - 46:23, 53:24, 373:10
**contents** [2] - 122:20, 194:7
**contest** [23] - 81:17, 84:1, 97:24, 98:1, 109:19, 110:11, 154:5, 294:6, 294:11, 294:12, 294:20, 294:23, 298:1, 298:5, 298:6, 298:19, 298:20, 300:3, 300:5, 319:14, 334:11, 357:13
**contested** [4] - 56:16, 294:16, 299:11, 373:14
**contests** [22] - 78:23, 82:16, 83:18, 108:25, 116:22, 145:20, 160:22, 161:11, 161:13, 161:16, 289:16, 289:19, 291:12, 291:19, 291:21, 294:13, 294:15, 298:20, 299:2, 299:7, 300:17, 319:13
**context** [12] - 46:14, 46:17, 47:15, 55:16, 58:17, 62:9, 65:4, 192:25, 285:1, 285:3, 285:6, 317:13
**contingent** [2] -

261:25, 331:12
**continually** [1] - 41:17
**continuation** [1] - 170:8
**continue** [20] - 49:2, 75:8, 89:1, 91:14, 92:23, 109:12, 117:14, 203:12, 203:14, 211:23, 228:10, 231:7, 233:24, 287:13, 304:19, 304:22, 367:19, 378:23, 380:10
**continued** [1] - 212:1
**Continued** [2] - 2:1, 3:1
**continuing** [1] - 10:22
**continuous** [1] - 131:14
**contract** [1] - 333:18
**contractor** [2] - 78:22, 140:17
**contracts** [3] - 264:25, 265:3, 265:13
**contradict** [1] - 368:22
**control** [28] - 61:17, 61:18, 130:24, 131:3, 131:7, 131:10, 131:13, 132:6, 132:8, 132:11, 132:13, 132:16, 132:22, 133:1, 133:12, 133:15, 134:1, 134:20, 135:14, 135:18, 135:21, 136:10, 136:20, 146:23, 148:3, 274:5, 356:20, 365:22
**controls** [1] - 131:15
**convention** [7] - 177:9, 177:13, 182:8, 204:2, 225:8, 238:19, 386:13
**conventions** [9] - 56:7, 177:10, 178:8, 185:2, 203:14, 203:21, 203:23, 210:20, 225:11
**conversation** [13] - 25:14, 204:5, 204:17, 225:9, 225:19, 226:17, 229:4, 231:6, 231:8, 362:10, 376:7, 377:24, 379:4
**conversations** [13] - 16:10, 175:16,

176:10, 183:9, 188:25, 189:10, 189:11, 190:2, 226:2, 226:21, 226:22, 376:10, 376:11
**convince** [4] - 33:2, 57:12, 57:15, 170:1
**convinced** [1] - 36:1
**coordinate** [3] - 156:16, 156:24, 387:12
**coordinating** [1] - 156:19
**coordination** [1] - 148:17
**copies** [4] - 92:9, 228:2, 233:11, 270:9
**copy** [13] - 29:1, 103:11, 193:10, 228:3, 228:11, 228:13, 228:16, 228:25, 233:10, 233:12, 247:11, 286:6, 345:5
**Correct** [2] - 324:18, 385:7
**correct** [281] - 41:6, 41:8, 45:5, 45:11, 45:16, 47:9, 54:9, 55:5, 71:18, 75:1, 75:2, 78:2, 80:17, 90:3, 111:14, 118:20, 120:4, 120:7, 122:12, 124:20, 125:6, 125:7, 125:10, 126:4, 130:20, 130:21, 131:19, 131:25, 132:1, 132:3, 132:4, 132:6, 134:12, 134:23, 136:23, 142:12, 142:13, 143:11, 144:6, 144:15, 144:16, 145:10, 145:11, 146:12, 148:22, 151:6, 151:16, 151:22, 154:13, 154:16, 154:17, 159:17, 159:19, 160:7, 160:18, 160:19, 162:2, 162:3, 162:7, 162:8, 166:19, 167:2, 167:3, 167:4, 167:13, 167:22, 168:9, 168:10, 169:21, 170:14, 170:15, 170:19,

172:3, 173:14, 174:10, 174:24, 177:6, 177:25, 178:19, 180:24, 181:8, 181:9, 181:15, 182:18, 184:5, 184:6, 185:24, 186:10, 186:11, 190:15, 191:13, 194:19, 198:11, 202:16, 203:3, 203:9, 203:13, 203:16, 203:21, 203:23, 204:7, 205:8, 205:9, 205:16, 205:17, 205:19, 205:20, 206:1, 206:2, 206:4, 206:5, 206:9, 206:10, 206:11, 206:12, 206:14, 207:8, 207:15, 207:16, 207:17, 207:24, 208:1, 209:8, 209:9, 209:14, 209:17, 210:25, 211:5, 211:21, 212:3, 212:18, 214:12, 221:2, 221:6, 224:24, 231:11, 232:14, 234:5, 234:9, 239:8, 239:18, 244:5, 244:15, 245:9, 245:12, 247:25, 253:4, 255:14, 255:18, 256:17, 256:20, 256:21, 258:15, 258:16, 259:13, 259:14, 259:16, 261:3, 262:6, 264:7, 265:24, 265:25, 266:4, 266:24, 267:1, 269:4, 269:5, 269:7, 269:9, 270:5, 270:23, 271:4, 271:25, 272:7, 272:12, 272:13, 272:16, 272:24, 273:3, 273:19, 274:1, 274:5, 274:10, 275:4, 275:18, 277:1, 277:3, 279:12, 280:20, 281:6, 282:10, 283:4, 284:17, 286:8, 286:9, 286:15, 286:22, 287:3,

287:4, 287:5,
289:11, 292:1,
292:22, 292:23,
293:22, 294:11,
294:24, 294:25,
295:11, 296:24,
296:25, 299:4,
299:14, 299:16,
300:1, 300:4,
300:18, 300:19,
301:11, 301:21,
301:23, 302:3,
302:17, 302:18,
303:5, 315:18,
315:23, 317:22,
318:12, 318:15,
320:22, 321:6,
323:3, 323:14,
325:19, 326:6,
326:8, 327:11,
328:8, 328:20,
329:15, 329:20,
332:9, 333:3, 333:7,
334:16, 351:20,
354:17, 374:4,
377:4, 377:5, 377:8,
378:1, 378:2,
378:11, 378:21,
379:12, 380:2,
381:5, 381:19,
382:4, 382:11,
382:12, 382:16,
383:8, 383:9, 384:8,
384:13, 384:24,
385:5, 385:9,
385:13, 385:17,
385:20, 386:1,
386:21, 386:22,
390:4
**corrected** [1] - 286:24
**correctly** [7] - 44:21,
46:16, 100:19,
134:11, 135:3,
300:2, 300:12
**correspond** [1] -
293:5
**correspondence** [1] -
20:15
**corresponding** [1] -
296:22
**corroboration** [1] -
191:5
**corrupted** [1] - 41:14
**cost** [4] - 40:13, 53:23,
343:4, 366:3
**costs** [1] - 12:19
**couching** [1] - 282:7
**Coughlin** [4] - 7:19,
9:8, 10:1, 10:8
**COUGHLIN** [1] - 3:14

**council** [1] - 245:23
**counsel** [95] - 6:10,
6:11, 11:6, 14:10,
14:16, 14:24, 18:16,
19:22, 22:2, 24:4,
25:14, 27:12, 28:1,
37:21, 46:21, 48:8,
50:20, 51:22, 67:4,
68:9, 78:4, 88:14,
104:13, 107:22,
121:3, 150:8,
150:18, 153:13,
153:15, 156:25,
164:15, 165:23,
187:11, 187:18,
188:8, 188:21,
189:8, 197:1,
197:20, 197:22,
198:15, 201:10,
218:24, 218:25,
223:7, 223:11,
224:14, 226:1,
226:3, 226:7,
227:21, 228:4,
232:21, 232:25,
233:9, 238:9,
238:22, 243:17,
243:21, 243:24,
244:11, 246:10,
246:16, 247:2,
247:11, 267:24,
268:22, 270:8,
271:20, 286:2,
296:13, 297:23,
312:11, 313:14,
333:2, 333:8,
333:12, 334:1,
335:6, 360:19,
373:6, 375:5, 375:8,
376:7, 376:10,
377:2, 377:18,
379:11, 380:6,
380:17, 381:1,
384:7, 387:1, 388:2,
389:5
**COUNSEL** [2] - 3:8,
3:11
**Counsel** [20] - 8:2,
8:13, 17:20, 20:8,
141:13, 150:3,
159:5, 162:18,
194:8, 194:12,
197:2, 201:23,
219:17, 239:1,
251:8, 270:13,
277:21, 280:9,
304:18, 344:16
**counsel's** [1] - 197:8
**count** [3] - 276:4,
280:16, 355:4

**counted** [3] - 260:21,
361:14, 365:25
**counties** [103] - 9:11,
19:4, 39:4, 64:1,
64:2, 64:3, 64:9,
64:14, 64:15,
102:10, 102:12,
102:15, 113:17,
114:9, 115:3,
117:11, 117:13,
145:12, 145:15,
146:6, 151:17,
157:12, 157:16,
157:18, 158:14,
158:21, 158:24,
170:14, 170:24,
174:17, 175:12,
177:6, 177:10,
177:12, 177:15,
178:2, 178:13,
178:16, 178:17,
180:9, 181:6,
181:10, 181:12,
181:14, 181:23,
181:25, 182:3,
182:5, 183:11,
183:18, 184:19,
185:8, 206:10,
206:17, 206:25,
207:1, 210:1, 210:3,
210:7, 210:9,
210:18, 210:19,
210:21, 210:23,
211:1, 214:2, 214:9,
214:11, 214:14,
214:16, 214:18,
214:22, 215:2,
225:14, 230:3,
237:15, 239:23,
246:2, 252:12,
253:6, 253:13,
258:19, 260:12,
264:24, 265:8,
266:22, 273:1,
274:18, 296:23,
301:23, 318:22,
320:21, 320:22,
323:2, 323:3,
323:12, 323:25,
324:2, 324:10,
324:24, 339:21
**counting** [5] - 276:4,
338:4, 343:6, 355:5,
364:25
**country** [14] - 39:4,
98:3, 98:5, 98:7,
98:12, 107:3, 109:4,
125:19, 130:17,
152:19, 152:20,
180:18, 184:10,
385:1

**COUNTY** [3] - 3:8,
3:11, 3:11
**County** [148] - 1:8,
1:11, 2:11, 2:16,
2:19, 2:22, 2:25, 3:7,
3:10, 3:12, 3:13,
3:18, 3:21, 3:24,
7:10, 7:11, 7:12,
7:20, 7:23, 8:2, 8:3,
8:7, 8:10, 8:13, 8:14,
8:18, 8:22, 8:24, 9:1,
9:4, 9:9, 9:13, 9:19,
9:20, 9:24, 10:2,
10:6, 10:9, 61:2,
62:12, 62:24, 62:25,
63:5, 93:3, 93:4,
93:12, 93:13, 96:9,
102:20, 103:7,
103:14, 111:9,
139:14, 139:24,
140:2, 140:6,
140:25, 141:10,
142:24, 156:14,
157:6, 182:7,
182:19, 190:12,
202:9, 204:15,
204:18, 204:20,
205:5, 206:11,
206:14, 211:13,
214:6, 242:1, 242:5,
246:17, 255:10,
256:3, 267:4, 267:6,
267:17, 268:3,
270:4, 270:20,
271:4, 271:25,
278:20, 280:17,
280:19, 280:20,
281:3, 287:23,
294:2, 294:4,
307:15, 318:18,
319:11, 319:12,
320:12, 320:15,
320:18, 321:13,
322:8, 323:18,
323:19, 323:23,
336:18, 336:22,
336:25, 337:1,
337:5, 337:6,
337:20, 337:22,
338:13, 338:16,
338:18, 338:23,
339:19, 339:21,
339:25, 340:7,
340:9, 342:21,
343:2, 343:4,
346:21, 346:22,
347:14, 347:18,
350:12, 350:18,
350:21, 358:20,
363:20, 365:10,
366:22, 371:2

**county** [279] - 7:10,
7:20, 32:4, 32:5,
32:9, 33:14, 33:15,
34:1, 39:2, 40:8,
42:1, 42:4, 42:10,
43:7, 43:13, 48:1,
61:8, 64:10, 64:22,
93:8, 93:16, 96:16,
96:19, 96:23, 98:13,
98:21, 98:25, 99:13,
99:16, 99:21, 100:3,
103:2, 103:21,
105:6, 106:4,
106:12, 106:22,
110:17, 117:18,
117:20, 117:22,
125:9, 128:2, 134:3,
134:16, 139:19,
140:9, 141:23,
143:2, 143:5,
143:14, 144:5,
146:2, 148:17,
150:7, 151:6,
151:15, 151:20,
152:16, 157:9,
157:11, 157:13,
158:16, 158:18,
159:2, 159:3,
167:19, 168:8,
168:19, 168:25,
169:12, 169:18,
170:9, 170:13,
170:16, 170:23,
171:10, 171:17,
171:21, 172:1,
172:2, 172:10,
172:24, 173:3,
173:6, 173:12,
176:3, 176:6, 177:2,
177:3, 177:5, 177:9,
177:13, 177:18,
177:19, 178:6,
178:8, 178:11,
178:14, 179:20,
179:25, 181:6,
181:14, 181:21,
182:7, 182:19,
182:25, 183:2,
183:14, 184:5,
184:23, 185:17,
186:1, 186:7,
186:13, 186:16,
186:17, 187:1,
188:1, 190:11,
196:11, 203:18,
203:25, 204:3,
206:9, 207:24,
208:11, 208:12,
209:8, 209:19,
209:20, 209:21,
212:6, 214:16,

214:17, 214:19,
214:23, 214:25,
215:1, 216:3,
222:14, 222:17,
222:21, 223:2,
223:4, 224:22,
224:23, 224:25,
225:1, 227:1, 229:5,
231:11, 231:23,
231:24, 232:6,
232:12, 232:16,
234:8, 234:13,
239:15, 240:1,
240:15, 240:17,
241:23, 242:2,
243:1, 245:16,
245:21, 246:5,
246:8, 252:12,
253:4, 253:7,
253:19, 253:21,
255:2, 256:1, 256:9,
256:19, 259:1,
259:22, 263:18,
266:22, 282:13,
282:24, 283:1,
285:4, 285:12,
286:23, 293:10,
300:16, 310:11,
311:25, 312:1,
314:13, 315:18,
315:22, 316:10,
317:3, 317:5,
317:18, 318:11,
318:12, 320:23,
321:1, 321:3, 322:8,
322:21, 323:2,
323:3, 323:5, 323:7,
323:8, 323:13,
324:1, 324:3, 324:5,
324:8, 324:11,
324:12, 324:15,
324:23, 324:25,
325:2, 325:4,
325:18, 325:19,
326:6, 328:3, 328:4,
329:2, 330:15,
330:23, 332:1,
334:20, 334:21,
336:19, 337:3,
337:7, 337:14,
337:15, 338:18,
339:11, 339:23,
339:25, 340:23,
341:4, 341:11,
342:23, 343:2,
347:1, 347:4, 347:8,
347:18, 349:8,
349:9, 349:10,
356:6, 363:7, 365:8,
370:17, 370:19,

370:25, 372:6,
376:8, 376:12,
376:15, 377:24,
378:4, 381:19, 383:7
**County's** [2] - 351:2,
363:13
**county-line** [99] -
96:19, 96:23, 98:13,
98:21, 98:25, 99:13,
99:16, 99:21, 100:3,
105:6, 106:4,
106:12, 106:22,
117:22, 167:19,
168:19, 168:25,
169:18, 170:9,
170:13, 170:16,
171:10, 171:17,
171:21, 172:1,
172:2, 172:10,
172:24, 173:3,
173:6, 173:12,
176:3, 176:6,
178:14, 179:20,
181:6, 181:21,
182:25, 184:5,
184:23, 185:17,
186:16, 187:1,
190:11, 196:11,
207:24, 214:17,
214:19, 215:1,
222:14, 222:17,
222:21, 239:15,
240:15, 241:23,
243:1, 293:10,
300:16, 314:13,
315:22, 316:10,
316:14, 316:21,
317:18, 318:11,
318:12, 320:23,
321:3, 322:8,
322:21, 323:2,
323:5, 323:7,
323:13, 324:1,
324:3, 324:5,
324:11, 324:15,
324:23, 324:25,
325:18, 325:19,
326:6, 328:3, 328:4,
329:2, 330:15,
330:23, 334:20,
334:21, 370:19,
370:25, 376:8,
376:12, 376:15,
377:24, 378:4,
381:19
**county-line-style** [3] -
96:16, 110:17,
117:20
**countywide** [1] -
349:9

**couple** [11] - 35:9,
124:17, 191:21,
202:11, 205:1,
243:15, 286:2,
303:9, 313:1,
317:16, 386:9
**course** [17] - 33:10,
136:6, 136:24,
153:2, 160:23,
161:2, 178:23,
178:25, 188:15,
188:17, 236:5,
248:11, 317:9,
346:9, 353:1, 353:11
**Court** [115] - 1:21, 7:1,
10:23, 11:2, 11:23,
11:24, 12:20, 12:23,
13:3, 13:24, 14:15,
15:11, 15:24, 17:2,
17:6, 19:11, 19:13,
20:17, 21:1, 21:4,
21:16, 21:18, 21:25,
22:3, 25:2, 25:3,
26:9, 27:9, 28:24,
31:17, 32:1, 33:6,
34:21, 35:3, 36:2,
37:1, 37:5, 37:22,
37:23, 38:14, 39:1,
39:7, 41:9, 41:12,
44:10, 47:18, 48:12,
52:5, 53:5, 53:7,
53:18, 57:13, 58:10,
60:12, 60:13, 71:8,
71:15, 78:5, 83:1,
85:8, 87:7, 87:21,
88:4, 114:12,
114:16, 124:10,
134:22, 150:22,
152:21, 160:9,
161:8, 161:15,
161:23, 166:3,
168:13, 177:22,
180:3, 180:4, 180:5,
181:5, 181:7,
181:19, 181:20,
184:4, 184:23,
188:5, 195:24,
205:18, 208:3,
208:15, 217:4,
221:8, 247:23,
248:8, 250:15,
259:9, 259:19,
273:18, 273:22,
273:24, 274:11,
275:13, 285:12,
322:17, 345:24,
353:18, 360:21,
361:25, 363:15,
364:20, 369:25,
387:17, 387:18,
389:7, 390:11

**COURT** [607] - 1:1,
6:4, 6:5, 6:15, 6:19,
6:24, 7:4, 7:14, 7:17,
7:21, 7:25, 8:4, 8:11,
8:16, 9:2, 9:6, 9:15,
9:21, 9:25, 10:3,
10:10, 10:14, 11:17,
12:16, 13:1, 13:13,
13:16, 13:19, 13:25,
14:6, 15:25, 16:5,
16:19, 17:8, 18:2,
18:5, 18:15, 19:3,
19:12, 19:14, 19:17,
22:12, 22:16, 22:19,
22:24, 23:6, 23:20,
23:24, 24:2, 24:20,
25:4, 26:1, 26:19,
27:1, 27:6, 27:11,
27:14, 27:20, 28:8,
28:13, 28:15, 28:20,
29:3, 29:5, 29:18,
29:22, 29:25, 30:13,
31:7, 31:10, 34:5,
34:11, 36:6, 38:1,
39:10, 39:17, 39:23,
40:5, 41:2, 41:7,
42:7, 42:10, 42:16,
42:19, 43:23, 44:23,
44:25, 45:8, 45:13,
45:15, 45:17, 45:22,
47:5, 47:24, 48:4,
48:15, 49:23, 50:1,
50:10, 51:5, 51:8,
51:12, 53:4, 54:3,
54:7, 54:10, 54:14,
54:20, 55:4, 55:6,
55:23, 56:19, 56:24,
57:10, 57:23, 59:4,
59:6, 59:8, 59:12,
59:15, 59:17, 59:23,
60:2, 60:5, 60:7,
61:8, 61:24, 62:15,
62:18, 62:21, 64:6,
66:3, 66:7, 66:18,
66:21, 66:24, 67:3,
67:8, 67:12, 67:15,
67:19, 68:3, 68:6,
68:15, 68:24, 69:16,
70:4, 70:17, 70:23,
71:7, 71:18, 72:1,
72:10, 72:15, 72:20,
72:22, 73:1, 74:18,
74:22, 74:25, 75:3,
75:12, 77:19, 78:6,
78:8, 78:12, 79:18,
79:21, 80:3, 83:8,
83:16, 84:13, 85:7,
85:13, 85:17, 86:21,
86:23, 87:4, 87:8,
87:16, 88:2, 88:15,
88:19, 89:18, 89:22,

89:25, 90:5, 90:12,
90:15, 90:18, 91:1,
91:5, 91:14, 92:22,
94:25, 95:11, 95:14,
95:19, 95:22, 97:6,
99:2, 99:7, 99:10,
104:15, 104:21,
105:23, 107:23,
108:2, 108:5, 109:9,
109:14, 109:21,
111:6, 114:17,
114:19, 114:24,
115:7, 115:9,
115:13, 115:16,
116:2, 116:6, 118:2,
118:18, 118:23,
119:4, 119:14,
119:16, 119:24,
120:3, 120:7,
120:11, 120:14,
120:18, 120:21,
121:4, 121:7, 121:8,
122:5, 122:10,
122:14, 122:22,
122:24, 123:4,
123:7, 123:12,
123:14, 123:17,
129:7, 129:13,
129:18, 129:21,
133:6, 141:4,
143:16, 143:20,
143:25, 147:4,
147:7, 147:13,
147:18, 149:22,
150:3, 150:13,
150:17, 153:11,
153:14, 155:11,
155:25, 156:3,
156:11, 156:13,
156:16, 156:20,
157:3, 157:21,
158:2, 158:6, 158:8,
159:5, 162:17,
162:21, 162:25,
163:23, 164:3,
164:14, 165:7,
165:11, 165:14,
165:18, 165:22,
187:6, 187:8,
187:11, 187:16,
187:18, 188:11,
188:16, 188:18,
193:6, 193:10,
193:14, 193:17,
194:8, 197:2, 197:5,
197:13, 197:15,
197:19, 197:20,
198:2, 198:4, 198:6,
198:10, 198:15,
198:17, 198:21,
199:3, 199:10,

199:19, 200:4,
200:13, 200:16,
200:20, 200:25,
201:18, 201:22,
202:3, 202:6,
202:18, 202:23,
208:17, 211:8,
218:9, 218:14,
219:14, 219:19,
220:1, 220:5,
220:21, 221:17,
221:21, 221:23,
222:3, 227:3, 227:6,
227:8, 227:10,
227:14, 227:20,
227:24, 228:3,
228:7, 228:10,
228:13, 228:17,
228:19, 229:1,
230:9, 230:21,
231:20, 232:2,
232:18, 232:21,
233:2, 233:9,
233:12, 233:16,
233:20, 233:23,
234:24, 235:2,
235:4, 235:6,
235:11, 235:22,
235:25, 236:7,
236:17, 239:1,
239:3, 239:5, 241:5,
241:7, 241:9,
241:17, 242:16,
242:18, 243:7,
243:13, 243:19,
244:3, 244:7, 244:9,
244:11, 246:10,
246:13, 246:24,
247:2, 247:4, 247:7,
247:12, 247:16,
248:1, 248:5,
248:10, 248:14,
248:18, 249:3,
249:7, 249:11,
249:21, 249:24,
250:23, 251:3,
251:6, 251:15,
251:20, 251:22,
262:13, 262:18,
262:22, 264:8,
264:11, 264:14,
264:17, 264:20,
265:5, 267:9,
267:14, 267:19,
267:24, 268:15,
268:19, 269:1,
269:25, 270:11,
270:13, 270:17,
271:13, 271:16,
271:18, 271:20,
277:19, 277:24,

278:5, 278:19,
279:10, 280:6,
280:9, 280:12,
280:16, 281:12,
281:14, 282:4,
282:12, 282:18,
282:23, 283:4,
283:6, 283:9,
283:12, 283:14,
283:17, 283:19,
284:2, 284:5,
284:13, 284:16,
284:18, 285:1,
285:3, 285:14,
285:16, 285:22,
286:11, 287:9,
287:16, 287:17,
287:21, 287:25,
290:3, 290:10,
290:13, 290:17,
290:19, 290:22,
290:24, 291:3,
291:5, 296:7,
296:16, 296:18,
297:22, 303:7,
303:11, 303:17,
304:17, 304:22,
306:2, 306:6, 306:9,
306:12, 306:19,
306:25, 307:2,
307:4, 307:8,
307:16, 307:18,
307:21, 308:1,
308:5, 308:8,
308:11, 308:15,
309:6, 309:18,
309:21, 309:25,
310:5, 310:12,
310:19, 310:22,
310:25, 311:2,
313:17, 313:21,
314:1, 315:4,
325:10, 330:19,
332:6, 332:23,
334:5, 334:8,
334:23, 335:4,
335:10, 335:14,
335:18, 336:5,
336:8, 336:12,
344:10, 344:13,
344:15, 344:18,
344:20, 344:22,
344:24, 345:1,
345:4, 345:7,
350:16, 350:19,
351:16, 351:19,
358:15, 360:3,
360:9, 360:17,
362:12, 364:10,
364:12, 366:7,
366:10, 367:1,

367:7, 367:9,
367:18, 367:22,
368:11, 368:16,
369:4, 369:8,
371:15, 371:24,
372:18, 372:20,
372:22, 372:24,
373:1, 373:3, 373:6,
374:21, 375:4,
375:8, 375:17,
375:21, 379:18,
379:24, 380:3,
381:22, 384:17,
386:25, 387:4,
387:8, 387:25,
388:4, 388:6, 388:9,
388:12, 388:17,
388:21, 389:6, 390:1
**court** [30] - 6:1, 8:17,
9:16, 11:25, 12:2,
16:11, 20:16, 20:22,
24:24, 28:23, 30:18,
33:9, 49:12, 73:7,
121:20, 194:10,
201:21, 201:24,
223:14, 236:16,
252:1, 283:20,
312:8, 314:19,
315:8, 327:5,
333:24, 369:15,
383:4, 385:11
**Court's** [6] - 12:15,
12:21, 24:14,
133:16, 149:18,
251:13
**courthouse** [1] -
388:23
**Courthouse** [1] - 1:13
**Courtroom** [1] - 24:8
**courtroom** [24] -
15:17, 26:19, 29:23,
30:2, 30:3, 35:11,
40:18, 52:25, 72:21,
121:15, 165:15,
198:1, 198:9,
198:25, 199:11,
200:7, 236:1,
250:16, 250:24,
282:13, 288:5,
288:11, 308:12,
335:25
**courts** [7] - 37:16,
37:20, 44:17, 44:18,
57:9, 58:25, 161:17
**Covello** [2] - 3:18,
7:20
**coverage** [1] - 179:13
**covered** [4] - 320:9,
321:25, 358:14,
358:17

**COVID-19** [1] - 363:18
**create** [10] - 100:6,
100:9, 102:7,
112:13, 239:23,
240:12, 240:13,
240:17, 240:22,
362:18
**created** [2] - 55:19
**creating** [2] - 152:25,
160:5
**creation** [1] - 161:5
**credibility** [1] - 250:5
**crisis** [1] - 363:18
**criticized** [1] - 58:25
**CROSS** [27] - 1:11,
4:4, 4:5, 4:5, 4:7,
4:8, 4:9, 4:10, 4:11,
4:12, 4:13, 4:14,
4:15, 4:17, 123:19,
153:18, 157:7,
202:7, 211:14,
246:18, 264:21,
281:16, 288:3,
303:12, 332:18,
370:15
**cross** [63] - 25:19,
47:17, 47:22, 48:20,
51:21, 56:23, 68:11,
68:17, 69:7, 69:9,
69:11, 88:11, 108:2,
108:3, 108:6, 108:8,
120:15, 120:25,
121:1, 121:9, 122:8,
122:16, 122:21,
123:5, 156:1, 156:4,
156:18, 163:25,
164:7, 164:9,
164:15, 197:3,
197:23, 198:14,
201:12, 201:23,
247:20, 249:8,
249:13, 249:15,
264:18, 264:19,
264:20, 267:24,
270:15, 284:9,
287:11, 287:18,
306:17, 306:24,
309:9, 309:21,
310:1, 366:8,
366:11, 367:10,
367:19, 368:2,
368:4, 368:12,
368:23, 369:4,
371:18
**cross-exam** [1] - 69:9,
197:23, 201:12
**cross-examination**
[25] - 25:19, 47:17,
56:23, 69:7, 120:15,
120:25, 121:9,

122:16, 123:5,
156:18, 164:7,
164:15, 197:3,
198:14, 201:23,
247:20, 249:8,
249:13, 249:15,
264:20, 287:18,
309:21, 368:4,
368:12, 369:4
**CROSS-
EXAMINATION** [23] -
4:4, 4:5, 4:5, 4:9,
4:10, 4:11, 4:12,
4:13, 4:14, 4:15,
4:17, 123:19,
153:18, 157:7,
202:7, 211:14,
246:18, 264:21,
281:16, 288:3,
303:12, 332:18,
370:15
**cross-examine** [8] -
48:20, 88:11, 108:6,
108:8, 156:4,
267:24, 284:9, 309:9
**cross-examined** [2] -
47:22, 51:21
**cross-examining** [2] -
108:3, 310:1
**CRR** [1] - 390:11
**crux** [1] - 371:17
**CSOs** [3] - 121:13,
236:2, 367:12
**Cumberland** [3] -
7:11, 270:4, 270:20
**cumulative** [1] -
371:14
**curiae** [1] - 33:11
**curious** [2] - 55:23,
57:3
**current** [16] - 56:20,
98:19, 108:16,
111:25, 130:22,
130:25, 133:22,
166:3, 168:2,
191:11, 191:19,
192:6, 258:21,
336:17, 339:23
**curriculum** [1] - 286:7
**custody** [3] - 158:20,
356:20, 365:22
**customer** [1] - 273:1
**customization** [2] -
342:16, 342:20
**customize** [1] - 343:2
**cut** [9] - 34:5, 53:16,
70:2, 70:5, 70:6,
70:8, 71:23, 309:22
**cutting** [1] - 91:6
**CV** [7] - 70:24, 70:25,

71:21, 75:5, 122:20,
286:14, 314:6
**CVs** [1] - 122:13
**CWA** [2] - 331:6, 331:7
**cybersecurity** [1] -
127:15
**cycle** [6] - 174:20,
191:2, 191:4, 191:7,
191:23, 192:6

# D

**D-1** [2] - 227:4, 227:10
**D-95** [1] - 267:12
**D-I-O-N** [1] - 375:19
**D.C** [2] - 175:8, 175:9
**D.s** [1] - 25:15
**dad** [1] - 253:1
**DALE** [1] - 1:11
**damage** [1] - 43:23
**DARROW** [1] - 86:22
**data** [38] - 78:23,
78:24, 79:1, 79:11,
79:12, 81:8, 81:14,
81:19, 81:20, 82:3,
82:9, 82:14, 82:22,
83:24, 134:2,
136:15, 161:10,
192:24, 196:17,
316:5, 318:17,
324:21, 325:13,
325:16, 325:18,
326:12, 330:21,
330:25, 331:4,
331:5, 331:8, 331:9,
356:8, 356:17,
356:19, 358:4
**databases** [1] - 135:9
**Date** [1] - 390:12
**date** [22] - 37:16, 38:1,
38:3, 38:4, 38:5,
38:8, 143:1, 168:5,
194:4, 254:9, 255:3,
343:17, 343:19,
343:25, 344:4,
345:20, 357:5,
378:22, 379:9,
379:10, 382:1,
382:22
**dated** [2] - 14:11,
286:7
**dates** [4] - 11:1,
343:15, 345:12,
346:11
**Daubert** [4] - 24:25,
26:6, 28:22, 75:6
**Dave** [1] - 247:6
**David** [5] - 9:8,
113:10, 251:5,
252:2, 318:11

**DAVID** [3] - 3:15, 4:9,
251:1
**Davidson** [1] - 1:19
**days** [11] - 15:23,
38:7, 38:10, 38:11,
38:12, 69:4, 186:6,
205:1, 354:16,
354:18, 357:19
**DE** [4] - 91:19, 104:4,
104:18, 166:21
**DE1-2** [1] - 193:21
**deadline** [20] - 37:12,
37:18, 51:2, 119:16,
210:5, 210:10,
254:8, 254:9,
254:18, 254:19,
259:15, 263:6,
263:8, 345:21,
346:7, 346:14,
346:17, 346:18,
382:4
**deadlines** [13] - 37:10,
37:11, 117:6,
256:15, 256:23,
345:23, 345:25,
346:12, 348:1,
353:21, 387:8, 387:9
**deal** [13] - 12:10, 25:1,
29:2, 29:5, 71:22,
75:6, 87:23, 129:15,
201:11, 247:16,
248:15, 363:8,
374:22
**dealing** [1] - 352:19
**dealt** [1] - 261:15
**Deanna** [19] - 2:6,
4:12, 8:23, 227:19,
287:20, 287:22,
288:2, 288:3, 290:1,
290:6, 290:23,
291:4, 291:7,
296:15, 296:17,
296:19, 298:17,
303:6
**DEANNA** [1] - 8:23
**deaths** [1] - 152:22
**debate** [1] - 52:11
**deceive** [1] - 248:7
**December** [34] -
167:14, 167:18,
189:10, 216:23,
218:5, 218:8,
218:12, 218:13,
218:15, 225:24,
226:4, 289:2,
304:11, 304:12,
305:10, 305:17,
305:22, 333:2,
333:5, 333:9,
333:10, 377:25,

378:3, 378:10,
378:19, 379:15,
379:21, 380:1,
380:5, 380:6, 382:3,
382:10, 382:14,
384:8
**decide** [11] - 13:9,
15:5, 21:8, 48:12,
48:15, 53:3, 161:15,
161:18, 282:13,
363:22, 370:8
**decided** [10] - 21:4,
21:21, 64:6, 87:20,
209:16, 210:24,
210:25, 340:9,
363:19, 378:20
**decides** [1] - 13:3
**deciding** [3] - 62:4,
87:23, 297:6
**decision** [20] - 16:22,
22:8, 34:16, 36:18,
49:12, 55:8, 58:10,
66:16, 173:20,
174:21, 195:11,
195:15, 205:21,
211:4, 282:25,
340:9, 341:23,
364:24, 381:6
**decisions** [4] - 49:13,
189:13, 250:6,
353:25
**deck** [5] - 308:13,
308:20, 354:22,
367:13, 368:4
**decks** [1] - 276:8
**declaration** [2] -
91:17, 91:24
**declare** [1] - 167:8
**declared** [10] - 167:10,
167:21, 167:23,
174:5, 174:11,
176:2, 185:16,
185:18, 225:18,
364:14
**declined** [1] - 24:17
**DeCotiis** [2] - 2:23,
9:23
**deem** [3] - 69:16,
194:21, 388:3
**deemed** [4] - 88:5,
88:20, 224:1
**deeming** [1] - 71:24
**deeply** [1] - 184:16
**deer** [1] - 199:7
**Defendant** [12] - 2:8,
2:11, 2:19, 2:22,
2:25, 3:4, 3:7, 3:10,
3:13, 3:18, 3:21,
3:24
**defendant** [1] - 224:14

**Defendant's** [7] - 4:21,
5:4, 227:11, 243:22,
244:8, 247:11,
303:20
**defendants** [10] -
10:13, 14:2, 34:3,
164:16, 223:7,
223:11, 223:14,
223:17, 226:13,
309:15
**Defendants** [2] - 1:9,
2:16
**Defendants'** [4] - 5:5,
344:9, 344:14,
375:25
**defending** [1] - 25:25
**defense** [56] - 7:5,
10:18, 11:9, 11:10,
13:6, 14:15, 14:25,
15:8, 16:7, 16:9,
17:5, 18:21, 24:15,
25:5, 26:3, 27:12,
28:1, 28:6, 30:10,
34:11, 36:9, 39:11,
39:15, 47:7, 55:24,
70:17, 71:20, 75:4,
88:13, 88:22, 104:3,
153:13, 153:14,
156:1, 156:4, 159:6,
164:15, 168:16,
197:1, 197:3, 201:9,
227:21, 251:18,
264:18, 307:13,
309:7, 334:6,
360:18, 366:11,
366:16, 368:1,
369:10, 369:23,
370:1, 370:10,
387:10
**Defense** [3] - 243:25,
244:2, 244:3
**defense's** [2] - 13:7,
25:24
**defer** [6] - 25:2, 58:1,
69:6, 122:16,
153:12, 369:23
**deferential** [1] - 187:5
**deferred** [1] - 49:12
**deferring** [1] - 306:17
**defers** [1] - 43:13
**define** [1] - 180:4
**defined** [2] - 33:4,
302:5
**defining** [3] - 161:3,
297:17, 297:18
**definitely** [2] - 115:14,
223:4
**definition** [9] - 37:2,
114:6, 135:2,
136:15, 160:5,

161:3, 161:5,
161:20, 296:3
**degree** [4] - 94:18,
95:8, 96:13, 362:4
**Delaware** [4] - 97:21,
101:21, 101:24,
106:13
**delay** [10] - 47:3, 52:2,
55:13, 55:19, 56:2,
263:3, 263:4, 369:1
**delayed** [4] - 50:24,
53:17, 56:1, 387:24
**delays** [1] - 145:18
**delegates** [3] - 43:13,
346:23
**delete** [2] - 110:18,
110:22
**deleted** [1] - 110:20
**deleting** [1] - 116:17
**demanding** [1] - 12:2
**demands** [1] - 38:24
**demarcation** [1] -
326:22
**democracy** [3] -
173:16, 173:19,
173:23
**Democracy** [5] -
80:25, 81:4, 85:5,
86:4, 138:11
**Democratic** [24] -
2:19, 7:23, 169:9,
169:10, 169:16,
177:16, 178:4,
178:7, 178:10,
178:13, 202:10,
204:15, 204:18,
205:5, 218:19,
219:3, 219:7,
220:15, 220:16,
234:3, 234:7,
319:23, 321:11,
347:12
**Democrats** [3] - 347:6,
347:15, 365:7
**Democrats/
Republicans** [1] -
268:7
**demonstrate** [5] -
169:11, 169:25,
189:17, 189:23,
191:2
**demonstration** [1] -
318:23
**denied** [2] - 29:13,
44:21
**deny** [2] - 13:3, 36:12
**Department** [5] -
125:15, 125:21,
126:13, 173:16,
346:16

**depended** [1] - 231:8
**dependent** [4] - 69:12, 140:9, 142:2, 161:13
**deposed** [2] - 47:22, 48:19
**depositions** [2] - 47:18, 51:18
**deprive** [1] - 58:13
**depth** [1] - 189:24
**Deputy** [2] - 8:13, 366:24
**DEPUTY** [14] - 3:11, 6:4, 72:22, 73:1, 121:7, 165:18, 197:19, 251:3, 285:22, 287:16, 310:19, 336:5, 375:17, 389:6
**deputy** [5] - 29:23, 72:21, 165:15, 250:24, 335:25
**derived** [1] - 331:1
**describe** [10] - 40:9, 40:20, 85:21, 86:3, 105:19, 114:3, 140:7, 255:19, 336:24, 353:18
**described** [17] - 15:19, 49:3, 81:8, 116:17, 151:9, 161:19, 163:16, 175:24, 240:25, 259:1, 274:15, 325:13, 328:6, 340:24, 342:5, 343:5, 366:1
**describes** [2] - 107:10, 115:21
**Description** [1] - 4:20
**description** [8] - 89:12, 93:24, 105:18, 106:19, 113:22, 113:24, 114:14, 141:3
**descriptions** [1] - 114:2
**descriptive** [11] - 316:2, 325:23, 326:21, 326:24, 326:25, 327:11, 327:12, 327:15, 327:17, 328:7
**design** [80] - 12:25, 25:20, 31:12, 38:21, 40:10, 43:13, 47:21, 52:4, 52:6, 75:24, 76:2, 81:9, 81:20, 82:5, 82:6, 82:8, 93:22, 94:2, 112:8, 113:25, 115:22, 125:24, 133:16,

138:5, 138:7, 140:11, 146:2, 146:3, 147:11, 148:18, 150:1, 150:25, 152:9, 152:25, 167:15, 168:14, 168:15, 176:2, 229:10, 229:25, 231:4, 237:20, 254:22, 254:25, 256:13, 257:13, 259:10, 259:13, 259:20, 259:23, 265:23, 274:22, 274:24, 275:15, 276:21, 277:7, 277:10, 277:17, 278:7, 278:11, 281:18, 297:19, 302:3, 314:7, 329:14, 348:11, 356:11, 357:24, 358:7, 359:20, 359:22, 373:12, 373:17, 383:2, 383:4, 383:12, 383:19, 384:12, 385:5, 385:25
**design-and-layout** [1] - 152:9
**design-wise** [1] - 277:10
**designated** [2] - 74:2, 367:3
**designation** [3] - 43:5, 43:21, 69:25
**designed** [21] - 32:11, 82:18, 101:3, 101:5, 102:3, 138:25, 260:15, 353:5, 355:20, 374:16, 385:22
**designing** [5] - 77:10, 78:15, 255:4, 276:16, 279:25
**designs** [3] - 273:25, 302:17, 360:14
**desire** [2] - 231:13, 231:14
**desk** [1] - 124:13
**despite** [4] - 144:14, 171:14, 179:16, 328:2
**detailed** [1] - 91:13
**detailing** [1] - 137:20
**details** [1] - 316:7
**determination** [3] - 154:18, 341:6, 359:18

**determinations** [2] - 41:4, 64:23
**determinative** [4] - 32:14, 168:25, 169:13, 172:25
**determine** [9] - 26:12, 58:20, 100:13, 106:17, 106:24, 320:25, 344:1, 358:8, 363:11
**determined** [3] - 13:8, 49:13, 107:1, 154:21, 241:24, 341:2
**determining** [3] - 155:18, 300:25, 373:16
**devastating** [1] - 171:19
**develop** [2] - 81:20, 142:6
**developed** [1] - 127:1
**development** [6] - 78:25, 107:11, 108:14, 108:20, 109:2, 313:5
**deviations** [4] - 106:16, 106:23, 109:6, 109:18
**device** [15] - 76:10, 76:13, 76:14, 76:15, 76:16, 76:21, 76:24, 80:13, 80:14, 81:24, 81:25, 96:1, 107:5, 113:3, 113:4
**devices** [7] - 75:25, 79:8, 84:25, 96:15, 109:3, 138:4, 161:24
**DHS** [1] - 126:20
**dictated** [2] - 43:16, 348:10
**dictates** [1] - 349:21
**Diez** [1] - 331:6
**difference** [14] - 27:14, 45:18, 63:11, 76:21, 102:4, 186:8, 186:12, 261:6, 261:7, 282:20, 285:9, 285:13, 327:14, 330:1
**differences** [1] - 46:4
**different** [123] - 17:3, 21:10, 27:11, 37:9, 45:9, 45:23, 45:25, 54:22, 54:23, 55:1, 55:4, 55:5, 57:7, 57:20, 58:17, 59:7, 59:10, 59:18, 76:8, 77:15, 78:20, 79:25, 80:10, 81:3, 83:18,

83:19, 98:1, 99:25, 107:8, 111:2, 111:13, 112:1, 113:3, 115:24, 116:6, 116:15, 116:22, 116:23, 118:6, 137:2, 143:21, 143:23, 147:20, 151:6, 152:18, 156:10, 157:14, 159:15, 159:16, 160:14, 170:18, 175:3, 175:11, 175:12, 175:16, 176:8, 176:10, 176:24, 177:1, 177:4, 179:7, 183:11, 185:8, 189:11, 191:18, 191:21, 195:19, 202:13, 206:10, 225:22, 230:21, 237:15, 242:11, 242:22, 245:18, 253:6, 253:25, 255:7, 256:1, 258:2, 259:22, 263:24, 268:9, 268:13, 271:22, 272:21, 272:22, 273:25, 291:15, 294:22, 298:2, 298:12, 298:14, 302:8, 303:10, 305:1, 310:1, 310:4, 310:6, 310:7, 310:8, 312:1, 317:3, 331:16, 332:12, 339:5, 343:20, 348:15, 352:16, 357:13, 358:21, 359:9, 361:4, 363:19, 366:1, 372:17, 378:24, 384:15
**differentiate** [1] - 322:7
**differently** [3] - 148:11, 176:4, 253:22
**differs** [1] - 159:2
**difficult** [9] - 10:15, 113:22, 169:25, 181:4, 182:12, 182:21, 183:20, 277:9, 277:11
**digit** [2] - 32:10, 179:12
**dilatory** [1] - 236:5
**diligence** [3] - 216:25, 217:18, 248:18

**Dion** [2] - 307:19, 375:19
**DION** [2] - 4:17, 375:15
**DIRECT** [16] - 4:4, 4:6, 4:7, 4:10, 4:12, 4:14, 4:16, 4:18, 73:6, 159:9, 166:1, 251:10, 285:25, 311:6, 336:16, 375:23
**direct** [40] - 68:4, 68:5, 68:6, 68:10, 68:16, 69:11, 69:14, 70:8, 76:15, 77:4, 88:24, 102:17, 119:25, 140:5, 140:21, 141:22, 142:23, 144:3, 148:13, 151:21, 163:25, 164:6, 165:23, 202:11, 247:19, 247:21, 249:13, 251:23, 283:23, 284:6, 286:3, 287:8, 288:17, 306:16, 309:10, 312:10, 319:2, 331:11, 336:13, 367:23
**directed** [3] - 10:23, 25:1, 250:3
**direction** [3] - 133:17, 214:24, 358:12
**directive** [1] - 364:19
**directly** [14] - 39:22, 126:17, 126:18, 131:12, 132:20, 139:16, 139:19, 143:2, 167:18, 241:15, 241:18, 308:4, 319:21, 373:19
**director** [1] - 73:17
**disagree** [8] - 12:12, 17:18, 47:6, 109:20, 135:18, 135:24, 164:16, 183:22
**disagrees** [1] - 164:15
**disappear** [1] - 305:16
**disbelieve** [3] - 320:12, 320:15, 320:18
**disclose** [1] - 188:7
**disclosed** [1] - 344:9
**disconnect** [1] - 152:4
**disconnected** [1] - 81:14
**discovered** [2] - 248:8, 311:21
**discovery** [13] - 44:15,

47:13, 50:24, 51:2,
51:14, 51:17, 51:18,
51:22, 54:16, 58:19,
368:10

**discretion** [1] - 120:16

**discuss** [8] - 138:4,
223:8, 223:12,
254:15, 255:11,
255:13, 288:23,
314:13

**discussed** [4] - 52:15,
52:16, 288:13,
326:11

**discussing** [2] -
289:15, 348:2

**discussion** [4] -
263:13, 376:16,
381:15, 381:24

**discussions** [1] -
49:23

**dismiss** [4] - 44:22,
54:18, 196:16, 282:5

**dismissal** [1] - 44:13

**dismissed** [1] -
375:10

**display** [6] - 76:5,
82:10, 93:4, 93:13,
103:24, 107:15

**displayed** [1] - 291:14

**dispositive** [1] - 54:17

**dispositively** [1] -
45:1

**dispute** [9] - 24:20,
25:9, 25:17, 56:8,
151:5, 151:16,
151:18, 151:21,
151:24

**disrupt** [3] - 52:6,
52:7, 56:15

**disruption** [1] - 47:3

**distance** [1] - 42:16

**distinct** [2] - 337:11,
338:3

**distract** [1] - 121:21

**distracting** [1] -
121:21

**distractions** [1] -
121:13

**District** [5] - 6:2,
166:5, 318:4, 320:8,
321:12

**district** [15] - 30:18,
169:12, 170:14,
260:11, 260:21,
260:22, 312:1,
320:6, 320:11,
320:14, 320:17,
321:16, 339:7,
347:13

**DISTRICT** [3] - 1:1,

1:1, 1:16

**districts** [16] - 40:2,
78:24, 81:18, 83:19,
222:22, 256:4,
338:7, 338:19,
338:23, 338:24,
339:12, 347:5,
347:10, 347:14,
347:17

**dive** [1] - 315:14

**divert** [1] - 47:12

**divided** [2] - 338:15,
338:18

**division** [1] - 345:19

**division-of-elections**
[1] - 345:19

**docket** [16] - 6:8,
86:10, 87:7, 87:11,
87:12, 88:6, 89:5,
91:19, 118:21,
118:22, 120:6,
120:7, 166:21,
193:20, 227:12,
387:11

**doctor** [2] - 297:22,
306:6

**Doctor** [2] - 312:14,
334:23

**document** [16] - 82:7,
87:10, 88:6, 89:8,
139:17, 233:7,
233:18, 243:22,
269:13, 269:15,
270:1, 311:9,
311:10, 344:20,
345:10, 372:1

**documentation** [5] -
27:8, 131:9, 132:10,
132:21, 158:25

**documents** [8] - 27:1,
88:10, 112:22,
124:8, 124:12,
127:1, 146:9, 152:6

**dog** [1] - 265:6

**dollars** [1] - 343:6

**Dominion** [47] - 75:18,
75:21, 76:7, 77:24,
80:9, 80:21, 80:25,
81:4, 85:5, 86:4,
94:4, 98:2, 98:8,
98:9, 98:18, 107:6,
107:7, 130:23,
131:2, 132:15,
136:25, 137:18,
138:10, 138:11,
139:4, 159:19,
159:25, 258:6,
260:3, 277:2, 277:3,
277:10, 277:14,
278:20, 279:16,

279:20, 281:7,
301:13, 301:16,
301:19, 301:22,
301:25, 302:4,
302:8, 302:10,
341:7, 341:9

**Dominion's** [1] -
301:10

**done** [110] - 17:13,
18:18, 19:7, 20:17,
21:8, 26:6, 28:18,
29:19, 29:20, 36:23,
36:25, 37:4, 37:19,
39:3, 39:6, 40:1,
40:2, 40:4, 40:7,
41:1, 42:14, 52:12,
57:11, 57:17, 57:18,
57:21, 58:18, 62:25,
67:22, 68:6, 68:10,
68:16, 101:10,
116:19, 119:24,
124:3, 138:12,
138:16, 138:22,
139:3, 139:7,
143:11, 144:8,
145:12, 145:15,
145:16, 149:8,
153:8, 153:9,
154:22, 155:25,
156:24, 176:4,
189:18, 190:24,
191:22, 192:7,
192:12, 194:13,
196:15, 199:21,
201:1, 222:7,
234:18, 235:9,
235:20, 236:13,
241:14, 248:18,
254:24, 254:25,
257:10, 257:21,
257:24, 257:25,
260:14, 264:18,
275:14, 282:15,
282:25, 285:5,
306:14, 307:10,
308:15, 308:22,
308:23, 308:25,
313:16, 331:11,
331:19, 342:1,
342:6, 350:2,
350:23, 356:3,
356:4, 356:11,
357:2, 361:9, 363:1,
366:14, 368:17,
369:19, 375:14,
382:19

**donors** [1] - 169:16

**doomed** [1] - 32:7

**door** [2] - 355:15,
365:12

**doors** [1] - 121:18

**double** [5] - 32:10,
87:22, 179:12,
303:25, 377:10

**double-digit** [2] -
32:10, 179:12

**double-sided** [2] -
303:25, 377:10

**double-tapping** [1] -
87:22

**down** [24] - 12:5, 21:1,
62:2, 128:18,
150:23, 153:23,
154:2, 154:6,
170:18, 175:8,
175:9, 190:5,
250:21, 255:9,
257:17, 260:11,
262:6, 262:16,
262:18, 298:11,
367:12, 369:21,
375:6, 388:22

**downloading** [1] -
356:15

**downsides** [1] -
170:20

**downstairs** [2] -
200:23

**dozens** [2] - 184:18,
314:15

**Dr** [23] - 31:17, 31:18,
34:20, 35:17, 194:1,
194:2, 194:7,
194:22, 194:23,
195:14, 205:8,
205:25, 206:16,
206:25, 226:9,
286:1, 286:17,
288:4, 311:7, 312:7,
312:16, 312:17,
312:18

**draft** [2] - 205:13,
290:7

**drastically** [1] -
261:15

**draw** [17] - 63:2,
65:16, 206:9, 207:9,
254:2, 257:10,
344:1, 348:25,
349:21, 350:11,
352:22, 352:23,
352:24, 353:2,
353:13, 363:25,
364:2

**drawing** [10] - 254:10,
254:16, 273:10,
273:11, 273:12,
273:13, 349:15

**drawn** [7] - 43:12,
64:24, 350:5, 350:6,

350:7, 350:10,
350:11

**draws** [4] - 37:17,
63:9, 155:18, 364:3

**DRE** [4] - 76:15,
76:22, 80:14

**dressed** [1] - 327:18

**drink** [1] - 306:20

**Drive** [2] - 2:10, 3:23

**driven** [1] - 55:9

**drives** [4] - 37:3,
356:16, 356:17

**driving** [2] - 201:17,
288:11

**drop** [3] - 15:17, 32:5,
173:6

**dropping** [1] - 172:25

**due** [7] - 97:10,
152:21, 152:22,
215:11, 216:25,
248:18

**DULY** [7] - 72:24,
165:16, 251:1,
285:20, 310:17,
336:3, 375:15

**duration** [1] - 212:1

**during** [9] - 110:8,
123:1, 124:4,
156:17, 199:24,
215:7, 288:13,
357:9, 365:15

**duties** [4] - 139:10,
164:24, 252:5,
337:11

**dynamics** [2] - 176:12,
195:6

---

**E**

**e-filed** [3] - 28:23,
29:20, 29:21

**EAC** [12] - 74:1,
131:14, 131:18,
131:22, 131:25,
132:2, 132:5,
132:19, 132:23,
148:2, 297:5, 297:8

**eardrum** [1] - 268:21

**early** [21] - 31:14,
35:18, 213:5,
216:22, 339:8,
339:9, 339:17,
339:19, 339:20,
339:25, 340:11,
346:6, 356:23,
357:5, 357:20,
365:2, 365:3,
365:14, 365:15,
365:17, 386:13

**earn** [2] - 265:2,

265:12
ease [1] - 159:22
easier [1] - 275:6
easiest [1] - 133:6
easily [1] - 14:23
Eastern [1] - 377:25
easy [2] - 26:1, 240:7
eat [2] - 20:3, 306:20
ECF [3] - 86:10, 87:7, 89:5, 100:22, 103:20, 111:10, 111:17, 113:10, 120:7, 227:14, 290:2, 372:1
edits [1] - 152:21
education [2] - 40:14, 69:23
EDWARD [1] - 2:20
Edward [3] - 86:9, 89:6, 246:16
Edwin [1] - 8:9
effect [17] - 40:12, 44:6, 63:10, 169:5, 172:23, 173:1, 173:17, 176:3, 176:5, 176:7, 185:9, 239:8, 312:4, 312:5, 317:18, 384:16, 384:21
effectively [1] - 18:9
effects [3] - 170:3, 188:1, 332:2
effectuate [1] - 384:12
efficiency [1] - 144:4
effort [4] - 175:22, 177:13, 239:22, 384:2
efforts [9] - 19:4, 164:9, 175:1, 175:13, 177:5, 177:10, 188:21, 196:16, 383:25
eight [7] - 68:21, 104:8, 104:23, 104:25, 166:22, 186:6, 211:1
either [25] - 10:17, 42:5, 45:1, 82:4, 87:16, 88:15, 108:25, 110:11, 113:2, 125:12, 125:24, 130:23, 131:1, 137:8, 137:17, 139:4, 139:5, 164:6, 178:13, 235:17, 258:6, 328:3, 364:20, 379:25, 383:7
elaborate [1] - 257:15

elected [9] - 46:8, 63:25, 166:6, 166:7, 166:12, 166:14, 176:24, 317:3, 336:23
election [265] - 23:11, 27:23, 28:2, 31:15, 32:2, 32:3, 33:25, 36:18, 38:7, 40:2, 40:3, 40:17, 40:21, 45:10, 45:13, 45:14, 45:19, 46:14, 46:17, 47:1, 47:4, 49:18, 52:6, 52:7, 53:22, 55:1, 56:15, 56:16, 58:14, 73:12, 73:13, 73:14, 74:8, 74:9, 74:11, 74:21, 74:23, 74:24, 75:10, 75:17, 76:1, 77:8, 77:25, 78:17, 78:21, 80:11, 80:16, 80:23, 81:2, 81:17, 82:18, 83:19, 84:1, 84:2, 84:3, 84:6, 91:9, 100:8, 100:12, 100:15, 100:17, 103:10, 103:11, 103:12, 103:14, 105:17, 107:19, 114:5, 116:20, 117:5, 117:18, 125:25, 127:1, 127:5, 127:7, 127:8, 127:10, 127:20, 127:22, 127:23, 128:3, 128:8, 130:10, 133:12, 133:25, 134:1, 134:6, 134:13, 134:19, 134:25, 135:1, 135:3, 135:6, 135:16, 136:5, 136:6, 136:15, 136:19, 136:21, 137:8, 138:14, 139:12, 143:9, 144:8, 149:9, 149:15, 149:16, 152:12, 152:20, 153:1, 153:9, 155:8, 157:12, 157:18, 158:20, 159:16, 159:19, 160:16, 160:21, 160:23, 161:1, 161:2, 161:3, 161:13, 161:14, 162:10, 163:16, 163:17, 182:1, 185:4, 191:2, 191:4, 191:7, 191:20,

191:23, 195:6, 206:4, 206:7, 210:16, 212:6, 218:6, 218:15, 218:16, 218:20, 219:3, 221:4, 221:7, 221:11, 222:2, 223:4, 226:15, 230:13, 231:2, 234:15, 234:23, 237:19, 238:4, 253:18, 254:4, 254:7, 258:12, 258:15, 258:19, 261:5, 263:14, 268:9, 268:11, 268:14, 269:3, 272:23, 277:11, 279:1, 281:21, 281:24, 281:25, 283:1, 289:21, 291:11, 294:9, 295:1, 296:22, 297:6, 297:9, 298:4, 299:11, 302:5, 302:9, 315:11, 316:24, 324:4, 324:14, 328:20, 337:11, 337:12, 338:6, 338:18, 338:19, 338:23, 338:24, 339:12, 339:22, 340:6, 342:1, 342:14, 343:10, 343:16, 344:12, 345:11, 345:14, 346:9, 346:11, 346:20, 347:1, 347:5, 347:10, 347:13, 347:14, 347:19, 347:22, 348:8, 348:12, 349:16, 349:17, 349:18, 349:25, 350:13, 350:22, 350:23, 351:1, 351:4, 351:5, 352:14, 352:16, 352:17, 354:23, 357:25, 358:6, 358:20, 358:21, 361:8, 362:3, 362:4, 362:6, 365:14, 365:15, 365:25, 370:16, 373:13, 373:14, 373:17, 374:4, 374:9, 374:11, 375:1, 382:3, 385:17, 386:10, 386:17, 386:20

Election [20] - 55:22, 73:16, 73:18, 74:6, 75:18, 85:24, 103:12, 124:19, 125:22, 126:2, 128:9, 128:10, 128:18, 131:5, 162:11, 163:4, 297:4, 339:8, 346:10, 356:24
election-related [1] - 315:11
elections [85] - 25:20, 28:3, 32:16, 33:5, 33:10, 38:22, 40:15, 41:16, 46:12, 74:4, 74:10, 82:17, 86:7, 92:8, 109:7, 113:18, 114:3, 125:11, 125:13, 125:18, 126:24, 127:12, 134:4, 134:15, 134:17, 134:18, 134:21, 139:19, 139:25, 140:16, 143:3, 143:7, 143:12, 145:2, 145:3, 149:13, 157:9, 157:13, 157:14, 157:17, 158:13, 158:17, 161:18, 171:16, 195:6, 210:15, 218:12, 229:11, 266:25, 273:1, 273:5, 289:15, 292:10, 314:8, 337:7, 337:9, 337:10, 337:15, 337:20, 337:21, 338:1, 338:2, 340:15, 341:2, 341:6, 341:17, 342:9, 342:10, 342:12, 345:19, 346:25, 347:2, 347:4, 348:5, 355:3, 355:4, 356:4, 356:7, 356:18, 358:23, 359:1, 359:19, 365:8, 370:20, 372:5
Electionware [6] - 80:24, 81:2, 81:6, 138:17, 353:23, 356:9
elective [1] - 175:18
electoral [6] - 172:9, 172:10, 177:17, 184:13, 186:20, 186:25

electronic [12] - 76:15, 76:17, 79:4, 79:8, 79:9, 84:24, 95:9, 95:25, 96:9, 112:14, 145:22, 340:6
elements [3] - 173:21, 183:2, 183:22
eleven [1] - 272:15
eliciting [1] - 286:3
eliminate [1] - 315:25
eliminated [1] - 184:4
elsewhere [1] - 198:24
email [3] - 304:15, 304:16, 353:9
emails [8] - 50:18, 50:23, 305:1, 378:13, 379:11, 380:12, 380:18
embarrassment [1] - 31:13
emergency [5] - 127:9, 127:11, 339:15, 357:11, 357:12
emergent [4] - 11:23, 20:17, 21:7, 45:4
emphasize [1] - 140:21
employee [1] - 126:3
employees [5] - 146:20, 165:2, 252:22, 252:23, 256:17
EMS [15] - 77:9, 78:1, 78:15, 79:24, 80:20, 80:23, 80:25, 82:4, 84:7, 84:18, 94:1, 137:1, 137:2, 138:6
EMS's [1] - 94:8
EMSs [1] - 79:25
en [1] - 232:10
encapsulates [1] - 322:23
encoded [1] - 356:9
encourage [1] - 234:9
end [22] - 17:21, 24:12, 26:7, 36:1, 58:12, 71:9, 83:24, 84:4, 136:21, 167:10, 188:22, 188:23, 206:20, 207:4, 215:14, 248:25, 264:8, 277:25, 305:21, 305:22, 356:6, 369:22
ended [2] - 14:13, 108:17
endorse [3] - 61:8, 61:15, 186:7

**endorsed** [16] - 182:12, 182:20, 186:18, 204:4, 204:11, 204:16, 204:21, 209:5, 311:25, 322:20, 322:21, 323:5, 330:22, 371:1

**endorsement** [29] - 60:24, 65:18, 177:1, 177:18, 177:20, 177:22, 186:1, 186:9, 203:12, 203:17, 203:22, 203:25, 204:6, 204:10, 204:14, 204:20, 205:5, 207:23, 209:21, 210:1, 210:7, 210:22, 211:5, 214:23, 242:3, 316:16, 321:13, 331:10, 331:19

**endorsements** [28] - 63:18, 64:1, 64:2, 65:25, 175:15, 176:20, 176:23, 177:6, 177:23, 178:2, 178:6, 179:25, 186:14, 186:23, 188:1, 209:19, 210:18, 210:19, 212:6, 214:17, 214:25, 216:3, 238:11, 240:15, 323:2, 323:3, 323:8, 383:6

**endorses** [2] - 325:2, 325:5

**ends** [5] - 58:11, 76:19, 79:7, 172:24, 359:12

**enforcement** [3] - 18:7, 18:13

**engage** [4] - 83:3, 177:14, 196:9, 216:12

**engaged** [10] - 143:19, 176:8, 176:16, 189:8, 217:22, 305:17, 333:1, 333:21, 334:1, 380:24

**engagement** [6] - 175:13, 182:24, 204:25, 216:16, 216:20, 292:3

**engagements** [1] - 175:3

**enhanced** [1] - 132:23

**enjoin** [5] - 39:1, 181:5, 181:8, 181:19, 181:20

**enjoined** [1] - 184:4

**enjoining** [1] - 160:10

**ensure** [11] - 100:13, 100:18, 131:16, 133:13, 135:4, 139:12, 147:1, 353:20, 354:25, 356:13, 365:24

**ensuring** [2] - 259:5, 355:6

**entail** [1] - 217:1

**enter** [3] - 213:14, 387:17, 387:23

**entered** [16] - 28:6, 79:12, 81:14, 86:10, 87:7, 89:5, 102:19, 111:9, 113:8, 185:22, 213:12, 214:14, 225:5, 356:8, 383:18, 387:19

**entering** [4] - 136:15, 161:6, 353:6, 355:21

**enters** [2] - 23:14, 160:10

**entertain** [1] - 24:18

**enthusiasm** [1] - 385:15

**entire** [7] - 71:17, 71:21, 252:25, 282:13, 332:13, 335:2, 340:10

**entirely** [1] - 38:4

**entirety** [2] - 249:25, 250:14

**entities** [3] - 175:15, 177:2, 343:20

**entitled** [6] - 63:20, 80:24, 80:25, 286:18, 287:2, 390:5

**entity** [2] - 337:23, 338:3

**entry** [7] - 11:15, 79:11, 81:8, 82:3, 82:22, 166:21, 193:20

**envelopes** [4] - 260:20, 355:11, 355:14, 365:23

**equal** [5] - 64:19, 323:8, 370:3, 374:10

**equality** [1] - 173:24

**equate** [2] - 82:7, 82:12

**equation** [1] - 282:12

**equipment** [9] - 34:22, 35:2, 296:21, 297:6,

340:14, 340:19, 341:5, 358:8, 362:7

**Equipment** [1] - 286:19

**equipment's** [1] - 299:19

**equivalent** [3] - 53:13, 99:24, 117:1

**equivalently** [1] - 117:17

**erase** [2] - 282:12

**error** [2] - 18:10, 248:6

**ES&S** [79] - 75:20, 75:21, 76:7, 77:25, 80:9, 80:21, 80:23, 85:4, 85:22, 94:4, 96:2, 96:5, 98:2, 98:4, 98:17, 101:22, 101:24, 104:5, 104:19, 105:2, 111:25, 112:4, 112:12, 113:1, 130:23, 131:2, 132:15, 132:16, 136:25, 137:18, 139:4, 159:16, 159:25, 258:6, 260:3, 276:20, 276:25, 277:6, 277:9, 277:16, 278:6, 278:9, 278:11, 279:17, 279:20, 279:24, 280:2, 280:5, 280:22, 281:1, 281:5, 292:7, 292:21, 292:24, 296:21, 297:1, 297:2, 297:7, 298:21, 298:24, 299:3, 341:8, 341:9, 343:1, 354:23, 355:18, 356:3, 356:9, 356:12, 357:25, 362:14, 364:22, 372:4, 374:1, 374:25

**ES&S's** [4] - 81:2, 81:6, 85:23, 292:17

**especially** [3] - 171:20, 172:16, 246:1

**ESQUIRE** [23] - 1:18, 1:19, 2:2, 2:5, 2:6, 2:6, 2:9, 2:10, 2:13, 2:13, 2:14, 2:14, 2:17, 2:20, 2:23, 3:2, 3:5, 3:15, 3:15, 3:16, 3:16, 3:20, 3:23

**essence** [1] - 34:20

**essentially** [5] - 183:8, 294:19, 366:23, 384:5, 386:11

**Essex** [2] - 2:16, 7:10

**establish** [5] - 25:18, 44:18, 46:17, 53:25, 164:11

**established** [2] - 143:18, 170:7

**estate** [4] - 154:8, 154:10, 154:15, 154:19

**estimate** [2] - 261:24, 265:15

**estimated** [2] - 259:8, 366:3

**estopped** [1] - 16:15

**et** [13] - 1:8, 1:12, 6:7, 6:8, 82:21, 88:11, 94:24, 98:11, 169:16, 275:1, 291:13, 335:3, 379:12

**evaluated** [3] - 106:16, 106:23, 106:25

**evaluating** [1] - 58:10

**eve** [3] - 17:1, 47:1, 52:5

**evenhanded** [2] - 31:24, 180:22

**evening** [8] - 287:20, 287:21, 288:4, 311:7, 312:14, 312:15, 336:9

**event** [1] - 363:16

**events** [2] - 175:4, 175:12

**eventuality** [1] - 212:22

**eventually** [1] - 216:17

**everyday** [2] - 46:11, 152:24

**everywhere** [1] - 338:17

**evidence** [71] - 4:20, 4:21, 4:22, 4:22, 4:23, 4:23, 4:24, 4:24, 4:25, 5:4, 5:5, 5:6, 11:1, 16:7, 21:15, 31:19, 32:8, 33:1, 35:14, 35:15, 35:16, 39:14, 40:6, 50:8, 50:13, 50:21, 50:23, 51:24, 53:24, 55:4, 55:12, 57:2, 59:19, 65:8, 88:1, 89:3, 89:18, 90:1, 91:20, 100:21, 100:23, 104:20, 108:1, 111:10,

111:16, 111:18, 111:19, 113:12, 120:2, 166:24, 169:19, 189:22, 190:1, 193:19, 195:25, 196:21, 227:11, 244:8, 290:14, 295:12, 295:25, 296:11, 303:20, 344:14, 351:22, 367:21, 379:14, 379:20, 387:19, 388:6

**EVS** [9] - 85:4, 85:22, 85:23, 105:2, 107:1, 107:17, 107:18

**exact** [9] - 16:16, 92:9, 103:11, 111:1, 211:2, 221:9, 224:6, 226:10, 265:14

**exactly** [12] - 53:6, 97:1, 113:23, 161:1, 220:4, 223:23, 271:22, 276:17, 286:24, 289:17, 314:9, 319:1

**exam** [6] - 69:9, 88:24, 119:25, 197:23, 201:12, 283:23

**examination** [32] - 25:19, 47:17, 56:23, 69:7, 120:15, 120:25, 121:9, 122:16, 123:5, 156:18, 164:7, 164:15, 165:24, 197:3, 198:14, 201:23, 202:11, 247:20, 247:21, 249:8, 249:13, 249:15, 251:23, 264:20, 286:4, 287:18, 309:20, 309:21, 336:14, 368:4, 368:12, 369:4

**EXAMINATION** [46] - 4:4, 4:4, 4:5, 4:5, 4:6, 4:7, 4:7, 4:8, 4:8, 4:9, 4:10, 4:10, 4:11, 4:12, 4:12, 4:13, 4:14, 4:14, 4:15, 4:15, 4:16, 4:17, 4:18, 73:6, 123:19, 153:18, 157:7, 159:9, 166:1, 202:7, 211:14, 244:13, 246:18, 251:10, 264:21, 281:16, 285:25, 288:3, 303:12,

311:6, 312:13,
332:18, 334:10,
336:16, 370:15,
375:23
**EXAMINATIONS** [1] -
4:2
**examine** [14] - 48:20,
88:11, 108:6, 108:8,
156:4, 267:24,
284:9, 292:4, 297:1,
300:24, 301:16,
301:19, 309:9, 368:2
**examined** [2] - 47:22,
51:21
**examining** [3] - 108:3,
235:13, 310:1
**example** [12] - 62:12,
69:21, 99:23,
102:12, 102:18,
103:2, 103:21,
154:19, 298:3,
318:21, 318:22,
363:12
**Excel** [1] - 353:7
**excellent** [3] - 123:24,
124:14, 253:3
**except** [5] - 41:23,
200:13, 286:23,
325:20, 340:24
**exception** [2] - 21:20,
360:8
**excess** [1] - 110:18
**excuse** [10] - 65:13,
95:5, 100:7, 101:23,
112:23, 125:17,
193:3, 253:11,
260:9, 387:2
**excused** [11] - 165:8,
246:25, 251:17,
283:7, 283:14,
283:16, 306:6,
334:24, 375:4,
387:4, 387:7
**executive** [4] - 166:15,
363:15, 363:20,
364:20
**exempting** [1] - 85:8
**Exhibit** [61] - 4:20,
4:20, 4:21, 4:21,
4:22, 4:23, 4:23,
4:24, 4:24, 4:25, 5:4,
5:4, 5:5, 87:3, 89:3,
89:4, 91:18, 91:20,
92:16, 92:25, 93:4,
93:8, 93:12, 93:16,
100:21, 100:23,
102:18, 102:19,
103:19, 103:20,
104:17, 104:20,
111:11, 111:15,

111:16, 111:18,
111:19, 111:21,
112:11, 113:9,
113:12, 120:10,
166:24, 193:8,
193:19, 227:11,
243:22, 244:2,
244:3, 244:8,
247:11, 269:13,
269:15, 290:2,
290:14, 303:20,
344:9, 344:14,
351:18, 375:25
**exhibit** [11] - 86:21,
86:23, 87:1, 87:2,
88:21, 92:17,
104:14, 227:6,
227:17, 306:1, 344:8
**exhibits** [4] - 92:1,
92:10, 120:4, 233:22
**Exhibits** [3] - 92:2,
120:2, 271:14
**exigency** [1] - 49:17
**exist** [4] - 52:24,
275:5, 316:1, 348:3
**existent** [1] - 25:20
**existing** [5] - 34:24,
82:11, 82:12, 82:16,
133:22
**exists** [3] - 53:20,
230:2, 230:6
**expect** [5] - 17:23,
30:18, 205:25,
233:21, 331:15
**expectation** [1] -
214:2
**expected** [3] - 178:14,
201:13, 331:20
**expedite** [2] - 29:8,
122:9
**expedited** [5] - 12:1,
20:12, 20:13, 20:16,
20:21
**expeditious** [1] -
262:3
**expense** [1] - 31:23
**experience** [19] -
25:19, 70:15, 128:6,
129:4, 130:1, 130:5,
130:19, 130:22,
131:23, 132:12,
141:23, 144:14,
153:6, 173:15,
176:19, 177:17,
179:18, 292:11,
350:24
**experienced** [2] -
242:12, 242:23
**experiences** [2] -
69:23, 190:23

**experiencing** [1] -
186:19
**experiment** [2] -
317:12, 326:15
**expert** [61] - 24:16,
24:24, 24:25, 25:7,
26:13, 27:4, 27:18,
27:20, 27:21, 29:3,
47:14, 69:25, 70:1,
70:25, 71:4, 71:24,
74:12, 74:19, 74:21,
75:10, 90:20, 91:10,
91:11, 105:23,
118:16, 122:6,
122:7, 125:16,
162:5, 189:13,
189:25, 191:17,
191:18, 191:19,
194:1, 217:23,
226:13, 249:12,
250:15, 289:10,
304:5, 311:12,
314:18, 315:2,
315:6, 329:23,
330:2, 330:9, 331:1,
332:9, 333:21,
351:6, 351:24,
361:19, 367:21,
367:23, 368:21,
369:9, 369:25
**Expert** [1] - 287:3
**expert's** [1] - 199:24
**expertise** [10] - 24:16,
115:6, 130:15,
137:24, 138:1,
140:18, 141:23,
144:4, 190:22,
295:20
**experts** [51] - 24:21,
25:10, 25:22, 25:23,
26:5, 29:11, 29:15,
31:17, 33:24, 38:13,
48:6, 48:11, 48:16,
48:20, 48:22, 48:24,
51:19, 51:21, 71:14,
71:15, 71:16,
118:25, 119:6,
172:14, 198:12,
212:21, 217:25,
225:24, 226:1,
226:3, 247:13,
247:18, 283:25,
309:2, 313:19,
367:22, 368:9,
379:1, 379:3, 379:4,
379:15, 379:20,
380:6, 380:13,
380:22, 380:24,
381:2, 384:16
**explain** [14] - 33:13,

33:24, 35:6, 36:23,
58:3, 61:24, 62:1,
62:8, 62:9, 62:21,
77:16, 253:17,
349:3, 349:15
**explained** [1] - 37:15
**explaining** [1] -
330:15
**explains** [1] - 23:12
**explanation** [5] -
70:15, 89:11, 90:7,
114:8, 318:25
**explanations** [1] -
325:20
**explore** [2] - 47:5,
250:9
**express** [2] - 112:25,
113:2
**Express** [2] - 372:4,
372:15
**expressed** [1] -
341:23
**ExpressVote** [39] -
96:2, 96:5, 96:10,
97:16, 105:3,
107:18, 112:15,
112:18, 113:2,
113:3, 113:6,
138:12, 138:13,
138:15, 138:18,
291:25, 292:4,
292:8, 292:11,
292:14, 292:18,
292:25, 293:1,
293:12, 293:14,
293:17, 294:2,
295:10, 295:13,
295:19, 295:23,
296:3, 297:14,
298:18, 299:13,
299:17, 302:23,
303:1, 341:10
**ExpressXL** [1] -
372:12
**extend** [1] - 146:6
**extension** [2] - 51:17,
51:22
**extensive** [1] - 148:7
**extent** [8] - 39:6, 44:4,
48:22, 56:3, 237:1,
296:21, 367:22,
387:9
**external** [1] - 127:18
**extra** [1] - 250:2
**extraordinary** [1] -
21:13
**extremely** [2] - 25:25,
334:9
**eyes** [3] - 19:1, 23:23,
169:20

33:24, 35:6, 36:23,

| **F** |
| --- |

**face** [2] - 46:11, 196:7
**facilities** [1] - 148:3
**facing** [1] - 181:4
**fact** [42] - 14:19,
16:12, 27:22, 27:23,
45:15, 47:13, 49:10,
50:25, 51:2, 52:14,
55:22, 57:5, 63:21,
66:14, 96:8, 100:5,
107:2, 124:5,
140:10, 144:14,
151:14, 151:16,
151:17, 151:24,
152:10, 179:15,
181:9, 206:3,
207:19, 265:22,
268:5, 272:11,
272:16, 273:8,
275:5, 297:7,
319:10, 369:1,
375:11, 379:14,
382:19, 383:1
**factions** [1] - 65:12
**factor** [3] - 188:5,
361:20, 373:16
**factors** [4] - 385:6,
385:16, 385:18,
385:19
**facts** [4] - 55:9, 55:10,
199:12, 387:19
**factual** [2] - 41:5,
44:13, 44:18
**factually** [1] - 55:1
**failed** [1] - 14:19
**fair** [39] - 13:11, 13:12,
13:25, 14:2, 14:6,
23:20, 26:8, 26:14,
33:23, 38:24, 38:25,
39:12, 59:23, 77:19,
88:16, 97:7, 124:22,
145:13, 145:15,
147:18, 150:13,
172:2, 177:24,
180:7, 180:13,
180:20, 180:23,
208:3, 237:13,
237:19, 277:16,
278:6, 291:18,
291:20, 313:8,
313:12, 315:20,
330:25, 335:21
**faired** [1] - 179:5
**fairly** [1] - 33:10
**fairness** [1] - 173:24
**fall** [2] - 30:20, 63:6
**falls** [2] - 154:18,
154:21
**familiar** [13] - 46:21,

89:8, 91:24, 111:8,
157:8, 218:22,
255:22, 257:20,
258:8, 261:8,
311:10, 373:8,
376:13
**familiarity** [2] - 163:9,
255:6
**family** [2] - 252:17,
265:19
**far** [6] - 46:24, 50:21,
179:24, 235:12,
237:17, 254:1
**fashion** [2] - 342:2,
343:1
**fast** [1] - 306:13
**father** [2] - 252:15,
252:17, 252:19
**fault** [1] - 360:4
**favor** [2] - 30:6, 53:16
**favorite** [1] - 179:14
**favors** [1] - 255:9
**feasibility** [4] - 35:21,
106:17, 106:24,
107:1
**feasible** [4] - 41:1,
53:22, 56:13, 364:15
**featured** [1] - 371:5
**features** [3] - 38:16,
78:20, 114:1
**February** [19] - 15:3,
51:3, 190:10,
190:12, 190:14,
192:2, 192:15,
192:23, 193:2,
194:5, 195:14,
196:11, 222:13,
224:21, 226:11,
226:25, 232:7,
232:16, 386:13
**FEDERAL** [1] - 390:1
**federal** [26] - 11:25,
33:7, 33:9, 33:10,
74:4, 74:10, 85:25,
128:14, 128:19,
128:20, 130:17,
132:6, 132:7,
166:15, 176:19,
179:18, 317:4,
343:12, 344:5,
346:12, 346:14,
382:3, 388:23
**Federal** [1] - 1:21
**feedback** [2] - 73:23,
175:23
**felt** [12] - 136:7,
171:15, 185:6,
186:19, 186:24,
191:3, 195:25,
196:21, 215:23,

235:9, 238:11,
285:11
**few** [22] - 10:16, 10:19,
27:10, 37:7, 38:10,
101:18, 119:10,
123:20, 159:13,
164:17, 186:6,
239:4, 241:19,
246:22, 258:11,
313:17, 337:10,
352:19, 370:4,
370:8, 375:13,
384:17
**fewer** [2] - 173:12,
173:13
**field** [9] - 73:11, 75:10,
90:9, 90:21, 91:9,
91:11, 115:6,
182:23, 370:3
**fields** [2] - 25:21,
90:20
**fight** [1] - 265:6
**Figure** [7] - 35:1,
101:2, 101:5, 102:1,
102:4, 102:21, 103:3
**figure** [5] - 35:3,
201:18, 240:5,
308:25, 359:16
**figured** [2] - 7:6, 156:6
**figures** [1] - 330:8
**file** [16] - 14:21, 29:7,
36:24, 37:2, 43:20,
50:6, 79:8, 138:15,
161:5, 207:19,
221:3, 337:24,
349:8, 382:7,
387:10, 387:12
**filed** [48] - 11:13, 16:1,
18:2, 18:3, 23:5,
23:6, 26:22, 27:14,
27:18, 27:25, 28:6,
28:23, 29:20, 29:21,
48:1, 51:23, 55:24,
70:14, 118:20,
118:24, 120:5,
166:17, 206:4,
207:11, 207:21,
208:4, 209:21,
213:18, 216:24,
223:12, 223:18,
223:21, 226:16,
226:19, 235:15,
270:1, 289:10,
289:11, 289:23,
293:21, 314:24,
323:22, 324:7,
328:10, 353:12,
362:5, 382:18,
384:13
**files** [7] - 11:23, 79:5,

79:6, 81:21, 138:17,
160:5, 161:20
**filing** [13] - 15:1, 18:2,
43:4, 223:6, 224:16,
224:17, 229:23,
295:16, 295:17,
343:18, 369:24,
382:5, 382:9
**filings** [2] - 29:12,
140:23
**fill** [1] - 62:12
**final** [8] - 76:5, 81:21,
113:7, 194:2,
205:12, 205:15,
354:20, 381:6
**finalized** [1] - 382:1
**finalizing** [2] - 260:7,
353:14
**finance** [3] - 323:22,
324:7, 382:6
**finances** [1] - 328:11
**financial** [2] - 340:8,
341:5
**financially** [1] - 170:1
**findings** [3] - 33:12,
41:5, 311:24
**fine** [8] - 26:7, 72:17,
72:18, 106:2,
188:11, 251:17,
303:14, 309:12
**finger** [2] - 42:5, 58:6
**fingertips** [1] - 345:15
**finish** [7] - 217:9,
260:6, 327:6, 327:7,
330:19, 332:5, 332:6
**finite** [1] - 161:11
**fire** [5] - 12:4, 20:25,
30:3, 127:15, 383:17
**firm** [3] - 9:8, 125:2,
202:9
**firms** [1] - 216:16
**first** [93] - 10:21, 14:8,
15:10, 17:11, 17:16,
17:25, 22:14, 22:17,
25:5, 43:7, 45:2,
48:1, 48:7, 57:25,
61:4, 63:3, 64:12,
67:4, 74:12, 105:1,
123:21, 124:3,
124:19, 137:14,
145:18, 146:1,
146:6, 155:1, 155:7,
155:13, 166:6,
167:12, 168:21,
168:23, 169:7,
171:10, 171:20,
179:21, 180:1,
182:8, 186:5,
189:10, 190:6,
196:11, 199:10,

206:8, 206:13,
207:14, 207:21,
207:23, 216:12,
216:21, 216:22,
220:9, 226:9,
232:12, 232:14,
233:5, 233:8, 242:6,
254:9, 256:5,
259:21, 273:15,
273:16, 279:20,
283:2, 286:6,
288:23, 291:11,
303:5, 304:12,
309:20, 313:9,
314:17, 315:2,
330:1, 330:7,
333:11, 337:2,
342:18, 343:17,
350:6, 352:4, 352:9,
353:20, 376:21,
383:23, 384:23,
385:25, 386:12
**First** [2] - 178:11,
313:2
**FIRST** [1] - 3:8
**Fisher** [1] - 1:13
**fit** [11] - 38:21, 299:5,
299:7, 299:8, 299:9,
299:12, 359:17,
361:17, 361:21
**FITZPATRICK** [1] -
2:23
**Fitzpatrick** [1] - 9:23
**five** [15] - 18:24, 19:2,
20:10, 22:25, 77:14,
84:1, 110:18,
162:15, 225:4,
306:11, 310:12,
347:2, 364:11,
371:15, 388:20
**flash** [3] - 356:16,
356:17
**Flavio** [4] - 7:2, 91:18,
159:10, 159:12
**FLAVIO** [1] - 1:19
**fleet** [1] - 340:10
**flexibility** [2] - 37:25,
300:22
**flexibly** [1] - 303:1
**floating** [1] - 67:8
**floor** [1] - 24:9
**Floor** [1] - 3:12
**Florio** [3] - 8:9, 246:16
**FLORIO** [7] - 2:20,
2:20, 4:9, 8:8,
246:11, 246:16,
246:18
**flow** [1] - 44:2
**fly** [1] - 305:15
**fly-by-night** [1] -

305:15
**focus** [10] - 22:2, 66:7,
134:8, 180:3,
191:19, 213:7,
238:15, 238:16,
313:4, 318:1
**focused** [2] - 132:5,
313:9
**focusing** [1] - 182:1
**folks** [37] - 6:5, 9:15,
11:20, 11:24, 12:2,
19:18, 24:9, 30:1,
30:11, 30:24, 42:3,
43:17, 46:16, 46:23,
47:18, 48:2, 71:14,
120:18, 120:19,
121:11, 121:16,
121:25, 122:24,
164:19, 197:20,
201:25, 241:12,
247:4, 247:8,
264:18, 270:17,
284:7, 287:17,
290:24, 368:19,
387:8
**follow** [12] - 43:17,
138:1, 181:12,
230:13, 230:16,
274:25, 316:16,
316:21, 343:9,
348:22, 350:9, 363:8
**follow-up** [2] - 138:1,
316:16
**followed** [1] - 276:1
**following** [2] - 43:1,
49:14
**FOLLOWS** [7] - 72:25,
165:17, 251:2,
285:21, 310:18,
336:4, 375:16
**foot** [1] - 369:21
**footnote** [1] - 227:16
**FOR** [4] - 1:1, 1:4, 1:4,
1:5
**force** [2] - 48:12,
116:5
**forced** [8] - 171:6,
183:13, 184:13,
203:1, 237:23,
238:3, 238:5, 238:20
**foregoing** [1] - 390:4
**foreign** [1] - 166:16
**foremost** [2] - 337:2,
342:18
**forget** [1] - 338:7
**forgot** [1] - 365:4
**form** [10] - 35:17, 94:6,
107:23, 155:14,
179:1, 187:1,
205:13, 205:15,

277:18
**formal** [7] - 13:23, 183:9, 190:11, 215:10, 215:18, 232:12, 232:14
**formality** [1] - 187:1
**formally** [5] - 213:12, 213:14, 214:22, 216:12
**format** [42] - 82:9, 83:24, 92:13, 92:19, 93:1, 93:6, 93:10, 93:14, 93:18, 94:3, 94:5, 94:7, 94:14, 96:16, 98:14, 98:22, 99:14, 99:16, 100:3, 101:16, 102:9, 105:12, 117:22, 118:7, 269:11, 270:23, 271:22, 272:20, 272:23, 295:7, 342:19, 348:23, 351:5, 353:5, 355:19, 359:2, 359:15, 362:22, 362:23, 372:6, 372:12, 372:15
**formats** [6] - 98:21, 98:23, 99:14, 99:15, 109:25, 301:1
**formatting** [1] - 348:11
**formed** [1] - 360:7
**former** [2] - 263:13, 318:18
**formidable** [1] - 383:21
**formulating** [1] - 163:15
**Forte** [1] - 334:1
**forth** [12] - 28:16, 82:2, 117:14, 135:14, 136:1, 148:6, 154:4, 254:3, 350:7, 354:15, 354:18, 382:21
**forthcoming** [1] - 168:4
**fortunately** [1] - 336:23
**forward** [9] - 34:18, 64:22, 73:4, 94:17, 195:11, 205:22, 215:17, 333:19, 376:14
**foundation** [5] - 92:19, 99:8, 262:9, 266:5, 353:24
**foundational** [1] -

108:1
**four** [45] - 46:25, 53:12, 62:12, 62:13, 63:4, 77:14, 97:20, 99:19, 99:20, 99:23, 99:24, 100:1, 102:7, 106:12, 110:18, 110:20, 110:21, 110:22, 115:22, 148:21, 148:24, 148:25, 149:1, 149:18, 150:23, 152:1, 154:20, 179:18, 212:21, 231:14, 259:11, 259:12, 259:19, 261:1, 261:24, 300:10, 307:3, 310:1, 314:12, 322:14, 374:20
**four-time** [1] - 179:18
**four-week** [2] - 261:1, 261:24
**fourth** [2] - 176:18, 260:2
**frame** [8] - 36:14, 142:22, 143:8, 143:11, 235:6, 235:7, 363:2, 364:16
**frames** [1] - 153:5
**framework** [7] - 348:19, 348:21, 363:10, 363:23, 364:6, 364:9, 365:19
**Francisco** [1] - 331:6
**Frank** [3] - 182:9, 263:14, 319:22
**frankly** [1] - 71:9
**free** [7] - 30:19, 121:17, 121:19, 165:24, 236:18, 251:22, 288:1
**freedom** [3] - 60:14, 184:10, 184:11
**Freehold** [1] - 342:25
**freeholder** [3] - 318:19, 319:11, 319:17
**freely** [3] - 51:4, 209:16, 211:5
**Friday** [15] - 17:9, 17:22, 18:17, 18:22, 21:21, 26:5, 29:7, 29:19, 71:1, 75:5, 119:5, 377:25, 378:7, 381:12, 387:8
**friend** [1] - 42:4
**friendliness** [2] - 277:15, 278:6
**friendly** [2] - 277:13,

278:10
**friends** [1] - 46:1
**front** [5] - 19:1, 62:10, 179:23, 377:11, 379:25
**frustrating** [1] - 327:3
**full** [13] - 165:20, 174:13, 174:19, 239:19, 239:23, 240:1, 242:7, 243:6, 245:25, 252:15, 286:3, 324:24
**full-time** [2] - 240:1, 324:24
**fully** [1] - 208:25
**fumbling** [1] - 308:25
**function** [4] - 12:19, 137:21, 251:13, 337:9
**functional** [1] - 34:24
**functions** [3] - 78:20, 81:3, 81:5
**fundamental** [1] - 168:21
**fundamentally** [2] - 160:3, 176:25
**fundraisers** [2] - 175:13, 324:11
**fundraising** [9] - 169:6, 169:23, 172:8, 174:23, 174:25, 175:25, 176:8, 179:21, 179:23
**funds** [2] - 313:6, 382:8
**furnished** [2] - 286:6, 286:7
**fusion** [1] - 126:20

---

# G

**gain** [2] - 203:15, 234:2
**gaining** [2] - 185:7, 215:6
**gallery** [6] - 120:21, 121:10, 121:16, 121:25, 198:13, 235:25
**game** [1] - 88:16
**gate** [2] - 10:20, 122:17
**gather** [1] - 201:7
**gathering** [1] - 353:10
**gauge** [1] - 24:14
**gears** [1] - 174:4
**general** [24] - 14:10, 14:18, 15:17, 15:22, 16:23, 17:1, 21:20,

32:21, 45:19, 53:8, 77:18, 82:20, 82:21, 107:25, 153:3, 155:7, 162:16, 267:2, 279:1, 293:8, 299:10, 348:8, 351:4, 365:15
**general's** [8] - 15:1, 15:4, 15:19, 16:8, 17:11, 17:22, 33:1, 88:7
**generalities** [1] - 107:19
**generalized** [1] - 143:17
**generally** [15] - 94:10, 97:18, 101:19, 128:16, 130:16, 131:10, 137:10, 138:11, 140:11, 143:12, 149:4, 151:24, 266:20, 289:1, 349:10
**generate** [1] - 138:15
**generated** [3] - 79:5, 97:16, 138:17
**generation** [1] - 81:21
**Genova** [18] - 7:9, 7:14, 7:16, 8:18, 9:10, 9:11, 10:10, 10:12, 10:13, 13:1, 14:7, 19:5, 28:23, 39:18, 45:23, 57:10, 88:7
**GENOVA** [70] - 2:12, 2:13, 7:7, 8:17, 11:14, 12:13, 12:18, 13:12, 13:14, 13:18, 13:21, 14:3, 15:14, 16:2, 16:9, 16:21, 19:2, 19:8, 19:13, 19:16, 24:23, 25:11, 29:4, 29:6, 39:20, 39:25, 40:8, 41:6, 41:8, 42:9, 42:15, 42:18, 42:20, 44:1, 44:24, 45:6, 45:12, 45:14, 45:16, 45:18, 45:24, 47:9, 48:3, 48:14, 49:2, 49:25, 50:8, 50:16, 51:7, 51:10, 51:16, 53:6, 54:6, 54:9, 54:15, 54:25, 55:5, 55:7, 56:3, 56:22, 57:4, 57:16, 57:25, 87:12, 235:24, 236:4, 368:6, 368:9, 368:14, 371:12
**geographic** [5] -

320:9, 338:19, 338:20, 338:22, 339:6
**geographically** [1] - 338:15
**Gibbs** [4] - 318:7, 318:10, 318:14, 318:18
**Gibbs/Richter** [2] - 321:6, 322:13
**GIBLIN** [1] - 2:23
**GIORDANO** [1] - 1:7
**Giordano** [1] - 2:8
**given** [36] - 83:24, 84:6, 100:8, 116:20, 135:1, 139:25, 141:15, 141:19, 143:7, 143:12, 143:14, 149:15, 154:5, 158:16, 160:15, 167:14, 174:20, 176:4, 180:18, 184:20, 191:1, 217:16, 226:23, 237:13, 242:3, 299:11, 305:18, 356:10, 356:18, 361:7, 364:16, 366:2, 366:23, 368:3, 384:6, 387:10
**glasses** [1] - 267:18
**glossing** [3] - 239:22, 240:6, 240:9
**Gloucester** [2] - 7:12, 320:14
**GOLDBERG** [4] - 3:8, 8:1, 54:11, 366:21
**Goldberg** [2] - 8:2, 366:22
**Goldman** [1] - 9:13
**GOLDMAN** [1] - 2:9
**golum** [1] - 9:12
**GOLUM** [2] - 2:10, 9:12
**Gordon** [1] - 9:12
**GORDON** [1] - 2:10
**governing** [1] - 51:9
**Government** [1] - 32:13
**government** [7] - 18:11, 125:9, 128:2, 136:11, 166:16, 252:8, 343:20
**governments** [3] - 152:16, 256:9, 256:19
**governor** [4] - 81:18, 84:1, 155:6, 291:12
**grandfather** [1] -

252:19
**grant** [13] - 11:18,
12:9, 13:3, 13:10,
13:17, 34:13, 36:14,
36:16, 38:15, 39:8,
48:17, 54:17, 62:4
**granted** [4] - 12:8,
59:25, 60:3, 263:23
**grants** [1] - 83:1
**graphic** [1] - 356:11
**grave** [1] - 363:1
**great** [6] - 174:3,
181:18, 228:23,
237:1, 363:8, 367:18
**greater** [1] - 209:3
**greet** [1] - 175:12
**grenade** [1] - 15:18
**grid** [55] - 94:3, 94:5,
96:3, 96:6, 97:15,
97:18, 101:3, 101:5,
101:7, 101:9,
101:14, 101:17,
101:19, 102:3,
102:6, 102:7,
102:24, 102:25,
103:24, 105:5,
106:4, 106:10,
106:11, 106:22,
108:23, 109:19,
110:10, 110:17,
112:16, 112:19,
115:25, 116:12,
117:20, 117:21,
144:18, 144:22,
153:20, 154:3,
155:21, 272:5,
293:2, 293:4, 293:7,
293:8, 294:5, 295:2,
295:5, 295:14,
296:4, 297:20,
300:7, 300:8,
300:16, 351:3, 361:1
**grid-based** [31] - 94:3,
94:5, 96:3, 97:15,
97:18, 101:3, 101:5,
101:7, 101:9,
101:14, 101:17,
101:19, 102:3,
102:6, 102:24,
102:25, 103:24,
105:5, 106:4,
106:10, 106:11,
106:22, 108:23,
109:19, 110:10,
110:17, 112:19,
115:25, 116:12,
117:20, 117:21
**grid-layout** [2] -
144:18, 144:22
**grids** [6] - 144:23,

145:6, 154:2, 276:1,
303:3, 361:20
**Grossi** [2] - 3:7, 96:9
**ground** [1] - 40:16
**group** [3] - 231:16,
231:18, 231:21
**Group** [4] - 126:3,
126:5, 126:8, 126:12
**grouping** [1] - 349:2
**groups** [1] - 202:13
**guarantee** [2] - 209:3,
209:6
**guaranteed** [4] -
60:11, 63:14, 63:15,
65:22
**guarantees** [1] - 65:2
**gubernatorial** [4] -
63:2, 82:19, 82:20,
83:25
**guess** [12] - 14:25,
25:4, 27:7, 198:12,
201:13, 207:7,
209:2, 238:8,
262:18, 275:9,
304:8, 304:9
**guidance** [4] - 126:25,
128:16, 139:17,
364:1
**guide** [12] - 127:9,
142:5, 142:9,
142:11, 142:14,
142:18, 142:19,
142:21, 348:7, 364:8
**guideline** [1] - 348:4
**guidelines** [1] -
349:24
**guides** [1] - 349:7
**guy** [1] - 248:23
**guys** [42] - 19:22,
28:9, 28:10, 28:18,
39:13, 59:9, 68:25,
69:16, 95:15, 97:11,
120:24, 122:11,
124:6, 129:7, 156:3,
156:6, 193:10,
199:6, 199:14,
227:6, 228:22,
232:22, 235:25,
236:10, 247:4,
247:7, 263:18,
282:21, 285:7,
287:18, 291:5,
307:5, 307:11,
308:24, 309:7,
309:12, 309:22,
309:23, 368:18,
369:16, 375:10,
387:12

# H

**H-A-N-L-O-N** [1] -
336:7
**Haddon** [1] - 2:18
**Haddonfield** [1] - 3:3
**half** [13] - 54:23,
151:14, 151:15,
151:20, 152:15,
177:11, 216:20,
260:8, 306:19,
306:20, 309:21,
343:6
**hand** [15] - 28:24,
72:23, 102:6, 102:8,
102:24, 102:25,
134:15, 154:3,
179:6, 181:19,
244:5, 260:22,
289:20, 337:12,
364:25
**hand-counting** [1] -
364:25
**hand-match** [1] -
260:22
**handle** [5] - 108:2,
111:25, 112:1,
112:4, 340:16
**Handle** [1] - 286:19
**handles** [2] - 337:24,
342:8
**handling** [2] - 51:15,
68:11
**hands** [1] - 25:24
**Hanlon** [23] - 2:8, 6:8,
9:5, 40:19, 156:15,
157:6, 218:22,
307:14, 335:1,
335:7, 335:14,
336:7, 336:17,
351:24, 367:15,
368:22, 369:5,
370:4, 370:9,
370:16, 372:3,
372:18, 375:4
**HANLON** [3] - 1:7,
4:16, 336:3
**happenstance** [1] -
52:7
**happy** [15] - 10:18,
19:24, 20:9, 28:24,
47:10, 59:23, 69:19,
69:20, 91:8, 265:20,
309:13, 322:15,
345:5, 388:1, 388:20
**hard** [11] - 19:25, 24:4,
37:3, 37:18, 38:1,
38:3, 38:4, 295:25,
329:25, 387:14,
389:4

**harder** [2] - 37:12,
38:8
**hardship** [1] - 53:23
**hardware** [1] - 302:19
**harm** [28] - 21:2, 21:7,
21:8, 53:20, 55:17,
55:19, 55:20, 55:21,
184:1, 185:20,
189:17, 190:24,
196:15, 199:21,
207:22, 215:10,
215:24, 237:7,
239:21, 241:3,
241:4, 242:11,
242:12, 242:21,
242:22, 243:3, 369:2
**harmed** [2] - 33:14,
61:7
**harmonized** [1] -
349:19
**harms** [1] - 58:22
**Harrisburg** [1] -
288:12
**HARRISON** [2] - 2:5,
2:14
**Harrison** [5] - 8:25,
9:3, 10:12, 157:5,
287:23
**hate** [1] - 369:13
**HAVING** [7] - 72:24,
165:16, 251:1,
285:20, 310:17,
336:3, 375:15
**hazard** [1] - 30:3
**hazards** [1] - 127:13
**head** [4] - 20:3,
102:16, 104:11,
211:3
**headed** [1] - 291:8
**heading** [1] - 381:5
**headlights** [1] - 199:7
**headset** [4] - 72:14,
72:15, 72:16, 72:20
**hear** [61] - 10:18,
18:21, 21:21, 31:17,
33:6, 35:25, 36:16,
39:15, 39:23, 40:6,
40:8, 40:19, 46:12,
47:2, 47:10, 50:15,
50:16, 56:12, 57:4,
57:5, 58:23, 58:24,
58:25, 59:24, 65:7,
69:19, 72:7, 72:8,
72:10, 72:11, 72:16,
72:18, 87:17, 95:20,
99:4, 109:13,
121:22, 122:5,
123:10, 123:13,
123:14, 123:22,
123:23, 124:6,

129:16, 129:17,
141:18, 199:10,
201:9, 268:22,
270:17, 279:10,
295:4, 351:6,
351:24, 360:9,
374:21
**heard** [21] - 42:3, 48:1,
155:18, 199:23,
201:9, 208:15,
217:11, 230:15,
244:21, 280:14,
288:7, 288:8,
288:17, 295:10,
309:18, 350:3,
352:1, 352:12,
360:24, 361:1
**hearing** [29] - 6:9,
11:20, 15:2, 15:3,
20:14, 23:17, 23:18,
23:19, 24:8, 26:22,
47:6, 49:5, 50:2,
69:2, 69:18, 71:15,
72:12, 72:13, 73:23,
87:22, 90:1, 175:23,
200:15, 250:4,
369:17, 376:14,
379:1, 379:3
**HEARING** [1] - 1:7
**hearings** [1] - 13:2
**hearsay** [7] - 89:16,
89:23, 187:13,
187:21, 360:6,
360:8, 360:18
**heavier** [1] - 53:13
**heavily** [1] - 46:15
**held** [10] - 6:1, 50:1,
50:5, 73:15, 218:8,
218:12, 254:4,
269:4, 319:5, 336:20
**help** [9] - 127:18,
128:24, 195:10,
217:19, 217:20,
225:9, 225:12,
322:9, 378:16
**Help** [1] - 74:2
**helped** [6] - 139:16,
142:5, 142:11,
142:15, 205:21,
322:8
**helpful** [4] - 73:5,
226:12, 226:18,
345:21
**helping** [1] - 362:18
**helps** [1] - 76:2
**hesitate** [1] - 119:1
**Hi** [2] - 159:10, 332:19
**hi** [1] - 72:7, 311:8
**hide** [1] - 382:19
**high** [12] - 30:18,

35:13, 189:20, 189:22, 191:9, 191:10, 195:1, 196:19, 217:3, 217:6, 217:8, 217:17

**highlight** [2] - 285:9, 345:24

**highlighted** [2] - 103:12, 319:15

**highlights** [1] - 35:9

**highly** [3] - 23:15, 30:23, 309:14

**Highway** [1] - 3:17

**Hill** [2] - 3:3, 102:20

**hire** [1] - 174:16

**hired** [9] - 125:11, 125:19, 225:24, 376:4, 379:2, 379:3, 379:15, 379:20, 380:1

**hiring** [3] - 175:24, 176:15, 225:22

**historical** [2] - 35:16, 191:11

**history** [3] - 42:24, 43:18, 322:7

**hit** [2] - 198:4, 256:14

**Hogan** [1] - 9:24

**hold** [12] - 16:6, 90:12, 175:12, 180:8, 194:8, 234:24, 242:16, 287:11, 317:7, 368:18, 368:24, 375:25

**holistically** [1] - 132:12

**Holly** [1] - 111:9

**home** [1] - 332:1

**Homeland** [3] - 125:15, 125:21, 126:13

**honest** [2] - 90:13, 266:12

**honestly** [1] - 265:14

**Honor** [272] - 6:13, 6:21, 6:25, 7:8, 7:15, 7:18, 7:22, 8:1, 8:5, 8:8, 8:12, 8:20, 9:7, 9:18, 9:22, 10:4, 10:7, 11:14, 12:13, 12:18, 12:24, 13:18, 15:14, 15:19, 16:2, 16:13, 16:21, 17:24, 19:2, 19:8, 19:11, 23:2, 23:10, 23:14, 23:23, 24:13, 24:18, 25:1, 25:13, 26:18, 26:21, 27:15, 27:17, 27:23, 28:14, 28:19, 28:25, 29:2, 29:4,

29:6, 29:21, 29:24, 30:12, 31:9, 31:12, 33:3, 33:6, 33:24, 34:10, 35:25, 36:4, 38:14, 39:16, 39:21, 40:14, 41:6, 41:8, 41:9, 42:18, 43:3, 44:20, 45:6, 45:18, 45:25, 46:8, 46:15, 47:9, 48:3, 49:2, 49:6, 49:11, 50:8, 51:2, 51:10, 51:25, 52:10, 54:12, 55:5, 55:12, 56:22, 58:9, 59:1, 59:5, 60:1, 60:4, 60:8, 62:10, 66:22, 67:5, 67:6, 67:11, 67:14, 67:16, 68:14, 68:19, 69:10, 69:20, 70:13, 70:18, 70:20, 70:22, 71:6, 71:11, 71:16, 71:25, 72:11, 75:2, 75:9, 79:13, 79:16, 83:6, 83:15, 84:9, 86:18, 87:3, 87:13, 88:1, 88:10, 88:11, 88:18, 89:16, 89:20, 89:24, 90:23, 92:18, 92:20, 95:12, 95:13, 95:23, 96:20, 96:21, 99:9, 104:13, 105:20, 107:16, 107:25, 108:4, 109:13, 111:4, 114:18, 115:8, 115:15, 116:4, 118:1, 118:15, 119:2, 119:9, 119:12, 119:15, 119:22, 120:17, 120:20, 121:2, 123:3, 123:6, 123:10, 141:14, 147:2, 149:24, 153:10, 156:2, 159:4, 162:20, 164:8, 187:4, 187:9, 187:22, 188:4, 193:5, 193:15, 193:18, 197:4, 198:3, 199:9, 199:16, 199:17, 200:1, 202:5, 220:22, 227:7, 231:25, 236:4, 239:2, 241:15, 242:14, 243:21, 243:25, 244:5, 247:5, 247:15, 247:25, 248:4, 248:20, 249:16,

250:22, 251:12, 251:21, 262:11, 262:24, 264:13, 267:8, 269:24, 270:8, 271:12, 278:17, 280:14, 281:11, 281:13, 283:8, 284:17, 284:20, 284:21, 286:10, 287:20, 290:1, 290:4, 290:15, 291:1, 296:2, 297:16, 303:6, 303:16, 304:21, 305:25, 306:18, 306:22, 307:25, 308:6, 309:5, 309:13, 309:24, 310:3, 310:14, 310:23, 314:3, 334:7, 334:9, 335:17, 336:10, 344:7, 351:15, 351:17, 351:22, 360:22, 366:9, 367:16, 367:17, 367:20, 368:9, 368:20, 368:25, 369:6, 371:12, 379:16, 379:19, 380:2, 386:7, 387:3, 387:16, 388:2, 388:5, 388:19

**honor** [2] - 157:25, 162:13

**Honor's** [8] - 23:16, 28:25, 29:12, 46:20, 60:6, 85:11, 244:6, 388:14

**HONORABLE** [1] - 1:16

**Honorable** [1] - 6:1

**Hooper** [1] - 3:20

**hope** [1] - 180:19

**hopefully** [3] - 10:14, 338:7, 367:10

**hoping** [2] - 315:25, 371:10

**horizontally** [1] - 84:22

**host** [1] - 29:14

**hot** [1] - 48:9

**hotly** [1] - 56:16

**hour** [7] - 49:18, 68:5, 68:20, 77:4, 306:15, 307:9, 314:23

**hours** [3] - 37:7, 309:20, 343:22

**house** [5] - 12:5, 21:1, 260:17, 260:18,

383:17

**House** [8] - 172:16, 172:17, 174:14, 183:19, 220:25, 244:19, 245:20, 315:17

**housekeeping** [10] - 6:10, 10:17, 19:7, 23:3, 24:11, 26:15, 30:10, 119:22, 120:12, 122:1

**houses** [1] - 335:5

**HOWARD** [1] - 3:8

**Howard** [2] - 8:2, 366:22

**Hudson** [10] - 2:22, 8:10, 93:8, 246:16, 255:10, 271:4, 280:17, 280:19, 280:20, 281:3

**huge** [2] - 340:8, 341:4

**human** [1] - 306:20

**hundred** [7] - 43:19, 57:9, 57:14, 58:18, 257:5, 261:4, 283:5

**hundreds** [1] - 184:19

**Hunterdon** [3] - 7:12, 324:4, 324:19

**hurry** [1] - 52:9

**hurt** [1] - 186:25

**hurting** [1] - 66:4

**hypothetical** [3] - 262:8, 262:19, 284:22

**I**

**i.e** [1] - 136:15

**idea** [10] - 142:17, 143:4, 146:20, 146:22, 146:25, 168:5, 168:8, 168:9, 183:6

**identical** [4] - 49:20, 49:21, 54:24, 54:25

**identically** [1] - 46:3

**identification** [2] - 63:18, 65:9

**identified** [5] - 63:23, 65:17, 124:10, 194:16

**identifier** [1] - 63:23

**identifiers** [2] - 61:20, 61:22

**identifies** [4] - 127:10, 127:14, 127:16, 127:17

**identify** [14] - 60:16, 60:18, 61:21, 65:11,

88:21, 89:4, 155:21, 157:3, 190:23, 211:10, 245:16, 245:17, 245:18, 246:4

**ideologies** [1] - 60:20

**ignored** [2] - 66:1, 66:14

**II** [1] - 2:9

**illustrate** [1] - 328:6

**image** [1] - 103:18

**imagine** [3] - 173:4, 226:11, 245:25

**immediate** [1] - 259:21

**immediately** [6] - 174:13, 174:18, 174:22, 174:24, 260:2, 319:7

**impact** [24] - 16:10, 25:20, 82:24, 100:3, 151:20, 169:15, 172:22, 192:12, 314:8, 314:10, 314:13, 316:10, 316:14, 316:18, 316:24, 317:4, 325:18, 326:5, 328:19, 354:1, 357:25, 358:20, 358:25, 359:4

**impacted** [4] - 315:22, 319:11, 340:14, 354:9

**impactful** [2] - 169:17, 325:9

**impacting** [1] - 326:18

**impacts** [2] - 354:6, 359:10

**implement** [3] - 162:6, 339:18, 366:3

**implementation** [2] - 339:8, 339:20

**implemented** [3] - 61:2, 105:17, 109:6

**implementing** [4] - 42:21, 43:8, 340:23, 341:12

**implements** [1] - 127:8

**implicated** [1] - 130:13

**implication** [1] - 20:23

**import** [2] - 82:10, 110:17

**importance** [1] - 22:4

**important** [24] - 22:6, 41:11, 52:15, 121:24, 138:1, 158:7, 169:3,

169:24, 170:9, 190:19, 190:20, 191:3, 194:21, 195:7, 195:12, 195:23, 229:19, 265:20, 265:24, 322:19, 327:19, 341:14, 341:20, 363:24

**importing** [2] - 110:13, 110:14

**imposed** [2] - 44:16, 51:2

**impossible** [3] - 173:2, 294:19, 387:21

**impression** [2] - 48:7, 360:7

**in-depth** [1] - 189:24

**in-person** [1] - 229:10

**inability** [1] - 362:6

**inception** [1] - 41:11

**incident** [1] - 127:15

**incidents** [3] - 127:17, 127:19, 190:21

**inclined** [2] - 36:16, 36:17

**include** [14] - 65:13, 82:17, 92:11, 93:9, 93:17, 105:12, 110:23, 208:14, 279:1, 316:15, 322:18, 324:13, 324:17, 324:19

**included** [4] - 92:2, 103:19, 112:7, 348:16

**includes** [4] - 79:9, 105:5, 272:4, 272:6

**including** [6] - 35:24, 37:20, 201:5, 206:11, 230:12, 293:2

**inclusion** [1] - 61:19

**inconsistent** [1] - 230:17

**incorrect** [2] - 151:2, 277:8

**increase** [3] - 145:21, 174:24, 234:4

**incredibly** [1] - 169:24

**incumbency** [2] - 321:2, 332:1

**incumbent** [7] - 169:8, 170:6, 174:6, 222:25, 321:2, 385:9, 385:16

**incumbents** [4] - 327:22, 328:3, 328:7, 328:11

**incurred** [1] - 382:13

**independent** [4] - 32:11, 33:21, 76:4, 192:7

**InDesign** [2] - 276:19, 277:13

**indicate** [2] - 303:1, 366:21

**indicated** [2] - 46:16, 46:19

**indicates** [2] - 295:18, 300:19

**indictment** [4] - 168:1, 168:4, 168:5, 168:8

**individual** [7] - 105:24, 130:6, 143:5, 164:23, 316:1, 317:2, 325:15

**individuals** [10] - 33:23, 40:13, 43:11, 52:22, 317:13, 343:23, 347:13, 347:15, 349:12, 349:14

**indulges** [1] - 388:19

**indulging** [1] - 59:3

**infeasibility** [1] - 35:4

**infer** [1] - 106:21

**inferential** [3] - 326:20, 327:1, 327:15

**influence** [5] - 70:9, 194:23, 195:15, 195:18, 329:4

**influenced** [1] - 118:7

**inform** [3] - 195:11, 199:17, 205:21

**information** [31] - 38:19, 54:23, 70:20, 79:12, 80:1, 81:25, 82:9, 82:24, 92:9, 152:17, 171:4, 191:9, 196:1, 201:8, 217:23, 218:1, 307:24, 316:8, 330:13, 343:20, 348:17, 353:3, 353:4, 353:8, 353:10, 353:14, 355:21, 356:16, 362:25, 373:19, 377:3

**informed** [3] - 30:2, 199:14, 223:3

**informing** [1] - 175:22

**infrastructure** [6] - 33:25, 73:13, 74:8, 127:8, 127:10, 329:6

**initial** [18] - 28:1, 189:9, 256:5,

289:12, 289:14, 289:22, 290:2, 291:24, 292:13, 292:16, 292:17, 293:11, 295:9, 295:16, 296:20, 297:13, 299:21, 302:22

**initiating** [1] - 188:3

**injunction** [29] - 6:9, 11:16, 11:19, 12:9, 13:2, 34:13, 36:3, 36:17, 38:15, 38:17, 45:3, 47:14, 47:16, 49:4, 49:16, 49:19, 49:20, 53:13, 54:19, 58:12, 58:16, 83:2, 88:17, 90:1, 189:21, 190:18, 191:10, 217:17, 370:12

**INJUNCTION** [1] - 1:6

**injunctions** [2] - 35:13, 360:7

**injured** [1] - 196:13

**injury** [18] - 33:16, 35:11, 186:19, 189:17, 190:6, 190:9, 196:15, 215:10, 222:7, 222:8, 222:15, 222:16, 222:18, 237:9, 237:10, 237:12, 237:20, 243:2

**inner** [2] - 143:13, 143:20

**input** [3] - 79:1, 83:25, 161:10

**inputs** [1] - 78:23

**inquiry** [4] - 235:14, 235:19, 236:7, 236:12

**inserted** [1] - 260:19

**inserting** [1] - 355:14

**inside** [1] - 22:6

**insist** [2] - 300:20, 305:13

**insofar** [2] - 102:23, 117:8

**inspect** [1] - 357:6

**inspections** [1] - 131:16

**instance** [11] - 83:25, 155:3, 169:7, 170:25, 182:7, 207:21, 207:23, 222:12, 233:8, 256:3, 318:20

**instances** [4] - 38:9, 317:14, 323:6,

334:19

**instead** [3] - 110:21, 110:22, 183:1

**institutions** [2] - 169:9, 169:16

**instruct** [2] - 13:15, 236:2

**instruction** [1] - 275:20

**instructions** [1] - 348:18

**insubstantial** [1] - 369:7

**integrate** [1] - 342:4

**integrated** [3] - 341:15, 341:24, 353:23

**intend** [6] - 17:12, 21:17, 27:2, 34:15, 119:7, 307:5

**intended** [1] - 10:22

**intending** [2] - 16:7, 231:7

**intent** [2] - 21:14, 68:20

**intentional** [2] - 199:19, 250:11

**intentions** [1] - 46:24

**interact** [1] - 79:10

**interaction** [1] - 353:18

**interactions** [1] - 149:12

**interacts** [1] - 76:17

**interchangeably** [1] - 84:11

**interconnected** [1] - 354:10

**interest** [9] - 16:23, 32:21, 59:7, 59:10, 59:18, 73:9, 90:25, 156:10, 358:16

**interested** [3] - 24:7, 208:12, 310:10

**Interested** [1] - 1:12

**interests** [4] - 18:12, 32:19, 32:22, 310:6

**interface** [7] - 76:18, 79:4, 79:9, 95:25, 96:10, 112:14, 145:23

**interfaces** [1] - 95:9

**interim** [1] - 49:20

**internal** [10] - 130:23, 131:2, 132:15, 133:1, 133:11, 135:18, 139:6, 146:22, 146:25, 150:24

**internally** [2] - 139:3,

140:18

**internationally** [1] - 74:11

**internet** [1] - 16:3

**interpret** [1] - 116:7

**interpretation** [5] - 76:12, 230:17, 230:18, 231:1, 234:14

**interprets** [1] - 76:10

**interrupt** [4] - 39:10, 304:18, 313:14, 330:18

**intervene** [9] - 14:12, 14:19, 14:20, 15:5, 16:14, 17:13, 39:1, 59:25

**intervened** [1] - 59:11

**intervention** [1] - 15:21

**interview** [2] - 167:17, 167:20

**introduce** [6] - 17:6, 226:25, 232:16, 252:1, 344:7, 351:10

**introduced** [4] - 233:7, 291:2, 344:8, 351:21

**introduces** [1] - 57:19

**introducing** [1] - 175:20

**invest** [1] - 340:1

**investment** [2] - 340:8, 341:5

**Invitation** [1] - 377:24

**invitation** [1] - 381:11

**involve** [1] - 380:21

**involved** [5] - 51:4, 70:6, 260:25, 342:7, 376:20

**involving** [1] - 206:7

**irrelevant** [1] - 200:5

**irreparable** [7] - 21:2, 21:7, 33:18, 53:19, 55:17, 55:18, 369:2

**irrespective** [1] - 253:18

**Iselin** [1] - 3:18

**isolates** [1] - 316:10

**issue** [63] - 11:6, 12:7, 14:7, 17:11, 17:16, 17:21, 19:6, 21:4, 21:8, 21:24, 24:22, 25:25, 26:15, 30:23, 34:9, 34:15, 35:5, 42:7, 42:11, 46:2, 47:6, 47:7, 47:25, 48:2, 48:7, 48:9, 48:13, 48:15, 49:9, 49:12, 49:21, 49:24,

58:12, 63:13, 70:20,
75:6, 87:23, 89:16,
95:18, 108:9,
114:15, 164:8,
167:15, 197:17,
198:7, 199:7, 201:3,
202:25, 203:7,
225:12, 247:13,
248:14, 284:4,
284:5, 308:6, 308:7,
358:5, 360:4, 368:6,
368:9, 377:4, 383:1,
383:19
**issues** [28] – 6:10,
10:17, 10:19, 22:3,
24:11, 25:1, 29:9,
29:15, 30:10, 44:25,
54:11, 88:1, 122:2,
123:25, 173:17,
181:4, 244:14,
245:3, 277:16,
278:6, 286:23,
325:13, 369:1,
369:2, 370:12,
387:10, 388:25
**issuing** [1] – 337:17
**item** [2] – 23:3, 113:7
**items** [3] – 23:13,
81:17, 260:19
**itself** [10] – 140:9,
150:1, 150:2,
166:20, 192:2,
192:21, 192:22,
192:23, 214:4, 361:4

## J

**JAIME** [1] – 2:23
**Jaime** [1] – 9:23
**Jamie** [1] – 178:11
**January** [20] – 126:22,
166:8, 216:19,
217:19, 226:6,
226:8, 286:18,
289:23, 290:20,
290:23, 305:5,
305:8, 305:12,
380:12, 380:25,
381:12, 381:15,
384:11, 386:11,
386:15
**Jason** [2] – 8:25,
211:12
**JASON** [1] – 2:6
**JENNIFER** [1] – 2:14
**Jennifer** [1] – 9:10
**JERSEY** [5] – 1:1, 1:4,
1:4, 3:8, 3:11
**Jersey** [176] – 1:14,
1:20, 2:7, 2:11, 2:15,

2:18, 2:21, 2:24, 3:3,
3:6, 7:9, 14:11,
27:24, 31:21, 33:19,
37:22, 38:16, 38:17,
38:20, 39:4, 39:7,
40:15, 41:16, 60:12,
61:23, 65:11, 74:17,
75:15, 76:7, 77:24,
80:9, 80:16, 81:11,
85:3, 86:1, 86:2,
86:4, 86:5, 86:6,
86:7, 94:20, 95:10,
96:1, 96:15, 96:18,
97:20, 98:3, 98:9,
98:15, 98:17,
101:23, 102:9,
103:2, 103:21,
105:3, 105:4, 105:9,
106:5, 106:6,
106:22, 107:8,
108:14, 110:1,
113:18, 118:13,
125:1, 125:5,
125:10, 125:12,
125:20, 126:9,
126:12, 126:17,
126:19, 126:23,
126:24, 127:7,
127:24, 128:3,
128:7, 128:11,
128:13, 128:25,
129:3, 130:5, 130:9,
130:20, 138:22,
139:7, 139:11,
139:14, 139:19,
139:24, 140:2,
140:6, 140:25,
141:10, 141:24,
142:24, 143:3,
143:14, 144:5,
144:15, 157:10,
163:10, 163:13,
163:18, 164:10,
164:12, 164:19,
166:5, 167:8,
168:13, 168:18,
169:4, 175:10,
177:12, 178:10,
180:5, 180:11,
181:2, 181:10,
184:21, 192:10,
203:19, 206:17,
206:25, 207:1,
231:2, 234:14,
234:22, 236:24,
237:2, 237:18,
246:20, 248:22,
252:13, 252:21,
260:8, 286:18,
289:4, 292:5,
296:23, 297:3,

297:5, 297:7,
298:18, 298:25,
299:10, 299:14,
300:23, 301:17,
301:20, 301:23,
302:2, 302:24,
314:12, 320:10,
322:4, 323:13,
338:17, 339:3,
339:4, 343:11,
345:13, 347:11,
348:19, 376:3,
376:13, 377:24,
381:18, 383:11,
383:12, 387:22
**Jersey's** [14] – 31:12,
33:25, 101:10,
106:3, 107:13,
108:16, 109:7,
117:7, 117:23,
118:11, 135:16,
167:15, 176:2, 212:5
**Joanne** [1] – 3:4
**job** [14] – 52:13, 53:2,
121:24, 140:2,
141:13, 213:3,
240:1, 252:5, 253:2,
264:6, 275:6,
332:14, 376:2, 376:4
**jobs** [1] – 166:15
**Joe** [2] – 240:14,
240:20
**John** [2] – 9:24,
366:24
**join** [1] – 240:4
**joining** [3] – 22:15,
72:5, 73:7
**joint** [6] – 43:5, 43:20,
328:16, 328:23,
349:9, 369:17
**jointly** [1] – 349:9
**Joseph** [1] – 9:19
**JOSEPH** [1] – 3:23
**josh** [1] – 194:1
**journal** [1] – 314:12
**journals** [1] – 314:10
**judge** [15] – 17:3,
28:22, 51:8, 51:15,
114:11, 156:9,
197:24, 233:14,
284:11, 332:16,
345:2, 362:10,
371:19, 376:1,
386:24
**JUDGE** [1] – 1:16
**Judge** [26] – 6:2,
18:17, 28:21, 34:12,
36:16, 42:13, 48:13,
59:13, 59:22, 60:9,
63:1, 65:7, 66:6,

66:13, 122:4,
155:24, 180:4,
211:7, 247:10,
283:15, 285:15,
303:9, 307:7, 334:4,
375:20, 375:22
**judgment** [2] – 173:25,
335:22
**judicially** [1] – 16:15
**Julia** [2] – 31:18,
310:21
**JULIA** [2] – 4:13,
310:17
**jump** [1] – 74:16
**jumped** [2] – 186:5,
216:2
**June** [6] – 153:9,
173:9, 346:9,
346:10, 381:10,
381:17
**Junior** [2] – 8:10,
246:17
**junk** [1] – 44:5
**jurisdiction** [4] –
110:15, 117:17,
142:3, 269:6
**jurisdictions** [11] –
101:20, 117:15,
125:18, 140:14,
142:2, 142:4, 142:8,
151:8, 157:15
**jury** [2] – 243:8, 243:9
**Justice** [1] – 346:16

## K

**K-I-M** [1] – 165:21
**Kate** [3] – 318:10,
318:14, 318:18
**keep** [14] – 178:1,
236:1, 247:8,
265:20, 268:20,
278:1, 283:22,
335:18, 335:20,
335:24, 336:10,
336:12, 346:3,
388:20
**keeper** [2] – 337:1,
337:2
**KENNY** [1] – 2:20
**Kenny** [1] – 8:9
**kept** [1] – 179:22
**Kevin** [1] – 252:4
**key** [5] – 284:20,
313:1, 343:15,
345:12, 345:23
**Kick** [2] – 126:19,
127:11
**kicked** [1] – 386:11
**Kim** [39] – 6:7, 22:18,

29:25, 33:7, 35:6,
165:13, 165:14,
165:20, 165:22,
188:13, 197:7,
198:4, 201:1,
201:12, 201:19,
202:8, 202:25,
211:15, 222:5,
228:24, 229:3,
230:23, 233:6,
233:17, 234:1,
235:13, 242:20,
243:18, 246:25,
249:23, 251:12,
251:22, 311:3,
367:3, 376:3,
377:15, 378:10,
378:14, 381:18
**KIM** [4] – 1:3, 1:4, 4:6,
165:16
**Kim's** [5] – 198:13,
249:2, 288:17,
307:19, 367:2
**kind** [43] – 12:24,
32:15, 35:1, 37:11,
74:16, 75:14, 134:2,
170:11, 176:23,
177:12, 180:17,
187:4, 187:10,
188:12, 189:24,
190:2, 190:18,
190:21, 190:24,
191:8, 192:12,
192:25, 195:2,
195:21, 195:24,
195:25, 217:2,
226:1, 238:8,
238:21, 240:19,
262:20, 265:2,
298:16, 339:21,
348:22, 357:23,
363:10, 364:1,
364:18, 364:19,
388:12
**kinds** [1] – 32:15
**Kirstin** [1] – 10:5
**KIRSTIN** [1] – 3:5
**knowing** [5] – 13:14,
51:23, 174:19,
228:21, 255:7
**knowledge** [29] –
25:19, 126:10,
139:23, 140:1,
140:5, 140:18,
140:22, 140:24,
141:9, 141:22,
142:23, 144:3,
147:16, 148:7,
148:13, 148:16,
149:19, 149:23,

149:25, 150:9,
150:11, 150:25,
151:3, 151:16,
151:21, 307:24,
373:25, 377:3
**known** [4] - 48:8,
185:17, 223:21,
316:23
**knows** [7] - 35:10,
35:12, 150:5,
201:25, 202:4,
274:15, 362:23
**KOMUVES** [142] -
1:19, 4:6, 4:7, 4:8,
4:10, 4:12, 4:17,
6:25, 7:2, 17:24,
18:3, 18:6, 24:13,
31:6, 31:9, 31:11,
34:10, 34:19, 36:21,
38:3, 39:16, 122:13,
122:18, 122:23,
159:9, 162:20,
162:24, 163:8,
164:2, 164:8,
164:22, 165:6,
165:13, 165:25,
166:1, 166:23,
166:25, 187:22,
187:24, 188:4,
188:15, 188:17,
188:19, 193:3,
193:5, 193:8,
193:20, 193:22,
194:13, 194:15,
197:1, 199:17,
200:11, 200:14,
200:19, 201:15,
202:17, 202:22,
208:16, 218:8,
218:11, 219:9,
219:18, 219:24,
220:22, 221:15,
227:12, 230:8,
230:19, 231:18,
231:25, 234:25,
235:5, 241:6,
243:15, 244:10,
244:13, 246:9,
251:12, 251:21,
262:8, 264:19,
264:21, 265:11,
266:6, 267:8,
267:11, 267:15,
267:21, 268:1,
268:2, 269:2,
269:24, 270:1,
270:3, 270:16,
270:18, 271:12,
271:14, 271:21,
273:16, 273:17,
277:23, 278:3,

278:8, 278:21,
279:22, 280:3,
280:11, 280:18,
281:11, 283:13,
283:18, 283:25,
284:3, 285:18,
285:25, 286:10,
286:12, 287:8,
290:20, 290:25,
308:6, 308:9,
350:15, 359:24,
360:1, 366:9, 369:6,
370:15, 371:19,
371:20, 371:23,
371:25, 373:7,
379:17, 379:22,
381:21, 388:5,
388:7, 388:11,
388:14
**Komuves** [13] - 7:2,
31:11, 52:3, 91:18,
159:10, 159:12,
193:12, 289:2,
291:2, 304:11,
304:13, 305:20,
381:11
**KOTZAS** [1] - 3:19
**Kotzas** [1] - 8:21


# L

**L.L.C** [2] - 74:7,
124:20
**L.L.P** [1] - 2:20
**lack** [3] - 99:8, 141:2,
147:5
**lacks** [1] - 266:5
**lady** [4] - 179:21,
180:1, 186:5, 383:23
**Lady** [1] - 178:11
**Lafayette** [4] - 126:3,
126:5, 126:8, 126:12
**laid** [12] - 29:16,
92:19, 99:22, 100:2,
101:7, 138:16,
168:18, 255:8,
257:13, 291:16,
300:15, 359:7
**LAMPARELLO** [1] -
3:5
**Lamparello** [1] - 10:5
**landscape** [4] - 84:22,
85:1, 255:11, 257:25
**language** [2] - 332:21,
348:15
**laptop** [1] - 342:23
**large** [3] - 190:23,
362:4, 376:19
**larger** [2] - 237:18,
321:20

**largest** [2] - 312:2,
322:4
**Last** [1] - 126:21
**last** [33] - 11:13, 73:2,
93:16, 105:14,
119:22, 120:12,
126:16, 126:23,
131:24, 138:19,
155:2, 155:12,
165:19, 165:20,
239:4, 248:23,
249:21, 251:4,
264:1, 270:7, 272:9,
285:23, 288:8,
310:20, 313:23,
336:6, 343:19,
345:20, 370:11,
375:18, 382:7,
384:18, 386:9
**lastly** [2] - 35:6,
100:15
**late** [12] - 29:11,
34:14, 35:20, 39:24,
48:13, 198:19,
200:4, 200:24,
358:11, 358:15,
358:16, 376:6
**laughter** [3] - 220:3,
220:23, 241:8
**launched** [1] - 241:23
**Lautenberg** [2] -
263:14, 319:22
**Lautenberg's** [1] -
317:1
**Lautenberg/
Andrews** [1] - 322:12
**Law** [1] - 6:17
**LAW** [1] - 2:2
**law** [41] - 9:8, 18:7,
18:13, 33:4, 35:12,
43:8, 43:9, 43:16,
43:17, 61:1, 65:2,
125:2, 154:22,
155:8, 155:15,
202:9, 216:16,
230:2, 230:6,
230:17, 234:15,
329:13, 330:1,
330:8, 331:1,
331:16, 332:8,
339:4, 343:12,
344:5, 345:4, 345:5,
345:13, 348:5,
348:19, 349:24,
364:21
**laws** [16] - 31:14,
33:19, 41:15, 52:24,
53:3, 131:20,
167:16, 168:14,
176:2, 185:19,

230:13, 231:2,
234:23, 236:21,
274:25
**lawsuit** [20] - 50:7,
56:9, 56:10, 133:11,
135:17, 206:4,
207:12, 207:19,
208:4, 208:14,
216:24, 222:18,
223:21, 229:23,
231:7, 235:15,
253:18, 266:2,
266:8, 384:13
**lawsuit's** [1] - 207:17
**lawyer** [4] - 202:4,
241:9, 305:16,
376:22
**lawyers** [13] - 11:21,
12:10, 41:22,
121:12, 121:21,
121:23, 188:13,
249:19, 310:1,
310:3, 376:22,
376:23, 376:25
**lay** [23] - 76:2, 82:8,
84:7, 84:18, 84:21,
84:25, 94:4, 94:13,
95:6, 95:24, 96:18,
111:1, 116:11,
138:13, 138:14,
149:2, 149:5,
253:20, 254:1,
255:21, 256:2,
256:4, 341:21
**layered** [1] - 136:10
**layers** [1] - 135:13
**laying** [7] - 77:10,
78:15, 78:22,
136:16, 139:2,
163:21, 276:12
**layout** [97] - 37:7,
79:2, 81:9, 82:4,
82:6, 83:13, 84:10,
93:22, 93:24, 94:1,
94:2, 94:6, 94:9,
94:13, 96:3, 96:11,
97:23, 101:15,
101:16, 102:5,
102:9, 102:15,
102:24, 102:25,
103:25, 105:5,
105:8, 105:9,
105:10, 105:11,
105:19, 106:5,
106:7, 106:10,
106:11, 107:10,
108:13, 108:18,
108:23, 109:19,
109:25, 110:5,
110:10, 110:16,

110:17, 110:23,
110:24, 116:15,
117:2, 117:7,
117:20, 133:21,
134:2, 134:7, 138:7,
138:25, 140:11,
144:18, 144:22,
152:2, 152:9,
152:25, 155:21,
159:22, 160:2,
160:3, 160:18,
161:4, 161:12,
161:20, 161:21,
162:1, 258:4, 258:9,
259:23, 260:1,
260:6, 275:15,
276:2, 288:16,
293:2, 296:4,
297:18, 297:19,
298:13, 298:19,
299:2, 299:5, 299:6,
299:23, 300:4,
300:16, 341:22,
348:14, 359:17
**layouts** [8] - 107:8,
110:13, 110:14,
112:2, 114:2, 260:7,
300:23, 302:13
**lays** [1] - 23:13
**lead** [7] - 56:4, 56:5,
158:4, 179:12,
187:12, 187:19,
188:13
**leader** [1] - 385:3
**leaders** [3] - 175:18,
176:25
**leading** [11] - 83:5,
83:9, 83:14, 118:1,
118:2, 118:7,
179:14, 187:6,
187:7, 223:4, 238:7
**leads** [1] - 359:13
**lean** [1] - 73:4
**learn** [1] - 46:10
**learned** [2] - 140:22,
383:13
**learning** [1] - 376:14
**least** [23] - 19:25,
34:12, 45:2, 49:14,
53:22, 61:2, 71:20,
71:23, 92:12, 92:25,
93:5, 93:9, 93:13,
93:17, 196:2,
198:13, 227:24,
248:18, 273:8,
279:23, 284:7,
286:7, 368:2
**leave** [8] - 26:23, 58:9,
61:12, 72:20,
120:16, 236:1,

251:14, 367:12, 387:16
**leaves** [1] - 21:3
**leaving** [2] - 57:1, 156:22
**left** [20] - 65:19, 102:6, 102:24, 132:16, 132:18, 154:3, 162:18, 200:12, 236:9, 239:1, 241:19, 277:22, 280:9, 296:14, 306:9, 307:12, 311:3, 364:10, 373:19, 384:17
**left-hand** [3] - 102:6, 102:24, 154:3
**leftmost** [2] - 206:20, 207:4
**legal** [20] - 22:2, 44:12, 55:2, 55:7, 64:16, 174:7, 195:2, 196:8, 202:17, 208:16, 219:9, 219:13, 219:18, 220:14, 221:16, 230:8, 230:19, 263:11, 266:13, 360:4
**legality** [1] - 64:8
**legislate** [1] - 52:25
**legislation** [2] - 339:17, 339:19
**legislative** [9] - 42:24, 43:1, 43:18, 200:15, 281:20, 327:22, 328:22, 330:21, 331:4
**legislatively** [1] - 58:18
**legislator** [6] - 43:18, 53:1, 173:15, 174:1, 291:13, 321:25
**legislators** [8] - 234:10, 234:19, 234:20, 234:21, 234:22, 236:21, 236:23, 237:2
**legislature** [2] - 52:17, 234:18
**legitimate** [1] - 25:23
**legwork** [1] - 149:9
**less** [7] - 38:24, 161:22, 173:17, 281:17, 328:15, 364:11, 383:6
**lesson** [1] - 369:14
**letter** [46] - 14:9, 14:18, 15:1, 15:6, 15:11, 15:16, 16:1,

16:4, 16:8, 16:10, 17:4, 17:22, 18:1, 19:5, 19:10, 21:20, 21:22, 33:1, 88:7, 155:1, 216:16, 216:21, 224:21, 224:23, 224:25, 225:1, 225:2, 225:4, 225:6, 225:15, 226:21, 226:25, 229:4, 229:17, 229:21, 231:9, 231:12, 232:7, 232:10, 232:16, 232:22, 234:1, 234:7, 368:14, 381:9, 387:11
**letters** [2] - 226:23, 387:12
**letting** [1] - 306:19
**level** [4] - 30:18, 163:9, 185:19, 260:11
**levels** [1] - 139:23
**liberty** [1] - 248:11
**license** [1] - 340:20
**licensing** [1] - 343:7
**lieu** [1] - 368:15
**life** [1] - 16:25
**light** [1] - 190:19
**Lighting** [1] - 3:6
**likelihood** [1] - 33:3
**likely** [7] - 29:13, 140:17, 160:13, 171:19, 172:5, 180:15, 366:13
**limine** [12] - 28:22, 29:10, 29:17, 69:24, 70:14, 94:23, 97:9, 118:19, 119:6, 119:10, 119:17, 313:18
**limit** [3] - 144:23, 361:19, 371:18
**limitations** [1] - 64:22
**limited** [5] - 173:1, 315:15, 354:4, 361:19, 370:1
**limiting** [2] - 173:21, 173:22
**Line** [1] - 377:1
**line** [152] - 32:4, 32:5, 32:9, 33:14, 33:15, 34:1, 38:16, 38:17, 39:2, 42:11, 43:6, 43:22, 64:10, 96:16, 96:19, 96:23, 98:13, 98:21, 98:25, 99:13, 99:16, 99:21, 100:3, 105:6, 106:4,

106:12, 106:22, 110:17, 117:20, 117:22, 144:2, 167:19, 168:8, 168:19, 168:25, 169:5, 169:18, 170:3, 170:9, 170:13, 170:16, 171:10, 171:17, 171:21, 172:1, 172:2, 172:10, 172:20, 172:24, 173:3, 173:6, 173:12, 176:3, 176:6, 178:14, 179:20, 180:11, 181:6, 181:21, 181:24, 182:4, 182:5, 182:13, 182:15, 182:25, 184:5, 184:23, 185:3, 185:17, 186:10, 186:16, 187:1, 188:8, 190:11, 192:11, 192:13, 195:18, 196:11, 207:20, 207:24, 214:17, 214:19, 215:1, 222:14, 222:17, 222:21, 235:7, 235:19, 236:25, 239:4, 239:15, 240:15, 240:22, 241:23, 243:1, 244:22, 244:23, 245:3, 245:4, 262:12, 264:8, 293:10, 300:16, 314:13, 315:17, 315:18, 315:22, 316:10, 316:14, 316:21, 317:18, 318:11, 318:12, 319:17, 320:23, 321:3, 322:8, 322:21, 323:2, 323:3, 323:5, 323:7, 323:13, 324:1, 324:3, 324:5, 324:11, 324:15, 324:23, 324:25, 325:18, 325:19, 326:6, 328:3, 328:4, 329:2, 330:15, 330:23, 334:12, 334:13, 334:20, 334:21, 370:19, 370:25, 371:11, 376:8, 376:12, 376:15, 376:19,

377:24, 378:4, 381:19
**lined** [1] - 300:21
**lines** [12] - 48:1, 169:12, 177:3, 178:11, 181:14, 183:2, 183:12, 185:1, 214:23, 223:2, 223:4, 383:25
**lineup** [1] - 22:21
**lining** [1] - 383:22
**link** [5] - 227:15, 227:20, 227:25, 232:22, 286:8
**links** [1] - 298:12
**list** [4] - 7:13, 115:4, 154:6, 380:21
**listed** [10] - 96:11, 97:22, 109:20, 110:11, 110:12, 110:21, 153:22, 182:15, 370:19, 377:2
**listen** [3] - 199:5, 268:19, 287:10
**listened** [3] - 199:11, 248:19, 248:21
**listening** [2] - 110:3, 375:11
**listing** [2] - 304:7, 305:1
**lists** [2] - 153:21, 298:5
**Literally** [1] - 246:12
**literally** [3] - 168:23, 192:8, 309:19
**litigated** [2] - 49:9, 49:10
**litigation** [16] - 15:17, 25:22, 41:19, 50:25, 51:23, 56:7, 188:3, 194:24, 333:13, 381:5, 381:12, 381:15, 381:18, 381:25, 382:13, 382:20
**living** [2] - 38:6, 252:3
**Liz** [1] - 123:12
**LLC** [5] - 2:2, 2:5, 2:12, 3:2, 6:22
**LLP** [1] - 2:23
**load** [1] - 161:24
**loaded** [2] - 37:3, 82:1
**lobbying** [1] - 14:22
**local** [3] - 74:10, 125:13, 140:15
**located** [1] - 252:20
**location** [5] - 338:22, 339:7, 339:12, 340:3
**locations** [10] - 82:10,

338:6, 338:15, 339:10, 340:2, 340:12, 356:23, 356:24, 357:4, 365:9
**lock** [1] - 121:18
**log** [4] - 244:4, 303:23, 304:4, 308:9
**logic** [12] - 100:16, 134:5, 135:2, 136:22, 139:17, 139:22, 142:5, 142:19, 144:10, 145:21, 356:5, 356:21
**logistical** [1] - 23:13
**logistically** [1] - 123:21
**logs** [1] - 243:23
**long-term** [1] - 321:2
**look** [67] - 23:24, 25:15, 27:1, 53:3, 60:21, 60:22, 60:24, 65:3, 65:7, 66:4, 70:23, 79:3, 80:3, 97:8, 97:16, 99:17, 102:21, 115:25, 168:20, 169:7, 173:19, 180:7, 184:6, 184:25, 190:21, 193:23, 194:25, 195:10, 196:6, 209:1, 212:11, 212:25, 214:8, 221:14, 226:20, 242:16, 242:25, 249:24, 264:3, 270:7, 280:7, 303:22, 307:8, 311:18, 315:16, 316:12, 318:17, 320:20, 324:6, 325:15, 327:22, 328:2, 328:10, 328:18, 329:9, 361:2, 361:24, 362:19, 372:16, 375:3, 377:9, 377:10, 378:23, 378:24
**Look** [2] - 42:12, 71:20
**looked** [8] - 92:8, 323:10, 323:11, 324:21, 325:1, 325:16, 369:18, 376:19
**looking** [22] - 24:6, 37:6, 37:10, 52:19, 55:10, 62:7, 100:25, 114:21, 114:22,

188:12, 192:8,
199:6, 219:14,
243:11, 254:8,
317:13, 319:14,
322:20, 330:22,
373:13, 378:13,
383:24
**looks** [13] - 56:21,
57:7, 194:3, 352:2,
362:19, 374:3,
374:8, 374:15,
377:17, 378:6,
379:9, 380:11,
381:10
**loom** [1] - 376:19
**loser** [1] - 33:19
**losing** [2] - 207:23,
328:11
**lost** [5] - 42:22, 45:13,
45:14, 178:2, 358:11
**LOUIS** [1] - 3:15
**Louis** [1] - 7:19
**Louisiana** [3] - 97:20,
101:19, 106:13
**love** [2] - 264:14,
317:24
**lower** [1] - 111:23
**luck** [1] - 134:16
**lunch** [12] - 19:21,
20:3, 28:10, 67:17,
68:1, 68:10, 90:25,
91:5, 97:9, 97:11,
120:15, 120:24
**Luncheon** [1] - 121:5
**Lyndhurst** [1] - 2:21

## M

**M-A-C-I-A-S** [1] - 73:3
**ma'am** [1] - 333:17
**Mac** [2] - 276:18,
277:4
**Mac-based** [2] -
276:18, 277:4
**machine** [72] - 23:11,
43:6, 43:22, 79:24,
80:1, 94:15, 96:5,
125:5, 257:19,
258:6, 260:3,
260:10, 261:3,
261:10, 261:17,
261:21, 261:25,
262:4, 262:9,
262:14, 263:2,
275:16, 275:23,
275:24, 275:25,
276:3, 276:6, 276:9,
276:11, 276:14,
276:20, 276:23,
286:24, 291:15,

292:4, 292:8,
292:14, 292:25,
293:2, 295:11,
299:6, 299:13,
300:19, 300:22,
300:25, 301:16,
302:6, 302:13,
306:19, 337:24,
339:24, 341:8,
353:19, 354:1,
354:6, 354:7, 354:9,
355:17, 355:19,
355:20, 355:23,
356:1, 356:2,
356:12, 359:10,
359:12, 359:22,
360:14, 362:19,
364:15, 373:21,
374:16
**machinery** [2] - 34:24,
40:15
**machines** [61] - 27:24,
37:3, 64:22, 64:23,
77:16, 90:8, 90:21,
103:15, 107:14,
107:20, 112:25,
113:2, 130:4,
136:12, 140:7,
158:21, 161:21,
248:22, 248:23,
262:5, 275:25,
276:5, 276:25,
279:14, 279:15,
288:16, 289:3,
291:25, 292:11,
295:21, 302:16,
302:20, 310:8,
337:25, 340:1,
340:10, 340:11,
340:13, 340:21,
340:25, 341:1,
341:3, 341:9,
341:10, 341:13,
341:21, 342:3,
342:4, 342:7, 343:5,
353:24, 356:19,
356:22, 356:25,
357:1, 357:3,
358:23, 358:24,
363:13, 365:21,
372:5
**MACIAS** [5] - 4:3,
72:8, 72:13, 72:18,
72:24
**Macias** [87] - 22:15,
34:20, 72:4, 73:3,
74:12, 75:14, 77:3,
77:23, 78:14, 79:11,
80:7, 80:15, 80:18,
83:12, 83:21, 84:16,
85:21, 86:8, 86:16,

89:8, 90:7, 91:9,
91:17, 91:24, 92:11,
92:25, 93:4, 93:8,
93:12, 93:16, 93:20,
93:21, 94:1, 94:18,
95:3, 95:8, 95:22,
96:13, 97:15, 99:13,
100:20, 100:25,
101:18, 101:25,
102:13, 103:18,
104:2, 104:23,
106:18, 107:9,
108:11, 109:5,
109:24, 110:4,
111:8, 111:21,
113:7, 115:21,
117:4, 117:23,
118:11, 118:16,
119:25, 121:8,
121:9, 123:7,
123:20, 129:16,
141:7, 147:11,
147:15, 150:14,
152:4, 153:19,
155:11, 159:12,
163:1, 164:21,
165:8, 248:24,
249:11, 249:22,
250:13, 270:2,
288:7, 351:7
**Macias'** [2] - 115:6,
198:14
**Mackey** [3] - 111:9,
111:12, 112:21
**magistrate** [1] - 51:8
**magnitude** [1] - 44:16
**mail** [39] - 37:8, 37:24,
57:6, 94:19, 229:10,
254:21, 260:9,
260:16, 260:18,
260:22, 274:4,
274:7, 274:8,
337:17, 337:18,
338:4, 339:14,
340:14, 340:15,
340:22, 344:5,
353:15, 353:19,
353:20, 353:22,
354:1, 354:5, 354:9,
354:20, 355:12,
355:16, 355:25,
363:21, 364:21,
364:23, 373:12
**mail-in** [25] - 37:24,
337:17, 337:18,
338:4, 339:14,
340:14, 340:15,
340:22, 344:5,
353:15, 353:19,
353:20, 353:22,

354:1, 354:5, 354:9,
354:20, 355:12,
355:16, 355:25,
363:21, 364:21,
364:23
**mailed** [2] - 354:12,
354:14
**mailing** [5] - 254:21,
259:17, 260:20,
263:10, 346:14
**main** [10] - 70:20,
75:17, 76:21,
169:20, 178:10,
189:15, 213:5,
240:15, 248:22,
272:25
**major** [2] - 152:20,
174:18
**majority** [5] - 98:5,
98:6, 98:11, 106:8,
178:6
**MALAMUT** [1] - 3:2
**Malamut** [1] - 8:6
**Maldonado** [2] - 8:10,
246:17
**MALLON** [1] - 3:5
**Mallon** [1] - 10:5
**manage** [1] - 306:14
**Management** [1] -
337:6
**management** [23] -
15:20, 74:11, 76:1,
77:8, 77:25, 78:18,
80:11, 80:16, 80:24,
127:11, 131:11,
131:13, 131:15,
132:8, 132:13,
138:14, 148:4,
159:16, 159:19,
163:16, 296:22,
297:9, 372:5
**manager** [13] - 104:5,
104:18, 189:3,
213:2, 307:20,
307:21, 307:23,
349:12, 367:4,
367:13, 370:6,
376:3, 384:11
**managers** [1] - 289:8
**mandate** [1] - 266:3
**mandated** [2] - 340:5,
340:19
**manipulated** [1] - 52:5
**manner** [2] - 17:7,
262:3
**manufactured** [1] -
49:17
**manufacturers** [1] -
302:16
**map** [1] - 22:13

354:1, 354:5, 354:9,
354:20, 355:12,
355:16, 355:25,
363:21, 364:21,
364:23
**March** [10] - 1:14, 6:2,
14:11, 257:7, 273:8,
286:7, 287:2,
293:24, 343:17,
390:11
**margin** [1] - 312:2
**margins** [1] - 170:11
**Marissa** [3] - 8:23,
227:18, 287:22
**MARISSA** [1] - 2:6
**mark** [9] - 8:6, 87:2,
104:13, 104:16,
111:16, 113:9,
166:21, 193:12,
227:3
**MARK** [1] - 3:2
**marked** [12] - 86:18,
86:25, 111:10,
249:9, 290:5, 290:6,
290:8, 291:1,
303:20, 310:24,
311:9, 375:24
**Market** [1] - 3:9
**marking** [6] - 76:15,
76:19, 76:21, 76:24,
80:14, 87:9, 91:18,
100:21
**Marshals** [1] - 30:2
**marshals** [1] - 30:8
**masse** [1] - 232:10
**massive** [2] - 339:22,
340:7
**master** [5] - 255:20,
256:6, 258:5,
274:14, 281:20
**masters** [6] - 256:4,
258:10, 258:14,
258:18, 258:22,
261:22
**match** [2] - 28:17,
260:22
**mate** [1] - 183:25
**materials** [3] - 33:11,
126:25, 127:4
**mathematical** [1] -
99:17
**Mathew** [1] - 8:21
**MATHEW** [1] - 3:20
**matter** [37] - 15:20,
15:21, 17:7, 32:24,
50:12, 52:11, 55:17,
58:16, 86:9, 96:8,
118:16, 120:12,
125:16, 137:9,
165:9, 166:18,
186:6, 189:13,
195:3, 196:8, 264:2,
288:21, 288:23,
288:25, 289:1,
292:8, 293:22,

301:4, 323:2, 333:2, 333:9, 333:22, 333:23, 358:4, 387:14, 390:5
**matters** [1] - 47:3
**MATTHEW** [1] - 3:16
**Matthew** [1] - 10:1
**max** [1] - 365:16
**mayor** [2] - 291:13, 322:3
**McKay** [2] - 1:21, 390:11
**McKay-Soule** [2] - 1:21, 390:11
**mean** [93] - 12:22, 23:7, 24:2, 27:14, 36:7, 45:9, 45:17, 47:6, 48:4, 48:19, 57:8, 64:7, 65:24, 68:17, 69:22, 70:23, 71:16, 77:14, 78:6, 104:23, 105:20, 114:12, 115:7, 120:18, 143:20, 143:21, 157:23, 170:22, 173:4, 177:19, 180:24, 181:13, 183:5, 184:6, 184:10, 189:14, 194:25, 198:21, 199:3, 199:6, 199:15, 203:20, 204:3, 204:4, 204:8, 204:25, 205:12, 208:25, 214:8, 216:14, 220:12, 224:17, 229:16, 232:1, 235:19, 236:11, 238:8, 239:16, 239:24, 240:1, 245:18, 245:19, 245:25, 247:8, 255:5, 255:19, 257:15, 262:19, 262:23, 273:22, 275:10, 279:17, 279:20, 296:7, 297:24, 298:15, 300:24, 307:8, 315:21, 316:3, 324:21, 327:17, 328:18, 335:2, 335:8, 349:3, 360:3, 368:17, 369:7, 371:13, 381:16, 384:1, 386:12
**meaning** [4] - 84:11, 266:9, 274:16, 275:7

**means** [10] - 42:17, 58:2, 60:15, 109:18, 115:11, 316:12, 350:14, 370:22, 370:23, 370:24
**meant** [6] - 115:5, 115:18, 116:7, 241:13, 318:24, 323:4
**meantime** [1] - 357:10
**meanwhile** [1] - 310:12
**measured** [1] - 178:4
**mechanical** [1] - 1:23
**media** [3] - 175:5, 175:25, 179:13
**median** [4] - 315:21, 315:23, 315:25, 316:12
**meet** [16] - 10:22, 29:16, 36:2, 53:25, 69:3, 117:5, 175:12, 217:6, 217:12, 217:19, 217:20, 253:23, 256:23, 257:23, 258:4, 342:16
**meeting** [11] - 87:24, 122:25, 175:25, 205:1, 205:3, 205:6, 216:14, 222:6, 377:6, 377:13, 380:5
**meetings** [10] - 143:2, 254:5, 254:10, 254:17, 255:2, 259:22, 273:5, 273:19, 275:14, 379:12
**meets** [1] - 224:2
**Megan** [2] - 1:21, 390:11
**Megan's** [1] - 268:21
**Megan_McKay** [1] - 1:22
**Megan_McKay-Soule@njd. uscourts.gov** [1] - 1:22
**member** [6] - 140:2, 140:4, 141:15, 141:20, 223:1, 321:24
**members** [4] - 38:6, 141:23, 343:13, 347:11
**memo** [1] - 82:13
**memorize** [1] - 164:4
**memory** [7] - 76:11, 76:23, 137:23, 137:25, 228:1,

378:16, 381:14
**Menendez** [1] - 168:2
**Menendez's** [1] - 212:16
**mention** [3] - 229:20, 229:23, 333:4
**mentioned** [40] - 11:7, 77:23, 78:17, 140:15, 171:11, 181:9, 183:10, 194:25, 195:8, 212:25, 214:22, 215:14, 217:3, 222:13, 231:9, 231:10, 238:14, 245:16, 251:25, 253:3, 256:17, 259:15, 261:1, 289:14, 319:22, 322:22, 329:11, 333:1, 334:11, 335:23, 337:19, 339:17, 345:20, 346:2, 346:6, 346:11, 346:12, 347:9, 348:21, 349:15
**mentions** [1] - 28:23
**Mercer** [6] - 7:20, 9:9, 10:2, 10:9, 271:24, 278:20
**merit** [1] - 20:24
**merits** [4] - 17:2, 21:5, 33:3, 53:15
**met** [4] - 87:25, 156:6, 175:21, 216:22
**method** [1] - 153:25
**mic** [1] - 268:20
**Michael** [1] - 8:13
**MICHAEL** [1] - 3:11
**microphone** [2] - 90:16, 270:13
**mics** [1] - 268:23
**mid** [2] - 186:4, 333:2
**mid-December** [1] - 333:2
**middle** [4] - 15:18, 51:14, 51:17, 386:20
**MIDDLESEX** [1] - 3:11
**Middlesex** [2] - 8:13, 8:14
**midnight** [2] - 307:6, 309:11
**might** [34] - 32:4, 44:3, 52:25, 69:22, 119:4, 146:6, 160:17, 171:5, 176:12, 183:22, 188:25, 190:24, 212:22, 224:17, 227:4,

227:15, 233:4, 262:10, 263:14, 264:11, 274:11, 289:24, 296:10, 299:4, 316:1, 316:18, 316:20, 317:3, 327:2, 362:2
**Mile** [1] - 126:21
**military** [3] - 343:13, 344:6, 346:15
**million** [2] - 265:16, 343:6
**mimic** [1] - 144:19
**Minchello** [5] - 7:19, 9:8, 9:9, 10:2, 10:8
**MINCHELLO** [3] - 3:14, 3:15, 9:7
**mind** [10] - 46:20, 46:21, 197:5, 228:10, 250:23, 278:18, 335:20, 336:10, 338:8, 371:16
**mindful** [3] - 69:17, 121:25, 309:7
**minds** [1] - 45:25
**mine** [10] - 171:7, 172:5, 182:10, 182:21, 185:2, 185:7, 199:8, 237:17, 242:3, 388:20
**Mineral** [1] - 3:23
**minimal** [2] - 25:20, 116:19
**minimum** [1] - 26:23
**minor** [1] - 152:1
**MINTZ** [1] - 1:18
**Mintz** [2] - 6:22, 7:2
**minute** [9] - 19:21, 47:11, 193:3, 197:5, 197:10, 197:16, 267:19, 280:7, 375:25
**minutes** [25] - 20:2, 20:10, 22:25, 67:17, 69:9, 71:2, 111:5, 248:23, 249:15, 249:21, 283:19, 287:12, 288:8, 288:10, 288:14, 307:20, 310:12, 375:5, 375:8, 375:12, 375:21, 384:17, 384:18, 388:20
**mischaracter** [1] - 42:6
**mischaracterization** [1] - 97:1

**mischaracterized** [1] - 279:11
**mischaracterizes** [1] - 279:8
**miss** [1] - 11:12
**missed** [2] - 248:5, 346:18
**missing** [4] - 66:9, 66:11, 197:21, 200:22
**Misstates** [1] - 379:17
**misstates** [2] - 379:22, 381:21
**mistake** [2] - 290:15, 311:23
**mistaken** [1] - 199:15
**mistakes** [1] - 354:21
**misunderstanding** [1] - 51:13
**mixed** [1] - 294:4
**mode** [1] - 84:8
**modification** [1] - 152:2
**modifications** [8] - 105:14, 105:15, 116:16, 133:20, 152:11, 152:23, 153:1, 153:5
**modified** [1] - 84:6
**modifies** [1] - 348:6
**modifying** [1] - 83:24
**moment** [9] - 29:21, 54:8, 86:12, 91:21, 174:4, 186:17, 186:18, 259:12, 361:11
**Monday** [4] - 1:14, 119:14, 119:20, 387:9
**monetary** [1] - 11:11
**money** [7] - 265:7, 325:3, 328:15, 328:19, 329:5, 385:7, 386:17
**monitoring** [1] - 131:14
**Monmouth** [45] - 1:8, 2:7, 8:23, 9:1, 9:4, 40:19, 93:13, 156:14, 157:6, 182:7, 211:13, 287:23, 307:15, 336:17, 336:22, 336:24, 337:1, 337:5, 337:8, 337:20, 337:22, 338:13, 338:16, 338:18, 338:22, 339:19, 339:21, 339:25, 340:7,

340:9, 342:21,
343:2, 343:4,
346:21, 346:22,
347:14, 347:18,
350:12, 350:18,
350:21, 351:2,
358:20, 363:13,
365:10, 371:2
**Monmouthcountyvot
es.com** [1] - 345:17
**month** [4] - 138:20,
196:4, 216:20,
305:21
**months** [5] - 46:25,
48:6, 48:11, 225:4,
309:16
**moot** [1] - 36:12
**moreover** [1] - 34:25
**morning** [50] - 6:7,
6:19, 6:20, 6:21,
6:24, 6:25, 7:4, 7:8,
7:14, 7:15, 7:17,
7:18, 7:21, 7:22,
7:25, 8:1, 8:4, 8:5,
8:8, 8:11, 8:12, 8:16,
8:20, 8:24, 9:2, 9:6,
9:7, 9:18, 9:21, 9:22,
9:25, 10:3, 10:4,
10:7, 10:15, 16:6,
20:4, 22:12, 22:13,
28:7, 31:9, 31:10,
60:7, 60:8, 121:21,
124:11, 200:12,
336:8, 350:3, 358:3
**Morris** [4] - 3:7, 10:6,
93:17, 182:19
**most** [19] - 10:15,
29:13, 69:13, 84:25,
155:11, 155:14,
171:19, 179:15,
183:10, 266:16,
297:11, 298:16,
307:20, 308:16,
336:1, 337:15,
345:18, 377:3, 379:9
**motion** [3] - 44:21,
54:18, 313:18
**motioning** [1] - 120:21
**motions** [17] - 28:22,
29:2, 29:7, 29:10,
29:17, 69:24, 70:14,
94:23, 97:9, 118:19,
118:24, 119:5,
119:6, 119:7,
119:11, 119:17
**mouth** [1] - 36:8
**move** [17] - 36:6, 36:9,
36:10, 78:12, 94:16,
154:10, 195:11,
213:23, 215:17,

220:6, 241:11,
241:21, 261:11,
262:25, 332:24,
333:19, 380:10
**moved** [5] - 14:21,
34:17, 59:24,
118:16, 120:2
**moving** [18] - 21:4,
27:16, 58:7, 58:8,
101:25, 214:24,
247:8, 283:22,
306:3, 309:1,
335:19, 335:21,
335:24, 344:18,
344:19, 357:24,
379:8, 384:15
**MR** [629] - 4:4, 4:5,
4:5, 4:6, 4:7, 4:7,
4:8, 4:8, 4:9, 4:10,
4:11, 4:12, 4:13,
4:14, 4:14, 4:15,
4:15, 4:16, 4:17,
4:18, 6:21, 6:25, 7:7,
7:15, 7:18, 7:22, 8:1,
8:5, 8:8, 8:12, 8:17,
8:20, 8:25, 9:3, 9:7,
9:12, 9:18, 9:22,
10:1, 10:7, 10:12,
11:14, 12:13, 12:18,
13:12, 13:14, 13:18,
13:21, 14:3, 15:14,
16:2, 16:9, 16:21,
17:24, 18:3, 18:6,
19:2, 19:8, 19:13,
19:16, 23:10, 24:13,
24:23, 25:11, 25:13,
27:22, 28:14, 28:19,
28:21, 29:4, 29:6,
29:20, 29:24, 30:12,
31:6, 31:9, 31:11,
34:10, 34:19, 36:21,
38:3, 39:16, 39:20,
39:25, 40:8, 41:6,
41:8, 42:9, 42:15,
42:18, 42:20, 44:1,
44:24, 45:6, 45:12,
45:14, 45:16, 45:18,
45:24, 47:9, 48:3,
48:14, 49:2, 49:25,
50:8, 50:16, 51:7,
51:10, 51:16, 53:6,
54:6, 54:9, 54:11,
54:15, 54:25, 55:5,
55:7, 56:3, 56:22,
57:4, 57:16, 57:25,
59:5, 59:7, 59:10,
59:13, 59:16, 59:21,
60:1, 60:4, 60:6,
60:8, 61:18, 62:9,
62:17, 62:20, 62:24,
64:17, 66:6, 66:13,

66:20, 66:22, 67:2,
67:5, 67:11, 67:14,
68:13, 68:19, 69:10,
70:18, 71:6, 71:8,
72:8, 72:13, 72:18,
75:2, 77:13, 78:4,
79:13, 79:16, 79:19,
79:22, 83:5, 83:14,
84:9, 85:6, 85:11,
85:15, 86:18, 86:22,
87:12, 87:25, 88:9,
88:18, 89:16, 89:20,
89:24, 90:10, 90:13,
90:17, 90:19, 92:18,
94:22, 95:12, 95:17,
96:20, 98:24, 99:5,
99:8, 104:13,
105:20, 106:2,
107:16, 107:25,
108:4, 114:11,
114:18, 115:8,
115:15, 116:4,
118:1, 118:22,
119:1, 119:9, 120:5,
120:16, 120:20,
121:2, 122:3, 122:6,
122:13, 122:18,
122:23, 123:3,
123:6, 123:18,
123:19, 129:12,
130:2, 133:4, 133:9,
141:14, 141:16,
141:18, 141:21,
143:24, 144:1,
147:15, 148:9,
150:4, 150:19,
150:20, 153:12,
153:17, 153:18,
155:17, 155:24,
156:2, 156:9,
156:12, 156:14,
156:19, 157:2,
157:5, 157:7,
157:25, 158:4,
158:7, 158:10,
158:11, 159:4,
159:9, 162:13,
162:20, 162:24,
163:8, 164:2, 164:8,
164:22, 165:6,
165:13, 165:25,
166:1, 166:23,
166:25, 187:4,
187:7, 187:9,
187:13, 187:17,
187:22, 187:24,
188:4, 188:15,
188:17, 188:19,
193:3, 193:5, 193:8,
193:12, 193:15,
193:18, 193:20,

193:22, 194:13,
194:15, 197:1,
197:4, 197:12,
197:14, 197:24,
198:3, 198:8,
198:11, 198:16,
198:18, 198:23,
199:9, 199:16,
199:17, 200:1,
200:11, 200:14,
200:19, 201:15,
201:16, 202:2,
202:5, 202:7,
202:17, 202:19,
202:22, 202:24,
208:16, 208:18,
211:7, 211:12,
211:14, 218:8,
218:11, 218:13,
218:16, 218:18,
219:9, 219:11,
219:18, 219:24,
220:4, 220:7,
220:22, 220:24,
221:15, 221:20,
221:22, 221:25,
222:9, 227:4, 227:7,
227:9, 227:12,
227:15, 227:22,
228:1, 228:5,
228:12, 228:15,
228:18, 228:25,
229:2, 230:8,
230:10, 230:19,
230:25, 231:18,
231:22, 231:25,
232:5, 232:15,
232:19, 232:24,
233:4, 233:11,
233:14, 233:19,
233:21, 233:25,
234:25, 235:5,
235:8, 235:21,
235:23, 235:24,
236:4, 236:19,
239:2, 239:4, 239:6,
241:6, 241:15,
241:22, 243:4,
243:11, 243:15,
243:16, 243:21,
243:25, 244:2,
244:5, 244:10,
244:13, 246:9,
246:11, 246:16,
246:18, 247:5,
247:10, 247:15,
247:25, 248:3,
248:6, 248:17,
249:4, 249:10,
249:16, 249:23,
250:22, 251:9,

251:10, 251:12,
251:19, 251:21,
251:24, 253:15,
262:8, 262:11,
262:14, 262:21,
262:24, 263:1,
264:10, 264:13,
264:16, 264:19,
265:4, 265:11,
266:5, 266:6, 267:8,
267:11, 267:13,
267:15, 267:21,
268:1, 268:2, 269:2,
269:24, 270:1,
270:3, 270:8,
270:12, 270:16,
270:18, 271:12,
271:14, 271:17,
271:19, 271:21,
273:16, 273:17,
277:18, 277:23,
278:3, 278:8,
278:17, 278:21,
279:8, 279:22,
280:1, 280:3,
280:11, 280:14,
280:18, 281:11,
281:13, 281:16,
282:3, 283:8,
283:10, 283:13,
283:18, 283:25,
284:3, 284:11,
284:15, 284:17,
284:19, 285:2,
285:9, 285:15,
285:18, 285:25,
286:10, 286:12,
287:8, 290:4, 290:8,
290:12, 290:15,
290:18, 290:20,
290:25, 291:1,
303:9, 303:12,
303:16, 303:18,
304:23, 304:24,
305:25, 306:5,
306:11, 306:18,
306:22, 307:1,
307:3, 307:7,
307:14, 307:17,
307:19, 307:23,
308:3, 308:6, 308:9,
308:14, 309:5,
309:13, 309:19,
309:24, 310:3,
310:6, 310:14,
310:23, 311:6,
312:13, 313:13,
313:20, 313:23,
314:3, 314:4, 315:5,
315:9, 325:7, 325:8,
325:11, 330:24,

332:4, 332:5, 332:7, 332:16, 332:18, 332:20, 332:21, 332:25, 334:4, 334:7, 334:9, 334:10, 334:22, 335:1, 335:8, 335:13, 335:17, 336:16, 344:7, 344:12, 344:17, 344:19, 344:21, 344:23, 345:2, 345:5, 345:9, 350:15, 350:17, 350:20, 351:10, 351:13, 351:15, 351:17, 351:20, 351:23, 358:16, 358:18, 359:24, 360:1, 360:6, 360:11, 360:22, 360:23, 363:3, 364:11, 364:13, 366:6, 366:9, 366:20, 366:21, 367:3, 367:8, 367:16, 367:20, 368:6, 368:8, 368:9, 368:14, 368:20, 369:6, 370:15, 371:12, 371:19, 371:20, 371:23, 371:25, 373:7, 374:19, 375:20, 375:22, 375:23, 379:17, 379:19, 379:22, 379:23, 380:2, 380:4, 381:21, 382:2, 384:19, 384:20, 386:6, 386:8, 386:24, 387:3, 387:16, 388:1, 388:5, 388:7, 388:8, 388:11, 388:14, 388:19

**MS** [143] - 4:4, 4:12, 6:13, 6:16, 6:20, 8:23, 9:10, 10:4, 22:11, 22:14, 22:17, 22:23, 23:2, 23:22, 24:1, 26:18, 26:20, 27:4, 27:10, 27:13, 27:17, 28:12, 67:16, 67:25, 68:5, 69:20, 70:12, 71:25, 72:4, 72:7, 72:9, 72:11, 73:4, 73:6, 74:20, 74:23, 75:9, 75:13, 77:21, 77:22, 78:3, 78:7, 78:11, 78:13,

79:14, 80:6, 83:11, 83:20, 84:15, 85:20, 86:14, 86:15, 87:2, 87:6, 89:2, 89:4, 89:7, 90:4, 90:6, 90:23, 91:3, 91:7, 91:15, 91:16, 91:21, 91:23, 92:24, 95:7, 96:4, 97:13, 97:14, 99:12, 100:24, 104:16, 104:22, 106:14, 108:10, 109:11, 109:22, 109:23, 111:4, 111:7, 111:20, 113:13, 114:22, 115:1, 115:12, 115:20, 117:3, 118:10, 118:15, 119:8, 119:12, 119:15, 119:22, 120:1, 120:9, 120:13, 123:10, 129:6, 129:10, 133:3, 141:2, 143:15, 143:17, 147:2, 147:5, 147:9, 149:21, 149:24, 150:15, 153:10, 157:20, 166:22, 200:22, 227:19, 228:9, 232:23, 242:14, 242:17, 248:20, 273:15, 287:20, 287:22, 288:2, 288:3, 290:1, 290:6, 290:23, 291:4, 291:7, 296:2, 296:15, 296:17, 296:19, 297:16, 298:17, 303:6, 304:20, 351:12, 351:14, 379:16, 388:16

**multipage** [6] - 145:9, 145:13, 145:17, 145:23, 145:25, 146:5

**multiple** [30] - 28:3, 78:19, 78:20, 80:10, 81:3, 85:15, 98:1, 107:17, 112:1, 135:13, 152:18, 154:1, 154:2, 170:24, 184:19, 260:19, 272:6, 294:13, 294:14, 294:18, 295:6, 295:13, 300:7, 300:17, 303:2, 309:16, 309:20,

329:17, 379:14

**multitude** [2] - 99:21, 385:19

**municipal** [16] - 245:22, 246:4, 246:5, 252:8, 252:11, 272:6, 273:1, 342:13, 342:23, 343:19, 347:2, 352:17, 358:25, 361:12, 361:13, 374:8

**municipalities** [4] - 338:25, 342:13, 342:14, 347:3

**municipality** [5] - 170:24, 239:25, 245:21, 246:5, 338:20

**Murphy** [7] - 178:11, 179:5, 186:5, 204:11, 204:16, 204:21, 215:22

**musical** [1] - 121:18

**must** [9] - 22:9, 69:7, 131:7, 131:9, 152:23, 179:13, 198:24, 338:21, 344:4

**mystery** [1] - 233:3

**N**

**name** [37] - 61:14, 73:1, 73:2, 102:14, 155:2, 157:11, 165:18, 165:19, 165:20, 170:16, 192:10, 201:24, 202:8, 211:12, 240:19, 246:13, 251:3, 251:4, 251:25, 263:15, 263:22, 285:22, 285:23, 287:22, 305:2, 310:19, 310:20, 336:5, 336:6, 370:19, 373:18, 375:17, 375:18, 377:21, 377:22, 378:15

**named** [1] - 181:22

**names** [18] - 56:19, 58:7, 58:8, 61:13, 62:5, 62:7, 81:17, 81:18, 82:15, 110:23, 192:10, 350:1, 350:4, 350:5, 353:7, 354:16, 355:22

**Nancy** [2] - 3:13, 8:14

**narrative** [1] - 52:13

**narrowing** [1] - 29:8

**NATALE** [78] - 3:2, 4:4, 4:10, 4:11, 4:14, 8:5, 23:10, 25:13, 27:22, 79:13, 79:16, 79:19, 79:22, 83:14, 85:6, 85:11, 85:15, 90:10, 90:13, 90:17, 90:19, 98:24, 99:5, 120:16, 120:20, 123:6, 123:18, 123:19, 129:12, 130:2, 133:4, 133:9, 141:14, 141:16, 141:18, 141:21, 143:24, 144:1, 147:15, 148:9, 150:4, 150:19, 150:20, 153:12, 247:5, 251:9, 251:10, 251:24, 253:15, 262:11, 262:14, 262:21, 262:24, 263:1, 264:10, 264:13, 264:16, 265:4, 277:18, 280:1, 280:14, 281:13, 281:16, 282:3, 285:9, 312:13, 313:20, 313:23, 314:3, 314:4, 315:5, 315:9, 325:8, 325:11, 330:24, 332:5, 332:7, 334:4

**Natale** [5] - 8:6, 29:14, 68:13, 90:15, 156:17

**nation** [1] - 181:4

**National** [1] - 169:9

**national** [3] - 31:13, 297:8

**natural** [3] - 317:12, 326:15, 326:21

**naturally** [1] - 316:21

**nature** [14] - 35:7, 44:16, 55:3, 94:23, 112:8, 166:13, 214:8, 219:17, 220:13, 222:16, 224:12, 294:6, 294:7, 294:8

**near** [4] - 257:5, 270:14, 379:10

**nearly** [1] - 151:15

**necessarily** [11] - 57:12, 143:10, 185:15, 192:21, 195:5, 203:24,

235:11, 240:8, 297:5, 298:4, 317:6

**necessary** [29] - 11:11, 13:8, 17:14, 33:16, 70:13, 78:25, 81:16, 81:19, 81:21, 82:10, 137:11, 152:2, 163:15, 163:17, 164:23, 165:1, 171:12, 176:20, 185:6, 189:21, 190:1, 191:9, 195:2, 196:1, 196:20, 196:21, 217:2, 217:24, 326:17

**necessitated** [1] - 12:19

**neck** [1] - 66:4

**need** [74] - 19:7, 20:2, 20:4, 20:8, 23:13, 30:14, 38:11, 55:13, 67:23, 68:10, 69:4, 69:5, 71:10, 79:18, 83:3, 83:12, 90:25, 102:14, 105:12, 106:16, 106:23, 106:25, 112:5, 121:16, 122:2, 124:17, 145:24, 149:18, 150:23, 151:19, 154:15, 164:4, 192:24, 199:21, 212:20, 213:10, 217:4, 233:17, 260:12, 260:14, 262:5, 276:1, 284:8, 302:1, 302:4, 302:11, 303:22, 307:21, 308:21, 309:8, 317:20, 345:15, 354:11, 356:25, 357:3, 357:11, 358:2, 358:7, 360:15, 361:8, 361:10, 363:10, 363:14, 364:1, 364:5, 364:19, 365:3, 365:19, 366:25, 368:17, 368:19, 368:23, 379:5, 387:2

**needed** [14] - 69:18, 100:4, 122:17, 146:1, 146:7, 170:11, 174:16, 191:1, 196:19, 217:15, 238:11, 262:15, 342:18,

381:7

**needs** [17] - 19:25, 20:1, 20:9, 27:18, 63:13, 83:13, 85:16, 251:16, 283:20, 308:19, 308:23, 348:16, 348:17, 357:2, 357:5, 357:15, 357:21

**negligent** [1] - 250:11

**negotiations** [1] - 50:4

**Nelson** [6] - 8:25, 9:3, 9:4, 157:5, 157:6, 287:23

**NELSON** [17] - 2:5, 2:5, 4:5, 9:3, 156:2, 156:12, 156:14, 156:19, 157:2, 157:5, 157:7, 157:25, 158:4, 158:7, 158:10, 158:11, 159:4

**net** [3] - 178:15, 178:17, 178:18

**never** [18] - 58:11, 131:4, 139:5, 145:12, 145:13, 145:16, 211:25, 213:3, 216:24, 228:10, 261:15, 278:18, 295:10, 298:21, 299:13, 315:7, 333:23

**NEW** [5] - 1:1, 1:4, 1:4, 3:8, 3:11

**new** [42] - 18:4, 27:8, 34:22, 34:23, 37:16, 57:20, 70:21, 105:13, 107:12, 108:15, 108:20, 130:16, 155:4, 163:10, 163:11, 164:1, 171:4, 230:16, 255:5, 255:6, 257:24, 259:13, 261:15, 263:3, 275:25, 276:10, 279:14, 330:13, 330:21, 331:10, 340:13, 340:15, 340:18, 340:19, 340:21, 341:13, 342:15, 359:17, 359:20

**New** [198] - 1:14, 1:20, 2:3, 2:7, 2:11, 2:15, 2:18, 2:21, 2:24, 3:3, 3:6, 3:13, 7:9, 14:11, 27:24, 31:12, 31:21, 33:19, 33:25, 37:22,

38:16, 38:17, 38:20, 39:4, 39:7, 40:15, 41:16, 60:12, 61:23, 65:11, 74:17, 75:15, 76:7, 77:24, 80:9, 80:16, 81:11, 85:3, 86:1, 86:2, 86:4, 86:5, 86:6, 86:7, 94:20, 95:10, 96:1, 96:15, 96:18, 97:19, 97:20, 98:3, 98:9, 98:15, 98:17, 101:10, 101:20, 101:23, 102:9, 103:2, 103:21, 105:3, 105:4, 105:9, 106:3, 106:5, 106:6, 106:13, 106:22, 107:8, 107:13, 108:14, 108:16, 109:7, 110:1, 113:18, 117:7, 117:23, 118:11, 118:13, 125:1, 125:5, 125:10, 125:12, 125:20, 126:9, 126:12, 126:17, 126:19, 126:23, 126:24, 127:7, 127:24, 128:3, 128:7, 128:11, 128:13, 128:25, 129:3, 130:5, 130:9, 130:20, 135:16, 138:22, 139:7, 139:11, 139:14, 139:19, 139:24, 140:2, 140:6, 140:25, 141:10, 141:24, 142:24, 143:3, 143:14, 144:5, 144:15, 157:10, 163:10, 163:13, 163:18, 164:10, 164:12, 164:19, 166:5, 167:8, 167:15, 168:13, 168:18, 169:4, 175:10, 176:2, 177:12, 178:10, 180:5, 180:11, 181:2, 181:10, 184:21, 192:10, 203:18, 206:17, 206:25, 207:1, 212:5, 231:2, 234:14, 234:22, 236:24, 237:2, 237:18, 246:20, 248:22, 252:13,

252:21, 260:8, 286:18, 289:4, 292:5, 296:23, 297:3, 297:5, 297:7, 298:18, 298:25, 299:10, 299:14, 300:23, 301:17, 301:20, 301:23, 302:2, 302:24, 314:12, 322:4, 323:13, 338:17, 339:3, 339:4, 343:11, 345:13, 347:10, 348:19, 376:3, 376:13, 377:24, 380:11, 381:18, 383:11, 383:12, 387:22

**Newark** [2] - 2:15, 7:9

**next** [39] - 15:25, 61:13, 62:5, 69:21, 107:9, 154:8, 154:11, 156:24, 165:11, 188:8, 239:20, 241:2, 241:18, 242:6, 247:4, 254:7, 254:18, 258:5, 283:9, 283:17, 296:9, 306:4, 306:5, 306:15, 308:18, 319:20, 321:9, 352:11, 352:25, 363:11, 366:11, 367:2, 367:4, 371:8, 373:6, 375:5, 377:17, 378:7

**NGOs** [1] - 176:1

**nice** [1] - 37:18

**night** [1] - 305:15

**nine** [8] - 101:9, 178:8, 186:7, 210:19, 330:7, 384:1

**nip** [1] - 250:7

**NJ** [7] - 3:9, 3:13, 3:18, 3:21, 3:24, 126:19, 127:11

**Noah** [2] - 307:19, 375:19

**NOAH** [2] - 4:17, 375:15

**Nobody** [1] - 246:15

**nobody** [2] - 52:14, 281:14

**nobody's** [1] - 375:11

**noise** [4] - 34:4, 73:24, 164:20, 198:4

**nominees** [1] - 31:15

**non** [5] - 189:17, 190:10, 196:14,

222:7, 323:3

**non-county-line** [1] - 323:3

**non-speculative** [4] - 189:17, 190:10, 196:14, 222:7

**nonacademic** [2] - 314:14, 314:16

**none** [8] - 30:12, 41:22, 50:12, 50:13, 144:14, 325:5, 338:11, 382:16

**nonetheless** [2] - 203:12, 204:6

**nonpartisan** [1] - 352:17

**nonparty** [2] - 198:10, 200:11

**nonsense** [1] - 369:17

**nonspeculative** [1] - 243:2

**Noon** [1] - 377:25

**normal** [10] - 136:5, 136:17, 136:24, 149:6, 149:12, 153:2, 160:23, 161:2, 253:18, 261:5

**normally** [5] - 11:19, 149:2, 149:5, 149:13, 342:19

**northern** [1] - 320:22

**note** [12] - 24:9, 28:10, 30:1, 58:9, 89:16, 92:21, 95:17, 96:21, 97:3, 247:10, 283:10, 283:12

**noted** [8] - 89:25, 95:11, 95:13, 97:6, 116:8, 283:12, 285:14, 331:8

**nothing** [18] - 12:1, 20:15, 21:9, 28:19, 54:21, 54:23, 151:18, 164:5, 165:6, 201:1, 246:9, 256:13, 256:23, 257:2, 281:11, 326:10, 365:13

**notice** [4] - 15:24, 18:1, 18:5, 137:25

**noticed** [1] - 199:9

**notified** [1] - 308:13

**notion** [1] - 293:9

**notwithstanding** [3] - 88:6, 275:2, 278:11

**November** [25] - 46:24, 50:22, 56:9, 103:10, 166:7, 173:9, 186:4, 188:22, 188:23,

213:13, 213:16, 213:19, 215:13, 215:14, 217:18, 238:23, 242:12, 242:23, 268:12, 272:4, 376:6, 377:7, 377:12, 383:18, 384:7

**NUMBER** [1] - 1:4

**number** [61] - 6:8, 13:23, 64:24, 82:23, 88:21, 100:10, 100:11, 110:19, 110:25, 111:1, 116:18, 116:22, 116:23, 117:15, 144:23, 145:5, 145:6, 145:20, 152:19, 161:10, 161:13, 161:14, 161:16, 165:1, 173:4, 178:15, 178:16, 179:7, 179:25, 191:18, 193:13, 204:3, 210:9, 211:1, 211:2, 215:2, 216:3, 227:13, 227:14, 232:9, 235:9, 267:12, 273:23, 273:24, 274:3, 274:7, 274:8, 278:14, 290:24, 300:10, 303:24, 361:10, 361:19, 365:6, 365:16, 366:1, 372:1, 373:15

**Number** [2] - 89:4, 303:21

**numbers** [6] - 32:15, 82:1, 127:18, 273:23, 334:18, 357:6

**numerous** [2] - 146:2, 322:17

# O

**o'clock** [2] - 156:22, 308:24

**oath** [2] - 123:8, 123:15

**object** [15] - 71:4, 71:22, 89:22, 90:19, 92:18, 99:3, 99:5, 187:8, 187:16, 218:10, 231:25, 234:25, 296:8, 335:12

**objected** [1] - 78:10

**objecting** [3] - 70:24, 99:4, 168:17
**Objection** [1] - 79:13
**objection** [127] - 23:21, 23:25, 24:3, 26:4, 26:9, 28:10, 68:15, 70:17, 70:19, 74:25, 77:13, 78:3, 78:8, 78:9, 79:16, 80:4, 83:8, 83:14, 84:9, 85:6, 85:13, 85:17, 87:10, 87:13, 87:17, 88:13, 88:14, 88:22, 88:25, 89:23, 89:25, 90:10, 90:12, 90:18, 91:6, 91:7, 92:21, 94:22, 95:17, 96:22, 97:3, 97:6, 98:24, 107:23, 108:9, 114:17, 115:13, 115:19, 116:3, 116:4, 116:8, 118:1, 120:4, 129:6, 129:7, 129:14, 133:3, 141:2, 141:6, 143:15, 143:22, 143:25, 147:2, 147:19, 149:21, 150:14, 153:10, 157:20, 158:9, 162:16, 162:22, 163:24, 187:6, 187:7, 187:12, 187:19, 187:20, 202:17, 202:22, 208:16, 218:9, 218:11, 219:9, 219:17, 219:25, 221:15, 222:4, 230:8, 230:19, 231:18, 235:4, 236:11, 241:6, 241:18, 242:14, 251:19, 262:8, 265:4, 266:5, 277:18, 278:17, 279:8, 280:1, 283:10, 283:12, 296:2, 296:9, 297:16, 304:17, 304:18, 304:20, 313:13, 325:7, 332:4, 335:6, 335:11, 335:13, 344:20, 344:21, 359:24, 371:12, 374:19, 379:16, 381:21, 388:4
**objectionable** [1] - 241:20

**objections** [10] - 86:24, 157:24, 187:13, 235:22, 251:18, 279:24, 280:24, 281:1, 285:14, 374:22
**objective** [1] - 52:9
**obligations** [1] - 310:7
**obliterate** [1] - 66:17
**observe** [3] - 24:7, 30:7, 170:3
**observing** [1] - 30:24
**obtain** [1] - 339:11
**obvious** [1] - 118:2
**obviously** [8] - 67:10, 69:11, 118:15, 155:7, 164:15, 175:7, 188:4, 384:1
**occupation** [1] - 166:3
**occur** [4] - 46:18, 127:17, 127:19, 134:2
**occurred** [5] - 131:18, 142:17, 144:15, 197:18, 287:15
**Ocean** [3] - 93:12, 318:12, 318:15
**October** [6] - 215:7, 225:16, 225:17, 225:20, 376:5, 383:14
**odd** [1] - 120:22
**oddities** [1] - 184:3
**OF** [1] - 1:1
**off-of-the-grid** [1] - 297:20
**offensive** [2] - 17:5, 17:6
**offer** [11] - 26:23, 70:14, 80:19, 80:21, 81:13, 93:23, 94:2, 94:20, 95:10, 106:18, 323:13
**offered** [10] - 27:18, 86:9, 86:22, 89:6, 89:13, 91:12, 111:14, 113:10, 146:12, 147:11
**offering** [1] - 107:14
**offers** [2] - 93:22, 115:3
**Office** [2] - 286:19, 337:6
**office** [192] - 15:4, 16:8, 33:7, 33:10, 35:1, 38:15, 56:19, 61:13, 62:6, 82:23, 92:12, 92:19, 93:1, 93:5, 93:10, 93:14, 93:18, 94:7, 94:8,

94:9, 94:12, 94:20, 95:6, 95:10, 95:25, 96:7, 96:11, 97:17, 97:23, 98:16, 99:18, 100:1, 101:13, 101:15, 103:3, 103:5, 103:22, 103:24, 106:8, 107:14, 108:24, 112:9, 112:19, 115:25, 116:11, 117:6, 118:13, 128:12, 139:8, 139:24, 139:25, 140:6, 141:24, 143:7, 143:12, 153:20, 153:22, 154:19, 158:15, 164:24, 169:4, 176:19, 180:12, 181:7, 181:10, 181:20, 209:1, 213:11, 218:3, 225:3, 225:13, 229:10, 229:25, 230:4, 231:4, 231:15, 234:4, 246:4, 246:5, 266:3, 268:5, 269:10, 269:11, 269:18, 270:23, 271:8, 272:6, 272:12, 272:14, 272:20, 272:23, 277:17, 278:7, 278:12, 278:15, 279:1, 279:2, 279:6, 282:9, 282:14, 289:17, 291:8, 292:1, 292:15, 292:19, 292:22, 293:1, 293:6, 293:10, 293:13, 293:14, 293:18, 294:2, 294:6, 294:8, 294:14, 294:16, 294:17, 294:18, 294:20, 294:24, 295:8, 295:10, 295:11, 295:14, 295:24, 296:3, 296:4, 296:6, 296:21, 296:24, 297:12, 297:14, 297:17, 297:19, 297:21, 297:23, 297:25, 298:1, 298:9, 298:11, 298:14, 298:15, 298:19, 299:2, 299:23, 300:4,

300:14, 300:21, 301:13, 302:13, 302:24, 303:2, 317:3, 317:5, 319:5, 319:6, 336:23, 337:21, 338:3, 340:16, 340:18, 340:20, 340:23, 340:24, 341:2, 342:24, 348:16, 350:21, 351:25, 352:2, 352:5, 352:13, 354:11, 354:16, 354:17, 356:18, 357:8, 358:23, 360:24, 361:2, 361:21, 361:25, 371:13, 372:6, 373:10, 373:18, 374:12
**office-block** [113] - 35:1, 92:12, 92:19, 93:1, 93:5, 93:10, 93:14, 93:18, 94:7, 94:8, 94:9, 94:12, 94:20, 95:6, 95:10, 95:25, 96:7, 97:17, 97:23, 98:16, 99:18, 100:1, 101:15, 103:3, 103:5, 103:22, 103:24, 106:8, 107:14, 108:24, 112:9, 112:19, 115:25, 116:11, 117:6, 118:13, 153:20, 181:10, 225:3, 225:13, 229:10, 230:4, 231:15, 234:4, 266:3, 268:5, 269:11, 269:18, 270:23, 272:12, 272:14, 272:20, 272:23, 277:17, 278:7, 278:12, 278:15, 279:1, 289:17, 291:8, 292:1, 292:15, 292:19, 292:22, 293:1, 293:6, 293:10, 293:13, 293:14, 293:18, 294:2, 294:6, 294:8, 294:14, 294:16, 294:17, 294:20, 294:24, 295:11, 295:24, 296:3, 296:4, 296:6, 296:21, 296:24, 297:12, 297:14, 297:17, 297:21,

297:23, 297:25, 298:15, 298:19, 299:2, 299:23, 300:4, 300:14, 301:13, 302:13, 302:24, 350:21, 351:25, 352:2, 352:5, 352:13, 360:24, 361:2, 361:25, 372:6, 373:10, 374:12
**Office-Block** [1] - 286:19
**office-block-design** [2] - 229:25, 231:4
**office-block-like** [2] - 96:11, 101:13
**office-block-like-layout** [1] - 297:19
**office-block-style** [1] - 180:12
**office-blocks** [1] - 303:2
**officer** [1] - 18:13
**officers** [4] - 41:13, 121:20, 310:7, 388:22
**offices** [31] - 64:24, 82:23, 140:16, 142:25, 143:5, 157:8, 158:20, 158:23, 160:7, 170:18, 203:10, 246:20, 295:6, 298:12, 299:10, 324:24, 337:7, 337:12, 337:16, 337:19, 338:10, 340:19, 341:24, 343:21, 346:21, 353:3, 355:22, 358:20, 358:21, 359:9, 361:10
**official** [26] - 1:8, 1:11, 41:19, 78:21, 82:18, 100:12, 100:16, 103:9, 117:18, 134:25, 136:5, 136:11, 136:19, 136:21, 139:20, 162:11, 163:18, 190:11, 213:15, 213:17, 213:24, 243:1, 254:15, 342:14, 345:22, 347:16
**OFFICIAL** [1] - 390:1
**Official** [1] - 1:21
**officially** [2] - 186:5, 186:15

**officials** [18] - 41:13, 41:25, 46:8, 52:8, 74:10, 125:12, 125:13, 125:18, 127:12, 134:4, 134:18, 135:6, 143:3, 149:13, 157:13, 343:9, 345:14

**officials'** [1] - 92:8

**often** [4] - 175:11, 179:16, 183:24, 289:18

**oftentimes** [2] - 172:24, 172:25

**old** [1] - 252:16

**oldest** [1] - 379:9

**on-screen** [3] - 96:8, 97:25, 112:24

**once** [17] - 33:14, 66:21, 67:1, 121:18, 150:22, 205:15, 257:10, 260:5, 275:14, 336:13, 340:19, 353:13, 355:12, 356:8, 365:20, 383:14, 383:18

**one** [212] - 10:11, 11:6, 13:12, 14:4, 15:6, 19:10, 19:19, 21:12, 21:24, 23:11, 25:13, 27:23, 29:13, 30:21, 30:25, 33:18, 33:22, 37:11, 37:12, 41:17, 53:25, 54:22, 59:8, 59:18, 59:21, 61:15, 65:14, 67:1, 68:20, 69:5, 77:1, 77:17, 78:19, 79:5, 79:9, 81:2, 85:2, 86:12, 88:10, 91:21, 92:12, 92:14, 92:16, 92:25, 93:5, 93:9, 93:13, 93:16, 93:17, 96:1, 99:20, 100:10, 102:5, 102:7, 102:12, 102:17, 102:24, 108:7, 110:14, 111:24, 113:3, 113:7, 116:2, 119:3, 119:22, 121:3, 121:24, 125:14, 125:15, 126:20, 127:5, 127:9, 127:16, 127:19, 128:17, 133:6, 135:15, 137:10, 139:18, 145:7, 145:8,

153:25, 156:22, 156:23, 159:10, 159:12, 159:19, 171:4, 171:17, 176:22, 176:25, 178:21, 180:21, 183:13, 189:16, 189:19, 191:19, 191:21, 193:3, 194:8, 196:8, 198:11, 200:13, 200:19, 201:7, 204:8, 204:9, 206:23, 212:11, 219:21, 221:21, 223:3, 223:9, 223:10, 227:16, 227:20, 230:24, 232:25, 241:11, 243:17, 244:14, 246:11, 246:12, 247:13, 248:8, 252:8, 252:25, 253:11, 253:21, 254:3, 256:10, 258:1, 263:22, 265:7, 271:12, 275:7, 275:8, 276:20, 277:2, 280:2, 280:17, 280:19, 281:3, 281:5, 282:13, 282:21, 283:5, 283:20, 283:25, 284:8, 285:9, 285:11, 285:13, 286:23, 290:22, 293:8, 294:7, 294:11, 294:12, 294:20, 294:23, 295:5, 297:25, 299:8, 299:9, 299:12, 300:3, 306:16, 306:23, 309:25, 310:15, 311:23, 311:25, 313:21, 315:18, 318:1, 318:21, 324:14, 327:20, 328:2, 329:17, 329:20, 329:22, 330:8, 338:2, 339:10, 341:16, 342:14, 342:23, 345:2, 345:8, 350:8, 352:21, 354:24, 359:8, 362:18, 366:13, 366:18, 367:4, 367:13, 370:11, 374:10, 375:3, 380:16,

387:1, 388:6, 388:18

**One** [1] - 3:17

**one-by** [1] - 102:5

**one-by-four** [1] - 102:7

**one-by-six** [1] - 102:5

**one-sentence** [1] - 15:6

**ones** [10] - 46:10, 46:11, 49:17, 120:5, 191:21, 203:20, 206:19, 207:4, 279:24, 309:3

**ongoing** [2] - 133:22, 355:24

**onsie** [1] - 246:15

**Open** [2] - 201:21, 236:16

**open** [4] - 6:1, 108:17, 349:23, 364:5

**opening** [11] - 22:24, 23:1, 30:14, 31:3, 31:5, 39:11, 50:11, 53:10, 59:8, 66:11, 67:21

**operate** [1] - 363:5

**operates** [1] - 147:10

**operating** [2] - 100:19, 230:5

**operation** [4] - 174:13, 174:17, 174:18, 386:19

**operations** [6] - 174:25, 176:8, 176:15, 256:22, 257:1, 288:15

**operators** [1] - 31:20

**opine** [9] - 17:15, 150:10, 299:3, 299:18, 299:21, 301:10, 301:25, 302:10, 302:12

**opined** [2] - 14:14, 291:24

**opining** [2] - 291:18, 291:21

**opinion** [16] - 14:22, 15:12, 21:22, 105:21, 129:2, 129:4, 130:12, 132:25, 133:10, 146:12, 162:5, 164:13, 164:16, 173:17, 301:3, 352:6

**opinions** [2] - 163:15, 313:25

**opponent** [8] - 33:15, 172:2, 182:17, 186:18, 311:25, 321:21, 334:13,

334:20

**opponents** [4] - 171:18, 208:11, 239:16, 328:17

**opportunities** [1] - 226:21

**opportunity** [32] - 23:22, 47:16, 48:21, 59:1, 61:3, 63:15, 64:4, 64:7, 64:19, 65:1, 65:3, 65:22, 67:7, 70:2, 70:21, 86:8, 88:11, 113:14, 180:14, 206:8, 206:13, 207:13, 229:7, 237:13, 241:24, 368:3, 368:23, 369:11, 384:6

**oppose** [5] - 17:17, 48:23, 119:17, 266:2, 266:3

**opposed** [14] - 98:1, 112:14, 114:6, 145:3, 167:19, 208:20, 208:24, 212:23, 233:3, 247:20, 262:15, 318:15, 326:24, 326:25

**opposing** [3] - 18:20, 48:2, 105:23

**opposite** [2] - 16:17, 49:11

**opposition** [1] - 34:3

**opt** [1] - 349:5

**option** [2] - 30:5, 94:2

**options** [6] - 188:22, 215:16, 216:10, 254:1, 293:2, 384:9

**orchestrated** [2] - 52:4, 55:15

**order** [48] - 12:21, 12:24, 22:9, 23:14, 23:16, 34:21, 55:24, 115:22, 122:9, 143:11, 147:1, 149:19, 150:23, 154:21, 155:1, 155:9, 155:18, 160:10, 161:9, 193:15, 198:1, 198:8, 199:13, 217:16, 234:15, 246:6, 249:5, 250:10, 256:23, 274:11, 282:8, 285:4, 288:15, 288:20, 298:5, 335:7, 335:15,

335:20, 348:25, 350:9, 359:8, 361:9, 361:22, 363:15, 363:20, 364:20, 384:11

**ordered** [8] - 12:20, 20:23, 37:16, 37:17, 69:2, 285:12, 298:2, 298:4

**ordering** [2] - 119:18, 155:15

**orders** [6] - 152:21, 161:23, 259:9, 259:19, 273:18, 275:13

**ordinary** [1] - 178:25

**organization** [2] - 209:19, 371:2

**organizations** [8] - 170:1, 175:16, 175:17, 176:24, 183:14, 329:2, 329:5, 383:8

**organize** [4] - 7:6, 174:12, 206:17, 207:1

**original** [5] - 111:14, 111:22, 113:6, 148:12, 311:22

**originally** [1] - 111:22

**origins** [1] - 313:5

**others'** [1] - 199:5

**otherwise** [6] - 14:5, 20:7, 42:2, 58:18, 139:14, 304:18

**outcome** [6] - 32:14, 42:5, 192:14, 195:9, 331:13, 331:16

**outlier** [1] - 31:13

**outperform** [1] - 323:5

**outperformed** [1] - 318:14

**outreach** [2] - 176:17, 226:24

**outset** [2] - 169:2, 213:1

**outside** [7] - 9:15, 22:5, 62:22, 97:19, 126:12, 308:20, 335:16

**outsource** [1] - 140:16

**overall** [2] - 176:13, 233:15

**overflow** [3] - 24:5, 24:7, 30:7

**overheard** [1] - 250:12

**overlaid** [1] - 79:1

**overlap** [2] - 330:12, 330:14

**overlay** [1] - 82:15

**overrule** [7] - 118:8, 129:13, 141:6, 147:19, 158:6, 162:17, 262:22
**overruled** [13] - 84:13, 99:7, 99:10, 116:8, 157:21, 158:8, 222:4, 230:22, 232:2, 265:5, 279:10, 335:12, 374:23
**overruling** [2] - 95:1, 108:9
**overseas** [4] - 57:7, 343:13, 344:6, 346:15
**oversee** [2] - 337:5
**overseen** [4] - 138:24, 139:1, 139:3, 351:2
**overview** [1] - 127:6
**overwhelming** [1] - 106:8
**own** [19] - 56:1, 117:18, 117:19, 124:19, 128:14, 184:13, 186:15, 192:7, 195:6, 217:6, 217:8, 245:22, 252:4, 261:12, 276:18, 276:21, 328:16, 329:20, 329:22
**owned** [2] - 146:14, 146:16
**owner** [4] - 74:6, 114:23, 252:6, 263:20
**owning** [1] - 126:2

**P**

**P-1** [4] - 87:9, 87:19, 88:21, 89:4
**P-10** [8] - 267:13, 290:16, 290:17, 290:18, 290:19, 290:25, 291:1, 291:3
**P-11** [4] - 290:12, 290:13, 310:24, 311:9
**P-2** [4] - 271:17, 271:18, 271:19, 351:12
**P-3** [1] - 351:19
**P-8** [1] - 166:24
**P-9** [3] - 193:16, 193:17, 193:19
**P-A-S-S-A-N-T-E** [1] - 251:5
**P.C** [1] - 3:19

**p.m** [14] - 77:4, 119:17, 119:19, 121:5, 121:6, 156:22, 198:5, 201:20, 235:3, 236:15, 349:23, 364:4, 377:25, 389:7
**pace** [1] - 68:22
**packet** [2] - 270:25, 377:9
**page** [30] - 101:3, 102:1, 144:23, 145:7, 145:8, 207:1, 228:1, 270:7, 270:25, 271:1, 271:2, 271:3, 271:6, 299:8, 299:9, 299:12, 303:24, 304:25, 315:15, 315:16, 318:5, 318:6, 359:8, 377:10, 377:11, 377:20, 377:21, 377:22, 378:14, 378:15, 378:24, 379:6, 379:8, 380:10
**Page** [1] - 4:20
**PAGE** [1] - 4:2
**pages** [12] - 18:24, 18:25, 19:2, 119:10, 146:9, 243:23, 299:4, 303:25, 330:1, 359:8, 375:14
**paid** [3] - 281:17, 314:20, 382:14
**Pallone** [2] - 182:9, 209:11
**paper** [30] - 26:24, 37:8, 76:10, 76:11, 76:25, 79:3, 79:7, 95:5, 95:6, 103:15, 103:17, 112:13, 145:23, 145:24, 259:16, 291:14, 298:8, 303:25, 338:5, 340:6, 354:8, 359:12, 364:17, 364:18, 364:25, 365:1, 365:3, 365:18, 365:20
**papers** [10] - 11:12, 12:10, 24:19, 34:3, 66:21, 66:24, 66:25, 71:13, 228:7, 313:16
**paperwork** [1] - 213:18
**paragraph** [13] - 104:8, 104:11, 104:23, 104:25, 111:24, 112:4,

113:1, 114:13, 207:1, 291:8, 291:23, 372:3, 373:4
**paragraphs** [1] - 113:25
**parameters** [2] - 276:3, 276:14
**Paramus** [2] - 2:24, 2:24
**paraphrase** [2] - 220:5, 282:8
**Parikh** [9] - 7:16, 7:17, 26:16, 68:11, 68:12, 79:23, 118:19, 162:22, 369:8
**PARIKH** [153] - 2:13, 4:13, 4:15, 4:18, 7:15, 28:14, 28:21, 29:20, 29:24, 30:12, 68:13, 68:19, 69:10, 70:18, 71:6, 71:8, 75:2, 77:13, 78:4, 83:5, 84:9, 86:18, 87:25, 88:9, 88:18, 89:16, 89:20, 89:24, 92:18, 94:22, 95:12, 95:17, 96:20, 99:8, 104:13, 105:20, 106:2, 107:16, 107:25, 108:4, 114:11, 114:18, 115:8, 115:15, 116:4, 118:1, 118:22, 119:1, 119:9, 120:5, 121:2, 122:3, 122:6, 123:3, 162:13, 187:4, 187:7, 187:9, 187:13, 187:17, 193:12, 197:24, 198:3, 198:8, 198:11, 199:9, 227:7, 227:9, 233:14, 235:23, 243:16, 243:21, 244:2, 244:5, 247:10, 247:15, 247:25, 249:4, 249:10, 249:16, 249:23, 250:22, 251:19, 266:5, 270:8, 270:12, 278:17, 279:8, 283:8, 283:10, 284:11, 284:15, 284:17, 284:19, 285:2, 285:15, 291:1, 303:9, 303:12, 303:16, 303:18, 304:23,

304:24, 305:25, 307:1, 307:3, 307:7, 307:14, 307:17, 307:19, 307:23, 308:3, 309:5, 309:13, 309:19, 309:24, 310:3, 310:6, 310:14, 332:16, 332:18, 332:21, 332:25, 334:7, 335:1, 335:17, 345:2, 345:5, 351:17, 351:20, 366:20, 367:3, 367:8, 368:8, 368:20, 374:19, 375:20, 375:22, 375:23, 379:19, 379:23, 380:2, 380:4, 382:2, 384:19, 384:20, 386:6, 386:8, 386:24, 387:16, 388:1, 388:8, 388:19
**Parikh's** [2] - 78:9, 163:23
**parrots** [2] - 46:3, 46:19
**part** [47] - 10:15, 32:22, 32:23, 57:25, 61:5, 64:15, 65:6, 87:10, 87:12, 98:19, 100:7, 102:23, 122:14, 130:22, 136:23, 149:7, 152:24, 155:12, 161:17, 171:25, 176:20, 176:21, 179:1, 194:17, 205:11, 205:19, 209:23, 227:1, 237:18, 238:14, 238:22, 238:25, 252:24, 261:20, 292:3, 292:6, 294:4, 294:5, 298:9, 308:4, 333:25, 344:15, 348:21, 353:22, 361:3, 384:2, 388:9
**partial** [1] - 328:4
**participate** [8] - 56:5, 171:15, 172:4, 177:2, 185:2, 185:6, 238:19, 238:20
**participating** [1] - 177:9
**particular** [23] - 13:4, 20:19, 47:7, 48:12, 50:3, 51:9, 70:7, 71:4, 73:11, 95:18,

108:9, 144:5, 153:22, 154:19, 163:11, 191:2, 191:6, 195:18, 209:7, 209:10, 300:21, 317:15, 331:13
**particularly** [4] - 40:3, 116:12, 153:5, 278:10
**parties** [37] - 7:16, 10:21, 20:16, 21:21, 46:5, 58:16, 59:22, 60:10, 60:24, 61:21, 63:17, 65:4, 65:12, 66:16, 67:10, 87:20, 117:9, 122:3, 156:10, 202:13, 202:14, 202:20, 203:13, 208:12, 214:25, 310:4, 310:10, 310:11, 323:23, 323:24, 324:8, 324:12, 347:12, 347:16, 347:17, 375:13, 389:1
**Parties** [1] - 1:12
**parties'** [2] - 60:20, 63:17
**partisan** [2] - 246:5, 272:5
**partisans** [1] - 41:14
**partners** [1] - 127:10
**parts** [2] - 320:17, 329:24
**Party** [1] - 169:9
**party** [41] - 14:19, 16:13, 20:9, 31:14, 41:24, 41:25, 60:15, 65:10, 65:11, 65:17, 65:18, 67:12, 78:22, 115:17, 136:4, 140:16, 155:5, 155:6, 155:22, 169:16, 177:5, 177:18, 186:9, 199:14, 203:8, 208:12, 231:9, 231:10, 231:23, 232:6, 232:12, 232:17, 234:7, 236:5, 251:15, 293:3, 293:4, 298:5, 307:17, 325:2, 325:4
**Pascrell** [4] - 321:13, 321:20, 321:24, 322:3
**Pasek** [8] - 31:17, 194:1, 194:7, 205:8,

205:25, 206:16, 206:25, 226:9
**Pasek's** [5] - 35:17, 194:2, 194:22, 194:23, 195:14
**pass** [1] - 344:23
**Passaic** [17] - 2:16, 7:11, 190:12, 207:20, 214:6, 222:14, 241:23, 242:1, 242:5, 321:13, 321:21, 321:25, 322:4, 322:8, 324:4, 324:13, 324:14
**PASSANTE** [2] - 4:9, 251:1
**Passante** [36] - 113:10, 113:16, 113:20, 114:23, 115:1, 115:3, 115:21, 117:11, 146:20, 147:6, 147:7, 147:9, 150:21, 150:22, 152:6, 153:7, 159:10, 247:6, 250:20, 251:5, 251:6, 251:11, 251:25, 252:2, 252:3, 264:1, 264:22, 267:16, 268:15, 270:19, 271:24, 277:25, 280:4, 281:17, 282:5, 283:14
**Passante's** [9] - 114:8, 140:15, 146:12, 148:14, 149:19, 149:25, 150:6, 150:9, 151:1
**passed** [1] - 339:18
**passport** [1] - 337:6
**past** [20] - 48:23, 57:17, 57:19, 57:21, 82:19, 131:1, 190:21, 190:23, 191:5, 191:21, 195:5, 210:15, 277:15, 278:5, 279:16, 279:17, 279:20, 322:7, 335:23, 353:5
**Paterson** [1] - 322:3
**pathways** [1] - 387:19
**Patrick's** [1] - 15:2
**pattern** [7] - 317:16, 317:17, 317:21, 321:5, 322:11, 322:18, 351:3

**Paula** [2] - 3:18, 7:20
**pause** [12] - 72:6, 86:13, 91:22, 94:16, 193:4, 243:20, 248:13, 267:20, 284:10, 285:19, 351:11, 375:7
**pay** [1] - 314:25
**paying** [1] - 305:16
**PC** [1] - 3:5
**PDF** [2] - 79:6
**PDFs** [1] - 276:6
**pending** [1] - 221:8
**Pennsylvania** [5] - 97:21, 101:20, 101:23, 106:13, 201:17
**people** [32] - 32:9, 40:16, 50:24, 52:11, 57:19, 61:22, 66:2, 169:21, 170:1, 173:20, 173:21, 175:14, 175:21, 184:14, 187:14, 189:2, 203:2, 203:7, 209:11, 209:17, 225:10, 228:20, 234:19, 236:12, 240:4, 245:22, 245:24, 260:24, 316:2, 316:5, 343:12, 344:1, 347:16, 358:2, 372:13, 383:22, 388:23
**per** [7] - 69:9, 69:11, 157:13, 226:21, 265:17, 325:15, 347:13
**percent** [14] - 177:15, 178:9, 178:12, 229:16, 248:3, 256:25, 257:1, 257:6, 261:4, 279:15, 279:18, 283:5, 312:6, 334:16
**percentage** [1] - 256:22
**perceptions** [2] - 172:8
**Perez** [2] - 86:9, 89:6
**Perez's** [2] - 89:11, 90:7
**perfectly** [1] - 49:4
**perform** [3] - 81:5, 125:8, 317:4
**performance** [6] - 312:2, 316:18, 316:24, 319:11, 320:25, 328:20

**performed** [3] - 126:11, 320:21, 325:21
**performing** [2] - 116:24, 137:22
**performs** [4] - 114:9, 151:8, 152:15, 152:17
**perhaps** [3] - 198:13, 298:2, 361:3
**period** [6] - 17:13, 90:23, 339:9, 341:16, 353:12, 357:20
**permanently** [1] - 283:6
**permission** [2] - 59:14, 251:13
**permit** [4] - 43:4, 43:20, 110:5, 230:13
**permits** [1] - 61:19
**permitted** [7] - 47:5, 61:5, 63:22, 64:2, 65:10, 145:7, 205:3
**pernicious** [1] - 39:2
**person** [4] - 61:11, 154:10, 229:10, 253:1
**person's** [1] - 114:13
**personal** [7] - 1:3, 20:5, 151:16, 171:2, 171:14, 186:15, 275:10
**personally** [8] - 33:13, 181:13, 185:5, 217:18, 266:13, 266:17, 298:21, 372:4
**persons** [1] - 175:15
**perspective** [5] - 99:17, 142:7, 153:3, 259:5, 263:20
**pertains** [6] - 130:25, 131:2, 137:7, 138:10, 145:22, 348:12
**pertinent** [1] - 47:3
**petition** [2] - 349:9, 386:14
**petitions** [6] - 43:5, 43:20, 337:16, 343:18, 353:12, 386:14
**Ph** [1] - 25:15
**Ph.D** [2] - 313:2, 313:5
**phase** [1] - 45:3
**phone** [5] - 60:2, 121:17, 121:19, 127:17, 304:16
**phones** [2] - 121:12,

121:23
**phrase** [2] - 220:1, 221:24
**phrased** [1] - 285:11
**phrases** [1] - 84:11
**physically** [5] - 292:4, 297:1, 300:24, 301:16, 301:19
**pick** [3] - 68:1, 155:1, 268:23
**picked** [1] - 31:15
**piece** [6] - 76:10, 76:11, 76:25, 81:2, 113:7, 119:23
**pieces** [1] - 381:7
**ping** [1] - 28:17
**ping-pong** [1] - 28:17
**Pinkin** [2] - 3:13, 8:15
**pivot** [4] - 206:19, 207:3, 207:7
**place** [28] - 15:16, 19:23, 23:14, 52:17, 64:12, 77:24, 80:8, 80:15, 83:12, 83:17, 109:25, 131:8, 132:9, 132:22, 133:12, 133:14, 142:21, 142:24, 147:17, 148:17, 149:15, 232:19, 349:22, 354:22, 355:13, 356:13, 358:2
**placed** [10] - 43:6, 43:22, 99:25, 110:8, 134:3, 347:25, 350:1, 350:2, 350:4, 353:4
**placek** [1] - 9:23
**PLACEK** [3] - 2:23, 9:22, 9:23
**places** [1] - 384:3
**placing** [1] - 82:9
**plague** [1] - 335:5
**Plaintiff** [1] - 166:21
**plaintiff** [12] - 6:12, 11:23, 56:4, 56:5, 63:24, 63:25, 75:4, 166:23, 289:24, 334:8, 366:17
**plaintiff's** [2] - 26:16, 361:19
**Plaintiff's** [7] - 4:21, 4:22, 17:20, 100:23, 104:20, 193:19, 290:14
**plaintiffs** [50] - 6:14, 6:18, 6:23, 7:3, 12:4, 18:17, 20:20, 21:12, 22:9, 25:6, 28:15,

29:1, 29:7, 31:11, 34:15, 36:2, 43:24, 44:12, 45:24, 48:18, 54:21, 55:13, 61:25, 62:5, 68:21, 69:6, 87:1, 96:24, 109:24, 110:6, 110:9, 122:7, 133:11, 159:11, 162:6, 166:17, 197:25, 228:8, 244:17, 245:2, 245:8, 245:11, 250:2, 266:2, 289:5, 289:9, 307:1, 309:15, 310:15, 387:23
**Plaintiffs** [5] - 1:5, 1:20, 2:4, 165:11, 344:9
**Plaintiffs'** [28] - 4:20, 4:21, 4:23, 4:23, 4:24, 4:24, 4:25, 5:4, 87:3, 89:3, 91:18, 91:20, 100:21, 102:19, 103:19, 104:16, 111:10, 111:15, 111:16, 111:18, 111:19, 111:21, 112:11, 113:9, 113:12, 120:2, 166:24, 351:18
**plaintiffs'** [40] - 10:17, 11:6, 11:18, 13:10, 18:16, 24:12, 25:14, 31:4, 42:4, 44:12, 44:15, 46:1, 46:21, 50:20, 51:22, 61:5, 67:4, 120:10, 121:3, 125:1, 159:13, 198:12, 228:4, 232:21, 233:9, 243:24, 247:13, 247:18, 266:8, 288:24, 289:7, 304:4, 307:12, 333:8, 335:3, 335:6, 351:6, 351:24, 360:19, 387:1
**plan** [2] - 25:18, 243:9
**planning** [3] - 34:9, 167:23, 224:15
**Platkin's** [1] - 19:14
**plausible** [1] - 151:12
**play** [6] - 132:19, 158:16, 158:18, 321:6, 362:16, 362:23
**players** [1] - 41:18
**playing** [1] - 370:3

**plays** [3] - 157:17, 157:18, 158:13
**plenty** [2] - 15:4, 25:21
**plug** [1] - 362:23
**plugged** [1] - 72:13
**plus** [2] - 144:9, 310:10
**podium** [3] - 59:12, 62:19, 211:9
**point** [54] - 11:16, 17:5, 21:18, 35:20, 38:20, 39:18, 44:24, 46:6, 49:6, 50:14, 51:13, 51:25, 57:18, 170:6, 173:19, 176:9, 185:16, 185:22, 185:25, 186:16, 187:1, 188:20, 189:7, 189:12, 196:14, 206:19, 207:3, 207:7, 211:18, 215:11, 222:18, 225:7, 236:4, 236:23, 242:10, 242:21, 243:5, 245:13, 247:14, 256:9, 260:4, 261:2, 294:15, 299:25, 300:5, 306:20, 316:4, 318:5, 352:24, 353:13, 366:4, 371:19, 376:6, 385:21
**points** [1] - 16:13
**policies** [4] - 73:14, 74:9, 127:7, 131:17
**policy** [6] - 166:16, 171:2, 183:17, 183:22, 240:5, 314:11
**policy-wise** [1] - 183:22
**political** [38] - 22:4, 22:6, 31:20, 41:23, 42:11, 59:22, 60:10, 60:15, 63:17, 65:4, 65:10, 65:11, 65:12, 65:18, 65:23, 65:24, 66:15, 155:22, 156:10, 169:21, 175:18, 186:1, 186:9, 202:12, 202:14, 202:20, 203:8, 203:13, 203:17, 208:12, 209:6, 314:14, 323:23, 323:24, 324:7, 347:17, 383:8
**politicians** [2] - 31:21,

41:25
**politics** [1] - 314:13
**poll** [8] - 179:11, 337:25, 338:5, 338:6, 340:6, 340:7, 342:11, 358:24
**polling** [10] - 57:6, 179:17, 338:5, 339:7, 339:12, 340:1, 340:25, 356:24, 357:4, 365:9
**polls** [6] - 178:22, 178:24, 179:4, 179:7, 179:9, 359:14
**pollsters** [1] - 178:24
**polsters** [1] - 178:22
**pong** [1] - 28:17
**popping** [1] - 59:20
**portion** [4] - 149:8, 281:23, 298:7, 321:20
**portrait** [5] - 84:8, 84:19, 85:1, 255:12, 257:25
**pose** [1] - 46:13
**posed** [1] - 36:13
**position** [57] - 12:12, 13:7, 13:17, 13:23, 14:1, 14:2, 14:4, 15:16, 15:22, 16:16, 16:17, 16:22, 16:24, 17:3, 17:19, 18:9, 18:16, 18:21, 36:8, 36:10, 36:15, 38:12, 52:8, 55:23, 60:23, 61:4, 63:3, 64:20, 65:19, 66:8, 73:15, 114:25, 118:3, 134:13, 134:19, 153:21, 154:21, 167:18, 206:9, 206:13, 206:19, 207:3, 207:14, 207:25, 223:20, 230:12, 235:12, 240:5, 249:3, 249:4, 266:7, 336:17, 336:20, 347:8
**positioning** [1] - 385:24
**positions** [3] - 63:2, 183:17, 266:13
**positive** [3] - 224:6, 317:18, 334:18
**possession** [1] - 152:7
**possibility** [5] - 206:15, 333:14, 364:17, 374:3, 374:7
**possible** [23] - 28:4,

83:21, 103:6, 132:15, 145:5, 173:7, 246:1, 253:24, 254:12, 293:7, 299:3, 299:11, 300:10, 305:21, 312:22, 316:8, 317:9, 326:7, 328:18, 329:4, 329:8, 335:22, 382:20
**possibly** [1] - 254:2
**post** [1] - 161:20
**posture** [2] - 45:22, 54:22
**postures** [1] - 45:9
**potential** [9] - 169:6, 169:23, 184:1, 187:20, 201:8, 215:16, 215:24, 223:8, 352:10
**potentially** [15] - 57:24, 83:19, 180:25, 217:4, 229:7, 245:7, 250:17, 316:25, 317:6, 317:23, 325:6, 347:2, 347:24, 355:8, 364:25
**practically** [2] - 34:17, 69:4
**practice** [2] - 20:22, 127:21
**practiced** [1] - 11:25
**practices** [5] - 39:2, 51:9, 128:16, 167:16, 185:17
**precinct** [2] - 76:9, 82:24
**precincting** [1] - 81:19
**precincts** [2] - 78:24, 82:1
**predominantly** [1] - 179:20
**preface** [1] - 329:12
**prefer** [2] - 282:25, 312:16
**preference** [2] - 24:14, 282:14
**preferences** [2] - 60:20, 275:11
**prejudice** [3] - 249:14, 249:16, 370:10
**prejudices** [1] - 15:7
**prejudicial** [2] - 25:25, 309:15
**PRELIMINARY** [1] - 1:6
**preliminary** [24] - 6:9,

11:19, 12:9, 13:2, 34:13, 35:13, 36:3, 38:15, 45:2, 47:14, 47:15, 49:4, 49:16, 49:19, 53:13, 83:2, 88:17, 90:1, 189:21, 190:18, 191:10, 217:17, 360:7, 370:12
**premature** [5] - 11:15, 11:17, 12:7, 12:14, 12:22
**premise** [1] - 47:20
**preparation** [6] - 311:18, 337:14, 340:17, 342:8, 348:3, 348:8
**prepare** [8] - 36:23, 212:22, 253:19, 273:5, 302:1, 302:11, 309:16, 347:21
**prepared** [16] - 24:23, 31:22, 31:23, 37:14, 137:14, 255:14, 261:9, 286:17, 347:7, 355:17, 357:16, 357:17, 357:21, 367:13, 388:16
**prepares** [1] - 273:25
**preparing** [7] - 125:25, 137:16, 273:22, 305:10, 355:19, 357:8, 357:10
**prepping** [3] - 253:17, 345:22, 355:11
**preprinting** [1] - 113:24
**present** [18] - 11:1, 11:5, 21:14, 23:1, 23:12, 32:8, 33:2, 39:14, 54:21, 59:2, 62:25, 70:9, 96:6, 97:21, 101:14, 177:21, 196:1, 388:12
**presentation** [12] - 79:3, 94:20, 95:10, 96:7, 103:3, 103:6, 103:22, 107:15, 116:1, 117:6, 118:13, 387:17
**presentations** [2] - 112:19, 314:16
**presented** [22] - 21:19, 23:17, 23:18, 31:24, 32:2, 33:2, 34:1, 38:18, 57:3,

63:16, 65:8, 92:12, 93:1, 93:5, 93:9, 93:14, 93:17, 180:22, 195:17, 227:17, 269:10, 270:22
**presenting** [6] - 19:23, 24:16, 27:4, 27:8, 50:21, 97:24
**presently** [4] - 43:16, 252:12, 257:7, 257:22
**presents** [4] - 96:6, 96:10, 183:6, 255:5
**preserved** [1] - 24:25
**president** [10] - 81:18, 153:22, 240:13, 240:16, 240:23, 240:24, 242:9, 245:17, 245:19, 346:22
**presidential** [11] - 40:3, 56:15, 56:16, 63:7, 82:20, 258:15, 258:19, 350:13, 350:22, 365:14
**press** [1] - 212:5
**pressures** [1] - 238:23
**presume** [11] - 11:10, 13:6, 14:1, 17:20, 18:20, 21:15, 22:10, 22:25, 159:6, 235:20, 236:10
**pretty** [8] - 164:18, 175:8, 236:10, 261:11, 310:9, 366:15, 369:7, 384:21
**prevail** [1] - 33:20
**prevent** [3] - 185:7, 200:9, 215:5
**preventing** [3] - 61:16, 173:10
**previous** [4] - 82:19, 112:7, 161:1, 344:15
**previously** [18] - 27:6, 27:9, 78:17, 81:7, 85:4, 87:5, 87:6, 87:20, 88:3, 91:19, 102:18, 116:21, 136:13, 160:12, 166:20, 218:2, 257:20, 344:8
**price** [1] - 13:15
**primacy** [1] - 44:6, 61:3, 61:7, 63:10, 172:18, 172:19, 207:14, 239:8, 244:15, 244:17, 244:19

**primarily** [2] - 166:16, 189:3

**primary** [81] - 31:12, 31:15, 32:3, 33:20, 34:2, 50:6, 63:24, 64:5, 82:19, 82:20, 83:25, 105:17, 109:7, 117:5, 117:7, 117:24, 118:12, 168:13, 168:17, 175:22, 179:24, 180:5, 206:17, 207:2, 218:5, 218:11, 218:15, 218:16, 218:20, 219:3, 219:8, 220:16, 221:7, 221:11, 222:2, 234:3, 238:3, 266:25, 267:2, 273:5, 281:25, 289:21, 298:3, 318:4, 319:7, 319:23, 320:3, 321:11, 343:10, 343:16, 344:12, 345:11, 345:22, 346:9, 346:20, 348:9, 348:12, 349:16, 349:17, 350:13, 350:22, 350:23, 351:4, 352:14, 352:17, 355:20, 358:6, 359:15, 361:7, 362:6, 365:7, 365:14, 370:16, 373:21, 374:4, 374:9, 374:25, 376:18, 386:10

**primary's** [1] - 218:8

**principal** [2] - 104:5, 104:18

**principles** [1] - 55:7

**print** [25] - 146:7, 146:8, 151:10, 252:12, 252:25, 253:7, 255:1, 258:7, 259:15, 260:16, 261:17, 267:3, 267:6, 269:16, 270:4, 271:4, 271:24, 272:14, 272:16, 272:18, 276:7, 353:1, 355:2, 364:5, 375:1

**printed** [9] - 79:7, 124:9, 126:25, 146:10, 267:16, 270:19, 271:6,

272:2, 274:4

**printer** [13] - 37:4, 37:13, 353:2, 353:11, 354:15, 354:22, 359:5, 359:6, 359:23, 360:2, 360:14, 374:2, 374:7

**Printing** [5] - 114:23, 252:2, 252:4, 252:6, 252:14

**printing** [45] - 40:11, 113:21, 114:4, 114:5, 114:6, 115:2, 136:18, 136:20, 146:11, 146:15, 146:18, 147:1, 147:6, 147:8, 147:10, 147:14, 147:16, 147:17, 147:21, 147:24, 147:25, 148:2, 148:8, 148:14, 150:2, 151:6, 151:8, 151:13, 165:2, 252:7, 252:9, 252:10, 252:11, 253:3, 257:18, 263:9, 263:18, 263:20, 263:21, 279:6, 344:3, 355:13, 362:20, 373:25

**prints** [4] - 76:25, 274:1, 278:24, 354:22

**priority** [1] - 213:5

**private** [2] - 125:1, 126:9

**privilege** [6] - 188:13, 243:23, 244:4, 303:22, 304:4, 308:9

**problem** [4] - 77:7, 141:19, 261:13, 327:9

**problems** [3] - 182:2, 209:13, 359:13

**Procedure** [1] - 17:14

**proceed** [16] - 10:22, 31:7, 69:16, 123:17, 165:23, 187:19, 188:18, 194:23, 195:21, 201:22, 244:12, 250:25, 288:1, 296:13, 306:15, 378:20

**proceeding** [6] - 15:18, 16:12, 17:1, 29:8, 49:3, 241:20

**proceedings** [4] -

44:14, 97:4, 312:8, 390:5

**Proceedings** [1] - 1:23

**PROCEEDINGS** [1] - 6:1

**proceeds** [1] - 58:20

**process** [63] - 43:25, 56:6, 58:6, 77:11, 78:14, 81:7, 81:10, 81:15, 82:4, 93:22, 94:1, 115:23, 117:12, 127:25, 128:4, 128:7, 128:21, 129:5, 130:6, 130:20, 135:23, 136:17, 136:20, 148:1, 149:6, 149:12, 150:1, 150:2, 151:9, 151:24, 151:25, 152:24, 160:1, 161:8, 161:12, 163:21, 188:3, 209:23, 217:1, 253:17, 255:8, 258:25, 259:4, 259:9, 260:9, 261:2, 318:23, 319:2, 337:11, 337:13, 339:22, 340:6, 354:13, 354:19, 355:15, 355:19, 355:24, 356:15, 358:7, 363:19, 366:4, 384:5, 386:10

**processes** [7] - 41:14, 127:7, 131:17, 132:22, 135:21, 148:6, 150:24

**processing** [1] - 355:12

**produce** [1] - 260:12

**produced** [5] - 1:24, 145:13, 243:24, 250:15, 378:25

**producing** [1] - 145:17

**product** [4] - 126:20, 126:24, 127:5, 270:7

**products** [1] - 126:20

**professional** [1] - 75:5

**professionalism** [1] - 30:19

**Professor** [2] - 198:1, 198:11

**program** [11] - 73:18, 100:4, 131:6, 131:21, 182:23, 276:8, 276:18,

277:4, 302:5, 303:1, 340:20

**programmed** [6] - 135:2, 152:11, 302:16, 354:2, 355:7, 359:2

**programming** [16] - 116:24, 117:15, 133:24, 135:6, 135:8, 136:3, 136:14, 140:12, 149:6, 151:10, 151:13, 160:1, 161:24, 288:16, 300:20, 300:22

**programs** [2] - 117:17, 276:18

**prohibit** [1] - 48:24

**project** [1] - 9:16

**prolific** [1] - 329:13

**promise** [2] - 30:21, 268:22

**prompt** [1] - 167:25

**prompted** [2] - 168:1, 174:9

**pronounced** [3] - 172:22, 183:19, 195:19

**proof** [2] - 134:4, 189:23

**proofing** [21] - 100:12, 134:5, 135:1, 135:7, 135:25, 136:17, 136:22, 139:15, 139:17, 139:22, 141:24, 142:4, 142:18, 142:20, 143:6, 144:11, 145:20, 148:4, 158:24, 259:4, 354:13

**proofreading** [2] - 354:13, 354:18

**proofs** [1] - 37:13

**proper** [1] - 15:11

**properly** [7] - 136:12, 261:9, 261:13, 264:6, 355:7, 356:9, 356:14

**property** [2] - 337:2, 337:4

**proposal** [5] - 68:25, 69:2, 307:5, 388:9, 389:3

**propose** [4] - 38:4, 141:1, 141:11, 387:17

**proposed** [6] - 29:7, 91:10, 122:6, 141:5, 315:22, 369:17

**proposing** [2] - 38:2, 155:20

**proprietary** [5] - 137:3, 137:17, 137:20, 138:3, 362:7

**proprietor** [1] - 74:7

**prospect** [1] - 229:23

**prospects** [2] - 172:20, 184:13

**protected** [1] - 365:24

**protocol** [5] - 25:3, 133:1, 133:12, 134:10, 150:24

**protocols** [15] - 130:24, 131:3, 132:16, 133:14, 133:16, 135:18, 143:6, 146:22, 146:25, 147:16, 148:7, 148:13, 148:16, 165:2

**proud** [1] - 253:1

**prove** [4] - 44:6, 58:21, 217:16, 326:5

**provide** [12] - 25:2, 69:2, 70:25, 96:15, 115:24, 192:25, 217:25, 233:17, 316:3, 316:6, 316:8, 387:18

**provided** [7] - 143:2, 226:14, 247:11, 364:16, 369:10, 369:16, 369:25

**provider** [3] - 78:22, 136:4, 302:9

**providers** [1] - 75:17

**provides** [12] - 43:3, 43:9, 43:10, 43:12, 65:2, 113:21, 113:23, 149:14, 301:23, 348:19, 349:4, 349:11

**providing** [4] - 40:24, 70:19, 193:8, 301:3

**provision** [1] - 98:16

**provisional** [3] - 339:16, 357:10, 357:12

**pseudo** [1] - 71:14

**public** [12] - 30:24, 41:12, 46:7, 52:8, 124:25, 126:9, 167:15, 168:7, 179:8, 349:23, 357:6, 364:5

**publically** [1] - 223:22

**publications** [1] - 179:16

**publicly** [11] - 167:19,

185:17, 211:19,
223:19, 223:25,
224:2, 224:5,
323:22, 324:7,
328:10, 345:16
**publish** [1] - 86:19
**published** [6] -
142:18, 142:19,
314:6, 314:9, 314:11
**publishing** [1] - 87:14
**Pugach** [1] - 6:22
**PUGACH** [49] - 1:18,
4:14, 4:15, 6:21,
28:19, 67:5, 67:11,
67:14, 193:15,
193:18, 198:16,
198:18, 198:23,
199:16, 200:1,
201:16, 232:24,
243:25, 248:3,
248:6, 248:17,
267:13, 271:17,
271:19, 290:4,
290:8, 290:12,
290:15, 290:18,
306:5, 306:11,
306:18, 306:22,
308:14, 310:23,
311:6, 313:13,
325:7, 332:4,
332:20, 334:9,
334:10, 334:22,
335:8, 335:13,
344:21, 367:16,
367:20, 387:3
**pull** [1] - 270:9
**pulled** [1] - 345:13
**pumpkin** [1] - 306:14
**Purcell** [7] - 46:15,
47:2, 52:1, 53:11,
58:10, 58:11, 387:21
**purchase** [4] - 340:11,
340:12, 341:3, 341:5
**purchased** [3] -
340:15, 340:19,
342:3
**purchasing** [1] -
341:12
**pure** [1] - 297:21
**purport** [2] - 50:21,
92:6
**purported** [2] - 29:15,
90:20
**purports** [1] - 47:19
**purpose** [9] - 43:4,
43:19, 113:18,
225:1, 225:2,
231:12, 234:8,
300:25, 301:2
**purposeful** [1] - 384:2

**purposes** [9] - 43:2,
49:15, 71:15, 87:22,
88:20, 107:14,
113:17, 193:13,
250:3
**pursuant** [1] - 344:5
**pursue** [12] - 175:15,
180:14, 212:14,
212:20, 215:8,
215:12, 215:13,
216:11, 216:13,
220:15, 237:19,
381:18
**pursued** [1] - 237:4
**pursuing** [10] -
171:10, 177:23,
180:12, 212:9,
212:16, 213:8,
214:10, 214:21,
217:5, 378:20
**pursuit** [1] - 173:23
**purview** [3] - 53:5,
53:6, 53:7
**push** [3] - 95:16,
111:6, 196:16
**put** [40] - 12:6, 21:1,
23:22, 32:12, 35:18,
38:22, 40:20, 42:3,
42:5, 52:7, 62:5,
65:15, 67:17, 68:21,
69:18, 71:11, 82:3,
82:22, 83:13, 104:8,
104:10, 109:9,
116:3, 160:6,
172:20, 201:23,
224:14, 239:23,
241:25, 242:8,
246:13, 267:18,
281:8, 294:14,
310:15, 311:2,
361:15, 368:21,
369:21, 383:25
**putting** [5] - 36:7,
56:19, 66:2, 103:18,
257:17
**PX** [2] - 193:13,
351:17
**pyramid** [1] - 255:22

## Q

**qualification** [2] -
25:10, 372:9
**qualifications** [5] -
25:9, 29:16, 71:3,
124:16, 313:15
**qualified** [2] - 24:21,
141:4
**qualifying** [2] - 74:19,
74:20

**quality** [29] - 130:24,
131:3, 131:7,
131:10, 131:13,
131:15, 132:6,
132:8, 132:11,
132:13, 132:16,
132:22, 133:1,
133:12, 133:15,
134:1, 135:13,
135:18, 135:21,
136:10, 136:20,
146:23, 148:3, 148:4
**quarters** [1] - 79:20
**questioned** [1] -
297:23
**questioning** [10] -
144:2, 147:18,
188:9, 235:7,
235:14, 235:19,
249:19, 264:9,
287:8, 308:10
**questions** [48] - 39:11,
39:13, 53:10, 58:4,
123:21, 124:2,
156:12, 156:17,
156:25, 157:22,
158:2, 159:14,
162:18, 164:17,
197:12, 197:14,
220:8, 221:18,
235:16, 236:9,
239:4, 241:10,
243:18, 264:16,
280:15, 281:12,
281:13, 281:14,
282:3, 286:3, 303:6,
303:10, 305:25,
313:1, 313:17,
327:2, 332:16,
332:23, 334:22,
364:10, 366:6,
370:4, 370:8,
371:16, 386:9,
386:24, 387:1, 387:3
**questions..** [1] - 39:9
**quick** [7] - 30:1,
156:12, 244:14,
327:21, 335:11,
380:12, 380:22
**quicker** [2] - 36:10,
255:8
**quickly** [14] - 11:24,
13:16, 13:19, 13:22,
20:18, 21:4, 28:4,
36:4, 36:7, 36:9,
143:4, 262:16,
312:22, 383:13
**quiet** [1] - 236:1
**quite** [5] - 44:10,
44:11, 141:18,

171:19, 355:9
**quo** [2] - 57:2, 176:5
**quote** [1] - 54:4
**quoting** [1] - 54:5
**Quraishi** [1] - 180:4
**QURAISHI** [2] - 1:16,
6:2

## R

**R-U-B-I-N** [1] - 310:21
**race** [66] - 62:11,
62:16, 62:17, 62:22,
63:1, 63:2, 92:12,
92:25, 93:5, 93:9,
93:13, 93:17,
167:12, 169:7,
171:20, 174:4,
177:7, 178:24,
179:5, 179:8,
184:18, 185:23,
186:5, 195:18,
205:2, 206:7,
206:22, 212:15,
212:19, 213:13,
213:14, 214:14,
215:10, 215:18,
216:2, 216:4, 225:5,
225:18, 238:15,
238:17, 239:9,
239:11, 246:1,
268:8, 268:9,
269:18, 270:22,
272:12, 281:20,
316:7, 316:18,
317:1, 317:14,
317:15, 317:16,
317:21, 319:20,
319:21, 321:6,
321:9, 322:12,
322:13, 325:9,
325:15, 349:20,
364:2
**races** [41] - 31:23,
36:24, 118:13,
145:6, 170:4, 170:5,
170:13, 171:10,
191:5, 245:19,
272:5, 272:7,
278:15, 279:2,
291:21, 315:22,
316:1, 317:19,
317:24, 318:24,
321:7, 322:14,
322:18, 325:15,
326:18, 327:20,
328:12, 328:15,
328:17, 328:22,
330:16, 330:21,
331:4, 331:21,
331:25, 354:24,

359:7, 361:12,
361:13, 375:2
**RAINONE** [3] - 3:14,
3:15, 7:18
**Rainone** [5] - 7:19,
9:8, 10:1, 10:8
**raise** [13] - 72:22,
197:25, 223:17,
223:22, 225:2,
225:12, 249:8,
279:24, 280:24,
281:1, 281:7, 382:8,
385:7
**raised** [13] - 15:21,
25:14, 34:12, 79:22,
202:25, 203:7,
209:11, 211:19,
223:25, 228:5,
233:5, 238:24,
244:14
**raising** [4] - 12:14,
223:20, 239:12,
386:17
**Raj** [1] - 7:16
**Rajapi** [1] - 266:17
**RAJIV** [1] - 2:13
**ramp** [2] - 174:23,
175:1
**ran** [10] - 168:11,
218:2, 220:18,
220:25, 221:4,
221:18, 222:20,
323:1, 336:23,
371:13
**random** [3] - 154:25,
155:15, 155:18
**randomly** [2] - 155:2,
350:5
**range** [2] - 316:3,
334:13
**rate** [1] - 314:22
**rather** [8] - 12:5,
44:13, 114:5, 134:3,
184:17, 208:19,
208:23, 286:3
**ratios** [1] - 32:15
**RAVAL** [1] - 2:20
**Raval** [1] - 8:9
**RDR** [1] - 390:11
**re** [4] - 284:16, 331:9,
380:22
**re-analyzed** [1] -
331:9
**re-collected** [1] -
331:9
**re-redirect** [1] -
284:16
**reach** [16] - 175:14,
188:24, 191:9,
196:21, 215:15,

217:2, 223:7, 223:17, 231:23, 234:7, 234:10, 236:20, 239:25, 376:21, 376:22, 376:25

**reached** [13] - 215:14, 216:9, 216:23, 231:16, 232:6, 234:19, 234:21, 238:22, 246:22, 304:13, 376:6, 376:23

**reaching** [4] - 176:7, 195:1, 223:11, 246:20

**react** [1] - 57:19

**reacting** [1] - 52:24

**reactions** [1] - 176:10

**read** [11] - 16:2, 16:3, 16:17, 21:3, 66:21, 66:25, 205:15, 205:18, 206:24, 242:18, 278:4

**reading** [4] - 11:8, 42:24, 130:14, 229:12

**readmit** [1] - 87:21

**ready** [21] - 31:8, 150:25, 165:23, 197:22, 244:11, 247:8, 247:17, 251:8, 285:17, 287:17, 287:18, 287:25, 310:14, 344:2, 352:25, 353:1, 353:21, 355:15, 355:25, 356:25, 357:1

**real** [16] - 35:14, 154:7, 154:10, 154:15, 154:19, 171:7, 172:21, 189:17, 190:9, 196:14, 207:22, 222:7, 243:2, 244:14, 249:14, 327:21

**reality** [2] - 31:16, 34:4

**realize** [3] - 198:19, 198:21, 260:25

**really** [30] - 22:17, 24:20, 26:8, 38:8, 38:24, 48:6, 86:20, 87:14, 107:20, 122:16, 195:12, 212:9, 223:23, 229:14, 236:11, 243:14, 249:12, 254:15, 257:16,

274:20, 300:9, 322:23, 323:9, 324:22, 332:10, 332:13, 339:24, 368:1, 385:25

**realm** [1] - 67:20

**reason** [20] - 11:21, 49:13, 151:5, 171:25, 179:24, 201:19, 222:10, 222:12, 238:22, 261:20, 284:25, 299:22, 315:24, 318:21, 320:12, 320:15, 320:18, 326:15, 367:25, 383:3

**reasonable** [4] - 70:1, 94:18, 95:8, 96:13

**reasons** [2] - 29:17, 161:18

**rebut** [1] - 28:5

**recap** [1] - 377:13

**receive** [2] - 32:4, 32:5

**received** [16] - 5:5, 14:9, 16:3, 64:1, 170:13, 185:25, 192:15, 195:9, 210:7, 210:18, 210:19, 210:21, 216:2, 344:14, 380:12, 383:7

**receives** [1] - 239:15

**receiving** [3] - 170:3, 186:8, 186:10

**recent** [2] - 275:24, 379:9

**recently** [1] - 339:5

**recertification** [13] - 98:17, 105:16, 108:21, 128:7, 129:3, 129:5, 130:6, 130:10, 130:13, 130:20, 162:12, 163:6, 163:12

**recertified** [1] - 130:4

**recess** [3] - 121:5, 197:18, 287:15

**recitation** [1] - 345:12

**recognition** [1] - 240:19

**recognize** [6] - 92:1, 193:23, 265:19, 267:22, 268:3, 304:7

**recognized** [1] - 60:10

**recollection** [4] - 210:13, 305:23, 346:4, 357:18

**record** [39] - 6:7, 9:17, 16:18, 20:13, 28:11,

44:19, 73:2, 77:18, 89:21, 92:21, 100:22, 102:19, 104:4, 104:18, 113:8, 113:10, 122:14, 165:19, 193:13, 197:22, 201:24, 205:11, 211:10, 246:3, 246:13, 247:10, 251:4, 253:12, 280:1, 284:12, 285:23, 287:13, 304:10, 310:20, 327:21, 336:6, 375:18, 379:22, 390:5

**record's** [1] - 104:14

**recorded** [1] - 1:23

**recording** [1] - 76:15

**records** [4] - 178:1, 178:5, 337:1, 337:2

**Records** [1] - 337:6

**rectangle** [1] - 300:9

**Red** [1] - 2:7

**redesign** [5] - 160:10, 160:12, 160:15, 160:18, 160:24

**redesigns** [1] - 37:17

**REDIRECT** [4] - 4:8, 4:15, 244:13, 334:10

**Redirect** [1] - 159:8

**redirect** [20] - 122:8, 122:17, 122:23, 150:16, 159:8, 159:13, 162:19, 164:1, 164:5, 243:14, 243:16, 244:9, 248:25, 280:13, 283:8, 283:11, 284:16, 284:21, 285:2, 306:3

**redistricted** [1] - 321:17

**redistricting** [2] - 321:19, 338:6

**redundant** [3] - 157:1, 247:21, 309:2

**reelection** [2] - 328:8, 371:10

**reentering** [1] - 358:4

**reevaluate** [1] - 195:21

**refer** [5] - 75:25, 80:13, 100:20, 102:14, 224:4

**reference** [4] - 65:14, 228:6, 345:21, 356:5

**referenced** [2] - 96:24, 118:20

**references** [1] - 65:15

**referred** [11] - 76:14, 77:2, 94:10, 179:16, 179:24, 183:24, 232:7, 232:24, 331:3, 351:7, 374:12

**referring** [13] - 85:18, 101:2, 103:22, 105:7, 112:21, 124:10, 142:3, 204:24, 222:15, 228:9, 231:21, 269:20, 289:17

**refers** [3] - 103:9, 104:24, 297:23

**reflect** [1] - 91:12

**reflective** [1] - 318:24

**reflects** [1] - 103:13

**reforms** [1] - 212:11

**refresh** [3] - 346:4, 378:16, 381:14

**refreshing** [1] - 357:18

**regard** [31] - 13:15, 26:18, 26:21, 65:10, 69:21, 69:22, 70:15, 74:21, 75:9, 78:15, 79:11, 80:19, 81:8, 82:22, 83:2, 83:3, 91:8, 93:21, 93:23, 108:11, 111:21, 117:5, 141:2, 147:5, 150:1, 170:12, 194:16, 202:12, 209:11, 266:25, 297:17

**regarding** [18] - 19:17, 19:21, 29:3, 118:24, 119:6, 148:18, 149:13, 163:10, 239:11, 266:8, 313:18, 333:9, 376:8, 377:4, 378:4, 379:12, 380:13, 381:12

**regardless** [12] - 37:1, 37:5, 83:12, 134:6, 161:11, 161:23, 161:25, 273:18, 273:21, 273:24, 275:13, 300:12

**regards** [6] - 116:14, 116:17, 117:11, 128:12, 128:23, 131:9

**regional** [1] - 342:22

**registered** [4] - 177:16, 178:9, 338:12, 338:14

**registration** [2] - 337:23, 337:24

**regrets** [1] - 171:9

**regular** [1] - 179:1

**regularly** [1] - 20:22

**regurgitating** [2] - 247:22, 249:13

**reject** [1] - 389:3

**relate** [3] - 41:16, 125:24, 130:19

**related** [7] - 35:16, 313:10, 314:12, 314:15, 315:11, 381:18, 382:13

**relates** [11] - 128:13, 128:14, 129:23, 135:10, 139:15, 239:8, 239:9, 239:12, 308:6, 329:14, 353:15

**relating** [9] - 337:3, 337:11, 342:21, 346:14, 348:10, 348:25, 349:1, 358:24

**relation** [2] - 292:8, 301:3

**relationship** [1] - 349:19

**relaxed** [4] - 37:20, 89:19, 90:1, 360:18

**relevance** [7] - 22:5, 114:17, 157:20, 232:1, 235:4, 235:7, 236:10

**relevancy** [1] - 105:20, 114:11, 114:15

**relevant** [10] - 18:10, 23:15, 47:7, 64:12, 164:12, 226:14, 235:13, 235:18, 236:7, 284:24

**relied** [1] - 178:24

**relief** [26] - 11:18, 11:23, 12:8, 12:20, 12:24, 13:3, 13:10, 13:14, 13:17, 20:17, 20:21, 21:7, 21:13, 36:13, 45:4, 46:13, 46:17, 48:17, 49:20, 58:13, 62:4, 83:1, 85:11, 162:6, 266:2, 387:23

**rely** [8] - 46:15, 56:22, 77:25, 297:8, 309:3, 362:4, 362:25, 368:24

**relying** [4] - 56:4, 122:7, 331:5, 362:17

**remain** [4] - 129:8, 197:19, 287:14, 287:16

**remarks** [12] - 22:25, 30:14, 31:3, 31:5, 39:11, 50:11, 66:12, 67:21, 388:10, 388:13, 388:18, 389:2

**remedial** [2] - 109:24, 110:5

**remedies** [2] - 53:21, 55:2

**remember** [9] - 11:8, 30:17, 163:2, 168:21, 221:9, 226:10, 377:1, 378:12, 378:22

**remembering** [1] - 45:20

**remind** [5] - 44:10, 97:10, 114:21, 123:8, 358:13

**reminder** [1] - 30:15

**remote** [1] - 68:1

**remotely** [1] - 72:5

**remove** [4] - 69:25, 84:5, 110:17, 110:25

**removed** [1] - 121:14, 363:5

**repeat** [5] - 43:19, 93:25, 116:9, 130:7, 140:20, 141:8, 150:3, 158:12, 185:15, 223:10, 232:2, 236:18, 274:23, 326:1, 379:18

**repeating** [1] - 157:25

**repeats** [1] - 219:15

**repetitive** [2] - 71:10, 162:14

**rephrase** [8] - 83:10, 101:4, 150:21, 217:11, 277:21, 280:6, 291:20, 379:23

**replace** [2] - 37:23, 340:10

**replaced** [1] - 263:15

**reply** [2] - 227:23, 228:1

**Report** [1] - 287:3

**report** [94] - 27:18, 27:20, 35:17, 76:5, 100:20, 100:25, 101:2, 102:1, 103:19, 120:9, 122:20, 192:17, 192:21, 192:22, 194:1, 194:2, 194:16, 195:9, 195:14, 205:8,

205:10, 206:1, 206:16, 247:19, 247:22, 249:9, 249:12, 250:1, 250:15, 267:12, 286:17, 286:22, 286:25, 287:2, 287:5, 289:3, 289:10, 289:12, 289:14, 289:23, 290:2, 290:17, 291:24, 292:13, 292:16, 292:17, 292:24, 293:11, 293:21, 294:1, 295:9, 295:17, 296:20, 297:13, 299:21, 299:25, 302:15, 302:22, 303:5, 305:10, 305:19, 311:12, 311:16, 311:22, 312:9, 315:14, 315:21, 318:2, 319:15, 320:3, 321:23, 322:3, 323:1, 323:21, 326:23, 327:23, 329:23, 330:2, 330:9, 331:1, 331:6, 331:13, 331:16, 332:9, 333:13, 341:15, 346:16, 351:14, 367:24, 382:10, 382:17

**report's** [1] - 249:9

**reporter** [5] - 9:16, 194:10, 201:24, 252:1, 385:11

**REPORTER** [2] - 90:15, 157:3

**Reporter** [2] - 1:21, 390:12

**reporter's** [1] - 327:5

**REPORTER'S** [1] - 390:1

**reporting** [2] - 341:25, 342:17

**reports** [22] - 27:5, 122:8, 122:13, 191:17, 191:18, 191:19, 249:10, 289:11, 290:20, 309:3, 323:22, 324:7, 328:11, 330:13, 330:17, 367:21, 368:21, 368:24, 369:9, 369:25, 380:24, 382:16

**represent** [14] - 15:24, 41:10, 41:22, 41:24, 41:25, 42:1, 42:3, 125:4, 181:3, 202:9, 246:14, 256:19, 310:4

**Representative** [2] - 33:7, 249:2

**representative** [7] - 35:10, 63:8, 135:15, 166:4, 243:23, 362:13, 362:16

**representatives** [3] - 204:19, 347:11, 347:16

**Representatives** [6] - 172:17, 174:15, 220:25, 244:20, 245:20

**represented** [3] - 15:20, 17:2, 321:20

**representing** [5] - 46:7, 56:11, 129:4, 218:24, 287:23

**represents** [3] - 41:23, 60:20, 115:23

**repressing** [1] - 173:22

**reprints** [1] - 271:14

**reprogram** [1] - 364:22

**reprogrammed** [1] - 359:19

**Republican** [5] - 169:8, 318:3, 319:7, 347:12, 371:2

**Republicans** [3] - 347:6, 347:15, 365:6

**request** [9] - 10:25, 26:23, 86:19, 180:3, 225:2, 234:15, 267:8, 335:21, 370:13

**requested** [8] - 20:17, 45:4, 48:17, 133:10, 133:20, 135:17, 229:9, 274:8

**requesting** [6] - 11:19, 20:20, 21:13, 110:10, 231:3, 231:4

**requests** [2] - 266:8, 343:24

**require** [19] - 34:22, 34:23, 98:17, 105:15, 107:11, 108:14, 108:19, 109:1, 129:3, 130:17, 132:7, 133:1, 133:11, 162:12, 163:4,

297:5, 339:18, 342:3

**required** [16] - 40:10, 65:16, 100:17, 130:16, 135:11, 135:20, 139:4, 161:7, 162:6, 163:11, 163:12, 163:14, 209:18, 230:12, 302:20, 343:16

**requirement** [2] - 263:11, 362:1

**requirements** [14] - 33:17, 36:3, 107:10, 108:13, 108:18, 108:19, 131:6, 131:20, 341:25, 342:17, 343:14, 348:3, 357:6, 357:22

**requires** [9] - 77:18, 96:2, 99:21, 100:11, 131:14, 160:6, 189:22, 217:17, 348:14

**requiring** [1] - 160:10

**research** [21] - 113:5, 177:20, 189:25, 190:3, 190:18, 190:22, 191:4, 191:11, 191:12, 191:22, 192:4, 195:5, 195:16, 196:18, 196:20, 217:2, 217:23, 315:11, 323:22, 325:12, 332:1

**researched** [2] - 195:8, 206:3

**reserve** [5] - 26:14, 94:25, 118:18, 201:2, 296:9

**reserved** [5] - 71:5, 88:8, 388:10, 388:17, 389:1

**reserving** [1] - 75:3

**reside** [1] - 178:13

**resides** [1] - 46:16

**resolution** [1] - 44:15

**resolve** [2] - 218:10, 332:16

**resolved** [3] - 52:16, 52:17, 52:18

**resort** [1] - 53:8

**resources** [5] - 117:10, 152:5, 213:7, 325:4, 329:5

**respect** [26] - 17:10, 24:24, 58:4, 60:6, 88:1, 93:3, 94:23, 107:21, 108:16,

115:2, 122:6, 159:21, 160:3, 160:5, 296:2, 304:13, 339:23, 348:4, 353:22, 353:25, 359:15, 359:21, 368:15, 370:12, 376:7, 376:11

**respectful** [1] - 195:24

**respectfully** [2] - 65:7, 229:9

**respective** [3] - 92:8, 132:9, 132:13

**respectively** [3] - 85:23, 92:14, 98:4

**respects** [3] - 34:19, 52:22, 269:8

**respond** [11] - 16:7, 16:11, 18:17, 70:21, 119:7, 119:13, 129:18, 234:15, 268:19, 369:11, 370:1

**responded** [1] - 231:6

**responding** [1] - 17:22

**response** [12] - 17:10, 26:24, 27:18, 71:1, 91:6, 91:7, 97:9, 127:9, 155:12, 196:5, 226:22, 229:8

**responsibilities** [5] - 139:11, 140:2, 252:6, 336:24, 338:10

**responsibility** [7] - 41:15, 41:21, 134:20, 157:15, 198:22, 199:4, 337:20

**responsible** [12] - 56:1, 132:18, 135:16, 263:21, 329:14, 337:10, 337:14, 337:22, 338:4, 338:5, 340:23, 355:5

**rest** [4] - 39:3, 153:12, 322:16, 370:9

**restart** [1] - 151:25

**restated** [1] - 16:22

**restricted** [1] - 300:20

**resubmit** [1] - 88:5

**result** [5] - 43:24, 119:4, 169:14, 194:23, 286:1

**results** [22] - 76:3, 76:4, 76:5, 76:11, 172:9, 172:10,

**United States District Court**
**District of New Jersey**

173:12, 194:22, 195:19, 226:9, 315:20, 316:14, 317:19, 324:16, 329:7, 331:20, 340:17, 341:15, 342:1, 342:22, 342:24, 342:25
**retained** [3] - 131:4, 331:12
**retainer** [5] - 305:4, 305:7, 305:12, 305:13, 381:9
**retest** [2] - 105:16, 163:6
**retesting** [2] - 98:17, 108:21
**reused** [1] - 116:22
**reusing** [2] - 84:3, 116:14
**reveal** [1] - 40:25
**revenue** [2] - 265:2, 265:12
**reverse** [1] - 17:1
**review** [17] - 28:9, 86:8, 104:3, 113:14, 205:10, 206:6, 234:6, 280:22, 329:13, 329:25, 330:1, 330:8, 331:1, 331:17, 332:8, 355:3
**reviewed** [2] - 167:2, 205:7
**reviewing** [2] - 44:17, 337:17
**revisit** [1] - 296:12
**revisited** [1] - 187:21
**reworded** [1] - 148:11
**RICHARD** [1] - 2:9
**Richard** [1] - 9:12
**Richter** [2] - 318:7, 318:11
**right-hand** [2] - 102:8, 102:25
**rights** [14] - 44:3, 44:9, 52:22, 63:18, 65:4, 65:5, 66:15, 66:18, 212:10, 212:14, 215:8, 219:6, 229:20, 245:10
**rigorous** [2] - 31:19, 35:24
**rise** [3] - 6:4, 121:7, 389:6
**risks** [1] - 127:14
**River** [2] - 3:21, 300:1
**road** [1] - 22:13
**Road** [2] - 2:24, 3:3
**Rob** [4] - 319:22, 320:3, 320:20,

320:25
**ROBERT** [1] - 3:2
**robust** [1] - 44:18
**Rockaway** [1] - 3:24
**role** [18] - 125:16, 125:21, 125:24, 126:1, 126:13, 128:9, 128:25, 130:25, 131:1, 137:7, 157:16, 157:17, 158:13, 158:15, 158:16, 158:17, 249:19, 376:1
**roles** [4] - 125:14, 132:19, 137:5, 157:14
**roll** [1] - 154:8
**room** [4] - 24:5, 24:7, 30:7, 124:7, 199:5
**rooms** [1] - 67:9
**rooted** [1] - 49:13
**rotation** [1] - 39:18
**roughly** [2] - 177:15, 260:12
**routinely** [1] - 37:16
**row** [3] - 61:4, 62:14, 101:9, 206:20, 207:4, 291:9, 298:11, 300:13, 349:5, 349:13, 350:13, 351:3, 351:5
**row-and-column** [1] - 291:9
**rows** [20] - 99:24, 100:6, 110:19, 110:22, 111:1, 116:18, 293:3, 293:4, 294:5, 295:6, 295:14, 300:7, 348:13, 348:14, 348:20, 350:24, 352:9, 372:15, 373:14, 373:15
**Royal** [5] - 114:23, 252:2, 252:4, 252:6, 252:14
**RSM** [5] - 74:6, 124:19, 125:22, 126:2, 128:9
**Rubin** [9] - 31:18, 310:21, 311:7, 312:7, 312:16, 312:17, 312:18, 332:19, 333:1
**RUBIN** [2] - 4:13, 310:17
**rule** [5] - 36:4, 71:16, 119:18, 187:16, 361:25

**ruled** [3] - 188:4, 374:2, 374:7
**Rules** [1] - 17:14
**rules** [9] - 37:1, 37:5, 89:18, 89:25, 274:22, 274:24, 275:8, 275:10, 348:22
**ruling** [2] - 29:12, 250:18
**rulings** [1] - 388:15
**run** [29] - 32:3, 33:10, 33:19, 33:21, 56:11, 62:7, 145:6, 154:7, 168:11, 174:9, 174:12, 174:17, 180:15, 180:16, 180:21, 184:7, 184:17, 196:7, 208:19, 208:24, 213:3, 213:11, 238:15, 240:23, 242:9, 268:11, 276:8, 279:20, 371:10
**running** [30] - 20:7, 61:13, 95:17, 96:22, 97:3, 168:12, 168:22, 169:4, 172:17, 174:14, 176:18, 178:23, 183:18, 183:24, 207:13, 209:3, 213:6, 229:17, 240:13, 245:22, 255:23, 255:25, 263:15, 279:16, 291:5, 317:4, 319:7, 321:13
**runoff** [1] - 272:9
**runs** [5] - 27:24, 151:1, 302:5, 302:12, 346:8
**Rush** [1] - 33:8
**RUSH** [2] - 1:4, 1:5
**RYAN** [2] - 4:3, 72:24
**Ryan** [10] - 22:14, 72:4, 72:7, 72:12, 73:3, 73:4, 73:7, 74:5, 101:25, 288:7

---

**S**

**safe** [1] - 143:13
**safely** [1] - 388:23
**Sahradnik** [1] - 8:21
**SAHRADNIK** [1] - 3:19
**sake** [2] - 52:2, 327:5
**Salem** [4] - 1:11, 7:11, 323:18, 323:23

**Sam** [2] - 31:11, 31:18
**sample** [14] - 58:4, 92:7, 103:7, 103:10, 103:11, 110:7, 154:1, 158:25, 192:9, 302:25, 357:15, 357:17, 357:19, 357:21
**Sarah** [1] - 33:8
**SARAH** [2] - 1:4, 1:4
**Sass** [3] - 31:18, 310:21, 312:17, 332:19, 333:1
**SASS** [2] - 4:13, 310:17
**sat** [1] - 249:14
**satisfaction** [1] - 278:23
**satisfied** [1] - 36:2
**satisfy** [2] - 78:3, 117:6
**save** [2] - 303:25, 322:17
**saves** [1] - 76:11
**saw** [4] - 65:14, 92:9, 195:17, 205:12
**scale** [2] - 32:12, 32:13
**scandal** [1] - 171:4
**scanned** [1] - 357:11
**scanners** [13] - 76:8, 76:9, 77:1, 80:12, 340:16, 340:22, 341:7, 341:8, 359:1, 359:18, 364:23
**scans** [1] - 76:10
**scattered** [1] - 65:20
**schedule** [7] - 20:12, 20:14, 20:16, 20:21, 20:23, 21:11, 257:12
**scheduled** [2] - 15:3
**Schmidt** [1] - 366:24
**SCHOENGOOD** [1] - 1:4
**Schoengood** [1] - 33:8
**school** [12] - 268:8, 268:9, 268:11, 269:20, 270:22, 271:10, 272:17, 272:18, 281:23, 294:9, 295:1, 295:7
**Schwartz** [1] - 3:4
**science** [2] - 35:25, 44:5
**scientific** [5] - 31:19, 94:19, 94:24, 95:9, 96:14
**scope** [2] - 87:15, 88:24

**Scott** [2] - 3:21, 8:22
**scratch** [3] - 82:6, 116:13, 255:4
**screen** [23] - 34:22, 66:2, 76:18, 76:19, 86:16, 92:15, 96:8, 97:25, 101:1, 104:9, 104:10, 109:9, 110:8, 112:3, 112:24, 124:9, 219:15, 228:16, 228:23, 270:10, 291:15, 298:8, 299:6
**screens** [1] - 22:15
**scroll** [2] - 92:14, 103:8
**scurry** [1] - 52:8
**seamless** [1] - 308:17
**season** [1] - 225:8
**seat** [6] - 167:8, 180:24, 184:7, 196:7, 212:16, 251:7
**seated** [7] - 6:5, 129:8, 165:22, 197:19, 287:14, 287:16, 310:22
**seats** [1] - 14:22
**Secaucus** [1] - 3:6
**second** [18] - 31:1, 78:10, 102:24, 102:25, 105:11, 121:3, 124:8, 127:9, 170:5, 189:19, 194:8, 234:6, 243:17, 286:17, 299:9, 350:7, 368:5, 368:18
**secondarily** [1] - 106:10
**secondary** [1] - 172:23
**secondly** [2] - 17:17, 259:23
**secretaries** [1] - 125:17
**Secretary** [5] - 75:16, 86:1, 86:6, 125:12, 128:11
**sections** [1] - 43:9
**secure** [2] - 127:8, 365:24
**securing** [1] - 383:25
**security** [11] - 73:13, 74:8, 74:23, 75:10, 121:20, 127:5, 127:7, 127:20, 127:22, 388:21, 388:25
**Security** [3] - 125:15, 125:22, 126:13

**see** [54] - 10:15, 13:4, 24:9, 41:10, 50:23, 55:12, 61:14, 62:6, 65:8, 68:16, 68:17, 70:22, 71:13, 85:7, 86:16, 101:1, 104:12, 109:10, 109:14, 109:15, 120:24, 132:21, 170:20, 172:13, 173:8, 188:22, 191:4, 193:24, 194:21, 195:10, 196:7, 205:13, 214:8, 217:4, 217:24, 220:2, 225:12, 226:9, 229:22, 234:22, 270:22, 282:20, 291:8, 304:4, 305:2, 317:15, 317:16, 319:24, 352:12, 360:18, 366:10, 377:22, 378:15, 380:14

**seeing** [3] - 97:25, 118:21, 317:17

**seek** [22] - 53:22, 58:13, 108:8, 109:24, 110:6, 188:21, 189:21, 203:12, 203:14, 203:25, 204:9, 204:12, 204:14, 204:19, 209:1, 211:4, 212:6, 212:11, 214:22, 214:25, 263:7, 266:2

**seeking** [12] - 29:10, 83:2, 162:7, 176:19, 205:5, 215:3, 215:5, 221:3, 229:14, 234:1, 234:23, 387:23

**seeks** [1] - 208:16

**seem** [6] - 156:8, 240:7, 317:6, 378:18, 380:8, 388:14

**select** [2] - 60:18, 155:2

**selected** [1] - 206:8

**selections** [2] - 76:23, 76:25

**Senate** [62] - 1:3, 62:11, 62:13, 62:15, 62:17, 62:22, 63:1, 63:6, 63:8, 63:25, 81:18, 154:20, 167:8, 167:24,

167:25, 168:12, 174:4, 174:11, 176:11, 177:7, 178:24, 180:15, 180:16, 180:21, 180:24, 181:3, 182:16, 183:18, 184:7, 184:18, 185:18, 185:23, 196:7, 205:2, 206:7, 206:21, 207:6, 207:9, 207:14, 211:16, 213:19, 229:6, 229:16, 236:24, 238:15, 239:9, 239:11, 245:19, 255:24, 315:7, 315:17, 319:23, 346:24, 349:17, 349:18, 349:20, 349:25, 350:1, 350:4, 350:8, 350:10

**Senates** [1] - 315:7

**senator** [2] - 168:2, 291:13

**Senator** [5] - 168:2, 174:7, 209:11, 212:16, 317:1

**senatorial** [3] - 178:5, 179:4, 179:5

**send** [13] - 205:4, 225:4, 225:15, 229:17, 258:5, 260:2, 261:2, 261:10, 275:15, 275:22, 276:6, 344:4, 357:18

**sending** [6] - 192:8, 232:7, 261:17, 353:2, 363:21

**sends** [1] - 274:7

**senior** [6] - 174:16, 188:24, 189:1, 189:9, 215:15, 342:13

**sense** [10] - 62:22, 122:10, 122:22, 122:25, 168:13, 195:17, 316:5, 380:8, 380:23, 382:22

**sensitive** [1] - 268:24

**sent** [11] - 227:1, 229:3, 231:9, 232:10, 234:1, 305:5, 305:7, 305:12, 356:12, 356:23, 381:11

**sentence** [4] - 15:6,

105:1, 107:9, 291:11

**separate** [16] - 51:15, 161:12, 197:17, 240:17, 269:3, 289:15, 289:18, 291:12, 294:5, 294:17, 298:1, 298:7, 298:9, 319:16, 338:3, 359:21

**separately** [3] - 347:7, 349:1, 364:2

**September** [17] - 167:10, 168:3, 174:6, 185:16, 211:16, 211:22, 212:4, 213:14, 213:17, 213:20, 213:24, 225:15, 225:17, 225:19, 238:15, 383:14

**sequence** [2] - 82:25, 185:13

**sequester** [2] - 198:22, 335:15

**sequestered** [2] - 67:6, 367:8

**sequestration** [11] - 197:25, 198:8, 199:13, 199:20, 248:14, 249:5, 250:10, 284:4, 288:20, 288:25, 308:12

**Sequoia** [5] - 299:18, 299:22, 300:24, 301:4, 301:6

**serial** [1] - 81:25

**series** [5] - 85:4, 85:22, 98:10, 379:11, 380:6

**serious** [1] - 381:8

**serve** [3] - 46:9, 180:17, 180:19

**served** [6] - 166:9, 314:17, 315:2, 317:3, 319:6, 320:6

**service** [3] - 38:6, 151:10, 328:23

**Service** [4] - 30:2, 252:2, 252:4, 252:14

**services** [18] - 113:16, 113:21, 114:4, 114:6, 114:7, 115:2, 125:8, 147:12, 147:14, 149:14, 151:13, 152:15, 152:17, 153:4, 301:23, 302:9, 305:14, 305:15

**Services** [2] - 114:23, 252:6

**servicing** [1] - 113:18

**serving** [1] - 74:12

**session** [1] - 23:4

**set** [17] - 78:18, 79:5, 80:12, 81:5, 94:6, 103:24, 174:13, 177:4, 254:10, 261:13, 275:8, 276:1, 298:8, 355:2, 355:6, 367:15

**setup** [1] - 330:15

**seven** [6] - 29:10, 68:21, 119:9, 211:1, 212:21, 368:21

**several** [13] - 289:15, 289:16, 289:18, 291:12, 291:13, 291:21, 291:22, 313:9, 316:17, 339:4, 353:5, 354:15, 354:18

**shaken** [1] - 350:5

**shape** [1] - 85:9

**share** [5] - 178:4, 184:23, 238:13, 343:20, 372:10

**shared** [1] - 184:3

**shave** [1] - 69:20

**sheer** [1] - 245:24

**sheet** [1] - 291:14

**sheets** [1] - 146:9

**shell** [12] - 114:9, 114:14, 115:2, 115:5, 115:11, 115:17, 116:7, 255:16, 255:20, 256:6, 258:4, 274:14

**shells** [6] - 114:1, 256:9, 258:10, 258:19, 258:22, 261:22

**sheriffs** [1] - 245:21

**shift** [1] - 174:19

**shifting** [1] - 364:17

**SHIVAS** [1] - 3:22

**shock** [2] - 118:4, 249:12

**shocked** [1] - 47:25

**shop** [2] - 252:25, 255:1

**short** [7] - 90:23, 153:5, 197:18, 287:15, 306:24, 341:15, 363:2

**shorthand** [1] - 168:18

**shortly** [4] - 49:18, 69:22, 176:1, 193:1

**shot** [4] - 33:22, 196:9, 237:19

**show** [19] - 50:9, 50:19, 53:12, 53:15, 53:16, 53:19, 53:21, 57:3, 88:22, 91:17, 92:25, 176:22, 181:11, 191:5, 217:16, 303:19, 316:6, 325:18

**showed** [4] - 179:11, 195:17, 279:23, 311:9

**shown** [9] - 65:9, 112:3, 154:1, 179:10, 278:14, 278:22, 279:6, 281:2, 361:10

**shows** [6] - 32:9, 229:18, 232:25, 305:4, 314:6, 379:11

**shut** [3] - 375:6, 384:5, 388:22

**shy** [1] - 20:8

**Siberia** [3] - 61:25, 172:21, 239:10

**sic** [3] - 113:8, 224:15, 299:9

**side** [20] - 10:18, 11:9, 11:10, 24:12, 26:16, 31:4, 42:4, 46:1, 102:25, 154:3, 249:18, 257:18, 258:2, 309:7, 341:8, 366:11, 388:18

**sidebar** [2] - 198:2, 235:2, 236:1

**Sidebar** [3] - 198:5, 201:20, 235:3, 236:15

**sided** [2] - 303:25, 377:10

**sides** [3] - 11:3, 67:9, 369:20

**sign** [6] - 209:20, 209:25, 210:10, 216:16, 216:20, 354:20

**sign-off** [1] - 354:20

**signature** [1] - 305:4

**signatures** [1] - 386:14

**signed** [4] - 210:3, 210:8, 210:17, 381:8

**significance** [1] - 300:8

**significant** [19] - 53:23, 149:4, 149:8, 169:14, 172:14, 178:18, 179:11,

**United States District Court**
**District of New Jersey**

179:17, 181:1, 181:2, 185:4, 197:24, 237:16, 237:17, 238:18, 239:14, 239:22, 384:21, 387:22

**significantly** [2] - 171:24, 172:6

**signing** [4] - 167:2, 191:15, 210:12, 210:13

**similar** [25] - 75:23, 75:24, 81:5, 97:16, 97:23, 100:5, 102:4, 103:1, 116:10, 117:12, 117:22, 131:20, 132:23, 135:7, 148:1, 170:3, 181:21, 184:25, 219:20, 220:9, 220:12, 313:23, 329:22, 329:24

**similarly** [3] - 136:18, 139:25, 313:24

**simple** [4] - 110:24, 240:10, 318:22, 326:21

**simplified** [2] - 98:22, 99:14

**simply** [6] - 14:11, 20:24, 31:16, 49:7, 170:25, 247:18

**single** [35] - 25:9, 83:19, 96:12, 97:22, 97:24, 97:25, 99:18, 100:18, 108:24, 109:19, 110:11, 110:16, 117:17, 133:25, 134:1, 134:6, 143:9, 152:12, 152:15, 157:25, 160:21, 160:23, 161:2, 179:11, 204:8, 214:23, 239:25, 240:1, 245:21, 246:7, 294:20, 295:7, 295:18, 300:21, 354:24

**single-column** [1] - 110:16

**sit** [4] - 14:8, 171:9, 255:9, 335:16

**sitting** [15] - 14:24, 23:7, 30:4, 40:17, 48:8, 48:9, 49:21, 198:12, 201:19, 222:25, 240:16, 240:24, 264:15, 268:23, 320:4

**situation** [17] - 10:25, 135:12, 177:1, 179:20, 180:18, 181:1, 181:2, 181:21, 184:12, 238:10, 255:24, 257:17, 261:14, 263:24, 317:14, 369:13, 376:18

**situations** [1] - 173:5

**six** [4] - 18:25, 68:21, 102:5, 368:21

**size** [5] - 178:15, 178:16, 354:5, 354:8, 354:9

**sizes** [1] - 354:6

**skills** [3] - 140:24, 141:9, 144:4

**skip** [3] - 73:8, 247:5, 315:14

**slate** [1] - 243:6

**slides** [1] - 388:1

**slight** [2] - 179:22, 248:6

**slightly** [1] - 271:22

**slogan** [5] - 43:6, 43:10, 43:22, 56:8, 63:23

**slogans** [5] - 43:18, 52:21, 52:23, 61:19, 61:22

**slow** [4] - 55:15, 262:6, 262:16, 262:18

**slow-walked** [1] - 55:15

**slowly** [2] - 335:3, 335:4

**small** [1] - 311:23

**smiling** [1] - 243:12

**snapshot** [1] - 127:6

**snip** [1] - 58:6

**so..** [10] - 77:12, 108:6, 119:21, 187:21, 193:11, 210:23, 247:9, 306:21, 309:18, 332:17

**social** [2] - 175:5, 175:25

**softer** [1] - 37:11

**software** [71] - 34:23, 40:12, 40:24, 77:10, 79:2, 81:3, 84:7, 84:18, 105:13, 105:16, 107:12, 108:15, 108:20, 109:2, 110:25, 130:18, 133:19, 133:23, 135:10,

135:11, 137:1, 137:2, 137:3, 137:6, 137:11, 137:13, 137:17, 137:21, 137:22, 138:3, 138:14, 138:17, 152:9, 162:5, 162:9, 163:6, 163:11, 276:17, 276:21, 276:25, 277:7, 277:13, 277:16, 278:7, 278:9, 278:11, 297:1, 297:2, 297:9, 297:10, 298:22, 298:24, 299:3, 301:19, 302:2, 302:4, 302:11, 302:12, 302:17, 302:19, 340:20, 341:19, 342:21, 353:23, 358:8, 362:7, 362:8, 372:5, 374:17

**Software** [1] - 75:18

**softwares** [1] - 77:25

**sole** [1] - 74:6

**solely** [3] - 57:23, 152:8, 188:10

**Sollami** [2] - 3:18, 7:20

**Solutions** [5] - 74:6, 124:19, 125:22, 126:2, 128:9

**someone** [14] - 20:9, 71:2, 171:17, 172:23, 173:16, 182:16, 207:20, 240:13, 240:18, 240:23, 308:14, 308:19, 325:21, 327:18

**Somerset** [3] - 1:20, 2:11, 9:13

**something's** [1] - 87:20

**sometime** [3] - 189:10, 216:22, 333:10

**sometimes** [2] - 192:11

**somewhere** [9] - 11:12, 19:1, 67:20, 127:2, 152:20, 270:14, 363:14, 367:8, 372:16

**soon** [3] - 305:21, 355:18, 355:24

**sooner** [1] - 196:3

**sore** [1] - 33:19

**sorry** [63] - 24:11, 26:20, 51:5, 70:18, 73:22, 73:23, 74:18, 74:20, 75:8, 77:4, 78:4, 79:19, 90:18, 93:13, 99:2, 101:4, 112:11, 123:12, 129:7, 147:4, 159:11, 181:20, 183:15, 197:13, 198:6, 204:12, 213:21, 218:7, 218:16, 219:14, 219:17, 221:23, 222:23, 223:9, 241:4, 244:2, 251:12, 262:13, 267:11, 270:19, 274:6, 276:15, 286:5, 289:1, 290:4, 290:6, 291:19, 295:4, 295:10, 302:7, 303:9, 327:8, 330:6, 330:18, 350:18, 362:20, 365:5, 366:5, 373:21, 374:5, 378:24, 379:18, 385:12

**Sorry** [2] - 6:16, 159:25

**sort** [8] - 36:24, 145:18, 154:23, 177:1, 189:14, 305:15, 343:1, 343:19

**sorted** [1] - 178:12

**sought** [5] - 55:2, 82:24, 203:17, 203:22, 204:6

**Soule** [2] - 1:21, 390:11

**Soule@njd.uscourts .gov** [1] - 1:22

**sound** [5] - 156:23, 164:20, 330:2, 330:9, 330:10

**sounds** [10] - 41:2, 42:16, 69:8, 71:19, 73:25, 120:20, 199:12, 237:4, 304:14, 377:8

**sources** [1] - 291:24

**South** [2] - 2:24, 3:17

**southern** [3] - 320:10, 320:21, 321:1

**space** [3] - 144:9, 154:7, 169:21

**spacing** [1] - 85:7

**sparked** [1] - 242:4

**speaking** [10] - 69:4, 156:9, 163:21, 191:16, 201:25, 202:4, 223:19, 277:20, 318:3, 349:10

**speaks** [3] - 296:9, 348:13, 349:7

**specialize** [2] - 73:10, 252:9

**specific** [22] - 77:14, 81:25, 85:18, 92:7, 116:18, 127:14, 130:19, 142:8, 143:1, 147:13, 150:25, 158:15, 191:3, 191:4, 191:22, 206:4, 206:7, 210:13, 258:11, 339:12, 352:18, 353:16

**specifically** [28] - 73:10, 74:23, 75:19, 75:25, 76:7, 80:12, 91:13, 96:2, 98:8, 102:15, 105:3, 108:24, 112:1, 112:3, 138:6, 138:10, 141:3, 149:25, 150:6, 160:2, 189:18, 191:16, 296:5, 314:10, 318:1, 325:24, 340:1, 349:7

**specificity** [4] - 80:18, 80:22, 80:23, 93:23

**specified** [2] - 126:14, 155:14

**specify** [3] - 85:16, 113:6, 142:10

**speculation** [1] - 325:7

**speculative** [10] - 35:15, 55:21, 149:21, 150:8, 189:17, 190:10, 196:14, 221:15, 222:7, 242:15

**speed** [2] - 77:5, 186:22

**spelling** [7] - 73:2, 165:19, 251:4, 285:23, 310:20, 336:6, 375:18

**spend** [1] - 239:24

**spending** [4] - 71:2, 250:8, 328:19, 329:5

**spent** [3] - 73:12, 144:17, 335:2

**SPIRO** [74] - 2:5, 2:6,

4:8, 4:16, 8:25,
197:4, 211:12,
211:14, 218:13,
218:16, 218:18,
219:11, 220:4,
220:7, 220:24,
221:20, 221:22,
221:25, 222:9,
227:4, 227:15,
227:22, 228:1,
228:5, 228:12,
228:15, 228:18,
228:25, 229:2,
230:10, 230:25,
231:22, 232:5,
232:15, 232:19,
233:4, 233:11,
233:19, 233:21,
233:25, 235:8,
235:21, 236:19,
239:2, 239:4, 239:6,
241:15, 241:22,
243:4, 243:11,
336:16, 344:7,
344:12, 344:17,
344:19, 344:23,
345:9, 350:17,
350:20, 351:10,
351:13, 351:15,
351:21, 351:23,
358:16, 358:18,
360:6, 360:11,
360:22, 360:23,
363:3, 364:11,
364:13, 366:6
**Spiro** [7] - 8:25, 9:3,
157:5, 211:12,
236:17, 287:23
**spite** [1] - 335:22
**Spitzer** [1] - 9:13
**SPITZER** [1] - 2:9
**spoken** [1] - 266:17
**spot** [3] - 35:22,
38:16, 52:2
**spread** [1] - 338:24
**spreadsheets** [1] -
353:7
**Springs** [1] - 3:23
**squeeze** [1] - 366:13
**St** [1] - 15:2
**staff** [45] - 20:1, 28:25,
139:11, 139:15,
140:3, 140:5,
140:13, 140:18,
140:25, 141:10,
141:15, 141:20,
141:23, 174:15,
174:16, 176:15,
188:24, 189:1,
189:4, 189:5, 189:9,

197:6, 213:2,
215:15, 216:23,
225:22, 255:1,
258:4, 259:24,
275:14, 276:16,
279:25, 283:20,
284:7, 287:11,
324:24, 325:3,
342:9, 342:10,
362:21, 362:22,
362:23, 374:1, 375:2
**staffing** [1] - 139:23
**stage** [4] - 44:14,
82:22, 117:4, 175:21
**stake** [1] - 184:8
**stakeholder** [1] -
126:17
**stakeholders** [2] -
58:16, 127:18
**stand** [16] - 6:15,
26:19, 45:20, 71:3,
79:18, 122:19,
197:8, 241:5,
247:19, 277:19,
310:15, 367:15,
372:8, 372:11,
372:22, 373:3
**standard** [10] - 30:20,
33:4, 44:18, 60:19,
63:18, 90:8, 90:22,
236:10, 275:7, 275:8
**standards** [5] - 47:2,
52:1, 132:6, 132:7,
190:19
**standing** [10] - 24:10,
26:17, 30:1, 30:4,
33:17, 35:12, 35:19,
85:8, 236:12, 240:3
**start** [33] - 19:3, 23:17,
26:22, 32:7, 39:20,
67:25, 123:6,
149:17, 153:23,
173:1, 173:10,
173:11, 174:24,
188:24, 213:1,
224:25, 226:2,
226:17, 229:4,
238:2, 251:23,
255:22, 255:23,
256:5, 263:8,
305:10, 309:1,
352:4, 356:15,
367:18, 373:23,
377:11, 379:8
**started** [14] - 10:19,
23:4, 136:7, 197:21,
225:19, 225:23,
226:3, 226:5, 226:6,
231:6, 252:10,
252:11, 368:4, 376:5

**starting** [11] - 81:9,
82:7, 95:16, 116:12,
153:22, 160:25,
202:2, 202:4, 238:9,
255:4, 256:2
**starts** [3] - 42:20,
83:23, 143:10
**State** [10] - 1:14,
14:11, 41:16, 86:1,
86:2, 86:6, 86:7,
94:20, 125:13,
173:16
**state** [103] - 16:23,
18:12, 18:13, 18:14,
30:13, 32:19, 32:21,
32:22, 37:15, 37:19,
49:10, 49:12, 52:12,
57:8, 57:9, 73:1,
74:10, 97:19,
101:21, 104:5,
104:18, 125:1,
125:5, 125:9,
125:12, 125:20,
126:9, 126:12,
126:17, 126:23,
127:2, 127:24,
128:3, 128:6, 128:8,
128:11, 128:12,
128:13, 128:14,
128:21, 128:24,
128:25, 129:3,
129:24, 130:5,
130:6, 130:9,
130:13, 130:20,
132:20, 138:22,
139:19, 143:3,
144:5, 144:15,
147:23, 154:22,
155:8, 163:10,
165:18, 175:4,
175:19, 177:16,
180:17, 181:2,
183:11, 203:18,
218:10, 234:14,
234:21, 236:21,
251:3, 252:13,
256:15, 263:12,
285:22, 292:13,
293:11, 293:12,
299:7, 299:16,
301:13, 302:15,
302:19, 310:19,
315:7, 321:25,
324:12, 327:22,
328:22, 328:24,
331:4, 336:5, 340:5,
344:5, 345:11,
346:11, 347:10,
363:19, 372:7,
375:17, 385:21,
387:22

**State's** [2] - 75:16,
128:11
**statement** [13] - 23:1,
43:1, 59:8, 108:11,
108:12, 109:5,
109:20, 145:16,
148:23, 212:9,
372:8, 372:11,
374:25
**statements** [8] -
167:1, 167:4,
167:15, 168:7,
200:12, 206:1, 212:4
**States** [20] - 6:2, 28:3,
60:12, 73:16, 73:18,
85:24, 128:10,
128:18, 162:10,
162:11, 167:24,
168:22, 181:3,
240:14, 240:16,
240:23, 240:24,
242:9, 298:16,
346:24
**states** [29] - 28:3,
38:18, 38:20, 38:21,
43:16, 97:20, 98:6,
98:12, 98:13,
101:16, 101:18,
101:22, 106:9,
106:12, 113:16,
128:22, 135:16,
155:5, 155:11,
155:14, 180:12,
297:3, 297:8,
297:10, 297:11,
301:14, 385:24
**STATES** [2] - 1:1, 1:16
**statewide** [6] - 181:8,
213:3, 246:1,
255:25, 275:7,
346:23
**stating** [1] - 74:1
**statistic** [1] - 316:2
**statistical** [3] -
319:16, 320:24,
325:21
**statistically** [1] -
327:19
**statistics** [9] - 325:23,
326:20, 326:21,
326:25, 327:12,
327:14, 327:15,
328:7
**status** [4] - 57:2,
176:5, 381:12,
381:15
**statute** [27] - 15:23,
18:8, 42:21, 42:22,
42:23, 43:2, 52:19,
53:20, 56:8, 61:19,

63:23, 130:13,
130:14, 234:22,
263:12, 348:12,
348:14, 348:24,
349:4, 349:7,
349:21, 350:25,
363:4, 363:6, 363:8,
363:16, 364:16
**statutes** [7] - 96:24,
348:7, 349:1,
349:19, 352:18,
364:8
**statutorily** [2] -
343:16, 343:18
**statutory** [11] - 63:21,
66:14, 117:6, 207:9,
343:11, 343:13,
348:2, 349:24,
353:21, 357:6,
357:22
**stay** [2] - 61:10,
388:24
**staying** [1] - 136:25
**stenography** [1] - 1:23
**step** [27] - 40:9, 79:11,
81:8, 81:10, 81:14,
82:3, 82:4, 82:22,
82:25, 83:4, 83:12,
83:13, 83:17, 89:11,
89:12, 93:21, 93:22,
94:1, 94:6, 121:17,
161:8, 180:16,
248:24
**stepping** [1] - 184:8
**steps** [9] - 36:23,
127:16, 161:4,
174:11, 174:23,
175:1, 178:22,
200:9, 236:20
**still** [36] - 30:7, 64:4,
67:8, 77:13, 83:14,
111:1, 123:8,
123:15, 151:24,
176:7, 176:15,
176:16, 199:20,
207:8, 208:25,
209:16, 211:24,
212:12, 213:3,
219:3, 221:8,
232:15, 240:4,
243:5, 247:12,
248:12, 264:15,
273:19, 273:22,
275:2, 308:24,
310:13, 327:18,
355:12
**stip** [1] - 332:17
**stipulate** [4] - 24:15,
25:5, 25:8, 366:25
**stipulated** [2] -

243:21, 313:15
**stipulations** [2] -
286:2, 307:4
**stop** [3] - 19:24,
19:25, 241:9
**stopped** [1] - 132:2
**stopping** [1] - 309:7
**story** [3] - 58:11,
58:12, 200:20
**strategic** [3] - 74:7,
189:13, 213:7
**strategically** [1] -
382:19
**strategy** [1] - 249:20
**streamline** [3] - 156:7,
248:1, 307:11
**streamlined** [3] -
156:8, 310:9, 312:8
**Street** [6] - 1:14, 2:3,
2:7, 2:15, 3:9, 3:12
**stricken** [1] - 249:6
**strike** [4] - 199:22,
237:8, 249:25,
360:25
**striking** [1] - 250:14
**strong** [2] - 195:17,
196:1
**stronger** [2] - 312:4,
312:5
**strongly** [1] - 11:4
**structure** [2] - 57:8,
207:17
**structured** [2] - 60:21,
61:1
**structures** [1] - 314:14
**studies** [1] - 326:5
**study** [1] - 323:1
**stuff** [1] - 36:25
**style** [64] - 82:13,
94:21, 95:6, 95:10,
96:1, 96:7, 96:16,
96:19, 96:23, 97:17,
98:13, 98:16, 98:21,
99:14, 99:18, 99:21,
100:2, 100:3, 105:5,
105:6, 105:8, 105:9,
105:10, 105:11,
105:19, 106:4,
106:5, 106:7, 106:8,
106:12, 106:16,
106:19, 106:21,
106:22, 107:10,
108:13, 108:18,
108:19, 108:24,
110:17, 112:4,
112:9, 112:13,
116:11, 116:12,
117:20, 118:13,
180:12, 255:12,
256:11, 257:25,

274:15, 293:2,
293:4, 293:5, 293:6,
293:8, 294:5,
294:24, 295:3,
295:6, 295:15
**styles** [9] - 107:2,
108:22, 109:3,
277:7, 293:7, 354:2,
357:13, 365:6, 365:9
**subject** [7] - 125:15,
127:4, 146:11,
216:6, 314:7,
333:21, 333:23
**subjects** [1] - 25:22
**submission** [1] -
344:15
**submissions** [1] -
217:24
**submit** [9] - 17:10,
24:24, 27:2, 29:22,
76:23, 76:24, 131:9,
132:9, 196:20
**submits** [1] - 297:2
**submitted** [21] -
21:16, 21:18, 27:9,
68:25, 87:21, 88:3,
104:3, 111:12,
205:11, 205:18,
226:16, 227:1,
247:22, 250:1,
270:2, 280:21,
287:2, 289:10,
297:7, 311:12,
311:15
**submitting** [1] - 297:3
**subsequent** [3] -
170:4, 316:22,
343:22
**subsequently** [1] -
102:7
**subsets** [1] - 328:2
**substance** [1] - 188:7
**substantial** [1] -
317:18
**substantially** [1] -
160:14
**substantive** [2] - 24:3,
34:8
**success** [1] - 33:3
**successful** [15] -
169:1, 171:13,
171:16, 180:10,
189:16, 190:3,
195:2, 196:22,
210:20, 211:2,
217:4, 217:16,
237:6, 237:15,
385:17
**successfully** [1] -
37:23

**suddenly** [1] - 294:1
**sued** [1] - 208:10
**suffer** [2] - 53:19,
55:18
**suffered** [2] - 242:10,
242:21
**suffering** [1] - 55:18
**sufficient** [1] - 33:16
**suggest** [4] - 11:4,
32:25, 39:1, 291:25
**suggesting** [2] - 91:4,
229:14
**suggestions** [1] - 42:2
**suggests** [4] - 292:18,
292:25, 293:13,
325:21
**suit** [11] - 35:7, 153:8,
181:12, 223:6,
223:12, 223:18,
224:16, 224:18,
226:16, 226:19,
376:20
**Suite** [14] - 1:19, 2:3,
2:7, 2:10, 2:21, 2:24,
3:3, 3:6, 3:17, 81:1,
81:4, 85:5, 86:4,
138:11
**summarize** [2] -
144:2, 179:9
**summarized** [1] -
150:4
**summation** [3] -
381:6, 387:17,
387:25
**summer** [1] - 142:20
**Sunday** [1] - 15:1
**super** [1] - 240:7
**superintendent** [17] -
157:17, 157:18,
157:19, 158:13,
158:14, 292:10,
337:21, 337:22,
341:2, 341:9,
341:16, 342:9,
356:4, 356:7,
356:18, 356:20,
358:22
**supplement** [2] - 75:4,
375:13
**Supplemental** [1] -
287:3
**supplemental** [16] -
12:10, 23:5, 23:10,
26:24, 27:25,
111:13, 111:15,
112:10, 112:23,
286:25, 289:12,
293:21, 295:17,
299:25, 302:15
**supplemented** [1] -

375:9
**supplied** [2] - 253:2,
296:23
**support** [23] - 47:19,
56:7, 61:9, 61:11,
117:25, 118:12,
127:12, 127:18,
203:11, 234:2,
234:4, 292:18,
292:21, 292:25,
295:13, 296:24,
297:11, 299:22,
301:1, 328:4, 329:1,
376:20
**supported** [1] - 169:9
**supporting** [2] -
182:10, 183:1
**supportive** [3] -
182:13, 236:24,
237:3
**supports** [4] - 16:24,
293:2, 293:9, 296:21
**suppose** [1] - 56:3
**supposed** [6] - 37:13,
52:20, 52:21,
254:21, 355:22,
356:11
**supposedly** [2] -
295:23, 302:23
**Supreme** [5] - 37:22,
37:23, 58:10, 60:12
**surprise** [5] - 286:5,
324:10, 324:20,
324:23, 328:14
**surprised** [1] - 318:20
**survey** [11] - 191:22,
191:25, 192:2,
192:6, 192:17,
192:21, 192:23,
194:17, 194:22,
194:23, 226:9
**survived** [1] - 44:23
**survives** [1] - 58:15
**suspense** [1] - 278:1
**Sussex** [2] - 323:19,
323:23
**sustain** [9] - 80:4,
83:9, 115:13,
115:19, 143:22,
162:23, 202:23,
222:8, 222:11
**sustained** [21] - 78:9,
85:17, 86:24, 95:20,
133:6, 143:25,
153:11, 187:8,
187:11, 187:20,
202:18, 208:17,
220:21, 230:9,
231:20, 241:7,
241:17, 350:16,

360:3, 360:5
**swapping** [1] - 263:22
**Swartz** [5] - 104:4,
104:17, 104:23,
104:24, 106:21
**Swartz's** [3] - 105:18,
108:11, 109:5
**swear** [2] - 250:24,
335:25
**sweet** [1] - 35:22, 52:2
**swept** [1] - 65:5
**switch** [2] - 26:16,
174:4
**switched** [1] - 137:25
**sworn** [3] - 72:21,
165:15, 166:7
**SWORN/AFFIRMED**
[7] - 72:24, 165:16,
251:1, 285:20,
310:17, 336:3,
375:15
**system** [80] - 33:14,
34:17, 57:14, 75:17,
76:1, 76:2, 77:8,
77:24, 77:25, 78:18,
79:15, 80:9, 80:11,
80:16, 80:20, 80:21,
80:24, 82:4, 94:2,
94:15, 95:24, 98:20,
101:4, 107:7,
111:25, 112:4,
112:12, 112:21,
131:7, 131:11,
144:19, 155:15,
159:19, 159:25,
163:12, 163:20,
171:16, 172:4,
173:12, 176:6,
177:3, 177:12,
180:13, 181:10,
184:20, 212:6,
214:9, 224:1,
233:15, 238:17,
238:20, 258:20,
258:21, 258:23,
276:10, 277:9,
277:10, 296:22,
340:18, 341:8,
341:14, 341:17,
342:15, 342:16,
342:22, 353:23,
354:23, 354:25,
355:21, 356:9,
356:12, 357:25,
361:20, 362:5
**systems** [57] - 73:17,
74:4, 74:16, 75:10,
75:14, 75:19, 75:20,
75:23, 75:24, 76:16,
77:15, 77:24, 80:8,

80:10, 80:15, 81:11, 81:22, 81:23, 85:3, 85:5, 86:4, 93:24, 94:13, 95:5, 96:14, 96:17, 98:2, 100:4, 101:11, 101:22, 101:24, 105:2, 107:6, 108:16, 109:3, 129:23, 131:13, 132:8, 132:14, 133:22, 135:5, 135:10, 144:12, 148:4, 159:16, 159:21, 159:23, 159:24, 163:16, 341:18, 373:12

**Systems** [7] - 75:18, 75:19, 75:21, 80:25, 98:8, 98:10, 98:18

**Systems'** [1] - 81:4

## T

**table** [10] - 14:24, 17:9, 48:9, 85:9, 197:9, 201:11, 247:2, 267:25, 320:20, 380:17

**tabloids** [1] - 76:12

**tabulated** [2] - 77:1, 276:13

**tabulation** [1] - 340:17

**tabulator** [2] - 76:24, 80:12

**tabulators** [3] - 76:4, 76:6, 276:4

**tailored** [1] - 79:25

**talks** [1] - 52:3

**tallied** [1] - 260:10

**Tambussi** [9] - 7:23, 26:3, 41:23, 59:24, 66:25, 153:16, 197:17, 202:1, 202:8

**TAMBUSSI** [38] - 2:17, 4:5, 4:7, 7:22, 59:5, 59:10, 59:13, 59:16, 59:21, 60:1, 60:4, 60:6, 60:8, 61:18, 62:9, 62:17, 62:20, 62:24, 64:17, 66:6, 66:13, 66:20, 66:22, 67:2, 153:17, 153:18, 155:17, 155:24, 156:9, 197:12, 197:14, 202:2, 202:5, 202:7, 202:19, 202:24, 208:18, 211:7

**tAMBUSSI** [1] - 59:7

**Tammy** [5] - 186:5, 204:11, 204:16, 204:21, 215:22

**tapping** [1] - 87:22

**task** [2] - 116:5, 260:18

**tasks** [2] - 114:9, 137:22

**TAVERAS** [2] - 3:16, 10:1

**Taveras** [1] - 10:1

**taxpayer** [1] - 31:23

**tea** [1] - 21:3

**team** [5] - 108:5, 353:6, 354:17, 355:11, 356:10

**technically** [1] - 207:7

**technological** [1] - 94:2

**technologies** [4] - 78:18, 133:2, 147:25, 148:5

**technology** [19] - 73:13, 74:8, 74:21, 75:11, 75:17, 91:9, 125:5, 127:22, 127:24, 128:3, 128:8, 129:5, 130:10, 133:13, 134:14, 134:20, 135:16, 152:8, 232:15

**teenagers** [1] - 369:14

**telephone** [1] - 73:24

**telephones** [1] - 121:14

**template** [22] - 82:8, 82:13, 82:14, 82:16, 83:23, 84:3, 96:6, 97:15, 101:7, 101:14, 102:3, 116:15, 116:21, 153:21, 160:25, 255:20, 256:6, 274:14, 296:5, 297:20, 297:21

**templates** [8] - 82:11, 82:17, 83:22, 84:5, 152:6, 258:10, 258:14, 258:18

**ten** [26] - 20:10, 22:25, 111:5, 115:23, 144:9, 197:5, 197:10, 197:16, 248:23, 249:15, 249:21, 253:13, 258:19, 266:22, 272:15, 283:19, 287:12, 328:11, 328:15, 339:10,

361:13, 361:15, 361:16, 365:10, 388:19

**ten-minute** [3] - 197:5, 197:10, 197:16

**ten-plus** [1] - 144:9

**tend** [2] - 44:17, 44:18

**term** [9] - 96:25, 115:1, 166:9, 166:11, 222:25, 321:2, 370:21, 371:8, 373:18

**terms** [31] - 18:8, 38:18, 40:10, 82:25, 151:23, 172:12, 172:14, 176:11, 176:14, 176:21, 176:24, 180:12, 181:2, 183:21, 190:2, 190:21, 203:20, 216:14, 217:1, 225:6, 237:15, 265:23, 284:20, 310:11, 331:18, 331:23, 334:16, 348:13, 354:4, 354:18

**terrible** [1] - 296:17

**territories** [1] - 128:22

**territory** [4] - 359:23, 360:15, 362:21, 375:1

**test** [16] - 29:16, 32:17, 47:16, 100:18, 134:4, 145:24, 262:5, 262:15, 276:8, 317:9, 317:11, 354:22, 354:24, 355:18, 356:12

**tested** [7] - 47:23, 105:4, 105:12, 138:18, 148:3, 355:10

**TESTIFIED** [7] - 72:24, 165:16, 251:1, 285:21, 310:17, 336:3, 375:15

**testified** [23] - 93:21, 107:17, 116:21, 137:1, 148:1, 149:8, 160:12, 162:14, 164:6, 211:15, 213:12, 218:2, 229:3, 239:7, 278:9, 325:17, 333:23, 346:6, 352:22, 369:3, 371:13, 382:25, 384:16

**testifies** [3] - 149:17,

150:22, 151:19

**testify** [19] - 22:18, 25:6, 26:2, 26:10, 34:20, 36:20, 36:22, 38:13, 48:25, 58:1, 122:19, 201:14, 247:17, 250:3, 250:9, 264:5, 335:7, 335:15, 351:24

**testifying** [8] - 22:12, 22:14, 25:7, 48:25, 200:14, 240:9, 307:13, 367:23

**testimony** [73] - 26:11, 27:2, 29:3, 36:25, 37:6, 40:23, 41:3, 44:7, 47:15, 66:10, 79:23, 90:24, 91:2, 110:3, 110:8, 119:3, 143:18, 150:8, 159:15, 159:21, 162:4, 164:5, 187:14, 189:13, 189:25, 196:2, 198:13, 199:5, 199:24, 205:23, 210:8, 212:24, 212:25, 214:20, 233:6, 237:7, 237:9, 241:24, 242:11, 242:13, 242:22, 242:23, 249:2, 249:5, 250:5, 270:2, 273:3, 277:6, 279:9, 288:7, 288:9, 288:17, 311:19, 312:10, 326:2, 326:4, 333:25, 351:6, 352:1, 358:3, 360:24, 361:1, 361:3, 361:18, 366:23, 367:25, 369:7, 370:7, 379:17, 379:20, 379:25, 381:21

**testing** [37] - 73:18, 74:3, 100:16, 107:11, 108:14, 108:19, 108:20, 109:2, 131:6, 131:21, 134:5, 135:1, 135:25, 136:19, 136:22, 137:7, 137:12, 138:7, 138:24, 139:1, 139:3, 139:6, 139:7, 139:15, 139:18, 141:25, 143:6, 144:10, 145:22, 158:24, 355:13, 356:2,

356:3, 356:4, 356:5, 356:22, 357:2

**tests** [1] - 135:4

**THE** [675] - 1:1, 1:16, 6:4, 6:5, 6:15, 6:19, 6:24, 7:4, 7:14, 7:17, 7:21, 7:25, 8:4, 8:11, 8:16, 9:2, 9:6, 9:15, 9:21, 9:25, 10:3, 10:10, 10:14, 11:17, 12:16, 13:1, 13:13, 13:16, 13:19, 13:25, 14:6, 15:25, 16:5, 16:19, 17:8, 18:2, 18:5, 18:15, 19:3, 19:12, 19:14, 19:17, 22:12, 22:16, 22:19, 22:24, 23:6, 23:20, 23:24, 24:2, 24:20, 25:4, 26:1, 26:19, 27:1, 27:6, 27:11, 27:14, 27:20, 28:8, 28:13, 28:15, 28:20, 29:3, 29:5, 29:18, 29:22, 29:25, 30:13, 31:7, 31:10, 34:5, 34:11, 36:6, 38:1, 39:10, 39:17, 39:23, 40:5, 41:2, 41:7, 42:7, 42:10, 42:16, 42:19, 43:23, 44:23, 44:25, 45:8, 45:13, 45:15, 45:17, 45:22, 47:5, 47:24, 48:4, 48:15, 49:23, 50:1, 50:10, 51:5, 51:8, 51:12, 53:4, 54:3, 54:7, 54:10, 54:14, 54:20, 55:4, 55:6, 55:23, 56:19, 56:24, 57:10, 57:23, 59:4, 59:6, 59:8, 59:12, 59:15, 59:17, 59:23, 60:2, 60:5, 60:7, 61:8, 61:24, 62:15, 62:18, 62:21, 64:6, 66:3, 66:7, 66:18, 66:21, 66:24, 67:3, 67:8, 67:12, 67:15, 67:19, 68:3, 68:6, 68:15, 68:24, 69:16, 70:4, 70:17, 70:23, 71:7, 71:18, 72:1, 72:10, 72:15, 72:20, 72:22, 73:1, 73:3, 74:18, 74:22, 74:25, 75:3, 75:12, 77:19, 78:6, 78:8, 78:12, 79:18, 79:21, 80:3, 83:8, 83:16, 83:17, 84:13, 85:7, 85:13,

85:17, 86:21, 86:23, 87:4, 87:8, 87:16, 88:2, 88:15, 88:19, 89:18, 89:22, 89:25, 90:5, 90:11, 90:12, 90:15, 90:18, 91:1, 91:5, 91:14, 92:22, 94:25, 95:4, 95:11, 95:14, 95:19, 95:20, 95:22, 95:23, 97:6, 98:25, 99:2, 99:7, 99:10, 104:15, 104:21, 105:23, 106:3, 107:23, 108:2, 108:5, 109:9, 109:13, 109:14, 109:17, 109:21, 111:6, 114:17, 114:19, 114:24, 115:7, 115:9, 115:13, 115:16, 116:2, 116:6, 116:10, 118:2, 118:18, 118:23, 119:4, 119:14, 119:16, 119:24, 120:3, 120:7, 120:11, 120:14, 120:18, 120:21, 121:4, 121:7, 121:8, 122:5, 122:10, 122:14, 122:22, 122:24, 123:4, 123:7, 123:12, 123:13, 123:14, 123:16, 123:17, 129:7, 129:13, 129:17, 129:18, 129:20, 129:21, 129:22, 133:6, 141:4, 141:15, 141:19, 143:16, 143:20, 143:25, 147:3, 147:4, 147:7, 147:13, 147:18, 147:20, 149:22, 150:3, 150:13, 150:17, 153:11, 153:14, 155:11, 155:13, 155:25, 156:3, 156:11, 156:13, 156:16, 156:20, 157:3, 157:21, 158:2, 158:6, 158:8, 159:5, 162:17, 162:21, 162:25, 163:3, 163:23, 164:3, 164:14, 165:7, 165:10, 165:11, 165:14, 165:18,

165:20, 165:22, 187:6, 187:8, 187:11, 187:16, 187:18, 188:11, 188:16, 188:18, 193:6, 193:10, 193:14, 193:17, 194:8, 197:2, 197:5, 197:13, 197:15, 197:19, 197:20, 198:2, 198:4, 198:6, 198:10, 198:15, 198:17, 198:21, 199:3, 199:10, 199:19, 200:4, 200:13, 200:16, 200:20, 200:25, 201:18, 201:22, 202:3, 202:6, 202:18, 202:23, 208:17, 211:8, 218:9, 218:14, 219:14, 219:19, 220:1, 220:5, 220:21, 221:17, 221:21, 221:23, 222:3, 222:6, 227:3, 227:6, 227:8, 227:10, 227:14, 227:20, 227:24, 228:3, 228:7, 228:10, 228:13, 228:17, 228:19, 229:1, 230:9, 230:21, 230:24, 231:20, 232:2, 232:18, 232:21, 233:2, 233:9, 233:12, 233:16, 233:20, 233:23, 234:24, 235:2, 235:4, 235:6, 235:11, 235:22, 235:25, 236:7, 236:17, 239:1, 239:3, 239:5, 241:5, 241:7, 241:9, 241:17, 242:16, 242:18, 242:25, 243:7, 243:13, 243:19, 244:3, 244:7, 244:9, 244:11, 246:10, 246:13, 246:24, 247:1, 247:2, 247:3, 247:4, 247:7, 247:12, 247:16, 248:1, 248:5, 248:10, 248:14, 248:18, 249:3, 249:7, 249:11,

249:21, 249:24, 250:23, 251:3, 251:5, 251:6, 251:15, 251:20, 251:22, 253:13, 262:13, 262:18, 262:22, 264:8, 264:11, 264:14, 264:17, 264:20, 265:5, 267:9, 267:14, 267:19, 267:24, 268:15, 268:18, 268:19, 268:25, 269:1, 269:25, 270:11, 270:13, 270:17, 271:13, 271:16, 271:18, 271:20, 277:19, 277:24, 278:5, 278:19, 278:20, 279:10, 279:13, 280:6, 280:7, 280:9, 280:12, 280:16, 280:17, 281:12, 281:14, 282:4, 282:11, 282:12, 282:17, 282:18, 282:22, 282:23, 283:3, 283:4, 283:5, 283:6, 283:9, 283:12, 283:14, 283:15, 283:17, 283:19, 284:2, 284:5, 284:13, 284:16, 284:18, 285:1, 285:3, 285:14, 285:16, 285:22, 285:24, 286:11, 287:9, 287:16, 287:17, 287:21, 287:25, 290:3, 290:10, 290:13, 290:17, 290:19, 290:22, 290:24, 291:3, 291:5, 296:7, 296:16, 296:18, 297:22, 297:25, 303:7, 303:11, 303:17, 304:17, 304:22, 306:2, 306:6, 306:8, 306:9, 306:12, 306:19, 306:25, 307:2, 307:4, 307:8, 307:16, 307:18, 307:21, 308:1, 308:5, 308:8, 308:11, 308:15, 309:6, 309:18,

309:21, 309:25, 310:5, 310:12, 310:19, 310:21, 310:22, 310:25, 311:1, 311:2, 311:5, 313:17, 313:21, 314:1, 315:4, 315:6, 325:10, 330:19, 330:20, 332:6, 332:23, 334:5, 334:8, 334:23, 334:25, 335:4, 335:10, 335:14, 335:18, 336:5, 336:7, 336:8, 336:10, 336:12, 336:15, 344:10, 344:13, 344:15, 344:18, 344:20, 344:22, 344:24, 344:25, 345:1, 345:4, 345:7, 350:16, 350:19, 351:16, 351:19, 358:15, 359:25, 360:3, 360:9, 360:17, 362:12, 362:13, 364:10, 364:12, 366:7, 366:10, 367:1, 367:7, 367:9, 367:18, 367:22, 368:11, 368:16, 369:4, 369:8, 371:15, 371:24, 372:18, 372:19, 372:20, 372:21, 372:22, 372:23, 372:24, 372:25, 373:1, 373:2, 373:3, 373:5, 373:6, 374:21, 374:24, 375:4, 375:8, 375:17, 375:19, 375:21, 379:18, 379:24, 380:3, 381:22, 381:24, 384:17, 386:25, 387:4, 387:6, 387:8, 387:25, 388:4, 388:6, 388:9, 388:12, 388:17, 388:21, 389:6

**theirs** [1] - 53:14
**theme** [1] - 325:17
**themes** [1] - 325:13
**themselves** [3] - 172:9, 202:14, 387:24
**theoretically** [1] -

242:8
**theories** [4] - 55:2, 58:21, 58:23, 58:24
**therefore** [3] - 105:16, 108:20, 110:13
**therein** [1] - 104:8
**they've** [9] - 16:16, 28:23, 58:25, 84:10, 121:24, 145:16, 198:1, 266:14
**thinking** [5] - 67:20, 175:3, 191:8, 222:10, 370:23
**thinks** [1] - 32:21
**third** [10] - 76:13, 78:22, 117:9, 136:4, 140:16, 166:9, 166:11, 170:5, 178:9, 259:25
**Third** [1] - 119:18
**third-party** [3] - 78:22, 136:4, 140:16
**Thirty** [1] - 19:21
**Thirty-minute** [1] - 19:21
**THOMPSON** [2] - 3:20, 8:20
**Thompson** [1] - 8:21
**thoughts** [1] - 184:23
**thousand** [3] - 340:13, 356:16
**threat** [1] - 387:22
**threats** [1] - 127:14
**three** [47] - 11:13, 31:17, 33:6, 48:6, 48:11, 84:4, 115:22, 148:20, 148:24, 148:25, 149:1, 149:18, 150:23, 152:1, 156:12, 156:17, 157:12, 157:22, 158:4, 168:11, 170:13, 171:10, 218:3, 231:14, 245:7, 245:11, 256:3, 256:4, 259:11, 259:12, 259:19, 261:1, 261:24, 280:15, 281:12, 281:13, 306:22, 307:3, 309:25, 322:14, 345:1, 346:24, 357:19, 358:21, 359:8, 384:18
**threshold** [13] - 17:11, 189:20, 190:17, 191:9, 195:1, 196:19, 217:3,

217:6, 217:8, 217:12, 223:24, 224:3, 243:2
**throughout** [9] - 96:25, 97:4, 98:5, 124:11, 136:17, 212:1, 317:21, 326:5, 342:23
**thumb** [2] - 32:12
**tight** [3] - 79:19, 85:7, 85:9
**timed** [1] - 48:16
**timeline** [11] - 188:14, 221:9, 305:18, 308:7, 308:8, 343:9, 343:11, 344:12, 345:11, 380:8, 387:24
**timely** [2] - 342:1, 342:25
**timing** [16] - 24:3, 34:9, 34:16, 35:5, 35:7, 39:19, 42:13, 45:7, 45:9, 82:25, 116:15, 119:19, 188:5, 188:10, 222:13, 225:6
**tired** [2] - 347:23, 365:5
**Title** [2] - 236:22, 348:4
**titles** [2] - 348:16, 354:17
**today** [90] - 10:23, 10:24, 11:5, 14:4, 14:23, 19:17, 19:19, 21:15, 21:19, 23:4, 23:12, 24:21, 25:2, 26:2, 26:10, 26:22, 27:1, 27:9, 27:15, 29:5, 30:17, 31:16, 31:17, 33:23, 34:7, 34:25, 35:2, 36:16, 37:21, 39:7, 40:6, 40:14, 40:21, 41:3, 45:9, 46:10, 47:8, 47:10, 47:14, 48:20, 52:24, 55:16, 56:25, 59:2, 68:22, 69:5, 70:10, 70:24, 73:7, 92:22, 110:3, 115:4, 118:20, 118:24, 119:3, 123:8, 123:15, 123:21, 134:22, 159:15, 161:23, 171:9, 177:21, 230:2, 230:6, 257:7, 264:2, 288:5, 311:19, 312:23, 314:20,

325:17, 326:11, 332:15, 359:2, 359:3, 361:18, 369:16, 369:19, 372:8, 372:13, 373:13, 373:17, 374:16, 376:23, 382:25, 387:14, 387:20, 389:5
**today's** [5] - 21:11, 50:2, 69:2, 69:9, 241:12
**together** [13] - 13:23, 40:10, 40:21, 52:23, 56:19, 69:18, 241:25, 242:8, 254:2, 321:17, 321:20, 371:5, 381:7
**tomorrow** [1] - 68:22
**Toms** [1] - 3:21
**took** [6] - 15:22, 18:9, 102:21, 142:24, 309:20, 318:17
**top** [15] - 65:19, 102:16, 103:9, 104:11, 153:23, 154:6, 206:20, 207:4, 211:3, 240:14, 240:18, 304:4, 379:10, 386:1
**topic** [4] - 136:25, 303:10, 313:9, 314:16
**topics** [1] - 313:10
**tops** [1] - 37:7
**totality** [2] - 33:1, 35:24
**totally** [5] - 17:3, 268:9, 268:13, 269:3, 341:14
**touch** [1] - 76:18
**touched** [1] - 174:5
**toward** [1] - 66:25
**towards** [1] - 381:5
**Township** [1] - 300:1
**township** [1] - 245:23
**track** [1] - 358:11
**traditional** [15] - 94:9, 95:6, 95:25, 98:16, 99:18, 105:4, 105:8, 105:9, 105:10, 105:18, 105:22, 106:4, 106:7, 106:11, 154:23
**traditionally** [1] - 300:23
**trail** [2] - 354:8, 359:12
**train** [1] - 342:12
**trained** [7] - 139:13,

140:6, 142:1, 142:4, 142:8, 142:9, 362:22
**training** [15] - 40:12, 140:1, 140:24, 141:9, 141:22, 143:19, 144:3, 338:6, 342:6, 342:7, 342:10, 342:11, 358:24, 358:25, 360:16
**trainings** [4] - 142:14, 142:17, 142:21, 142:24
**transaction** [1] - 337:3
**transcript** [5] - 1:23, 211:11, 246:15, 379:25, 390:4
**transcription** [1] - 1:24
**transcripts** [1] - 164:3
**transferred** [1] - 161:21
**translate** [1] - 58:21
**transmit** [1] - 342:24
**travel** [1] - 175:11
**treating** [1] - 179:19
**treatment** [1] - 80:19
**Trenton** [1] - 1:14
**tried** [5] - 138:4, 177:21, 226:20, 309:5, 332:16
**trigger** [1] - 135:17
**triggered** [2] - 11:15, 47:20
**trouble** [1] - 174:7
**true** [16] - 177:5, 242:7, 246:19, 246:21, 286:22, 287:5, 294:3, 297:15, 311:16, 313:2, 313:4, 316:17, 316:20, 316:25, 329:17, 369:19
**truly** [1] - 37:18
**truncate** [1] - 131:23
**truth** [1] - 149:20
**truthful** [1] - 205:25
**try** [29] - 29:8, 35:3, 63:25, 68:6, 69:20, 69:24, 77:3, 77:5, 111:4, 122:9, 190:3, 192:12, 196:16, 225:12, 225:13, 234:4, 245:24, 254:10, 254:17, 255:21, 256:2, 260:2, 303:25, 305:18, 312:22, 335:24, 357:1,

370:11, 386:6
**trying** [23] - 15:12, 24:14, 42:16, 65:21, 68:21, 73:25, 92:20, 115:5, 131:23, 164:11, 169:8, 187:10, 195:2, 213:4, 278:22, 279:5, 308:25, 316:7, 319:1, 322:23, 327:4, 327:16, 371:17
**Tuesday** [1] - 103:10
**turn** [19] - 13:16, 33:20, 113:7, 167:7, 169:22, 174:22, 192:5, 197:1, 257:16, 269:13, 270:25, 303:24, 304:25, 306:13, 312:11, 335:2, 359:10, 377:20, 379:6
**turnaround** [1] - 261:25
**turning** [1] - 262:15
**turns** [1] - 272:16
**twelve** [1] - 343:6
**twice** [1] - 162:15
**two** [81] - 34:19, 37:11, 39:4, 69:4, 75:17, 75:23, 76:8, 77:15, 80:8, 80:15, 84:5, 100:11, 101:8, 101:9, 105:2, 111:12, 124:2, 157:13, 159:15, 159:16, 159:23, 159:24, 161:15, 170:4, 172:11, 174:15, 181:6, 181:10, 189:15, 190:5, 220:8, 222:25, 227:22, 229:6, 230:3, 230:5, 236:23, 237:2, 239:19, 241:1, 258:6, 260:3, 260:4, 262:5, 262:15, 262:18, 286:23, 289:11, 290:20, 295:5, 300:10, 300:12, 300:15, 306:24, 309:16, 310:10, 314:7, 314:9, 314:11, 318:22, 323:12, 329:11, 329:13, 330:12, 330:17, 337:6, 337:12,

337:19, 338:10, 340:19, 347:5, 347:6, 347:12, 347:15, 359:8, 370:20, 387:1
**two-by-four** [1] - 300:10
**two-by-nine** [1] - 101:9
**two-term** [1] - 222:25
**type** [17] - 46:7, 79:12, 113:3, 113:4, 170:7, 171:4, 183:25, 185:7, 191:8, 203:16, 217:23, 218:1, 258:11, 352:14, 353:16, 362:22, 379:4
**types** [17] - 76:8, 77:15, 81:23, 85:15, 117:1, 127:14, 175:13, 176:16, 189:25, 224:12, 237:3, 258:2, 339:5, 339:15, 348:2, 348:10
**typically** [13] - 76:13, 76:18, 79:6, 80:13, 82:17, 97:18, 114:3, 116:19, 133:25, 154:8, 154:22, 261:20, 357:1

**U**

**U.S** [18] - 1:3, 1:13, 3:17, 30:2, 74:2, 131:5, 166:4, 167:8, 167:25, 168:12, 213:19, 315:7, 349:17, 349:18, 349:20, 349:25, 350:1, 350:4
**ultimate** [1] - 22:8
**ultimately** [12] - 76:5, 76:9, 77:1, 78:21, 79:3, 136:21, 189:7, 249:17, 274:3, 356:22, 359:12, 365:25
**umpires** [1] - 41:18
**unable** [1] - 363:13
**unacceptable** [1] - 297:10
**unaware** [2] - 148:25, 295:12
**unbracketed** [2] - 258:20, 258:23
**Uncharted** [1] - 375:1
**uncharted** [2] -

360:15, 362:20
**unchartered** [1] -
359:23
**unclear** [1] - 79:23
**unconstitutional** [7] -
57:22, 214:4, 216:1,
216:6, 224:5, 224:9,
364:15
**undefined** [1] - 90:21
**under** [27] - 15:23,
17:14, 32:17, 33:16,
35:23, 44:17, 47:2,
49:20, 52:1, 53:11,
58:11, 61:23, 63:22,
74:2, 92:20, 97:24,
123:8, 123:15,
125:18, 128:9,
131:5, 133:16,
162:12, 230:2,
230:6, 236:22, 305:2
**undercut** [1] - 107:25
**underdog** [3] -
179:16, 179:19,
179:25
**undergo** [1] - 259:9
**undergoing** [2] -
127:24, 128:3
**underlying** [1] - 53:15
**understood** [26] -
31:2, 90:8, 123:16,
129:14, 143:24,
162:24, 187:22,
241:13, 306:22,
315:1, 321:8,
322:15, 332:15,
333:25, 380:23,
381:4, 382:24,
383:10, 383:11,
383:19, 383:21,
384:10, 384:11,
384:19, 385:23,
386:10
**undertake** [1] - 359:6
**undertaken** [1] - 358:7
**underway** [1] - 16:11
**undue** [1] - 369:1
**unduly** [3] - 53:17,
55:13, 55:25
**unfair** [3] - 224:2,
224:11, 384:4
**unfamiliarity** [1] -
257:18
**unfortunately** [3] -
31:16, 184:20,
317:25
**uniform** [3] - 274:20,
274:22, 274:24
**union** [4] - 252:24,
252:25, 253:2,
279:25

**Union** [2] - 2:16, 7:10
**unions** [1] - 175:17
**unique** [10] - 11:22,
13:4, 20:24, 21:9,
85:1, 98:9, 98:15,
106:5, 347:21,
383:12
**United** [20] - 6:2, 28:3,
60:12, 73:16, 73:18,
85:24, 128:10,
128:18, 162:10,
162:11, 167:24,
168:22, 181:3,
240:14, 240:16,
240:23, 240:24,
242:9, 298:16,
346:24
**UNITED** [2] - 1:1, 1:16
**unless** [7] - 20:5, 24:2,
32:1, 35:11, 88:13,
258:8, 348:5
**unlike** [1] - 249:17
**unnecessary** [1] -
371:14
**unofficial** [1] - 254:14
**unopposed** [6] -
145:2, 208:20,
208:24, 209:3,
220:18, 221:19
**unresolved** [1] - 387:9
**unsure** [1] - 212:19
**unusual** [3] - 12:1,
12:2, 20:15
**up** [100] - 14:5, 21:18,
22:17, 23:16, 26:19,
30:8, 30:9, 34:21,
57:1, 59:20, 66:2,
67:4, 68:1, 71:3,
72:2, 76:19, 77:5,
79:7, 79:18, 83:24,
84:4, 92:8, 97:4,
99:3, 103:8, 103:18,
103:24, 112:24,
121:4, 121:12,
138:1, 141:17,
162:15, 162:22,
165:14, 170:18,
172:24, 174:13,
174:23, 175:1,
179:22, 180:16,
181:13, 184:8,
184:24, 206:20,
207:4, 213:1, 213:6,
222:12, 223:4,
225:21, 225:23,
228:16, 228:20,
228:23, 233:7,
238:7, 240:4, 241:5,
248:15, 250:23,
254:10, 258:4,

261:13, 264:12,
267:24, 268:23,
270:9, 281:2, 285:8,
300:21, 315:23,
315:24, 316:12,
316:16, 332:11,
332:13, 339:10,
344:23, 346:7,
347:1, 347:20,
347:24, 353:7,
353:10, 359:12,
361:12, 361:16,
367:15, 370:9,
371:8, 378:15,
379:8, 380:10,
381:10, 382:10,
383:22, 388:24,
388:25
**upcoming** [3] - 34:2,
117:24, 125:25
**update** [3] - 302:19,
380:12, 380:22
**updated** [5] - 105:13,
105:16, 107:12,
108:15, 142:21
**updates** [1] - 342:21
**upgraded** [1] - 109:2
**upload** [1] - 356:19
**uploaded** [1] - 37:4
**upside** [1] - 257:17
**urgency** [2] - 212:9,
212:13, 216:8,
229:14, 235:10
**useful** [2] - 176:20,
176:21
**user** [4] - 277:13,
277:15, 278:5,
278:10
**user-friendliness** [1] -
277:15
**uses** [7] - 80:25, 96:6,
115:1, 160:11,
286:23, 292:14,
293:13
**ushered** [1] - 339:22
**utilize** [4] - 56:8,
229:9, 231:4, 342:15
**utilized** [3] - 75:25,
86:5, 98:6
**utilizing** [3] - 81:24,
133:22, 231:14

---

## V

**vague** [1] - 305:23
**valuable** [1] - 152:16
**value** [4] - 135:22,
135:24, 136:8, 136:9
**variability** [3] -
274:18, 275:3, 275:5

**variable** [5] - 317:21,
326:4, 326:18,
328:15, 329:6
**variables** [8] - 32:11,
262:11, 315:25,
316:15, 316:17,
316:20, 326:11,
366:1
**varies** [1] - 365:16
**variety** [2] - 166:15,
277:7
**various** [9] - 43:9,
56:7, 58:3, 142:24,
157:8, 163:16,
348:7, 349:5, 349:18
**vein** [1] - 358:19
**vendor** [23] - 82:18,
129:24, 136:4,
136:11, 136:13,
136:14, 137:9,
140:16, 151:6,
151:14, 151:17,
152:15, 152:17,
152:20, 282:16,
296:23, 342:7,
358:1, 359:22,
362:18, 362:20,
373:25, 375:1
**vendors** [12] - 40:23,
75:18, 131:7,
131:13, 132:8,
132:9, 133:25,
135:5, 135:15,
137:9, 152:18, 359:5
**venture** [1] - 313:6
**verbally** [1] - 275:17
**verbiage** [1] - 265:23
**verdict** [1] - 44:17
**verified** [6] - 166:18,
166:20, 191:15,
191:16, 193:9,
369:24
**version** [6] - 75:20,
75:21, 79:7, 86:5,
107:12, 108:15
**versions** [1] - 105:13
**versus** [7] - 6:8, 38:20,
291:9, 321:2, 322:8,
322:21, 334:12
**vertically** [2] - 84:8,
84:19
**vest** [2] - 50:2, 50:5
**vested** [1] - 43:11
**vet** [1] - 240:5
**via** [3] - 304:15,
328:16, 332:17
**viability** [8] - 169:13,
169:19, 169:20,
169:22, 169:25,
170:6, 172:8, 176:11

**viable** [1] - 169:15
**video** [3] - 25:7, 48:25,
381:11
**view** [4] - 12:15, 17:6,
32:24, 230:5
**viewed** [1] - 71:14
**views** [1] - 238:12
**violate** [1] - 199:13
**violated** [2] - 197:25,
219:7
**violates** [1] - 32:16
**violation** [4] - 199:20,
229:20, 249:5,
250:10
**violence** [1] - 127:14
**virtually** [1] - 140:20
**virtue** [2] - 32:10,
35:12
**vis-à-vis** [1] - 180:5
**visited** [3] - 47:4,
55:21, 56:18
**visits** [1] - 58:2
**visual** [1] - 316:6
**visually** [1] - 182:16
**vitae** [1] - 286:7
**voice** [1] - 26:9
**volume** [1] - 245:24
**voluminous** [1] -
11:12
**volunteering** [2] -
189:5, 189:6
**volunteers** [2] -
385:13, 386:19
**Vote** [2] - 74:3, 372:4
**vote** [12] - 57:6, 76:25,
94:19, 254:21,
260:9, 300:11,
338:21, 339:7,
339:14, 365:17
**vote-by-mail** [5] -
57:6, 94:19, 254:21,
260:9
**voter** [14] - 56:17,
57:5, 76:16, 76:19,
76:22, 79:10, 96:10,
97:21, 97:23,
182:24, 337:24,
340:2, 359:11,
365:20
**voter's** [1] - 300:11
**voters** [63] - 31:15,
31:24, 32:18, 38:25,
46:9, 56:18, 56:20,
57:1, 57:24, 61:14,
62:2, 62:6, 62:23,
63:20, 65:21, 92:12,
93:1, 93:5, 93:9,
93:14, 93:17, 94:21,
96:15, 173:1,
173:13, 175:2,

175:13, 175:25, 176:7, 176:16, 177:16, 178:4, 178:7, 178:10, 178:13, 180:20, 180:22, 182:25, 183:4, 183:5, 192:9, 240:20, 269:6, 274:4, 274:9, 275:12, 338:12, 338:14, 338:21, 339:2, 339:6, 339:9, 339:14, 344:6, 345:14, 346:15, 354:14, 357:19, 361:10, 365:17, 387:22

**votes** [3] - 209:7, 339:2

**Voting** [8] - 75:19, 75:21, 80:25, 81:4, 98:8, 98:10, 98:18, 286:18

**voting** [136] - 27:24, 37:3, 43:6, 43:22, 58:3, 62:6, 64:23, 73:17, 74:3, 74:16, 75:10, 75:14, 75:17, 75:20, 75:24, 76:1, 76:4, 76:6, 77:16, 77:23, 79:24, 80:1, 80:8, 80:20, 81:10, 81:22, 81:23, 84:25, 85:3, 85:5, 86:4, 90:8, 90:21, 95:5, 95:24, 96:1, 96:5, 96:14, 96:17, 97:15, 98:2, 100:4, 101:10, 101:22, 101:24, 103:15, 107:14, 108:16, 125:4, 129:5, 129:23, 131:7, 131:12, 133:2, 135:5, 135:9, 135:10, 140:7, 144:11, 161:21, 161:24, 248:21, 248:23, 257:19, 258:6, 260:3, 261:3, 261:10, 261:17, 261:21, 261:25, 262:4, 262:9, 262:14, 263:2, 275:16, 275:23, 275:24, 276:3, 276:6, 276:11, 276:20, 276:23, 286:24, 288:16, 289:3, 291:15, 292:4, 292:8, 292:11, 292:14,

293:3, 293:4, 295:21, 296:21, 300:6, 300:19, 302:5, 302:16, 337:24, 338:15, 339:4, 339:5, 339:9, 339:10, 339:17, 339:19, 339:20, 339:25, 340:1, 340:10, 340:11, 340:13, 340:21, 341:1, 341:3, 346:6, 354:6, 354:7, 354:8, 356:19, 356:23, 357:5, 357:20, 359:11, 359:22, 360:14, 363:13, 365:2, 365:3, 365:14, 365:15, 365:20

**vs** [1] - 1:6

**VVSG** [1] - 162:12

**vying** [2] - 206:18, 207:3

---

# W

**wait** [15] - 12:5, 12:9, 13:9, 21:1, 21:8, 26:5, 87:18, 118:17, 147:4, 225:4, 242:18, 254:12, 260:4, 268:15, 277:25

**waited** [3] - 46:25, 49:22, 216:20

**waiting** [7] - 228:15, 248:12, 250:19, 283:21, 284:11, 308:21, 310:13

**waived** [1] - 38:9

**walk** [7] - 40:5, 40:20, 77:11, 78:14, 200:21, 259:18, 343:15

**walked** [6] - 55:15, 199:23, 200:24, 264:14, 340:2, 365:11

**walking** [3] - 200:10, 250:16, 308:22

**walks** [2] - 57:6, 387:18

**walls** [1] - 22:5

**Wang** [1] - 31:18

**wants** [8] - 29:2, 32:3, 36:4, 77:16, 92:20, 96:21, 156:23, 182:16

**warn** [1] - 59:9

**warning** [1] - 30:22

**warrant** [2] - 54:15, 54:18

**warranted** [1] - 44:14

**Warren** [6] - 3:24, 9:19, 111:9, 324:3, 324:4, 324:17

**Washington** [2] - 293:12, 293:18

**waste** [1] - 368:13

**wasted** [1] - 309:19

**wasteful** [1] - 309:21

**wasting** [1] - 368:12

**watched** [1] - 148:4

**water** [3] - 306:20, 311:3, 336:11

**ways** [7] - 44:2, 143:21, 172:11, 253:25, 291:15, 339:2, 339:4

**weaker** [1] - 172:6

**weakest** [1] - 324:11

**website** [5] - 75:16, 92:8, 345:17, 345:19, 377:1

**websites** [1] - 345:18

**weeds** [1] - 49:22

**week** [10] - 26:7, 254:11, 261:1, 261:24, 273:10, 273:11, 273:13, 273:15, 273:16, 353:2

**weekly** [3] - 378:7, 378:8, 384:8

**weeks** [16] - 11:13, 115:22, 148:21, 148:24, 149:1, 149:2, 149:18, 150:24, 152:1, 259:11, 259:12, 259:19, 262:5, 262:15, 262:19, 309:16

**weighed** [1] - 32:19

**weighing** [1] - 18:7

**weight** [7] - 71:11, 88:12, 244:22, 244:23, 245:2, 245:4

**WEISSMAN** [1] - 1:18

**Weissman** [2] - 6:22, 7:2

**welcome** [4] - 59:1, 73:7, 285:16, 335:18

**well-known** [2] - 48:8, 316:23

**West** [2] - 2:3, 252:21

**Westmont** [1] - 2:18

**whatnot** [1] - 97:1

**whatsoever** [2] -

124:12, 162:2

**whereas** [5] - 76:24, 81:4, 99:21, 178:10, 285:12

**whereby** [1] - 110:20

**whichever** [1] - 339:12

**white** [1] - 198:4

**whole** [14] - 29:14, 47:19, 70:24, 83:6, 173:19, 183:5, 294:15, 309:19, 314:2, 330:21, 335:2, 340:6, 340:18, 360:9

**WILENTZ** [1] - 2:9

**Wilentz** [1] - 9:13

**WILLE** [1] - 2:9

**Wille** [1] - 9:12

**William** [1] - 7:23

**WILLIAM** [1] - 2:17

**Williams** [1] - 8:13

**WILLIAMS** [2] - 3:11, 8:12

**willing** [5] - 25:5, 25:8, 199:22, 333:15, 333:20

**Wilson** [1] - 285:24

**WILSON** [2] - 4:11, 285:20

**win** [11] - 170:10, 173:2, 177:19, 177:23, 177:24, 182:8, 182:17, 185:10, 209:1, 209:4, 209:7

**winner** [1] - 180:24

**winning** [1] - 177:18

**winter** [2] - 332:14, 333:7

**wise** [3] - 27:8, 183:22, 277:10

**wisely** [3] - 11:2, 19:20, 384:18

**wishes** [1] - 60:16

**withdraw** [5] - 130:8, 133:4, 160:4, 274:6, 275:21

**withdrawn** [4] - 106:2, 153:12, 278:18, 304:22

**WITNESS** [68] - 73:3, 83:17, 90:11, 95:4, 95:20, 95:23, 98:25, 106:3, 109:13, 109:17, 116:10, 123:13, 123:16, 129:17, 129:20, 129:22, 141:15, 141:19, 147:3, 147:20, 155:13,

163:3, 165:10, 165:20, 222:6, 230:24, 242:25, 247:1, 247:3, 251:5, 253:13, 268:18, 268:25, 278:20, 279:13, 280:7, 280:17, 282:11, 282:17, 282:22, 283:3, 283:5, 283:15, 285:24, 297:25, 306:8, 310:21, 311:1, 311:5, 315:6, 330:20, 334:25, 336:7, 336:10, 336:15, 344:25, 359:25, 362:13, 372:19, 372:21, 372:23, 372:25, 373:2, 373:5, 374:24, 375:19, 381:24, 387:6

**Witness** [1] - 283:16

**witness** [112] - 19:23, 23:11, 27:2, 27:22, 27:23, 62:25, 67:17, 67:22, 69:9, 69:11, 69:21, 70:7, 72:3, 74:13, 86:20, 87:14, 88:23, 90:24, 95:15, 107:16, 108:3, 114:13, 115:4, 115:7, 115:9, 115:14, 115:16, 116:5, 116:7, 120:25, 122:19, 124:2, 129:14, 156:5, 165:12, 165:14, 187:12, 187:20, 188:6, 188:7, 193:5, 197:8, 200:10, 200:13, 200:17, 201:2, 201:8, 228:22, 247:6, 247:13, 247:17, 248:12, 248:19, 248:21, 249:17, 249:25, 250:8, 250:14, 250:19, 250:24, 251:15, 279:11, 283:9, 283:17, 283:22, 284:3, 284:12, 284:14, 284:25, 285:7, 285:17, 291:2, 306:4, 306:5, 308:11, 308:18, 308:19, 308:22, 309:9, 309:10,

310:2, 310:13, 310:24, 311:3, 311:4, 312:11, 313:21, 313:23, 314:18, 315:3, 315:6, 335:8, 335:16, 351:15, 366:12, 366:18, 367:11, 367:15, 368:4, 368:12, 370:2, 370:10, 370:11, 375:9, 375:12, 381:23, 387:2, 387:7

**witnessed** [1] - 172:23

**witnesses** [38] - 22:9, 24:16, 36:20, 36:21, 50:15, 50:16, 50:17, 67:6, 67:10, 67:24, 68:22, 69:12, 69:13, 71:12, 122:7, 198:9, 198:10, 198:22, 199:4, 200:8, 200:11, 228:21, 241:11, 247:9, 249:18, 250:3, 306:9, 306:14, 306:23, 306:24, 307:12, 308:25, 335:3, 366:16, 368:2, 368:17, 369:1, 369:10

**woah** [3] - 91:1

**won** [11] - 178:2, 178:5, 178:8, 178:16, 178:17, 181:14, 182:5, 182:7, 182:19, 328:8, 384:1

**Woodbridge** [2] - 2:10, 2:11

**Word** [2] - 82:7, 82:13

**word** [4] - 84:9, 137:25, 255:16, 256:6

**worded** [1] - 148:11

**wording** [3] - 143:23, 224:6, 224:8

**words** [10] - 36:7, 83:1, 134:11, 144:4, 220:6, 224:11, 224:12, 258:11, 282:10, 294:8

**workers** [6] - 58:3, 279:25, 338:5, 338:6, 342:12, 358:24

**workforce** [1] - 252:24

**workings** [2] - 143:13, 143:20

**works** [5] - 62:21, 71:25, 260:12, 276:2, 279:21

**world** [2] - 114:3, 257:16

**worried** [3] - 171:8, 196:12, 196:22

**worse** [2] - 15:18, 334:20

**write** [6] - 139:17, 142:6, 224:21, 224:23, 289:2, 352:10

**write-ins** [1] - 352:10

**writer** [1] - 329:13

**writing** [9] - 16:8, 17:10, 19:9, 71:1, 71:22, 225:1, 323:21, 375:9, 375:13

**written** [3] - 86:9, 127:4, 149:11

**wrote** [7] - 115:17, 289:22, 302:22, 303:5, 320:2, 369:18, 372:4

## X

**XL** [37] - 96:2, 96:5, 96:10, 97:16, 105:3, 112:15, 113:3, 113:6, 138:12, 138:13, 138:15, 138:18, 291:25, 292:4, 292:8, 292:11, 292:14, 292:18, 292:25, 293:1, 293:12, 293:14, 293:17, 294:2, 295:10, 295:13, 295:19, 295:23, 296:3, 297:14, 298:18, 299:13, 299:17, 341:10, 372:4, 372:15

## Y

**Yael** [2] - 6:13, 6:17

**YAEL** [1] - 2:2

**year** [21] - 33:19, 40:4, 54:23, 126:22, 218:12, 253:18, 254:4, 254:7, 255:5, 255:24, 256:16, 258:12, 258:14, 260:8, 261:5, 265:17, 277:12,

343:8, 347:18, 355:9, 371:8

**year's** [2] - 182:1, 346:20

**Year's** [1] - 380:11

**years** [22] - 37:20, 43:19, 57:9, 57:14, 58:19, 73:12, 112:7, 144:9, 153:6, 230:18, 252:16, 253:21, 256:8, 258:15, 258:19, 272:1, 275:24, 313:9, 341:23, 353:5, 384:24

**yesterday** [2] - 14:9, 18:1

**York** [7] - 2:3, 97:20, 101:20, 101:23, 106:13, 252:21

**you-all** [7] - 36:15, 48:24, 55:25, 87:23, 119:6, 201:4, 284:8

**yourself** [7] - 48:17, 54:2, 157:3, 211:10, 252:1, 295:20

## Z

**ZAHID** [2] - 1:16, 6:2

**zealously** [1] - 30:19

**zero** [1] - 345:1

**ZINGARO** [2] - 3:16, 10:7

**Zingaro** [1] - 10:8

**Zoom** [2] - 248:24, 377:6